**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

| | |
|---|---|
| Gerald Akari Angye, Navdeep, Erik Ivan Rodriguez Flores, and ZOR, on their own behalf and on behalf of others similarly situated, | |
| *Plaintiffs*, | |
| v. | Civil Action No.:  __3:26-cv-1515__ |
| U.S. Immigration and Customs Enforcement, Todd Lyons, Marisa Flores, Angel Garite, U.S. Department of Homeland Security, Markwayne Mullin, U.S. Department of War, and Pete Hegseth, | **CLASS ACTION COMPLAINT** |
| *Defendants*. | |

**INTRODUCTION**

1.      In August 2025, the U.S. government rushed to erect and populate a massive tent encampment on the Fort Bliss military base in El Paso, Texas. With a stated capacity of 5,000 detained human beings, the ERO El Paso Camp East Montana Detention Facility ("Camp East Montana") is the largest immigration detention center in the country.[1] And in the ten months that it has been operational, the facility has become notorious for flagrant human rights abuses that people endure during their detention—they are confined to windowless enclosures in tents and

---

[1] The Pentagon Press Secretary Kingsley Wilson declared: "Upon completion, this will be the largest federal detention center in history for this critical mission — the deportation of illegal aliens." David Vergun, *Press Secretary Outlines Detention Center Plans, Commends National Guard in L.A.*, U.S. Dep't of War (Aug. 7, 2025), https://www.war.gov/News/News-Stories/Article/Article/4269101/press-secretary-outlines-detention-center-plans-commends-national-guard-in-la/ [https://perma.cc/23VQ-J8FG].

suffer egregious physical abuse by guards; abhorrent medical and mental health care, including for people with chronic conditions like cancer and HIV; indiscriminate use of solitary confinement to punish and silence victims of guard abuse; and other flagrant constitutional violations, including exposure to measles, tuberculosis, and other diseases. Not even a year in, there already have been three reported deaths at Camp East Montana. In one case, a man was beaten to death after asking for his asthma medication—a death the Medical Examiner later ruled a homicide. A fourth man died shortly after being released from Camp East Montana, where he had been denied the chemotherapy that he needed to treat his cancer.

2.      Camp East Montana consists of a series of tents in the Chihuahuan Desert:



---

[2] Brian Kanof, *Photos of Camp East Montana, controversial ICE facility in El Paso*, El Paso Times (May            5,            2026),            https://www.elpasotimes.com/picture-gallery/news/immigration/2025/10/13/camp-east-montana-photo-gallery-of-ice-immigration-detention-facility-fort-bliss-el-paso-texas/86616916007/.

3.      The opening of Camp East Montana is part of a broader effort by Defendant U.S. Immigration and Customs Enforcement ("ICE") to ramp up enforcement across the country, using increasingly aggressive tactics, while simultaneously expanding its detention network, pouring tens of billions of taxpayer dollars into new facilities.[3] At the same time, Defendant ICE has gutted the government watchdog agencies that are supposed to ensure minimally adequate conditions in those facilities while also preventing members of Congress from conducting statutorily authorized visits.[4] The result is a vast and expanding network of detention facilities with scant oversight and harmful conditions.

4.      Day-to-day life at Camp East Montana is dire. Detained people are regularly subjected to severe beatings or sexual harassment by guards; squalid living conditions; spoiled and inadequate food; no meaningful programming or recreation; inadequate access to basic hygiene products such as soap, razors or nail clippers; outbreaks of disease; and limited or no access to sunlight.

5.      Every day, people are subjected to inadequate medical care. People do not timely receive the medication they need to manage a wide range of serious medical issues, including HIV, tuberculosis, diabetes, cancer, and pregnancy.

---

[3] Camilo Montoya-Galvez, *Trump's "big, beautiful bill" gives ICE unprecedented funds to ramp up mass deportation campaign*, CBS News (July 10, 2025), https://www.cbsnews.com/news/ice-funding-big-beautiful-bill-trump-deportations/ [https://perma.cc/S5WY-APUK].

[4] Kanishka Singh, *US to close watchdog office for federal immigration detention abuses*, Reuters (May 5, 2026), https://www.reuters.com/legal/government/us-close-watchdog-office-federal-immigration-detention-abuses-2026-05-05/; Maegan Vazquez and Michael E. Miller, *Democrats sue Trump Administration over access to immigration facilities*, Washington Post (Jul. 31, 2025), https://www.washingtonpost.com/politics/2025/07/31/democrats-sue-trump-access-immigration-detention/; *see also* Andrea Castillo, *ICE puts new restrictions on members of Congress inspecting detention centers*, L.A. Times (May 12, 2026), https://www.latimes.com/politics/story/2026-05-12/ice-immigration-congress-detention-centers-oversight [https://perma.cc/J9EN-6NTW].

6.      People report starting to mentally deteriorate while held in these conditions day after day, no longer feeling human and contemplating suicide—without any meaningful and consistent psychological support. Some who cannot take it anymore ask to be deported, giving up their chance to stay with their families in the United States where they have lived for decades.

7.      Detained people struggle to breathe as sand and dust from the desert pours in through the ventilation system and gaps in the shoddy tents they are forced to live in. One professional marathon runner who has been detained at Camp East Montana for over two months, and who before detention had no issues breathing or with asthma, now has to use an asthma inhaler regularly.

8.      Each housing unit is a penned enclosure in a windowless tent and can hold approximately 72 people packed in bunk beds crammed within just a few feet of each other. There are no walls between the bunk beds. There are no windows anywhere in the unit—no view of the sun or sky, no way to mark the passage of time. There are not enough seats around the lunch tables in the middle of the housing units for everyone to sit, and there is nowhere else to go; many people spend their days simply sitting on their bed or walking in circles. Everyone shares a handful of toilets and showers that quickly get filthy, and staff do not timely fix sewage overflows. Mold grows and goes untreated, making it more difficult to breathe. When people use the toilet or take a shower, other people detained there and guards can watch through small windows cut in the fabric that encloses toilets and showers. All this—the beds, the few tables, and the toilets—are crammed together to make up the entire living unit where people are kept almost every hour of every day, so the smell of urine, feces, and body odors is ever-present throughout the unit. As one Named Plaintiff explained: "We get this smell when we eat, while we are sleeping, and all day."

4

9.      The only views inside come from the people detained there, who have sketched diagrams of their windowless tent enclosures.



10.     Camp East Montana is a *civil* immigration detention center. People from all over the country are detained there while waiting for courts to decide their civil immigration cases. Others are detained while they wait for the U.S. government to make travel arrangements to remove them to their home countries after their immigration cases have concluded. Others have *won* their immigration cases but are detained there while the government attempts to remove them to a third country that will accept them. People detained at Camp East Montana include asylum seekers, mothers and fathers who have lived in the United States for decades, and people who are stateless. People have been confined there for six months or more while they wait for their immigration cases to be heard or travel documents to be procured. Some have been waiting for

5

travel documents from a foreign country that has failed to produce such documents for over a decade and expect a long, continued wait, caged in these torturous conditions.

11.     No one at Camp East Montana is confined there pursuant to a criminal sentence, meaning that, under constitutional law, their conditions of confinement cannot lawfully amount to punishment. In fact, as of the latest available data, only 20% of those detained in Camp East Montana were identified by ICE as having a criminal background.[5] Despite this, the conditions at Camp East Montana are unquestionably punitive, in some respects even more punitive than prison.

12.     The cruelty of this system is by design. As courts across the country have recognized, Defendants use the prospect of detention in harsh conditions to threaten immigrants.[6] The previous Secretary of Homeland Security, under whose authority the tent encampment at Ft. Bliss was erected, stated that immigrants should "not come to this country or we will hunt you down, find you, and lock you up," and that if people choose nonetheless to pursue their immigration claims and remain with their families, "there will be consequences."[7] Official ICE documents threaten immigrants: "If You Don't Self-Deport," "you may have to spend several

---

[5] *See* Detention Reports, ICE ERO El Paso Camp East Montana, ICE Detention Facility Statistical Report, *available at* https://detentionreports.com/facility/EROELP.html [https://perma.cc/MDF4-8C9Y] (data as of April 2, 2026).

[6] *Barco Mercado v. Noem*, 800 F. Supp. 3d 526, 575 (S.D.N.Y. 2025) ("Statements from senior officials suggest that harsh conditions of confinement are a deliberate feature of the enforcement program intended to induce self-deportation and to deter illegal immigration."); *D.N.N. v. Liggins*, No. 1:25-CV-01613-JRR, 2026 WL 632371, *33 (D. Md. Mar. 6, 2026) ("Defendants' own press releases and statements suggest the complained-of conditions are intended to be punitive . . . ."); *Luna Gutierrez v. Noem*, 811 F. Supp. 3d 133, 172 (D.D.C. 2025) ("[T]he Court sees unusually strong direct evidence that the Defendants chose to detain some noncitizens at Guantanamo for the express purpose of retaliating against them and deterring others' conduct.").

[7] Sec'y Kristi Noem (@Sec_Noem), X (Feb. 9, 2025, at 12:12 ET), https://x.com/Sec_Noem/status/1888637061453762584 [https://perma.cc/VXD2-CRA6 ]; Nicole Sganga, *Kristi Noem says "Alligator Alcatraz" to be model for ICE state-run detention centers*, CBS News (Aug. 4, 2025), https://www.cbsnews.com/news/alligator-alcatraz-model-kristi-noem-homeland-security/ [https://perma.cc/BCL9-62US].

months in detention."[8] The White House has trumpeted the "deterrence" of its mass removal apparatus, pointing to immigrants' decisions to "self-deport[]" rather than risk detention.[9]

13.    ICE and Defendant U.S. Department of Homeland Security ("DHS") have sought out and constructed visibly inhumane facilities to strike fear in those who consider remaining in the United States to fight their cases. For instance, a DHS press release stated: "If you are a criminal alien and we have to deport you, you could end up in Guantanamo Bay or CECOT. Leave now."[10] Camp East Montana—located on a military base on the site of a former WWII prison camp for people of Japanese descent—is exactly this type of notoriously inhumane facility whose remote placement appears designed to strike fear in those who refuse to abandon their claims and leave their families behind in the United States. The ICE office for Enforcement and Removal Operations ("ERO") in El Paso reposted a self-deportation tweet by ICE shortly after Camp East Montana opened that warned: "Leave on your OWN terms. AVOID THE JAIL CELL. AVOID THE HUMILIATION."[11] And guards tell people detained at Camp East Montana who complain about conditions that if they do not like the conditions, they should self-deport.

---

[8] U.S. Immigration and Customs Enforcement, *Self-Deportation*, https://www.ice.gov/self-deportation [https://perma.cc/RDB8-PGQP] (last visited May 27, 2026).

[9] The White House, *President Trump Is Securing Our Homeland: Ending the Invasion, Deporting Criminals, and Protecting Our Communities* (Feb. 24, 2026), https://www.whitehouse.gov/releases/2026/02/president-trump-is-securing-our-homeland-ending-the-invasion-deporting-criminals-and-protecting-our-communities/ [https://perma.cc/P6HV-5BEJ].

[10] U.S. Dep't of Homeland Security, *100 Days of Fighting Fake News*, Press Release (Apr. 30, 2025), https://www.dhs.gov/news/2025/04/30/100-days-fighting-fake-news [https://perma.cc/2SLZ-CZKN].

[11] ICE Enforcement and Removal Operations El Paso (@EROElPaso), X (formerly Twitter), https://perma.cc/3XMW-KLLF.

14.    Plaintiffs, four people currently detained at Camp East Montana, bring this case on behalf of themselves and a class of all people who are or will be detained at Camp East Montana. They do so not only to vindicate their and all putative class members' constitutional and statutory rights, but also in the hope that by seeking relief from this Court they can put an end to the abuses at the facility and escape the deathly fate that took the lives of other detained people. Evidence in this case also comes from people no longer at Camp East Montana but who nonetheless are willing to risk Defendants' ire by speaking out about what they experienced to help others avoid the appalling conditions they faced.

## JURISDICTION AND VENUE

15.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the Constitution and laws of the United States, specifically the Fifth Amendment to the United States Constitution and the Administrative Procedure Act. This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1346 because the United States is a defendant. Defendants have waived sovereign immunity for purposes of this action. *See* 5 U.S.C. § 702.

16.    Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201–02 and the inherent equitable powers of this Court.

17.    Personal jurisdiction and venue are proper in the Western District of Texas pursuant to 28 U.S.C. § 1391(e) because all Defendants are agencies of the United States, or officers of agencies of the United States, Defendants Flores and Garite reside in this District, and a substantial part of the events and/or omissions giving rise to Plaintiffs' claims occurred in this judicial district.

18.    Assignment to the El Paso Division is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of Defendants' actions and/or omissions that resulted in the violation of Plaintiffs' constitutional rights occurred in this division.

## PARTIES

19.     **Plaintiff Gerald Akari Angye** is currently detained at Camp East Montana at Ft. Bliss, under the authority of DHS and ICE. Mr. Angye has been at Camp East Montana for just over a month. In that time, he has already been severely beaten by guards after insisting on speaking to an attorney before signing documents and facing transfer to an unknown location, hospitalized and placed in a wheelchair for the injuries he sustained during the beating, and locked in an isolated cell upon return from the hospital. Though weeks have passed since the beating, his left arm and wrist are still in a brace and remain painful. The dust at Camp East Montana has made him cough blood. He has had trouble obtaining basic informational resources, such as the facility handbook, his medical records, and English translations of announcements that are only made in Spanish.

20.     **Plaintiff Navdeep** is currently detained at Camp East Montana at Ft. Bliss, under the authority of DHS and ICE. Before he was detained, Navdeep was a mail handler. He has no criminal history. Upon arriving at Camp East Montana, Navdeep was forced to sleep on the dirty floor of a crowded room with approximately 40 other people for three days. Navdeep had to wear the same dirty clothes day after day for approximately three weeks after arriving at the facility. In his five months at the camp, Navdeep has been shuffled between multiple units at the facility and experienced inhumane conditions in each one, including dirty toilet water flowing to his sleeping area, difficulty accessing cups to drink water with, and struggles to breathe due to the excessive desert dust in the tent. He often goes to bed and wakes up hungry due to the inadequate supply of food. Navdeep has preexisting injuries that prevent him from consistently being able to put his hands behind his back without severe pain. After he was unable to put his hands behind his back

after being directed to do so, guards violently forced his hands behind his back to cuff him and locked him in solitary confinement for appearing to refuse their order.

21.    **Plaintiff Erik Ivan Rodriguez Flores** is currently detained at Camp East Montana at Ft. Bliss, under the authority of DHS and ICE. He has been detained at the facility since on or around January 8, 2026. Mr. Rodriguez Flores came to the United States as an adult and has lived in Minnesota for several years. Mr. Rodriguez Flores has no criminal history. During his time at Camp East Montana, he has been held in horrible and degrading conditions in various low-security units across the facility, including receiving inadequate and spoiled food, inadequate access to counsel, being confined to a windowless tent for 23 or 24 hours per day, being subjected to excessive physical searches, working as a barber at the facility without pay, and being forced to live in crowded, unclean, and unhygienic conditions, with constant exposure to dust and sand. Despite arriving to the facility as a healthy young man, after being at the facility for a few months his health has deteriorated quickly. He is now experiencing severe breathing issues and struggles to walk and stand in the facility because of his knee, which was injured at the facility.

22.    **Plaintiff ZOR**, proceeding under a pseudonym, is currently detained at Camp East Montana at Ft. Bliss, under the authority of DHS and ICE. ZOR has been at Camp East Montana for over eight months. During these months he has been separated from his wife and three children, the youngest of whom is only six years old. Four days after ZOR arrived at Camp East Montana, ICE officers shackled him and drove him to the Mexican border. These officers told him to leave for Mexico, falsely claiming he had been granted asylum. ZOR was not shown any papers and was not able to contact his attorney. Officers have attempted to deport ZOR to Mexico or to his country of birth approximately five additional times during his detention, despite a court order prohibiting his removal to his country of birth. In December, ZOR was beaten by another person detained at

the facility as the guards stood by and watched. As a result, three of his teeth were broken and his nose was badly injured and would bleed continuously. ZOR then faced serious delays and deficiencies in medical care to treat these injuries. ZOR is a devout Christian, and a guard took his crucifix from him. When ZOR told the guard he was able to keep the crucifix under the handbook rules, the guard responded by throwing it in the trash. During his over eight months in detention, ZOR has experienced violence, sewage leaking from the toilets on a consistent basis, breathing and skin issues as a result of the excessive dust in the housing units, insufficient food, and the constant pain of being separated from his family whom he misses deeply.

23. **Defendant U.S. Immigration and Customs Enforcement ("ICE")** is a federal law enforcement agency within the U.S. Department of Homeland Security. ICE is responsible for the criminal and civil enforcement of immigration laws, including the detention and removal of immigrants. Defendant ICE bears a legal duty to ensure Plaintiffs and members of the putative class are kept in conditions that comply with the Constitution and the law. ICE has contracted with private entities, including Amentum Services, Inc., Acquisition Logistics LLC, Akima Global Services LLC, GardaWorld Federal Services LLC, and Loyal Source Government Services, to run and manage aspects of Camp East Montana. Private contractors' facility administration, staff, and other personnel are agents of Defendant ICE.

24. **Defendant Todd Lyons** is the current senior official performing the duties of the Director of ICE. Defendant Lyons is responsible for ICE's policies, practices, and procedures, including those relating to the detention and detention conditions of immigrants. He is sued in his official capacity.[12] Upon information and belief, Defendant Lyons will step down from his position

---

[12] All allegations against Defendant ICE in this complaint are also alleged against Defendant Lyons given his control over Defendant ICE.

at the end of the month. Public reporting indicates that David Venturella is expected to assume the role on June 1, 2026, and is currently listed as the senior official performing the duties of the Director. Because this filing precedes that date, Plaintiffs assert their claims against Mr. Lyons in his official capacity through the end of his tenure, and when a new director is appointed, that new director will be automatically substituted for Mr. Lyons pursuant to Federal Rule of Civil Procedure 25(d).

25.     **Defendant Marisa Flores** is the Acting Director of ICE's El Paso Field Office, Enforcement and Removal Operations, which is the ICE Field Office with jurisdiction and responsibility over Camp East Montana. Defendant Flores is responsible for ICE's policies, practices, and procedures, including those related to the detention and detention conditions of immigrants. She is sued in her official capacity.[13]

26.     **Defendant Angel Garite** is the Assistant Field Office Director of ICE's El Paso Field Office, Enforcement and Removal Operations, which is the ICE Field Office with jurisdiction and responsibility over Camp East Montana. Defendant Garite is responsible for ICE's policies, practices, and procedures, including those related to the detention and detention conditions of immigrants. He is sued in his official capacity.[14]

27.     **Defendant U.S. Department of Homeland Security ("DHS")** is a federal executive agency responsible for, among other things, enforcing federal immigration laws. Defendant ICE is a component of Defendant DHS.

---

[13] All allegations against Defendant ICE in this complaint are also alleged against Defendant Flores given Defendant Flores' control over Defendant ICE's field operations in El Paso.

[14] All allegations against Defendant ICE in this complaint are also alleged against Defendant Garite given Defendant Garite's control over Defendant ICE's field operations in El Paso.

28. **Defendant Markwayne Mullin** is the DHS Secretary. Defendant Mullin is responsible for the administration of the immigration laws under 8 U.S.C. § 1103. He is sued in his official capacity.[15]

29. **Defendant U.S. Department of War ("DOW")** is a federal agency responsible for the Ft. Bliss military base on which Camp East Montana is housed. DOW has been responsible for aspects of the construction, contracting, and operation of Camp East Montana.

30. **Defendant Pete Hegseth** is the United States Secretary of War. He is sued in his official capacity.[16]

**FACTUAL ALLEGATIONS**

31. Camp East Montana was erected on the Ft. Bliss military base, a site where in 1942 Japanese Americans and others considered by the United States to be "alien enemies" and their descendants were forced into a prison camp.[17] Torn from their communities, homes, and livelihoods without due process, they faced harsh, inhumane, and dangerous conditions while incarcerated in a temporary camp enclosed by barbed wire and armed guards. Eighty years later, on this same land in the Chihuahuan Desert, Defendants have built another temporary camp—also surrounded by barbed wire and watched by armed guards:

---

[15] All allegations against Defendant DHS in this Complaint are also alleged against Defendant Mullin given his control over Defendant DHS.

[16] All allegations against Defendant DOW in this Complaint are also alleged against Defendant Hegseth given his control over Defendant DOW.

[17] Texas Hist. Comm'n, *Texas in World War II*, https://thc.texas.gov/learn/military-history/texas-world-war-ii [https://perma.cc/9TJ4-842E] (accessed on May 27, 2026).



32.     This camp holds and isolates immigrants—including parents, workers, and caregivers—who are fighting their immigration cases (or have done so and are awaiting release or removal). These individuals have been ripped from their communities across the country, thrust into the black hole of ICE detention, and confined in a tent camp plagued with compounding crises.

**Defendants Enlisted Contractors and Subcontractors to Run Camp East Montana With Nonexistent or Deficient Track Records.**

33.     ICE officials or other agents of the federal government are generally nowhere to be found at Camp East Montana. Instead, a jumble of contractors run the facility.

34.     Acquisition Logistics LLC was selected to oversee a contract worth over $1 billion for constructing and operating Camp East Montana. Acquisition Logistics is shrouded in opacity. It has no publicly listed experience in civil detention or corrections operations and yet was awarded

---

[18] Brian Kanof, *Photos of Camp East Montana, controversial ICE facility in El Paso*, El Paso Times (May 5, 2026), https://www.elpasotimes.com/picture-gallery/news/immigration/2025/10/13/camp-east-montana-photo-gallery-of-ice-immigration-detention-facility-fort-bliss-el-paso-texas/86616916007/ (accessed on May 27, 2026).

a contract to oversee and operate the largest detention center in the country.[19] Upon information and belief, the federal government terminated its contract with Acquisition Logistics in March 2026, awarding a new no-bid contract to Amentum Services, Inc., to run Camp East Montana and manage detainees.[20] Amentum was a subcontractor already operating at Camp East Montana and, like Acquisition Logistics, has no publicly listed experience with the operation of civil detention centers or correctional facilities.[21]

35.     Loyal Source Government Services, LLC ("Loyal Source"), serves as the medical contractor at Camp East Montana.[22] Loyal Source has a documented history of providing inadequate staffing and negligent medical care to immigration detainees. For instance, a Congressional report published in January 2025, approximately six months before Camp East Montana opened, documented that "Loyal Source has consistently neglected to provide sufficient medical staff at CBP facilities," which hold fewer people than Camp East Montana.[23] The report

---

[19] Michael Biesecker & Joshua Goodman, *Mystery Surrounds $1.2 Billion Army Contract to Build Huge Detention Tent Camp in Texas Desert*, PBS News (Aug. 28, 2025), https://www.pbs.org/newshour/politics/mystery-surrounds-1-2-billion-army-contract-to-build-huge-detention-tent-camp-in-texas-desert [https://perma.cc/HL5Z-9GUD].

[20] Suzanne Gamboa, *Fort Bliss detention center to get new operator after scrutiny*, NBC News (Mar. 12, 2026), https://www.nbcnews.com/news/us-news/camp-east-montana-detention-new-contractor-rcna263129 [https://perma.cc/TL8H-CKZK].

[21] *See* Natalie Venegas, *Amentum Services named new contractor for Camp East Montana detention center*, KFOX14 (Mar. 16, 2026), https://kfoxtv.com/news/local/amentum-services-named-new-contractor-for-el-pasos-camp-east-montana-detention-center; *see also* Patrick Terpstra, *New contractor at troubled ICE detention center has dozens of federal violations*, Scripps News (Apr. 24, 2026), https://www.scrippsnews.com/investigations/ice-inc/new-contractor-at-troubled-ice-detention-center-has-dozens-of-past-federal-violations.

[22] Douglas MacMillan, Samuel Oakford, N. Kirkpatrick & Aaron Schaffer, *60 Violations in 50 Days: Inside ICE's Giant Tent Facility at Ft. Bliss*, Wash. Post (Sept. 16, 2025), https://www.washingtonpost.com/business/2025/09/16/ice-detention-center-immigration-violations/ [https://perma.cc/U2NQ-C3QQ] ("*60 Violations*").

[23] U.S. Senate Comm. on the Judiciary, *The Failure to Provide Adequate Care to Vulnerable Individuals in CBP Custody* (Minority Staff Report, Jan. 24, 2025),

also found that Loyal Source staff "have not always properly recorded medical records" in the electronic medical records system or checked the system when treating patients.[24]

36.     In November 2023, representatives for a whistleblower employee of the U.S. Customs and Border Protection ("CBP") highlighted Loyal Source's performance failures in a public letter, including its understaffing, medical providers working without proper clearances and/or licenses, and failure to maintain electronic medical records.[25]

37.     In 2022, the DHS Office of the Immigration Detention Ombudsman had similarly documented that Loyal Source's weekly reports to CBP reflected "critical understaffing," with a shortage that "could jeopardize the health and safety of noncitizens in CBP custody."[26]

38.     Until recently, Akima Global Services provided security contracting services at Camp East Montana. Akima too is a company with a record of troubling mistreatment of immigration detainees. For instance, in June 2025, the DHS Office of Inspector General published a report after conducting an unannounced inspection of an immigration detention center where Akima was contracted to provide security and food services.[27] The report found several areas of

---

https://www.judiciary.senate.gov/imo/media/doc/FINAL%20CBP%20Medical%20Care%20Report.pdf [https://perma.cc/V53H-9WFE].

[24] *Id.*

[25] Government Accountability Project, *Protected Whistleblower Disclosures of Troy Hendrickson Regarding CBP's Medical Services Contract* (Nov. 30, 2023), https://whistleblower.org/wp-content/uploads/2023/11/11-30-2023-Hendrickson-Congressional-Disclosure.pdf [https://perma.cc/9N3A-MA25].

[26] Office of the Immigration Detention Ombudsman, U.S. Dep't of Homeland Sec., *OIDO Ombudsman Alert: Critical Medical Understaffing on the Border* (July 12, 2022), https://www.dhs.gov/sites/default/files/2022-08/OIDO%20Ombudsman%20Alert%20CBP%20Medical%20Contract%20Final_508.pdf [https://perma.cc/Q9ST-QSHQ].

[27] Off. of Inspector General, U.S. Dep't of Homeland Sec., *Results of an Unannounced Inspection of ICE's Buffalo Federal Detention Facility in Batavia, New York* (June 3, 2025),

non-compliance, including "inappropriate use of force" and failing to comply with grievance-related requirements.[28] And a federal audit report concerning another immigration detention facility also run by Akima found multiple incidents of inappropriate use of force, including a guard pepper-spraying a man in solitary confinement who posed no threat.[29]

39.     Upon information and belief, the contract with Akima was terminated and replaced with GardaWorld Federal Services LLC. Despite the contract change, the guards are largely the same people and wear the same uniforms as before. Moreover, GardaWorld is a subcontractor already operating at Camp East Montana with a documented history of compliance failures and training violations.[30] Such violations include a whistleblower lawsuit alleging GardaWorld falsified training records for guards sent to protect U.S. diplomatic facilities in Afghanistan and failed to provide required classes on use of force.[31]

40.     Defendants' contractor selections—awarding contracts with little transparency to companies with no experience operating a facility anything like Camp East Montana and troubling

https://www.oig.dhs.gov/sites/default/files/assets/2025-06/OIG-25-24-Jun25.pdf [https://perma.cc/YW4R-D5AL].

[28] *Id.*

[29] Office of Inspector General, U.S. Dep't of Homeland Sec., *Results of an Unannounced Inspection of ICE's Krome North Service Processing Center in Miami, Florida*, OIG-24-21 (Apr. 16, 2024), https://www.oig.dhs.gov/sites/default/files/assets/2024-04/OIG-24-21-Apr24.pdf [https://perma.cc/QV4Y-E5NA]; *see also* Human Rights Watch, *"You Feel Like Your Life Is Over": Abusive Practices at Three Florida Immigration Detention Centers Since January 2025* (July 21, 2025), https://www.hrw.org/report/2025/07/21/you-feel-like-your-life-is-over/abusive-practices-at-three-florida-immigration [https://perma.cc/8J8A-R3MQ].

[30] *See* Investigate, *GardaWorld Corporation* (updated June 29, 2023), https://investigate.afsc.org/company/gardaworld [https://perma.cc/PPY3-XMY4] .

[31] Dylan Jackson, *Whistleblower: Security firm falsified Georgia training records for guards sent to Afghanistan*, The Atlanta Journal-Constitution (March 1, 2022), https://www.ajc.com/news/investigations/whistleblower-security-firm-falsified-georgia-training-records-before-sending-guards-to-afghanistan/AU3JJZ6C2JH5RNDXF3Y3FAUVQI/.

17

past records of abuses when operating smaller facilities—have led to predictable results: a facility mired in scandal due to mismanagement, abusive treatment, and abhorrent conditions, resulting in injuries, illnesses, and deaths that are ultimately the responsibility of Defendants.

41.    Defendants and their contractors are bound to follow not only the U.S. Constitution and applicable federal statutory laws in operating Camp East Montana and caring for those detained there, but they are also required to abide by the National Detention Standards 2025 ("2025 NDS").[32] Those standards set out the basic minimum requirements that must be met with respect to conditions of confinement at Camp East Montana, including standards governing temperature control, air and water quality, food quantities and quality, access to hygiene products, use of force, medical care, programming and recreation, and attorney access, among others.[33] But, as set out below—and as Defendants are well aware—conditions at Camp East Montana violate the constitutional and statutory rights of the individuals detained there and fail to meet even the most basic standards set out in the 2025 NDS.

**Conditions at Camp East Montana Are Punitive**

42.    People held at Camp East Montana are in *civil* detention, not serving criminal sentences. In fact, the majority of people detained at Camp East Montana have no criminal background whatsoever. As of April 2026, approximately 80% of people detained there had no

---

[32] U.S. Immigration and Customs Enforcement, Office of Detention Oversight, ERO El Paso Camp East Montana, El Paso, TX (Feb. 10–12, 2026) at 3 (2026), https://www.ice.gov/doclib/foia/odo-compliance-inspections/eroElPasoCampEastMontana_ElPasoTX_Feb10-12_2026.pdf [https://perma.cc/EL6M-7UKN] ("February 2026 Inspection Report") ("The facility is a dedicated ICE detention facility and operates under National Detention Standards (NDS) 2025.").

[33] U.S. Immigration & Customs Enforcement, 2025 National Detention Standards, https://www.ice.gov/detain/detention-management/2025 [https://perma.cc/N8WL-2N69] (last visited May 28, 2026). Citations hereinafter will be to 2025 NDS followed by the relevant section.

criminal histories. [34] Even those with past criminal histories—the majority of which are for nonviolent offenses—have already served their time and are not detained at Camp East Montana under a criminal sentence.

43.    Because people detained at Camp East Montana are in civil detention, the law is clear: their confinement must not be punitive. Yet in practice, Camp East Montana imposes conditions that are restrictive, severe, and punitive, in many cases even more so than those found in prisons. This is inconsistent with the fundamental principle that civil detention cannot be punishment.

44.    One person formerly detained at Camp East Montana for several weeks at the beginning of 2026 told AP News that "Camp East Montana was 1,000% worse than a prison."[35] People who were previously incarcerated in a state or federal prison also report that conditions at Camp East Montana are far worse than any prison that they have been in before. People consistently report that they are being "punished," "tortured," and deprived of basic human necessities. People arbitrarily placed in low, medium, and high security housing units at Camp East Montana are subjected to similar punitive conditions including being in a windowless tent, with bright white lights, engulfed by sand and dust, with no meaningful programming or recreation, and with severe restrictions on their movements and invasions of their privacy.

---

[34] *See* Detention Reports, ICE ERO El Paso Camp East Montana, ICE Detention Facility Statistical Report, *available at* https://detentionreports.com/facility/EROELP.html [https://perma.cc/V8E2-C4BQ] (data as of April 2, 2026); *see also* Laura Strickler & Julia Ainsley, *ICE Is Re-Evaluating the Future of Camp East Montana, Its Largest Detention Facility*, NBC News (Mar. 5, 2026), https://www.nbcnews.com/news/us-news/ice-camp-east-montana-detention-facility-fort-bliss-future-rcna261891 [https://perma.cc/934L-Y3RY].

[35] Morgan Lee, Ryan J. Foley & Michael Biesecker, *Takeaways from AP's Reporting on ICE's Largest Detention Camp*, AP News (Mar. 6, 2026), https://apnews.com/article/ice-detention-camp-conditions-911-calls-738c63a2b96a90c2f85a668ec2fd3b5b [https://perma.cc/2F2H-6TUT].

45.    When discussing who would be detained at Camp East Montana, Texas Senator John Cornyn emphasized that "we are not talking about gardeners, housekeepers, or people like that."[36] But in reality, before their detention, people detained at Camp East Montana had occupations such as gardeners, housekeepers, IT managers, painters, delivery drivers, hibachi chefs, tow truck drivers, electricians, students, butchers, Uber drivers, salon workers, construction workers, car washers, and small business owners.[37] They were beloved community members who attended church, donated to charity, and volunteered at community temples.

46.    The punitive conditions of confinement at Camp East Montana impose an atypical and significant hardship on detained individuals that flatly contradicts any legitimate purpose of civil detention. People detained there experience pervasive and serious harms spanning almost every aspect of their confinement. From the moment of arrival, they are generally held en masse and forced to sleep on the floor of overcrowded holding rooms. They are subjected to and witness abusive treatment from guards, including threats and actual uses of force and attempts of coerced removal, including to countries they have never been to. Day-to-day life is marked by a system of degradation, including inadequate or spoiled food, a lack of even rudimentary hygiene supplies and clothing, and unsanitary living conditions. People are caged together in windowless pods for 23 or 24 hours a day, cut off from the outdoors and sunlight, subjected to invasive pat downs and searches, confined to their bunks during three long counts per day, and forced to depend on guards to tell them what time it is and whether it is night or day. They are denied any meaningful

---

[36] Robert Holguin, *Fort Bliss Facility Poised to Become Nation's Largest Migrant Detention Center*, KFOX14/CBS4 (Aug. 12, 2025), https://kfoxtv.com/news/local/fort-bliss-facility-poised-to-become-nations-largest-migrant-detention-center [https://perma.cc/S42V-4S4K].

[37] American Civil Liberties Union, *Fort Bliss Declarations – December 2025* (Dec. 8, 2025), https://www.aclu.org/documents/fort-bliss-declarations-december-2025 [https://perma.cc/GHX4-PB8B].

programming and recreation, must pay high costs to call family and friends, and cannot make confidential outgoing calls to an attorney. Everyone at Camp East Montana is at risk of harm due to a broken medical system and inadequate disease mitigation protocols, and people with serious or chronic medical conditions are regularly denied the care they require. Those who resist or complain face solitary confinement for extended periods without adequate justification and without meaningful oversight. Taken together, these conditions are not isolated failures but reflect a pattern of punishment imposed on people in civil detention and a facility operating in fundamental violation of the constitutional rights of every person held there.

47.    Conditions at Camp East Montana have proven to be lethal. Three people died at Camp East Montana in the span of just six weeks between December 2025 and January 2026.

48.    Francisco Gaspar-Andres, a 48-year-old Guatemalan national, died on December 2, 2025, after staff delayed transferring him to a hospital despite his repeated requests for care, ultimately succumbing to organ failure.[38]

49.    Geraldo Lunas Campos, a 55-year-old Cuban national, died on January 3, 2026, in what the El Paso County Medical Examiner ruled a homicide caused by asphyxia due to neck and torso compression.[39] In federal court statements, witnesses reported that facility staff had denied Mr. Lunas Campos his medicine and that Mr. Lunas Campos said that he would not go into his solitary confinement cell unless he received his medicine. The guards grabbed Mr. Lunas Campos

---

[38] Emma Hoggard, *Camp East Montana Detainee Dies at El Paso Hospital of Natural Causes, ICE Says*, KVIA (Dec. 9, 2025), https://kvia.com/news/border/2025/12/09/camp-east-montana-detainee-dies-at-el-paso-hospital-of-natural-causes-ice-says/ [https://perma.cc/C4ER-MWNW].

[39] Natalie Venegas, *Medical Examiner Rules Migrant's Death at Camp East Montana a Homicide*, NBC15 (Jan. 23, 2026), https://mynbc15.com/news/nation-world/medical-examiner-rules-migrants-death-at-camp-east-montana-a-homicide [https://perma.cc/7J7A-YMSG].

and physically assaulted him. The last thing others in the solitary confinement unit heard him say was "Me estás asfixiando"— Spanish for "you're choking me." Then silence.

50.    Government officials issued conflicting press releases, first asserting that Mr. Lunas Campos died after becoming disruptive while waiting for medication and then asserting that he died by suicide.[40] After the El Paso County Medical Examiner ruled his death a homicide, ICE declined to have the Medical Examiner perform an autopsy on the next person who died at Camp East Montana.[41]

51.    Victor Manuel Diaz, a 36-year-old Nicaraguan national, died on January 14, 2026. ICE attributed his death to a presumed suicide, but his family questioned the agency's account.[42]

52.    Another formerly detained person, Oudone Lothirath, who was not counted in the official death tally, died soon after being released from Camp East Montana, where he appears to have suffered from egregious medical neglect.[43]

53.    All these deaths reflect a pattern of dangerous neglect and, in at least one case, lethal violence at the hands of Defendants.

---

[40] U.S. Immigration & Customs Enforcement, Detainee Death Report: LUNAS Campos, https://www.ice.gov/doclib/foia/reports/ddr_LUNASCampos.pdf [https://perma.cc/BL4Z-3KHX]; Michael Biesecker, Cedar Attanasio & Ryan J. Foley, ICE says Cuban immigrant died while attempting suicide. A witness says guards pinned and choked him, AP News (Jan. 17, 2026), https://apnews.com/article/ice-immigration-detention-death-texas-2bfb614b2b222803d309f338357d04eb [https://perma.cc/UG8K-6NGP].

[41] Colleen DeGuzman, *After El Paso's ME ruled migrant's death a homicide, ICE sent the next body to an Army hospital*, Texas Tribune (Feb. 3, 2026), https://www.texastribune.org/2026/02/03/texas-ice-detention-deaths-autopsy-el-paso/[ https://perma.cc/RY9K-NZ2H].

[42] *Id.*

[43] Alexa Cimino, *Refugee detained by ICE missed vital chemo and is now on his deathbed, heartbroken family says*, Daily Mail (Mar. 28, 2026), https://www.dailymail.com/news/article-15687243/refugee-ice-detention-chemo-deathbed.html [https://perma.cc/ZM5V-M87U].

54.     After each of the three recorded deaths at Camp East Montana, Defendants responded not with transparency or accountability or compassion, but by invoking the individuals' criminal histories to deflect from the circumstances of their deaths. For instance, when Defendant ICE announced the death of Geraldo Lunas Campos—later ruled a homicide by the El Paso County Medical Examiner—it chose to emphasize that he was an "aggravated felon," dismissing entirely the official finding that he was killed while in custody.[44] At no point did Defendants announce any investigation into the deaths at Camp East Montana, not even the one that has been ruled a homicide. Local and federal officials have called for an official investigation, but there is no evidence that one has been initiated.

Frigid and Crowded Intake Hold Rooms

55.     When people arrive for intake at Camp East Montana, they are crammed into small holding rooms, often for many hours or up to multiple days with the same clothes, where they are forced to sleep on the dirty floor or to take turns on metal benches without any blankets, mattresses, or coverings, and forced to huddle for warmth next to each other. People report that at times there is not enough room for everyone in the room and that they must take turns standing up and laying down. The intake area often holds 50 to 70 people at a time despite a posted room capacity of 30 people. Even when people arrive who are visibly sick, they are forced to be in the same room as others while they cough, sneeze, have high fevers, and tell guards that they are sick and need medical attention. One individual repeatedly told guards that he needed medication to treat his tuberculosis but was told that there was nothing that they could do until he was processed, keeping

---

[44] U.S. Immigration & Customs Enforcement, Newsroom, *ICE reports aggravated felon and convicted child sex offender's death at Camp East Montana in Texas*, Jan. 9, 2026, https://www.ice.gov/news/releases/ice-reports-aggravated-felon-and-convicted-child-sex-offenders-death-camp-east [https://perma.cc/LZ7N-T5BR].

him locked in that small holding room with many other detainees. As a result, he missed his daily tuberculosis medication during the nearly 24 hours that he waited to be processed into the facility. One person went through intake on four separate occasions and reported that the conditions at intake have remained consistently bad during each time and that he got sick when he went through intake. People also report being forced to use the same dirty toilet in the hold room in front of others without any privacy and limited toilet paper. People report that there is a security camera pointing directly towards them. The only water they receive is from a faucet above the toilet that is dirty with sand, mucus, spit, and discarded food. People report receiving a small packet of food that consists of two pieces of white bread, a piece of ham or bologna, mustard, and a single slice of cheese and a piece of fruit or cookie, for all three meals.

56.    Plaintiff Navdeep described the hold rooms as so dusty that he could "draw a picture with my fingers in the dust that covered the floor." He was "not given any blankets or other materials for comfort or warmth." During and after his time in the hold room, he had to continue wearing the same clothes he had arrived at Camp East Montana in, even his underwear "day after day after day after day."

57.    There is no legitimate justification for these conditions in the hold rooms. In fact, underscoring the lack of legitimate justification, it is worth noting that the conditions violate Defendants' own standards. The 2025 NDS provide that a hold room "shall contain a minimum of 37 square feet … [with] an additional seven square feet of unencumbered space for each additional detainee," "will contain sufficient seating for the maximum room capacity," equipped "with toilets [to] allow for an appropriate amount of privacy," that "[a] detainee may not be held in a hold room for more than 12 hours," "[o]fficers shall provide a meal to any adult in the hold room for more than six hours," "[d]etainees shall be provided with basic personal hygiene items, e.g., potable

water, disposable cups,…" and "[s]taff shall ensure that sanitation and temperatures in hold rooms are maintained at acceptable levels."[45]

58.     Defendants have been on notice of the deficiencies of their hold rooms, including by ICE's own inspections. In September of 2025, a month after Camp East Montana opened, the detention oversight unit of ICE found that people detained at the facility were subjected to conditions that violated at least 60 federal standards for immigration detention.[46] Although this inspection report remains unavailable to the public, the Washington Post obtained a copy and made information about it available.[47] Advocacy groups, including some of the undersigned counsel, then sent a letter in December of 2025 detailing, with supporting declarations, abuses at Camp East Montana.[48] Finally, ICE's Office of Detention Oversight inspected the facility in February of 2026 and similarly found numerous violations of detention standards.[49] ICE's initial inspection in September 2025 and inspection in February 2026 both found that the facility failed to comply with standards involving hold rooms.[50] The February inspection confirmed that, in a substantial number of detainee files, the initial classification process and housing assignments were not completed within the required 12-hour window following admission—with some completed between 14 hours and 25 days after admission to the facility, indicating that the intake hold process remained

---

[45] 2025 NDS § 2.5(II)(A), (II)(B), (II)(D)(3).

[46] *60 Violations.*

[47] *Id.*

[48] Letter Re: Coercive Third Country Deportations and Abusive Conditions of Confinement in Immigration Detention at Fort Bliss, TX (Camp East Montana) (Dec. 8, 2025) ("December 2025 Letter"), https://assets.aclu.org/live/uploads/2025/12/2025-12-8-Ft-Bliss-ICE-Detention-Letter-FINAL.pdf.

[49] February 2026 Inspection Report.

[50] *60 Violations*; February 2026 Inspection Report at 6.

deficient months after notice was first provided.[51] The December 2025 letter also documented that detained people were held in frigid, overcrowded hold rooms for days at a time.[52]

Inappropriate Use of Force, Sexual Abuse

59.    Officials routinely engage in abusive behavior and unreasonable use of force against people detained at Camp East Montana.

60.    Officials use force against detained people for simply requesting that their basic needs be met. Detained people have been hospitalized as a result of guard violence, while others have suffered fatal consequences.

61.    For example, Mr. Lunas Campos died after guards denied him asthma medication, placed him in solitary confinement, and used force that resulted in fatal asphyxia, with his death later ruled a homicide.[53]

62.    Officials have also used force against detained people even when the detained person has complied with an order, such as returning to their bunk beds. Plaintiff Navdeep experienced the use of force after he tried unsuccessfully to put his arms behind his back after being directed to do so.

63.    Guards touch people sexually without consent with no accountability. For example, one person reports that a male guard sexually assaulted him during an invasive pat down in front of two female guards, one of whom encouraged the detained person to report it to a supervisor. But, after he reported this sexual assault to the supervisor, the guard continued to harass him with

---

[51] February 2026 Inspection Report at 6.

[52] December 2025 Letter at 14-15.

[53] Natalie Venegas, *Medical Examiner Rules Migrant's Death at Camp East Montana a Homicide*, NBC15 News (Jan. 23, 2026), https://mynbc15.com/news/nation-world/medical-examiner-rules-migrants-death-at-camp-east-montana-a-homicide [https://perma.cc/7J7A-YMSG].

sexual innuendos at night. Another guard in that unit also encouraged the detained person to file a PREA complaint. But, after he filed this PREA complaint, a GardaWorld official accused the detained person of lying, and nothing ever came from the report. A Named Plaintiff also reports that "[t]he guards will sometimes touch us inappropriately, like in the groin area, when patting us down, and it seems as if they are trying to provoke us." In his case, "[g]uards have also put their hands under [his] pants, moving from the inner thigh area to the area near [his] penis and testicles."

64.    Named Plaintiff Navdeep described that the new contractors "frisk" detained people whenever they leave the pod. "Anytime we step out of our pod for anything, like recreation, medical, visits, or anything, they pat us down," he described.

65.    There is no legitimate justification for subjecting people at Camp East Montana to abuse by guards. In fact, the 2025 NDS bar officials from using force except in very limited circumstances, only "after all reasonable efforts to resolve a situation have failed."[54] They require staff to "attempt to gain the detainee's willing cooperation, in a language or manner that the detainee understands, before using force" and prohibit "[u]sing force against a detainee offering no resistance."[55] The standards further instruct that guards "shall use only the force necessary to gain control of the detainee," and prohibit guards from "[s]triking a detainee for failing to obey an order."[56] And the standards require facilities to "act affirmatively to prevent sexual abuse and assaults on detainees; provide prompt and effective intervention and treatment for victims of sexual abuse and assault; and control, discipline and prosecute the perpetrators of sexual abuse and assault."[57]

---

[54] 2025 NDS § 2.8(I).

[55] *Id.*

[56] 2025 NDS § 2.8.

[57] 2025 NDS § 2.11.

66.     Defendants have long had reason to be on notice of the disturbing uses of force at the facility. ICE's own initial inspection report in September 2025 revealed that the facility lacked an approved use-of force policy, that armed guards had no written guidance on when lethal force was justified, and that the contractor's use of force policy was not aligned with ICE's own policy.[58] The February 2026 ICE inspection found 22 separate deficiencies in the Use of Force and Restraints standard alone.[59] These included failures to forward use of force documentation to ICE/ERO for review, failures to seek mental health or medical assistance after gaining control of a detainee, failures by medical personnel to document examinations or treatment following use-of-force incidents, failures to prepare use of force reports or witness memoranda, and failures by after-action review teams to examine whether force was appropriate, including by reviewing video recordings.[60] A December 2025 letter also documented a widespread pattern of excessive and abusive force against detained people.[61]

Coerced Removals

67.     Detained people at Camp East Montana report a disturbing pattern of guards attempting to coerce removals by using threats or force to get individuals to leave the United States—sometimes to third countries where they have no connections. And where guards are not actively trying to get people at Camp East Montana to sign deportation papers, the conditions are so horrific and punitive that many decide to give up their claims just to get out of the facility.

68.     Detained people report being pressured and coerced by ICE and guards to give up on their immigration case, sign third-country removals and/or self-removal forms.  For example,

---

[58] *60 Violations*.

[59] February 2026 Inspection Report at 8–10.

[60] *Id.*

[61] December 2025 Letter at 6–8.

a Named Plaintiff reports that he was "[woken] at 4 or 5 a.m. in the early morning and being asked to sign a voluntary departure form and being told [that] 'under the Trump Administration, [the Named Plaintiff] would not be able to win my immigration case.'" Another person reported that he was pressured multiple times by ICE to sign third country removal papers, driven to the Mexican border, and physically assaulted when he refused to sign removal papers. Another declarant reports that guards would tell people, "You guys can always self deport and get away faster" and "If you don't like it, you shouldn't be here."

69.     Even those who are not subjected to these disturbing explicit attempts to coerce their removal are sometimes forced to give up their claims for another reason: the conditions at Camp East Montana are, both in purpose and effect, so terrible and unbearable that people feel forced to ask to be deported. Indeed, a Named Plaintiff reported that "[b]eing here has made me not want to keep fighting to stay in the United States and the conditions here have made me feel forced to sign a voluntary departure, which I would not have signed otherwise if I had access to counsel and if I was not at this detention center." A Named Plaintiff was told by an ICE officer that "[the Named Plaintiff] was wasting [the ICE officer's] time, that [the Named Plaintiff] would be sent to Africa or sit in detention for a long time unless [the Named Plaintiff] left for Mexico." Recent reporting has confirmed what detained people at Camp East Montana have experienced: that the combination of prolonged detention and degrading conditions have led record numbers of people to give up hope and leave. Voluntary departures during the second Trump administration reached 89,494 cases as of May 1, more than seven times the number recorded in the last 16 months of the Biden administration.[62]

---

[62] Tim Henderson, *Voluntary departures spike as immigrants face squalid detention, pressure to leave*, Stateline (May 26, 2026), https://stateline.org/2026/05/26/voluntary-departures-spike-as-immigrants-face-squalid-detention-pressure-to-leave/.

70.     There is no legitimate justification for these coercive practices that, in purpose and effect, result in people giving up their legal rights just to get away from the violence and suffering inflicted upon them at Camp East Montana.

71.     Defendants have had reason to be on notice about these coerced deportations. In a letter sent in December 2025, civil and human rights groups documented guards handcuffing and rounding up large groups of non-Mexican immigrants, loading them onto vans, and transporting them over an hour to the U.S.-Mexico border and instructing them to "jump" into Mexico. Beatings and threats were used to coerce immigrants to "jump" into Mexico.[63] This did not stop Defendants from continuing the practice.

Excessive Solitary Confinement

72.     Defendants impose an extreme and harsh form of solitary confinement at Camp East Montana, using it for behavior that does not warrant such a punishment and untethered to any law or policy guiding its appropriate use.

73.     People report being threatened with being sent to the "hole," "can," or solitary confinement, which ICE calls the Segregation Management Unit ("SMU"), for asking for clarity on rules, raising complaints about the conditions in their unit, refusing to go out to yard when they physically cannot move, being physically unable to place their hands behind their back, asking to use the restroom when they are out in yard, or for raising other concerns. Solitary confinement is a small room with a bed and toilet with a sink on top:

---

[63] December 2025 Letter at 3–5.



74.     The SMU is also inappropriately used as a "resource" for people struggling with mental health. A declarant, for example, who had previously attempted suicide in another detention facility was offered placement in solitary confinement, where he would have been stripped of his clothing and left alone for days, as the only option for managing his acute mental health condition.

75.     Plaintiff Navdeep was placed into solitary confinement after experiencing violent treatment by officers for failing to place his hands behind his back when instructed, even though he had preexisting injuries that prevented him from doing so. While in confinement, he felt too depressed to eat for many days, there was "nothing to do," and he felt especially scared at night knowing he was "completely alone in a cell in a tent in the desert."

76.     Plaintiff Angye was placed into solitary confinement for fifteen days after guards beat him so severely that he had to be hospitalized and placed in a wheelchair. He had refused to sign documents before speaking with an attorney. He remained in severe pain while in solitary confinement while bright lights remained on 24/7, which gave him migraines. He experienced bloody noses in isolation and was sometimes covered in blood when he woke up in the morning.

77.    Once in solitary confinement, people are subject to arbitrary rules and are given no real opportunity to contest their placement. Despite being told that they have a right to a panel hearing to review their placement, no hearing occurs. Plaintiff Navdeep spent hours preparing a written statement in anticipation of a hearing, but no hearing occurred and he never had the opportunity to present the words he had carefully written.

78.    After placement in solitary confinement, regardless of the reason, detained people have experienced being reclassified to a higher security level as indicated by their uniform color. Named Plaintiff Angye wore a blue uniform before placement in solitary confinement and was forced to wear an orange uniform after his placement in solitary confinement. He described people pointing to him and calling him a criminal as a result. There is no straightforward way to challenge one's security classification. It is a moving target.

79.    SMUs at Camp East Montana are used in a manner far more punitive than permitted under ICE standards, which make clear that administrative or disciplinary segregation should only be used for limited, documented purposes and requires review, records, medical and mental health involvement, and continued access to basic services. The December 2025 Letter provided clear notice of this abusive practice, yet detained individuals confirm its continuation: the immediate placement of individuals in SMUs upon returning from the hospital after serious injuries caused by excessive uses of force by guards, extended isolation in SMUs without timely or rational justification, and punitive placement into SMUs solely for requesting basic needs like medication or hygiene products. People report that the rules are arbitrary and change often and that guards regularly threaten to send people to "the hole" for failing to follow rules that are constantly changing or unpredictably upheld.

80.     Such actions by officials are not mere errors. They show a pattern of repeated infliction of harm, and Defendants' continued use of solitary confinement at Camp East Montana underscores the fundamentally punitive nature of its operations.

81.     These practices are more extreme even than those employed in Texas state prisons—institutions expressly designed to punish those serving criminal sentences. For instance, in Texas prisons, solitary confinement is imposed only after "a major disciplinary hearing or a state jail offender disciplinary hearing." [64] It is meant to be used "when all other levels of discipline have been tried; where the safety of other offenders or staff is concerned; or when the serious nature of the offense makes it necessary."[65]

82.     There is simply no legitimate justification for the arbitrary and indiscriminate use of solitary confinement at Camp East Montana.

Failed Communications about Operations

83.     People detained at Camp East Montana cannot obtain basic information about operations at the facility, forcing them to "go[] in circles" as they attempt to make sense of routines and rules they are subjected to.

84.     Plaintiff Angye requested a handbook when he first arrived at Camp East Montana on or around April 22, 2026, but he has still not received a copy of the handbook despite asking for it multiple times. One officer told him he wouldn't need the handbook because "the longest anyone stays here is two weeks." Another officer told him he "didn't even know there was a handbook."

---

[64] Tex. Dep't of Crim. Just., *Offender Orientation Handbook* 72 (Feb. 2017), https://www.tdcj.texas.gov/documents/Offender_Orientation_Handbook_English.pdf. [https://perma.cc/HP49-6JQ4].

[65] *Id.*

33

85.    There are serious language barriers at Camp East Montana. The Public Addresses or announcements at Camp East Montana are generally in Spanish. Plaintiff Navdeep and Plaintiff Angye do not speak Spanish. When Plaintiff Navdeep has asked the guards to "please translate into English" because he "doesn't want to miss the announcements," they have usually refused to translate from Spanish into English and have turned around and left. This causes him to miss important announcements, such as those for attending the barbershop or library when available. He has requested without success for the announcements to happen in English as well as Spanish. Plaintiff Angye worries that he has missed opportunities for pro bono immigration assistance because he cannot understand the announcements in Spanish.

86.    Other inconsistencies include the lack of clear information about challenging one's arbitrary placement in solitary confinement, challenging one's arbitrary security classification, and trying to figure out the sick call, grievance process, and medical request process. Detained people feel like "fools" trying to make sense of the systems they are subjected to, noting that it is especially perplexing when officials do not follow their own rules.

87.    Defendants have had reason to be on notice about the challenges caused by their failed communications. The February 2026 ICE inspection report noted that in 16 out of 91 logged grievances, "the facility did not make every effort to resolve the grievances in a timely manner," taking up to 14 days to resolve them.[66] This lack of timely response causes confusion for detained people simply trying to use the systems available to them to get relief.

Limited Access to Outdoors, Sunlight, or Programming

88.    People at Camp East Montana get limited time outdoors in what they have described as being herded into a dog pen. The area where individuals are taken for recreation, or

---

[66] February 2026 Inspection Report at 12.

34

"yard," is just another enclosed tent with artificial grass. Only one "yard" appears to permit some limited sun exposure if weather and timing permits (and even in that one "yard," only half of the yard has sun exposure).

89.     People report that, despite a posted recreation schedule, "yard" time is inconsistent in terms of duration, frequency, and time of day. On some occasions, "yard" is obligatory, meaning that everyone in the unit must leave the unit, even if they are sick or unable to walk and be outside. Sometimes, people struggle to stand outside and collapse on the ground because of how ill they are. On other occasions, yard time is cut short, to only 20 minutes. Sometimes, there is no recreation time at all. Even when they are let outside, there is not enough space for everyone to be in the "yard" and walk or exercise. People report that they are given a heavy plastic soccer ball or football, that some people play soccer, while the rest of the people in the unit stand on the sides to try to avoid being hit by the ball, sometimes unsuccessfully. Above all, people report that there is so much sand and dust in the "yard" that it is difficult to breathe.

90.     Some detained people have gone weeks without seeing the sun during their time at Camp East Montana, including when first arriving at the facility, such as Plaintiff Navdeep. The recreation schedule is inconsistent, so detained people cannot predict when they will be outside again.

91.     Depriving detained people of sun exposure for extended periods of time impacts more than just their mood. It puts them at risk of vitamin D deficiency, which could weaken muscles and immunity, leading to bone density loss and increased fracture risk.

92.     There is no legitimate justification for these limitations on outdoor access and sunlight. Even the basic requirements set out in Defendants' own standards demand more. The 2025 NDS provide that, where outdoor recreation is available, "each detainee shall have access for

35

at least one hour per day, five days per week; or, six or more hours per week, at least four days per week," weather permitting. If indoor recreation is available, then "detainees shall have access for at least one hour each day and *shall have access to natural light.*"[67]

93.     Programming of any sort is virtually nonexistent at Camp East Montana. People report that "there's nothing to do all day" across all three security levels. There are no educational, vocational, or meaningful programming at the facility. Programming is limited to tablet use which charges people by the minute, plus fees, for making calls, video calls, receiving and sending text messages (which must be approved by the facility), listening to music, watching movies (which are all in English), and playing games. Moreover, there are only a maximum of 18 tablets per housing unit, and the tablets are also used for submitting medical request forms or grievances or making other requests from the facility. As a result, even the limited programming in the tablet— for those who can afford it and access it—is extremely limited.

94.     There are only two televisions in the unit, and the guards control the remote control.

95.     While there is "a very small bookshelf" in the multi-purpose room, with restricted access, most books are in English, which makes the library virtually inaccessible to the many people who cannot read or speak fluently in English. There are only around 30 soft-cover books in the library that individuals are allowed to check out to take back to their housing unit. There are also some hard-cover books that are not permitted to leave the library. Access to the library, to read or to access legal information, is limited and unpredictable.

96.     There is little or no formal religious programming. Some individuals have set up daily prayer circles in their units but, sometimes, guards get upset at people for singing or praying

---

[67] 2025 NDS § 5.2(II)(A) (emphasis added).

during bible study. A Named Plaintiff who is Christian has only been to a religious service once in the approximately seven months that he has been detained at Camp East Montana.

97.    People detained at Camp East Montana who have been formerly incarcerated note that, unlike time in jail or state or federal prison, "there's nothing to do" at Camp East Montana that is meaningful. One person stated that "I was in state prison for about 19 years and the conditions here are worse."

98.    Detained persons are not even allowed to make arts and crafts by recycling cartons, paper, and plastic left over from their meals which would be allowed in other prison or jail contexts. As a Named Plaintiff reports, to pass the time, he and others tried to make art out of what little they had access to—food packaging and trash: "we tried to use white plain paper, cracker boxes that we recycle, and plastic bags to make little shoes as a group. This takes us about two days to make it. But the guards take this away from us and throw it away in the trash and say that this is contraband, and they threaten us with solitary confinement. But we made these pass the time and help with our stress. I feel that it's necessary to do this to deal with my stress and anxiety, but we are not allowed to. The guards told us that we are not allowed to make these, but I have not seen a written rule saying that."

99.    In all, there is no meaningful educational, vocational, or other programming at the facility. This has a profound negative impact on individuals. As a Named Plaintiff explained, "[b]ecause of the lack of programming, I feel anxious and depressed because of everything going on and there's nothing to keep my mind or body in a productive and healthy way."

100.    In contrast, Texas state prisons offer a variety of programming to the people detained there serving criminal sentences. Texas state prisons offer educational programs, including post-secondary educational programs, that allow incarcerated individuals to develop

their mental skills and provide them with job training skills.[68] Texas state prisons also offer rehabilitation programs that, for example, provide treatment for addiction to or use of substances or alcohol.[69] And Texas state prisons offer an intervention and recovery program for women with history of prostitution, human trafficking, sexual abuse, and domestic violence.[70]

101.    There is no legitimate justification for subjecting detained people at Camp East Montana to the torturous idleness that they endure there. In fact, the 2025 NDS mandate that facilities "shall provide detainees with access to recreational programs and activities, within the constraints of the safety and security of the facility," including providing that "general-population housing units will offer board games, television, leisure reading materials, and other sedentary activities."[71]

102.    Defendants have had reason to be on notice about deficiencies related to recreation and programming at Camp East Montana. The December 2025 Letter documented that not a single interviewed detainee reported receiving daily outdoor recreation, and most had gone weeks or months without seeing the sky.[72]

Limited Access to Loved Ones

---

[68] Windham School District, *About Windham*, https://wsdtx.org/about-windham/ (last visited Mar. 4, 2026); Tex. Dep't of Crim. Just., *Postsecondary Education Programs*, https://www.tdcj.texas.gov/divisions/rrd/ps_education.html [https://perma.cc/E6F3-7EHN] (last visited Mar. 9, 2026).

[69] Tex. Dep't of Crim. Just., *General Information Guide for Families of Inmates* (May 2026), https://www.tdcj.texas.gov/documents/General_Information_Guide_for_Families_of_Inmates_English.pdf [https://perma.cc/U79G-D324].

[70] *Id.*

[71] 2025 NDS § 5.2.

[72] December 2025 Letter at 15.

103. The ICE Online Detainee Locator, the government website that is supposed to notify families, loved ones, service providers, and attorneys about where a person is detained so that they can figure out how to contact them, does not always show a detained person as being at Camp East Montana. For example, one Named Plaintiff who has been at Camp East Montana for months still does not show up on the detainee locator, despite repeated alerts to Defendants regarding this issue.

104. Even if a person is able to identify that their loved one is detained at Camp East Montana, visits are incredibly difficult given how far their family, friends, and loved ones must travel to Camp East Montana, which is located in the middle of the Chihuahuan Desert.

105. When loved ones manage to make the long trip to Camp East Montana, they are greeted by an armed checkpoint before even arriving at the parking lot. It is staffed by guards who sometimes have their faces covered and who ask questions before a visitor even enters the visitation area. Once a visit begins, detained people report not being "allowed to touch our family members when they come to visit." All in-person visits, which must be scheduled at least 24 hours in advance, happen behind Plexi glass in an open and non-private area.

106. People also report not having consistent access to video calls. For example, between on or about April 13, 2026, until on or about May 13, 2026, people did not have access to video calls across the facility. This negatively impacted the mental health and wellbeing of detained people who were not able to contact their families.

107. Even when video calls are available, people are charged about 21 cents per minute to make them. As a result, only individuals who can afford video calls have access to them. Moreover, video calls are not private or in quiet locations as they occur in the video kiosks which are underneath the televisions in the common area of the housing enclosures in the tent camp.

108. All SMS messages and photos are screened by the facility. There are instances where family members send pictures of pets, their own children, and family, but the facility has not permitted detained people to receive these photos. As a result, people feel isolated, further disconnected from the outside world and their families.

109. Moreover, as noted above, each unit has a maximum of 18 tablets, and each tablet is shared between four people in the same four-person bunk space. Some units have fewer than the 18 tablets. Detained persons also cannot use the tablets during the three counts in the daytime. As a result, tablet usage is highly limited throughout the day.

110. All calls on the tablet are monitored and recorded as well. Phone calls on the tablet cost anywhere from 7 cents to 9 cents per minute, in addition to fees. As a result, only people who have access to funds can make phone calls.

111. On or about March 2026 to April 2026, there was a measles outbreak at Camp East Montana. During this time, the facility was on lockdown and in quarantine, meaning that all in-person visits, including counsel visits, were prohibited.

112. There is no reasonable justification for denying detained people at Camp East Montana reliable and meaningful access to their families and loved ones. In fact, the 2025 NDS provide that facilities "shall provide detainees with reasonable and equitable access to telephones during established facility waking hours," that such access shall be "reasonably priced," and "shall provide at least one operable telephone for every 25 detainees," among other phone access requirements.[73] In addition, the 2025 NDS *encourage* contact visitation, recognizing that family visitation is important to "maintain detainee morale and family relationships."[74]

---

[73] 2025 NDS § 5.4.

[74] 2025 NDS § 5.5.

113.    Defendants have had reason to be on notice regarding deficiencies in facilitating communications between detained people and their loved ones. The initial 2025 ICE inspection noted that detained people were denied access to telephones and had no way to contact lawyers or family members.[75] The February 2026 ICE inspection found a deficiency in telephone access, specifically that housing unit officers did not conduct daily serviceability checks of tablets, did not promptly report out-of-order tablets for repair, and did not ensure quick completion of repairs.[76] Still, these communication-related problems remain.

<u>Unsanitary Living Areas and Inadequate Access to Sanitation Supplies</u>

114.    Conditions at Camp East Montana are squalid and fetid. Staff do not regularly clean the living areas and individuals are not provided with sufficient cleaning supplies to do so themselves. As one person explained, "[t]he facility is dirty. Sand and dirt get everywhere in the unit. Because the toilets are close to the bunkbeds, we get the foul smell of urine, feces, and body odors."

115.    Despite these dirty conditions, facility staff do not clean the units regularly. For example, people in the high security unit report that "[t]he unit is very dirty, and the staff clean it maybe once a week." Others report that facility staff do not clean for weeks. For example, someone in the low security unit shared that "[s]ince [she's] been here, from on or about May 8, 2026 [until on or about May 26, 2026], [she] only saw that the facility staff cleaned the unit once." "The other days, the detainees have to clean the unit."

116.    Detained people are regularly expected to clean the housing units themselves but are not given proper supplies to clean. For example, someone reported that "detainees clean the

---

[75] *60 Violations*.

[76] February 2026 Inspection Report at 12.

bathrooms, common area, bunkbeds, and unit but we are not given any proper cleaning supplies to do it." Others report the same and state that the "[t]he guards give us a broom, mop, and toilet brush. We get some chemical agent to clean the toilet, but it's not enough to clean the unit." But access to cleaning supplies is inconsistent. As another detained person reports, "[s]ometimes they do not give us gloves. Sometimes, we use hand rags or shirts, towels to clean our bunk beds, toilets, showers, and lunch tables." Another reports that they "are not given any disinfectants, and we must clean with just the tap water. We are often mopping the floors with just water which is dirty because of the sand and dirt that enters the unit."

117. Because of the lack of cleaning supplies, detained persons often have to use whatever leftover shampoo they have from the single use packets they receive to try to clean the living area. As a Named Plaintiff reports, in the low security unit, "[w]e have to use some of our personal hygiene products to clean the unit."

118. The expectation that detainees clean the unit without pay and with limited or no cleaning supplies is consistent in both the high security and low security units. For example in the women's low security unit, "detainees use toothbrushes, hand cloths, extra shirts, and water to clean the sinks, beds, floors, bathrooms, lunch tables, and showers. Detained people are not paid for cleaning the unit." Another person reports that they are not even given "any food or pay if we 'volunteer' to clean the unit."

119. The systemic lack of proper cleaning protocols means that detained persons must endure egregious, inhumane, and unsanitary conditions that are particularly acute and dangerous when infrastructure systems fail at the facility. For example, on or about May 10, 2026, detained individuals housed in housing unit B-5 were subjected to inhumane and unsanitary living conditions. Four of the approximately six toilets in the unit became clogged, causing sewage and

42

human waste to seep out onto the bathroom floors and into the corridor leading to the toilets and showers. Despite the overflowing sewage, detained individuals "had no choice but to continue using the toilets," forcing them to walk through standing sewage water contaminated with human feces in order to access the bathrooms and showers. Facility staff observed these conditions, yet the sewage remained on the floor for days before maintenance responded. Even after maintenance unclogged the toilets, the facility failed to provide a professional cleaning or sanitation crew. Instead, detained individuals were expected to clean the contaminated area themselves with only minimal supplies, including brooms, gloves, and buckets of water, and without disinfectant, soap, masks, or other protective equipment. Some individuals were forced to use their own personal towels to wipe sewage and human waste from the floors. The stench of sewage permeated the housing unit, including common areas where meals were eaten and where detainees slept, causing nausea, stomach pain, disrupted sleep, and preventing them from using common spaces or even using the restroom normally. These degrading and hazardous conditions persisted for days before the facility finally sent a cleaning crew, and only after detainees had already attempted to clean the area themselves. Plaintiff Navdeep experienced an overflowing toilet that caused "smelly and dirty" water to come "all the way to the bed area where I was sleeping." He described the toilets as using a "vacuum system," so when it breaks, "everything gets pushed out rather than in."

120.    There is no legitimate justification imaginable that would support these conditions at Camp East Montana. Defendant ICE, in its own detention standards, requires that "[f]acility cleanliness and sanitation shall be maintained and in good repair. Suitable and sufficient cleaning equipment and supplies shall be available throughout the facility."[77] Camp East Montana does not meet this standard.

---

[77] 2025 NDS § 1.1(II)(I)(2).

43

121.    The 2025 NDS require that "detainees [be] responsible for personal housekeeping,"[78] and another set of ICE detention standards, the Performance-Based National Detention Standards (PBNDS), make clear that this expectation is limited to their personal areas and includes tasks such as "making their bunk beds daily; stacking loose papers; keeping the floor free of debris and dividers free of clutter; and refraining from hanging/draping clothing, pictures, keepsakes, or other objects from beds, overhead lighting fixtures or other furniture."[79] Personal housekeeping does not include cleaning an entire unit, restroom and shower areas, and common areas every day in the same manner and to the same extent as a private paid contractor or facility staff is responsible for. That extensive scope of work qualifies under the voluntary work program which requires that the facility compensate people for cleaning the entire unit. The PBNDS, for instance, require that detainees be paid a minimum of $1 per day for such scope of work.[80] Accordingly, the facility staff are forcing detained people to perform unpaid labor by requiring them to clean the unit daily. This work is coerced because detained people who refuse to clean are forced to live in dirty, unsanitary conditions.

122.    Defendants have reason to have been on notice of these unsanitary conditions. For example, the December 2025 letter documented that detained people were not provided adequate cleaning supplies to address persistent flooding of water containing feces in living areas.[81]

Lack of Basic Hygiene Supplies and Clothing

123.    People detained at Camp East Montana are denied basic hygiene supplies, such as soap, shampoo, nail clippers, and grooming razors. Plaintiff Navdeep's nails grew approximately

---

[78] *Id.*

[79] 2011 PBNDS § 5.8 (V)(C).

[80] 2011 PBNDS § 5.8 (V)(K).

[81] December 2025 Letter at 12–13.

an inch long or even longer when the barbershop was closed for an extended period. It felt "dirty and uncomfortable to have my nails grow so long without a way to trim them," he reported.

124. People are provided with limited personal single-use hygiene supplies that they must request every single day and that often is not enough to wash their bodies and their hands after using the toilet and before eating.

125. None of the units have hand soap or anti-bacterial hand sanitizer. As one person shared, "[w]e do not have hand soap in the bathroom to wash our hands. Instead, we have to use whatever remaining shampoo/body wash we have from our single use packets. Or we have to wash our hands with just water." Another reports that they "didn't get a bar of soap and didn't have access to a soap dispenser. All we got was a tiny packet of shampoo. It was so small, like the condiment packages from a gas station." A Named Plaintiff also reports that "[t]here is not enough shampoo to properly take a shower. To shower, they give us sample size shampoo packets, but we often have to ask for more packets when we run out."

126. Moreover, personal hygiene supplies regularly run out. Individuals have filed complaints but seen no change. As a Named Plaintiff shared, "when I was in C-8, members of our unit submitted a complaint about the lack of shampoo and hygiene supplies, but we never heard back from the facility. When we ask the guards for supplies, they say they will bring it but it usually never arrives."

127. Personal grooming services are also limited, inconsistently provided, and detained persons are required to work without any pay. For example, between on or about April 13, 2026 until May 14, 2026, the barbershop services, which also included the nail trimming, facial beard trimming, and the law library, were closed because detained persons refused to continue to work without pay and without even being offered extra food. A Named Plaintiff, who previously worked

as a barber, reported that "[o]n or about April 13, 2026, I went to work at the barbershop. At around the lunch time, a guard told me that the new company did not want to pay us with food anymore and that moving forward we would be 'volunteering' our time to work as barbers. There were four other barbers and we all decided to no longer return to the barbershop if we were not going to receive extra food as payment." According to multiple declarants, the guards informed the detained people that the new company was going to hire a third-party contractor to cut hair, but this never materialized. According, "[o]n or about the week of May 11, 2026, the barbershop was re-opened after new detainees arrived who volunteered to serve as barbers." The same Named Plaintiff who previously cut hair was asked if he wanted to "work as a barber" but he declined because the facility would not pay him and asked that he work "for free."

128.   Defendants' failure to provide detained people with personal hygiene supplies falls below agency standards and below what is routine even at Texas state prisons, showing that there is no legitimate justification for subjecting people detained at Camp East Montana to these conditions. For instance, the 2025 NDS require that all detainees must be provided with "[o]ne bar of bath soap, or equivalent" and "one bottle of shampoo, or equivalent."[82] In addition, the 2025 NDS require that all facilities provide detainees with clean clothing and linens. "Socks and undergarments will be exchanged daily, outer garments at least twice weekly and sheets, towels, and pillowcases at least weekly."

129.   Moreover, here again the facility maintains a practice of requiring detained persons to perform work and tasks that should be either performed by staff or for which they should be compensated. The facility essentially coerces people to work for the facility by creating

---

[82] 2025 NDS § 4.4(II)(F).

46

unsupportable conditions that force detained people to choose between cleaning or cutting hair for free, for example, or continuing to live in squalor or with ungroomed hair.

Inadequate Food

130.    People detained at Camp East Montana are deprived of sufficient food. They are provided with meager portion sizes and often go hungry. While some try to quell their hunger by drinking water all day, they lack a sufficient amount of calories and nutrients.

131.    People consistently describe the food as "terrible," "rotten," and spoiled," and have found insects in their food. For example, one declarant shared that on "[o]n or about April 23, 2026, I received rotten potatoes in my unit for lunch and I showed it to the guard. The guard said that he could not do anything because they are just following orders. I threw away the spoiled potatoes. Others complained as well. On or about April 23, 2026, I saw that another detainee had a bug in this food." The portions of food they are provided are described as largely inedible and inadequate. Another noted that "[t]he food is horrible. It comes frozen or partly frozen. I feel hungry constantly. I have reported the bad quality of food to the supervisors, and they have taken pictures, but nothing has changed." Another declarant reported that "[t]he food is not enough at all. I am hungry here all of the time and we drink water to help pass the hunger. Because of the lack of food, I feel weak and tired all the time. The food quality is bad, it's badly seasoned, very sour, has a terrible season, and tastes horrible."

132.    On occasions when people receive spoiled food, they are often not provided a replacement meal. For example, one declarant reported that "[o]n or about May 5, 2026, we received meals that we think had expired. The meal was chicken penne pasta with basil broccoli cream, and the milk in the cream tasted sour as if it had expired. We all returned our dinner because it tasted terrible and we didn't want to get sick. Staff took the trays back but did not give us anything else to eat. We went to sleep without dinner."

47

133.    Detained people at Camp East Montana have no access to commissary, meaning that there is no option for people to purchase extra food to supplement meager portions or foul-tasting meals.

134.    The lack of adequate, healthy, and filling meals seriously impacts the physical and mental health of people detained at Camp East Montana. For example, a Named Plaintiff reported that "[b]ecause of the lack of food, I feel low energy, tired, anxious, and stressed."

135.    People detained at Camp East Montana lose weight because the quantity and quality of the meals are inadequate, describing it as "the bare minimum just to keep us surviving." For example, one individual reported losing nearly 30 pounds in just three weeks. Many others reported losing significant amounts of weight while housed at Camp East Montana.

136.    The lack of adequate food and nutrition has caused stress and tension in the housing units, with people resorting to stealing and fighting over food, and the guards doing nothing to address it.

137.    People regularly protest and complain about the food. It is so bad that despite the little food that they receive, and because the facility staff does not improve conditions, people are willing to go on hunger strike in hopes of improving conditions.

138.    Others have reported not receiving special diets necessary for their medical conditions. Even when they receive special diets, the food is substantially the same as the regular diet.

139.    For example, one person who is diabetic and has high blood pressure reported that although her food says "medical," "the food is exactly the same as the food that the other detainees are receiving. It's rice, potatoes, beans, chicken, and vegetables. It's the same as what others are eating. Even when I eat this 'special diet,' I still feel nauseous and lightheaded, headaches, because

the food is not good, not enough quantity, and badly seasoned (it has a sauce that is sour and tastes horribly)."

140.  During Easter week, for example, the facility provided the same meal three times a day in at least one pod that only consisted of "carrots in water or potatoes" with a small protein. On the fourth day of receiving this "Easter meal, about 6-7 people [] complained to the guards." People "protested by returning the meals." But the guards told the people that "if [they] did not want that food then [they] would not get anything else." After these complaints, the facility staff withheld food and did not provide any meals.

Restrictions on Access to Counsel at Camp East Montana

141.  Yet another way in which Defendants punish those detained at Camp East Montana and drive them toward abandoning their claims to legal status in the U.S. is by limiting their communications with their retained or prospective counsel.

142.  For many people, access to their attorney is of primary importance while detained. Torn from their loved ones, they find themselves subject to a web of complex civil immigration laws. Faced with harmful and dangerous conditions of confinement, many seek legal counsel to assist them with basic functions such as accessing health care or seeking release from detention.

143.  For those who do not already have immigration counsel upon arriving at Camp East Montana, it is functionally impossible to obtain representation. Plaintiff Angye noted, "If you don't have an attorney from before you arrive at Camp East Montana, there is basically no way to find an immigration lawyer once you are here."

144.  There are only three ways for detained clients to potentially have conversations with their attorneys, assuming technology permits: (1) legal calls or virtual visits, (2) calls from

49

shared phones or tablets from the unit that may be overheard by others, or (3) in-person visits. Each of these options is hindered by a lack of actual and perceived privacy.

145. During virtual video visits, the detained person sits in a fully transparent room where guards can be seen walking past. Plaintiff Navdeep described that "the guards that are walking around outside the virtual visitation booth can see me and my mouth moving and they might also be able to hear me." In addition, guards occasionally enter the transparent rooms mid-conversation while the detained person is meeting with counsel.

146. Camp East Montana does not offer any way for detained people to make outgoing confidential legal calls. Instead, detained people have to use the tablets—if they have sufficient funds and access to a tablet—to place a call in the open housing units, where their calls will be monitored by the facility and easily overheard by everyone else in the open housing unit.

147. Officials at Camp East Montana erode the privacy of both virtual visits and in-person visits. Officials tend to poke their heads into the visitation room while the conversation is ongoing. In-person legal visits are conducted in makeshift rooms inside one of the tent structures, separated only by thin plastic partitions and each with a lightweight door and a plastic window that suggests privacy without providing it. The rooms have no ceilings and open into the tent structure above, meaning conversations carry easily into neighboring rooms and across the tent. Plaintiff Navdeep described that while he was speaking to his own attorney during a visit, he could "hear people speaking with their lawyers in the rooms around us."

148. For in-person and virtual visitation, attorneys must attempt to sign up through the online system at least 24 hours in advance, even if they must urgently meet with their client, and visits are restricted to just one hour time blocks. At times, counsel signs up to attend a visit, but

50

officials fail to inform the detained person about the visit, so they are never given the opportunity to appear.

149.    Consistent, clear, and confidential access to counsel is especially critical for those in immigration detention. Immigrants seeking legal counsel must discuss highly personal, traumatic aspects of their life with counsel, which relies on them feeling a sense of safety do so. The attorney-client relationship relies on trust to operate.

**Healthcare at Camp East Montana Is Grossly Inadequate**

Inadequate Intake Procedures and Continuity of Care

150.    The intake process at Camp East Montana is delayed and puts people at risk of harm by forcing people who have not yet been medically screened and may have infectious diseases together in cramped quarters for extended periods of time.

151.    The medical screenings themselves are cursory, inconsistent, and held in nonconfidential spaces. Plaintiff Angye was asked just "basic questions like my name and date of birth." People report, among other things, not receiving tuberculosis skin tests, not being asked basic questions about their health, and nurses seemingly acting outside their scope of practice, including by not elevating concerns to the relevant practitioner and by informing people that basic care and some medications, including psychiatric medications, are not available at the facility. Another Named Plaintiff noted that he told medical staff at intake that he had depression symptoms, but he did not feel comfortable sharing any details because people around him could hear what he was saying.

152.    People arrive at Camp East Montana with a wide range of serious healthcare needs, including people undergoing chemotherapy, people who require insulin, people who are pregnant, and people on various medications, including for tuberculosis and HIV. During and after intake,

people do not timely or consistently receive the medications and care they need, even when they inform custody and healthcare staff repeatedly of their urgent need for insulin, HIV medication, or tuberculosis medication, and even when they have their medication in their personal property.

153.    People can go days and weeks after arrival without receiving their medication, and people report not receiving comprehensive medical exams in the weeks following the initial intake screening. Even when they do receive their medications, there are gaps between the refill periods which force people to wait days, sometimes weeks, to receive their refills.

154.    When people leave Camp East Montana, including when they are released to the community or transferred to another detention facility, there is also no continuity of care. People are not transferred with a requisite supply of medication or information about their medical condition and medication needs. One man was released from Camp East Montana directly to a shelter in El Paso without any medication for his tuberculosis. And a detention facility down the road from Camp East Montana informed people that they had to re-do medical tests because staff at Camp East Montana had not transferred relevant medical records. One man with diabetes was told that the El Paso Service Processing Center received no medical records upon his transfer, and he had to be tested for diabetes again at that location. This meant that the next detention facility had to start from the lowest dosages of each diabetes management drug. As a result, he did not receive the full proper dosage of his medications for over a month.

155.    Camp East Montana has also failed to produce medical records to attorneys despite attorneys submitting properly signed medical waivers and their repeated and months-long attempts to follow thefacility's procedures for doing so on behalf of the Named Plaintiffs, declarants, and their counsel. Camp East Montana has also refused to provide detained persons with their own medical records when they request them.

Medication Administration

156.    ICE Detention Standards require that "[m]edication will be distributed according to the specific instructions and procedures established by the health care provider."[83]

157.    Even when prescribed medication, including medication for HIV, people at Camp East Montana often do not receive it timely, consistently, or at all, posing a serious risk of harm.

158.    People with insulin-dependent diabetes are not provided insulin, are provided insulin at inappropriate times, and/or are not provided appropriate diets, which can lead to high glucose levels and other harmful consequences. While at home, one individual managed his diabetes with insulin multiple times a day alongside two other medications. While detained at Camp East Montana, the daily single dose of insulin he was given was often late or missed altogether. He was told that the other two medications were not available at the facility and would be ordered, but he never received them. He brought those medications with him from home but was not permitted to take them while in detention. Another woman was told that the facility could not provide her with her weekly insulin shot because it was too costly, so she has gone weeks without it.

Sick Call and Responses to Medical Complaints

159.    People detained at Camp East Montana must navigate an inconsistent and unreliable process for requesting medical care, with unclear and ever-changing rules, even in emergency situations.

160.    Medical requests are largely ignored at Camp East Montana, even after a detained person has put in several requests. At best, it often takes multiple days for a sick call to be addressed. Requests for basic medication like Tylenol or allergy medication can take days or weeks. Requests

---

[83] 2025 NDS § 4.3.

for urgently needed care, including for extreme pain, are not processed timely. Plaintiff Navdeep reported that "It takes a long time to get medical care here. If you have or develop a serious condition, you're out of luck." He submitted multiple sick call forms over the course of multiple days for pain in his mouth before he was finally given painkillers. It took additional time for him to receive antibiotics.

161.    When people are seen, it often is in the middle of the night, and they are left to wait for hours before or after the appointment. This forces people to choose between sleep and medical care and indicates insufficient healthcare staffing. Often, people are seen in nonconfidential spaces, including hallways, where others can see and overhear what they are telling medical staff, evidencing a lack of adequate clinical space and basic principles of appropriate healthcare. When people are seen, it is often abbreviated encounters with nurses without seeing a doctor.

162.    ICE's own February 2026 investigation found that "the facility did not promptly refer nor answer medical grievances." [84] In fact, the inspection found that in 12 out of 39 logged medical grievances, the facility did not promptly refer or answer medical grievances, sometimes taking 14 business days to respond.[85]

Chronic and Specialty Care

163.    Camp East Montana is ill-equipped to manage people with complex healthcare needs, including people on chemotherapy, people with liver and prostate issues, and people who require specialty care. At least two such people already have died while at Camp East Montana or shortly thereafter. Neither should have been accepted into the facility if staff there could not provide access to appropriate chronic and specialty care. In another example, one man with severe

---

[84]  February 2026 Inspection Report.

[85]  *Id.*

prostate issues, and who, sometimes cannot walk because of his condition, was told by a guard during an emergency medical appointment that the facility would not pay for him to see a urologist. The same man has also not received the proper medication to treat his prostate.

164.    Camp East Montana is ill-equipped to deal with serious chronic care conditions such as diabetes, high blood pressure, ulcers, and high cholesterol. People report not receiving proper medication for these chronic conditions, if they even receive it at all. For example, one woman has not received her weekly insulin shot even after being at the facility for about three weeks. People do not receive special diets, instead they receive the same food as others or must choose the Kosher diet which does not help their condition. Even when they eventually receive a proper special diet, it is limited to a few days and is calorically insufficient, bland food. In one instance, a woman who has diabetes was prescribed a "medical meal" but she has observed that it is the exact same meal that the general population receives. As a result, she has felt dizzy, nauseous, and sick.

165.    ICE's February 2026 inspection confirmed five deficiencies in the Medical Care standard, including failure to properly evaluate and isolate a patient with suspected pulmonary tuberculosis—a priority component deficiency—and failure to evaluate co-occurring HIV risk.[86]

Infectious Diseases

166.    The broken healthcare delivery system at Camp East Montana, along with poor sanitation, crowded living units, and other grossly inadequate conditions of confinement, has had dire and far-reaching public health consequences and placed everyone at Camp East Montana at risk of harm. In early February 2026, two cases of tuberculosis and 18 cases of Covid-19 were

---

[86] February 2026 Inspection Report at 11-12.

detected at the facility.[87] These outbreaks were foreseeable. At the time, the facility held roughly 3,100 detained people, around one-third of whom had a chronic illness.[88] Less than three weeks later, on February 26, 2026, the situation worsened when local health officials confirmed that seventeen measles cases were reported in El Paso, including thirteen at Camp East Montana.[89] The specter of transmission into the broader El Paso community and across the border into Ciudad Juarez galvanized local health officials, who scrambled to coordinate containment, all while being hampered by ICE's delayed and incomplete reporting.[90]

167.    ICE's own inspection found violations of protocols regarding tuberculosis, including failure to house a "detainee with symptoms suggestive of pulmonary tuberculosis disease (TB)" in "an airborne infection isolation room with negative pressure ventilation."[91]

168.    On March 3, 2026, Camp East Montana closed to visitors after at least 14 cases of measles were detected at the facility.[92] Yet, for those detained inside, the closure brought little meaningful protection. People detained during that time reported receiving little to no information about what was happening or the spread of airborne diseases such as measles, no systematic

---

[87] Colleen DeGuzman & Lomi Kriel, *Two Tuberculosis Cases Detected at Camp East Montana ICE Facility*, Tex. Trib. (Feb. 7, 2026), https://www.texastribune.org/2026/02/07/ice-facility-el-paso-tuberculosis/ [https://perma.cc/6ZBY-RYTL].

[88] *Id.*

[89] El Paso Matters, *17 Measles Cases Reported in El Paso, Including 13 at ICE Camp East Montana*, Tex. Trib. (Feb. 26, 2026), https://www.texastribune.org/2026/02/26/measles-el-paso-camp-east-montana-ice/ [https://perma.cc/3MWT-RQRS].

[90] Priscilla Totiyapungprasert, *How Measles Reporting Gaps by ICE, Hospital Delayed El Paso's Response to Outbreak*, El Paso Matters (May 3, 2026), https://elpasomatters.org/2026/05/03/el-paso-texas-measles-outbreak-ice-camp-east-montana-west-texas-detention/ [https://perma.cc/EVT4-WGQD].

[91] February 2026 Inspection Report.

[92] Lomi Kriel & Alex Nguyen, *14 Measles Cases Reported at El Paso ICE Tent Camp*, Tex. Trib. (Mar. 3, 2026), https://www.texastribune.org/2026/03/03/texas-ice-detention-measles-east-montana-dilley-el-paso/ [https://perma.cc/TN8S-LW3Q].

vaccination or testing campaign, and no personal protective equipment, such as masks, to reduce transmission. Cleaning frequency and ventilation, already inadequate, remained unchanged. But other conditions worsened, including the ability to go outside, clip nails, or shave.

169.    Facility officials provided no transparency about what protocols, if any, were in place. They "isolated" 112 people who had been exposed, but they provided no information about these people's status or condition. The walls in the housing units at the Camp East Montana encampment do not reach the ceilings. As a result, all people in the same tent, even if located in separate housing areas, breathe the same air. During an outbreak of an airborne disease, such as the measles outbreak, there is no way for detained people to protect themselves from the air around them, including the air in quarantined housing units located right beside them. In short, while the facility closed its doors to the outside world, those inside remained as vulnerable as before, left to weather a contagious outbreak in the same conditions that allowed it to spread in the first place.

Failure to Timely Respond to Urgent and Emergent Medical Issues

170.    Camp East Montana fails to timely and appropriately respond to acute medical emergencies or provide care with the urgency that the medical situation requires.

171.    The follow-up care provided at Camp East Montana when a patient returns from an emergency room visit is inadequate and places people at risk. For example, Plaintiff Angye was placed into a solitary housing unit with limited monitoring immediately after being returned from the hospital.

172.    Serious medical and mental health neglect appears to have been routine at Camp East Montana. Reporting based on 130 calls in the first five months of operation describe detained

57

people facing assaults, pregnancy complications, breathing problems, seizures, and repeated suicide and self-harm attempts after the camp opened last August.[93]

173.    Even visibly sick people at Camp East Montana do not receive help from guards. For example, one declarant shared that "on or about May 13, 2026, at around 11 PM, I was at my bunk bed talking to others. I saw a person who was sitting down at the lunch bench table who had an arm sling. He was sleeping and he looked very sick. Suddenly, the man collapsed and fell on the floor. We called the guards for help. When the Captains arrived, we asked why they were not helping the man or picking him up. The captains told us to shut up. The medics arrived and brought a gurney. But I saw that the man picked himself up and struggled to get on top of the gurney without any help."

174.    Similarly, another declarant reported that on or about May 23, 2026, a woman in her unit had reported to guards that she had severe pain in her lower back, had difficulty breathing and walking, and a high fever.  She sat on the metal tables "crying in pain for hours." She noted that "no guard or facility member had helped her," and reported that the "guard said that [they] had called the medical team but that the medical team had not arrived." Hours later, when the declarant sat next to the infirm woman, "the woman collapsed and fainted." The declarant "begg[ed] the guards to come and help [her] because [she] could not carry her." "The guards were just yelling at [the declarant] asking [her] what happened," and told the declarant that they could not help her or touch her. Instead, they just left the declarant there alone to "help support [the

---

[93] Jeff Abbott, *Exclusive: 911 calls from migrant detention center highlight dire conditions*, El Paso                Times                (Dec.                20,                2025), https://www.elpasotimes.com/story/news/immigration/2025/12/20/911-calls-from-camp-east-montana-detention-center-highlight-dire-conditions/87792917007/?gnt-cfr=1&gca-cat=p&gca-uir=true&gca-epti=z116029p001250c001250e001200v116029d--50--b--50--&gca-ft=152&gca-ds=sophi [https://perma.cc/9WTJ-CNFK].

woman who fainted], but [she] could not sustain her body weight." When the declarant laid the woman on the ground, the infirm woman "started to convulse aggressively. Only then is when the medical team arrived with a first aid kit."

Inadequate Mental Health Care Services

175.    Many people at Camp East Montana experience severe mental health distress, including suicidality, as a result of preexisting mental health conditions and because of the conditions they are subject to at Camp East Montana, which include: sudden isolation from their families, constant hunger, sleep deprivation, lack of exposure to sunlight and regular physical activity, the fear of coerced deportations, and inadequate healthcare.

176.    Officials at Camp East Montana have gamified suicide. One person formerly detained at Camp East Montana told a news outlet that he had overheard a security guard talking about bets made among facility staff over which detained person would be the next to die of suicide.[94] The guard said and the total pot depended on the outcome.[95]

177.    For at least the first five months of its operation, staff at Camp East Montana made nearly one 911 call per day.[96] In one of those calls, a doctor said a man was banging his head against the wall while expressing suicidal thoughts. The calls also show that detained people have tried to harm themselves and have expressed suffering.

178.    For example, a declarant, who had previously attempted suicide at Torrance Detention Facility, was told that his only option for addressing his suicidal ideation at Camp East

---

[94] Morgan Lee, Ryan J. Foley & Michael Biesecker, *'Worse than a Prison': 911 Calls, Interviews Reveal Problems at ICE's Largest Detention Camp*, AP News (Mar. 6, 2026), https://apnews.com/article/ice-detention-camp-conditions-911-calls-738c63a2b96a90c2f85a668ec2fd3b5b [https://perma.cc/VP9P-FVGS].

[95] *Id*.

[96] *Id*.

Montana was to be taken "to the observation cell where they would strip [him] of [his] clothing, and [he] would be there alone for days in solitary confinement." As he reported, "All I wanted was to talk to a therapist about my experiences, as that has helped me in the past, outside of Camp East Montana. I don't want to be banished to a solitary cell alone. I do not deserve this kind of negative hurtful mistreatment happening to me."

<u>Exposure to Hazardous Levels of Desert Dust Affecting Breathing</u>

179.    The El Paso region's airborne dust that penetrates Camp East Montana's makeshift tents cause respiratory problems for detainees.[97] Camp East Montana is located within one of the most persistent dust-producing regions of North America, where Valley Fever (coccidioidomycosis) is endemic.[98]Inhalable particulate matter originating from El Paso's desert landscape during dust events can reach hazardous levels.[99] Desert dust in the El Paso area is mostly fine soil and sand particles lifted by strong winds.[100] El Paso dust events correspond to increases in respiratory problems, and very fine particles are the ones most likely to penetrate deep into the lungs.[101] Desert dust can also carry fungal spores, which can lead to fungal infection, creating an additional breathing risk beyond simple irritation.[102] Detainees at Camp East Montana have complained about struggling to breathe and experiencing serious respiratory symptoms from dust that pours into the tents they are forced to live in. They describe dust coating their beds, tables,

---

[97] *See* Herrera-Molina, E.; Gill, T.E.; Ibarra-Mejia, G.; Jeon, S. *Associations between Dust Exposure and Hospitalizations in El Paso, Texas, USA*. Atmosphere 2021, 12, 1413. https://doi.org/10.3390/ atmos12111413.

[98] *Id.* at 1413–14.

[99] *Id.* at 1413–14.

[100] *Id.*

[101] *Id.* at 1414.

[102] *Id.*

and even food that they eat. Even short-term dust exposures are associated with significant increases in hospitalizations.[103] Further, a study published on March 24, 2026, found a significant ascending trend in valley fever (coccidioidomycosis) cases in El Paso from 2013 to 2022, with incidence rates more than tripling and strong associations to El Paso's meteorological factors like extreme heat, high wind gusts, and elevated airborne dust concentrations, particularly inhalable coarse particles like fungal spores.[104]

180.    Despite repeated detainee complaints, officials at Camp East Montana knowingly subject people to high levels of hazardous dust infiltration without providing masks, air filtration, relocation, or medical monitoring for resulting respiratory distress. Officials are aware of the health dangers from pervasive dust, linked to respiratory illness and fungal infections in the El Paso region, yet consciously disregard them by withholding basic protective measures and refusing to provide reasonable safety. Such punitive persistence elevates substandard tent housing to willful infliction of harm, demanding immediate cessation and remedial action.

<u>Dental Care</u>

181.    Staff have told people detained at Camp East Montana that the only dental care provided is extractions, even when a declarant's tooth was broken by ICE agents during their arrest. But a broken tooth is a serious dental injury that should have been elevated to a dentist. Not only is it painful, but because the nerve may be exposed, there is an increased risk of infection. The proper treatment could be a cap—a straightforward dental procedure that was not carried out.

---

[103] *Id.* at 1420.

[104] *See* Gabriel Ibarra-Mejia et al., *The ascending trend of valley fever in El Paso, Texas and its association with regional meteorological and dust factors*. 70 Int. J. of Biometeorology 101, 110–113 (2026), https://doi.org/10.1007/s00484-026-03159-8 [https://perma.cc/34QH-HLZX].

182.    Inadequate access to dental hygiene and lack of access to dental care degrades the dental health of people detained at Camp East Montana. Plaintiff Navdeep did not have dental problems before arriving at Camp East Montana, but experienced tooth pain in his back molars and swelling after receiving inadequate amounts of toothpaste. A medical staff member told him that he would need a root canal but informed him that root canals were not performed at Camp East Montana. Plaintiff Navdeep still has not seen a dentist and continues to feel intense sensitivity in his mouth, especially when drinking cold water.

**Defendants Demonstrated Intent to Create Punitive Conditions at Camp East Montana**

183.    Despite being a civil detention center, conditions at Camp East Montana are overwhelmingly punitive. That is so just based on the conditions themselves, without more. But the punitiveness of the detention is also reflected in something else: Defendants' clear expressed intent to punish people like the Plaintiffs and the putative Class.

184.    As noted above, and as courts have recognized, Defendants have been clear that they are purposefully creating unbearable and harsh detention conditions in an effort to punish and pressure immigrants to leave.

185.    In addition to that evidence of punitive intent, Defendants have repeatedly emphasized that the purpose of Camp East Montana is to detain "criminal aliens." A barrage of press releases and tweets by ICE and the ERO El Paso office, some entitled "Worst of the Worst," accompanied by mug shots, photographs of people in handcuffs being forced into patrol cars, and lists of past crimes, suggest an agency determined to re-punish people for past criminal convictions. Though the vast majority of people at Camp East Montana have no criminal record, these statements appear to group all people at Camp East Montana into the category of "criminal."

**Defendants Had Early and Repeated Notice of Abusive Conditions at Camp East Montana and Yet Have Failed to Remedy Any Conditions**

62

186.    None of these complaints concerning conditions at Camp East Montana will come as a surprise to Defendants. Reports of abusive, inhumane, and dangerous conditions followed almost immediately after the facility opened and have continued unabated since then. Defendants therefore have been on notice about the dangerous and abusive conditions that are pervasive at Camp East Montana. Yet Defendants have done nothing to address to rectify those conditions or ensure compliance with even the most basic provisions of their own detention standards—instead, Defendants have taken affirmative steps to avoid oversight and corrective action, shielding abuses from the public, and issuing categorical denials that strain credulity.

187.    In September 2025, a month after Camp East Montana opened, the detention oversight unit of ICE found that people detained at the facility were subjected to conditions that violated at least 60 federal standards for immigration detention. According to the Washington Post, which obtained a copy of the inspection report that remains unavailable to the public, the detention center "failed to properly monitor and treat some detainees' medical conditions, lacked basic procedures for keeping guards and detainees safe and for weeks did not provide many of them a way to contact lawyers, learn about their cases or file complaints."[105] Inspectors noted that Camp East Montana had no approved security policy and that armed guards stationed along the perimeter of Camp East Montana were not instructed on situations that would justify the use of lethal force.[106] The Washington Post noted that throughout much of August, when relatives, lawyers, or others tried to search the ICE detainee locator, the site failed to show that certain detained people were in fact being held at Camp East Montana. Instead, the site displayed an ICE phone number

---

[105] *60 Violations*.

[106] *Id.*

that rarely connected[107] All the while, people detained at Camp East Montana struggled to make calls using the limited tablets that worked inconsistently. The result was that people could be—and were—held at Camp East Montana without their families, attorneys, or anyone else knowing their location.

188.    Defendants DHS responded by press release the next day, stating that the Washington Post report was "categorically false" and a "smear campaign" and accusing the reporters of "twist[ing] preliminary inspector notes."[108]

189.    That same month, Representative Veronica Escobar sent a letter to Defendants DHS and ICE following two Congressional oversight visits to Camp East Montana. The Representative noted in her letter that "my staff and I observed serious issues regarding insufficient staffing, lack of access to the facility for legal counsel, and unresponsive phones. Detainees we spoke to told us about being served rotten food and shared urgent concerns over the quality of the drinking water at the facility, which they reported had a bad smell and made them feel sick."[109]

190.    Congresswoman Escobar sent a follow up letter to Defendants DHS and ICE on November 7, 2025. In that letter, the Congresswoman noted that her office had received reports from people held at Camp East Montana that "the drinking water at the facility continues to taste foul," that "the food quality for detainees has not improved, and some detainees are skipping meals

---

[107] *Id.*

[108] U.S. Dep't of Homeland Sec., *DHS Debunks Washington Post's False Reporting about Camp East Montana at Fort Bliss*, Sept. 17, 2025, https://www.dhs.gov/news/2025/09/17/dhs-debunks-washington-posts-false-reporting-about-camp-east-montana-fort-bliss [https://perma.cc/9YDM-YK4C].

[109] Letter to Secretary Kristi Noem and Acting Director Todd Lyons from Member of Congress Veronica Escobar (Sept. 26, 2025), https://escobar.house.gov/uploadedfiles/9.26.25_letter_to_ice_on_urgent_concerns_regarding_camp_east_montana.pdf [https://perma.cc/GRM9-6PG2].

altogether due to a lack of dietary accommodations," "that their dormitory pods are cleaned only once every eight days," that laundry service was inconsistent, "that the facility frequently experiences flooding and sewage backups," and that detainees were receiving inadequate medical care."[110] On that last point, the letter noted that some detainees are denied access to medical appointments altogether, while "access to necessary medications has been inconsistent," flagging the specific case of "a detainee who is living with HIV but has not been receiving his medication."[111]

191.    In December 2025, human and civil rights organizations, including some of undersigned counsel, submitted a letter to Defendants detailing abusive conditions of confinement at Camp East Montana, based on over 45 interviews with people held there.[112] This demand letter was accompanied by sworn declarations. The organizations reported that the issues uncovered by the Post persisted. They detailed multiple incidents of excessive use of force by guards against detained people, lack of adequate food and the provision of spoiled food, failure to provide basic hygiene supplies, squalid conditions, a lack of cleaning supplies, prolonged detention in hold rooms, lack of outdoor recreation, and unreasonable barriers to counsel. They reported that officials beat and threatened people held at Camp East Montana in an attempt to get them to voluntarily deport across the border to Mexico, a short distance away.

---

[110] Letter to Secretary Kristi Noem and Acting Director Todd Lyons from Member of Congress Veronica Escobar (Nov. 7, 2025), https://escobar.house.gov/uploadedfiles/10.27.25follow_up_letter_to_dhs_on_camp_east_monta na.pdf [https://perma.cc/Y6JC-PDDD].

[111] *Id.*

[112] ACLU, Human Rights Groups Urge ICE to End Immigration Detention at Fort Bliss Military Base, Halt Abusive Third-Country Deportations, Dec. 8, 2025, https://www.aclu.org/press-releases/human-rights-groups-urge-ice-to-end-immigration-detention-at-fort-bliss-military-base-halt-abusive-third-country-deportations [https://perma.cc/7FQ5-6R82].

192.    Within days, before any chance to meaningfully investigate, the Assistant Secretary of Homeland Security for Public Affairs reflexively dismissed the letter as "fearmongering clickbait" and repeated the assertion that "any claim that there are 'inhumane' conditions at ICE detention centers are categorically false."[113] Defendant DHS did not meet with the organizations to discuss their concerns.

193.    ICE Office of Professional Responsibility conducted an inspection of Camp East Montana between February 10-12, 2026.[114] The inspection found 49 "deficiencies," *i.e.* violations of detention standards, policies, or operational procedures. Among other deficiencies, the report found:

- With respect to the grievance system, "the facility did not make every effort to resolve the grievances in a timely manner," that "the facility did not promptly refer nor answer medical grievances," and that "the facility did not follow its policy of urgent response to any grievance alleging any threat of a detainee's health, safety or wellbeing" finding that "in 2 out of 10 logged emergency grievances, the facility responded to the emergency grievances in 6 and 8 days."

- With respect to use of force, 22 separate deficiencies, including that "the facility did not forward UOFR documentation to ICE/ERO for review," "there was no documentation indicating that staff sought assistance from mental health or other medical personnel immediately after gaining physical

[113] KVIA ABC-7, *ACLU Alleges Beatings, Sexual Abuses Happened at Camp East Montana on Fort Bliss*, Dec. 8, 2025, https://kvia.com/news/border/2025/12/08/aclu-alleges-beatings-sexual-abuses-happened-at-camp-east-montana-on-fort-bliss [https://perma.cc/5Z38-8YNJ].

[114] February 2026 Inspection Report.

control of the detainees," "medical personnel did not document the detainees' examinations or treatment of injuries," "all personnel who used force or observed the UOFR did not document their actions or observations in a written report before leaving their shift," "facility staff did not prepare [use of force] reports," "the after-action review team did not determine or document whether the incidents required further investigation or referral to law enforcement."

- With respect to sexual abuse and assault prevention, "the facility has not implemented a coordinated, multidisciplinary team approach to responding to sexual abuse and assault."

- With respect to medical care, at least one "detainee with symptoms suggestive of pulmonary tuberculosis disease (TB) was not housed in an airborne infection isolation room with negative pressure ventilation" and were "not evaluated for human immunodeficiency virus."

- With respect to self-harm and suicide prevention, "staff did not accurately document required checks to prevent significant self-harm and suicide."

- With respect to personal property, "detainees did not have designated space, such as lockers or other securable areas, for storing their authorized personal property."

- With respect to telephone access, "housing unit officers did not conduct daily serviceability checks of tablets, promptly report out-of-order tablets for repair, nor ensure quick completion of repairs."

67

194.     On February 26, 2026, 24 members of Congress wrote a letter to Defendants calling for Camp East Montana to be shut down. In that letter, Congressmembers noted "constant and consistent problems at the facility since it opened," including "inadequate meals, including food that is rotten or frozen," detainee complaints about "sporadic access to outside spaces and recreational areas," that "dormitory pods are cleaned only once every eight days, despite pods housing up to 72 people at a time," inconsistent laundry services, that "the facility experiences flooding and sewage backups when it rains, leading to stagnant water," "irregular access to [] legal counsel," with the "biggest concern" being "the inadequate medical care being provided to detainees."[115]

195.     On March 25, 2026, Representative Kelly Morrison conducted an oversight visit at Camp East Montana and found "disturbing reports of inadequate medical care and human rights abuses," "including overcrowding, shackling, denial of medical care, and other inhumane conditions."[116] On medical care specifically, Representative Morrison noted cases of lack of access to prenatal care and a report of "a man with diabetes who is not receiving the medication he needs."[117]

196.     On April 6, 2026, Representative Gabe Vasquez conducted an oversight visit at Camp East Montana, reporting that detainees complained of "limited access to health care (including the withholding of medications), insufficient food containing little to no protein, a lack

---

[115] Letter from Veronica Escobar, et al, to DHS Secretary Kristi Noem, Feb. 26, 2026 https://escobar.house.gov/uploadedfiles/shut_down_camp_east_montana_final.pdf. [https://perma.cc/AK96-H3MR].

[116] Press Release, *U.S. Rep. Kelly Morrison Conducts Oversight of Nation's Largest Detention Facility in Texas Where Minnesotans Are Being Held*, March 25, 2026, https://morrison.house.gov/media/press-releases/us-rep-kelly-morrison-conducts-oversight-nations-largest-detention-facility. [ https://perma.cc/LDG9-3SZA].

[117] *Id.*

of access to personal care products (like shampoo), forced sleep deprivation, poor sanitation, and verbal abuse from facility guards."[118] During that visit, Representative Vasquez noted that Defendants confirmed "the recent measles outbreak" and that "[i]nstances of tuberculosis and COVID-19 were also reported by ICE officials."[119]

197.    The reported changes in contractors at the facility have done nothing to address any of the repeated and ongoing abuses at Camp East Montana.

198.    After Defendants failed to respond substantively to their December 2025 letter, the same human and civil rights organizations sent a follow-up letter on May 22, 2026, notifying Defendants about additional concerns regarding harsh conditions of solitary confinement, ailments from inhaling dust that flows into the facility, serious difficulty obtaining medical records, and denial of access to grooming and hygiene.

199.    Defendants' abusive conditions at Camp East Montana—which were documented in the December 2025 and May 2026 letters, Congressional oversight visit reports, and in Defendants' own inspection reports—are ongoing and establish that officials had actual notice of unconstitutional conditions, yet failed to act. Chronic reports of spoiled food, untreated medical needs, prolonged exposure to extreme temperatures, guard abuse, pervasive dust exposure, and unsanitary living environments, among other conditions, reflect not isolated lapses but entrenched, systemic failures that pose an obvious and substantial risk to detainees' health and safety.

200.    Despite ample notice, officials have not taken reasonable corrective measures and, in several respects, have worsened conditions by maintaining overcrowding, restricting access to

---

[118] Press Release, *Rep. Gabe Vasquez Conducts Congressional Oversight Visit at Camp East Montana*, April 6, 2026, https://vasquez.house.gov/media/press-releases/rep-gabe-vasquez-conducts-congressional-oversight-visit-camp-east-montana. [https://perma.cc/D83Y-VSMJ].

[119] *Id.*

hygiene and medical care, and imposing punitive solitary confinement within already dangerous environments. These conditions are longstanding, pervasive, and well documented, and Defendants' continued inaction in the face of known risks shows their deliberate indifference—not mere negligence—to detainees' constitutional rights.

## INJUNCTIVE RELIEF

201. Plaintiffs re-allege and incorporate by reference paragraphs 1–200 of this Complaint as if fully set out herein.

202. Plaintiffs and the putative class are entitled to preliminary and permanent injunctive relief.

203. Defendants have acted, and threaten to act, to deprive Plaintiffs and others they seek to represent, of their constitutional and statutory rights.

204. Plaintiffs and those similarly situated have suffered irreparable physical and psychological injury and the loss of fundamental due process and Fifth Amendment rights. They have been and will continue to be subjected to serious risk of irreparable harm as the result of their detention at Camp East Montana.

205. In light of the December 8, 2025, and May 22, 2026, letters to Defendants and reports from Congressional visits, and Defendants' own internal inspections, Defendants have known and continue to know of the conditions and deprivations alleged herein. In the alternative, Defendants have acted with deliberate indifference and reckless disregard toward the conduct and conditions described herein.

206. Plaintiffs and putative class members have no plain, adequate, or speedy remedy at law.

## CLASS ACTION ALLEGATIONS

207. Plaintiffs re-allege and incorporate by reference paragraphs 1–206 of this Complaint as if fully set out herein.

208. Plaintiffs Angye, Navdeep, Rodriguez Flores, and ZOR bring this lawsuit as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2) on behalf of themselves and all other persons who are similarly situated.

209. Plaintiffs seek to represent a class consisting of and defined as follows: "All persons who are now, or in the future will be, in the legal custody the U.S. Immigrations and Customs Enforcement ('ICE') and detained at Camp East Montana" ("the Class").

210. The Class is easily ascertainable. Defendants keep records of who is detained in the facility.

211. The putative Class is so numerous that joinder of all members would be impracticable. Camp East Montana has a capacity of 5,000 beds and has detained over 4, 000 people at a time.[120] As of April 6, 2026, ICE reported that it was holding 821 people at Camp East Montana.[121] Further, with the probability of future class members, the number of class members will increase substantially over time. The putative class is also fluid, with people being brought to and removed from Camp East Montana approximately every day, making joinder of all members not just impracticable but impossible.

212. The lawfulness of the proposed class members' detention presents common questions of fact and law. All class members are similarly situated in that they are civilly detained at Camp East Montana, subject to the same conditions of confinement challenged here. All class

---

[120] U.S. Representative Gabe Vasquez, *Rep. Gabe Vasquez Conducts Congressional Oversight Visit at Camp East Montana* (Apr. 6, 2026), https://vasquez.house.gov/media/press-releases/rep-gabe-vasquez-conducts-congressional-oversight-visit-camp-east-montana [https://perma.cc/RQS6-HXT8].

[121] *Id.*

members are similarly situated in that conditions at Camp East Montana are dangerous and present a grave risk of serious injury, illness, or death from further detention at Camp East Montana. They all share the common question of whether their continued detention under the conditions at Camp East Montana violates the Due Process Clause and the Administrative Procedure Act.

213. The claims of the proposed class representatives, Plaintiffs, are typical of the claims of the putative Class. Each of the Plaintiffs, like all putative class members in the Class, is civilly detained at Camp East Montana, subject to the same conditions of confinement challenged here. The claims of the Plaintiffs are typical of the claims of the proposed class. All proposed class representatives face a grave risk of serious injury, illness, or death from the conditions of confinement challenged here, and all raise the same due process challenge to their detention. The Plaintiffs' legal challenges to their detention are identical to those of the proposed class.

214. Plaintiffs will fairly and adequately represent the interests of all members of the putative Class because they seek relief on behalf of the class they represent as a whole and have no interest adverse or antagonistic to other members of the class. The Plaintiffs are adequate representatives because they seek the same relief as the other members of the class: declaratory and injunctive relief to remedy violations of the Fifth Amendment, and declaratory and set-aside relief under the Administrative Procedure Act. The Plaintiffs are represented by counsel from the American Civil Liberties Union Foundation National Prison Project, the American Civil Liberties Union Foundation of Texas, Texas Civil Rights Project, and Farella Braun + Martel LLP. Counsel are experienced collectively in class action, complex litigation, immigration detention, constitutional law, and the Administrative Procedure Act.

215. Defendants have acted on grounds generally applicable to the class by continuing to detain them in circumstances where they are likely to suffer serious injury, medical

complications, and/or die. Thus, injunctive and declaratory relief is appropriate with respect to the class as a whole.

## CLAIMS FOR RELIEF

### FIRST CLAIM
**(Violation of the Fifth Amendment to the United States Constitution)**
**(Conditions Constituting Punishment)**
**(By All Plaintiffs Against All Defendants)**

216. Plaintiffs re-allege and incorporate by reference paragraphs 1–215 of this complaint as if fully set out herein.

217. The Fifth Amendment prohibits the use of detention as a means of punishing those who are civilly detained. The government unconstitutionally punishes people who are civilly detained when it subjects them to conditions that are not reasonably related to a legitimate governmental objective.

218. The conditions described herein, which are illustrative and not exhaustive, represent facility-wide policies, structural deficiencies, or systemic practices. These conditions violate the Due Process clause because they, individually and collectively are expressly intended to punish and are not reasonably related to legitimate, non-punitive governmental objectives.

219. Defendants violate the Fifth Amendment by holding Named Plaintiffs and class members in these conditions.

**SECOND CLAIM**

**(Violation of the Fifth Amendment to the United States Constitution)**
**(Inadequate Medical Care)**
**(By All Plaintiffs Against All Defendants)**

220.    Plaintiffs re-allege and incorporate by reference paragraphs 1–219 of this complaint as if fully set out herein.

221.    The Fifth Amendment requires Defendants to provide for Named Plaintiffs' and class members' basic human needs, including adequate and necessary medical care.

222.    Defendants have deprived and continue to deprive Plaintiffs and putative class members detained at Camp East Montana at Ft. Bliss of adequate and necessary medical care by, without limitation:

    a.   Failing to provide adequate intake procedures and continuity of care;

    b.   Failing to timely, consistently or reliably respond to sick call requests or medical complaints;

    c.   Denying, delaying, or inconsistently providing medication;

    d.   Failing to provide appropriate chronic care;

    e.   Failing to provide appropriate specialty care;

    f.   Failing to provide adequate quality of care;

    g.   Inadequate medication administration;

    h.   Failing to protect against outbreaks of disease;

    i.   Failing to timely respond to urgent and emergent medical issues;

    j.   Failing to provide adequate dental care; and

    k.   Providing inadequate mental health services.

223.   These failures represent facility-wide policies, structural deficiencies, and systemic practices. Defendants' failures are not reasonably related to a legitimate governmental objective and are intended to punish people detained at Camp East Montana at Ft. Bliss.

224.   Defendants violate the Fifth Amendment by subjecting Named Plaintiffs and class members to these conditions.

**THIRD CLAIM**
**(Violation of the Administrative Procedure Act)**
**(By All Plaintiffs Against All Defendants)**

225.   Plaintiffs re-allege and incorporate by reference paragraphs 1–224 of this complaint as if fully set out herein.

226.   The 2025 NDS, under which Camp East Montana operates, set out the basic minimum requirements that Defendants (and their contractors) must meet with respect to conditions of confinement at Camp East Montana, including standards governing food quantities and quality, access to hygiene products, use of force, hold rooms, medical care, programming and recreation, and visitation, among others.

227.   An agency's unexplained failure to follow its own rules constitutes "arbitrary" and "capricious" conduct in violation of the Administrative Procedures Act. 5 U.S.C. § 706(2)(A); *United States ex. rel. Accardi v. Shaughnessy*, 347 U.S. 260, 266–67 (1954) (vacating a Board of Immigration Appeals decision that failed to comply with the agency's own requirement that the Board exercise independent judgment); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("An agency may not . . . depart from a prior policy sub silentio or simply disregard rules that are still on the books.").

228.   Defendants' own inspectors have found on at least two occasions that Camp East Montana violates dozens of NDS provisions. The facility continues to violate numerous NDS

75

provisions. Defendants' decisions to continue to operate the facility in violation of the NDS after each of these inspections constitute arbitrary and capricious final agency actions.

229.    Named Plaintiffs, and the proposed class have suffered and will imminently suffer irreparable injury as a result of Defendants' violation of the Administrative Procedures Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully ask the Court:

A. Certify the Class as described above, appoint the Named Plaintiffs to serve as representatives of the Class, and appoint undersigned counsel to represent the Class;

B. Declare that conditions of confinement at Camp East Montana at Ft. Bliss amount to unconstitutional punishment in violation of the Fifth Amendment;

C. Preliminarily and permanently enjoin Defendants from subjecting the Named Plaintiffs and class members to unconstitutional punishment in violation of the Fifth Amendment;

D. Declare that Defendants' failure to provide adequate and necessary medical care at Camp East Montana at Ft. Bliss violates the Fifth Amendment;

E. Preliminarily and permanently enjoin Defendants from denying the Named Plaintiffs and class members adequate and necessary medical care in violation of the Fifth Amendment;

F. Declare that Defendants' continued operation of the facility in violation of the 2025 NDS after multiple inspections indicated 2025 NDS violations is unlawful under the Administrative Procedure Act;

G. Set aside Defendants' decision to continue to operate the facility in violation of the 2025 NDS after multiple inspections indicated 2025 NDS violations and bar them from

continuing to operate the facility in violation of the 2025 NDS under the Administrative

Procedure Act;

H.  Preliminarily and permanently enjoin Defendants from retaliating against Plaintiffs and

other named participants in this litigation;

I.  Award Plaintiffs their attorneys' fees and costs; and

J.  Enter such other and further relief as the Court deems just and proper.


Dated: May 29, 2026

Respectfully submitted,


/s/ Kyle Virgien
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
Kyle Virgien (*pro hac vice* forthcoming)
Rita Lomio (*pro hac vice* forthcoming)
Felipe Hernandez (*pro hac vice* forthcoming)
425 California Street, 7th Floor
San Francisco, CA 94104
Tel.: (415) 343-0770
kvirgien@aclu.org
npp_rlomio@aclu.org
npp_fhernandez@aclu.org

Carmen Iguina Gonzalez (*pro hac vice*
forthcoming)
Elisa Epstein (*pro hac vice* forthcoming)
915 15th Street NW, 7th Floor
Washington, D.C. 20005
Tel.: (202) 393-4930
ciguinagonzalez@aclu.org
eepstein@aclu.org


FARELLA BRAUN + MARTEL LLP
Jim Day (CA SBN 197158) (*admitted*)
Cynthia A. Castillo (TX SBN 24097474)

/s/ Savannah Kumar
ACLU FOUNDATION OF TEXAS, INC.
Savannah Kumar
TX Bar No. 24120098
Fabiola Alvelais
TX Bar No. 24146029
Edgar Saldivar
TX Bar No. 24038188
Adriana Pinon
TX Bar No. 24089768
P.O. Box 8306
Houston, TX 77288
Tel. (713) 942-8146
Fax (713) 942-8966
skumar@aclutx.org
falvelais@aclutx.org
esaldivar@aclutx.org
apinon@aclutx.org

Alana Park
Texas Bar No. 24150568
Zachary Dolling
Texas Bar No. 24105809
Charlotte Weiss (application for admission
pending)
New York Bar No. 6313639
TEXAS CIVIL RIGHTS PROJECT

Raven Quesenberry (CA SBN 346250)
(*admitted*)
Hilary C. Krase (CA 318762) (*pro hac vice*
forthcoming)
One Bush Street, Suite 900
San Francisco, California 94104
Telephone: (415) 954-4400
Fax: (415) 954-4480
jday@fbm.com
ccastillo@fbm.com
rquesenberry@fbm.com
hkrase@fbm.com

P.O. Box 17757
Austin, Texas 78760
(512) 474-5073 ext. 162
alana@texascivilrightsproject.org
zachary@texascivilrightsproject.org
cweiss@texascivilrightsproject.org

Dustin Rynders
Texas Bar No. 24048005
TEXAS CIVIL RIGHTS PROJECT
P.O. Box 1108
Houston, Texas 77251
(832) 767-3630 ext. 196
dustin@texascivilrightsproject.org

Daniel Hatoum
Texas Bar No. 24138347
TEXAS CIVIL RIGHTS PROJECT
P.O. Box 219
Alamo, Texas 78516
(956) 787-8171 ext. 127
daniel@texascivilrightsproject.org