# DECLARATION OF CCD

**DECLARATION OF [redacted]**

I, [redacted], hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct.

1. I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently and truthfully to these matters.

2. My name is [redacted] I am [redacted] years old and from [redacted].

3. I arrived at the United States when I was 10 years old and lived in Los Angeles with my family since that time, except when I was incarcerated. I have worked hard to improve myself since I was incarcerated. When I was detained by ICE, I was living with my family in Los Angeles and working in the entertainment industry setting up stages.

4. I was incarcerated in various California state prisons from on or about 1995 until 2016 for an armed robbery. I was in Delano, High Desert State Prison (where I was in the Segregated Housing Unit ("SHU") for most of my time), Pelican Bay Prison (where I was in the SHU for about 48 months), Salinas Valley (Soledad), New Folsom, Calipatria State Prison (CAL) (where I was the "hole" for about 1 year), California State Prison, and Corcoran (COR) (where I was in the SHU for about eight years).

5. When I was in State Prison, I was diagnosed with Schizophrenia, depression, anxiety, high cholesterol, high blood pressure, and post-traumatic stress disorder ("PTSD").

6. I was then detained by ICE on or about late 2016 when I was released from COR. I was detained at immigration detention centers in San Francisco and Oakland. Then, I was transferred to a San Diego immigration detention center. Then, I was transferred to a federal building in Los Angeles. Then, I was detained at the Adelanto Detention Center for about 1.5 to 2 years. Then, I was transferred to a county jail in Orange County.

7. I was released on bond around 2018. Then, a judge granted my application for withholding removal under the Convention Against Torture in or around 2020. I believe I was granted a withholding of removal to [redacted] because of my mental health needs and because of my fear of violence caused by the gangs in [redacted]. After this, I was doing much better because I was working and I was probation. I was working hard to better myself.

8. I was detained by ICE again on or about January 27, 2026, in Van Nuys when I was checking in with my probation officer.

9. I was detained in a holding cell in Los Angeles for about five days—sleeping on the floor, with the same clothes I was arrested in, and in bad conditions.

10. Then I was transferred to an immigration detention facility in Adelanto, CA, and held there from on or about January 31, 2026, until on or about May 6, 2026.

11. Then I was transferred to Camp East Montana in Ft. Bliss in El Paso, Texas, on or about May 6, 2026.

12. When I arrived at Camp East Montana, I was brought to intake on a Saturday morning, and I left intake on Sunday night. There were about 25 people in a small intake room. People were sleeping on the floor without blankets, pillows, or mattresses. There was one toilet that we all shared that was in the open air, so every time I used the bathroom, everyone could see me. There was a security camera in the intake room that could see us when we used the bathroom. There was a faucet on top of the toilet where we had to drink water from. The water and intake unit smelled bad. For food, we received a small sandwich, which was white bread, a piece of baloney, no cheese, and a small fruit or cookie. We had to drink water from the dirty sink on top of the toilet. The room itself was filthy. There was dust and sand everywhere, urine on the toilet, and discarded food on the floor.

13. During intake, on Sunday after sleeping on the floor I had to take a shower because I was dirty after sleeping on the floor. I had to take a shower where other people could see me. Then, I was given a quick medical evaluation that consisted of measuring my blood pressure, weight, height, and asking me about the medications I was taking. I told them that I was taking 5-6 medications for my mental health conditions. I take medication for Schizophrenia, depression, anxiety, PTSD, high cholesterol, and high blood pressure. The nurse said that they would give me the medications, but I did not receive them.

14. I was then transferred to B-10, which is a high security unit, for about three days. I am currently housed in A-14, which is a high security unit. All of the units that I've been in have the same layout.

15. I am being treated much worse here at Camp East Montana than I was treated at any of the state prisons where I served time. In those state prisons, I had better conditions, rights, and privileges, and better medical care, medication, and mental health care.

16. The housing unit where I am detained contains about 72 beds arranged in four-person bunk beds on both sides of the dorm. There are no windows or clocks anywhere in the unit, so we cannot see sunlight or tell the time of day. All of the walls are white and bright because of the lights that stay on from about 5 a.m. to about 10 p.m. every day. Because every day looks the same, it is difficult to distinguish one day from another. We depend on officers or the shared tablet to know the time and schedule. The lack of daylight and connection to the outside world has affected me emotionally and mentally. The lack of sunlight has worsened my mental health. I often feel very anxious, depressed, desperate, and hopeless. Officers control when I wake up, eat, go to the yard, and sleep.

17. The unit is very dirty, and the staff clean it maybe once a week. Even when they do, they do not do a good job. Even the guards have admitted to me that the facility is dirty. The other days we are the ones who have to clean it.

18. The food is horrible. It comes frozen or partly frozen. I feel hungry constantly. I have reported the bad quality of food to the supervisors, and they have taken pictures, but nothing has changed.
19. Being in the enclosed windowless tent reminds me of when I was in the SHU. I feel trapped inside here. I feel very anxious being inside here. This facility has more rules that restrict us, more than I was when I was in state prison.

20. Since I've been here, guards and officers have conducted three counts each day. During morning count, which begins around 5:00 a.m., the lights are turned on and we must wake up so officers can scan our wristbands. Sometimes they scan us multiple times. Midday count can last several hours and often overlaps with lunch, forcing people to rush through meals or eat on their bunks. Evening count goes from about 7 p.m. to about 8 p.m. or later. During count, we are not allowed to move freely, use tablets, or watch television, and even using the restroom requires officer permission. Sometimes guards ignore requests for restroom access, including when we ask in Spanish. In comparison, when I was in state prison, we had maybe one or two counts per day, but we were free to move around the prison. The counts here are more restrictive than in a state prison.

21. The dorm lights remain bright throughout the day and most of the night. Even after the main lights are turned off at around 10:00 p.m., a strong light near the entrance of the unit stays on all night. The light shines into the sleeping area and makes it difficult for me to rest. Since arriving at this facility, I regularly feel exhausted and sleep deprived.

22. The center of the housing unit has about four metal tables (each with about 5 or 6 seats) and two televisions on one side of the unit. There are not enough tables for us all to sit at the same time. Behind that area are the toilets and showers. The bunk beds are placed close together with no walls separating them, so there is no privacy. The showers and toilets are covered only by tarp walls with clear openings that allow people outside to see inside. We can see and smell the restroom area while eating meals. The lack of privacy is humiliating and degrading—much worse than when I was in state prison.

23. There are no regular educational programs, counseling services, vocational classes, or organized activities. The days feel repetitive and empty, which has made me feel anxious and emotionally distressed. Unlike my time in state prison, there's nothing to do here.

24. Each four-person bunk shares a single tablet used for phone calls and messaging. Phone calls cost money by the minute, along with additional fees. We also get charged for making video calls, watching movies, playing music, or playing games on the tablet. Using the tablet is expensive, especially because we have no way to earn money while being here. Because the tablet is shared among multiple detainees, access is limited.

25. The housing unit has only two video kiosks located in the common area below the televisions. There is no privacy because other people can hear conversations and see the screen during calls.

26. There is access to a very small library shelf near the barber area. This library does not have anything for us to use. The barbershop is also limited. We can only get certain kinds of haircuts.

27. Officers conduct invasive pat-down searches several times each day. Every movement is controlled by a pat down. We have to put our hands up and we are searched worse than in state prison, because in state prison we were just patted down quickly. But here, the guards touch us inappropriately. We get searched this way anytime we leave or return from the yard, medical appointments, or attorney visits. During these searches, guards inspect inside our waistbands and touch our bodies in ways that feel intrusive and degrading.

28. On or about May 13, 2026, at around 10:00 p.m., I went to the medical tent because I still had not received the medication I had been waiting for, for about two weeks. Earlier that same day, I had gone to the medical tent, but medical staff also told me they did not have my medication. On my way to the medical tent, Detention Officer Garcia placed me against the wall. I raised my arms and spread my legs. During the search, Officer Garcia told me, "I am going to be a little rough on you." He then ran his hands up my legs toward my buttocks, grabbed my waist near my genitals, and pulled my body against his body so that my buttocks pressed against his genital area. I felt his penis. It felt sexual and inappropriate. I pushed him away and asked why he was searching my body like that. The incident triggered memories of childhood sexual abuse and caused me severe emotional distress. Two female officers witnessed what happened, and one encouraged me to report it. I reported the incident to Officer Blanco, Garcia's supervisor. I was shaking while reporting it, but Officer Blanco only responded, "I'll talk to him."

29. Later that night, after returning to my housing unit, I told the other office that I wanted to shower because I felt dirty after what happened. While I was showering, Officer Garcia stared at me through one of the clear tarp windows of the shower. He later approached my bunk multiple times during the night saying, "Are you going to sleep, mijo?" and "I don't think you want to go to sleep, mijo." I understood these comments as threats of sexual assault. He also repeatedly came to my bunk during the morning count at 5:00 a.m., scanned my bracelet multiple times after count was already complete, and continued making comments like, "Wake up, mijo, it's count time." Another officer in the unit later told me he thought Garcia's behavior toward me was inappropriate and encouraged me to file a PREA complaint.

30. On or about May 14, 2026, I submitted a written PREA grievance to that officer who encouraged me to file, who gave it to a supervisor. A female supervisor later spoke with me, and I explained that I had already reported the incident to Officer Blanco. About an hour later, I met with Garda official Michael Short and described what happened. I also told him there was video footage and that other officers witnessed the incident. During the interview, Michael Short repeatedly stated that other detainees had previously "lied" about sexual assault allegations, although he eventually said he "believed" me. He told me he "might report it to ICE," but since then I have not received any updates or follow-up. No staff person has come to check on me and see how I am doing. I also attempted

multiple times to call the ICE sexual abuse reporting hotline number posted inside the facility, using the tablet, but no one answered. Since then, another detainee has told me that Officer Garcia is still working at the facility. I am afraid that I might run into Officer Garcia because he knows that I reported the sexual assault incident and I am concerned that he might do something to me. Since the incident, other detainees have told me that they have had similar encounters with Officer Garcia. For example, one detainee told me that Officer Garcia has made sexual comments towards others in the yard and around the facility.

31. I also know that there was also another detainee, PKP., who was physically assaulted by Officer Garcia.

32. Since arriving at this facility, I have never been given access to a free, private, and confidential phone call with an attorney. Unlike state prison, I cannot make any free or confidential calls to an attorney. The only way I can speak with a lawyer is if the attorney schedules a virtual or in-person appointment in advance. But, any calls made through the tablet system are monitored, recorded, and cost money.

1. On or about May 13, 2026, I finally received my psychiatry medications. Since then, however, I've only gotten my medications correctly on two occasions administered by the nurses in my unit. That means that the other times the nurses have not administered my medications correctly in terms of the same type, dosage, delivery time, or medications that I am required to receive. On the days when I do not receive my correct medication, I cannot sleep well, I feel severe symptoms like persistent rumination, anxiety, depression, nightmares, and I have thoughts of suicide and self-harm. Since I've been here, I've filed, approximately, at least 12 sick call requests to get my correct medication.

2. When I arrived, I told the medical team about my suicide ideation. The nurses here told me that they cannot do anything about it. When I arrived, I saw that the facility had my medications from Adelanto and I saw these during intake. I asked the nurse if I could access these medications. The nurse said no because they were not approved yet.

3. Since I've only seen the psychologist once and briefly, it was only to discuss my PREA complaint. During that visit, I asked about my medications and to see a psychologist consistently, but I have not seen a psychologist since then.

4. I also take medication for my back pain and for high cholesterol. When I arrived, I told the nurse that I need pain medication for my back and high cholesterol. It took about 8 days to give me some kind of pain medication. But I have not received my cholesterol medication.

5. I have chronic anxiety. Since being here, I have felt the symptoms of chronic anxiety because there are no windows, I feel trapped here, and feel that I cannot get any fresh air. I also feel depressed because I am trapped here and I cannot even see my family.

6. Camp East Montana is the worst experience I have ever had of being detained even compared to my time in the SHU in state prison because there are so many restrictions, rules, dust and sand in the unit, the unit is dirty, the terrible quality of the food which makes me feel sick and lack of commissary, the sexual assault I experience, the windowless tarp cell, the terrible yard, horrible medical care and mental health care, lack of access to a lawyer, absence of programming, and poor hygiene conditions. I was in state prison for about 19 years and the conditions here are worse. I feel like being tortured and punished.

Everything in this declaration is true and correct to the best of my knowledge and recollection.
This declaration was read back to me in Spanish, a language in which I am fluent.
Executed on the 27 th of May 2026 in El Paso, Texas.

Signature: [redacted] ____________

**ATTESTATION AND CERTIFICATE OF TRANSLATION**

I, [redacted], certify that I am fluent in both English and Spanish. On [redacted], I personally spoke with CCD and read the foregoing declaration to him/her, translated into Spanish faithfully and accurately. CCD affirmed that s/he understood my translation and that the information in the above declaration is true and accurate.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

[redacted]

[redacted]
**Date**