# DECLARATION OF GERALD AKARI ANGYE

I, Gerald Akari Angye, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct.

1. I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently and truthfully to these matters.

2. My name is Gerald Akari Angye. I am 35 years old and from Cameroon.

3. I have a bachelor's degree and was a teacher in Cameroon before being kidnapped and tortured by separatists there and then beaten and left for dead by the police. I was seeking asylum in the United States.

4. I am currently detained at Camp East Montana, an immigration detention center in El Paso, Texas.

## Intake Process

5. I was first brought here to Camp East Montana on or around April 22, 2026. Officials attempted to move me to the El Paso Service Processing Center on or around April 30, 2026. I was brought back to Camp East Montana approximately the next morning, May 1, 2026. I have been here ever since.

6. My initial intake process at Camp East Montana happened on or around April 22 at around 3 pm. Officers asked basic questions like my name and date of birth. They took my picture. They gave me a wristband and had us change clothes. They took my blood pressure. I told officials I have migraines, especially when I'm directly under the air conditioner or when the light is on. In addition to migraines, I told the officials at intake unable to take most painkillers like ibuprofen. I told them that when I have taken painkillers in the past, my tongue and mouth have swollen up.

7. I requested a handbook when I first arrived at Camp East Montana. At other detention centers, like the Otero Processing Center, I have been handed the facility handbook and ICE's general handbook before I even left intake. At Camp East Montana, I was not been given the facility handbook and ICE's general handbook despite asking for it multiple times. One officer told me I won't need it because the longest anyone stays here is two weeks. Another officer told me he didn't even know there was a handbook.

## Use of Force by Officers

8. I have experienced violence from officers while I have been detained at Camp East Montana. On or around the evening of April 30, 2026, an officer at Camp East Montana

told me that I had to take my things out of my housing unit because I was going to be moved. I was taken from my housing unit, Alpha-9, into a small room. This small room was in the outtake area. I believe the outtake area is the same as the intake area, but is renamed depending on how it is being used. In the outtake area, a guard whose name I believe is Sergeant Green came to me along with an ICE officer on duty whose name I believe was A. Garcia, a deportation officer. I asked Sergeant Green where I was going to be moved and he said he did not know. Then, my deportation officer, A. Garcia, told me I was going to be moved to El Paso Service Processing Center, which is about a 15 minute drive from Camp East Montana. I told A. Garcia I needed advance notice before being moved, since I have ongoing court proceedings, including a habeas proceeding, and need to provide accurate information about the address where I am detained to the court. I was worried the court wouldn't be able to find me and I might lose my habeas case because of that. A. Garcia said he would talk to his supervisor. A. Garcia then came back and said moving me has nothing to do with the court. A. Garcia then left and came back with documents that he tried to have me sign. I declined to sign the documents and I told him that I didn't want to sign anything without talking to a lawyer first. A. Garcia then left the room and came back in the room with a lot of guards, approximately 21 guards, which is approximately the number they have while they are doing count.

9. At that point, Sergeant Green told me that if I didn't get up and go with him, the guards would use force against me. A. Garcia was behind Sergeant Green at that point. I was inside the small room and the guards were crowded outside the small room. I was sitting on the floor and had my hands behind my head. Officers shackled my legs. At that time, four other guards stormed into the room behind me. I remained calm with my hands still behind my head, though I was scared. One of the guards then forcefully twisted my left wrist and left hand.

10. In pain, I was shouting out things like "You will break my hand!" and "You are hurting my hand." However, the guard kept twisting my hand. Another guard twisted my little finger on my right hand. At that point I tried adjusting my arms because my wrist and hands were hurting so much. At that point, more guards stormed into the room. One of the guards smashed my lower spine with his boot and another guard had his knee on my neck. My nose was injured during this time. I could not stand due to the intense pain in my back. My spine and left hand in particular were in incredible pain. A true and correct copy of a diagram I marked on May 27, 2026 reflecting the places on my body where I suffered injuries on around April 30, 2026 is attached hereto as **Exhibit A**.

11. Despite my injuries and the resulting pain, four guards lifted me into a van to take me to the El Paso Service Processing Center. I could not even stand up at that time due to my injuries. I still could not stand up after arriving at the El Paso Service Processing

Center. Two guards had to lift me up completely with my legs up to bring me from the van to the intake area. At intake, my condition was so terrible that guards called the nurses. A nurse saw me and told me she couldn't treat me because I was still listed as being at Camp East Montana. I pleaded with the nurse to do something and she gave me two ice packs for my back.

12. At that point, I was put into a cell alone. I still could not stand up, even to use the bathroom. I was there in that cell until approximately 6 am in the morning. At that point, two ICE officers came and told me that the next time they want to deport me, they will make sure my body is in a body bag being sent to Cameroon. They said they would wrap my entire body, including my mouth and stuff me in a body bag. I asked them if they were threatening me and they replied that they were simply telling me what they would do to me.

13. Later, a guard told me that they would take me back to Camp East Montana. I still could not stand because of my back. At around 6:30 am in the morning of approximately May 1, 2026, officers put me in a van and brought me back to Camp East Montana. Approximately four officers lifted me out of the van when we arrived at Camp East Montana. Since I still could not stand, one of the guards told another guard to get me a wheelchair. From the wheelchair, I was taken through a shortened version of the intake process I went through when I had first arrived at Camp East Montana. I believe it's called a "kickback" and it took approximately 20 minutes.

14. Right after the kickback intake process, guards tried to take me to a segregation unit. However, I told them I needed to go to the hospital first. I had to insist that I be taken to the hospital by requesting it repeatedly. My hands were swelling a lot and my fingers were swollen and I still could not walk. The guards then called the captain who took me to the medical unit. The nurse tried to do first aid, but told me that they did not have the equipment needed to check on me. The nurse told me that I needed to go to the hospital, but that first they needed to get permission from ICE. Then, approximately three ICE officers came to the medical unit. The officers asked me what happened. I tried to summarize it and I told them if they want to get more information, they can contact my deportation officer, A. Garcia. The officers then finally recognized that I needed emergency medical care. The nurse then told me I'd be taken to the hospital in about an hour. I was taken to another room to wait. My temperature was taken while I was waiting. Officers then came in and handcuffed me even though my left hand and wrist was still very swollen. They also shackled my legs. Officers then pushed me in the wheelchair until we arrived at the van. Officers then placed me in the van and I was transported to Las Palmas Del Sol hospital.

15. At the hospital, a guard had to bring me a wheelchair again. Medical staff did a scan of my back and a scan of my left wrist. I believe these were x-ray scans. I was told by medical staff that my left wrist appeared to be fractured, but they told me it was hard to tell because of all the swelling. Medical staff told me I should come back to the hospital in a week or two to do the scans again when the swelling hopefully goes down. My fingers were swollen as well. Medical staff placed a brace on my hand and wrist. The brace is black and provides support to my wrist to prevent additional movement. I believe the scan of my back showed there was stress on my spine and that I had soft tissue injuries. They told me they do not do scans of noses, so they were not able to scan my nose, which was still in pain. At the hospital, I asked the medical staff for my medical records, since I know that it is difficult to obtain medical records directly from Camp East Montana, but I wanted a record of what has happened to me.

16. On or around May 1, 2026, I requested a copy of my medical records from a medical practitioner at Las Palmas Del Sol Hospital. She initially said that she would just email the records to the facility, but I asked again for my own copy of the records. She then told me she would bring me copies of the physical documents, which she did. That same day, she gave me a set of medical documents in response to my request. A true and correct copy of the documents the medical practitioner gave me is attached hereto as **Exhibit B.**

17. From the hospital, I was taken to the clinic at Camp East Montana. I was still in a wheelchair at that time. I was then immediately placed in segregation on or around Friday, May 1, 2026.

**Segregation**

18. On or around May 2, 2026, an officer said I was placed in segregation because I violated code 198, which is "interfering with a staff member on duty". They told me the crime for this was to be put in segregation for fifteen days and to have five days without a tablet to call anyone. There was no hearing about this violation and I was told about the violation while I was still in severe pain. I tried to explain that I had been hurt by officers and did not understand why I was being punished and I asked for clarification about why I was being punished. I did not receive an answer. Later, I was given a paper about the violation signed by someone whose name I believe is Londono. There has been no process to contest this violation or explain what happened to me.

19. Starting on or around May 2, 2026, staff asked me to sign various documents. True and correct copies of the documents staff gave me are attached hereto as **Exhibit C**.

20. On or around May 1, 2026, staff asked me to sign a document called "Incident of Prohibited Acts And Notice of Charges." The "Description of Incident" on that document

is false. That's not what happened. The "Description of Incident" also says: "No injuries to involved officers or the detainee were reported." I don't know how they could say I wasn't injured. I told them I wouldn't sign it because I didn't trust them and wanted them to bring me my own copy first. I was mistrustful because the description of what happened on the document was a lie and also because often staff come with a document and ask you to sign it, but then they never bring you a copy later so you don't have a record of what you signed. On the "Incident of Prohibited Acts And Notice of Charges," staff wrote down that I refused to sign and gave me a copy of that document.

21. I saw on the form that I was charged with code "198 – INTERFERING WITH STAFF MEMBER DUTIES." I asked the person giving me the document where I could find out what "Code 198" meant. The staff person told me it was in the handbook. I told him I didn't have a copy of the handbook, and he said he would bring me a copy of the handbook. But I didn't get a copy of the Camp East Montana Detainee Handbook until on or around May 10, 2026, even though I've asked multiple times since arriving here at Camp East Montana.

22. Staff also gave me a CEM-26-143, Notice of Right to Staff Representation. I didn't ask for a staff representative and I didn't sign it because I don't trust staff here. My experience with the staff at Camp East Montana was that they hurt me. I didn't feel comfortable having them represent me. I also didn't know anyone else to list at Camp East Montana who had not hurt me or had treated me well.

23. Staff also gave me a CEM-26-143, Notice of Institution Disciplinary Panel Hearing. I didn't ask for a staff representative and I didn't sign it because I don't trust staff after I was hurt by the staff here. I didn't know who I could list as witnesses on the form, because the same people who hurt me were the witnesses to what happened.

24. On or around May 2, 2026, staff brought me one page of a CEM-26-00, Institution Disciplinary Panel Report (Cont'd). I think I am missing a page, because it starts at section "IV. Findings." I told the staff person who delivered it to me that it was an injustice, that I had been injured, and that there was evidence of what had happened to me. I was really upset. I asked him if he had watched the camera footage of what happened to me. He just said, "This is their decision."

25. I filed a grievance about the sanctions I was given, but it was denied the next day. No one came to talk to me about my grievance before it was denied. It made me feel like no one cared about me and that there was no point in trying to ask for help. Everything up until then showed me that there was nothing I could do to try to help myself. A true and

correct copy of the grievance I submitted (No. 2026-0057) and the response I got is attached hereto as **Exhibit D**.

26. While I was in segregation, staff came by several times to give me a form called "Disciplinary Segregation Review." True and correct copies of several of the forms I was given are attached hereto as **Exhibit E**.

27. In segregation, I was housed in a small room where I was kept by myself. There was a bed and there was a toilet close to the bed. There was a black camera above the door that seems to operate 24/7 and I believe it was watching everything I did in segregation, even when I was using the unit. During that time, I still had the brace on from the injuries I sustained on April 30, 2026. I remained in pain. The lights stayed on 24/7 in segregation. This gave me migraines. I experienced bloody noses in segregation regularly. Sometimes when I woke up in the morning, I was covered in blood.

28. The water I was given in segregation seemed to have gravel in it that settled into the cup. The ground here is red and the water had some gravel that seemed to come from the ground in it. I thought the cup might just be dirty, but I tried rinsing it out and refilling it and the water still came out with gravel in it. This water seemed different from the water that is given to us in the regular housing unit which comes from a dispenser. The water in segregation comes from the toilet area. There is a sink above the toilet. I was worried about drinking this water with gravel, but I had no other option.

29. When I was in segregation, no one came to check on me to ask how I was doing, except for nurses who would come to check my hand. One day I asked to talk to the captain because segregation was very hard on me mentally, particularly with my physical pain, because there was nothing to do or keep my mind busy. The guards said they would call the captain, but the captain never showed up.

30. I am no longer in segregation. The experience in segregation really broke me down. They changed my clothing colors from blue to orange when they put me in segregation, which I believe indicates I am now a higher security level. I was placed in a different housing after my time in the segregation unit because I no longer had a blue uniform. As a result, I could not see the people I had become friends with before I was in segregation.

31. When people see me wearing the orange uniform now, I believe they see me as a criminal. In fact, one day when I was walking to a video call with an attorney, there were detained people in blue uniforms in the hallway who pointed at me and my orange uniform and called me a criminal. This made me feel awful. I still have flashbacks to segregation and how isolated and poorly treated I was there, and I am sad that the fact I was placed in segregation is causing negative effects for me even now with how others

view me. Many of the people I am housed with now do not speak any English, so I am unfortunately continuing to feel somewhat alone with my thoughts.

**Housing Units**

32. After segregation I was moved to the Alpha-12 unit on or around May 16, 2026. I am there now, and there are approximately 68 people in the unit now, though the number changes often.
33. When I was moved to Alpha-12, I was given an orange-colored uniform instead of the blue I had before. We are supposed to have multiple pairs of clothing items, but I was only given one pair of underwear, one shirt, one pair of socks, and one pair of pants. This meant that when I showered, I had to put on the same dirty underwear and all other clothing. I also did not receive a sweater even though it was very cold. I put in a request approximately twice to an officer to receive additional pairs of clothing items. I was eventually brought a new pair of underwear on or around May 23, 2026, but that pair of underwear seemed used by someone else and dirty. The next day, which was over approximately a week of being in the same clothes, I was brought additional clothing items. During the time that I had to wear the same clothes, I felt nasty. I felt like I should keep to myself because I was worried I smelled bad. It did not feel hygienic to live that way.

34. On or around May 19, 2026, there was water on the floor of the unit because the toilet was not flushing. It took approximately two hours before officials came to check on the water and move us to a different unit temporarily. The water seemed to be coming from under the seat of the toilet. I was on the other side of the unit, but from what I could see it seemed like poop-filled water. It was stinky – I could smell it from where I was.

35. There are no bars or rails in the showers or around the toilets here at Camp East Montana. Back when I was in a wheelchair after officers used force on me on or around April 30th, it was hard for me to shower because there was nothing I could hold onto to stay steady and it was hard to safely transfer from the wheelchair to the toilet. I am no longer in a wheelchair, but I worry based on my own experience that people in wheelchairs at Camp East Montana do not have the resources they need to safely carry out daily, necessary activities such as showering. I saw someone else who uses a wheelchair in one of the units I've been housed in here. Another detained person would push him outside for recreation, and he used the same showers as everyone else in the unit, without grab bars.

36. On or around May 19, 2026, I signed up to go to the library. But there was no announcement in English for that, so I only learned that people had gone when I saw a bunch of people come back from the library. I was listening all day for the library announcement, so I think it must have been one of the announcements they make only in

Spanish. The officers here mostly speak in Spanish without translating into English or other languages.

**Dust**

37. The dust is so terrible here at Camp East Montana. For example, even when I wipe my hand on the table in the attorney visit room, you can see the red dust that is left on my hand. When I'm eating, the dust gets all over my food. The dust makes me cough. There is sometimes blood that comes out when I cough from the dust.

**Medical Care**

38. I had a medical visit with additional scans at a different hospital on or around May 15, 2026. I requested copies of those medical records, but I have not yet received them. They told me they would mail them to Camp East Montana.

39. I had another medical visit, this time at Camp East Montana, on or around May 22, 2026. The medical staff there was a woman and she checked my wrist and the brace around it. She also took my temperature. I asked her for my medical records, including those from my scan at my last medical visit on or around May 15, 2026. She said there was nothing in the records even indicating I had additional scans on or around May 15, 2026. She said she was going to take me to the records room, but then she left the room and seemed to disappear.

40. My left wrist is still in a brace and still hurts intensely, especially at night. The color of my fingers has changed. My fingers now seem to be very black. I worry there is some sort of blood-related issue. I can't move my left wrist like I can move my right wrist. I am in a lot of pain and do not feel comfortable. I'm not given any medication for the pain and I am worried about permanent damage. It's important to me to be able to use my hands so I can work to support my young children.

**Attorney Access**

41. I still do not have an immigration attorney. If you don't have an attorney from before you arrive at Camp East Montana, there is basically no way to find an immigration lawyer once you are here. Money is required to make phone calls here and I think that is true even for attorney calls. I haven't heard anything about pro bono immigration attorneys here. When I was detained in New Mexico, pro bono lawyers came regularly and you could sign up to speak with them. The announcements at Camp East Montana are in Spanish, so even if there were announcements about legal services, I wouldn't have been able to understand them.

42. An attorney from the ACLU came to visit me on May 20, 2026. We were put in a contact visitation room, V5. It was like four walls inside the larger tent. There were other contact rooms for other visits and a desk with guards right outside the door to V5. There was no ceiling, just four walls, so we could hear noises from elsewhere in the tent, including guards talking.

**Lack of Safety**

43. I don't feel safe here. My experience of being badly injured by guards here made me feel like I will never be safe in the United States. They are treating me and others here like we are not human. I worry that I am being treated like nothing because I am a Black African. Guards here don't seem to care that we are treated so inhumanely. There is nowhere for me to turn for help.

Everything in this declaration is true and correct to the best of my knowledge and recollection.

Executed on the 27 of May 2026 in El Paso, Texas.

Signature: [signature]

# EXHIBIT A

GERALD AKARI ANGYE



DEL SOL EMERGENCY ROOM
10301 GATEWAY WEST
EL PASO, TX
79925
Phone #: (915) 263-3500
Fax #: (915) 595-9781

Name: ANGYE,GERALD AKARI
Phys: Folkerson,Lindley E MD
DOB: 11/29/1990 Age: 35 Sex: M
Acct: V00108379416 Loc: V.ER4
Exam Date: 05/01/2026 Status: PRE ER
Radiology No:
Unit No: V001243690

| Exams: | CPT Code: | |
|---|---|---|
| 003310771 XR LT WRIST 3 + VWS | 73110 | 73110 |

EXAM:
3 VIEW(S) XRAY OF THE LEFT WRIST
05/01/2026 11:52:00 AM
COMPARISON:
None available.
CLINICAL HISTORY:
Back pain. Left wrist pain status post altercation.
FINDINGS:
BONES AND JOINTS:
Age indeterminate nondisplaced fracture of the scaphoid waist with areas of sclerosis along the distal aspect of the fracture line and apparent cystic change along the proximal aspect of the fracture line. Osseous structures appear otherwise normal. Normal alignment. Please correlate for point tenderness. The need for CT wrist examination to assess for acute the presence of a fracture line should be determined on a clinical basis.
SOFT TISSUES:
Unremarkable.
***IMPRESSION:***
***1. Age indeterminate nondisplaced fracture of the scaphoid waist with areas of sclerosis along the distal aspect of the fracture line and apparent cystic change along the proximal aspect of the fracture line.***
***Electronically signed by: Robert Williams MD 05/01/2026 12:02 PM MDT RP Workstation: RPBRZWRS22Z3J***

** Electronically Signed by M. D. ROBERT W. WILLIAMS JR. **
** on 05/01/2026 at 1202 **
Reported and Signed by: ROBERT W. WILLIAMS JR., M. D.

CC: Lindley E Folkerson MD

Dictated Date/Time: 05/01/2026 (1202)
Technologist: KIARA MONTALVO, RT
Transcribed Date/Time: 05/01/2026 (1202)
Transcriptionist: RAD.VR
Printed Date/Time: 05/01/2026 (1218) Batch No: N/A

DEL SOL EMERGENCY ROOM
10301 GATEWAY WEST
EL PASO, TX
79925
Phone #: (915) 263-3500
Fax #: (915) 595-9781

Name: ANGYE,GERALD AKARI
Phys: Folkerson,Lindley E MD
DOB: 11/29/1990 Age: 35 Sex: M
Acct: V00108379416 Loc: V.ER4
Exam Date: 05/01/2026 Status: PRE ER
Radiology No:
Unit No: V001243690

| Exams: | CPT Code: | |
|---|---|---|
| 003310770 XR SPINE LUMB 2-3 VWS | 72100 | 72100 |

EXAM:
2-3 or 72100 VIEW(S) XRAY OF THE LUMBAR SPINE
05/01/2026 11:52:00 AM
COMPARISON:
None available.
CLINICAL HISTORY:
BACK PAIN//DHS//1116 ; sp altercation, pain
Back pain; DHS 1116; status post altercation, pain.
FINDINGS:
BONES:
Vertebral body heights are maintained. Alignment is normal. No anterolisthesis or retrolisthesis. Nondisplaced defects of the L5 pars interarticularis favored to be chronic given apparent sclerosis along the fracture margins.
DISC SPACES:
Mild lower lumbar discogenic degenerative change was pronounced at L5-S1.
SOFT TISSUES:
Unremarkable.
***IMPRESSION:***
***1. Nondisplaced defects of the L5 pars interarticularis favored to be chronic given apparent sclerosis along the fracture margins.***
***2. Mild lower lumbar discogenic degenerative change was pronounced at L5-S1.***
***Electronically signed by: Robert Williams MD 05/01/2026 12:03 PM***
***MDT RP Workstation: RPBRZWRS22Z3J***

** Electronically Signed by M. D. ROBERT W. WILLIAMS JR. **
** on 05/01/2026 at 1203 **
Reported and Signed by: ROBERT W. WILLIAMS JR., M. D.

CC: Lindley E Folkerson MD

Dictated Date/Time: 05/01/2026 (1203)
Technologist: KIARA MONTALVO, RT
Transcribed Date/Time: 05/01/2026 (1203)
Transcriptionist: RAD.VR
Printed Date/Time: 05/01/2026 (1218) Batch No: N/A

LAS PALMAS DEL SOL HEALTHCARE

Patient: ANGYE,GERALD AKARI
Account No: V00108379416
Unit No: V001243690
Location: EMERGENCY DEPT-FASTT RACK DSMC
Physician: Folkerson,Lindley E MD
Date:

## Patient Visit Information

**You were seen today for:**

Left wrist pain
Low back pain

**Staff**

Your caregivers today were:

Physician: Folkerson,Lindley E MD
Nurse: LNB

**Patient Instructions Reviewed**

Back Care Tips
Possible Wrist Fracture

received 05/01/26 - 1219

**Follow-up**

Please contact the following to make an appointment for follow-up care:

Dunn,John MD
1125 Texas Avenue
Suite B -01
El Paso, TX 79901
Phone: 915-910-1351 Fax: 915-262-4876
Follow-up Plan: Follow up as needed

Note: Your health care plan may require a referral from your primary care provider prior to making an appointment.

LAS PALMAS DEL SOL HEALTHCARE

Patient: ANGYE,GERALD AKARI
Account No: V00108379416
Unit No: V001243690
Location: EMERGENCY DEPT-FASTTRACK DSMC
Physician: Folkerson,Lindley E MD
Date:

## Back Care Tips

### Caring for your back

These are things you can do to prevent a recurrence of acute back pain and to reduce symptoms from chronic back pain:

- Stay at a healthy weight. If you are overweight, losing weight will help most types of back pain.
- Exercise is an important part of recovery from most types of back pain. The muscles behind and in front of the spine support the back. This means strengthening both the back muscles and the belly (abdominal) muscles will provide better support for your spine.
- Swimming and brisk walking are good overall exercises to improve your fitness level.
- Practice safe lifting methods (see below).
- Practice good posture when sitting, standing, and walking. Don't sit for a long time. This puts more stress on the low back than standing or walking.
- Wear quality shoes with good arch support. Foot and ankle alignment can affect back symptoms. Don't wear high heels.
- Therapeutic massage can help relax the back muscles without stretching them.
- During the first 24 to 72 hours after an acute injury or flare-up of chronic back pain, put an ice pack on the painful area for 20 minutes and then remove it for 20 minutes. Do this over a period of 60 to 90 minutes, or several times a day. As a safety precaution, don't use a heating pad at bedtime. Sleeping on a heating pad can lead to skin burns or tissue damage.
- You can alternate using ice and heat.

### Medicines

Talk with your healthcare provider before using medicines, especially if you have other health problems or are taking other medicines.

- You may use over-the-counter medicines, such as acetaminophen, ibuprofen, or naproxen to control pain, unless your healthcare provider prescribed other pain medicine. Talk with your provider before taking any medicines if you have a long-term (chronic) condition, such as diabetes, liver or kidney disease, stomach ulcers, or digestive bleeding, or are taking blood thinners.
- Be careful if you are given prescription pain medicines, opioids, or medicine for muscle spasm. They can cause drowsiness, and affect your coordination, reflexes, and judgment. Don't drive or operate heavy machinery while taking these types of medicines. Take prescription pain medicine only as prescribed by your provider.

### Lumbar stretch

LAS PALMAS DEL SOL HEALTHCARE

Patient: ANGYE,GERALD AKARI
Account No: V00108379416
Unit No: V001243690
Location: EMERGENCY DEPT-FASTTRACK DSMC
Physician: Folkerson,Lindley E MD
Date:



This simple stretch will help relax muscle spasm and keep your back more limber. If exercise makes your back pain worse, don't do it.

- Lie on your back with your knees bent and both feet on the ground.
- Slowly raise your left knee to your chest as you flatten your low back against the floor. Hold for 5 seconds.
- Relax and repeat the exercise with your right knee.
- Do 10 of these exercises for each leg.

### Safe lifting method

- Don't bend over at the waist to lift an object off the floor. Instead, bend your knees and hips in a squat.
- Keep your back and head upright
- Hold the object close to your body, directly in front of you.
- Straighten your legs to lift the object.
- Lower the object to the floor in the reverse fashion.
- If you must slide something across the floor, push it.

### Posture tips

#### Sitting

Sit in chairs with straight backs or low-back support. Keep your knees lower than your hips, with your feet flat on the floor.

When driving, sit up straight. Adjust the seat forward so you are not leaning toward the steering wheel. A small pillow or rolled towel behind your low back may help if you are driving long distances.

#### Standing

When standing for long periods, shift most of your weight to one leg at a time. Switch legs every few minutes.

#### Sleeping

LAS PALMAS DEL SOL HEALTHCARE

Patient: ANGYE,GERALD AKARI
Account No: V00108379416
Unit No: V001243690
Location: EMERGENCY DEPT-FASTTRACK DSMC
Physician: Folkerson,Lindley E MD
Date:

The best way to sleep is on your side with your knees bent. Put a low pillow under your head to support your neck in a neutral spine position. Don't use thick pillows that bend your neck to one side. Put a pillow between your legs to further relax your low back. If you sleep on your back, put pillows under your knees to support your legs in a slightly flexed position. Use a firm mattress. If your mattress sags, replace it, or use a 1/2-inch plywood board under the mattress to add support.

### Follow-up care

Follow up with your healthcare provider as advised.

If X-rays, a CT scan, or an MRI scan were taken, they may be reviewed by a radiologist. You will be told of any new findings that may affect your care.

### Call 911

Call 911 if any of the following occur:

- Trouble breathing
- Confusion
- Very drowsy
- Fainting or loss of consciousness
- Very fast or very slow heart rate
- Loss of bowel or bladder control

### When to get medical advice

Call your healthcare provider right away if any of these occur:

- Pain becomes worse or spreads to your arms or legs
- Weakness or numbness in 1 or both arms or legs
- Numbness in the groin area

**WebMD last reviewed this educational content on** 8/1/2022

© 2000-2025 The StayWell Company, LLC. All rights reserved. This information is not intended as a substitute for professional medical care. Always follow your healthcare professional's instructions.

LAS PALMAS DEL SOL HEALTHCARE

Patient: ANGYE,GERALD AKARI
Account No: V00108379416
Unit No: V001243690
Location: EMERGENCY DEPT-FASTTRACK DSMC
Physician: Folkerson,Lindley E MD
Date:

## Possible Wrist Fracture

You are very sore over a bone in your wrist called the navicular, or scaphoid, bone. This could be a sign of a hairline fracture, or break. But no fracture was seen on the X-ray. So a splint or cast will be applied until repeat X-rays are taken in about 1 to 2 weeks or other tests are done. If you have a hairline fracture, it will often show up on the second X-ray. Then you may have to keep wearing a cast for about 6 to 20 weeks, depending on the location of the fracture. Sometimes other tests, such as an MRI, are needed. If no fracture is seen on the second X-ray or other tests, this means you may only have a wrist sprain. The splint or cast can then often be removed.

### Home care

- Keep your arm raised to reduce pain and swelling. When sitting or lying down, raise your arm above the level of your heart. You can do this by placing your arm on a pillow that rests on your chest or on a pillow at your side. This is most important during the first 48 hours after injury.
- Place an ice pack over the injured area for no more than 15 to 20 minutes. Do this every 1 to 2 hours for the first 24 to 48 hours. To make an ice pack, put ice cubes in a plastic bag that seals at the top. Wrap the bag in a clean, thin towel or cloth. Never put ice or an ice pack directly on the skin. As the ice melts, be careful that the cast or splint doesn't get wet. You can place the ice pack inside the sling and directly over the splint or cast. Keep using ice packs as needed to ease pain and swelling.
- Keep the cast or splint completely dry at all times. Bathe with your cast or splint out of the water. Protect it with 2 large plastic bags. Place 1 bag around the other. Tape each bag with duct tape at the top end or use rubber bands. If a fiberglass cast or splint gets wet, you can dry it with a hair dryer on a cool setting.
- You may use over-the-counter pain medicine to control pain, unless another pain medicine was prescribed. If you have chronic liver or kidney disease, ever had a stomach ulcer or gastrointestinal bleeding, or take a blood thinner, talk with your health care provider before using these medicines.
- If you smoke, get help to quit. Tobacco use can interfere with the healing of this fracture. It can also increase the risk of a complication needing surgery.

### Follow-up care

Follow up with your health care provider in 1 week, or as advised. This is to be sure the bone is healing correctly.

If X-rays were taken, you will be told of any new findings that may affect your care.

### When to get medical advice

Contact your health care provider right away if:

- The plaster cast or splint becomes wet or soft.
- The plaster cast or splint becomes loose.
- The fiberglass cast or splint remains wet for more than 24 hours.
- Increased tightness or pain occurs under the cast or splint.

LAS PALMAS DEL SOL HEALTHCARE

Patient: ANGYE,GERALD AKARI
Account No: V00108379416
Unit No: V001243690
Location: EMERGENCY DEPT-FASTTRACK DSMC
Physician: Folkerson,Lindley E MD
Date:

- Fingers become swollen, cold, blue, numb, or tingly.

**WebMD last reviewed this educational content on** 4/1/2025

© 2000-2025 The StayWell Company, LLC. All rights reserved. This information is not intended as a substitute for professional medical care. Always follow your healthcare professional's instructions.

LAS PALMAS DEL SOL HEALTHCARE

Patient: ANGYE,GERALD AKARI
Account No: V00108379416
Unit No: V001243690
Location: EMERGENCY DEPT-FASTTRACK DSMC
Physician: Folkerson,Lindley E MD
Date:

**For Patients Prescribed an Antibiotic**

Be Antibiotics Aware!

Antibiotics save lives, and they are critical tools for treating a number of common infections, such as pneumonia, and for life-threatening conditions such as sepsis. They need to be used properly because they can cause side effects and lead to antibiotic resistance.
But when antibiotics are needed, the benefits outweigh the risks of side effects or antibiotic resistance. There are some important things you should know when prescribed antibiotic treatment.

-You may experience side effects from your antibiotic.
 -Like all medications, antibiotics have side effects. Some of these can be serious.
 -Let your healthcare team know if you have any known allergies.
 -Common side effects of antibiotics can include rash, dizziness, nausea, yeast infections, and diarrhea.
 -The most serious side effects include Clostridium difficile infection (also called C. difficile or C. diff) and life-threatening allergic reactions.
 C. difficile causes diarrhea that can lead to severe colon damage and death.
  -Diarrhea caused by C. difficile can be serious and must be recognized and treated quickly. When you are taking an antibiotic and you develop diarrhea, let your healthcare team know immediately.
  -The risk of getting C. difficile diarrhea can last for up to several months even after you are no longer getting antibiotics. You should let your healthcare team know if you develop diarrhea even after you are no longer getting an antibiotic.

-As a patient or caregiver, it is important to understand you or your loved one's antibiotic treatment. It is especially important for caregivers to speak up when patients can't speak for themselves. Here are some important questions to ask your healthcare team.
 -What infection is this antibiotic treating and how do you know I have that infection?
 -Is the antibiotic being prescribed the most targeted to treat the infection while causing the least side effects?
 -What side effects might occur from this antibiotic?
 -How long will I need to take this antibiotic?
 -Is it safe to take this antibiotic with other medications or supplements (e.g., vitamins) I am taking?
 -Are there any special directions I need to know about taking this antibiotic? For example, should I take it with food?

LAS PALMAS DEL SOL HEALTHCARE

Patient: ANGYE,GERALD AKARI
Account No: V00108379416
Unit No: V001243690
Location: EMERGENCY DEPT-FASTTRACK DSMC
Physician: Folkerson,Lindley E MD
Date:

-How will I be monitored to know whether my infection is responding to the antibiotic?
-What should I do if my infection doesn't get better or gets worse?
-What tests may help to make sure the right antibiotic is prescribed for me?

**Discharge Prescription Program**

Medication Affordability Program
powered by RxLink

Two Easy Ways to Use This Program

1. Show this discount card to the pharmacist and save up to 80% on your medication(s).

BIN: 610378
GROUP: RSSOL
PCN: SC1
ID: 333111333

2. Visit the below URL and complete the simple sign-up. Show the digital coupon to the pharmacist when you fill your prescription. Search for additional discounts on other medications at:

laspalmasdelsolhealthcare.rxlink.com

How Does it Work?

It's as easy as using a coupon at a grocery store. Show this flyer or digital coupon to the pharmacist when you fill your prescription(s). The pharmacist will enter the numbers on the coupon into their system for any discount.

Do I Have to Sign Up for Something?

Not at all! The discount card is ready to use. You don't need to sign up to use the coupon and you can use this card for family members, too.

Are There Other Features I Can Use?

Complete the simple sign-up at laspalmasdelsolhealthcare.rxlink.com and enter your health insurance information. The St. Davids Healthcare Medication Affordability Program will help you understand your insurance coverage and recommend options that may save even more money on your prescriptions.

For help navigating the medication savings portal visit:
http://cipherhealth.com/patientportal

LAS PALMAS DEL SOL HEALTHCARE

Patient: ANGYE,GERALD AKARI
Account No: V00108379416
Unit No: V001243690
Location: EMERGENCY DEPT-FASTTRACK DSMC
Physician: Folkerson,Lindley E MD
Date:

**Additional Patient Discharge Resources**

Find-A-Doctor
-Do you need help finding a physician? We can help find one near you!
-The number to call is (855)790-3627 (DOCS)

Consult-A-Nurse
-This is our 24/7 nurse advice line offering free access to licensed nurses for expert assessment, care navigation, and answers to health-related questions.

-The number to call is (844)706-8773 (844-70 NURSE)

Additional Resources for food, housing, financial assistance, health care, and more
-Check out https://findhelp.org/
-Enter your zip code to find free or reduced-cost resources

Need access to your medical records?
We offer free, quick access to your electronic record online through our patient portal MyHealthONE.com. For questions on how to enroll, please call (855)422-6625

We also offer online resources to obtain information about medical records requests via My Health One Portal, Fax, or email at https://www.stdavids.com/locations/st-davids-medical-center/for-patients/medical-records

**Resources for Providing Nutrition in the Home**

Nutritious food is essential to health and well-being. If you have trouble affording nutritious food, there are resources at the federal, state, and county level that can help.

Federal + State Resources

National Hunger Hotline
-USDA National Hunger Hotline, operates from 7:00 AM - 10:00 PM Eastern Time.
-Call 1-866-3-HUNGRY or 1-877-8-HAMBRE (Spanish)
-By Text: Text "97779" with a question that may contain a keyword such as "food", "summer", "meals", etc. to receive an automated response to resources

SNAP Food Benefits
-The Supplemental Nutrition Assistance Program (SNAP) assists with purchasing food.
-Call 877-541-7905 or 211
-https://www.hhs.texas.gov/services/food/snap-food-benefits

WIC (Women, Infants, and Children)
-WIC is a Program for pregnant women and families with children from birth to age 5.

# EXHIBIT B

LAS PALMAS DEL SOL HEALTHCARE

Patient: ANGYE,GERALD AKARI
Account No: V00108379416
Unit No: V001243690
Location: EMERGENCY DEPT-FASTTRACK DSMC
Physician: Folkerson,Lindley E MD
Date:

-Phone: 800-942-3678
-Website: https://texaswic.org/
-Services:
-Moms will receive assistance to purchase food.
-Monthly food packages packed with vitamins and minerals.
-Free breastfeeding consultations + nutrition classes
-myWIC app- shopping scanner to identify WIC approved items.

County Resources

El Paso

El Pasoans Fighting Hunger Food Bank
-El Pasoans Fighting Hunger (EPFH) is El Paso's only food bank and a member of Feeding America, the nation's largest hunger relief network.
-Address: 9541 Plaza Circle, El Paso, TX 79927 *Phone: (915) 298-0353
-El Pasoans Fighting Hunger Program offers:
-Home Delivery Program- Home deliveries are for the entire household and consist of one box per household; Must be disabled, homebound, AND 60+ years
-Partner Agency Food Pantries- This food bank works with 130+ 501c3 organizations.
-Mobile Client Choice Pantries - Choice distribution model. This allows participants to "shop" for their own food.
-School Pantries - Food bank partners with schools, which allows families to have access to nutritious food.
-Commodity Supplemental Food Program- Program for seniors who are low-income for the purpose of maintaining health.

**GENERAL ED DISCHARGE INSTRUCTIONS**

Del Sol Medical Center
10301 Gateway Blvd W, El Paso, Tx 79902
(915) 595-9000

GENERAL EMERGENCY DEPARTMENT DISCHARGE INSTRUCTIONS
The treatment and evaluation you received have been provided on an emergency basis only and is not intended to be a substitute for, or an effort to provide complete medical care. It is important that you follow up with your primary care provider for ongoing monitoring and intervention. Tell your follow-up physician or clinic that we have sent you. Take a copy of your discharge instructions, which includes a list of your current medications and any new medications prescribed and share this information with them. If you had x-rays, an EKG, or lab tests today, they have been reviewed by your doctor. We will contact you at once if other important findings are noted after further review by our staff. If your symptoms become worse or you do not improve as expected and you are unable to reach your usual health care provider, you should return to the Emergency Department. We are available 24 hours a day. Please make an appointment for further treatment as instructed.

LAS PALMAS DEL SOL HEALTHCARE

Patient: ANGYE,GERALD AKARI
Account No: V00108379416
Unit No: V001243690
Location: EMERGENCY DEPT-FASTT RACK DSMC
Physician: Folkerson,Lindley E MD
Date:

WHAT TO DO:
- Take this sheet with you when you go to your follow-up visit.
- Take all medication as directed. If side effects develop, such as a rash, difficulty breathing, or a severe upset stomach, stop the medication and call your doctor or the Emergency Department.
- If you have been referred to a specialist, you may be contacted by ER Follow-up Services within 24 hours to schedule your appointment. If you would like to schedule an appointment and have not received a call, please contact them at (915)-401-7452.
- There are occasions where additional lab tests return - such as culture results or an X-ray or EKG - is further reviewed after you are discharged. If a change in your diagnosis or treatment is indicated, we will attempt to contact you. It is critical that we have a current phone number for you.
- If you have received any radiology testing today, please note that the x-ray has been read by your ED physician. A final reading by a Radiologist will be completed and you will be notified by the Emergency Department staff of any additional findings. If you need a copy of your x-ray for your follow-up appointment, please ask the operator for the Imaging Department and request the images be ready for pickup.
- Culture results may take 2-3 days. We review many culture results and will attempt to contact you if the results are significant or may change your treatment. You may obtain a copy of your culture results from our medical records department Monday - Friday 8:30am - 4:00pm. The phone number is 888-749-7952.
- Your prescription(s) may have been sent directly to your specified pharmacy electronically. If the pharmacy is unable to fill your prescription(s), ask the Pharmacist if your prescription(s) can be transferred to another pharmacy.
- If you want your prescription(s) to be filled at a different pharmacy, have your desired pharmacy contact the pharmacy that received them for transfer. In case your prescription(s) are not eligible to be transferred, please contact the prescribing provider for a new prescription to be sent to the desired pharmacy. If you have questions, contact your provider and have a full list of your medications available.
- If your blood pressure measured over 119/79 during your emergency department visit, you should have your blood pressure re-checked with your regular provider or the referral provider within 4 weeks. Hypertension is a common, but serious, illness that should be monitored closely.

PREVENTATIVE HEALTH INSTRUCTIONS:
The care you received in the emergency department has been done on an emergency basis only and is not intended to be a substitute for regular medical care. If your condition or symptoms persist or get worse at any time, you should return to the emergency department if you're unable to contact your own physician. Please understand that although we may not have determined a specific cause of your symptoms today, further evaluation may be necessary. It is so important to get a primary care provider (doctor, PA, or nurse practitioner) for follow up as well as ongoing healthcare needs.

The following information is provided for you as education regarding preventative health care and follow up from your emergency department visit:

LAS PALMAS DEL SOL HEALTHCARE

Patient: ANGYE,GERALD AKARI
Account No: V00108379416
Unit No: V001243690
Location: EMERGENCY DEPT-FASTT RACK DSMC
Physician: Folkerson,Lindley E MD
Date:

Regular exercise, good diet and adequate fluid intake are very important for general health maintenance. Please discuss these with your primary care doctor to develop a plan specific to your needs.

PRESCRIBING OPIOID PAIN MEDICATION
Our emergency department staff understands that pain relief is important when someone is hurt or needs emergency care. However, providing pain relief is often complex. Mistakes or misuse of pain medication can cause serious health problems and are a major cause of accidental death. Our emergency department strives to provide pain relief options that are safe and appropriate. Our main job is to look for and treat an emergency medical condition. Chronic pain is best managed and coordinated by a primary care provider or a pain specialist outside the emergency department. We use our best judgement when treating pain, and follow all legal and ethical guidelines.
For your safety, we:
- May not refill stolen or lost prescriptions for pain medication or controlled substances.
- Do not prescribe missed methadone doses or long-acting narcotic pain medication that has a high risk of addiction or overdose.
- Review your health and prescription history to determine the best approach to managing your pain.
- Prescribe the most appropriate pain medication favoring those with the lowest risk of addiction or overdose, and for no longer than necessary.
- Take into consideration whether you already receive pain medication from another health provider or emergency department, and whether you have a doctor who can follow up on your condition.

SMOKING CESSATION:
Smoking is related to many diseases including Pneumonia, Bronchitis, Emphysema, Various Cancers, Heart Attack, and Stroke. If you are a smoker, we encourage you to quit. There are many methods to help you quit. Please discuss these options with your primary care physician, your clinic, or go online to the American Lung Association at www.lungusa.org and double click the Quit Smoking icon in the tabs at the top of the page.

SEDATION:
If you receive any sedative medications (often used to ease discomfort, pain, anxiety, and/or procedures) during your emergency visit avoid driving for 24 hours and please ask a family member or friend to take you home after. Don't make any important decisions, such as financial or legal, for 24 hours if you are still experiencing the effects of sedation. Follow all other instructions from your healthcare provider.
Please notify your healthcare provider immediately if you experience any of these:
-Drowsiness that get worse
-Weakness or dizziness that gets worse
-Repeated vomiting
-You can't be awakened
-Severe or ongoing pain not relieved by prescribed medicine

LAS PALMAS DEL SOL HEALTHCARE

Patient: ANGYE,GERALD AKARI
Account No: V00108379416
Unit No: V001243690
Location: EMERGENCY DEPT-FASTTRACK DSMC
Physician: Folkerson,Lindley E MD
Date:

IMMUNIZATIONS:
Vaccines are available for vaccine preventable diseases including Hepatitis A and B, Diphtheria, Tetanus, Pertussis, Haemophilus Influenza, Polio, Measles, Mumps, Rubella, Varicella (chicken pox), Pneumococcal and Influenza. It is important to keep children up-to-date on their immunization schedule to help prevent the spread of these diseases. If you have children, please discuss their immunization schedule with the child's primary care physician or clinic.
El Paso Immunizations: (915) 533-3414

ABUSE: No one deserves physical or emotional abuse. If you are the victim of abuse; either physical, sexual, or psychological, help is available. Please discuss any concerns you have with your ED physician, your primary care physician, or your clinic.
Texas Abuse Hotline (800)252-5400. 24/7

MENTAL HEALTH CRISIS INFORMATION:
If you are experiencing a mental health emergency call, the EHN Crisis Line (915) 779-1800 anytime for immediate assistance.

SUICIDE RISKS AND WARNING SIGNS:
Please call or text 988 to get the Suicide Prevention Lifeline or dial (800) 273-8255

If you are experiencing or notice suicide risks and warning signs such as: seeking access to guns, pills, other; talking or writing about death/dying or suicide feelings of hopelessness; feeling rage or seeking revenge; uncontrolled anger; feeling trapped with no way out; anxious, agitated, unable to sleep or sleeping all the time; dramatic mood changes; seeing no reason for living or having no sense of purpose; giving away possessions to others that are of importance to the individual.

SEAT BELTS:
Seat belts save lives. Each percentage-point increase in safety belt use represents 2.8 million more people buckling up, 250 more lives saved, and 6,400 serious injuries prevented annually. We encourage everyone to use your safety belt correctly and restrain children appropriately. Please go to www.nhtsa.gov/risky-driving/seat-belts for more information.

SATISFACTION SURVEY REMINDER:
Providing you an excellent experience is our top priority. You will receive a follow-up call from our team in 1-3 days to see how you are doing. In addition, you may receive a survey from our vendor Press-Ganey through mail, email, or text with a brief series of questions about the services you received. We appreciate your time in providing us this valuable feedback and thank you for choosing Del Sol Medical Center.

BILLING REMINDER:
Your personal physician or other physicians providing you with services related to your hospital stay or visit will bill you separately. This can include fees related to hospitalists (i.e. the physician who may have managed your care while in our

LAS PALMAS DEL SOL HEALTHCARE

Patient: ANGYE,GERALD AKARI
Account No: V00108379416
Unit No: V001243690
Location: EMERGENCY DEPT-FASTTRACK DSMC
Physician: Folkerson,Lindley E MD
Date:

facility) and specialists (e.g. anesthesiologist, pathologists, radiologists, cardiologists, pulmonologists). Independent laboratory or radiology services will also bill you separately for reading and interpreting EKG's, X-rays, EEG's and lab work. If you have questions about those bills, please call the number printer on your statements. You will receive a separate bill for the services rendered to you by the attending physician in the emergency department from Emergency Services of Texas, PA. Please contact the physician's billing office regarding any questions you may have concerning the physician services or your statement. Emergency Services of Texas, PA. P.O. Box 638668, Cincinnati, OH 45263-8668 (888) 952-6772.
Office hours: M-F 8am to 8pm EST, Sat 10am to 3pm EST.

MY HEALTH ONE

Thank you for visiting our hospital. Don't forget, through MyHealthOne you can view your health information and details from your stay.
MyHealthOne consolidates many common tasks into one secure, east-to-use online portal. You can use the portal on your desktop computer, laptop, tablet or smartphone 24 hours a day to access these features and more:

-Health Records
-Classes and Events
-Bill Pay
-Lab Results
-Pre-Registration
-Health Summary
-Find a Doctor
-Make an appointment
-Manage Loved ones

*Bill pay excludes anesthesia or emergency physician bills, which are billed separately. Some features may not yet be available in all areas.

Create a MyHealthOne account:
1. Visit https://laspalmasdelsolhealthcare.com/myhealthone and click "Create an Account"
2. Pick a username and password
3. For security purposes, we'll ask you some information about yourself that you provided when you visited the hospital.

Manage the health of a loved one

Authorized parents or caregivers can act on behalf of a patient, such as a child or elderly parent, to view hospital records, sign up for classes or provider appointments, pay hospital bills and more.
1. Visit our hospital and complete a Proxy Waiver form.
2. Once the patient has been discharged, call (855) 422-6625 to complete the enrollment process.
3. Sign in to MyHealthOne and begin managing the health of your loved ones.

If you need help or have questions about MyHealthOne, call 855-422-6625.

# EXHIBIT C

GARDAWORLD

Emergency Grievance/*Emergencia*: [ ] YES/Sí [ ] NO Medical Grievance/ *Queja médica*: [ ] YES/Sí [ ] NO **Grievance Number:** 2026 0057

**CAMP EAST MONTANA**

**DETAINEE GRIEVANCE FORM / *FORMULARIO DE QUEJA DEL DETENIDO***

**INSTRUCTIONS / *INSTRUCCIONES*:** Submit to staff or place in grievance box. No retaliation for filing. Entregar al personal o en el buzón de quejas. No habrá represalias.

**Name/*Nombre*:** Angye Gerald ·A **A#:** [redacted] **Date/*Fecha*:** 05-03-2026

**Housing Unit/*Unidad*:** Segregation **Nationality/*País*:** Anglophone Cameronian

**TYPE OF GRIEVANCE / *TIPO DE QUEJA* (Mark one / *Marque una*):**

☒ Staff Conduct / *Conducta del personal* ☐ Medical Care / *Atención médica* ☐ Conditions / *Condiciones*
☐ Property / *Propiedad* ☐ Food Service / *Alimentos* ☐ Religious / *Religioso*
☐ Legal Access / *Acceso legal* ☐ Other / *Otro*: ____________

**GRIEVANCE DETAILS / *DETALLES DE LA QUEJA*:** I appeal the Sanctions given to me by Sgt londono I can agree for the 15 days and 5 days Sanctions put on me. I wan to talk to the grievance officer.

**INFORMAL RESOLUTION ATTEMPT / *INTENTO INFORMAL*:** ☐ Yes / Sí ☐ No
If yes, explain / Si sí, explique: ____________

**REQUESTED RESOLUTION / *SOLUCIÓN SOLICITADA*:** ____________

**DETAINEE SIGNATURE / *FIRMA*:** ____________ **Date/*Fecha*:** ____________

**STAFF USE ONLY / *USO OFICIAL***

**Received By / Recibido por:** ____________ **Date/Fecha:** ____________ **Time/Hora:** ____________

**DISPOSITION / *RESOLUCIÓN*:** ☐ Approved / Aprobada ☒ Denied / Denegada ☐ Referred / Referida

**RESPONSE / *RESPUESTA*:** Records indicate that the sanctions applied are appropriate and justified. Records indicate that an incident occurred that required additional staff due to your refusal to comply with multiple verba commands. Your noncompliance resulted in officer having to physically restrain and physically carry you onto a transportation vehicle.

**Staff Name & Title / *Nombre y título*:** Patricia - Grievance Coordinator

**Signature / *Firma*:** [signature] **Date/*Fecha*:** 5 04 2026

**APPEAL / *APELACIÓN*:** You may appeal within 5 days / *Puede apelar dentro de 5 días* ☐ Yes / Sí ☐ No

# EXHIBIT D

# Incident of Prohibited Acts And Notice of Charges

CEM– 26-____

Detainee Name: ANGYE,GERALD AKARI

A-Number: [redacted]

Nationality: CAMER

Date & Time of Incident: 4/30/26 2110

Incident Location: OUTTAKE HOLDING CELL 4

Work Assignment: N/A

Classification Level: LO

Quarters: N/A

Prohibited Act(s):

Code: 198 - INTERFERING WITH STAFF MEMBER DUTIES

Code: ____

Code: ____

Description of Incident:

On 04/30/2026 at 2110, Detainee ANGYE GERALD AKARI, [redacted] was in Outtake, undergoing final preparation for departure from CEM. Detainee ANGYE A#9069 then laid down on the ground to prevent his own departure. ICE DO Garcia advised SGT Green,Larry of the detainees actions. SGT Green ordered an officer to enter Hold Room 4. While attempting to restrain the detainee with belly chains, Detainee ANGYE A#9069 actively resisted and remained physically unwilling to get hand cuffed or belly chained. Officers held him down to properly restrain him with belly chains and leg shackles. Upon conclusion of restraints being applied, Detainee ANGYE A#9069 was carried into the awaiting transport van by the 4 officers. No injuries to involved officers or the detainee were reported.

Staff Witness? ☐ Yes ☐ No

Evidence Attached? ☐ Yes ☐ No ☐ NA

Supporting Memorandum? [ ] Yes [ ] No [ ] NA

GREEN, LARRY SGT — 4/30/26 2130 — [signature]

Name of Reporting Officer — Date & Time — Signature

Reviewed for accuracy prior to investigation by: [signature] Supervisor/SDDO — 5-1-26 1604 Date & Time

Incident Recorded on EADM ? ☐ Y ☐ N

Classification Level Changed? ☐ Y ☐ N

Level changed from ________ To ________

[ ] Copy to Detainee within 24 hrs and prior to UDC.

Form No. I-884 (Revised 09/09)

Copy Received by: Refused to Sign
Detainee Signature
Sgt Nera Mark

Date/Time: 5/1/26 1513

CEM– 26-

### Detainee Rights at The Institution Disciplinary Panel Hearing (IDP)

As a detainee charged with a Prohibited Act(s), you have been referred to the Institution Disciplinary Panel for disposition. While at the IDP hearing, you have the following rights;

1. The right to have a written copy of the charge(s) against you at least 24 hours prior to appearing before the IDP.
2. The right to have a full time member of staff who is reasonably available to assist you before the IDP.
3. The right to call witnesses and present documentary evidence in your behalf provided institutional safety would not be jeopardized.
4. The right to remain silent. Your silence may be used to draw an adverse inference against you. However, your silence alone may not be used to support a finding that you committed a prohibited act.
5. The right to be present throughout the IDP, except during committee deliberations and where institutional safety would be in jeopardy.
6. The right to be advised of the IDP decision in writing and the facts supporting the panel's decision, except where institutional safety would be jeopardized.
7. The right to appeal the decision of the IDP by means of the Detainee Grievance Procedure to the Officer in Charge, within 15 days of the notice of the panel's decision and disposition.

**I hereby acknowledge that I have been advised of the rights afforded me at the Institution Disciplinary Panel hearing.**

Signed: ____________________ A – Number: [redacted] Date: 5/1/26

Notice of Rights given to the detainee by: Sgt Meza, Mark [signature] 5/1/26
Staff Member & Date

### Refusal to Sign

I have personally advised ____________________ of the rights afforded detainees at the Institution Disciplinary Panel Hearing. The detainee refused to sign the acknowledgement.

Staff member and date: ____________________

### Waiver of 24 Hours Notice

I have been advised that I have at least 24-hour notice prior to appearing before the IDP. At this time, I wish to waive this right and proceed with the IDP hearing.

Detainee Signature, Date and Time: ____________________

Form I-892 (Revised 09/09)

Original Form Received by: ____________________ Date/Time ____________________
Detainee Signature

## Staff Representation (IDP)

CEM–26- 143

### Notice of Right to Staff Representation

You have been referred to a hearing before the **Institutional Disciplinary Panel** (IDP), for having been found to have committed a violation of Prohibited Act(s) categorized as "Greatest" or "Highest" that carry a Sanction from A through D. Or you have been referred directly to the Institutional Disciplinary Panel (IDP) due to the allegation of the Prohibited Act(s) being of serious nature.

Per National Detention Standards, Disciplinary Policy, III. Standards and Procedures, E. Staff Representation, you have the following right;

1. To request assistance in preparing your defense.
2. The assistance will be from a Staff member appointed by the Officer In Charge (OIC).
3. You may also request your own staff representative, but cannot be anyone already involved in the disciplinary proceedings.
4. You have three choices, if the staff representative you have chosen refuses.
5. You may also proceed without a staff representative.

The Officer In Charge will automatically assign a staff member representative if;

1. You are illiterate.
2. You have limited English-language skills.
3. You do not have the means to collect and present essential evidence.
4. You cannot effectively present your own case.
5. You are currently being held in Administrative or Disciplinary Detention

I have been served with this notice and request;

☐ Staff Representation

☑ No Staff Representation

_______________________ 7 May 2026
Date

Original Form Received by: Refused to sign. Detainee Signature Dorentena Date/Time: 7 May 26 1513

# Administrat..e Segregation Order

| | |
|---|---|
| **Special Management Unit Officer** | M. JONES |
| To | Segregation Order issued by |
| GERALD ANGYE | [signature] |
| Reference to Detainee | Signature |
| [redacted] CAMER | CAPTIAN |
| A# Nationality | Title |

The above-named detainee is to be admitted to Administrative Segregation for the following reason *(choose one)*;

- [x] **Pending an Investigation** - hearing for the commission of a Prohibited Act(s) or Rule violation and requires pre-hearing detention.
- [ ] **Pending Prosecution** – criminal prosecution of the detainee is pending.
- [ ] **Medical Observation** - medical staff will provide DIHS-819 (Special Needs) form.
- [ ] **Pending a Transfer or Release** - within 24 hours.
- [ ] **Terminating Disciplinary Segregation** and has been ordered to Administrative. Segregation by the Disciplinary Panel.
- [ ] **Security Risk** - to self or the security of the facility.
- [ ] **Protective Custody (PC)** – requested by detainee for Protection.

I hereby request placement in the Administrative Segregation for my own protection.
I **do** [ ] **do not** [ ] request a hearing concerning my segregation.

Signature of ______ A-Number ______ Date ______

*Record below, a brief outline of the circumstances and the names of any witnesses to events leading to placement in Administrative Segregation.*

DUE TO DETAINEE ANGYE GERALD AKARI [redacted] ACTIONS IN OUTTAKE, DETAINEE IS BEING REFERED TO SMU

**Medical Staff Evaluation for SMU Placement**

An assessment and review has been performed on the above noted detainee by medical personnel.

Javila RNBSN, ANM 05/01/26 1446

Signature or Stamp of Medical Personnel Date/Time

Received at SMU by: ______ Title: SMU Officer In Charge

Date Received: ______ Time: ______

Released by : ______ Title: ______

Date Released: ______ Time: ______

**Copy received by detainee:** ______ ______

Detainee Signature Date and Time

**Refused to sign for copy:** ______ ______

**Officer Signature** **Date and Time**

Form No. I-886 (Revised 09/09)

# Notice of Institution Disciplinary Panel Hearing

CEM–26- 143

ANGYE, GERALD AKARI [redacted] 5/2/26

Name of Detainee A-Number Date

Alleged Disciplinary Code Violation(s):

Code: 198-INTERFERING WITH STAFF MEMBER OF DUTIES

Code:

Code:

Date of offense: 4/30/26

You are being referred to the Institution Disciplinary Panel for the above-mentioned charge(s).

The hearing will be held on or before 5/2/26, at 2000 (time) at the following location SMU.

You are entitled to have a full time staff member represent you at the hearing. Please indicate below if you desire to have a staff member assist you, and if so, his or her name.

I (do) ______ (do not) ✓ wish to have a staff representative.

If so, the staff representative's name is: N/A.

You also have the right to call witnesses at the hearing and to present documentary evidence in you behalf; provided that calling your witnesses will not jeopardize facility security. Names of witnesses you wish to call should be listed below. State below what each proposed witness would be able to testify to:

Name: N/A can testify to: N/A

Name: N/A can testify to: N/A

Name: N/A can testify to: N/A

The chairperson of the Institution Disciplinary Panel will call those listed above as witnesses (staff or detainee) who are reasonably available, and who are determined by the chairperson to be necessary for an appreciation of all of the circumstances surrounding the charge(s). Repetitive witnesses need not be called. Unavailable witnesses may be asked to submit written statements. If additional space is required, use the reverse side of this form.

Form I-893 (Revised 09/09)

Original Form Received by: Refused to sign. Date/Time 5/2/26 @ 1950hrs.

Detainee Signature

SGT Londono, N.

CEM– 26-00 Institution Disciplinary Panel Report (Cont'd)

IV. Findings:

[✓] a. The Prohibited Act(s) were committed as charged.

[✓] b. The following Prohibited Act(s) were committed: 198 - Interfering with staff Duti

[ ] c. No Prohibited Act(s) were committed.

V. Specific Evidence relied on to support finding:

CCTV and officer Incident Reports

VI. Sanctions or Action taken: Offense Severity:

15 days in segregation with 1 day served. 5/1/26 – 5/16/26

5 days no tablet (only for legal calls) 5/2/26 – 5/7/26

VII. Reason for Sanction or Action taken:

198- 'interfering with staff member duties.

| | | |
|---|---|---|
| [signature] | | |
| Signature | Signature | Signature |
| SGT Londono, Nicolas. | | |
| Chairperson (Print Name) | Member (Print Name) | Member (Print Name) |

Do Not Write in this Section – Officer In Charge/Designee must review and concur **prior** to imposing sanctions

VIII. Review and Concur: *(Check One)*

[✓] Concur with findings

[ ] Proceedings terminated

[ ] Discipline Imposed

Signature: [signature] Date: 05-02-26 Time: 2000

Officer in Charge or Designee

Copy delivered to detainee by: ______________ on ______________

Signature and title Date

**Copy Received by:** [signature] **Date/Time:**

Detainee Signature

# EXHIBIT E

# Disciplinary Segregation Review

** A review shall be conducted within 72 hrs of the detainee's initial placement in Disciplinary Segregation to determine whether segregation still warranted, then every 7 days thereafter, up to 30 days, then every 10 days up until the release from the SMU.*

On 05/04/2026 (Today's Date) Supervisory Detention and Deportation Officer (SDDO) or contract equivalent SGT Londono, N. (Print Name) conducted a formal review of the Disciplinary Segregation status of:

[redacted] (Detainee A Number) ANGYE,GERALD AKARI (Detainee Name) CAMEROON (Nationality) who is presently in

[ ] Pending an Investigation [ ] Protective Custody [ ] Pending Prosecution [ ] Medical [ ] Security Risk [ ] Pending release/transfer

Detainee has been in Disciplinary Segregation for 3 days. Admitted on: 05/1/2026 (Date)

**The following factors were reviewed with the results as indicated:**

| | YES | NO |
|---|---|---|
| 1. Does the reason for initial placement remain valid? | ✓ | |
| 2. Does the detainee pose a threat to himself? | | ✓ |
| 3. Does the detainee pose a threat to others? | | ✓ |
| 4. Does the detainee pose a threat to property? | | ✓ |
| 5. Does the detainee pose a threat to security? | | ✓ |
| 6. Is the detainee defiant towards authority? | | ✓ |
| 7. Is the detainee unwilling or unable to live in the general population? | | ✓ |
| 8. Is the detainee's habitual conduct, language, or behavior of a type which may provoke or instigate stressful/violent situations amongst the general population? | | ✓ |

If any of the above factors are marked "**Yes**", the detainee must continue his/her existing status, unless the OIC determines otherwise. If all factors are marked "**No**", the detainee may be released.

**Document Review: X**

| | YES | NO |
|---|---|---|
| 1. Is the detainee being offered three showers per week and taken showers? | ✓ | |
| 2. Is the detainee exercising at least one hour daily, 5 days a week? | ✓ | |
| 3. Is the detainee being offered three meals daily and consuming at least one meal daily? | ✓ | |
| 4. Is the detainee receiving daily visits from medical staff? | ✓ | |
| 5. Are the special housing officers signing and properly filling out the special housing unit record | ✓ | |

A "**No**" answer to any of the above questions will require notification of the Detention Operations Supervisor or officer of equal or greater rank.

* I state that the initial reason for my placement in Protective Custody (PC) no longer remains valid. I am requesting removal from PC status. Translation into the Spanish or other language provided by ______

Detainee Signature: ______ Date/Time: ______

For the reasons above, I [ ] **recommend** [✓] **do not recommend** removal from Disciplinary Segregation.

Supervisor signature: [signature] Date/Time: 5/04/2026 @ 1900

*If the detainee has been segregated for the detainee's protection, but not at the detainee's request, the signature of the OIC or AOIC is required to authorize continued detention.*

[ ] Concur with Recommendation
[ ] Continue Status
[ ] Release

______ OIC or Designee Signature ______ Date

**Copy received:** ______ Detainee Signature **Date:** ______ **Time:** ______

# Disciplinary Segregation Review

** A review shall be conducted within 72 hrs of the detainee's initial placement in Disciplinary Segregation to determine whether segregation still warranted, then every 7 days thereafter, up to 30 days, then every 10 days up until the release from the SMU.*

On 5.8.26 (Today's Date) Supervisory Detention and Deportation Officer (SDDO) or contract equivalent SGT MEZA MARK (Print Name)
conducted a formal review of the Disciplinary Segregation status of :

[redacted] (Detainee A Number) ANGYE, GERALD AKARI (Detainee Name) CAMEROON (Nationality) who is presently in

[ ] Pending an Investigation [ ] Protective Custody [ ] Pending Prosecution [ ] Medical [ ] Security Risk [ ] Pending release/transfer

Detainee has been in Disciplinary Segregation for 7 days. Admitted on: 5.1.26 (Date)

**The following factors were reviewed with the results as indicated:**

| | YES | NO |
|---|---|---|
| 1. Does the reason for initial placement remain valid? | ✓ | |
| 2. Does the detainee pose a threat to himself? | | ✓ |
| 3. Does the detainee pose a threat to others? | | ✓ |
| 4. Does the detainee pose a threat to property? | | ✓ |
| 5. Does the detainee pose a threat to security? | | ✓ |
| 6. Is the detainee defiant towards authority? | | ✓ |
| 7. Is the detainee unwilling or unable to live in the general population? | | ✓ |
| 8. Is the detainee's habitual conduct, language, or behavior of a type which may provoke or instigate stressful/violent situations amongst the general population? | | ✓ |

If any of the above factors are marked "**Yes**", the detainee must continue his/her existing status, unless the OIC determines otherwise. If all factors are marked "**No**", the detainee may be released.

**Document Review: X**

| | YES | NO |
|---|---|---|
| 1. Is the detainee being offered three showers per week and taken showers? | ✓ | |
| 2. Is the detainee exercising at least one hour daily, 5 days a week? | ✓ | |
| 3. Is the detainee being offered three meals daily and consuming at least one meal daily? | ✓ | |
| 4. Is the detainee receiving daily visits from medical staff? | ✓ | |
| 5. Are the special housing officers signing and properly filling out the special housing unit record | ✓ | |

A "**No**" answer to any of the above questions will require notification of the Detention Operations Supervisor or officer of equal or greater rank.

* I state that the initial reason for my placement in Protective Custody (PC) no longer remains valid. I am requesting removal from PC status. Translation into the Spanish or other language provided by ______________________

Detainee Signature: ______________________ Date/Time: ______________

For the reasons above, I [ ] **recommend** [X] **do not recommend** removal from Disciplinary Segregation.

Supervisor signature: [signature] Date/Time: ______________

*If the detainee has been segregated for the detainee's protection, but not at the detainee's request, the signature of the OIC or AOIC is required to authorize continued detention.*

[ ] Concur with Recommendation
[ ] Continue Status
[ ] Release

______________________ OIC or Designee Signature ______________ Date

28

Copy received: Refused (Detainee Signature) Date: 5-8-26 Time: 1100

Aranda. R

# Disciplinary Segregation Review

** A review shall be conducted within 72 hrs of the detainee's initial placement in Disciplinary Segregation to determine whether segregation still warranted, then every 7 days thereafter, up to 30 days, then every 10 days up until the release from the SMU.*

On 05-15-2026 (Today's Date) Supervisory Detention and Deportation Officer (SDDO) or contract equivalent David Stanfield (Print Name) conducted a formal review of the Disciplinary Segregation status of:

[redacted] (Detainee A Number) Angye, Gerald Akari (Detainee Name) CAMER (Nationality) who is presently in

[ ] Pending an Investigation [ ] Protective Custody [ ] Pending Prosecution [ ] Medical [ ] Security Risk [✓] Pending release/transfer

Detainee has been in Disciplinary Segregation for 14 days. Admitted on: 05-01-2026 (Date)

**The following factors were reviewed with the results as indicated:**

| | YES | NO |
|---|---|---|
| 1. Does the reason for initial placement remain valid? | ✓ | |
| 2. Does the detainee pose a threat to himself? | | ✓ |
| 3. Does the detainee pose a threat to others? | | ✓ |
| 4. Does the detainee pose a threat to property? | | ✓ |
| 5. Does the detainee pose a threat to security? | | ✓ |
| 6. Is the detainee defiant towards authority? | | ✓ |
| 7. Is the detainee unwilling or unable to live in the general population? | | ✓ |
| 8. Is the detainee's habitual conduct, language, or behavior of a type which may provoke or instigate stressful/violent situations amongst the general population? | | ✓ |

If any of the above factors are marked **"Yes"**, the detainee must continue his/her existing status, unless the OIC determines otherwise. If all factors are marked **"No"**, the detainee may be released.

**Document Review: X**

| | YES | NO |
|---|---|---|
| 1. Is the detainee being offered three showers per week and taken showers? | ✓ | |
| 2. Is the detainee exercising at least one hour daily, 5 days a week? | ✓ | |
| 3. Is the detainee being offered three meals daily and consuming at least one meal daily? | ✓ | |
| 4. Is the detainee receiving daily visits from medical staff? | ✓ | |
| 5. Are the special housing officers signing and properly filling out the special housing unit record | ✓ | |

A **"No"** answer to any of the above questions will require notification of the Detention Operations Supervisor or officer of equal or greater rank.

* I state that the initial reason for my placement in Protective Custody (PC) no longer remains valid. I am requesting removal from PC status. Translation into the Spanish or other language provided by ______

Detainee Signature: ______ Date/Time: ______

For the reasons above, I [ ] **recommend** [✓] **do not recommend** removal from Disciplinary Segregation.

Supervisor signature: [signature] Date/Time: 05/15/26 0940

*If the detainee has been segregated for the detainee's protection, but not at the detainee's request, the signature of the OIC or AOIC is required to authorize continued detention.*

[✓] Concur with Recommendation
[ ] Continue Status
[ ] Release

OIC or Designee Signature ______ Date ______

**Copy received:** ______ (Detainee Signature) **Date:** ______ **Time:** ______