**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | |
|---|---|
| Gerald Akari Angye, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. Immigration and Customs Enforcement, *et al.*,<br><br>*Defendants*. | Civil Action No.: 3:26-cv-1515-LS |

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION ....................................................................................................1

BACKGROUND ....................................................................................................2

I. DEFENDANTS HAVE BEEN ON NOTICE OF INHUMANE AND ABUSIVE CONDITIONS AND VIOLATIONS OF FEDERAL STANDARDS AT CAMP EAST MONTANA SINCE THE FACILITY OPENED. ....................................3

II. PEOPLE ARE HELD IN DEGRADING AND UNSAFE CONDITIONS AT CAMP EAST MONTANA. ....................................6

A. People Are Held in Filthy, Crowded Enclosures with Severely Limited Access to Soap, Personal Grooming Supplies, and Nutrition. ....................................6

B. With Nothing to Do in a Crowded and Windowless Enclosure, People Become Hopeless and Desperate. ....................................10

C. Poorly Trained Guards Harass and Assault People, Leading to Serious Injury and Death. ....................................12

D. The Healthcare Delivery System at Camp East Montana Is Dangerously Deficient and Puts People at Risk of Harm. ....................................14

ARGUMENT ....................................................................................................17

I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS. ....................................18

A. Harsh, Degrading, and Unsafe Living Conditions Serve No Legitimate Governmental Purpose. ....................................21

B. Excessive Idleness and Lack of Recreation and Programming Serve No Legitimate Governmental Purpose. ....................................23

C. Staff Abuse and Harassment Serve No Legitimate Governmental Purpose. ..........25

D. Grossly Inadequate Healthcare Serves No Legitimate Governmental Purpose. ....................................26

II. PLAINTIFFS LIKELY WILL SUFFER IRREPARABLE INJURY WITHOUT A PRELIMINARY INJUNCTION. ....................................28

III. THE EQUITIES AND PUBLIC INTEREST FAVOR PLAINTIFFS. ....................................29

IV. THERE IS NO NEED FOR A SECURITY BOND. ....................................30

CONCLUSION ....................................................................................................30

## TABLE OF AUTHORITIES

**Page(s)**

### FEDERAL CASES

*ADT, LLC v. Capital Connect, Inc.*,
145 F. Supp. 3d 671 (N.D. Tex. 2015) ....29

*Awad v. Ziriax*,
670 F.3d 1111 (10th Cir. 2012) ....30

*Barco Mercado v. Noem*,
800 F. Supp. 3d 526 (S.D.N.Y. 2025)....20, 25, 26, 29

*Bell v. Wolfish*,
441 U.S. 520 (1979)....19, 21

*Brown v. Plata*,
563 U.S. 493 (2011)....19

*BST Holdings, L.L.C. v. Occupational Safety & Health Admin., United States Dep't of Lab.*,
17 F.4th 604 (5th Cir. 2021) ....29

*Campos v. I.N.S.*,
70 F. Supp. 2d 1296 (S.D. Fla. 1998) ....30

*City of Atlanta v. Metropolitan Atlanta Rapid Transit Authority*,
636 F.2d 1084 (5th Cir. 1981) ....30

*Cooper v. Sheriff, Lubbock County*,
929 F.2d 1078 (5th Cir. 1991) ....22

*D.N.N. v. Liggins*,
822 F. Supp. 3d 543 (D. Md. 2026)....20, 29, 30

*Daniels Health Sciences, L.L.C. v. Vascular Health Sciences, L.L.C.*,
710 F.3d 579 (5th Cir. 2013) ....18

*Dunn v. Comm'r, Alabama Dep't of Corr.*,
179 F.4th 1277 (11th Cir. 2026) ....19

*Duvall v. Dallas County, Texas*,
631 F.3d 203 (5th Cir. 2011) ....22

*Edwards v. Johnson*,
209 F.3d 772 (5th Cir. 2000) ....19

*Gomez Ruiz v. ICE*,
834 F. Supp. 3d 835 (N.D. Cal. 2026) ....................20, 29

*Gomez Ruiz v. ICE*,
No. 3:25-09757, 2026 WL 391924 (N.D. Cal. Feb. 10, 2026) ....................18, 30

*Hare v. City of Corinth, Miss.*,
74 F.3d 633 (5th Cir. 1996) (en banc) ....................19

*J.A.V. v. Trump*,
No. 1:25-CV-072, 2025 WL 1226023 (S.D. Tex. Apr. 24, 2025) ....................30

*Jackson Women's Health Org. v. Currier*,
760 F.3d 448 (5th Cir. 2014) ....................30

*Janvey v. Alguire*,
647 F.3d 585 (5th Cir. 2011) ....................18

*Kaepa, Inc. v. Achilles Corp.*,
76 F.3d 624 (5th Cir. 1996) ....................30

*L.T. v. ICE*,
No. 5:26-00322, 2026 WL 2131142 (C.D. Cal. July 16, 2026) ....................18, 24, 30

*L.T. v. ICE*,
No. 5:26-CV-00322, 2026 WL 2338452 (C.D. Cal. Aug. 12, 2026) ....................20, 29

*Moreno Gonzalez v. Noem*,
No. 25-13323, 2025 WL 3170784 (N.D. Ill. Nov. 5, 2025) ....................20

*Nken v. Holder*,
556 U.S. 418 (2009) ....................18, 30

*Pablo Sequen v. Albarran*,
810 F. Supp. 3d 1084 (N.D. Cal. 2025) ....................20, 21, 27, 29

*Shepherd v. Dallas County*,
591 F.3d 445 (5th Cir. 2009) ....................19, 26, 27

*Sierra Club v. United States Army Corps of Engineers*,
482 F. Supp. 3d 543 (W.D. Tex. 2020) ....................29

*Singh v. Bondi*,
No. 26-00541, 2026 WL 752457 (W.D. Tex. Mar. 16, 2026) ....................21

*Tiede v. Collier*,
796 F. Supp. 3d 275 (W.D. Tex. 2025) ....................28

*Univ. of Texas v. Camenisch*,
451 U.S. 390 (1981) ....................18

*Vazquez Barrera v. Wolf*,
455 F. Supp. 3d 330 (S.D. Tex. 2020) ....................29

*Wages & White Lion Inv., L.L.C. v. FDA*,
16 F.4th 130 (5th Cir. 2021) ....................30

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ....................28

*Youngberg v. Romeo*,
457 U.S. 307 (1982) ....................19

*Zadvydas v. Davis*,
533 U.S. 678 (2001) ....................19

**FEDERAL RULES**

Local Rule 7(D)(2) ....................31

Federal Rule of Civil Procedure 65(c) ....................30

**OTHER AUTHORITY**

*Inspecting Detention Facilities*, Project On Government Oversight (Aug. 18, 2026), https://www.pogo.org/investigates/inside-ices-broken-system-for-inspecting-detention-facilities [https://perma.cc/3VZS-FMDU] ....................2

## INTRODUCTION

"It's only God that helps us here."[1] That statement is from one of the many people who have come forward to tell the Court of the real and present danger they face every day in a tent encampment on the Fort Bliss military base. All tell similar stories—of relentless physical and verbal abuse by guards; of going days or weeks without seeing the sun; of filthy, crowded living conditions with repeated outbreaks of measles, tuberculosis, and other diseases; and of egregious medical neglect that has resulted in unnecessary suffering and death. They describe conditions that "destroy [their] soul," make them "lose [their] minds," and strip them of their humanity.[2]

The loved ones of those who have died describe how their father, husband, or friend deteriorated in custody. One saw her formerly independent friend barely able to speak or walk and require hospice care after release.[3] A daughter witnessed her father's decline through phone calls, listening as her usually upbeat father's voice faltered, grew faint and slurred, until he was taken to a hospital.[4] The doctor there said that her "dad was in septic shock and his organs were infected" and that detention staff "waited until the last minute to take him to the hospital." When she saw her dad on a video call, "[i]t was like he was drowning in his own blood." He died the next day.

These and countless other accounts of abuse and neglect have followed the immigration detention encampment, called ERO El Paso Camp East Montana, since it opened last year. People have been taken to the Mexican border and beaten when they refuse to self-deport.[5] A young man with tuberculosis was released to a Texas shelter without his medication.[6] A father was asphyxiated and killed by guards, and evidence was missing or destroyed.[7] Guards beat Named Plaintiff Gerald Angye—shackled and not resisting—so badly that they fractured his wrist and spine.[8]

---

[1] ECF No. 2-20 ¶ 41 ("RES Decl.").
[2] Second Suppl. Declaration of Erik Rodriguez Flores, filed herewith, ¶ 16; ECF No. 2-9 ¶ 39 ("Ly Decl."); ECF No. 2-10 ¶¶ 27-28 ("Senevilay Decl."); ECF No. 2-15 ¶ 27 ("Moreno Rodriguez Decl."); ECF No. 2-16 ¶ 29 ("Camarillo-Gonzalez Decl.").
[3] ECF No. 2-21 ¶¶ 10, 15, 18 ("Vilay Decl.").
[4] Declaration of Albina Cristobal, filed herewith, ¶¶ 10-27.
[5] Declaration of Rita Lomio, filed herewith, Ex. 1 at 2.
[6] ECF No. 2-8 ¶ 18 ("Mbabid Decl.").
[7] Lomio Decl., Ex. 8 at 18.
[8] ECF No. 2-27 ¶¶ 9-10 ("Angye Decl."); Declaration of Dr. Jeffrey Keller, filed herewith, ¶ 181.

Experienced prison and jail administrators have found that conditions at Camp East Montana shock the conscience, are harsher than in the most secure prisons, and put all detained individuals at risk of serious harm and death.[9] Defendants' own oversight entities repeatedly have found systemic and uncorrected failures to provide safe and humane conditions at Camp East Montana. They have documented unsanitary living conditions, environmental hazards, spoiled food, inadequate healthcare, inadequate tuberculosis protocols, absent use-of-force protections, and more. This year, the number of violations found at Camp East Montana by a government watchdog was "among the highest number of violations in a single report of any facility."[10]

Nonetheless, conditions at the encampment remain dangerous and inhumane. Plaintiffs therefore urgently request that the Court issue a preliminary injunction, in line with courts across the country, to protect the health and safety of all who are or will be detained at Camp East Montana.

## BACKGROUND

Starting in August 2025, people from all over the country have been sent to Camp East Montana, "the largest migrant facility in U.S. history."[11] This includes parents who have lived in the United States for decades, people seeking asylum, and people who are stateless.[12] People have been confined there for four months or more while they wait for their immigration cases to be heard or travel documents to be procured.[13] The vast majority have no criminal record.[14]

---

[9] Declaration of Dean Williams, filed herewith, ¶¶ 18-25; Dr. Keller Expert Decl. ¶ 30.

[10] Isabel Del Mastro & René Kladzyk, *Inside ICE's Broken System for Inspecting Detention Facilities,* Project On Government Oversight (Aug. 18, 2026), https://www.pogo.org/investigates/inside-ices-broken-system-for-inspecting-detention-facilities [https://perma.cc/3VZS-FMDU].

[11] Lomio Decl. ¶¶ 34-36; *id.*, Ex. 8 at 2.

[12] Declaration of Lucia Pedro Juan, filed herewith, ¶ 3; Ly Decl. ¶ 5; Senevilay Decl. ¶ 3; Moreno Rodriguez Decl. ¶ 3; RES Decl. ¶ 2; ECF No. 2-24 ¶ 3 ("NYG Decl."); Angye Decl. ¶ 40; ECF No. 2-30 ¶ 5 ("ZOR Decl."); Declaration of Alejandro Gonzalez Ramirez, filed herewith, ¶ 3; Declaration of Ashweel Majok, filed herewith, ¶ 4; ECF No. 2-12 ¶ 3 ("Bounvongxay Decl."); ECF No. 2-11 ¶ 3 ("Baccam Decl.").

[13] ZOR Decl. ¶ 3; ECF No. 2-22 ¶ 5 ("SNM Decl."); Declaration of Braumer Rodriguez Sanchez, filed herewith, ¶ 2; Declaration of Tiago Claudina de Paula, filed herewith, ¶ 5.

[14] Lomio Decl. ¶ 45 (about 92% of female detainees and 80% of male detainees at Camp East Montana listed as "Non-Crim").

Camp East Montana is a *civil* detention facility, which Defendant U.S. Immigration and Customs Enforcement ("ICE") acknowledges should be "non-punitive" and is meant simply to "secure [people's] presence for immigration proceedings or removal from the United States."[15] Defendants contract with for-profit companies to operate Camp East Montana, which in turn have relied on subcontractors to manage various aspects, including medical care and food services.[16]

## I. DEFENDANTS HAVE BEEN ON NOTICE OF INHUMANE AND ABUSIVE CONDITIONS AND VIOLATIONS OF FEDERAL STANDARDS AT CAMP EAST MONTANA SINCE THE FACILITY OPENED.

Each facility "housing ICE detainees must comply with one of several sets of detention standards," which are meant to "ensure that detainees are treated humanely; protected from harm; provided appropriate medical and mental health care; and receive the rights and protections to which they are entitled." Lomio Decl., Ex. 21 at 1; ECF No. 13-5 at 3. The 2025 National Detention Standards ("NDS 2025") govern operation of Camp East Montana. Lomio Decl., Ex. 10 at 2.

Before and after Camp East Montana opened, elected officials, government oversight entities, news media, and legal advocates have documented widespread violations of federal standards. In September 2025, the Washington Post reported that ICE inspectors found 60 violations of federal standards in the first 50 days of the encampment's operation, including related to medical care, inadequate food, and use of force. Lomio Decl., Ex. 6. Defendant U.S. Department of Homeland Security ("DHS") responded by press release, calling the report "categorically false," a "smear campaign," and "fearmongering clickbait." *Id.*, Ex. 7 at 1, 2.

In a report released in June 2026, the U.S. Government Accountability Office ("GAO") found that "[t]he facility opened without meeting key detention standards," including related to security and recreation. Lomio Decl., Ex. 8, Highlights. The GAO found that "[a]fter the facility opened, ICE reported additional problems, including gaps in medical services, the loss of a loaded firearm, and unsanitary conditions, among other issues," which "posed serious risks to the safety and security of both detained noncitizens and staff at the facility." *Id.* In the first week of operation,

---

[15] Lomio Decl., Ex. 21 at 2.
[16] Lomio Decl., Ex. 8 at 9; *id.*, Ex. 10 at 2; *id.*, Ex. 11 at i.

Defendant U.S. Department of War ("DOW") identified at least 22 violations in "multiple areas, such as food services, safety, and hygiene," and listed violations related to environmental health, hazardous substances, handbooks, personal grooming supplies, post orders, and spoiled food, among other things. *Id.*, Ex. 11 at 13, 15-16. A month later, DOW reviewed surveillance checklists related to these 22 violations and identified that the compliance status of more than half was either "Noncompliant" or "Unknown." *Id.* at 14-16. DOW "communicated outstanding deficiencies to the contractor and DHS on September 25, 2025." *Id.* at 18.

On September 26, 2025, Representative Veronica Escobar wrote to DHS and ICE leadership, reporting serious concerns she and her staff witnessed or that were reported during oversight inspection visits, including regarding insufficient staff and rotten food. Lomio Decl., Ex. 12 at 2. On November 7, 2025, Representative Escobar wrote again, reporting that "the food quality for detainees has not improved," and raised concerns about the cleaning of housing units, sewage backups, and inadequate medical care. *Id.*, Ex. 13 at 1-2. On December 8, 2025, several legal organizations sent a letter to ICE and DOW officials outlining a wide range of abuses based on interviews with over 45 people, including related to use of force and threats to coerce voluntary deportation, sexual abuse, inadequate and spoiled food, medical neglect, insufficient mental health care, lack of hygiene supplies, and inadequate recreation. *Id.*, Ex. 1 at 1-18. DHS again dismissed reports of abuse and neglect as "fearmongering clickbait." *Id.*, Ex. 6 at 2.

In January 2026, an investigator with the ICE Health Service Corps completed a Preliminary Report of Findings regarding healthcare provided to a man who was killed by guards at Camp East Montana. Declaration of Em Chapin, filed herewith, Ex. A at 1. The investigator identified serious lapses in care, including that "medication continuation at intake is unclear," no evidence that staff took appropriate action in response to "abnormal vital signs" and "elevated blood pressure," and missing medical records. *Id.* at 3-4, 6.

The ICE Office of Detention Oversight ("ODO") conducted a pre-announced inspection of Camp East Montana in February 2026. Lomio Decl., Ex. 9 at 4. ODO reviewed compliance with NDS 2025 standards and found a 37.5% failure rate. *Id.* at 13. Failures were in "areas critical to

operation of a safe and secure facility," including "Use of Force and Restraints," "Facility Security and Control," "Sexual Abuse and Assault Prevention and Intervention," and tuberculosis protocols. Williams Expert Decl. ¶ 122; Lomio Decl., Ex. 9 at 8-11. ODO nonetheless gave the facility an "Acceptable/Adequate" rating. Lomio Decl., Ex. 9 at 13.

On February 26, 2026, twenty-four members of Congress wrote to DHS and ICE and demanded that Camp East Montana "be shut down" to ensure "the safety of everyone at the facility[.]" Lomio Decl., Ex. 14 at 2. On March 25, 2026, Representative Kelly Morrison issued a statement following an oversight visit to Camp East Montana, noting that she was "horrified by the cruelty, inhumanity, and inadequate care" she observed at the facility. *Id.*, Ex. 15 at 1. On April 6, 2026, Representative Gabe Vasquez issued a statement following an oversight visit, reporting that "[t]he conditions I saw today are beneath our American values" and noting that people "reported limited access to health care (including the withholding of medications), insufficient food containing little to no protein, a lack of access to personal care products (like shampoo), forced sleep deprivation, poor sanitation, and verbal abuse from facility guards." *Id.*, Ex. 16.

In May 2026, ODO conducted an unannounced follow up inspection. That inspection uncovered even *more* violations: "Overall Number of Deficiencies" increased from 49 to 52, "Priority Component Deficiencies" increased from 3 to 12, and there were eight "Repeat Deficiencies." Lomio Decl., Ex. 10 at 12. An "Area of Concern" related to security was identified but redacted. *Id.* at 7. "Again, the problems identified were of the most serious nature," including related to use of force, security staffing, searches, tool control, training, medical care, solitary confinement, suicide prevention, and post orders. Williams Expert Decl. ¶ 126; Lomio Decl., Ex. 10. The report listed zero "Corrective Actions." Lomio Decl., Ex. 10 at 12.

Although ICE told a federal judge in May 2026 that Camp East Montana "is prohibitively expensive to operate and is not designed for long-term use," it remains in operation. Lomio Decl., Ex. 34 ¶ 15; *id.*, Ex. 5 at 5. On May 29, 2026, Plaintiffs filed this lawsuit. ECF No. 1. As of June 30, 2026, ICE was still "waiting for the El Paso Field Office to provide a corrective action plan" in response to the February 2026 inspection report. Lomio Decl., Ex. 5 at 5.

## II. PEOPLE ARE HELD IN DEGRADING AND UNSAFE CONDITIONS AT CAMP EAST MONTANA.

The below summary of conditions at Camp East Montana is drawn from the declarations of 43 people who are or were detained at Camp East Montana and, for those who have died, their family and friends; 29 medical records; four government oversight reports; congressional oversight reports; and two expert declarations, among other sources of information. To assist the Court, and given the large record, Plaintiffs provide a summary chart presenting key quotations from the fact declarations that support this motion. *See* Declaration of Felipe Hernández, filed herewith, Ex. A.

### A. People Are Held in Filthy, Crowded Enclosures with Severely Limited Access to Soap, Personal Grooming Supplies, and Nutrition.

Upon arrival to Camp East Montana, people are held in a filthy, crowded, and cold holding room that people held there call "*la hielera*" (the freezer) because of the frigid temperature.[17] Many stay in that room for days and are forced to sleep on the floor with dozens of other people, including people who are visibly sick, and without mattresses, bedding, or pillows. In the holding room, there is not enough seating for everyone, minimal food and dirty water, and no privacy when using the one open toilet.[18] People receive no or inaccurate information about the rules at the facility and are shown an orientation video that presents a false picture of what is to come.[19]

[17] Mbabid Decl. ¶ 10; Ly Decl. ¶¶ 11-13; Baccam Decl. ¶¶ 9-10; Camarillo-Gonzalez Decl. ¶ 3; ECF No. 2-18 ¶ 4 ("UEG Decl."); ECF No. 2-23 ¶¶ 8-9 ("PKP Decl."); NYG Decl. ¶ 8; ECF No. 2-25 ¶ 6 ("HOK Decl."); ECF No. 2-26 ¶¶ 12, 13 ("CCD Decl."); *id.* at 5 ¶ 2; ECF No. 2-28 ¶¶ 6-7 ("Navdeep Decl."); LLH Decl. ¶¶ 7, 11, 15; Gonzalez Ramirez Decl. ¶¶ 7, 10; Majok Decl. ¶¶ 3-4, 6; ECF No. 2-6 ¶ 7 ("Rodriguez Flores Decl."); Rodriguez Flores Second Suppl. Decl. ¶¶ 3, 9-10; Bounvongxay Decl. ¶¶ 7-8; ECF No. 2-17 ¶ 4 ("Do Decl."); Declaration of Franco Nelson, filed herewith, ¶ 5; ZOR Decl. ¶¶ 9-12; SNM Decl. ¶ 18; ECF No. 2-31 ¶ 7 ("JLE Decl."); ECF No. 2-32 ¶¶ 8, 11, 15, 21 ("LLH Decl."); Rodriguez Sanchez Decl. ¶¶ 3-4; Declaration of Luiz Rivero-Gonzalez, filed herewith, ¶ 7; Claudina de Paula Decl. ¶ 11; Declaration of Julio Romero-Paredes, filed herewith, ¶ 5; Declaration of Daniel Monroy, filed herewith, ¶¶ 5, 7.

[18] LLH Decl. ¶¶ 7, 11, 15; Rodriguez Flores Second Suppl. Decl. ¶¶ 9-10; Mbabid Decl. ¶¶ 10, 12; Ly Decl. ¶¶ 11-12; Baccam Decl. ¶¶ 9-10; Bounvongxay Decl. ¶ 6; Camarillo-Gonzalez Decl. ¶ 3; UEG Decl. ¶ 4; PKP Decl. ¶ 8; NYG Decl. ¶ 8; CCD Decl. ¶¶ 12-13; Navdeep Decl. ¶¶ 6-7; ZOR Decl. ¶¶ 9-10; JLE Decl. ¶ 6; Gonzalez Ramirez Decl. ¶¶ 7-12; Nelson ¶ 5; Majok Decl. ¶¶ 6-7; Rodriguez Sanchez Decl. ¶¶ 3-4; Rivero-Gonzalez Decl. ¶¶ 7, 12-15; Pedro Juan Decl. ¶ 8; Claudina de Paula Decl. ¶¶ 6, 9-10, 14; Romero-Paredes Decl. ¶ 5; Monroy Decl. ¶ 7; Declaration of Yajaira Grande Aguilar, filed herewith, ¶ 4.

[19] Angye Decl. ¶ 7; Ly Decl. ¶ 34; LLH Decl. ¶¶ 22, 46; Rivero-Gonzalez Decl. ¶ 43; Do Decl. ¶ 5; SNM Decl. ¶ 7; ZOR Decl. ¶ 13; Claudina de Paula Decl. ¶ 13; RES Decl. ¶ 40; Suppl. Declaration of Alfredo Antonio Reina, filed herewith, ¶ 6; Declaration of Adams Pico Piñango, filed herewith, ¶ 3; Monroy Decl. ¶ 12; Lomio Decl., Ex. 10 at 6.

People then are moved to large windowless tents, divided into separate penned enclosures with no ceiling except the tent roof above.[20] Each open-air enclosure houses up to 72 people in open bunkbeds, with a handful of shared tables, toilets, and showers.[21] The living areas are kept uncomfortably cold and people are given inadequate clothing and bedding.[22] People are confined to these enclosures for 23 or 24 hours each day, with no windows and thus no natural light. They feel depressed, trapped, anxious, frustrated, and disoriented—unable to tell the time of day or "to distinguish one day from another."[23] People can go weeks without seeing the sky.[24]

Living areas are filthy.[25] Sand and dust coat every surface—on tables, beds, toilets, clothing, and floors, and in food, eyes, and hair.[26] People wake up unable to breathe and experience

---

[20] Rodriguez Flores Decl. ¶¶ 4-5; Navdeep Decl. ¶ 8; Senevilay Decl. ¶¶ 17, 19; Bounvongxay Decl. ¶ 5; Mbabid Decl. ¶ 14; Ly Decl. ¶¶ 14, 21; ECF No. 2-14 ¶ 4 ("Fernandez-Gastelum Decl."); Moreno Rodriguez Decl. ¶ 5; Do Decl. ¶¶ 10, 19; UEG Decl. ¶ 10; RES Decl. ¶¶ 10-12; SNM Decl. ¶¶ 9-10, 13-14; PKP Decl. ¶¶ 12, 14-15; NYG Decl. ¶¶ 28-29; HOK Decl. ¶¶ 15, 18, 19; CCD Decl. ¶¶ 16, 19, 21, 22; Angye Decl. ¶ 35; ZOR Decl. ¶¶ 14-15; JLE Decl. ¶¶ 9-11; LLH Decl. ¶ 25; Gonzalez Ramirez Decl. ¶ 15; Rodriguez Sanchez Decl. ¶ 11; Declaration of Maximo Valera Barreto, filed herewith, ¶ 11; Declaration of Alfredo Antonio Reina, filed herewith, ¶ 6; Claudina de Paula Decl. ¶¶ 8, 16, 31.

[21] *Id.*

[22] Gonzalez Ramirez Decl. ¶ 15; Ly Decl. ¶ 31; Senevilay Decl. ¶ 21; Do Decl. ¶ 18; ZOR Decl. ¶ 30; LLH Decl. ¶ 27; Claudina de Paula Decl. ¶ 8; Bounvongxay Decl. ¶ 5; Aguilar Decl. ¶ 14.

[23] PKP Decl. ¶ 12; CCD Decl. ¶ 19; SNM Decl. ¶ 10; LLH Decl. ¶ 16; Nelson Decl. ¶ 20.

[24] PKP Decl. ¶ 12; JLE Decl. ¶ 9; Claudina de Paula Decl. ¶ 16; LLH Decl. ¶ 40; JLE Decl. ¶¶ 9, 15; HOK Decl. ¶¶ 15, 28; Navdeep Decl. ¶ 13; Gonzalez Ramirez Decl. ¶¶ 15, 19; RES Decl. ¶ 29; UEG Decl. ¶ 8; Second Suppl. Declaration of Gerald Akari Angye, filed herewith, ¶ 9; SNM Decl. ¶ 10; Nelson Decl. ¶ 22; Rodriguez Flores Decl. ¶¶ 5, 12; NYG Decl. ¶ 29; CCD Decl. ¶ 16; LLH Decl. ¶ 40; Romero-Paredes Decl. ¶ 9.

[25] Rodriguez Flores Decl. ¶ 11; Ly Decl. ¶¶ 25, 27, 32; Senevilay Decl. ¶ 20; Angye Decl. ¶ 34; Angye Second Suppl. Decl. ¶ 10; Bounvongxay Decl. ¶ 5; Camarillo-Gonzalez Decl. ¶¶ 5, 8; Do Decl. ¶ 15; RES Decl. ¶¶ 13, 25; NYG Decl. ¶¶ 33-34; HOK Decl. ¶ 16; CCD Decl. ¶ 17; Navdeep Decl. ¶¶ 11-12; ZOR Decl. ¶ 21; JLE Decl. ¶ 18; Nelson Decl. ¶¶ 7, 9; Majok Decl. ¶ 15; Rivero-Gonzalez Decl. ¶ 21; Barreto Decl. ¶ 12; Suppl. Declaration of ZOR, filed herewith, ¶ 5; Pedro Juan Decl. ¶ 9; Piñango Decl. ¶ 18; Second Suppl. Declaration of Navdeep, filed herewith, ¶ 5; Lomio Decl., Ex. 8 at 18.

[26] Rodriguez Flores Decl. ¶¶ 38, 45; Ly Decl. ¶¶ 27, 29, 32, 33; Majok Decl. ¶ 18; Navdeep Decl. ¶¶ 7, 34; Senevilay Decl. ¶¶ 18-19; Angye Decl. ¶ 37; Bounvongxay Decl. ¶¶ 5, 17-18; Baccam Decl. ¶¶ 19, 21-22, 38; Fernandez-Gastelum Decl. ¶ 4; Camarillo-Gonzalez Decl. ¶ 7; Do Decl. ¶¶ 14, 16; UEG Decl. ¶¶ 7, 10; RES Decl. ¶¶ 13, 18, 36; ZOR Decl. ¶¶ 28, 29; JLE Decl. ¶ 17; LLH Decl. ¶ 29; Nelson Decl. ¶ 11; Rodriguez Sanchez Decl. ¶ 16; Barreto Decl. ¶ 13, 17-18; ZOR Suppl. Decl. ¶ 11; Reina Decl. ¶ 13; Pedro Juan Decl. ¶¶ 9-10; Moreno Rodriguez Decl. ¶ 25; Angye Second Suppl. Decl. ¶ 4; Claudina de Paula Decl. ¶ 46; Romero-Paredes Decl. ¶ 15; Piñango Decl. ¶ 5; SNM Decl. ¶ 10; CCD Decl. ¶ 12; PKP Decl. ¶ 8; Monroy Decl. ¶ 29; Aguilar Decl. ¶ 12.

sore throats, coughing, watery eyes, congestion, runny noses, and nosebleeds.[27] Dust is visible suspended in the air.[28] A professional marathon runner held at Camp East Montana now must regularly use an inhaler to breathe.[29] Named Plaintiff Erik Ivan Rodriguez Flores explained: "Sometimes I want my nose to fall off because of the dust. I feel like the dust is eating me from the inside."[30] Although staff wear masks, detained people almost never are provided them.[31]

Rain, rocks, mice, and crickets infiltrate the living areas.[32] Toilets clog and overflow and are not timely fixed.[33] The foul smell of urine, feces, and body odor is ever-present: "We get this smell when we eat, while we are sleeping, and all day."[34] Cleaning by staff is inadequate and at most once per week, and detained people who attempt to clean on their own are unpaid and denied proper cleaning supplies.[35] There is no soap.[36] People instead are forced to ration small packets of shampoo, the size of single-use ketchup packets, but even then do not have enough to wash their hands after using the bathroom and before eating.[37]

---

[27] *Id.*; Camarillo-Gonzalez Decl. ¶ 7; Nelson Decl. ¶ 11; Romero-Paredes Decl. ¶ 15; Ly Decl. ¶ 29; Angye Decl. ¶ 37; ZOR Decl. ¶ 29; JLE Decl. ¶ 17; Reina Decl. ¶ 13; Pedro Juan Decl. ¶ 9; Baccam Decl. ¶ 25; LLH Decl. ¶ 48; Monroy Decl. ¶ 30; Aguilar Decl. ¶ 12.

[28] Baccam Decl. ¶ 19; Rodriguez Sanchez Decl. ¶ 16; Angye Second Suppl. Decl. ¶ 4; Majok Decl. ¶ 18; Aguilar Decl. ¶ 12.

[29] UEG Decl. ¶ 7.

[30] Rodriguez Flores Decl. ¶ 45.

[31] *Id.*; Ly Decl. ¶ 27, 33; Mbabid Decl. ¶ 10; RES Decl. ¶¶ 25, 36; ZOR Decl. ¶ 29; Romero-Paredes Decl. ¶¶ 11, 15; LLH Decl. ¶¶ 9, 47; Nelson Decl. ¶ 28; Navdeep Decl. ¶ 37; Monroy Decl. ¶¶ 30–31.

[32] Ly Decl. ¶¶ 21, 32; Fernandez-Gastelum Decl. ¶ 5; Reina Suppl. Decl. ¶ 8; Senevilay Decl. ¶ 20; RES Decl. ¶ 13; HOK Decl. ¶ 16; ZOR Decl. ¶ 28; Aguilar Decl. ¶ 13.

[33] RES Decl. ¶¶ 25; Navdeep Decl. ¶ 12; ZOR Decl. ¶ 21; Rivero-Gonzalez Decl. ¶¶ 12, 21; Fernandez-Gastelum Decl. ¶ 5; Barreto Decl. ¶ 13; Pedro Juan Decl. ¶ 9; Rodriguez Flores Second Suppl. Decl. ¶ 9; Navdeep Second Suppl. Decl. ¶ 3; Lomio Decl., Ex. 11 at 15.

[34] NYG Decl. ¶ 33; Rodriguez Flores Decl. ¶ 12; Rivero-Gonzalez Decl. ¶¶ 12, 21; PKP Decl. ¶ 15; HOK Decl. ¶ 19, CCD Decl. ¶ 22; JLE Decl. ¶ 11; Angye Decl. ¶ 34; ECF No. 2-13 ¶ 10 ("Angye Suppl. Decl."); RES Decl. ¶ 25; Navdeep Decl. ¶¶ 9, 11; Nelson Decl. ¶ 7; Pedro Juan Decl. ¶ 9; Barreto Decl. ¶ 13; Aguilar Decl. ¶ 9.

[35] Rodriguez Flores Decl. ¶ 38; JLE Decl. ¶ 19; Camarillo-Gonzalez Decl. ¶ 5; RES Decl. ¶¶ 17, 25; Romero-Paredes Decl. ¶¶ 10, 15; Reina Decl. ¶ 13; LLH Decl. ¶ 29; SNM Decl. ¶ 42; HOK Decl. ¶ 20; Navdeep Second Suppl. Decl. ¶ 5; Aguilar Decl. ¶ 9; Lomio Decl., Ex. 8 at 18.

[36] Barreto Decl. ¶ 17; Rodriguez Flores Decl. ¶ 36; RES Decl. ¶¶ 19-20; Reina Decl. ¶ 10; Claudina de Paula Decl. ¶ 6; Baccam Decl. ¶ 18; SNM Decl. ¶ 24; Angye Second Suppl. Decl. ¶¶ 5, 8; ZOR Decl. ¶ 31; JLE Decl. ¶ 12; Majok Decl. ¶ 14; Rodriguez Sanchez Decl. ¶ 15; Pedro Juan Decl. ¶ 11; Piñango Decl. ¶ 6; Monroy Decl. ¶ 28; Aguilar Decl. ¶ 10.

[37] *Id.*

Food is inadequate.[38] Portions are small and food sometimes arrives spoiled, undercooked, or infested with insects.[39] People throw up and experience diarrhea, nausea, gas, stomach pain, and substantial weight loss.[40] People are hungry all the time and think constantly about food.[41] As one man explained: "I am dying of hunger here. I throw up frequently after eating. I am a skeleton of the person I was before. Any day now, I think I will die here."[42] People become irritable, weak, tired, anxious, and stressed.[43] The restricted availability of food causes tensions and fights.[44] People who require special diets do not get them, and people whose medical conditions require food at a specific time do not regularly get it.[45] People have engaged in hunger strikes and other forms of protest because of how unbearable the situation is.[46]

People have severely restricted access to nail clippers and razors for shaving.[47] They are not permitted those items in the housing units and instead have to be lucky enough to get one of

---

[38] Rodriguez Flores, Decl. ¶¶ 17-18; NYG Decl. ¶¶ 44-45; CCD Decl. ¶ 18; Navdeep Decl. ¶¶ 32-33; ZOR Decl. ¶ 35; JLE Decl. ¶¶ 20-21; LLH Decl. ¶¶ 30-34; Gonzalez Ramirez Decl. ¶¶ 46-47; Nelson Decl. ¶¶ 12-14; Majok Decl. ¶¶ 12-13; Rodriguez Sanchez Decl. ¶¶ 5-7, 12; Rivero-Gonzalez Decl. ¶¶ 30-32; Barreto Decl. ¶ 20; ZOR Suppl. Decl. ¶ 6; Pedro Juan Decl. ¶ 13; RES Decl. ¶ 39; Do Decl. ¶ 11; Camarillo-Gonzalez Decl. ¶¶ 10-11; Bounvongxay Decl. ¶¶ 15-16; Ly Decl. ¶¶ 19-20; Baccam Decl. ¶ 26; Senevilay Decl. ¶ 11; SNM Decl. ¶¶ 41, 43; Angye Second Suppl. Decl. ¶ 3; Claudina de Paula Decl. ¶¶ 7, 18; Romero-Paredes Decl. ¶ 13; Piñango Decl. ¶ 4; Navdeep Second Suppl. Decl. ¶ 2; Aguilar Decl. ¶ 11; Lomio Decl., Ex. 11 at 15; *id.*, Ex. 8 at 17.

[39] *Id.*

[40] Rivero-Gonzalez Decl. ¶ 32; Camarillo-Gonzalez Decl. ¶ 11; Rodriguez Flores Decl. ¶ 18; Majok Decl. ¶ 12; LLH Decl. ¶ 33; Rodriguez Sanchez Decl. ¶ 7; Barreto Decl. ¶ 20; Pedro Juan Decl. ¶ 13; Romero-Paredes Decl. ¶ 13; SNM Decl. ¶ 41; Ly Decl. ¶ 20; Do Decl. ¶ 11; Aguilar Decl. ¶ 11.

[41] Rodriguez Flores, Decl. ¶¶ 17-18; NYG Decl. ¶¶ 44-45; CCD Decl. ¶ 18; Navdeep Decl. ¶¶ 32-33; JLE Decl. ¶¶ 20-21; LLH Decl. ¶¶ 30-34; Gonzalez Ramirez Decl. ¶¶ 46-47; Nelson Decl. ¶¶ 12-14; Majok Decl. ¶¶ 12-13; Rodriguez Sanchez Decl. ¶¶ 7, 12; Rivero-Gonzalez Decl. ¶¶ 30-32; Barreto Decl. ¶ 20; ZOR Suppl. Decl. ¶ 6; Pedro Juan Decl. ¶ 13; Do Decl. ¶ 11; Camarillo-Gonzalez Decl. ¶¶ 10-11; Bounvongxay Decl. ¶¶ 15-16; Baccam Decl. ¶ 26; Senevilay Decl. ¶ 11; Ly Decl. ¶¶ 19-20; SNM Decl. ¶¶ 41, 43; Romero-Paredes Decl. ¶ 13; Piñango Decl. ¶ 4.

[42] Gonzalez Ramirez Decl. ¶ 46.

[43] Rodriguez Flores Decl. ¶¶ 17, 29; JLE Decl. ¶ 20; Rodriguez Sanchez Decl. ¶ 7; Rivero-Gonzalez Decl. ¶¶ 30, 32; Bounvongxay Decl. ¶ 15; SNM Decl. ¶ 41; Pedro Juan Decl. ¶ 13; Gonzalez Ramirez Decl. ¶ 15; PKP Decl. ¶¶ 12, 32; HOK Decl. ¶¶ 15, 21; CCD Decl. ¶¶ 16, 19, 23; Piñango Decl. ¶ 10; NYG Decl. ¶¶ 23, 46.

[44] Ly Decl. ¶ 19; Baccam Decl. ¶ 26; Majok Decl. ¶ 13; ZOR Suppl. Decl. ¶ 6; SNM Decl. ¶ 42.

[45] JLE Decl. ¶ 21; Majok Decl. ¶ 12; Barreto Decl. ¶ 20; ZOR Suppl. Decl. ¶ 6; Bounvongxay Decl. ¶¶ 15-16; LLH Decl. ¶ 22; PKP Decl. ¶¶ 7, 9, 31.

[46] Barreto Decl. ¶¶ 11-13, 15-16; LLH Decl. ¶¶ 30, 32; Camarillo-Gonzalez Decl. ¶¶ 12-14.

[47] Rodriguez Flores Decl. ¶ 40; Baccam Decl. ¶¶ 28-30; RES Decl. ¶ 22; SNM Decl. ¶¶ 20-22; PKP Decl. ¶ 21; HOK Decl. ¶ 25; Angye Second Suppl. Decl. ¶ 12; ZOR Decl. ¶ 32; Rodriguez

the limited spots at the barbershop, which has a long waitlist and inconsistent availability—and once was closed for weeks.[48] Guards told people, "you can just bite your nails," and when asked about toenails, guards responded, "If you can bite them, bite them."[49]

### B. With Nothing to Do in a Crowded and Windowless Enclosure, People Become Hopeless and Desperate.

People spend 23 to 24 hours a day confined in a windowless tent at Camp East Montana, unable to see the sun, sky, or the world outside.[50] They become disoriented, unable to tell the time without clocks or windows, and have difficulty distinguishing one day from another.[51] They feel trapped, depressed, anxious, desperate, frustrated, sad, and hopeless, with nothing to occupy the time, and some "want to take their own life because they feel trapped" there.[52] As Named Plaintiff ZOR explained: "I think this idleness is one of the hardest things here for me and for many people around me."[53]

There is little to do in the windowless housing units, and days feel empty.[54] Tensions and tempers run high.[55] There are no recreational or educational programs.[56] There are two televisions

---

Sanchez Decl. ¶ 14; ZOR Suppl. Decl. ¶ 18; Reina Decl. ¶¶ 11-12; Romero-Paredes Decl. ¶ 12; Piñango Decl. ¶ 17; Senevilay Decl. ¶ 25; Navdeep Second Suppl. Decl. ¶ 6.

[48] Baccam Decl. ¶ 28; RES Decl. ¶ 22; SNM Decl. ¶¶ 20-22; PKP Decl. ¶ 21; HOK Decl. ¶ 25; Angye Second Suppl. Decl. ¶ 12; ZOR Decl. ¶ 32; Rodriguez Sanchez Decl. ¶ 14; ZOR Suppl. Decl. ¶ 18; Reina Decl. ¶ 12; Romero-Paredes Decl. ¶ 12; Piñango Decl. ¶ 17; Senevilay Decl. ¶ 25; Navdeep Second Suppl. Decl. ¶ 6; Lomio Decl., Ex. 5 at 3.

[49] Baccam Decl. ¶ 29.

[50] PKP Decl. ¶ 12; Claudina de Paula Decl. ¶ 16; LLH Decl. ¶ 40; JLE Decl. ¶¶ 9, 15; HOK Decl. ¶¶ 15, 28; Navdeep Decl. ¶ 13; Gonzalez Ramirez Decl. ¶¶ 15, 19; RES Decl. ¶¶ 12, 29; UEG Decl. ¶ 8; Angye Second Suppl. Decl. ¶ 9; SNM Decl. ¶ 10; Nelson Decl. ¶ 22; Rodriguez Flores Decl. ¶¶ 5, 12; NYG Decl. ¶ 29; CCD Decl. ¶ 16; Romero-Paredes Decl. ¶ 9; Aguilar Decl. ¶ 8.

[51] PKP Decl. ¶ 12; Gonzalez Ramirez Decl. ¶ 15; Rodriguez Sanchez Decl. ¶ 11; RES Decl. ¶ 12; HOK Decl. ¶ 15; CCD Decl. ¶ 16; JLE Decl. ¶ 9.

[52] PKP Decl. ¶¶ 16; *see also id.* ¶¶ 12, 32, 34; HOK Decl. ¶¶ 15, 28; CCD Decl. ¶¶ 16, 19, 23; Romero-Paredes Decl. ¶ 12; NYG Decl. ¶ 17-18, 23, 30, 46; HOK Decl. ¶ 21; Piñango Decl. ¶¶ 13, 15; JLE Decl. ¶¶ 9, 13; Barreto Decl. ¶ 12; Navdeep Decl. ¶¶ 23-24; Majok Decl. ¶ 11; LLH Decl. ¶¶ 37, 40; Gonzalez Ramirez Decl. ¶ 19; Baccam Decl. ¶ 38; Aguilar Decl. ¶ 8.

[53] ZOR Decl. ¶ 33.

[54] PKP Decl. ¶ 16; HOK Decl. ¶ 21; CCD Decl. ¶ 23; LLH Decl. ¶¶ 37, 40; Gonzalez Ramirez Decl. ¶ 19; Baccam Decl. ¶ 38.

[55] ZOR Decl. ¶¶ 33; Barreto Decl. ¶¶ 12, 26; PKP Decl. ¶¶ 12,16; CCD Decl. ¶¶ 16, 19; JLE Decl. ¶¶ 9, 13; Ly Decl. ¶ 19; Rodriguez Flores Decl. ¶ 29; HOK Decl. ¶ 21.

[56] Rodriguez Flores Decl. ¶¶ 24, 29; LLH Decl. ¶ 37; HOK Decl. ¶ 21; Navdeep Decl. ¶ 16; LLH Decl. ¶ 22; RES Decl. ¶¶ 7, 26; PKP Decl. ¶ 16; CCD Decl. ¶ 23; *id.* at 6 ¶ 6.

in each unit, which are usually on Spanish-language channels and therefore inaccessible to English speakers and others, and disputes arise over access to them.[57] There are not enough chairs for people to sit on, so people mostly stay on their beds all day or walk in circles.[58] Library access is severely limited, with just a few books that also do not meet the language and recreation needs of the population, and there are inconsistent policies on whether people can check out books to read.[59] People are forced to share tablets, which have pay-per-minute movies, games, and music that people cannot afford.[60] People try to make art out of what little is available to them—leftover food wrappers—but guards confiscate it and threaten people with solitary confinement.[61] There are few if any religious programs, and guards have broken up informal gatherings to worship together.[62]

Outdoor time is rare, at most an hour a day, and at unpredictable times.[63] People have gone days or weeks without going outside.[64] When they are taken outside, people are taken to a cramped, caged-in area with artificial grass that quickly gets covered in sand—the same sand that blows into people's eyes and causes respiratory problems.[65] There is no place to sit and rest, and no bathroom.[66] There is no exercise equipment beyond one or two balls, sometimes deflated

[57] Ly Decl. ¶ 26; Baccam Decl. ¶ 38; Rodriguez Flores Decl. ¶ 12; PKP Decl. ¶ 15; HOK Decl. ¶ 19; CCD Decl. ¶ 22; JLE Decl. ¶ 11; LLH Decl. ¶ 25; RES Decl. ¶¶ 10, 28.
[58] Senevilay Decl. ¶ 8; UEG Decl. ¶ 9.
[59] LLH Decl. ¶ 39; CCD Decl. ¶ 26; ZOR Decl. ¶ 19; Nelson Decl. ¶ 23-24; RES Decl. ¶ 24; PKP Decl. ¶ 20; Ly Decl. ¶ 35; Angye Second Suppl. Decl. ¶ 11; Romero-Paredes Decl. ¶ 14; Angye Decl. ¶ 36; Navdeep Decl. ¶ 43; Navdeep Second Suppl. Decl. ¶ 7.
[60] RES Decl. ¶ 27; Rodriguez Flores Decl. ¶¶ 25-27; NYG Decl. ¶ 30; PKP Decl. ¶ 12; HOK Decl. ¶¶ 15, 22-23; CCD Decl. ¶¶ 16, 24; ZOR Decl. ¶¶ 20, 23; JLE Decl. ¶ 16; LLH Decl. ¶ 38; Baccam Decl. ¶¶ 36-37; Monroy Decl. ¶¶ 16-17.
[61] Rodriguez Flores Decl. ¶ 28; ZOR Decl. ¶ 26; ZOR Suppl. Decl. ¶ 16.
[62] Rodriguez Flores Decl. ¶ 30; HOK Decl. ¶ 29; ZOR Suppl. Decl. ¶ 13; RES Decl. ¶ 26.
[63] Rodriguez Flores Decl. ¶¶ 19-20, 23; LLH Decl. ¶ 40; JLE Decl. ¶ 15; NYG Decl. ¶ 35; HOK Decl. ¶ 28; Navdeep Decl. ¶¶ 13-14; ZOR Decl. ¶¶ 23, 25; Gonzalez Ramirez Decl. ¶ 19; Nelson Decl. ¶ 21; Majok Decl. ¶ 16; ZOR Suppl. Decl. ¶ 15; RES Decl. ¶¶ 29-30; UEG Decl. ¶¶ 8-9, Do Decl. ¶ 16; Ly Decl. ¶ 21; Claudina de Paula Decl. ¶ 17; Romero-Paredes Decl. ¶ 8; Piñango Decl. ¶¶ 14-15; Navdeep Second Suppl. Decl. ¶ 4; Aguilar Decl. ¶ 8.
[64] *Id.*
[65] Rodriguez Flores Decl. ¶¶ 19-20, 22-23; LLH Decl. ¶ 40; JLE Decl. ¶ 15; NYG Decl. ¶ 35; HOK Decl. ¶ 28; Navdeep Decl. ¶ 13; ZOR Decl. ¶ 25; Gonzalez Ramirez Decl. ¶ 19; Nelson Decl. ¶¶ 21-22; RES Decl. ¶ 29; UEG Decl. ¶ 8; Do Decl. ¶¶ 7, 16; Baccam Decl. ¶¶ 22, 23, 38; Ly Decl. ¶ 21; Angye Second Suppl. Decl. ¶ 9; Romero-Paredes Decl. ¶ 8; Navdeep Second Suppl. Decl. ¶ 4; Aguilar Decl. ¶ 8.
[66] ZOR Decl. ¶ 25; Gonzalez Ramirez Decl. ¶ 19; SNM Decl. ¶ 61; Navdeep Second Suppl. Decl. ¶ 4.

basketballs, which some people use to play soccer.[67] Everyone else is forced to stand alongside the fence and try to keep out of the way.[68] For many, the top of the yard is covered, so people cannot see the sky and sun above them.[69] The yard is "just another cell"—"a dog pound."[70]

### C. Poorly Trained Guards Harass and Assault People, Leading to Serious Injury and Death.

Guards regularly use unnecessary and excessive force against people, including for harmless conduct and minor infractions.[71] Several guards at one time use force against unresisting people, slamming people to the floor and pressing down forcefully on people's necks, making it difficult to breathe, and indiscriminately deploy chemical munitions.[72] Guards killed one person after he requested his asthma medication—a death the El Paso Medical Examiner ruled a homicide from "asphyxia due to neck and torso compression."[73] Guards assaulted Named Plaintiff Angye so badly that his spine and wrist were fractured.[74] Guards do not always wear nametags, making it difficult to report abuse, and guards falsify paperwork related to use of force.[75]

---

[67] Rodriguez Flores Decl. ¶ 20; ZOR Decl. ¶ 25; LLH Decl. ¶ 40; JLE Decl. ¶ 15; HOK Decl. ¶ 28; Navdeep Decl. ¶ 13; Gonzalez Ramirez Decl. ¶ 19; Nelson Decl. ¶ 22; Do Decl. ¶ 16; Ly Decl. ¶ 21; Claudina de Paula Decl. ¶ 17; Romero-Paredes Decl. ¶ 8.

[68] Rodriguez Flores Decl. ¶¶ 20-22; LLH Decl. ¶ 40; JLE Decl. ¶ 15; Gonzalez Ramirez Decl. ¶ 19; Do Decl. ¶ 16.

[69] LLH Decl. ¶ 40; JLE Decl. ¶ 15; NYG Decl. ¶ 35; HOK Decl. ¶ 28; Navdeep Decl. ¶ 13; Angye Second Suppl. Decl. ¶ 9; Romero-Paredes Decl. ¶ 8; Piñango Decl. ¶ 14; Navdeep Second Suppl. Decl. ¶ 4; Aguilar Decl. ¶ 8.

[70] LLH Decl. ¶ 40; Nelson Decl. ¶ 21.

[71] ZOR Decl. ¶ 39 (eating at tables after 10 pm or waiting for medication); Barreto Decl. ¶¶ 29-36 (witnessed beating of epileptic man for using towel to block light from eyes while sleeping and thrown face-first to the ground after speaking up in protest); Rivero-Gonzalez Decl. ¶ 9 (multiple guards jumped on and punched disabled man who threw himself from his wheelchair after ICE officials told him that he was being deported); Reina Decl. ¶¶ 17-21 (man pulled into bedframe, kicked, carried out of unit, and forcibly handcuffed after telling officer he was sick and needed to lie down); Claudina de Paula Decl. ¶¶ 19-28 (kicked and forcibly restrained after requesting his towel).

[72] Moreno Rodriguez Decl. ¶ 8; ZOR Decl. ¶ 39; Nelson Decl. ¶ 17; Angye Decl. ¶¶ 8-10; Rodriguez Sanchez Decl. ¶¶ 23-27; Barreto Decl. ¶¶ 32-35; Claudina de Paula Decl. ¶¶ 19-28.

[73] Hernández Decl., Ex. 2 ¶ 8; *id.*, Ex. 3 ¶ 7; *id.*, Ex. 5 ¶ 9; *id.*, Ex. 7 ¶ 6; *id.*, Ex. 8 ¶¶ 6-7; Lomio Decl., Ex. 35 at 1.

[74] Angye Decl. ¶¶ 8-16; Dr. Keller Expert Decl. ¶ 181.

[75] Piñango Decl. ¶¶ 7, 8; Romero-Paredes Decl. ¶ 16; Reina Suppl. Decl. ¶ 19; Reina Decl. ¶¶ 23, 27, 29-30; Claudina de Paula Decl. ¶¶ 29, 39; Navdeep Decl. ¶¶ 18-19, 25-29; Angye Decl. ¶¶ 18, 20, 24-25.

ICE's own oversight body found that staff are not trained "in approved methods of self-defense, crisis intervention, conflict de-escalation, use-of-force techniques, recognizing signs and symptoms of mental illness, and reporting requirements," "prohibited use-of-force acts and techniques," or "the use of chemical agents, including the treatment of individuals exposed to them."[76] Staff, in violation of policy, do not document use of force; do not preserve video, audio, and other evidence related to uses of force; and do not conduct appropriate after-action review.[77] Evidence related to the homicide by guards "was missing or destroyed."[78]

Guards put their hands all over people's bodies every time people enter or exit the housing unit, and insert their hands in people's waistbands.[79] People feel violated because of the invasive and constant body searches.[80] A guard pressed his penis against someone's buttocks during a search, which triggered memories of childhood sexual assault and caused severe emotional distress.[81] Guards have put their hands "under [a person's] pants, moving from the thigh area to the area near [the] penis and testicles."[82]

Guards also harass and verbally abuse people in their custody, using profanity and calling people "f*ggot," "homo," "gay," "pendejo," "chino," "fucker," and "worse than women."[83] In one case, a guard told other detained people that someone had HIV and "then had them vote on whether [that person] should be removed from the housing unit because [they] have HIV."[84] Guards routinely threaten people with and confine people to solitary confinement in response to routine

[76] Lomio Decl., Ex. 10 at 8.
[77] Lomio Decl., Ex. 9 at 7-9.
[78] Lomio Decl., Ex. 8 at 18.
[79] Gonzalez Ramirez Decl. ¶¶ 14, 20, 32; Rodriguez Flores Decl. ¶ 31; Ly Decl. ¶ 23; Senevilay Decl. ¶ 5; Baccam Decl. ¶ 24; RES Decl. ¶ 29; CCD Decl. ¶¶ 27-28; ZOR Decl. ¶ 23; ZOR Suppl. Decl. ¶¶ 4, 19; JLE Decl. ¶ 30; LLH Decl. ¶ 28; PKP Decl. ¶¶ 22, 26; NYG Decl. ¶ 32; HOK Decl. ¶ 26; Navdeep Decl. ¶ 16.
[80] *Id.*
[81] CCD Decl. ¶ 28.
[82] ZOR Decl. ¶ 23; *see also* JLE Decl. ¶ 30.
[83] Ly Decl. ¶ 40; PKP Decl. ¶ 27; Claudina de Paula Decl. ¶¶ 23, 28; Reina Decl. ¶¶ 19, 35; Aguilar Decl. ¶¶ 16–18.
[84] Fernandez-Gastelum Decl. ¶ 11.

requests or minor infractions.[85] Conditions in solitary confinement are extremely isolating and people's mental health deteriorates.[86] Guards often speak only in Spanish, saying, "This is El Paso, you better learn how to speak Spanish."[87] Guards and ICE officials encourage people to give up their legal rights and accept deportation to avoid continued detention, calling people "illegals" and telling a man from Cuba who declined to be deported to Mexico that he would be "locked up in this facility for [his] entire life."[88]

Because of the way they and others have been treated by guards at Camp East Montana, people feel sad, frustrated, and helpless.[89] People are scared of the guards because of what they have witnessed the guards do to others, do not believe that guards will keep them safe, and are afraid to ask for help because they fear that they too will be assaulted or abused.[90]

### D. The Healthcare Delivery System at Camp East Montana Is Dangerously Deficient and Puts People at Risk of Harm.

The healthcare delivery system at Camp East Montana is broken and puts all people at serious risk of harm. As soon as people arrive, they are at risk of bad medical outcomes—crowded into a holding room with sick people; subjected to delayed, nonconfidential, and incomplete medical screening; and endangered by lapses in prescribed medications and treatment, including for tuberculosis, cancer, diabetes, heart disease, and HIV.[91]

---

[85] Gonzalez Ramirez Decl. ¶¶ 19-20 ("I don't like going to recreation and don't feel safe there . . . but I must go because otherwise I will be sent to the punishment cell."); Rivero-Gonzalez Decl. ¶¶ 16-17, 23 (disabled man sent to solitary confinement for asking for personal belongings and threatened with 30 days in solitary confinement for refusing medical appointment because he feared pain and falling from his wheelchair while being pushed along inaccessible path to clinic); Reina Suppl. Decl. ¶ 19; Aguilar Decl. ¶ 11.

[86] Navdeep Decl. ¶ 24; Claudina de Paula Decl. ¶¶ 30, 31, 41-43; Piñango Decl. ¶¶ 9, 13, 15; Rivero-Gonzalez Decl. ¶ 23; Declaration of Francisco Rossa Chanchamire, filed herewith, ¶ 12.

[87] Baccam Decl. ¶ 33; *see also* Senevilay Decl. ¶ 9; Angye Decl. ¶ 36; Navdeep Dec. ¶ 43.

[88] Hernández Decl., Ex. 2 ¶ 13; Baccam Decl. ¶¶ 27, 42; Navdeep Decl. ¶ 17; ZOR Decl. ¶¶ 36-37; JLE Decl. ¶ 32; Moreno Rodriguez Decl. ¶¶ 6-7, 10-11, 15-16; Gonzalez Ramirez Decl. ¶ 12; LLH Decl. ¶¶ 10, 13; Rodriguez Flores Decl. ¶ 13; Claudina de Paula Decl. ¶ 47.

[89] Fernandez-Gastelum Decl. ¶ 11; Ly Decl. ¶ 37; Barreto Decl. ¶ 37; Claudina de Paula Decl. ¶ 39; PKP Decl. ¶ 34; HOK Decl.¶ 31.

[90] Ly Decl. ¶ 37; Do Decl. ¶ 25; NYG Decl. ¶ 40; SNM Decl. ¶ 55; ZOR Suppl. Decl. ¶ 6; Reina Suppl. Decl. ¶ 17; Monroy Decl. ¶¶ 20, 25.

[91] Rodriguez Flores Decl. ¶ 7; Ly Decl. ¶¶ 11-13; Bounvongxay Decl. ¶¶ 7-8; Do Decl. ¶ 4; PKP Decl. ¶¶ 8-9; Nelson Decl. ¶ 5; ZOR Decl. ¶¶ 9-12; UEG Decl. ¶ 7; SNM Decl. ¶ 18; NYG Decl. ¶ 9; HOK Decl. ¶ 9; CCD Decl. ¶¶ 13; *id.* at 5 ¶ 2; JLE Decl. ¶ 7; LLH Decl. ¶¶ 8, 11, 15, 21;

Healthcare staff provide grossly incompetent care in inappropriate conditions. For example, staff force people to choose between healthcare and sleep by conducting routine medical appointments in the middle of the night.[92] Staff conduct healthcare encounters in public hallways, provide delayed and incompetent evaluations, and fail to recognize and provide basic treatment in response to serious symptoms and abnormal vital signs.[93] In one case, staff's repeated failure to examine, diagnose, and treat a husband and father for months—even after repeated requests for medical attention—resulted in his preventable death from bleeding and sepsis.[94] People with chronic medical conditions are not appropriately managed or treated, including patients with HIV, hypertension, hyperlipidemia, asthma, and diabetes.[95] Patients do not timely receive their prescribed medications, including for diabetes, HIV, high blood pressure, depression, anxiety, and claustrophobia, and are denied appropriate meals, including for diabetes.[96] People are denied necessary specialty and emergency care, including through lack of working emergency equipment and failure to timely refer people to emergency services.[97] In some cases, staff refuse to even give the 9-1-1 operator their name or position.[98] Mental health care is cursory and inadequate, and a nurse told someone to harm himself, making him stop asking for help.[99]

---

Gonzalez Ramirez Decl. ¶ 10; Rodriguez Flores Second Suppl. Decl. ¶ 10; Majok Decl. ¶ 6; Rodriguez Sanchez Decl. ¶¶ 3-4; Rivero-Gonzalez Decl. ¶¶ 7, 42; Barreto Decl. ¶ 8; Claudina de Paula Decl. ¶ 11; Angye Decl. ¶¶ 6, 13; Romero-Paredes Decl. ¶ 5; Monroy Decl. ¶¶ 8-10, 38; Dr. Keller Expert Decl. ¶¶ 32-65.

[92] Senevilay Decl. ¶ 16 (around 3:30 am); Rivero-Gonzalez Decl. ¶ 29 (midnight until 6 or 7 am); Claudina de Paula Decl. ¶ 20 (around 4 am); ZOR Suppl. Decl. ¶ 7 (middle of the night); Gonzalez Ramirez Decl. ¶ 37 (same); Do Decl. ¶ 21 (midnight); JLE Decl. ¶ 26 (around 1-3 am); SNM Decl. ¶ 30 (around 11 pm or 2 am until around 4 or 5 am).

[93] Dr. Keller Expert Decl. ¶¶ 26, 66, 118, 155, 222-26; Rodriguez Flores Decl. ¶¶ 49; Nelson Decl. ¶ 36; Baccam Decl. ¶ 39; Camarillo-Gonzalez Decl. ¶ 23; LLH Decl. ¶ 12; Aguilar Decl. ¶ 7.

[94] Dr. Keller Expert Decl. ¶¶ 195-218; Pedro Juan Decl. ¶¶ 18-21.

[95] Dr. Keller Expert Decl. ¶¶ 86-110.

[96] PKP Decl. ¶ 7; Nelson Decl. ¶ 38; Majok Decl. ¶ 12; Bounvongxay Decl. ¶¶ 15-16; JLE Decl. ¶ 21; Senevilay Decl. ¶¶ 14-15; Romero-Paredes Decl. ¶¶ 6-7; Rivero-Gonzalez Decl. ¶¶ 19, 23-24, 28; Claudina de Paula Decl. ¶¶ 35-36; Nelson Dedcl. ¶¶ 5, 30; Gonzalez Ramirez Decl. ¶¶ 35, 37; RES Decl. ¶¶ 33-34; CCD Decl. ¶ 28; *id.* at 5 ¶¶ 1, 4; Rossa Chanchamire Decl. ¶¶ 5, 7.

[97] Dr. Keller Expert Decl. ¶¶ 121-26 (specialty care); *id.* ¶¶ 127-133 (emergency care); Declaration of Juan Prieto, filed herewith, Ex. 14 at 6-13, 19-22, 27-42.

[98] Prieto Decl., Ex. 14 at 16, 18, 25.

[99] Majok Decl. ¶ 11; Rodriguez Sanchez Decl. ¶ 30; Rivero-Gonzalez Decl. ¶¶ 20, 22, 26-27; Fernandez-Gastelum Decl. ¶ 13; Navdeep Decl. ¶ 23; PKP Decl. ¶ 32; NYG Decl. ¶ 23; CCD Decl. at 5 ¶ 3; Monroy Decl. ¶¶ 37; Aguilar Decl. ¶ 6; Dr. Keller Expert Decl. ¶¶ 154-64.

In addition, unhygienic living conditions, contamination from dust and sand, and lack of soap put all at risk of serious medical harm, including from Valley Fever (coccidioidomycosis).[100] People have experienced serious medical symptoms from sand and dust in their confined living spaces.[101] Tuberculosis, measles, and other infectious diseases have infiltrated the tent encampment, resulting in isolation and quarantine of hundreds of people.[102] In February and March 2026, over a dozen people at Camp East Montana were infected with measles—a "highly contagious" disease that can "cause serious health complications," including "pneumonia, encephalitis (swelling of the brain) and in some cases, death"—and hundreds of people were held in quarantine and isolation for measles again in May and June.[103]

Government oversight entities have found that staff do not properly implement required screening, treatment, and quarantine protocols for tuberculosis—"a serious health threat, especially for people who live or work in correctional facilities."[104] In October 2025, a young man undergoing treatment for tuberculosis repeatedly was denied his medication upon arrival and was made to sleep on the floor next to other people before seeing medical staff.[105] When he was released from custody two months later, he was left at a shelter, where he knew no one, without his tuberculosis medication, medical records, or information on how to continue to treat his tuberculosis.[106] Then, "in November 2025, a detained noncitizen with tuberculosis was housed

[100] Do Decl. ¶¶ 14-15; Rodriguez Flores Decl. ¶ 11; Ly Decl. ¶¶ 25, 27, 32; Senevilay Decl. ¶ 20; Angye Decl. ¶ 34; Angye Second Suppl. Decl. ¶ 10; Bounvongxay Decl. ¶ 5; Camarillo-Gonzalez Decl. ¶¶ 5, 8; RES Decl. ¶¶ 13, 25; NYG Decl. ¶¶ 33-34; HOK Decl. ¶¶ 16, 19; CCD Decl. ¶ 17; Navdeep Decl. ¶¶ 11-12; ZOR Decl. ¶ 21; JLE Decl. ¶ 18; Nelson Decl. ¶¶ 7, 9; Majok Decl. ¶ 15; Rivero-Gonzalez Decl. ¶ 21; Barreto Decl. ¶ 12; ZOR Suppl. Decl. ¶ 5; Pedro Juan Decl. ¶ 9; Piñango Decl. ¶ 18; Dr. Keller Expert Decl. ¶¶ 143-46.

[101] Rodriguez Sanchez Decl. ¶ 16; Angye Second Suppl. Decl. ¶ 4; Majok Decl. ¶ 18; Camarillo-Gonzalez Decl. ¶ 7; Nelson Decl. ¶ 11; Romero-Paredes Decl. ¶ 15; Ly Decl. ¶ 29; Angye Decl. ¶ 37; ZOR Decl. ¶ 29; JLE Decl. ¶ 17; Reina Decl. ¶ 13; Pedro Juan Decl. ¶ 9; Baccam Decl. ¶¶ 19, 25; LLH Decl. ¶ 48; Monroy Decl. ¶¶ 29–31; Aguilar Decl. ¶ 12.

[102] Lomio Decl., Exs. 23, 24; Senevilay Decl. ¶¶ 22-26; Rodriguez Sanchez Decl. ¶ 38; Reina Decl. ¶¶ 15-16; Romero-Paredes Decl. ¶ 11; Nelson Decl. ¶¶ 28-29, 31-32; Gonzalez Ramirez Decl. ¶¶ 11, 41; ZOR Decl. ¶ 50; Navdeep Decl. ¶ 37; LLH Decl. ¶ 47; SNM Decl. ¶ 27; Monroy Decl. ¶ 36.

[103] Lomio Decl., Ex. 23 at 1; *id.*, Ex. 24 at 1; *id.*, Ex. 25; *id.*, Ex. 26; *id.*, Ex. 28.

[104] Lomio Decl., Ex. 27; *id.*, Ex. 9 at 11-12; *id.*, Ex. 8 at 17.

[105] Mbabid Decl. ¶¶ 9-12.

[106] *Id.* ¶ 18.

with the general population."[107] Additional cases of tuberculosis were identified at Camp East Montana in February 2026 and an inspection by the ODO that same month identified multiple violations of governing standards related to the housing and evaluation of a person with symptoms suggestive of pulmonary tuberculosis.[108] During a follow up inspection in May 2026, ODO found that in 16% of the records reviewed, people did not receive appropriate tuberculosis screening "prior to placement in general population."[109]

People are released to the community or transferred to other facilities without their medications and without necessary medical records and forms to ensure continuity of care in the community or at the receiving facility.[110] This includes the person described above who was released to a shelter without his tuberculosis medication.[111] It also includes people with diabetes and HIV who were transferred to another facility in El Paso without medical information needed to ensure uninterrupted medical care.[112] Finally, Camp East Montana does not maintain complete and accurate medical records and is unable to produce complete medical records upon request.[113] Patients, their representatives, and next of kin seeking medical records are given the run-around—or no information at all.[114]

## ARGUMENT

A preliminary injunction is warranted when the movant demonstrates "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public

[107] Lomio Decl., Ex. 8 at 17; *id.*, Ex. 9 at 11-12.
[108] Lomio Decl., Ex. 9 at 11-12.
[109] Lomio Decl., Ex. 10 at 11.
[110] Mbabid Decl. ¶ 18; Baccam Decl. ¶ 41; Bounvongxay Decl. ¶ 14; Angye Decl. ¶ 11; Angye Second Suppl. Decl. ¶ 15.
[111] Mbabid Decl. ¶ 18.
[112] Bounvongxay Decl. ¶¶ 9, 14; Camarillo-Gonzalez Decl. ¶¶ 23, 27; Rossa Chanchamire Decl. ¶ 14; Dr. Keller Expert Decl. ¶ 176.
[113] Rivero-Gonzalez Decl. ¶ 19; Reina Suppl. Decl. ¶¶ 5-6; Cristobal Decl. ¶ 31; Camarillo-Gonzalez Decl. ¶ 27; Angye Decl. ¶¶ 38-39; ECF No. 13-2 ¶ 11; ECF No. 13-14 ¶ 57; Monroy Decl. ¶ 33; Lomio Decl. ¶¶ 59-76 & Exs. 29-33; Dr. Keller Expert Decl. ¶¶ 19, 166.
[114] *Id.*; Declaration of Jennifer de la Cruz, filed herewith, ¶¶ 4-21.

interest." *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011) (citation omitted). Where, as here, the government is the defendant, the final two elements merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). As explained below, Plaintiffs easily satisfy each element and the Court should grant relief.

The proposed injunction, in line with court orders in similar cases, is carefully structured to allow Defendants to develop remedial plans in the first instance and to appoint independent experts to assist the Court in evaluating the plans and to support Defendants in implementing them. *See, e.g.*, *L.T. v. ICE*, No. 5:26-00322, 2026 WL 2131142 (C.D. Cal. July 16, 2026); *Gomez Ruiz v. ICE*, No. 3:25-09757, 2026 WL 391924 (N.D. Cal. Feb. 10, 2026). That is necessary given Defendants' failures to timely and fully address known violations. Dean Williams, an experienced correctional administrator who oversaw two state prison systems, explained that "government officials have not acted with sufficient urgency to remedy unsafe conditions" and "external guidance and action" likely is needed to "fully and durably" correct violations. Williams Expert Decl. ¶¶ 2, 125, 133; *see id.* ¶¶ 120-132 (discussing inadequacy of oversight and accountability mechanisms). Dr. Jeffrey Keller, an experienced correctional physician and administrator who has overseen healthcare delivery in detention facilities in nine states, recommended appointment of an "independent monitor" in light of "pervasive, repeated, and substantial problems with healthcare delivery at Camp East Montana." Dr. Keller Expert Decl. ¶¶ 3-4, 228; *see also id.* ¶¶ 219-226.

## I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

To meet the first element, Plaintiffs "must present a prima facie case, but need not prove that [they are] entitled to summary judgment." *Daniels Health Sciences, L.L.C. v. Vascular Health Sciences, L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013). Indeed, the Supreme Court has long cautioned against "improperly equat[ing] 'likelihood of success' with 'success'" when analyzing the first element. *See Univ. of Texas v. Camenisch*, 451 U.S. 390, 394 (1981). Here, the voluminous record is more than sufficient to present a *prima facie* case of Fifth Amendment violations.

When the government holds people in detention, it must "provide for [their] basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety," or run afoul of the Eighth Amendment (criminal detainees) or the Due Process Clause (civil detainees). *See Hare v. City of*

*Corinth, Miss.*, 74 F.3d 633, 639 (5th Cir. 1996) (en banc) (citation omitted); *see also Brown v. Plata*, 563 U.S. 493, 511 (2011) ("A prison that deprives prisoners of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society."). Civil detainees "are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg v. Romeo*, 457 U.S. 307, 322 (1982). Because immigration detention is "civil, not criminal," it must be "nonpunitive in purpose and effect." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001).

Where, as here, Plaintiffs allege unconstitutional conditions of confinement, courts apply the test set forth in *Bell v. Wolfish*, 441 U.S. 520 (1979). *See Hare*, 74 F.3d at 639, 644; *Edwards v. Johnson*, 209 F.3d 772, 778 (5th Cir. 2000). Under *Bell*, "the determination whether . . . restrictions and practices constitute punishment in the constitutional sense depends on whether they are rationally related to a legitimate nonpunitive governmental purpose and whether they appear excessive in relation to that purpose." 441 U.S. at 561. Plaintiffs need not prove "an official intent to punish"; such intent is inferred. *Shepherd v. Dallas County*, 591 F.3d 445, 454 (5th Cir. 2009). An explicit policy as well as "an unstated or *de facto* policy, as evidenced by a pattern of acts or omissions," can support a finding of impermissible punishment. *Id.* at 452; *cf. Dunn v. Comm'r, Alabama Dep't of Corr.*, 179 F.4th 1277, 1314 (11th Cir. 2026) ("When taken together, all contributing factors detail a prison system that failed as a whole to care for its inmates."); *Plata*, 563 U.S. at 505 n.3 (court need not determine whether individual instances of deficient care violate the Constitution where "Plaintiffs rely on systemwide deficiencies").

As explained below, harsh custodial conditions and grossly inadequate healthcare serve no legitimate governmental purpose. That is clear from the testimony of two detention experts. Mr. Williams found that the conditions at Camp East Montana "shock the conscience," are "far beyond those of the most secure prisons I have overseen," and in fact *weaken* institutional security. Williams Expert Decl. ¶ 18. Dr. Keller found that "[t]he very foundations of healthcare delivery in detention facilities, including systems related to medical screening, medical records, medication administration, lab results, sick call, chronic care, emergency care, and specialty care, are deeply

flawed, and healthcare staff at all levels are providing incompetent care." Dr. Keller Expert Decl. ¶ 227. "Poor healthcare and unsafe conditions at Camp East Montana have resulted in preventable death and put all people at risk of harm, including serious injury and death." *Id.* ¶ 23.

In addition, conditions at Camp East Montana violate Defendants' own detention standards. Those standards were designed to "ensure that detainees are treated humanely; protected from harm; provided appropriate medical and mental health care; and receive the rights and protections to which they are entitled." ECF No. 13-5 at 3. There certainly can be no legitimate governmental purpose in violating those standards. *See Pablo Sequen v. Albarran*, 810 F. Supp. 3d 1084, 1131 (N.D. Cal. 2025) (finding that the government's "failure to provide adequate medical care is punitive" because "ICE itself commits to providing such medical care" and thus "the government cannot reasonably assert an interest in denying it").

Courts across the country, considering materially similar conditions in immigration detention facilities, have found a substantial likelihood of success under the Fifth Amendment. *See L.T. v. ICE*, No. 5:26-CV-00322, 2026 WL 2338452, at *15-19 (C.D. Cal. Aug. 12, 2026) (cleanliness, food, outdoor recreation, restrictive housing, medical care); *D.N.N. v. Liggins*, 822 F. Supp. 3d 543, 590-97 (D. Md. 2026) (cleanliness, hygiene supplies, medical care); *Gomez Ruiz v. ICE*, 834 F. Supp. 3d 835, 847-850 (N.D. Cal. 2026) (outdoor recreation, temperature-appropriate clothing, medical care); *Pablo Sequen*, 810 F. Supp. 3d at 1128-131 (sleeping conditions, cleanliness, hygiene supplies, medical care); *Barco Mercado v. Noem*, 800 F. Supp. 3d 526, 571-573 (S.D.N.Y. 2025) (sleeping conditions, unsanitary conditions, food, water, medical care); *Moreno Gonzalez v. Noem*, No. 25-13323, 2025 WL 3170784 (N.D. Ill. Nov. 5, 2025) (cleanliness, hygiene supplies, food, medication).

There is no reason to depart from that line of cases here. In fact, rampant abuse and disregard at Camp East Montana "suggest that harsh conditions of confinement are a deliberate feature of the enforcement program intended to induce self-deportation and to deter illegal immigration." *See Barco Mercado*, 800 F. Supp. 3d at 575 (noting that the Secretary of DHS "acknowledged that ICE selected a notoriously harsh state prison as an ICE detention center for

aliens charged with violent crimes in part to encourage self-deportation"). The El Paso ICE Enforcement and Removal Operations ("ERO") reposted a tweet by Defendant ICE shortly after Camp East Montana opened, warning: "Leave on your OWN terms. AVOID THE JAIL CELL. AVOID THE HUMILIATION." Lomio Decl. ¶ 37. A barrage of press releases and tweets, some entitled "Worst of the Worst," accompanied by mug shots, photographs of people in handcuffs, and lists of past crimes, suggest an agency determined to villainize and re-punish people for past criminal convictions. *Id.*, Exs. 18-20. That it cannot do. *Bell*, 441 U.S. at 539 n.20 ("Retribution and deterrence are not legitimate nonpunitive governmental objectives."); *Singh v. Bondi*, No. 26-00541, 2026 WL 752457, at *10 (W.D. Tex. Mar. 16, 2026) ("Civil detention is punitive if it becomes a mechanism for retribution or general deterrence.") (citation modified).

**A. Harsh, Degrading, and Unsafe Living Conditions Serve No Legitimate Governmental Purpose.**

Harsh and restrictive living conditions at Camp East Montana as summarized above serve no legitimate nonpunitive governmental purpose. *See* pages 3-10; Hernández Decl., Ex. 1 at 19-66, 79-87. As Mr. Williams explained, the prolonged intake process, including confinement of people to crowded and filthy holding cells overnight without bedding, mattresses, or pillows "increases anxiety, anger, and hostility to the system, making everyone—detained individuals and staff alike—less safe." Williams Expert Decl. ¶¶ 73-76; *see Pablo Sequen*, 810 F. Supp. 3d at 1128 (issuing preliminary injunction after finding that ICE makes people sleep "on the floor of hold rooms," in "frigid temperatures," without "beds, mattresses, pillows, or blankets," and with inadequate cleaning). Similarly, delayed and inaccurate information about the facility's policies and rules serves no legitimate governmental purpose and instead "only leads to confusion, distrust, and disorder." Williams Expert Decl. ¶ 77.

Unsanitary housing units and excessively cold temperatures similarly serve no legitimate governmental purpose and instead "create a risk of disorder," "go against principles of basic decency," "raise serious health and safety concerns," and "can have a debilitating impact on a person's physical and psychological well-being." Williams Expert Decl. ¶¶ 78, 82, 89. Unhygienic

living conditions and lack of access to soap "put all . . . at increased risk of disease." Dr. Keller Expert Decl. ¶ 135; *see Duvall v. Dallas County, Texas*, 631 F.3d 203, 208-09 (5th Cir. 2011) (affirming conditions-of-confinement verdict where jail officials failed to take necessary steps to control MRSA "outbreak through tracking, isolation, and improved hygiene practices"). Sand and dust contamination in living spaces also pose a health hazard and put people at risk of "asthma and chronic respiratory disease," including "serious, long-term lung problems" from Valley Fever (coccidioidomycosis), a fungal infection of the lungs. Dr. Keller Expert Decl. ¶ 143; *see also id.* ¶ 144 (discussing health risks from dust, mold, and rats); *id.* ¶ 137 (discussing health risks from sewage and backed up toilet water). The same is true of extreme restrictions on personal hygiene and grooming supplies, which Mr. Williams found to be "far outside the norm of prisons and jails," explaining that razors and nail clippers "are essential items and, even in the most secure of prison facilities, should be available in the housing units daily." Williams Expert Decl. ¶¶ 86-87.

In addition, no legitimate governmental purpose is served by paltry and inadequate food. *See generally Cooper v. Sheriff, Lubbock County*, 929 F.2d 1078, 1083 (5th Cir. 1991) ("depriving a prisoner of adequate food is a form of corporal punishment"). "[A]dequate nutrition is essential in any detention facility" and, as Mr. Williams explained after reviewing the record here of inadequate and spoiled food, "[s]carcity of any essential resource, including food, harms institutional security by creating anxiety, frustration, disorder, and potentially desperate actions." Williams Expert Decl. ¶ 112. Dr. Keller also explained the "many adverse health effects of inadequate nutrition," including that "the body's ability to fight infections is diminished if the immune system lacks adequate calories to function properly" and that "poor nutrition causes an increased release of stress hormones which can, over time, increase the risk of heart disease, strokes and other cardiovascular maladies." Dr. Keller Expert Decl. ¶ 148.

If further evidence were needed, one need only look to the fact that conditions at Camp East Montana violate even Defendants' own detention standards—there certainly can be no legitimate governmental purpose served by such noncompliance. For example, conditions in hold rooms violate Standard 2.5 of the NDS 2025, which requires among other things "sufficient seating

for the maximum room capacity" and "an appropriate amount of privacy" for toilets. ECF No. 13-5 at 38. Unhygienic conditions, extreme cold, and lack of cleaning supplies violate Standard 1.1 of the NDS 2025, failure to provide temperature-appropriate clothing violates Standard 4.4, and lack of hygiene supplies violates Standards 2.1 and 4.4.[115] The lack of soap and personal grooming supplies makes it impossible to comply with the handbook's direction to "keep your fingernails and toenails clipped short," "[d]o not share your razor with others," and "use soap to wash your hands." Lomio Decl., Ex. 36 at 15, 17, 18.[116] Paltry and inedible food violates Standard 4.1, which sets requirements for "nutritious, attractively presented meals," and turns the handbook's instructions—"Eat three (3) good meals a day. Be sure to eat fruit and vegetables. Don't eat too much candy."—into a cruel joke. ECF No. 13-5 at 104; Lomio Decl., Ex. 36 at 18. Failure to timely provide accurate information about rules violates Standard 6.1, which requires that "[e]very detainee" upon arrival be given a handbook that includes "the rules and procedures in effect at the facility." ECF No. 13-5 at 187.

### B. Excessive Idleness and Lack of Recreation and Programming Serve No Legitimate Governmental Purpose.

The absence of meaningful programming and activities, religious services, recreational opportunities, and outdoor time at Camp East Montana, as summarized above, also serves no legitimate governmental purpose. *See* pages 10-12; Hernández Decl., Ex. 1 at 66-79. As Mr. Williams explained, "maximizing recreational opportunities and access to the outdoors enhances order and safety in the institution for everyone." Williams Expert Decl. ¶ 91. That is why prisons and jails "routinely offer access to education, entertainment, and rehabilitative

---

[115] *See, e.g.*, ECF No. 13-5 at 13-14, Standard 1.1 (requiring, among other things, that "[e]nvironmental health conditions . . . be maintained at a level that meets recognized standards of hygiene"; "appropriate temperatures, air and water quality, ventilation, lighting, noise levels, and detainee living space"; "cleanliness and sanitation"; and "[s]uitable and sufficient cleaning supplies and equipment"); *id.* at 134, Standard 4.4 (requiring "temperature-appropriate" clothing"); *id.* at 26, Standard 2.1 ("Staff shall provide detainees with articles necessary for maintaining proper hygiene."); *id.* at 135, Standard 4.4 (requiring each person receive, "at a minimum," "[o]ne bar of bath soap, or equivalent" and "[o]ne bottle of shampoo, or equivalent").

[116] Page numbers to this exhibit refer to the PDF pages of the exhibit, as the exhibit does not have internal pagination.

programming," "outdoor yard recreation," "a wide range of books, audiobooks, newspapers, and magazines . . . , in various languages and formats," and "a multitude of faith opportunities." *Id.* ¶¶ 95-96, 99, 106. A policy of one hour of recreation per day, even if it were consistently applied (which it is not), "is less than people serving criminal sentences in disciplinary segregation typically get," and the spartan conditions in the outdoor caged enclosure are at odds with what is regularly offered in prisons and jails. *Id.* ¶¶ 96-97; *see also L.T.*, 2026 WL 2131142, at *1 (ordering individual access to outdoor recreation spaces "for at least four hours per day, seven days per week, unless there are documented security risks or reasons necessitating otherwise"). Use of solitary confinement should be sparing, with robust protections, and people should "have access to a wide range of recreational materials" to mitigate its harmful effects, including psychological deterioration. Williams Expert Decl. ¶¶ 64-66.

Conditions at Camp East Montana are in fact detrimental to safety and security. As Mr. Williams explained, "tensions, fights, and self-isolation over limited 'shared' access to televisions and tablets and cramped outdoor recreation yards" all serve as "examples of how scarcity in a detention setting result in conflict and make detained individuals, staff, and the institution as a whole less safe." Williams Expert Decl. ¶¶ 101, 113. And, after reviewing "reports that people feel 'empty,' 'trapped,' 'depressed,' 'emotionally distressed,' 'hopeless,' 'frustrated,' 'sad,' and 'anxious' at Camp East Montana, and resort to walking in circles 'to avoid going crazy' because '[t]here's nothing else to do,'" Mr. Williams explained that such feelings are "precisely what you do not want in a detention facility." *Id.* ¶ 100.

Again, conditions at Camp East Montana conflict with ICE's own standards. *See, e.g.*, ECF 13-5 at 159-160, Standard 5.2 (requiring that dayrooms "offer board games, television, leisure reading materials, and other sedentary activities," and that "[e]xercise areas . . . offer a variety of fixed and movable equipment"); *id.* at 163, Standard 5.3 ("All facilities shall designate adequate space for religious activities that can equitably meet the needs of the detainee population."). Conditions in solitary confinement are at odds with Defendant ICE's assertion that "detainees in segregation experience basic living conditions akin to those provided to the general population."

Lomio Decl., Ex. 5 at 1. And, again, conditions make it impossible to comply with the handbook's directions. *See id.*, Ex. 36 at 17, 18 ("Play sports, walk around, run in place, or do pushups"), 22 ("Watch TV shows that make you laugh."), 29-31.

In fact, at other immigration detention facilities, people "got a lot more outdoor time and had other things to keep [them] occupied," including "exercise equipment like weights and a stationary bicycle." RES Decl. ¶ 31; ZOR Decl. ¶¶ 8, 14. And restrictions at Camp East Montana are more severe than what people experienced living and working in prison or jail, with one person noting that limits on recreation at Camp East Montana were even more extreme than solitary confinement in prison. CCD Decl. at 6 ¶ 6. People report that, in prison or jail, they had access to their own tablets, could watch movies and educational videos, had a bigger library, were offered vocational programs, "could work and go to classes and other programs, like AA meetings and church," and sometimes got to "be outside all day." Ly Decl. ¶¶ 23-24; PKP Decl. ¶ 16; CCD Decl. ¶¶ 19, 23; SNM Decl. ¶ 6; RES Decl. ¶¶ 7, 31.

### C. Staff Abuse and Harassment Serve No Legitimate Governmental Purpose.

Staff abuse and harassment, as summarized above at pages 12-14, serves no legitimate governmental purpose. *See also* Hernández Decl., Ex. 1 at 1-19. Use of unnecessary and excessive force, including assaulting people who are not resisting and using prohibited neck compression techniques, and failure to comply with NDS 2025 requirements regarding use, documentation, and oversight of force, serve no legitimate purpose and instead put all people "at serious risk of harm, up to and including death." Williams Expert Decl. ¶ 50; *see* ECF No. 13-5 at 51, Standard 2.8 (setting forth detailed requirements for "Use of Force and Restraints").

Similarly, verbal abuse by staff "serves only to humiliate, intimidate, and endanger people and serves no legitimate nonpunitive governmental purpose." Williams Expert Decl. ¶ 52; *compare with Barco Mercado*, 800 F. Supp. 3d at 576 (finding that "abusive and demeaning behavior by guards . . . suggests an intention to humiliate and degrade detainees"). It also, again, violates Defendants' own standards. *See, e.g.*, ECF No. 13-5 at 73, Standard 2.10 (requiring staff to "address detainees in a professional and respectful manner"); *id.* at 79, Standard 2.11

(prohibiting "[t]hreats, intimidation, harassment, indecent, profane or abusive language, or other actions or communications aimed at coercing or pressuring a detainee to engage in a sexual act"); *see also* Lomio Decl., Ex. 36 at 37 ("It is CEM policy to treat detainees with dignity and respect"). The same is true of staff's exclusive use of Spanish and refusal to speak in English for people who do not know Spanish. Williams Expert Decl. ¶ 55. Attempts by staff to coerce people to self-deport to avoid continued detention also are "completely inappropriate and go[] against correctional norms, ethics, and good sense," akin to "jail officers attempting to pressure a pretrial detainee to take a plea deal rather than go to trial." *Id.* ¶ 54; *see Barco Mercado*, 800 F. Supp. 3d at 576 ("Nor is encouragement of alien self-deportation on pain of otherwise enduring inhumane conditions of confinement a legitimate, nonpunitive objective.").

### D. Grossly Inadequate Healthcare Serves No Legitimate Governmental Purpose.

As summarized above, the healthcare delivery system at Camp East Montana is profoundly broken and falls well below standards for criminal or civil detention facilities. *See* pages 14-17; Hernández Decl., Ex. 1 at 95-143. Dr. Keller found that "[p]oor healthcare and unsafe conditions at Camp East Montana have resulted in preventable death and put all people at risk of harm, including serious injury and death." Dr. Keller Expert Decl. ¶ 23. The evidence is not episodic or anecdotal; as Dr. Keller explained, "[t]hrough my review of medical records and other available information, the deficiencies I found were present consistently, across separate encounters and patients, and are typical of those found in healthcare systems that are poorly staffed and poorly managed." *Id.* ¶ 24; *see also id.* ¶ 227. Because there is no legitimate governmental purpose for this failed system, "this amounts to punishment." *See Shepherd*, 591 F.3d at 454 (discussing healthcare in civil detention); *see also* Williams Expert Decl. ¶ 108 (inadequate healthcare "strains institutional resources and causes a less safe environment for all").

"As soon as people arrive at Camp East Montana, they are at serious risk of harm." Dr. Keller Expert Decl. ¶ 25. The medical intake process is deeply flawed; conditions in intake holding rooms "create a health hazard for all," inadequate tuberculosis protocols "violate standard

correctional practice and create a serious risk of harm," and untimely, incomplete, and nonconfidential medical screening and evaluation fail to identify serious healthcare conditions and ensure continuity of care, including uninterrupted provision of prescribed medications. *Id.* ¶¶ 34, 44, 46-65; *see Pablo Sequen*, 810 F. Supp. 3d at 1128 (issuing preliminary injunction after finding that ICE, among other things, "does not provide regular medical screening" or "prompt medical care").

The problems continue after intake:

> People routinely are subjected to shoddy and incompetent medical evaluations. Serious chronic conditions such as hypertension, hyperlipidemia, asthma, Type 2 diabetes mellitus, HIV, and women's health problems are improperly evaluated and managed. There is inadequate clinical space, with people reporting lack of privacy for medical encounters that occur in hallways or other public spaces. People are denied access to necessary specialty care, and the emergency care system is deficient.

Dr. Keller Expert Decl. ¶ 26; *see id.* ¶¶ 66-85 (sick call), ¶¶ 86-111 (chronic care), ¶¶ 117-120 (clinical space), ¶¶ 121-26 (specialty care), ¶¶ 127-132 (emergency care); *Shepherd*, 591 F.3d at 454 (affirming verdict for civil detainee given "the jail's gross inattention to the needs of inmates with chronic illness"). People also receive cursory and inadequate mental healthcare that falls "way below the standard of care" and risks psychological deterioration. Dr. Keller Expert Decl. ¶ 164; *see id.* ¶¶ 154-164. People are awoken in the middle of the night or early morning to wait to see medical staff—a "ridiculous" practice that pressures people to "refuse medical appointments and therefore staff will miss the opportunity to identify and treat a disease early or at all." *Id.* ¶¶ 69-70; *see also* Williams Expert Decl. ¶ 110 (discussing security risks of having unnecessary movement at those times, including risk of "inappropriate conduct . . . such as use of force, sexual conduct, and trafficking of contraband"). People are transferred out of Camp East Montana without a supply of medication and without appropriate medical information, which can lead to bad medical outcomes, including death. Dr. Keller Expert Decl. ¶¶ 28, 167, 171, 173-76.

Staff's inability to produce complete medical records promptly upon request, and maintenance of incomplete and inaccurate medical records, also serves no legitimate governmental

purpose, "would be unheard of for a doctor's office or hospital," and puts people at risk of harm. *Id.* ¶ 170 ("[I]t is critical to be able to timely produce the complete medical record, particularly for complex patients where the receiving medical team would want to review past labs, x-rays, and medications, among other things.").

Again, Defendants cannot claim that a legitimate governmental purpose is served by inadequate healthcare. Conditions at Camp East Montana violate their own detention standards. Standard 4.3 of the NDS 2025 requires, among other things, "[m]edically necessary and appropriate medical, dental and mental health care," "[c]omprehensive, routine and preventive health care," "[e]mergency care," "[s]pecialty health care," "[t]imely responses to medical complaints," "[a]dequate space . . . so that all detainees are provided basic health examination, treatment, and communication in private," timely and comprehensive screening and intake, tuberculosis screening, sick call processes timely reviewed and acted upon, medication "distributed according to the specific instructions and procedures established by the health care provider" and documented in writing, appropriate HIV treatment, release of medical records to patients and their representatives, and provision of medical information, full medical records, and medications upon transfer and release—all areas with systemic deficiencies at Camp East Montana. ECF No. 13-5 at 119-133; *see also* Lomio Decl., Ex. 36 at 16-17.

## II. PLAINTIFFS LIKELY WILL SUFFER IRREPARABLE INJURY WITHOUT A PRELIMINARY INJUNCTION.

Next, the record amply demonstrates that "irreparable injury is likely in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "When an alleged deprivation of a constitutional right is involved, . . . most courts hold that no further showing of irreparable injury is necessary." *Tiede v. Collier*, 796 F. Supp. 3d 275, 333 (W.D. Tex. 2025) (quotation marks and citation omitted); *see also BST Holdings, L.L.C. v. Occupational Safety & Health Admin., United States Dep't of Lab.*, 17 F.4th 604, 618 (5th Cir. 2021).

Following "good faith efforts to investigate facts and law," including litigation and negotiations "to collect information from the government," there now is a well-developed record

of constitutional violations.[117] *See ADT, LLC v. Capital Connect, Inc.*, 145 F. Supp. 3d 671, 698-99 (N.D. Tex. 2015) (quotation marks and citation omitted) (describing reasonable efforts to investigate before moving for a preliminary injunction and finding irreparable harm); *Sierra Club v. United States Army Corps of Engineers*, 482 F. Supp. 3d 543, 555 (W.D. Tex. 2020) (same). After reviewing the record, Dr. Keller explained that "[p]oor healthcare and unsafe conditions at Camp East Montana . . . put all people at risk of harm, including serious injury and death." Dr. Keller Expert Decl. ¶ 23; *see also id.* ¶¶ 30, 43, 97, 182-83 (finding preventable death at Camp East Montana and "near misses" that could have resulted in strokes, heart attacks, or spread of tuberculosis). Mr. Williams also explained that "people at Camp East Montana are at risk of serious injury and death at the hands of guards." Williams Expert Decl. ¶ 19.

Courts have found irreparable harm from similar conditions in immigration detention. *See D.N.N.*, 822 F. Supp. 3d at 597 ("The unhygienic conditions, lack of sanitary care, and woefully inadequate screening (and treatment) of medical issues pose obvious and serious risks of irreparable harm to class members' physical well-being."); *Gomez Ruiz*, 834 F. Supp. 3d at 850 (finding "deprivation of adequate medical care and imposition of other punitive conditions of confinement" constituted irreparable harm); *L.T.*, 2026 WL 2338452, *19 (same); *Pablo Sequen*, 810 F. Supp. 3d at 1131-32 (same); *Barco Mercado*, 800 F. Supp. 3d at 564-68 (same); *Vazquez Barrera v. Wolf*, 455 F. Supp. 3d 330, 340 (S.D. Tex. 2020) (finding irreparable harm given "the serious and imminent risk of infection" for plaintiffs with medical vulnerabilities).

## III. THE EQUITIES AND PUBLIC INTEREST FAVOR PLAINTIFFS.

The final two elements—the balance of hardships and the public interest—weigh heavily in favor of Plaintiffs. *Nken*, 556 U.S. at 435. The injunction Plaintiffs seek will protect the

[117] In particular, two business days after filing the complaint, Plaintiffs moved for expedited discovery for medical records that had been wrongly withheld, which were needed "to determine the proper scope of a motion for preliminary injunction and to provide the best evidence to support such a motion." ECF No. 13 at 2. Since then, Plaintiffs engaged in extensive negotiations with Defendants. Lomio Decl., Exs. 29-33. Plaintiffs also carefully evaluated conditions after Defendants appointed a new contractor to operate the facility and filed this motion after determining conditions had not materially improved.

constitutional rights of the putative class on a limited set of issues related to their living conditions and healthcare. In line with its sister courts of appeals, the Fifth Circuit has upheld a preliminary injunction "because it will prevent constitutional deprivations." *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014) (citing approvingly *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights.")). The Fifth Circuit also has held that "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Wages & White Lion Inv., L.L.C. v. FDA*, 16 F.4th 130, 1143 (5th Cir. 2021).

## IV. THERE IS NO NEED FOR A SECURITY BOND.

Finally, the Court should use its discretion and waive the Rule 65(c) security requirement. *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) ("we have ruled that the court may elect to require no security at all"). Courts regularly waive the security requirement in cases like this one, where the case is brought in the public interest, regarding conditions in immigration detention facilities, and/or by indigent or detained people. *See, e.g.*, *City of Atlanta v. Metropolitan Atlanta Rapid Transit Authority*, 636 F.2d 1084, 1094 (5th Cir. 1981); *J.A.V. v. Trump*, No. 1:25-CV-072, 2025 WL 1226023, at *2 (S.D. Tex. Apr. 24, 2025); *Campos v. I.N.S.*, 70 F. Supp. 2d 1296, 1310 (S.D. Fla. 1998); *D.N.N.*, 822 F. Supp. 3d at 598; *Gomez Ruiz v. ICE*, 2026 WL 391924, at *2; *L.T.*, 2026 WL 2131142, at *4.

## CONCLUSION

Plaintiffs respectfully request that the Court issue the proposed preliminary injunction filed herewith. Plaintiffs also request that the Court grant Plaintiffs' pending motion for class certification, which was filed on May 30, 2026, and is necessary to support the class-wide relief sought here. *See* ECF No. 2. That motion is fully briefed and ready for decision.[118]

[118] Defendants did not file a response to the motion. *See* Local Rule 7(D)(2) ("If there is no response filed within the time period prescribed by this rule, the court may grant the motion as unopposed."). They instead filed a motion to stay, which has not been granted. ECF No. 26.

Dated: October 15, 2026

Respectfully submitted,


*/s/ Savannah Kumar*
ACLU FOUNDATION OF TEXAS, INC.
Savannah Kumar
Texas Bar No. 24120098
Fabiola Alvelais
Texas Bar No. 24146029
Edgar Saldivar
Texas Bar No. 24038188
Adriana Pinon
Texas Bar No. 24089768
P.O. Box 8306
Houston, TX 77288
Tel.: (713) 942-8146
Fax: (713) 942-8966
skumar@aclutx.org
falvelais@aclutx.org
esaldivar@aclutx.org
apinon@aclutx.org

*/s/ Cynthia A. Castillo*
FARELLA BRAUN + MARTEL LLP
Jim Day (CA 197158) (*admitted*)
Cynthia A. Castillo (TX 24097474)
Raven Quesenberry (CA 346250) (*admitted*)
Hilary C. Krase (CA 318762) (*pro hac vice*)
One Bush Street, Suite 900
San Francisco, California 94104
Tel.: (415) 954-4400
Fax: (415) 954-4480
jday@fbm.com
ccastillo@fbm.com
rquesenberry@fbm.com
hkrase@fbm.com

*/s/ Rita Lomio*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
Rita Lomio (CA 254501) (*pro hac vice*)
Kyle Virgien (CA 278747) (*pro hac vice*)
Felipe De Jesús Hernández (CA 338468) (*pro hac vice*)
425 California Street, 7th Floor
San Francisco, CA 94104
Tel.: (415) 343-0770
rlomio@aclu.org
kvirgien@aclu.org
npp_fhernandez@aclu.org

Carmen Iguina Gonzalez (*pro hac vice*)
915 15th Street NW, 7th Floor
Washington, D.C. 20005
Tel.: (202) 393-4930
ciguinagonzalez@aclu.org

*/s/ Charlotte Weiss*
TEXAS CIVIL RIGHTS PROJECT
Zachary Dolling
Texas Bar No. 24105809
Charlotte Weiss (application for admission pending)
New York Bar No. 6313639
P.O. Box 17757
Austin, Texas 78760
Tel.: (512) 474-5073 ext. 162
zachary@texascivilrightsproject.org
cweiss@texascivilrightsproject.org

Dustin Rynders
Texas Bar No. 24048005
TEXAS CIVIL RIGHTS PROJECT
P.O. Box 1108
Houston, Texas 77251
Tel.: (832) 767-3630 ext. 196
dustin@texascivilrightsproject.org

Daniel Hatoum
Texas Bar No. 24099136
TEXAS CIVIL RIGHTS PROJECT

P.O. Box 219
Alamo, Texas 78516
Tel.: (956) 787-8171 ext. 127
daniel@texascivilrightsproject.org

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 15, 2026, a true and correct copy of the foregoing document was electronically filed via the Court's CM/ECF system, which sends notice of electronic filing to all counsel of record.

*/s/ Cynthia Castillo*

48313\21406022.1