**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

Gerald Akari Angye, *et al.*,

*Plaintiffs*,

v.

U.S. Immigration and Customs Enforcement, *et al.*,

*Defendants*.

Civil Action No.: 3:26-cv-1515-LS

# DECLARATION OF DEAN WILLIAMS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS


I. BACKGROUND ..... 1

II. METHODOLOGY ..... 2

III. SUMMARY OF FINDINGS AND OPINIONS ..... 6

IV. DETAILED FINDINGS AND OPINIONS ..... 8

A. General Principles ..... 8

B. Specific Conditions ..... 11

1. Dangerous Use of Force by Untrained Staff ..... 11

2. Harassment, Coercion, and Unprofessional Conduct by Staff ..... 16

3. Excessive and Unprofessional Body Searches ..... 18

4. Misuse of Solitary Confinement ..... 21

5. Degrading, Prolonged, and Inadequate Intake Process ..... 24

6. Unhygienic Living Conditions ..... 27

7. Lack of Personal Hygiene and Grooming Supplies ..... 29

8. Excessively Cold Living Conditions ..... 31

9. Idleness and Inadequate Programming and Recreational Opportunities ..... 32

10. Inadequate Healthcare ..... 37

11. Inadequate Nutrition ..... 39

C. Oversight and Accountability ..... 40

V. CONCLUSION ..... 49

Appendix A

1. I, Dean Williams, hereby declare:

## I. BACKGROUND

2. I have more than 20 years of experience managing and overseeing a wide range of detention facilities, including facilities that hold people in pre-trial detention, people in protective custody, and people serving criminal sentences.[1] Between 2019 and 2022, I served as the Executive Director of the Colorado Department of Corrections, which had approximately 6,100 employees and 18,000 residents at any given time, and a nearly $1 billion budget. Between 2016 and 2018, I served as the Commissioner of the Alaska Department of Corrections, a unified correctional system where I oversaw both jails and prisons, with approximately 1,800 employees and 4,500 residents at any given time, and a budget of $350 million. I also served as the superintendent (warden) of juvenile detention facilities in Alaska. In each position, I oversaw operation of all aspects of the detention facilities.

3. In my position as Executive Director of the Colorado Department of Corrections, I also oversaw all operations of the Office of the Inspector General, which included approximately 50 staff members, including approximately 35 sworn police officers.[2] The Office of the Inspector General was responsible for, among other things, investigating "any crimes, criminal enterprises, or conspiracies originating within the department," "any violations of administrative regulations or state policy and procedure," "any waste or mismanagement of departmental resources and corruption that may occur within the department," and "any other violation that may be committed by department staff where the violation could affect the performance of staff duties or tend to erode public confidence in the performance of the department."[3]

4. Before being appointed as Commissioner of the Alaska Department of Corrections, I served as a Special Assistant to then-Alaska Governor Bill Walker. In that position, I investigated

---

[1] In Alaska, people who are intoxicated or incapacitated by alcohol or drugs may be placed in protective custody. *See* Alaska Stat. § 47.37.170.

[2] Colo. Rev. Stat. § 17-1-103.8.

[3] *Id.* § 17-1-103.8(2)(a)-(b).

recent deaths and areas of noncompliance within the Alaska Department of Corrections and made recommendations on areas for improvement and required remedies. After I became the Commissioner of the Alaska Department of Corrections, I created an Internal Affairs unit to investigate misconduct.

5. In addition to my work in Alaska and Colorado, I have visited many prisons and jails in the United States and abroad, both as a consultant and at the invitation and request of other government leaders. I continue to mentor prison administrators as a Senior Fellow with the Prison Fellowship Warden Exchange Program.

6. In 2022, I received the Head of Service Award from the International Corrections & Prisons Association, which is dedicated to advancing professional correctional practice.

7. My resume, including my rate of compensation and expert consulting experience, is attached as Appendix A.

## II. METHODOLOGY

8. Plaintiffs' counsel asked me to opine on conditions at Camp East Montana, a 5,000-bed immigration detention facility on the Fort Bliss military base in El Paso, Texas. Plaintiffs' counsel asked me to opine on whether certain conditions and restrictions there serve legitimate nonpunitive governmental purposes and on the adequacy of existing oversight and accountability mechanisms.

9. In forming my opinions, I reviewed a wide range of documents and information from different sources, including government oversight reports and the accounts of people who are or were detained at Camp East Montana. It is important to consider different perspectives to develop balanced, well-informed opinions. Here, there was considerable overlap in the type of issues reported, regardless of the source of the information.

//

//

//

//

10. I reviewed the following documents related to the opening and operation of Camp East Montana:

a. U.S. Immigration and Customs Enforcement ("ICE"), Office of Acquisition Management, Justification for Other Than Full and Open Competition (J&A-26-0098)

b. Camp East Montana Local Supplement of the ICE National Detention Center, Detainee Handbook (rev. May 2026) ("Detainee Handbook")[4]

c. ICE National Detention Standards (rev. 2025) ("NDS 2025")

d. U.S. Department of Homeland Security ("DHS"), *DHS Debunks Washington Post's False Reporting about Camp East Montana at Fort Bliss* (Sept. 17, 2025)

11. I reviewed the following government oversight, inspection, and audit reports:

a. ICE Office of Professional Responsibility ("OPR"), ERO El Paso Camp East Montana Inspection 2026-001-098 (Feb. 10-12, 2026) ("February 2026 ODO Inspection Report")

b. ICE OPR, ERO El Paso Camp East Montana Inspection 2026-004-128 (May 12-14, 2026) ("May 2026 ODO Inspection Report")

c. U.S. Government Accountability Office ("GAO"), Report to Congressional Requesters, Immigration Detention: Waste and Performance Issues at Camp East Montana Provide Valuable Lessons for Future Facilities, GAO-26-108886 (June 2026) ("GAO Report")

d. U.S. Department of War ("DoW"), Inspector General, Audit of DoW Support for the Care and Safety of Detainees in Response to the National Emergency at the Southern Border, Report No. DOWIG-2026-088 (June 9, 2026) ("DoW Audit")

12. I reviewed five letters and statements by members of Congress related to Camp East Montana:

a. Letter from Veronica Escobar, Member of Congress, to Kristi Noem, Secretary, Department of Homeland Security, and Todd Lyons, Acting Director, ICE (Sept. 26, 2025)

b. Letter from Veronica Escobar, Member of Congress, to Kristi Noem, Secretary, Department of Homeland Security, and Todd Lyons, Acting Director, ICE (Nov. 7, 2025)

c. Letter from Veronica Escobar, Member of Congress, *et al.* to Kristi Noem,

[4] The Detainee Handbook I was provided does not include page numbers. I refer to the page of the PDF document when I cite to the Detainee Handbook in this declaration.

Secretary, Department of Homeland Security, and Todd Lyons, Acting Director, ICE (Feb. 26, 2026)

d. U.S. Representative Dr. Kelly Morrison, *U.S. Rep. Kelly Morrison Conducts Oversight of Nation's Largest Detention Facility in Texas Where Minnesotans Are Being Held* (Mar. 25, 2026)

e. U.S. Representative Gabe Vasquez, Press Release, *Rep. Gabe Vasquez Conducts Congressional Oversight Visit at Camp East Montana* (Apr. 6, 2026)

13. I reviewed declarations under penalty of perjury regarding conditions at Camp East Montana by Erik Ivan Rodriguez Flores, Jayson Mbabid, Dat Ly, Phetsamone Senevilay, Cuong Baccam, Somsak Bounvongxay, Gerald Akari Angye, Jesus Alfonso Fernandez Gastelum, Reinaldo Moreno Rodriguez, Carlos Camarillo Gonzalez, Lung Van Do, UEG, ZOR, RES, Christina Vilay, SNM, PKP, NYG, HOK, CCD, Navdeep, JLE, LLH, Antonio Frometa Ascon, Santos Jesus Flores, Henry Negrin Bolano, Jenrry Melendez, Mayron Pazpuerto, Ashweel Majok, Braumer Reylet Rodriguez Sanchez, Alfredo Antonio Reina, Luis Rivero-Gonzalez, Albina Cristobal, Lucia Pedro Juan, Tiago Claudina de Paula, Adams Pico Piñango, Julio Cesar Romero-Paredes, and Maximo Rafael Valera Barreto.

14. I reviewed the following government documents related to the deaths of Francisco Gaspar-Andres and Geraldo Lunas Campos:

a. County of El Paso, Office of the Medical Examiner and Forensic Laboratory, Autopsy Report Case 2025-0601, Francisco Gaspar-Andres

b. County of El Paso, Office of the Medical Examiner and Forensic Laboratory, Autopsy Report Case 2026-0007, Geraldo Lunas Campos

c. ICE Detainee Death Notification, Francisco Gaspar-Andres (Dec. 5, 2025)

d. ICE Detainee Death Notification, Geraldo Lunas Campos (Jan. 9, 2026)

e. ICE Detainee Death Report: LUNAS Campos

f. ICE Detainee Death Report: GASPAR Andres, Francisco

g. ICE, Preliminary Report of Findings – Mortality Review Geraldo LUNAS-Campos (Jan. 16, 2026)

//

//

15. Finally, I reviewed other documents related to this lawsuit, including two letters sent from counsel for Plaintiffs to ICE before the lawsuit was filed:

a. Letter from Community Organizations to ICE and U.S. Army, *Coercive Third Country Deportations and Abusive Conditions of Confinement in Immigration Detention at Fort Bliss, TX* (Camp East Montana) (Dec. 8, 2025), and supporting declarations

b. Letter from ACLU to ICE *et al.*, *Continued Concerns About Conditions of Confinement at Camp East Montana* (May 22, 2026)

c. Letter from Megan Echtenkamp, Acting Assistant Director, Office of Partnership and Engagement, ICE, to ACLU (June 30, 2026) (June 2026 ICE Response")

d. Class Action Complaint, *Angye v. ICE*, No. 3:26-CV-01515, ECF No. 1 (W.D. Tex. May 29, 2026)

e. Plaintiffs' Motion for Limited Expedited Discovery, *Angye v. ICE*, No. 3:26-CV-01515, ECF No. 13 (W.D. Tex. June 2, 2026), and supporting documents

16. I also reviewed a news report—Erika Esquivel, *911 call reveals riot reported among Venezuelan detainees at El Paso's Camp East Montana*, KFOX14 (Sept. 29, 2026)—which includes a statement attributed to DHS officials.

17. Throughout this report, I cite a number a different sources on various issues, including government reports and reports of detained individuals. These citations are not exhaustive, meaning that I do not necessarily cite to every piece of supporting or corroborating evidence for a particular statement.

//

//

//

//

//

//

//

//

## III. SUMMARY OF FINDINGS AND OPINIONS

18. I have reviewed declarations from 38 individuals regarding conditions at Camp East Montana. The conditions reported in those declarations shock the conscience. People describe degrading, unsafe, and unsanitary conditions, abuse by guards, and extreme restrictions and harsh treatment far beyond those of the most secure prisons I have overseen. These conditions serve no legitimate nonpunitive governmental purpose. Instead, they only weaken safety and security.

19. As explained below, people at Camp East Montana are at risk of serious injury and death at the hands of guards not trained in appropriate use of force and deescalation techniques. And other conditions of confinement—including harassment, coercion, and unprofessional conduct by staff; excessive body searches; misuse of solitary confinement; unsafe intake process; unhygienic living conditions; lack of personal hygiene and grooming supplies; excessively cold living conditions; lack of recreational and programming opportunities; inadequate healthcare; and inadequate nutrition—serve no legitimate nonpunitive governmental purpose and in fact weaken institutional security and the safety of all who live and work there.

20. I understand that the U.S. Department of War was initially responsible for overseeing construction and operation of Camp East Montana, including "maintain[ing] control over contract support for the site, which included goods and services needed to provide for the care and safety of IDCs, such as armed detention guards, medical services, food, transportation, and administrative support."[5] I understand the Department of War contracted with Acquisition Logistics LLC, a for-profit company, to do so. I understand that on October 1, 2025, responsibility over aspects of Camp East Montana transferred to U.S. Department of Homeland Security, and in or around March 2026 a no-bid contract was awarded to Amentum, another for-profit company, to operate Camp East Montana.[6]

---

[5] DoW Audit at 3.

[6] *Id.*; February 2026 ODO Inspection Report at 3 n.2.

21. Through review of the documents available to me, it is clear that Camp East Montana was opened before it could safely house anyone.[7] This laid the groundwork for subsequent and current operational failures. Three federal government agencies—U.S. Immigration and Customs Enforcement, U.S. Government Accountability Office, and U.S. Department of War—have issued inspection and audit reports documenting serious, repeated, and uncorrected violations of NDS 2025, the standards that govern operation of Camp East Montana.

22. These serious and systemic failures evidence a facility in crisis. It is not surprising that the facility has been marked since its opening by disorder and chaos, including violent encounters between untrained guards and detained individuals, unnecessary deaths of detained individuals, hazardous and inhumane living conditions, concealment of misconduct, and wasted money and resources.

23. In my experience, an agency's response to institutional failures of this magnitude generally takes one of two roads. On the one hand, officials committed to the lawful and humane treatment of people in their custody may work to develop and implement comprehensive reforms and provide full transparency and access to experts and others so they can adequately assess operations and propose durable solutions. On the other hand, officials may instead advance a concealment-based response. Under this approach, an agency may issue flat denials in the face of compelling evidence of misconduct and makes efforts to prevent "prying eyes" from witnessing operations.

[7] *See, e.g.*, GAO Report at i, Highlights ("The facility opened without meeting key detention standards. For example, the facility initially did not have perimeter security cameras, outdoor recreation space, or space for attorney and family visitation."); DoW Audit at 16 (reporting that people were moved into Camp East Montana while the "contractor was still in the process of building the facility to accept [people]," which "created challenges for the contractor to meet the contract requirements"); ICE, Justification for Other Than Full and Open Competition, J&A-26-0098 at 3 ("The urgency and exclusivity of this requirement are underscored by a history of significant performance deficiencies under the current contract, which was originally issued by the Department of the Army on July 18, 2025. ICE was not the source selection authority for the original task order, resulting in a contract and Performance Work Statement (PWS) that did not accurately reflect ICE's operational needs or the actual usage of the facility.").

24. In reviewing the material available to me, I fear that those responsible for Camp East Montana are on the second road. In the face of compelling government reports, dozens of sworn declarations describing inhumane and unlawful conditions, observations by members of Congress, and a death that was ruled a homicide by an independent Medical Examiner, government officials have issued flat denials and exhibited a distinct lack of urgency. After ICE's own Office of Detention Oversight found in February 2026 that Camp East Montana violated standards necessary "to ensure a safe and secure detention environment for staff and aliens in detention," it nonetheless rated the facility "Acceptable/Adequate."[8]

25. The disconnect between the magnitude and severity of reported violations and the government's response is perhaps the most troubling aspect of this matter. The unsafe, deadly, and degrading conditions reported by individuals detained at Camp East Montana, their legal representatives, members of Congress, and government agencies themselves should not be treated as business as usual. They are cause for alarm, searching inquiry, and immediate action to protect the health and safety of all who live and work at Camp East Montana.

## IV. DETAILED FINDINGS AND OPINIONS

### A. General Principles

26. The core function of any detention facility, whether civil or criminal, is to maintain a safe and secure facility that protects the life and well-being of those who live and work in the facility. This includes, among other things, suitable living conditions, healthcare, nutrition, clothing, and personal hygiene and grooming supplies for detained individuals.

27. Detention administrators routinely develop standards meant to ensure safe operation of facilities. These standards are important for several reasons. They set out basic requirements that promote the safe and orderly operation of a facility. Standards, along with policies, also remove the guesswork about how staff should respond to various situations,

---

[8] ICE, Detention Management: Detention Standards, *available at* https://www.ice.gov/detain/detention-management (describing NDS 2025); February 2026 ODO Inspection Report at 13.

minimizing the possibility that staff will make a bad decision under pressure. Finally, standards provide a straightforward, uniform way to measure whether staff are operating the facility properly. Compliance with those standards should be carefully monitored, and violations taken seriously and promptly corrected.

28. I understand that ICE requires all facilities to "comply with one of several sets of detention standards which," according to ICE, "identify what a facility must do to ensure a safe and secure detention environment for staff and aliens in detention."[9] I understand that the NDS 2025 govern operation of Camp East Montana. Although I did not evaluate the sufficiency of the NDS 2025, they appear to provide important guidance on a number of issues, including related to use of force. It is important to note that the NDS 2025 set general standards and do not set forth specific policies, procedures, or training necessary to meet those standards — facilities are expected to develop policies, procedures, and training to comply with the standards.

29. I understand that detention at Camp East Montana is civil, not criminal. The distinction between criminal detention and civil detention is important. People are not placed in *civil* detention as punishment for any criminal or other conduct. Conditions in civil detention therefore should be much less restrictive than conditions in prison for people serving sentences for criminal offenses.

30. It is well established in the field of corrections that more restrictions do not necessarily translate to a safer and more secure facility. Order, predictability, and fairness in a detention facility create a safer environment for all. Those factors engender goodwill and trust between detained individuals and staff. A lack of order and predictability, and the perception of unfairness, about what the rules are and how they are applied create confusion, anger, and hostility. Further, people are more likely to not follow rules and to act out, or to not report problems, creating a risk to the safe and orderly operation of the facility.

---

[9] ICE, Detention Management: Detention Standards, *available at* https://www.ice.gov/detain/detention-management.

31. Positive, respectful relationships between detained individuals and staff are critical to safety and security. Such relationships, among other things, encourage rule following, reduce tensions and violence, and ensure detained individuals are comfortable reporting safety and security concerns, including sexual abuse and potential security threats. Unprofessional conduct by facility staff and unduly harsh restrictions that serve no legitimate governmental purpose harm institutional security by creating an adversarial relationship between staff and detained individuals.

32. Harsh, cruel, and inhumane confinement of any kind does not produce a better human; it produces a traumatized, hurt, and angry one. Institutional safety is eroded, not bolstered. The additional fruit of that approach is a detention environment that is more dangerous for staff and detained individuals alike. Put differently, dangerous and dysfunctional detention serves no legitimate nonpunitive governmental purpose. By eroding the self-dignity of people, conditions and tempers in a facility can reach a boiling point. People can be expected to act out or have their mental health degrade; suicides and attempted suicides can be expected to increase. When people feel hopeless, when they feel that no one cares or will help them, people often become depressed, hostile, and angry, and there is a high risk of a breakdown in institutional order.

33. I understand that in early September 2026, DHS reported that people detained at Camp East Montana "began throwing items, flipping furniture, and disabling security cameras."[10] I do not know the details of what happened other than what has been publicly reported by DHS, but for the reasons discussed above, it would be foreseeable that these types of actions and other acts of protest and disorder would take place and escalate at Camp East Montana, given the poor conditions there, limited programming and recreation, adversarial relationships with staff, and staff's failure to implement appropriate deescalation techniques.

//

//

//

[10] Erika Esquivel, *911 call reveals riot reported among Venezuelan detainees at El Paso's Camp East Montana*, KFOX14 (Sept. 29, 2026).

**B. Specific Conditions**

1. Dangerous Use of Force by Untrained Staff

34. In a properly run facility, use of force should be rare and fully documented. Force may be used only as a last resort, may not be used to punish, and may be used only in the amount necessary to gain control of the detained individual. Each facility must have a comprehensive policy on use of force and train staff on it. Although a use of force policy describes when and how force may used, more important is its discussion of when force may *not* be used and what techniques, practices, and procedures must be utilized before any amount of force can be considered. Use of force policies also must include rigorous training, documentation, review, and accountability procedures. A facility cannot be safely run without these protections in place.

35. Immigration detention facilities are no exception; the NDS 2025 appropriately require, among other things, that force be used "only after all reasonable efforts to resolve a situation have failed," may not be used to punish, and may be used only in the amount "necessary to gain control of the detainee."[11] The NDS 2025 set forth governing principles, types of force, prohibited acts and techniques, safeguards, documentation, and training requirements, including training on crisis intervention, conflict de-escalation, and recognizing signs and symptoms of mental illness.[12]

36. The ICE OPR Office of Detention Oversight ("ODO") has documented a complete breakdown in use of force requirements at Camp East Montana. In its February 2026 inspection, the ODO found 22 violations in the category of "Use of Force and Restraints." These violations cover a wide range of areas necessary for the safe operation of the facility, including use of force documentation, medical examination, evidence preservation, supervisory oversight, after-action review, referral to law enforcement, and notification of ICE.[13] These failures are cause for grave

---

[11] NDS 2025 at 44, Standard 2.8.

[12] *Id.*

[13] February 2026 ODO Inspection Report at 8-10. One confounding aspect of the inspection report, which obfuscates certain conclusions, is the blacking out of the numbers associated with this report. It is unclear why ODO or ICE would black out how many detainee files were reviewed,

concern; absent strict adherence to use of force requirements designed to identify and root out unlawful force, people at Camp East Montana are at risk of serious injury and death. The failures also suggest a culture of concealment and deception by at least some staff.

37. In a follow up inspection in May 2026, the ODO reported that Camp East Montana did not produce its use of force policy and for that reason "ODO could not determine if facility staff only use force, restraints, and non-lethal weapons in accordance with approved facility policy."[14] The ODO nonetheless found, based on interviews of facility leadership, review of use-of-force incidents, and request of staff training records, that no training had been provided "in approved methods of self-defense, crisis intervention, conflict de-escalation, use-of-force techniques, recognizing signs and symptoms of mental illness, and reporting requirements"; "on prohibited use-of-force acts and techniques"; and "in the use of chemical agents, including the treatment of individuals exposed to them"; and that there was "[n]o documentation that officers were certified to use any non-lethal or chemical control devices."[15]

38. A facility staffed by people who have not received use-of-force training cannot be safely operated. All staff must go through a rigorous training academy before being assigned permanent duties. Otherwise, people in custody are at substantial risk of serious injury or death at the hands of untrained or poorly trained staff. Similarly, a facility can safely hold people in its custody only if it can demonstrate that it has a comprehensive use of force policy in place.

39. The danger of untrained or inadequately trained staff can be seen in the declarations of people who are or were detained at Camp East Montana. People describe frequent, unnecessary,

---

for example. This is aggregate data, not personal data, and there is no security or other reason I can determine for concealing this data.

[14] May 2026 ODO Inspection at 8.

[15] *Id.* at 8. The ODO also reported that there was "[n]o specialized training provided for [redacted]." *Id.* It is not clear what text is redacted. The ODO report includes a footnote that also is redacted, which reads: "'Specialized training shall be required for certain [redacted].'" *Id.* at 8 n.34 (quoting ICE NDS 2025, Standard, Use of Force and Restraints, Section (II)(L)). The quoted standard is publicly available on the ICE website, and the redacted information reads as follows: "certain non-lethal equipment, e.g., OC spray and electronic devices."

and excessive force in response to minor infractions and heated encounters—commonplace events in detention facilities that well trained officers handle routinely through application of deescalation techniques and without resorting to force.[16] Use of force in such situations puts everyone at unnecessary risk of harm and creates a hostile, explosive environment that makes all less safe.

40. The case of Geraldo Lunas Campos provides an example of what can go wrong when staff are not appropriately trained on use of force and deescalation techniques. Mr. Lunas Campos died at Camp East Montana in January 2026. ICE first issued a statement reporting that Mr. Lunas Campos died after "staff observed him in distress" in segregation and later issued a death report that claimed that Mr. Lunas Campos died after a "spontaneous use of force."[17]

41. At least five detained people, in written declarations submitted under penalty of perjury, provide compelling testimony surrounding the death of Mr. Lunas Campos. All five state that Mr. Lunas Campos asked for his asthma medication on the day of his death, and one person reported that Mr. Lunas Campos requested his asthma medication the day before his death as well.[18] Matters reportedly escalated after Mr. Lunas Campos tried to get the guards' attention.[19] One person described the argument that followed:

> I saw Geraldo keep asking the guards for his asthma medicine. The guards still wouldn't give him his medicine. Geraldo again started knocking on the door to get the guards' attention but they wouldn't give him his medicine. Instead, the guards said, "If you keep kicking the door, we'll take you to the hole." The hole is solitary confinement. Geraldo responded, "If you give me my medicine, I'll stop kicking the door." The guards wouldn't bring Geraldo his medicine. Then, Geraldo said, "You can take me to the hole but just give me my medicine."[20]

[16] Ly Decl. ¶ 37; Moreno Rodriguez Decl. ¶ 8; Do Decl. ¶ 25; PKP Decl. ¶ 27; HOK Decl. ¶ 30; CCD Decl. ¶ 31; Angye Decl. ¶¶ 8-10; Navdeep Decl. ¶ 18; ZOR Decl. ¶ 39; Nelson Decl. ¶17-19; Rodriguez Sanchez Decl. ¶¶ 23-27

[17] ICE Detainee Death Notification, Geraldo Lunas Campos (Jan. 9, 2026); ICE Detainee Death Report: LUNAS Campos.

[18] Ascon Decl. ¶ 8; Flores Decl. ¶ 7; Bolano Decl. ¶ 9; Melendez Decl. ¶ 5; Pazpuerto Decl. ¶ 6.

[19] Ascon Decl. ¶ 8.

[20] *Id.*

42. As a result of an argument with staff over access to his medication, the detainee witnesses report that Mr. Lunas Campos was taken to the segregation unit, with one person noting that both Mr. Lunas Campos's hands and feet were restrained.[21]

43. Four of the detainee witnesses were housed in segregation that day and overheard the incident that followed play out. All reported that Mr. Lunas Campos again stated that he needed his medicine, and one reported that Mr. Lunas Campos said that he would not enter the cell until he received his medicine.[22]

44. Two detainee witnesses recall staff saying they were going to make Mr. Lunas Campos "faint" if he did not "shut up."[23] All four heard sounds of a physical altercation and heard Mr. Lunas Campos say, in Spanish, that he could not breathe or "you're asphyxiating me."[24] All four agree that Mr. Lunas Campos was apparently incapacitated and that staff requested emergency help.[25]

45. The body of Mr. Lunas Campos was taken to the El Paso County Medical Examiner. The Deputy Medical Examiner ruled the manner of death a homicide and found the cause of death to be "asphyxia due to neck and torso compression."[26]

46. The death of Mr. Lunas Campos is an extremely troubling incident. The combined evidence of the accounts of the detained individuals and the findings of the Medical Examiner leaves little doubt as to the cause of death. In any correctional context, lethal force is unjustified and profoundly disproportionate in response to a person demanding his medication. There were

---

[21] Ascon Decl. ¶ 9; Flores Decl. ¶ 6; Bolano Decl. ¶ 9; Melendez Decl. ¶¶ 5-6; Pazpuerto Decl. ¶ 6.

[22] Flores Decl. ¶ 7; Bolano Decl. ¶ 9; Melendez Decl. ¶ 5; Pazpuerto Decl. ¶ 6.

[23] Melendez Decl. ¶ 5; Pazpuerto Decl. ¶ 7.

[24] Flores Decl. ¶ 8; Bolano Decl. ¶ 10; Melendez Decl. ¶ 6; Pazpuerto Decl. ¶7-8.

[25] Flores Decl. ¶8-10; Bolano Decl. ¶¶ 11-12; Melendez Decl. ¶¶ 6-7; Pazpuerto Decl. ¶ 8.

[26] County of El Paso, Office of the Medical Examiner and Forensic Laboratory, Autopsy Report Case 2026-0007, Geraldo Lunas Campos at 7.

multiple opportunities for deescalation—including providing time and space for compliance, utilizing appropriate communication tone, working with medical staff to address any medical needs, and requesting support from trained supervisors—that apparently were not taken.

47. There also is evidence of a possible effort by staff to cover up the incident. The GAO found that evidence related to the incident "was missing or destroyed."[27] No quarter can be given to false reporting or deceptive documentation, and any failure to comply with reporting requirements should be viewed in the most serious light. False reporting, omission of critical facts, and purposeful concealment breed not only a dysfunctional culture, but also violate commonly established laws and standards and erode public trust and accountability.

48. In addition, three of the detainee witnesses report potential retaliation, with two reporting unnecessary force used against them.[28] In one case, a detainee witness claims a lieutenant apologized to him after he viewed video of the action taken against him.[29] Noteworthy as well is the statement issued by ICE shortly after the death of Mr. Lunas Campos that appears to stigmatize Mr. Lunas Campos based on decades-old criminal convictions that should have no bearing on the matter, and puts forth an apparently misleading narrative instead of responding, as government officials typically would, by simply stating that the incident was under investigation.[30]

49. Others have reported that guards at Camp East Montana have used unlawful force by pressing a knee against people's necks.[31] Applying pressure to a person's neck is an inherently dangerous restraint technique that should never be used; it can compromise a person's airway and blood circulation and result in serious injury, loss of consciousness, and death. These reports again suggest to me what the ODO found—that staff at Camp East Montana have not been properly

---

[27] GAO Report at 18.

[28] Flores Suppl. Decl. ¶¶ 3-7; Ascon Suppl. Decl. ¶¶ 5-6; Pazpuerto Decl. ¶¶ 11-13.

[29] Flores Suppl. Decl. ¶ 7.

[30] ICE Detainee Death Notification, Geraldo Lunas Campos (Jan. 9, 2026).

[31] Angye Decl. ¶ 10; Moreno Rodriguez Decl. ¶ 8; ZOR Decl. ¶ 39.

trained, including on prohibited use-of-force acts and techniques. Multiple accounts of the same dangerous technique being used in separate incidents also provide strong evidence of inadequate documentation, supervision, and self-correction practices at Camp East Montana.

50. There is no legitimate governmental interest served by having an untrained workforce, in having staff use unnecessary and excessive force, or in failing to comply with NDS 2025 requirements. To the contrary, such conditions put all people at Camp East Montana at serious risk of harm, up to and including death.

2. Harassment, Coercion, and Unprofessional Conduct by Staff

51. As I explained above, positive, respectful relationships between detained individuals and staff are critical to safety and security. People report pervasive harassment, verbal abuse, and other unprofessional conduct by staff at Camp East Montana. People report frequent arguments between guards and detained individuals and report that guards publicly call people homophobic and racist slurs, disclosed someone's HIV status to other detained individuals and "had them vote on whether [he] should be removed from the housing unit because [he had] HIV," and otherwise treat people poorly.[32] One person reported that guards woke him up at 3:00 am in the morning and made him sweep the hallways.[33]

52. The described conduct serves only to humiliate, intimidate, and endanger people and serves no legitimate nonpunitive governmental purpose. It is dangerous in a prison or jail setting to suggest or disclose that someone is gay or HIV positive. Any disclosure of otherwise confidential information provides an opportunity for targeting those people and creates a hazardous and unsafe environment. The described conduct by staff at Camp East Montana also violates the NDS 2025, which require that "[f]acility staff will address detainees in a professional and respectful manner" and prohibit "[t]hreats, intimidation, harassment, indecent, profane or

[32] NYG Decl. ¶¶ 40-41; Ly Decl. ¶¶ 37, 40; Fernandez-Gastelum Decl. ¶ 11; Moreno Rodriguez Decl. ¶¶ 5, 8; Do Decl. ¶¶ 25-26; SNM Decl. ¶¶ 35, 55; ZOR Decl. ¶ 37; PKP Decl. ¶ 27.

[33] Do Decl. ¶ 26.

abusive language, or other actions or communications aimed at coercing or pressuring a detainee to engage in a sexual act."[34]

53. People also report that guards at Camp East Montana call them "illegal," tell them to self deport, and threaten to press charges against them or send them to a third country if they do not sign paperwork agreeing to deportation.[35] They report that ICE officials repeatedly visit them at Camp East Montana and ask them to sign paperwork to agree to be deported, including by threatening that they will otherwise be incarcerated at Camp East Montana for a long time.[36]

54. This conduct is completely inappropriate and goes against correctional norms, ethics, and good sense. It is equivalent to jail officers attempting to pressure a pretrial detainee to take a plea deal rather than go to trial. Attempts to coerce someone to give up their legal rights serve only to undermine trust with detained individuals, which creates a less safe environment for all. Such conduct erodes the role and responsibilities of officers. People detained at a facility will be less likely to report problems to officers, including threats on staff, if they believe the officers' ultimate goal is not to ensure their safety but instead to coerce them to self-deport. The primary function of staff in a detention facility is to ensure the safety and security of people in their custody and care. They must set aside any personal beliefs and ignore larger policy debates that might interfere with their duties.

55. People report that guards largely communicate only in Spanish, and that non-Spanish speakers as a result may miss important information and announcements, including about library access and legal services.[37] People report that when they ask the guards to speak in English, guards often refuse or say things like, "This is El Paso, you better learn how to speak Spanish."[38]

---

[34] NDS 2025 at 66, Standard 2.10 § II.A; *id.* at 72, Standard 2.11 § II.B.

[35] Baccam Decl. ¶ 42; Moreno Rodriguez Decl. ¶15-16.

[36] Navdeep Decl. ¶ 17; Moreno Rodriguez Decl. ¶ 15; ZOR Decl. ¶¶ 36-37; Ascon Decl. ¶ 13.

[37] Senevilay Decl. ¶ 9; Baccam Decl. ¶ 33; Angye Decl. ¶¶ 36, 41; Navdeep Decl. ¶ 43.

[38] Baccam Decl. ¶ 33; Navdeep Decl. ¶ 43.

This is another example of unprofessional conduct that serves no legitimate governmental purpose. The NDS 2025 include a number of provisions to ensure appropriate language access for people with limited English proficiency.[39] The same principle applies here. Staff are obligated to ensure that people in their custody and care understand all communications, including announcements and rules.

56. Given the reported behavior of staff, I am not surprised that so many people report a lack of trust or comfort with staff.[40] That serves only to make a facility less safe, for the reasons I explained above. The widespread nature of the unprofessional behavior by guards that detained individuals report is, in my experience, an indication of lack of adequate training, a culture that allows or encourages such behavior, and no or insufficient oversight and accountability mechanisms. If staff see others acting that way without consequence, they will believe that is the way they are supposed to act too. Without firm intervention and corrective action, a culture of abuse and harassment will continue unabated.

57. Finally, people report that guards do not wear nametags.[41] The regular use of visible nametags by staff, especially in a jail or short-stay facility, improves the safety and security of an institution in at least two ways. First, the use of nametags supports more normalized, positive interactions between detained individuals and staff. Second, the use of nametags also allows people to identify and report, and administrators to meaningfully investigate and act on, staff misconduct.

3. <u>Excessive and Unprofessional Body Searches</u>

58. The touching of detained individuals should be limited to the most essential and critical circumstances. More is not better—less is better when it comes to touching people who are detained. Body searches may lead to people reliving traumatic moments in their past and may make people less likely to leave the housing unit, limiting access to services and activities like

---

[39] NDS 2025, Forward (discussing changes to language access provisions).

[40] Ly Decl. ¶ 40; Moreno Rodriguez Decl. ¶15-16; NYG Decl. ¶ 38; Angye Decl. ¶ 25.

[41] Piñango Decl. ¶ 7; Romero-Paredes Decl. ¶ 16; Antonio Reina Suppl. Decl. ¶ 19; Claudina de Paula Decl. ¶ 29.

healthcare and outdoor recreation. In prisons and jails, it is common to do some form of searching when people move from unsecure to secure areas, including through use of technology by having people walk through a metal detector, but not to automatically conduct body searches of people every time they go in and out of their housing unit, including when people leave the housing unit to go to yard or programming.

59. People who are or were detained at Camp East Montana describe a policy and practice of being subjected to a clothed body search each time they leave or enter the housing unit, which people described as "invasive" and involving guards touching their entire bodies and inspecting inside their waistbands and underwear.[42] The Detainee Handbook appears to confirm this policy: "Searches are also routine requirements when entering or exiting *any area* throughout the facility."[43]

60. Such excessive screening of movement within and between what should be secure facility areas is far outside the norm of correctional facilities, even high security prisons. This frequent touching of detainees is not only unnecessary, but it also wastes staff time and resources and creates circumstances for anxiety and hostility between staff and detained individuals. The NDS 2025 do not appear to require body searches every time a person enters or exits any area and do not appear to include looking inside waistbands and underwear in its definition of pat searches.[44]

61. People also report that in some cases body searches are done in an unprofessional manner, describing invasive touching in and around genital areas, a guard pressing his genitals into a detained person's buttocks, and a guard yanking up a person's pants so hard that they got a

---

[42] Rodriguez Flores Decl. ¶ 31; Ly Decl. ¶ 23; Senevilay Decl. ¶ 5; Baccam Decl. ¶ 24; RES Decl. ¶¶ 7, 29; PKP Decl. ¶ 22; NYG Decl. ¶ 32; HOK Decl. ¶ 26; CCD Decl. ¶ 27; Navdeep Decl. ¶ 16; ZOR Decl. ¶ 23; JLE Decl. ¶ 30; LLH Decl. ¶ 28.

[43] Detainee Handbook at 13 (emphasis added).

[44] NDS 2025 at 37, Standard 2.7 § II.C.1 (defining a pat search as "sliding or patting of the hands over the clothed body").

"wedgie."[45] Such conduct represents a complete breakdown of professional physical interactions between detained people and staff and will lead to distrust and frustration on behalf of people subjected to the searches, cause people to feel violated or dehumanized, and erode privacy—all of which weaken, not strengthen, institutional security. Such conduct can also be a form of grooming or identifying vulnerable detained people to victimize, by seeing how people react to such actions. For example, people who do not fight back or express concerns may be identified as a person to target for sexual abuse in the future. The reported problems are compounded by inadequate policies around sexual abuse and assault prevention. In particular, the ODO, during its February 2026 inspection, "found no documentation that ICE/ERO approved the SAAPI policy and procedures," and found that "the facility has not implemented a coordinated, multidisciplinary team approach to responding to sexual abuse and assault."[46] In its May 2026 inspection, the ODO found, among other things, "[n]o written procedures for administrative investigations" that met certain NDS 2025 requirements related to sexual abuse and assault prevention and intervention.[47]

62. The described conduct appears to violate the NDS 2025, which require that "[a]ll pat searches shall be conducted in a professional and respectful manner, and in the least intrusive manner possible, consistent with security needs including consideration of officer safety."[48] The NDS 2025 strictly prohibit "[i]ntentional touching of the genitalia, anus, groin, breast, inner thighs or buttocks, either directly or through the clothing, that is unrelated to official duties or where the staff member, contractor, or volunteer has the intent to abuse, arouse, or gratify sexual desire."[49]

//

//

---

[45] CCD Decl. ¶ 28; ZOR Decl. ¶ 23.

[46] February 2026 ODO Inspection Report at 11.

[47] May 2026 ODO Inspection Report at 10.

[48] NDS 2025 at 37, Standard 2.7 § II.C.1.

[49] *Id.* at 72, Standard 2.11 § II.B.2.

4. Misuse of Solitary Confinement

63. Solitary confinement is generally understood to be the removal of a person from the general population, and placement in a cell or other confined space, with substantial restrictions on access to programs, services, and activities, including recreation and time outdoors, and limited contact with other people. It can be called various things, including "special management unit (SMU)," "special housing unit (SHU)," "restrictive housing," "administrative segregation," and "the hole."

64. Solitary confinement is one of the most restrictive and harsh forms of detention. If used at all, it should be used sparingly, with robust procedural protections. Solitary confinement should be used only as long as necessary to protect immediate safe operations of the facility.

65. Overuse of solitary confinement harms people subjected to it and can undermine institutional safety rather than promote it. It can lead, among other things, to psychological deterioration, including high levels of anxiety and depression, sleep disturbance and insomnia, perceptual and psychotic symptoms, paranoia, hostility, aggression, and increased acts of self-harm and suicidal behavior. It also makes the facility less safe, as it creates a hostile, adversarial, and punishment-based relationship with staff.

66. In the limited circumstances where solitary confinement is used, it is important to attempt to mitigate its harmful effects. People in solitary confinement should have access to a wide range of recreational materials, including tablets, televisions, radios, books, games, puzzles, and opportunities for outdoor exercise and for socialization.

67. The NDS 2025 set forth limitations on the use of solitary confinement and procedural protections for both "Administration Segregation" (meant "only to ensure the safety of detainees or others, the protection of property, or the security or good order of the facility") and Disciplinary Segregation (meant to "discipline anyone whose behavior does not comply with facility rules and regulations").[50] It appears based on reports from detained people and the most

[50] NDS 2025 at 53, Standard 2.9.

recent ODO inspection that those standards are not complied with. In its May 2026 report, the ODO found, based on interviews with facility leadership and review of available documentation, eight violations of the applicable NDS 2025 standard:

a. No written procedures governing the management of administrative segregation . . . ;

b. No written procedures requiring documentation of detailed reasons for placing an individual in administration segregation;

c. No written procedures to regularly review continued placement in protective custody or to provide for release from protective custody when appropriate;

d. No written procedures for regular placement review of all detainees held in administration segregation;

e. No written procedures for the regular review of all disciplinary segregation cases;

f. No written procedures requiring a security supervisor or equivalent to interview detainees and review their status in disciplinary segregation every seven days;

g. No written procedures requiring the facility administrator to review the status of detainees in disciplinary segregation after the first thirty days and every 30 days thereafter to determine whether continued detention in disciplinary segregation is warranted; and

h. No documented training for staff assigned to the SMU on relevant topics, such as identifying signs of mental health decompensation, appropriate interactions with mentally ill detainees, the impact of isolation, or de-escalation techniques.[51]

68. People report that guards at Camp East Montana regularly threaten people with solitary confinement, including after people raise concerns, ask for an explanation of rules, or ask to use the bathroom during yard time.[52] People report that they or others were placed in solitary confinement after suffering abuse from guards, after minor rule violations, or after verbal

[51] May 2026 ODO Inspection Report at 9-10 (parentheticals and footnotes omitted).

[52] Camarillo-Gonzalez Decl. ¶ 29; PKP Decl. ¶ 26; NYG Decl. ¶38-39, 42; ZOR Decl. ¶ 16.

arguments.[53] People who were put in solitary confinement at Camp East Montana report extremely isolating conditions that caused them to mentally decompensate without access to anything to keep their mind busy.[54] As Named Plaintiff Navdeep describes:

> It was hard to keep track of time in the SMU. SMU is a small room where there is just a toilet and a bed. There is nothing to do. I had to just stare at the wall. As part of my punishment, I did not have a tablet. I already felt sad and depressed before being put in SMU, and I felt even worse when in there. . . .
>
> During my time in SMU, I felt depressed. At first, there was nothing in the room, not even a bedsheet on the mattress. I just sat on the floor for many hours when I arrived in the small room. For several days, I did not eat any meals because I didn't feel hungry. I was sad being completely alone. Being in there made me miss my family a lot. . . . It's hard to explain, but it was scary to feel like I was completely alone in a cell in a tent in the desert.[55]

People also describe a perfunctory administrative process where, although they were told they would have a hearing, they were not allowed to participate in it or provide a statement.[56]

69. The reported frequent threats of solitary confinement for minor issues, extreme isolation in solitary confinement, and lack of meaningful procedural protections serve no legitimate governmental interest. In my experience, when guards regularly threaten, misuse, and/or overuse solitary confinement, it is typically because they are poorly trained on how to properly interact with detained individuals and deescalate situations.

//

//

//

//

[53] Rodriguez Flores Decl. ¶ 24; Camarillo-Gonzalez Decl. ¶ 29; PKP Decl. ¶ 26; NYG Decl. ¶¶ 38-39, 42; Angye Decl. ¶¶ 17-19; 26-31; Navdeep Decl. ¶¶ 15, 21-29, 31; ZOR Decl. ¶16, 39-40; LLH Decl. ¶ 30; Gonzalez Ramirez Decl. ¶ 20; Nelson Decl. ¶ 21; Majok Decl. ¶ 11;

[54] Angye Decl. ¶¶ 28-30; Navdeep Decl. ¶ 22.

[55] Navdeep Decl. ¶¶ 22, 24.

[56] *See, e.g.*, *id.* ¶¶ 27-28.

5. Degrading, Prolonged, and Inadequate Intake Process

70. When someone first arrives to a detention facility, they go through an intake process. The intake process is critical to determining, among other things, any urgent healthcare needs or suicide risk factors; explaining facility rules and processes; providing necessary items, including clothing and personal hygiene supplies; and assigning appropriate housing.

71. The intake process should be completed promptly. When people are first incarcerated and/or arrive to a new facility, individuals experience acute stress associated with their arrest, transportation to the detention center, separation from family, loss of autonomy, and the abrupt transition into a new and restrictive environment. This period is consistently associated with an elevated risk of suicide and other psychiatric crises, particularly for individuals with a history of mental health conditions, underscoring the need for prompt mental health screening, close observation, and access to supportive services. People who arrive at Camp East Montana, like those arriving to a jail, are under a high degree of stress; they may have been recently removed from their communities, families, and lives, and are facing the possibility of losing the life they had and not being able to provide for their families. Those people are at high risk of self-harm, suicide, and other desperate actions. Keeping people in intake for long periods of time only prolongs and increases the anxiety of people who quite likely are already in distress.

72. People describe a poorly managed intake process at Camp East Montana, with many people crammed together in a small room for days, with meager food, no place to sit, and harsh treatment from staff.[57] People describe being made to sleep on the floor next to others without a mattress, pillow, or blanket.[58] The February 2026 ODO Inspection Report notes that in an undefined number of cases, "the initial classification process and initial housing assignments

[57] Rodriguez Flores Decl. ¶¶ 4, 8; Bounvongxay Decl. ¶ 6; Camarillo-Gonzalez Decl. ¶ 3; NYG Decl. ¶ 8; HOK Decl. ¶¶ 6-7; Navdeep Decl. ¶¶ 6-7; ZOR Decl. ¶¶ 9-10; JLE Decl. ¶ 6; LLH Decl. ¶¶ 7, 11, 15, 21.

[58] PKP Decl. ¶ 8; Mbabid Decl. ¶ 10; Baccam Decl. ¶¶ 9-10; UEG Decl. ¶ 4; CCD Decl. ¶¶ 12-13.

. . . were completed 14 hours to 25 days after being admitted to the facility."[59]

73. There is no good reason for the described conditions during intake; no legitimate nonpunitive governmental purpose is served by forcing people to languish in such degrading and harsh conditions. To the contrary, a logical, orderly, and efficient intake process advances institutional safety and reduces the anxiety of detained individuals and staff. Forcing people to sleep on the floor without a mattress, pillow, or blanket is inexcusable; that serves no legitimate nonpunitive governmental purpose. Instead, it increases anxiety, anger, and hostility to the system, making everyone—detained individuals and staff alike—less safe.

74. The clustering of dozens of people in a room together for many hours is bad correctional practice. It creates the potential for harm because you do not know who is in there, who may need to be separated from whom, and who is at risk of self-harm.

75. The reported backlog and delays in the intake process at Camp East Montana strongly suggest inadequate staff to conduct the process timely. Inadequate staffing is not a legitimate governmental interest; prisons and jails routinely conduct staffing analyses to ensure that they have sufficient staff to implement policies and procedures, meet all relevant legal standards, and serve the needs of the detained population. I understand that the facility did not produce its comprehensive security staffing analysis to the ODO for either the February or May 2026 inspection, and therefore ODO could not determine the sufficiency of security staffing levels.[60]

76. The intake conditions described appear to violate the NDS 2025. For example, the NDS 2025 require that a hold room "contain sufficient seating for the maximum room capacity, which shall be posted outside the hold room."[61] The NDS 2025 also require that "[t]he initial classification process and initial housing assignment should be completed within 12 hours of

[59] February 2026 ODO Inspection Report at 6.

[60] February 2026 ODO Inspection Report at 6-7; May 2026 ODO Inspection Report at 5.

[61] NDS 2025 at 31, Standard 2.5 § II.A.

admission to the facility."[62] In the jail systems I oversaw, it would be unacceptable for the intake process to regularly take 12 hours. Even in large, busy jails, people should be processed through intake in several hours at most. It is helpful, however, to have a defined "cap" so that any intake that took longer than that cap would generate an action report that would explain what caused that type of delay and allow facility leadership to take action to improve the process.

77. Finally, orientation processes and facility handbooks play an important role in orienting detained individuals to a facility, including providing information about how to access healthcare and other services, and how to report abuse. Facility handbooks generally are considered a requirement of any prison or jail and are provided to each person upon arrival, so they can quickly become familiar with the rules and expectations of a given facility and can refer to the handbook at any time. Indeed, the NDS 2025 require that each facility "have a local handbook" that "will specify in detail the rules, regulations, policies, and procedures with which every detainee must comply" and that "[e]very detainee will receive a copy of this handbook upon admission to the facility along with a copy of the ICE/ERO National Detainee Handbook."[63] During its inspection in May 2026, the ODO found that "[t]he facility had not established and provided a local handbook."[64] People report that they never received a handbook at Camp East Montana or, if they did, it was after they had been in custody for a significant period of time.[65] And as can be seen by comparing statements by detained individuals with the provisions in the handbook made available to me, information and rules in the handbook do not seem to apply to Camp East Montana. People also report viewing a video upon arrival that presented a facility and procedures that proved to be in stark contrast to reality.[66] There is no legitimate governmental

---

[62] NDS 2025 at 21, Standard 2.2 § II.A.2.

[63] NDS 2025 at 180, Standard 6.1.

[64] May 2026 ODO Inspection Report at 6.

[65] Angye Decl. ¶ 7; Ly Decl. ¶ 34; Piñango Decl. ¶ 3.

[66] LLH Decl. ¶ 22; RES Decl. ¶ 40.

purpose to delay providing people information on how to navigate a detention setting or in providing inaccurate information—that only leads to confusion, distrust, and disorder.

6. Unhygienic Living Conditions

78. A clean and hygienic living environment promotes order and stability. When I walk through a detention facility, I expect to see clean floors, tidy living spaces, and well-groomed people. That is an indication of the level of care provided at the facility. Living areas should be thoroughly and regularly cleaned; all fixtures, including toilets, should be maintained in good working order; and pests should be eradicated immediately. Dirty and unsanitary conditions serve no legitimate governmental purpose. To the contrary, such conditions create a risk of disorder and go against principles of basic decency, for the reasons I explained above.




79. People describe being held in large, 72-person open dormitories at Camp East Montana with a handful of shared bathrooms, as seen in the drawing above.[67]

[67] Do Decl., Ex. B.

80. People describe these living spaces as filthy, with clogged toilets, pests, water leakage, and foul smells, as well as substantial dust and sand intrusion.[68] People report that cleaning by staff is insufficient to maintain a clean living environment, and that detained individuals are not given proper cleaning supplies such as soap and disinfectant to clean their living areas themselves (and regardless are not paid to do so).[69]

81. The GAO found that "[o]n March 3, 2026, ICE issued a discrepancy report because the contractor had not cleaned some of the dormitories for detained noncitizens daily, as required. Rather, these dormitories were cleaned weekly, resulting in unsanitary conditions."[70] The Department of War reported similar concerns months earlier, in August and September 2025, and documented, of an August 2025 inspection, "Hazardous Substances" in the form of "[w]ater flow and toilet problems within the dormitories and sinks did not have water."[71]

82. There is no legitimate reason for people to live in the unsanitary conditions described, which raise serious health and safety concerns. People should not be forced to clean living areas without adequate and sufficient supplies, and facilities must have a comprehensive cleaning plan in place that does not rely on voluntary cleaning by detained individuals. Prisons and jails routinely train and pay incarcerated people to clean living spaces throughout the day and provide detained individuals with soap and other disinfectants to do so. The repeated reports of sand and dust contamination in living spaces also are particularly troubling. A facility should be

[68] Rodriguez Flores Decl. ¶¶ 11-12, 14, 36, 45; Ly Decl. ¶¶ 27, 32; Senevilay Decl. ¶¶ 18, 20; Baccam Decl. ¶¶ 19-21; Bounvongxay Decl. ¶¶ 5, 17-18; Moreno Rodriguez Decl. ¶ 25; Camarillo-Gonzalez Decl. ¶¶ 5, 7-8; Do Decl. ¶ 14; UEG Decl. ¶ 10; RES Decl. ¶¶ 13, 18, 25-26; SNM Decl. ¶ 32; NYG Decl. ¶ 33; Angye Decl. ¶¶ 34, 37; Navdeep Decl. ¶¶ 8, 11-12, 34; ZOR Decl. ¶¶ 21, 28; JLE Decl. ¶¶ 11, 17; LLH Decl. ¶ 29; Fernandez-Gastelum Decl. ¶ 5; PKP Decl. ¶ 15; HOK Decl. ¶ 19; Piñango Decl. ¶ 5.

[69] Ly Decl. ¶ 25; Camarillo-Gonzalez Decl. ¶ 5; RES Decl. ¶¶ 17, 25; SNM Decl. ¶ 23; NYG Decl. ¶ 34; HOK Decl. ¶ 20; CCD Decl. ¶ 17; ZOR Decl. ¶ 27; JLE Decl. ¶ 19; LLH Decl. ¶ 29; Romero-Paredes Decl. ¶ 10; Reina Suppl. Decl. ¶ 10.

[70] GAO Report at 18 ("In addition, some contract security guards offered detained noncitizens cookies in exchange for cleaning their own dormitories").

[71] DoW Audit at 15.

constructed and operated in such a way as to prevent and eliminate environmental hazards and contaminants.

83. The described conditions also appear to be in violation of NDS 2025, which require, among other things, "a high level of environmental sanitation," compliance with "recognized standards of hygiene" and "any applicable state and local jail/prison standards," that "[a]ll surfaces, fixtures, and equipment shall be kept clean and in good repair," and that "[s]uitable and sufficient cleaning equipment and supplies shall be available throughout the facility."[72] The Texas Commission on Jail Standards in turn require that "[e]ach facility shall have and implement a written plan, reviewed and approved by the commission, for the maintenance of an acceptable level of cleanliness and sanitation throughout the facility."[73] The standards require the plan to include a "regular daily schedule" of cleaning and sanitation inspections supervised by responsible jailers, as well as requirements concerning functioning toilets, lavatories, showers, and other equipment; sanitary food-contact surfaces; appropriate cleaning equipment and storage; continuous compliance of water and sewage systems; and hand-washing before meals in holding cells.[74]

7. <u>Lack of Personal Hygiene and Grooming Supplies</u>

84. Personal hygiene and grooming supplies are essential items in all prisons and jails. Restricting or eliminating access to such items creates stress and disorder inside the institution and erodes detained individuals' sense of safety, humanity, and well-being, which serves no legitimate governmental purpose for the reasons explained previously.

85. People report that there is no soap at Camp East Montana and describe instead receiving single-use shampoo packets that they must use for all cleaning, including washing their

---

[72] NDS 2025 at 6-7, Standard 1.1 § II.I.

[73] 37 Tex. Admin. Code § 279.1.

[74] *Id.* § 279.1(1), (5)–(10).

hands, body, and hair.[75] People report that because of this, they sometimes are unable to wash their hands with shampoo before eating and after toileting, and that sometimes there is not enough toilet paper.[76] People also report severely restricted access to shaving razors and nail clippers, reporting that they can use them only when they are permitted to go to the barbershop.[77] People report that access was denied altogether during quarantines and when there apparently was not enough staff to run the barbershop for weeks.[78] ICE appeared to confirm reports of the location of nail clippers and razors and of a temporary shutdown when it acknowledged that, during a contractor transition, "barbershop, nail clipper, and facial hair services were temporarily disrupted."[79]

86. The described restricted access to personal hygiene and grooming supplies is far outside the norm of prisons and jails and serves no legitimate governmental purpose. Soap should be available at all times, and people should have access to soap whenever they use the bathroom, shower, or eat, either through a sufficient personal supply or access to soap dispensers. Otherwise, illnesses and infections can spread rapidly throughout communal living environments such as the housing units at Camp East Montana.

87. Razors and nail clippers similarly are essential items and, even in the most secure of prison facilities, should be available to people in the housing units daily, including when they are in quarantine or isolation. That is standard in any detention facility, civil or criminal. Even in extremely rare cases where staff have a credible, individualized concern that a specific person may try to use the razor for self-harm, that concern can be mitigated in a variety of ways, including by providing regular access to an electric razor in the housing unit.

[75] Rodriguez Flores Decl. ¶¶ 36-37; SNM Decl. ¶ 20, 24; Baccam Decl. ¶ 18; RES Decl. ¶ 19; ZOR Decl. ¶ 31; JLE Decl. ¶ 12; Piñango Decl. ¶ 6.

[76] RES Decl. ¶¶ 20-21; SNM Decl. ¶¶ 20, 24; Rodriguez Flores Decl. ¶ 36; Baccam Decl. ¶ 18; ZOR Decl. ¶ 31; JLE Decl. ¶ 12.

[77] Senevilay Decl. ¶ 25; Baccam Decl. ¶¶ 28-29; ZOR Decl. ¶ 32; Reina Decl. ¶ 12.

[78] Rodriguez Flores Decl. ¶ 40; Senevilay Decl. ¶ 25; RES Decl. ¶ 22; HOK Decl. ¶ 25; Navdeep Decl. ¶ 45.

[79] June 2026 ICE Response at 3.

88. Again, the reported conditions appear to be in violation of the NDS 2025, which require that "[s]taff shall provide detainees with articles necessary for maintaining proper hygiene" and "[t]he facility will replenish all hygiene supplies as needed at no cost to the detainee."[80] The reported conditions also make it difficult or impossible to comply with the direction in the Detainee Handbook to "keep your fingernails and toenails clipped short," "use soap to wash your hands," and "[w]ash hands before eating, after going to the bathroom, after playing or working outside, or after being near a sick person" to "help keep you from getting sick."[81]

8. Excessively Cold Living Conditions

89. It is the expectation in all detention facilities that all living areas be maintained at appropriate temperatures, and people should be provided temperature-appropriate clothing and bedding. People describe uncomfortably cold temperatures in the living areas at Camp East Montana and a lack of temperature-appropriate clothing.[82] There is no legitimate governmental reason for excessively cold living conditions. The conditions described can inhibit sleep and can have a debilitating impact on a person's physical and psychological well-being, as well as increase irritability and hostility, which as explained above creates a less secure environment.

90. Again, the reported conditions appear to be in violation of NDS 2025, which require that a "facility shall ensure appropriate temperatures . . . in accordance with any applicable state and local jail/prison standards."[83] The Texas Jail Standards require that "[t]emperature levels shall be reasonably maintained between 65 degrees Fahrenheit and 85 degrees Fahrenheit in all occupied areas."[84]

---

[80] NDS 2025 at 19, Standard 2.1 § II.E; *see also id.* at 128, Standard 4.4 § II.F (listing the "minimum" supplies each person should receive, including "[o]ne bar of bath soap, or equivalent" and "[o]ne bottle of shampoo, or equivalent").

[81] Detainee Handbook at 15, 17-18.

[82] Ly Decl. ¶ 31; Senevilay Decl. ¶ 21; Do Decl. ¶ 18; Angye Decl. ¶ 33; ZOR Decl. ¶ 30; LLH Decl. ¶ 27.

[83] NDS 2025 at 6-7, Standard 1.1 § II.I.1.

[84] 37 Tex. Admin. Code § 261.255.

9. Idleness and Inadequate Programming and Recreational Opportunities

91. Programming and recreation are essential components of any prison or jail. They reduce stress and anxiety in an institutional setting and are critical to maintaining order and the safety of both detained individuals and staff. In detention facilities, the proverb "idleness is the devil's workshop" holds true. Idleness in a detention environment creates conditions for disorder, angst, and anxiety. That is why it is important for any detention facility, civil or criminal, to find ways to keep people busy, maximize opportunities for recreation and outdoor time, and otherwise limit the amount of "idle time"—time when people are sitting around with little to do but think about their detention, frustrations, fears, and worries. Put another way, maximizing recreational opportunities and access to the outdoors enhances order and safety in the institution for everyone. This is true regardless of whether someone is housed in the general population, solitary confinement, or medical isolation or quarantine.

92. People detained at Camp East Montana report being confined for at least 23 hours a day in a windowless, crowded housing unit, with no natural light and not enough seats for everyone.[85] They report having very little to do other than sit on their beds or walk in circles, with no art and craft supplies and, at most, a deck of cards.[86] People report that in the 72-person housing units, there are only two televisions, the televisions are often not accessible to all (that is, they would be only on Spanish-language channels and therefore inaccessible to non-Spanish speakers), and that people fight over the limited television access.[87] People report limited access to shared tablets where there they could message people, listen to music, or watch movies, but only if they pay for those services, and that fights also sometimes break out over use of the tablets, because

[85] Rodriguez Flores Decl. ¶¶ 6, 12; Ly Decl. ¶ 21; UEG Decl. ¶ 9.

[86] *Id.*; Ly Decl. ¶ 26; Rodriguez Flores Decl. ¶ 29; Senevilay Decl. ¶ 8; Baccam Decl. ¶ 38; PKP Decl. ¶ 16; HOK Decl. ¶ 21; CCD Decl. ¶ 23; Navdeep Decl. ¶ 16; ZOR Decl. ¶¶ 17, 33; JLE Decl. ¶¶ 13, 32; LLH Decl. ¶ 37.

[87] Rodriguez Flores Decl. ¶ 12; Ly Decl. ¶ 26; Baccam Decl. ¶ 38; Do Decl. ¶ 13; UEG Decl. ¶ 9; RES Decl. ¶ 10; SNM Decl. ¶ 58; NYG Decl. ¶ 29; HOK Decl. ¶ 19; ZOR Decl. ¶ 17; JLE Decl. ¶ 11; LLH Decl. ¶ 25

each person is not given their own tablet and they are how people communicate with their loved ones.[88] People report that they cannot afford the per-minute charges to access tablet entertainment services.[89] People further report substantial restrictions of movement and ability to access recreation during institutional counts where they must stay on their bed without accessing a tablet or television, and that the timing of counts disrupts sleep and substantially limits time to eat.[90]

93. People report infrequent and inconsistent access to outdoor recreation, reporting that at most they get one hour a day and, in some cases, have gone days or weeks without going outside.[91] People report that when they are allowed outside, conditions on the "yard" are bleak. People report being placed in a small, caged area crowded together with too many other people, with no place to sit, rest, or use the bathroom, and in many cases with no ability to get direct sunlight because of a cover over the yard enclosure.[92] People report that the only exercise equipment is a ball or two and that people who are not playing with the ball must cluster on the side of the yard and try not to get hit, which can result in tension between detained people.[93] People report no protection from sand and dust, and inadequate clothing on cold mornings.[94] People describe feeling unsafe and degraded (like they were in "a dog cage") during outdoor recreation,

[88] Rodriguez Flores Decl. ¶¶ 25-26; Baccam Decl. ¶ 36; SNM Decl. ¶ 15; NYG Decl. ¶ 29; HOK Decl. ¶ 22; CCD Decl. ¶ 24; ZOR Decl. ¶ 20; JLE Decl. ¶ 16.

[89] Rodriguez Flores Decl. ¶ 25; RES Decl. ¶ 27; PKP Decl. ¶ 18; LLH Decl. ¶ 38.

[90] Rodriguez Flores Decl. ¶32-33; RES Decl. ¶ 15; SNM Decl. ¶16-17; PKP Decl. ¶ 13; NYG Decl. ¶ 31; HOK Decl. ¶ 17; CCD Decl. ¶ 20; JLE Decl. ¶ 10; LLH Decl. ¶ 26.

[91] Rodriguez Flores Decl. ¶6, 19; Ly Decl. ¶¶ 21, 34; Fernandez-Gastelum Decl. ¶ 14; Camarillo-Gonzalez Decl. ¶ 9; RES Decl. ¶ 30; SNM Decl. ¶ 60; Navdeep Decl. ¶ 13.

[92] Rodriguez Flores Decl. ¶ 20-21 (elderly man fainted against the chain linked fence); Baccam Decl. ¶ 22-23; Fernandez-Gastelum Decl. ¶ 14; Do Decl. ¶ 16 ("From November until April, I didn't see any sunlight because our recreation was all covered."); UEG Decl. ¶ 8; RES Decl. ¶ 29; SNM Decl. ¶ 61; NYG Decl. ¶ 35; Navdeep Decl. ¶ 13; ZOR Decl. ¶ 23; LLH Decl. ¶ 40.

[93] Rodriguez Flores Decl. ¶¶ 20, 22; SNM Decl. ¶ 61.

[94] Baccam Decl. ¶ 22; Rodriguez Flores Decl. ¶ 22; Do Decl. ¶ 16; HOK Decl. ¶ 28; SNM Decl. ¶ 60; JLE Decl. ¶ 15.

and people have asked not to go to outdoor recreation.[95]

94. People report limited and infrequent access to a small library, with inconsistent rules over whether books can be checked out to read in the housing units and insufficient books in languages accessible to the population at Camp East Montana.[96]

95. These conditions serve no legitimate governmental purpose. They appear to be substantially more limited and harsher than what you would find in prison or jail. Prisons and jails routinely offer access to education, entertainment, and rehabilitative programming, to allow people to engage in productive, prosocial activities.

96. Prisons and jails also routinely have outdoor yard recreation, where people have access to a wide range of activities and equipment, including basketball courts, hand-ball walls, exercise equipment like pull-up bars and benches, tables and seating, water fountains, and a track to walk or jog around. And, given that people at Camp East Montana are in civil (not criminal) detention, they should have more access to outdoor and recreational opportunities than people in prison.

97. The NDS 2025 require that, in facilities where outdoor recreation is available, "each detainee shall have access for at least one hour per day, five days per week; or, six or more hours per week, at least four days per week," weather permitting.[97] I assume that is meant as a bare minimum; one hour a day, five days per week is less than people serving criminal sentences in disciplinary segregation typically get. Put differently, one hour of recreation is considered the minimum in the most restrictive and harsh prisons and should certainly not set the standard for the general population in civil detention. Prisons and jails routinely try to maximize outdoor time for everyone, particularly people in general population, for the reasons I explained above.

---

[95] Baccam Decl. ¶ 23; Navdeep Decl. ¶ 13.

[96] Ly Decl. ¶ 35; Fernandez-Gastelum Decl. ¶ 15; Do Decl. ¶ 13; RES Decl. ¶ 24; SNM Decl. ¶ 59; PKP Decl. ¶ 20; HOK Decl. ¶ 24; CCD Decl. ¶ 26; Angye Decl. ¶ 36; Navdeep Decl. ¶ 45; ZOR Decl. ¶ 19; LLH Decl. ¶ 39; Romero-Paredes Decl. ¶ 14.

[97] NDS 2025 at 152, Standard 5.2 § II.A.

98. Institutional counts are an expected part of institutional operations, and in prisons and jails they are expected to be completed promptly and with as little interruption of programming and movement as possible. In fact, lengthy counts may indicate inadequate and/or poorly trained staff.

99. Prisons and jails also are expected to provide regular access to a wide range of books, audiobooks, newspapers, and magazines available for free through libraries, in various languages and formats to be accessible to the diverse population. This includes material in the different languages of the detained population, large print and audiobooks for people with disabilities or low literacy, and material on a variety of topics that may be of interest to people, including fiction, non-fiction, history, current events, and self-help. Robust access to such material promotes emotional well-being, reduces idleness, and provides intellectual stimulation that can help mitigate the psychological effects of detention. Material in a person's primary language not only facilitates access to information but also provides a critical source of comfort, normalcy, and connection during detention.

100. I am struck by reports that people feel "empty," "trapped," "depressed," "emotionally distressed," "hopeless," "frustrated," "sad," and "anxious" at Camp East Montana, and resort to walking in circles "to avoid going crazy" because "[t]here's nothing else to do."[98] That describes precisely what you do not want in a detention facility and serves no legitimate nonpunitive governmental interest, for the reasons I described previously.

101. I am concerned, too, about reports that there are tensions, fights, and self-isolation over limited "shared" access to televisions and tablets and cramped outdoor recreation yards—all examples of how scarcity in a detention setting result in conflict and make detained individuals, staff, and the institution as a whole less safe. Personal televisions and radios are routine in prisons and jails to help provide mental stimulation to people and avoid conflict over shared resources, and I understand that, in other facilities, each person is issued their own tablet.

---

[98] Senevilay Decl. ¶ 8; Baccam Decl. ¶ 38; PKP Decl. ¶ 16; HOK Decl. ¶ 21; CCD Decl. ¶ 23; Navdeep Decl. ¶ 16; ZOR Decl. ¶17, 33; JLE Decl. ¶13, 32; LLH Decl. ¶ 37.

102. Not only is there no legitimate governmental purpose for the conditions reported at Camp East Montana, but they also appear to be inconsistent with the policies and procedures set by ICE and Camp East Montana itself. The NDS 2025 require, among other things, that dayrooms "offer board games, television, leisure reading materials, and other sedentary activities," that people have access to toilet facilities during outdoor recreation, that "[e]xercise areas shall offer a variety of fixed and movable equipment," and that "[c]ardiovascular exercise shall be available to detainees for whom outdoor recreation is unavailable."[99] The NDS 2025 also require "sufficient space and resources to facilitate detainees' legal research and writing."[100]

103. The Detainee Handbook states "[y]ou will be provided with both indoor leisure activities and outdoor recreational equipment," including "exercise equipment" and "table games," that "[y]ou will be provided with access to religious resources, services, instruction, and counseling," and that various library and law library services are available.[101]

104. It also is critical to the safe operation of a detention facility and the well-being of people detained there that people be given an outlet for their faith—that they have an opportunity to speak and gather around faith-based services. Religion for many people provides meaning and helps build resilience to get through difficult times. That, in turn, can help people cope with the stresses of incarceration and the unknown of what is ahead.

105. People report limited or no formal religious services, including Christian church services, and report that although they sometimes try to organize their own prayer circles, there is no private space to do so and the guards sometimes attempt to break up informal religious gatherings.[102]

---

[99] NDS 2025 at 152-53, Standard 5.2 § II.C.

[100] NDS 2025 at 185, Standard 6.3 § II.A.

[101] Detainee Handbook at 27-29.

[102] Rodriguez Flores Decl. ¶ 30; PKP Decl. ¶ 16; HOK Decl. ¶ 29; ZOR Decl. ¶ 26; JLE Decl. ¶ 14.

106. Again, such limited and restricted access to congregate religious services and gatherings serves no legitimate nonpunitive governmental purpose, is a departure from what is expected in prison and jails, and appears to violate the NDS 2025. Prisons and jails routinely provide a multitude of faith opportunities, including different religious services (including Islam, Judaism, and Christianity) and access to spiritual advisors. In fact, the NDS 2025 include requirements related to people's ability "to engage in practices of . . . religious faith," including that "[a]ll facilities shall designate adequate space for religious activities that can equitably meet the needs of the detainee population" and that "[d]etainees will have the opportunity to engage in group religious activities."[103]

10. Inadequate Healthcare

107. All prisons and jails are responsible for providing sufficient healthcare, including medical, mental health, and dental care, to people in their custody.

108. Lack of adequate healthcare services in a facility strains institutional resources and causes a less safe environment for all. When people do not receive adequate healthcare or timely access to medications, people's health can degrade and it can lead to urgent and emergent situations, requiring custody staff to respond to help stabilize a person and staff and resources to transport people to offsite care. It also increases the risk of friction, distrust, and altercations between detained individuals and staff (as in the case of Mr. Lunas Campos), which as I have explained above does not advance any legitimate governmental interest and instead makes everyone less safe as detained individuals feel desperate, unsafe, and disrespected.

109. It also is critical that detention facilities have appropriate infectious disease protocols, including related to tuberculosis, flu, Covid, and measles. This is particularly true at Camp East Montana because infectious disease can spread quickly in the large congregate and open-air living areas with shared toilets, sinks, tables, and other high-touch surfaces. The ODO found five separate violations related to protocols around pulmonary tuberculosis ("TB")—a

[103] NDS 2025 at 155, Standard 5.3 § II.A; *id.* at 156, Standard 5.3 § II.E; *id.* at 156, Standard 5.3 § II.H.

highly contagious disease.[104] These violations appear to be related to a person who was exhibiting symptoms of pulmonary TB. The ODO found that the person was not housed properly to prevent the spread of infection "until determined by a health professional to be noncontagious," that the person was not evaluated in accordance with medical protocols, and that ICE was not notified of the situation. The breakdown and failure to respond to this situation represents a troubling failure of safe operations and put staff and detained people alike at risk of infection.

110. People at Camp East Montana report that when they are seen for sick call, it is often in the middle of the night or early in the morning.[105] This is not typical practice in prisons and jails and serves no legitimate governmental purpose. Detention facilities generally have fewer custody staff on duty overnight, when detained individuals are expected to be sleeping. Conducting routine medical appointments at that time burdens limited custody resources. It can be dangerous to have unnecessary movement through a facility at that time, as there are more opportunities for and risk of misconduct given a lessened security presence, including through inappropriate conduct between detained individuals and guards, such as use of force, sexual conduct, and trafficking of contraband. Routine movement in the middle of the night also disrupts sleep patterns, which as I described above creates a less safe facility.

111. I understand that detained individuals and their representatives have been unable to get access to medical records from Camp East Montana. There are no operational or security reasons to generally withhold medical records from patients or their representatives. Prison and jail staff should facilitate people's access to necessary information, including information related to their medical conditions and treatment, and promptly comply with policies regarding production of information. How staff respond to such requests is indicative of their commitment to transparency and accountability.

[104] February 2026 ODO Inspection Report at 11-12.

[105] Do Decl. ¶ 21; SNM Decl. ¶ 30; JLE Decl. ¶ 26.

11. Inadequate Nutrition

112. Providing adequate nutrition is essential in any detention facility. When people have access to good quality food, they are healthier and more likely to meaningfully participate in activities that promote their well-being, including recreation. Scarcity of any essential resource, including food, harms institutional security by creating anxiety, frustration, disorder, and potentially desperate actions.

113. Here, people describe inadequate and spoiled food at Camp East Montana, as well as significant weight loss, fatigue, preoccupation with thoughts of food and persistent hunger, tensions, fights, and protests related to food—all foreseeable consequences of providing inadequate and poor-quality food.[106] The Department of War found that in August 2025, "[t]here were instances of [people at Camp East Montana] not being fed or being served spoiled food."[107] "On February 20, 2026, ICE issued a discrepancy report on food service issues, such as the contractor's inability to produce evidence that the dietician had reviewed the menus for detained noncitizens."[108]

114. Most prisons and jails have a commissary (store) where people can purchase extra food and drinks, such as ramen, candy bars, cookies, chips, and soda. People report that there is no commissary or vending machine at Camp East Montana.[109] The Department of War reported that in August 2025, "[t]he contractor had not provided a commissary . . . to purchase snacks," and that compliance was "unknown" as of September 2025.[110] During its inspection in May 2026, the

[106] Rodriguez Flores Decl. ¶ 17-18, 53; Ly Decl. ¶¶ 19-20, 37; Baccam Decl. ¶ 26; Bounvongxay Decl. ¶ 15; Fernandez-Gastelum Decl. ¶ 16; Moreno Rodriguez Decl. ¶ 26; Camarillo-Gonzalez Decl. ¶ 11; Do Decl. ¶ 11; SNM Decl. ¶ 41, 43; NYG Decl. ¶¶ 44-45; CCD Decl. ¶ 18; Navdeep Decl. ¶¶ 32-33; JLE Decl. ¶ 20; LLH Decl. ¶ 30; Gonzalez Ramirez Decl. ¶¶ 46-47.

[107] DoW Audit at 15.

[108] GAO Report at 17.

[109] Rodriguez Flores Decl. ¶ 17; Ly Decl. ¶ 20; Bounvongxay Decl. ¶ 13; Piñango Decl. ¶ 4.

[110] DoW Audit at 15.

ODO found that "[t]he facility did not have a commissary provider."[111] This would further exacerbate the issue of inadequate food. Even if there was a commissary, however, snacks provided through the commissary, which detained individuals must pay for, are not meant to be meal replacements but instead are intended to be special comfort items. A commissary is not a substitute for a detention facility's obligation to provide people in its custody and care with adequate food and nutrition.

**C. Oversight and Accountability**

115. It is essential to the operation of any detention facility that there be a strong policy and practice of transparent accountability, rigorous oversight, and prompt action to correct any deficiencies. I viewed that as my primary responsibility when I oversaw the Colorado and Alaska Departments of Correction.

116. Prisons and jails routinely use a grievance process as part of a multi-pronged approach to identify and correct problems. A grievance process should be readily accessible and result in prompt and substantive responses to the grievant. Cursory denials without appropriate investigation discourage people from using the grievance process and allow problems to continue or worsen. Prisons and jails use the grievance process not only to address specific concerns, but also to track trends and repeat complaints. In that way, the grievance system serves as an early warning system and allows leadership, for example, to identify problematic officers who require intervention before their conduct worsens or to identify new issues that may require development of or revision to policies and procedures or other systemic relief to fully address.

117. The grievance process at Camp East Montana is not working as it should. On June 30, 2026, in letter from ICE to Plaintiffs' counsel, ICE stated that "[n]o grievances have been filed by detainees regarding dust exposure, respiratory distress, or related conditions."[112] Given overwhelming reports by people of constant exposure to sand and dust at Camp East Montana, and

[111] May 2026 ODO Inspection Report at 2.

[112] June 2026 ICE Response at 1-2.

related adverse health effects, either people are unable or unwilling to report those concerns through the grievance process or the facility is not properly identifying those grievances (or some combination of the two).

118. As noted above, the conditions reported in declarations at Camp East Montana do not encourage people to be proactive about reporting concerns through a grievance or otherwise; people describe being afraid to speak up or being resigned to the fact that nothing will be done anyway.[113] In addition, people report delayed and cursory denials to grievances—or no response at all.[114] The ODO also found that grievances were not addressed timely.[115] As a result, the absence of grievances on a particular issue does not mean an issue does not exist; it simply means that people are not reporting the issue through the grievance process because they don't know how, are too scared to, don't think it will do any good, or some other reason. And that should worry a correctional administrator. When I was overseeing correctional systems, it was what I didn't know that scared me the most.

119. For that reason, facility administrators must implement robust oversight mechanisms that do not rely exclusively on detained individuals affirmatively reporting problems. When systemic problems are identified, there should be a reliable process to ensure that remedies are developed and implemented as soon as possible, with tailored monitoring to ensure the remedies are durable and effective. Whatever written policies and procedures say, they are no good if they are not followed in practice.

120. I reviewed four government reports related to the operation of Camp East Montana—two by the Office of Professional Responsibility of U.S. Immigration and Customs Enforcement (dated February 10-12, 2026, and May 12-14, 2026), one by the U.S. Government Accountability Office (June 2026), and one by the Inspector General of the U.S. Department of

---

[113] Senevilay Decl. ¶ 7; JLE Decl. ¶ 36.

[114] Rodriguez Flores Decl. ¶34, 37; SNM Decl. ¶56-57; CCD Decl. ¶ 30; Angye Decl. ¶ 25; Navdeep Decl. ¶ 30; Majok Decl. ¶ 19; Ly Decl. ¶ 30.

[115] February 2026 ODO Inspection Report at 12.

War (June 9, 2026)—as well as statements and letters by members of Congress and legal advocates. These reports chronicle a long list of dangerous violations since the facility opened and raise significant questions about the adequacy of government oversight over the contractors' performance, and in particular the ability to ensure timely and durable solutions to identified problems. In short: From my review of the publicly available inspection reports and audits, I have serious concerns over the adequacy of existing oversight and accountability mechanisms.

121. **First**, it does not appear that a full and complete audit has ever been conducted of Camp East Montana. ICE—in violation of its own policy—"failed to conduct a pre-occupancy inspection prior to the opening of Camp East Montana."[116] Although the Department of War reportedly oversaw operations between July 2025 and October 2025, it "did not independently assess the support services [people at Camp East Montana] received."[117] The GAO similarly "did not systematically assess adherence to all National Detention Standards" and instead relied on "select gaps that ICE identified and those we observed during our visit to Camp East Montana in September 2025."[118] The ODO, in its February and May 2026 inspections, reported that because the facility did not provide requested information, it was unable to determine, among other things, "[w]hether security staffing levels were sufficient to maintain facility security," "met the facility's detainee supervision needs," or "were sufficient to protect detainees against sexual abuse and assault and other forms of violence or harassment, and to prevent significant self-harm and suicide."[119] Sufficient staffing, as the ODO correctly recognized, is necessary to ensure a safe and secure facility. Similarly, during its May 2026 inspection, the ODO report that the facility did not

---

[116] GAO Report at 22.

[117] DoW Audit at 13, 20. The Department of War appears to have conducted a walk-through of an empty facility still under construction and reviewed information provided by the contracting officer's representatives. *Id.*

[118] GAO Report at 15.

[119] February 2026 ODO Inspection Report at 6-7; May 2026 ODO Inspection Report at 5, 6 ("A finalized training plan has not been implemented; therefore, ODO could not determine if essential posts and positions were filled with qualified personnel.").

produce its use of force policy and "therefore, ODO could not determine if facility staff only use force, restraints, and non-lethal weapons in accordance with approved facility policy."[120] It is deeply concerning that the facility apparently refused to produce the requested information, which was critical to a credible audit, and that ODO had no means of requiring such information be produced. Instead, the ODO issued two incomplete oversight reports. ODO inspections serve an important function, and I appreciate that a review was completed, but the ODO needs the ability to require the facility to produce all information necessary for a complete review.

122. **Second**, ICE officials do not appear to appreciate the seriousness of the documented violations and the need for immediate, bold action. This can be seen in the ODO assigning an "Acceptable/Adequate" facility rating following the February 2026 inspection.[121] The ODO reviewed compliance with 24 NDS 2025 standards and found the facility in compliance with only 15. The ODO found that the facility was "deficient" in the remaining nine standards, which included "deficiencies"—defined as "any violation of detention standards, policies, or operational procedures"—in three so-called "priority components."[122] The ODO found 49 separate violations in the nine failed standards.[123] To be clear, these appear to be 49 different violations of specific requirements (my term), not repetitive failures of the same requirement.[124] Especially concerning are the areas in which notable failures of operations occur—areas critical to operation of a safe and secure facility. These include violations in the areas of "Use of Force and Restraints," "Facility Security and Control," "Sexual Abuse and Assault Prevention and Intervention," and around

---

[120] May 2026 ODO Inspection Report at 8.

[121] February 2026 ODO Inspection Report at 13.

[122] *Id.* at 4-12. "Priority component" is not defined in the standards, but one example of this in the inspection report was the facility's failure to maintain an accurate inventory of ammunition or tools. As noted above, the GAO reported the loss of a loaded firearm. For obvious reasons, this represents one of the worst kinds of breakdown of not only inventory, but overall safety at the facility.

[123] February 2026 ODO Inspection Report at 5-13.

[124] *Id.* at 5.

protocols of pulmonary tuberculosis.[125]

123. The failure of so many standards would cause significant alarm in any institution I led and require immediate corrective action and a credible monitoring system tailored to ensure that reforms were effective and durable (*i.e.*, remained effective in the long term). Any one of the documented deficiencies noted above should give serious pause to the operation of the facility, and the failures in the area of "Use of Force and Restraints" and "Facility Security and Control" should cause a failure rating in my opinion. I would consider a 37.5% failure rate (nine out of 24 standards), even accounting for a relatively new facility operation, cause for an immediate crisis response. Problems must be corrected from the ground up, including construction of adequate facilities and hiring sufficient and qualified staff for the planned population, development and approval of policies and procedures, and a rigorous training academy. And yet here, the ODO wrote only that it "recommends ERO El Paso continue to work with the facility to resolve the deficiencies that remain outstanding in accordance with contractual obligations."[126] After the May 2026 inspection identified even more problems, the ODO again simply issued the same toothless recommendation.[127] That is not nearly enough, in light of the magnitude of the violations.

124. These are not minor or inconsequential issues; continued violations can lead to serious injury and death. To provide one example of the foreseeable harm that can follow failing to correct known problems: the GAO reported that "ICE officials raised concerns to the contractors in October 2025 regarding the lack of vision panels on the doors in the medical holding rooms because there was no line-of-sight to detained noncitizens."[128] *Three months later*, in January 2026, the problem had not been corrected, and a person who had "exhibited risk factors for suicide"

[125] *Id.* at 8-11.

[126] *Id.* at 13.

[127] May 2026 ODO Inspection Report at 12.

[128] GAO Report at 18.

was placed in a medical holding room and died by suicide.[129]

125. **Third**, government officials have not acted with sufficient urgency to remedy unsafe conditions. The serious violations reported by various entities, including the Department of War, ICE, members of Congress, and legal organizations and service providers, in August, September, and December 2025 should have been corrected well before the February 2026 inspection, and violations identified during the February 2026 inspection should have been corrected before the May 2026 inspection. Instead, in May 2026, the ODO conducted an unannounced follow up inspection. That inspection uncovered even more problems and a four-fold increase in "Priority Component Deficiencies."[130]

| Inspection Results Compared | FY 2026 Full Inspection (NDS 2025) | FY 2026 Follow-up Inspection (NDS 2025) |
|---|---|---|
| Standards Reviewed | 24 | 24 |
| Deficient Standards | 9 | 9 |
| Overall Number of Deficiencies | 49 | 52 |
| Priority Component Deficiencies | 3 | 12 |
| Repeat Deficiencies | N/A | 8 |
| Areas Of Concern | 0 | 1 |
| Corrective Actions | 0 | 0 |
| Facility Rating | Acceptable/Adequate | N/A |

126. Again, the problems identified were of the most serious nature. The facility again did not produce a comprehensive security staffing analysis.[131] The ODO found that no finalized training plan had been implemented, that there were no written policies or procedures for housing unit and personal area searches, that there was no established tool-control policy, that the "facility had not established and provided a local handbook," that there were substantial violations in provision of medical care, that there were no written procedures governing the management of administrative segregation, that suicide watch cells were not suicide-resistant, and that there was

[129] *Id.*

[130] May 2026 ODO Inspection Report at 12. This inspection was unannounced and involved interviews with staff, which is more likely to result in an accurate picture of conditions at a facility than when the facility is given advance notice.

[131] *Id.* at 5.

inadequate monitoring of people on suicide watch.[132] The ODO further found that there was "[n]o master file of all post orders made available to all employees," "[h]ousing unit post orders were not reviewed and signed by the facility administrator or designee," and "[s]upervisors did not ensure officers understood the post orders for each post to which they were assigned."[133] An "Area of Concern" was identified but redacted, so I do not know what it is referring to.[134]

127. Morever, as of June 30, 2026—***over four months*** after receiving a briefing on preliminary findings and ***three months*** after receiving a written copy of the final February 2026 inspection report—ICE ERO was still "waiting for the El Paso Field Office to provide a corrective action plan."[135] That is unacceptable. The allegations and findings of serious violations should have raised urgent concerns and prompted the immediate development and implementation of a comprehensive corrective action plan to protect the health and safety of those who live and work at Camp East Montana.

128. **Fourth**, in any large government system, including detention systems, firm leadership, clear roles and responsibilities, and coordinated action are required to develop and maintain robust oversight and accountability mechanisms. This is necessary to ensure, for example, that auditing entities have all necessary information, that root-cause analyses are completed, that a tailored corrective action plan is developed, and that monitoring systems are in place to ensure the plan is effective and durable—and that all these processes are completed timely.

129. Absent clear direction and management, there is a danger that responsibilities will be spread across multiple actors and entities who may take a pass-the-buck approach, resulting in

[132] *Id.* at 5-12.

[133] *Id.* at 7.

[134] *Id.* at 5, 7.

[135] June 30 ICE Letter at 5 ("The Office of Detention Oversight (ODO) within the ICE Office of Professional Responsibility conducted an inspection on February 12, 2026, with a final rating of acceptable/adequate. ERO received the ODO final report on March 31, 2026, and is waiting for the El Paso Field Office to provide a corrective action plan"); *see also* February 2026 ODO Inspection Report at 4 ("Upon completion of each inspection, ODO conducts a closeout briefing with facility and local ERO officials to discuss preliminary findings.").

delays and inaction.

130. In this case, statements by various government actors pointing to others as responsible and/or the reason for delay raise concerns that actions between agencies and entities—including ICE executive management, the ERO, the El Paso Field Office, the contractor, and the subcontractors—are not being appropriately coordinated and managed. For example, the ODO states that its final inspection reports are meant to "assist ERO in developing and initiating uniform corrective action plans" and "inform ICE executive management in their decision-making to better allocate resources across the agency's entire detention inventory."[136] As noted above, the ERO, in turn, months after the February 2026 inspection report was issued, was still waiting on the "El Paso Field Office" to come up with a plan. The GAO reported that the "detention facility operator" is responsible "to create corrective action plans and eventually correct the deficiencies identified" when "ICE" issues "discrepancy reports," and that "some of the eight discrepancy reports issued to the contractor remained in draft or pending status as of March 2026 because ICE was awaiting the contractor's response before finalizing the report."[137] According to the GAO, ICE officials said "they were unable to apply any financial penalties" to the facility operator under the initial contract, because "the Army did not finalize a Quality Assurance Surveillance Plan for inclusion in the Camp East Montana contract."[138]

---

[136] May 2026 ODO Inspection Report at 3.

[137] GAO Report at 17 & n.39; *id.* at 18 n. b.

[138] The GAO reported:

> [Quality Assurance Surveillance Plans] establish how the government will monitor contractor performance against contract requirements, including the methods and frequency of oversight activities and how performance deficiencies will be documented and addressed. ICE and Army officials told us the Army did not include a Quality Assurance Surveillance Plan in the Camp East Montana contract due to the expedited time frames for opening the facility. Without this framework, ICE contracting officials told us they experienced significant challenges conducting oversight and addressing performance issues they identified. For example, while ICE issued discrepancy reports related to contractor performance issues, ICE officials said they were unable to apply any financial

131. Absent firm leadership and accountability mechanisms, diffusion of responsibility across multiple actors will only delay corrective action efforts.

132. **Finally**, I am concerned about the timeliness of a review of the death of Mr. Lunas Campos. All deaths in custody should be thoroughly reviewed. Allegations of the kind here—denial of medication and use of unwarranted and lethal force—are of the utmost concern, including to the continued health and safety of those who remain at the facility. According to the GAO:

> ICE's Office of Professional Responsibility is responsible for examining deaths of detained noncitizens in ICE custody. According to ICE officials, as of April 2026, the Office of Professional Responsibility's investigation is on hold pending an ongoing criminal investigation.[139]

I do not know exactly what the OPR investigation would entail, but the existence of a pending criminal investigation should not prevent an institution from conducting a thorough after-action report, identifying needed reforms, and implementing them. There may be some questions that need to be answered about whether and how to interview staff who may be criminally responsible during such a review, but correctional administrators routinely navigate those situations as they urgently review processes and procedures after significant events, including the deaths of people in their custody and care.

//

//

//

//

//

//

---

> penalties without meaningful performance metrics and a Quality Assurance Surveillance Plan.

*Id.* at 18-19. In its response to the GAO report, DHS claimed that "ICE has issued numerous [Contract Discrepancy Reports (CDRs)] to address performance issues at CEM, both under the previous and current vendor." *Id.* at 27, Appendix I.

[139] *Id.* at 18.

## V. CONCLUSION

133. Based on my review of the material available to me, including government inspection reports and first-hand accounts of people who are or were detained at Camp East Montana, I find that the conditions and restrictions that Plaintiffs complain of do not serve any legitimate nonpunitive governmental purpose. People at Camp East Montana are housed in dangerous and cruel conditions in violation of even ICE's own standards. Those conditions, if not addressed, will continue to result in disorder and unsafe conditions for all who live and work at the facility. Moreover, serious gaps and delays in oversight and accountability mechanisms have resulted in failures to correct known problems. I do not have confidence that the problems at Camp East Montana will be fully and durably corrected without external guidance and action.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 14, 2026, in Des Moines, Iowa.

By: [signature]
Dean Williams

# APPENDIX A

# DEAN R. WILLIAMS

## PROFESSIONAL PROFILE

Results driven leader who has led transformational changes in correctional systems and the criminal justice field. Strong leadership and management skills developed through leading two complex state corrections systems and other leadership positions in state government. Core competencies include strategic change management, corrections leadership, and criminal justice implementation. Extensive training in best practices for planning new institutions, prison reform initiatives, risk management, and alternatives to incarceration.

## PROFESSIONAL EXPERIENCE

**New Sky Justice Consulting, LLC**
*Director/Owner*, March 2023 – Present
Provide consulting services in the corrections and public safety arena. Clients include state government, non-profit organizations, and private companies. Based on my extensive experience in corrections management, I provide, among other things, guidance and recommendations on issues related to conditions of confinement and detention management.

**State of Colorado, Colorado Department of Corrections**
*Executive Director of Corrections*, January 2019 – December 2022
Led the Colorado Department of Corrections, a complex system of approximately 6,100 employees and 18,000 inmates, and a budget of approximately $1 billion. Oversaw all parole operations in the State as well as an Inspector General Office with approximately 35 certified peace officers.

- Formed a close-knit and highly functional executive team with the values of servant leadership.
- Led the Department through the Covid-19 pandemic with intelligent and thoughtful strategies, avoiding the gaffs of other correctional systems.
- Initiated major reforms in prison to humanize/normalize prisons that included inmate led newspaper, podcast, (first in the world) public broadcast radio station, honor units that are inmate led, inmate seminary program, inmate led mentoring, Vera Institute of Justice Restoring Promises Unit, inmate theater inside and outside the walls, revamp of the entire training academy, and expanded education opportunities.
- Developed a work release program where inmates made prevailing wages before their eventual release.
- Created the first of its kind (in Colorado) inmate council in all prisons. Separately created a core group of statewide inmates that became part of the policy review process.
- Led a legislative reform effort to overhaul the correctional industries division to focus on meaningful wages and jobs versus the profit driven motivation for the Department.
- Implemented dynamic security training and efforts in all prisons.
- Led a major reform of the Inspector General's Office.
- Facilitated efforts to start medically assisted treatment behind the walls for opioid addiction.

- Created close-knit relationships with advocacy and prison reform entities through purposeful partnerships.

**State of Alaska, Alaska Department of Corrections**
*Commissioner of Corrections*, January 2016 – November 2018
Led the Alaska Department of Corrections, a unified correctional system, and oversaw operations of community jails, halfway houses, pretrial and sentenced facilities at all security levels, and probation/parole divisions. Oversaw approximately 1,800 employees and 4,500 inmates, with a $350 million budget.

- Appointed as Commissioner when the Alaska Department of Corrections was in a highly troubled state and set a vision for transparency and accountability, operational changes to avert avoidable deaths and harm to staff and incarcerated people, a reset of leadership, clear and regular communications to staff during the much-needed changes, and the formation of the first internal affairs unit in the Department's history.
- Implemented a broad array of changes as a result of a major crime omnibus bill.
- Developed a coalition of diverse stakeholders to visit the Norway prison system and applied lessons and principles from that experience to develop improvement plans for the Alaska Department of Corrections.
- Worked to repair major harm done with indigenous native communities in Alaska.
- Initiated a medically assisted treatment program for releasing inmates.
- Partnered with state and federal law enforcement to address long standing corruption issues and developed the Department's first internal affairs agency.
- Reviewed finances, expenditures, and budgets, and identified cost-saving measures.
- Closed an unneeded prison that resulted in no layoffs, saved money, and mitigated community criticism.
- Embraced "results first" research that informed programming decisions, including enhancements to certain types of programming.
- Developed a policy and procedure process to address the archaic policies in the Department, some of which had not been changed for 30 years.
- Initiated faith-based efforts behind the walls.

**State of Alaska, Office of the Governor**
*Special Assistant to Governor Walker*, August 2015 – January 2016
Served to advance the administration's agenda with a focus on areas that needed special attention, including complex issues related to public safety, criminal justice, and resource development, and building partnerships with entities and the Governor's office to improve coordination and collaboration. Developed and oversaw investigation into deaths and dysfunction in the Alaska Department of Corrections, which led to publication of a comprehensive report and release of all background video and evidence to improve transparency and accountability. The report set the road map for systemic changes throughout the Department.

**State of Alaska, Department of Public Safety**
*Special Assistant*, March 2015 – August 2015
Managed special projects within the Department of Public Safety and analyzed the impact of legislation on the Department and the justice system. Reviewed law enforcement data to

determine vulnerabilities and opportunities to advance smart justice approaches. Developed and presented recommendations on bills passing through the legislature to the Governor's Office. Coordinated with legislators and other leaders regarding criminal justice issues.

**Alaska Legislature, Representative Lora Reinbold**
*Researcher*, July 2014 – December 2014
Developed policy, conducted research and analysis, and led constituent issues.

**Downtown Soup Kitchen**
*Executive Director*, September 2012 – July 2013
Oversaw all the operations of a faith-based organization to feed and cloth the homeless and working poor of Anchorage. Initiated the effort to move the organization from a small home-based operation into a modern facility and led fundraising efforts. Uncovered and addressed with the Board budget irregularities.

**State of Alaska, Department of Juvenile Justice**
*Juvenile Justice Superintendent III*, April 2010 – May 2012
Oversaw operation of all aspects of the State's largest juvenile detention and treatment facility and developed and implemented trauma-informed approaches and practicers. In particular, oversaw seven living units (criminal and civil) at McLaughlin Youth Center, which held 165 youth, two community-based programs, and two smaller detention facilities in Kenai and Palmer. Led efforts to reduce the school-to-prison pipeline, including the development of an expulsion and suspension school. As a result of that work, we were selected as part of a national effort on sensible school discipline.

*Juvenile Justice Superintendent I*, April 2001 –April 2010
Oversaw operation of all aspects of four units at McLaughlin Youth Center, including two male detention units, one female detention and treatment unit, and one diversion program. I oversaw the construction of a new detention unit that advanced more humane architectural features. I also established stronger professional internal investigation standards.

*Juvenile Justice Superintendent I*, May 1998 – April 2001
Oversaw all operation of all aspects of the Nome Youth Facility in remote Alaska. Led efforts to obtain funding to rebuild the dilapidated facility, worked to achieve full staffing, held staff accountable for mistreatment of youth, and developed a program that involved youth in restorative justice efforts in the local community.

*Youth Counselor III*, January 1989 – May 1993
Supervised line staff at the Nome Youth Facility and oversaw treatment plans for Alaska native youth.

*Youth Counselor II*, July 1981 – January 1989
Served as line staff in a long-term treatment unit at McLaughlin Youth Center.

**State of Alaska, Department of Law**
*Associate Attorney I* (non-lawyer position), Fall 1996 – May 1998
Worked directly for the Assistant Attorney General on multiple projects, including initiating a pilot program that trained volunteers to work with crime victims and help address their needs and working on complex criminal cases. (The Associate Attorney position is a non-lawyer position that was used for special or more complicated assignments within the Department of Law.)

*Paralegal Assistant II*, May 1993 – May 1998
Conducted investigations and case preparation for criminal cases out of the Nome and Kotzebue District Attorney's Office.

**Anchorage Police Department**
*Reserve Police Officer*, January 1986 – January 1989
Served as a commissioner/sworn police officer on a part-time, voluntary basis.

## EDUCATION

Anchorage Police Academy, Police Officer Certification (1986)
Ohio University, Bachelor of Science in Communication (1980)

## HONORS

International Corrections & Prisons Association, Head of Service Award (October 2022)
*This award is the highest international award presented by an international prison association.*

## GOVERNMENT APPOINTMENTS

- Colorado Clemency Board (March 2019)
- Colorado Commission on Criminal and Juvenile Justice (January 2019)
- Alaska Criminal Justice Commission (January 2016)
- Governor Walker/Lt. Governor Mallott Transition Team (November 2014)
- Board of Equalization, Anchorage City (February 2014)
- Housing and Neighborhood Development Commission (March 2013)
- Council of State Governments, Law Enforcement Subcommittee on School Discipline (September 2012)
- Federal Advisory Committee on Juvenile Justice (OJJDP) (February 2012)
- Subcommittee of FACCJ on School Engagement, Chair (August 2012)
- Alaska Juvenile Justice Advisory Committee, Vice Chair (2010)
- Tri-Borough Anti-Gang and Youth Violence Steering Committee (2007)

## ACTIVITIES

- Law Enforcement Leaders to Reduce Crime & Incarceration (November 2024)
- Jobs for the Future, Advisory Board Member (October 2024)
- Downtown Hope Center, Board Member (August 2024)
- University of Texas, Prison/Jail Innovation Lab Advisory Board (January 2024)
- Jesuit Prison Education Network, Advisor (January 2024)

- National Re-entry Workforce, Board Member Collaborative (June 2023)
- Warden Exchange Program, Senior Fellow (January 2023)
- USA Department of State (INL & IDLO), International Advisory Member (2022)
- Western Directors Chair, Correctional Leaders Association (2019)
- Alaska Public Employees Association, Negotiator (2001)

## PUBLICATIONS AND REPORTS

Dean Williams & Joe Hanlon, Alaska Department of Corrections: An Administrative Review (Nov. 13, 2015), https://docshare.tips/alaska-department-of-corrections-review_577e4091b6d87f934e8b4f86.html

Dean Williams, School Discipline and the Zero Tolerance Approach, Alaska Justice Forum, Vol. 30 No. 1 (Spring 2013), https://scholarworks.alaska.edu/cgi/viewcontent.cgi?article=1004&context=uaa_ak_justice_forum_21-30

The Council of State Governments Justice Center, The School Discipline Consensus Report: Strategies from the Field to Keep Students Engaged in School and Out of the Juvenile Justice System (2014), https://csgjusticecenter.org/publications/school-discipline/
*I assisted in the writing and editing of this seminal report and was the only representative from Alaska to work on this report.*

**Supplemental Information for *Angye v. ICE***

**Compensation**

- $350.00/hour for research, report writing, and all associated casework.
- $100.00/hour for travel and $500.00/hour for courtroom testimony and depositions.

**Expert consulting experience that involved testimony**

1. *Tiede v. Lumpkin*, 1:23-CV-1004 (W.D. Texas)

2. *Chipps v. State of Alaska*, 3:22-CV-00047 (D. Alaska)

3. *E.L. v. Claps*, 2025-CV-031717 (District Court, Adams County, Colorado)