**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

Gerald Akari Angye, *et al.*,

*Plaintiffs*,

v.

U.S. Immigration and Customs Enforcement, *et al.*,

*Defendants*.

Civil Action No.: 3:26-cv-1515-LS

**DECLARATION OF JEFFREY KELLER, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Page

I. BACKGROUND ....... 1
II. METHODOLOGY ....... 2
III. SUMMARY OF FINDINGS ....... 6
IV. DETAILED FINDINGS ....... 8
A. Necessary Components of a Healthcare Delivery System ....... 8
1. The Medical Intake Process ....... 8
a. Unsafe conditions in intake holding rooms ....... 8
b. Inadequate tuberculosis protocols ....... 9
c. Lack of confidential medical screening ....... 11
d. Untimely and incomplete medical screening ....... 13
e. Lack of continuity of care and follow-up ....... 16
f. Lack of timely and complete comprehensive health assessments ....... 18
2. Evaluation of Medical Complaints (Sick Call) ....... 19
3. Chronic Care ....... 27
a. Improper evaluation and management of HIV ....... 28
b. Improper evaluation and management of hypertension ....... 30
c. Improperly evaluation and management of hyperlipidemia ....... 33
d. Improper evaluation and management of asthma ....... 33
e. Improper evaluation and management of diabetes ....... 34
f. Improper evaluation and management of women’s health problems ....... 36
4. Medication Administration ....... 36
5. Confidentiality of Healthcare Encounters ....... 38
6. Specialty Care ....... 39
7. Emergency Care ....... 41
8. Infectious Disease Controls ....... 42
9. Environmental Contamination ....... 44
10. Nutrition and Medical Diets ....... 46
11. Mental Health Care ....... 48
12. Medical Records and Continuity of Care ....... 51

13. Use of Force ....... 54

B. The Preventable Death of Francisco Gaspar-Andres ....... 56

1. If the Intake Process Had Operated Properly, Mr. Gaspar-Andres Likely Would Not Have Died. ....... 56

2. If the Sick Call Process Had Operated Properly, Mr. Gaspar-Andres Likely Would Not Have Died. ....... 58

C. Oversight and Accountability ....... 63

V. CONCLUSION ....... 66

Appendix A

I, Dr. Jeffrey Keller, hereby declare:

## I. BACKGROUND

1. I have worked as a physician in jails and prisons for 29 years. My opinions in this case are derived from my extensive experience providing direct clinical care to incarcerated patients, managing and overseeing all aspects of the delivery of healthcare in both jails and prisons, and applying and evaluating compliance with national healthcare standards.

2. I am licensed to practice medicine in Idaho. I received my M.D. degree from the University of Utah in 1985. I am residency-trained and board certified in Emergency Medicine. I have been elected as a Fellow of the American College of Emergency Physicians ("FACEP"). I also hold advanced certification from the National Commission on Correctional Health Care ("NCCHC") as a Certified Correctional Health Physician.

3. From 1997 to 2021, I served as the Chief Executive Officer and Medical Director of a correctional healthcare company that provided medical and mental health care services to incarcerated people in 17 Idaho jails and juvenile facilities. I also served as the Medical Director of the Ada County Jail in Boise, Idaho, from 2009 to 2013. In both positions, I was responsible for overseeing all aspects of healthcare delivery, including reviewing the adequacy of care, resources, and healthcare processes; evaluating compliance with relevant standards; engaging in various forms of continuous quality improvement ("CQI"); and developing and implementing corrective action plans when needed.

4. I served as the Chief Medical Officer ("CMO") of Centurion LLC from 2013 to 2018. As CMO for Centurion, I supervised medical services for tens of thousands of people confined in prisons in Massachusetts, Tennessee, Minnesota, Mississippi, Vermont, New Hampshire, New Mexico, and Florida. In that position, I developed disease management guidelines. I also developed sentinel event forms to guide and document review of sentinel or so-called "near-miss" events to ensure quality improvement. Such reviews allowed us to learn from mistakes, improve systems, and prevent the same problems from affecting future patient care. In addition, each state was responsible for implementing a CQI program and reporting the results to

me. If a state was struggling to meet expectations, I would help them make sure all processes were running properly to support the healthcare delivery system, including by visiting the statewide medical director and providing individual counseling and support on how to improve systems.

5. I was President of the American College of Correctional Physicians ("ACCP") from 2023 until 2025, and I currently serve on the Board of Directors of ACCP.

6. The ACCP awarded me the Armond Start Award of Excellence in Correctional Healthcare in 2020. The National Commission on Correctional Health Care awarded me the B. Jaye Anno Award of Excellence in Communications in Correctional Health Care in 2023.

7. I am currently an independent monitor of the medical care provided at the Fulton County Jail in Atlanta, Georgia, and the Fresno County Jail in Fresno, California, which both typically house around 2,500 pre-trial and sentenced individuals. *See United States v. Fulton County*, No. 25-CV-0024 (N.D. Ga.); *Hall v. County of Fresno*, No. 11-CV-2047 (E.D. Cal.). I also have served as a consultant to assist detention facilities improve their delivery of healthcare to incarcerated people, including for the California Department of Corrections and Rehabilitation, the Idaho Department of Corrections, the Maricopa County (Arizona) Jail, and the Macon County (Illinois) Jail.

8. My curriculum vitae and list of recent cases in which I have given testimony are attached as **Appendix A**. My compensation for this case is $350.00 per hour.

## II. METHODOLOGY

9. Plaintiffs' counsel asked me to opine on the adequacy of the health care delivery system at Camp East Montana, an immigration detention facility on the Fort Bliss military base in El Paso, Texas.

10. In forming my opinions, I reviewed medical records in the possession of Plaintiffs' counsel for 29 patients who are or were incarcerated at Camp East Montana. I understand that the records for 25 patients were provided to Plaintiffs' counsel by counsel for Defendants and were created and maintained by Camp East Montana and document healthcare people received at Camp East Montana. One of the records I received from Plaintiffs' counsel was created and maintained

by a different immigration detention center after someone was transferred there from Camp East Montana and documents healthcare the patient received at that facility.

11. I also reviewed declarations under penalty of perjury from 40 people who are or were incarcerated at Camp East Montana and their loved ones: Erik Ivan Rodriguez Flores, Jayson Mbabid, Dat Ly, Phetsamone Senevilay, Cuong Baccam, Somsak Bounvongxay, Gerald Angye, Jesus Alfonso Fernandez-Gastelum, Reinaldo Moreno Rodriguez, Carlos Camarillo-Gonzalez, Lung Van Do, UEG, ZOR, RES, Christina Vilay, SNM, PKP, NYG, HOK, CCD, Navdeep, JLE, LLH, Antonio Frometa Ascon, Santos Jesus Flores, Henry Negrin Bolano, Jenrry Melendez, Mayron Pazpuerto, Ashweel Majok, Braumer Reylet Rodriguez Sanchez, Franco Mairena Nelson, Luis Rivero-Gonzalez, Albina Cristobal, Lucia Pedro Juan, Alfredo Antonio Reina, Tiago Claudina de Paula, Adams Pico Piñango, Julio Cesar Romero-Paredes, Francisco Rossa Chanchamire, and Maximo Rafael Valera Barreto.

12. I reviewed 9-1-1 emergency calls, transcripts, and logs of those calls made regarding Camp East Montana.

13. I reviewed the following documents related to the deaths of Francisco Gaspar-Andres and Geraldo Lunas Campos:

a. County of El Paso, Office of the Medical Examiner and Forensic Laboratory, Autopsy Report Case 2025-0601, Francisco Gaspar-Andres

b. County of El Paso, Office of the Medical Examiner and Forensic Laboratory, Autopsy Report Case 2026-0007, Geraldo Lunas Campos

c. ICE Detainee Death Notification, Francisco Gaspar-Andres (Dec. 5, 2025)

d. ICE Detainee Death Notification, Geraldo Lunas Campos (Jan. 9, 2026)

e. ICE Detainee Death Report: LUNAS Campos

f. ICE Detainee Death Report: GASPAR Andres, Francisco

g. ICE, Preliminary Report of Findings – Mortality Review Geraldo LUNAS-Campos (Jan. 16, 2026)

14. I reviewed the following government inspection and oversight reports:

a. U.S. Immigration and Customs Enforcement ("ICE") Office of Professional Responsibility, ERO El Paso Camp East Montana Inspection 2026-001-098 (Feb. 10-12, 2026) (hereinafter "February 2026 ODO Report")

b. U.S. Immigration and Customs Enforcement Office of Professional Responsibility, ERO El Paso Camp East Montana Inspection 2026-004-128 (May 12-14, 2026) (hereinafter "May 2026 ODO Report")

c. U.S. Government Accountability Office ("GAO"), Report to Congressional Requesters, Immigration Detention: Waste and Performance Issues at Camp East Montana Provide Valuable Lessons for Future Facilities, GAO-26-108886 (June 2026) (hereinafter "GAO Report")

d. U.S. Department of War, Inspector General, Audit of DoW Support for the Care and Safety of Detainees in Response to the National Emergency at the Southern Border, Report No. DOWIG-2026-088 (June 9, 2026) (hereinafter "DoW Audit")

15. I also reviewed the ICE National Detention Standards (revised 2025) ("NDS 2025"), which I understand govern operation of Camp East Montana, as well as the Camp East Montana Local Supplement of the ICE National Detention Center Detainee Handbook (revised May 2026) ("Detainee Handbook"). I also reviewed ICE Directive 11003.6, Notification, Review, and Reporting Requirements for Detainee Deaths (Feb. 27, 2025).

16. I also reviewed email correspondence between Rita Lomio, counsel for Plaintiffs, and Samuel Go, counsel for Defendants, dated June 5, 2026, and June 11, 2026, related to medical concerns for a patient at Camp East Montana.

17. Medical records are a critical source of information necessary to understand the operation of a healthcare system, where there are systemic failures, and what should be done to correct those failures. Medical records provide evidence of whether a facility has problems with continuity of care, problems addressing acute care, problems delivering chronic care, and the quality of care generally provided by healthcare staff, among other things. When evaluating a correctional healthcare delivery system, I typically review a sample of medical records for patients with a range of medical conditions to evaluate how different processes are functioning.

18. In this case, I was able to review medical records for people with a wide range of serious health conditions, including people with HIV, diabetes, hyperlipidemia, asthma, and high

blood pressure, as well as people who required off-site care, and, through each record, had multiple opportunities to observe the operation of the healthcare system, as individual patients often had different types of healthcare encounters and, in some cases, many of the same type of healthcare encounter (e.g., sick call visits) to evaluate.

19. In most cases, the medical records from Camp East Montana appeared to be missing certain documents, including Medication Administration Records (MARs), lab results, and consultation reports. It is not clear to me whether those records do not exist or whether for some other reason they were not included in the medical records produced by Defendants. I discuss concerns about the facility's inability to produce complete medical records later in this declaration. Except where noted below, none of my findings and opinions depend on the presence or absence of those records.

20. The medical records, along with the other information available to me, were sufficient for me to form an opinion about the operation of the healthcare delivery system at Camp East Montana. The serious flaws in the healthcare delivery system that I identified warrant a fuller evaluation, with a larger sample of patient records and review of other documents, to determine whether there are additional faults in the healthcare delivery system and to help develop a meaningful and sufficiently detailed corrective action plan.

21. Throughout my declaration, I reference a "standard of care." I use this term to refer to the standard of healthcare that is expected in any prison or jail, including that people receive clinically appropriate care and be competently evaluated, diagnosed, and treated by qualified healthcare staff; that people receive a medical evaluation consisting of vital signs, a physical examination that includes the area of complaint (e.g., an abdominal examination for complaints of abdominal pain), and, where clinically appropriate, laboratory tests and imaging studies; that a provisional diagnosis be made and care plan established (depending on the diagnosis, this care plan may be as simple as a prescription or as complicated as emergency surgery); that people receive treatment to alleviate pain and other symptoms; that people be re-evaluated to determine

whether treatments have been effective; and that the entire interaction with the patient be documented timely and accurately in the medical record.

22. Finally, I note that in this declaration, I provide examples to illustrate each opinion. I do not necessarily reference all information in the material provided to me that informed my opinion on each topic.

## III. SUMMARY OF FINDINGS

23. Poor healthcare and unsafe conditions at Camp East Montana have resulted in preventable death and put all people at risk of harm, including serious injury and death. Camp East Montana has a poorly functioning healthcare delivery system that is not adequate to care for patients with serious medical needs. In addition, patients at Camp East Montana are housed in a medically unsafe environment that itself increases the risk of poor medical outcomes. Between the medically unsafe environment and poor medical care, patients there are at much increased risk of a bad medical outcome compared to detention facilities with a properly functioning medical program and appropriate living conditions.

24. Through my review of medical records and other available information, the deficiencies I found were present consistently, across separate encounters and patients, and are typical of those found in healthcare systems that are poorly staffed and poorly managed.

25. As soon as people arrive at Camp East Montana, they are at serious risk of harm. The intake process is broken and does not serve its vital role of protecting people from harm. People are housed in medically unsafe holding cells and receive inadequate tuberculosis screenings. The intake screens and health assessments are not timely done, fail to identify serious medical problems, and result in delays in meeting the medical needs of incoming patients. Patient medications are not bridged in a timely manner and people report going days or weeks without prescribed medication.

26. After processing, people remain at risk from deficient healthcare systems. People routinely are subjected to shoddy and incompetent medical evaluations. Serious chronic conditions such as hypertension, hyperlipidemia, asthma, type 2 diabetes mellitus, HIV, and women's health

problems are improperly evaluated and managed. There is inadequate clinical space, with people reporting lack of privacy for medical encounters that occur in hallways or other public spaces. People are denied access to necessary specialty care, and the emergency care system is deficient.

27. The conditions in which people are housed also put all at risk of serious harm. People report unhygienic living conditions, including lack of access to hand soap, sewage leaking in housing units, contamination of housing units by dust and sand, and inadequate and infrequent cleaning—conditions that put everyone at risk of infectious diseases and respiratory illnesses, among other things. People report receiving inadequate food and experiencing substantial weight loss. People report unnecessary and excessive use of force by detention officers, which has resulted in serious injury and death.

28. The broken healthcare system at Camp East Montana fails people even when they are transferred out of the facility. Staff fail to provide complete medical transfer summaries and a supply of medications when patients are transferred or discharged, and the facility is unable to produce complete and accurate medical records upon request.

29. Finally, I have seen no evidence of effective CQI processes at Camp East Montana to identify and correct systemic deficiencies—I see the same serious issues repeat again and again in patient medical records. Government oversight inspections and audits also have identified serious problems that do not appear to have been timely resolved.

30. Put simply, core components of the healthcare delivery system at Camp East Montana, including intake, sick call, chronic care, medication administration, specialty care, infectious disease protocols, urgent and emergent care, and continuity of care, are not properly functioning. As a result, all people at Camp East Montana are at serious risk of harm, up to and including death. The tragic case of Francisco Gaspar-Andres illustrates this harm. He died after repeated medical mismanagement at Camp East Montana. There were many opportunities for medical staff to identify that he was slowly bleeding to death and to take immediate action to properly treat him, but they did not. His death was preventable.

## IV. DETAILED FINDINGS

31. In this section, I explain how basic components of the healthcare delivery system at Camp East Montana are inadequate and put people at risk of harm. I then discuss the case of Francisco Gaspar-Andres, who died in December 2025. Mr. Gaspar-Andres's case illustrates critical failures of the Camp East Montana healthcare delivery system that I saw time and again in other patient charts, including inadequate intake and screening procedures, failure to do a physical exam, substandard care, and failure to review and act upon abnormal lab results. His case demonstrates the serious harm that results from the system failures that I identified.

### A. Necessary Components of a Healthcare Delivery System

#### 1. <u>The Medical Intake Process</u>

32. The medical evaluation of people upon arrival at a detention facility, sometimes referred to as "intake," is critically important to the health and well-being of everyone at the institution. It serves several purposes. First, it is meant to identify and treat people with urgent or emergent health problems. Second, it is meant to identify people who potentially have communicable diseases or infestations like tuberculosis, Covid-19, and lice, who could, if not isolated and treated, spread the disease or infestation throughout the detention facility. Finally, it is meant to ensure continuity of care for people who are receiving medications and other treatment, to avoid adverse health effects that come from missed or delayed treatment.

33. Based on the information available to me, the intake process at Camp East Montana poses a serious health risk to all who live and work at the facility.

##### a. *Unsafe conditions in intake holding rooms*

34. The conditions that people are held in upon arrival to Camp East Montana create a health hazard for all who live and work at the institution and do not meet standards that would be expected in prisons and jails.

35. People report that upon arrival to Camp East Montana, they are held in a dirty, cold, and crowded room with a shared toilet with dozens of other people, forced to sleep on the floor close to one another without a mattress or bedding, without masks, and with visibly sick and

coughing people around them. People report that they were held in these conditions overnight and in some cases for days before receiving a medical screening.

36. These conditions are dangerous and unhygienic, and they increase the risk of infection and illness. People exhibiting symptoms of illness, including coughing, sneezing, and congestion, should be removed and isolated from others immediately to determine what illness they have and to protect others. People who are sick and coughing can transmit infections like tuberculosis and Covid-19 to others in close proximity, like the conditions described in the holding room. Illnesses such as influenza are spread via contaminated hands touching and contaminating other hands and shared surfaces, including floors, benches, and toilets. The open toilet described, like all toilets, emits an aerosolized spray of toilet water and waste that, unrestrained by a lid or a bathroom door, wafts through the open room and settles on surfaces, people and food, increasing the risk of infection and illness.

b. *Inadequate tuberculosis protocols*

37. During intake, patients must be identified who have potentially communicable diseases that could be spread to other people. One of the most important of these diseases is tuberculosis ("TB")—a dangerous and extremely contagious disease that can spread rapidly through congregate living environments like those at Camp East Montana. All detention facilities must have a process in place to identify people with active tuberculosis so that they are not housed with, and do not infect, other people. Patients with communicable diseases like tuberculosis should not be placed with other people until they are treated and are no longer contagious.

38. It is important to identify people who have active TB infections during intake before they infect others and so they can be treated. The U.S. Centers for Disease Control and Prevention ("CDC") has strict guidelines for TB screening in detention centers. Most commonly, all incoming detainees are asked questions to determine if they have the symptoms of active TB and are given a TB skin test. Patients who are determined to be at risk for active TB based on symptoms or a positive skin test should be quarantined and have a chest x-ray taken to look for evidence of TB.

39. Camp East Montana's screening for TB is haphazard and does not meet the standard of care in prisons and jails.

40. Under the NDS 2025, "[a]ll new arrivals shall receive tuberculosis (TB) screening in accordance with the most current Centers for Disease Control and Prevention (CDC) guidelines . . . prior to being placed in general population." NDS 2025 at 114, Standard 4.3 § II.D.1. The NDS 2025 also outline specific requirements for housing and treatment of people "with symptoms suggestive of pulmonary TB and/or with suspected or confirmed TB disease . . . ." *Id.*

41. ICE's Office of Detention Oversight ("ODO") identified problems with tuberculosis management at Camp East Montana in February 2026, and again in May 2026. In the February 2026 report, the ODO found (at pages 11-12):

a. "One detainee with symptoms suggestive of pulmonary tuberculosis disease (TB) was not housed in an airborne infection isolation room with negative pressure ventilation,"

b. "One detainee with symptoms suggestive of pulmonary TB was not housed in an airborne infection isolation room until determined by a health care professional to be noncontagious,"

c. "One detainee with symptoms suggestive of pulmonary TB disease was not evaluated for human immunodeficiency virus,"

d. "ICE/ERO was not notified of one detainee with symptoms suggestive of pulmonary TB disease," and

e. "One detainee with symptoms suggestive of pulmonary TB disease was not evaluated for human immunodeficiency virus."

42. In the May 2026 report, the ODO found (at page 11) that in **16%** of the medical records reviewed (4 out of 25), "detainees did not receive tuberculosis screening in accordance with Centers for Disease Control and Prevention guidelines prior to placement in general population." That is a significant percentage, particularly given the contagiousness of the disease and the frequent turnover of the population at Camp East Montana. The expectation is that all people are screened and managed in accordance with CDC guidelines.

43. The ODO's findings are corroborated by patient accounts and my review of medical records, which confirm a slipshod TB screening program. People report untimely and inconsistent

administration of TB tests and screening, as well as failure to timely assess the skin tests. HOK Decl. ¶ 10; Baccam Decl. ¶ 40; Rivero-Gonzalez Decl. ¶ 23; ZOR Decl. ¶ 12; UEG Decl. ¶ 5; SNM Decl. ¶ 37; LLH Decl. ¶ 8; Do Decl. ¶ 24. One person who had been diagnosed with tuberculosis before arrival reported that guards repeatedly denied him access to his tuberculosis medication after he arrived and he was made to sleep on the floor next to others before he was finally seen by medical staff the next day and isolated. Mbabid Decl. ¶¶ 9-13. The medical record of HOK[1] shows that a TB skin test was placed but these tests must be read between 48-72 hours later. HOK's skin test was not timely assessed and therefore invalid. A month later, another skin test was placed for HOK, which turned out to be positive. A chest x-ray was done, which showed that HOK did not have active TB. This was a near miss and should never happen. Had tuberculosis been confirmed by the chest x-ray, all people in HOK's dorm, and all staff who interacted with him, would have been exposed.

44. These failures to timely and adequately screen for tuberculosis are deeply concerning. Lapses in appropriate tuberculosis protocols violate standard correctional practice and create a risk of serious harm. Tests must be timely placed and read to identify cases before they can infect others. Tuberculosis is a serious disease and is highly contagious. It is an airborne disease that can spread rapidly through coughing and particles in the air. Based on the descriptions of the enclosures in the housing tents at Camp East Montana, it appears the 72-person dormitories are open air, which raises a risk of the TB organism spreading into adjacent housing areas as well.

c. *Lack of confidential medical screening*

45. Healthcare encounters must be done in confidential settings with audio and visual privacy. This is necessary to protect the privacy of patients and to allow patients to express themselves fully so medical staff have all necessary information. Indeed, the NDS 2025 also require that "[a]dequate space and equipment . . . be furnished so that all detainees are provided

[1] Some patients filed declarations under a pseudonym. In those cases, I refer to them by their pseudonym.

basic health examination, treatment, and communication in private." NDS 2025 at 113, Standard 4.3 § II.B.

46. Camp East Montana fails to provide appropriate privacy for medical screening at intake. People reported that their medical screening upon arrival to Camp East Montana was not private and that other detained individuals could see and hear the screening. *See, e.g.*, Do Decl. ¶ 4 ("There were two tables at the front of the room where the staff were doing a health check and a mental health check. I could hear and see everything that happened at that table because it was all in the same room and there was no barrier."); UEG Decl. ¶ 4 ("The exam was in the same waiting room that we were all in together and so I could see and hear everyone else's medical exams and they could see and hear mine."); Ly Decl. ¶ 13 ("This medical intake was not private. Nothing is private there because it is like a cubicle with the top section open, and other detainees were sitting near me and waiting their turn. They could hear everything I told the medical staff during the screening."); ZOR Decl. ¶ 11 ("This medical intake happens in a room with staff, guards, and other detainees around you. There was no privacy; there were people right next to me who could overhear everything I was saying."); Baccam Decl. ¶ 11 ("When medical staff asked me questions for the medical screening, other people could see and hear. We were sitting right next to each other. When we went up to the nurse, we sat at a table. But everyone else was sitting on a bench behind us waiting for their turn and could hear what was being said. There wasn't anything to give people privacy.").

47. Named Plaintiff ZOR reported that he did not feel comfortable sharing information with medical staff "because people around me could hear what I was saying and there is a lot of stigma associated with mental illness and depression, especially for men." ZOR Decl. ¶ 11. That is not surprising; many people do not feel comfortable sharing sensitive health information, including related to suicidal ideation, HIV status, and sexual health concerns, publicly. That information, however, is critical for healthcare staff to provide appropriate treatment. Put simply, healthcare staff cannot diagnose or treat health problems they do not know about. And they cannot protect other patients from contagious diseases that they did not learn about because patients

declined to reveal these diseases in a non-confidential setting. By not providing confidential space for medical screening at intake, Camp East Montana is violating the standard of care and placing people at risk of harm.

d. *Untimely and incomplete medical screening*

48. The medical screening itself must be timely, accurate, and complete to ensure that people receive appropriate care. The NDS 2025 require that, "[a]s soon as possible, but no later than 12 hours after arrival, all detainees shall receive, by a health care practitioner or a specially trained detention officer, an initial medical, dental, and mental health screening and be asked for information regarding any known acute, emergent, or pertinent past or chronic medical conditions, including history of mental illness, particularly prior suicide attempts or current suicidal/homicidal ideation or intent, and any abilities or impairments affecting major life activities." NDS 2025 at 113, Standard 4.3 § II.D.

49. Based on my review of patient accounts, medical records, and ICE's own inspection reports, I find that intake screens are not done, not timely done, and/or fail to identify critical healthcare information for incoming patients at Camp East Montana—all of which put people at unnecessary risk of harm.

50. First, in some cases, people did not receive a medical screening upon intake. In its May 2026 inspection, the ODO found that in **12%** of the medical records it reviewed (3 of 25), "detainees did not receive an initial medical, dental, and mental health screening by a health care practitioner or specially trained detention officer." *See also* LLH Decl. ¶ 8 ("During my intake, I did not receive a medical intake exam. The guards only gave us the uniforms and then sent me to my unit. I was not screened for tuberculosis, COVID-19, or measles. They did not ask me if I was sick, felt sick, was on any medications, had a rash, had been throwing up, or had a fever, or anything like that."). In my review of medical records, I found instances where there is no intake form (or a blank intake form). NYG, for example, arrived at Camp East Montana in March 2026, and there is no intake form in his medical record. RES's intake form, dated January 14, 2026, is blank.

51. Second, in other cases, medical screenings reportedly were significantly delayed. *See* Rodriguez Flores Decl. ¶ 7 (medical screening about four days after arrival); PKP Decl. ¶ 9 (two days); Rivero-Gonzalez Decl. ¶ 7 (four days); SNM Decl. ¶ 18 (about a week); Majok Decl. ¶ 7 (seven or more days); Claudina de Paula Decl. ¶ 11 (five days). Delays such as this increase the risk of harm for detainees because some detainees may have significant medical problems that are not recognized and treated during the delay. Similarly, patients with communicable diseases like COVID or measles may continue to be able to transmit their disease to others during these delays.

52. Third, people describe an inconsistent and sometimes cursory medical screening process at Camp East Montana, without necessary questions about medical conditions or symptoms. *See, e.g.*, Fernandez-Gastelum Decl. ¶ 6; SNM Decl. ¶ 18; UEG Decl. ¶ 4. The ODO also identified incomplete screening at intake. In its Inspection Report dated May 12-14, 2026, the ODO reviewed medical records for 25 people and found (at page 11) in three cases (**12%**), "initial screenings did not include an evaluation for use of or dependence on mood and mind-altering substances."

53. My review of medical records also provided evidence of incomplete screening. For example, the intake form for Mr. Fernandez-Gastelum stated: "No patient reported problems." According to Mr. Fernandez-Gastelum, however, he was asked no questions about HIV or any other chronic disease. Fernandez-Gastelum Decl. ¶ 6. In fact, Mr. Fernandez-Gastelum had HIV and had been taking Biktarvy, and that should have been documented during the medical screening so treatment could continue uninterrupted. According to Mr. Fernandez-Gastelum, it was only after he told a guard weeks after he arrived that he had HIV that he was finally evaluated by medical staff for HIV and prescribed medication. *Id.* ¶ 8.

54. Carlos Camarillo-Gonzalez similarly reported that upon arrival, he asked a nurse to test him for HIV because he knew he had been exposed to HIV. Camarillo-Gonzalez Decl. ¶ 20. Despite this, the intake form in his medical record reported no complaints and no findings. He was diagnosed with HIV six months later. This was a critical medical mistake that put Mr. Camarillo-

Gonzalez at high risk for a bad medical outcome. The HIV virus acts by attacking lymphocytes that are essential in our normal immune response that protects us from diseases and keeps us healthy. Delaying Mr. Camarillo-Gonzalez's HIV treatment for six months allowed the virus to rage unchecked and destroy lymphocytes during that time that could have resulted in a preventable life-threatening infection.

55. Fourth, medical staff at Camp East Montana do not properly incorporate health information from sending institutions when a patient is transferred from another immigration detention facility. The NDS 2025 properly require that, "[w]hen a detainee is transferred to another detention facility, the sending facility shall ensure that a medical transfer summary accompanies the detainee." NDS 2025 at 120, Standard 4.3 § II.Q.3. It is critical that the receiving institution (here, Camp East Montana) promptly review that information to ensure continuity of care.

56. ZOR was transferred from another facility to Camp East Montana on September 21, 2025. He arrived with a Medical Transfer Summary dated September 19, 2025. The Transfer Summary listed ZOR's medications as Sertraline 50mg every day and triamcinolone cream. However, during the intake screening at Camp East Montana, the RN wrote: "Hx of anxiety, Pt. currently taking hydroxyzine 50mg." This was incorrect because it is incomplete; it omits reference to Sertraline and indicates that the RN did not appropriately refer to and incorporate the information in the Transfer Summary. Sertraline should not be abruptly discontinued; doing so can suddenly worsen depression and anxiety.

57. CCD was transferred to Camp East Montana on May 10, 2026, from Adelanto ICE Processing Center ("IPC") in California. The Medical Transfer Form filled out at Adelanto IPC and dated May 9, 2026, lists a diagnosis of "Heart Disease, unspecified," "Chest pain unspecified," and "shortness of breath." The Medical Transfer Form also lists a pending cardiology consult that had already been approved and scheduled, but had not occurred at the time of transfer. It appears that no one at Camp East Montana read this information in the incoming transfer form and there is no indication that any action was taken regarding the pending cardiology consult. There is no mention of the transfer diagnoses of heart disease in CCD's intake screen done on May 10, 2026,

or his Intake History and Physical Exam, done on May 14, 2026. Missing this information put CCD at high risk that a heart problem that would have been identified and treated by the cardiologist would instead get worse due to this neglect and cause CCD harm, such as a heart attack.

58. I also saw repeated examples of patients who were transferred to Camp East Montana from other facilities and who therefore should have arrived with a Medical Transfer Summary, but I did not see a Transfer Summary in the medical records I was provided (Reinaldo Moreno Rodriguez, RES, PKP, CCD, and NYG). That, too, is a serious concern. If someone does not arrive with a Transfer Summary, staff at Camp East Montana should immediately reach out to the sending facility to request a copy, to ensure they have accurate and up to date information about patients in their care, including their medical diagnoses and medications. And if someone *does* arrive with a Transfer Summary, it should be included in their medical record.

e. *Lack of continuity of care and follow-up*

59. When people are identified upon arrival as having medical conditions, a plan must be put in place for their medical care, including continuation of prescribed medications, special diets (*e.g.*, for people with celiac disease or with food allergies), monitoring of chronic medical problems (*e.g.*, for people with diabetes who need their blood sugars checked during the day), or referral to a practitioner for further evaluation. Many incoming patients are on medications for which a missed dose can lead to severe outcomes, such as patients with seizure disorders, HIV/AIDS, and patients taking insulin. The process of ensuring that patients receive their medications after intake, without interruption, is called "bridging."

60. Patient medications are not bridged in a timely manner at Camp East Montana, creating risk of poor medical outcomes for patients dependent on important medications. People reported that they experienced a delay in receiving previously prescribed medications upon arrival to Camp East Montana. *See, e.g.*, Nelson Decl. ¶ 5 ("I was not told whether I would receive the medication I was already taking. Approximately 1 month passed before I received any medication."); Vilay Decl. ¶ 11 ("He said he never received any insulin or other medication,

including his heart medication, while at Camp East Montana, and he didn't receive chemotherapy."); Rossa Chanchamire Decl. ¶ 5 ("When I was first transferred to Camp East Montana, the facility didn't give me my HIV medication for approximately five days."); Majok Decl. ¶ 6 ("When I first arrived at Camp East Montana, I was put in the processing area for about seven days. . . . For those approximately seven days, the facility did not give me my medication for diabetes, high blood pressure, and depression."); PKP Decl. ¶ 31 ("When I was in federal prison, I was receiving medication and a special diet to manage my high cholesterol. When I arrived here, neither the nurse or the medical team checked my cholesterol levels or provided me with medication or provided me a special diet.");[2] CCD Decl. ¶ 13 ("I told them I was taking 5-6 medications for my mental health conditions. I take medication for Schizophrenia, depression, anxiety, PTSD, high cholesterol, and high blood pressure. The nurse said that they would give me the medications, but I did not receive them.");[3] Bounvongxay Decl. ¶ 10 ("I told the officers at intake and in medical about all three of my medications [to manage my diabetes], and I showed them all three of those medications. I was told that the facility didn't have Jardiance or Victoza, so they would be ordered, but I never received either of those medications and they wouldn't let me take the medications I had brought from home.");[4] Fernandez-Gastelum Decl. ¶ 8 (did not receive HIV medication until weeks after arrival);[5] NYG Decl. ¶ 9 (did not receive prescribed medication "until about two weeks" after intake screening).[6]

---

[2] PKP's medical records confirm that they did not receive a prescription.

[3] I was not able to confirm this from the very few medical records available to me.

[4] I have very few medical records for Mr. Bounvongxay. Those I do have show that Jardiance and Victoza were ordered but there is no MAR in his record to show if they were given.

[5] The medical records I was provided for Mr. Fernandez-Gastelum are missing MARs so I cannot confirm when he received the first dose.

[6] The medical records I was provided for NYG are missing MARs so I cannot confirm when they received the first dose.

61. In addition, Cuong Baccam reported that he told the nurse during intake screening that his "front tooth had been broken when ICE arrested me and was painful." Baccam Decl. ¶ 12. He reported that the nurse "told me that it wasn't of concern unless it really hurts, in which case they'd give me Tylenol." *Id.* This was inadequate. Because they can be painful and become infected, a patient reporting broken teeth should automatically be referred for an evaluation by a dentist or practitioner.

f. *Lack of timely and complete comprehensive health assessments*

62. New arrivals also should receive a health assessment, which consists of a physical examination. These should be completed within 14 days of arrival, and in practice they are often done during intake (that is, institutions often decide to conduct the intake medical screening and the comprehensive health assessment at the same time). The NDS 2025 include these requirements, providing that each facility "will conduct and document a comprehensive health assessment, including a physical examination and mental health screening, on each detainee within 14 days of the detainee's arrival at the facility." NDS 2025 at 114, Standard 4.3 § II.E.

63. Based on my review of the medical records available to me, health assessments are not done, not done timely, and/or fail to identify and address serious medical needs at Camp East Montana. Multiple records I reviewed either did not contain a health assessment (PKP) or had a health assessment that was completed months after the person's arrival (SNM, NYG). The ODO also identified, in its review of a sample of 25 medical records, one case in which there was "no documented comprehensive health assessment, including a physical examination and mental health screening." May 2026 ODO Inspection Report at 11.

64. Even when done, health assessments are not being done properly and omit important information. Luis Rivero-Gonzalez arrived at Camp East Montana unable to walk and requiring a wheelchair. On June 15, 2026, Mr. Rivero-Gonzalez was found to have a "disability unable to walk" and it was noted that he had used a wheelchair for eight months. However, the nurse who did his history and physical examination did not mention a foot injury or a wheelchair and wrote "MSK (musculoskeletal) exam normal." That is incorrect and represents poor and

inattentive work. Failure to properly examine a patient and false information in the medical record both increase the risk that important medical problems will be overlooked and not properly treated.

65. In addition, as I describe below, on March 10, 2026, Mr. Fernandez-Gastelum had a physical exam health assessment done, which did not mention HIV but did say "per chart review, pt. has insomnia. Medical diagnoses obtained through chart review of prior records." Evidently, the reviewer missed entirely his diagnosis of HIV infection.

2. <u>Evaluation of Medical Complaints (Sick Call)</u>

66. Patients at Camp East Montana routinely are subjected to delayed, shoddy, and incompetent evaluations of their medical complaints. All detention facilities must have processes to provide episodic care, which often is referred to as "sick call." This is the opportunity for incarcerated people to notify medical staff when they have medical symptoms and request medical evaluation and treatment. A properly functioning sick call system is vital to the health and well-being of incarcerated people and is standard in prisons and jails. People must submit a request to be seen and then wait for the medical system to respond. It is critical for all detention centers to review and act on these medical requests in a timely manner. This is because it is important to triage urgent conditions and diagnose and treat illnesses early before they get worse. Particularly in a congregate living environment like Camp East Montana where diseases can spread rapidly, medical staff need to promptly determine why people are experiencing certain symptoms (for example, if they have pneumonia, asthma, or Valley Fever), get them on the right course of therapy, and quarantine and isolate people where necessary to avoid infecting others.

67. The NDS 2025 set forth requirements for sick call and require facilities to "have regularly scheduled times . . . when medical personnel are available to see detainees who have requested medical services, commonly known as sick call." NDS 2025 at 115, Standard 4.3 § II.I. The NDS 2025 further require facilities to "have a mechanism that allows detainees the opportunity to privately request health care services (including mental health and dental services) provided by a physician or other health care practitioner in a clinical setting," that "all request slips

are received and triaged by the medical staff within 24 hours of receipt of the request," and that "[a] health care practitioner will review the request to determine when the detainee will be seen based on the acuity of the problem and within a reasonable period of time." *Id.* These general standards are consistent with expectations for prisons and jails.

68. People at Camp East Montana report not being seen timely in response to urgent and routine medical needs. *See, e.g.*, Senevilay Decl. ¶¶ 11-12 (delay in being seen for extreme pain); Baccam Decl. ¶¶ 17, 25 ("it could take weeks just to get an aspirin" and he was told he "wasn't on the list" when he inquired about being seen for sick call); Rodriguez Sanchez Decl. ¶ 31 (guard told him he wasn't allowed to go to medical while in solitary confinement when he requested medical help after peeing blood); Rivero-Gonzalez Decl. ¶ 23 (no response to repeated sick call requests); LLH Decl. ¶ 9; UEG Decl. ¶ 6; SNM Decl. ¶¶ 28-29; Nelson Decl. ¶¶ 25-26, 34.[7] That may be evidence of insufficient staff and/or lack of other systems to timely process, document, and act on sick call requests.

69. People also report being woken up late at night or early in the morning and waiting hours to see medical staff, being forced to choose between seeking medical care and sleep, and for that reason being discouraged from seeking and even refusing medical care. *See, e.g.*, Rodriguez Flores Decl. ¶¶ 48, 50 ("the guards woke me up for the appointment at around 3 am"); Senevilay Decl. ¶ 16 ("I was taken to see another nurse at around 3:30 am"); Gonzalez Ramirez Decl. ¶ 37 ("Sometimes I am taken to the medical unit in the middle of the night while I am sleeping."); Rivero-Gonzalez Decl. ¶ 29 ("the guards may take me at midnight to medical and I am there until about 6 or 7 am in the morning"); Do Decl. ¶ 21 ("They came to take me to the clinic at midnight that night. . . . It's really frustrating when they wake me up because they know that I have trouble sleeping and am on sleep medications but they still come late at night."); RES Decl. ¶ 33 ("guards took me out around 2 AM to go to a different part of the camp to get a refill of my prescription,

[7] Again, I was unable to independently evaluate those concerns because many of the sick call requests were missing from the medical records available to me.

with about four other detainees. We were there until 6 am waiting for our medication."); SNM Decl. ¶ 30 ("I have had two medical appointments after submitting a sick call slip where the guards woke me up late at night, like at 11 p.m. or 2 a.m., to go to the waiting room next to other sick people sitting and waiting for hours. After I was seen by the medical staff, I returned to our unit around 4 a.m. or 5 a.m."); JLE Decl. ¶ 26 ("I made another sick call request so that the nurse could explain my blood test results. I was taken to my appointment at about 1:00 a.m. and I returned to my unit at around 3:00 a.m."); ZOR Suppl. Decl. ¶ 7 ("I rarely submit a sick call request if I feel sick. That's because when I do, the guards usually wake me up in the middle of the night to go to the doctor. It is really difficult to sleep at Camp East Montana, so being woken up in the middle of the night is very distressing."); Claudina de Paula ¶ 20 ("at approximately 4 am, I was woken up and taken to the medical unit to get medication for my psoriasis").

70. I have never seen a jail or prison run sick call in the middle of the night or early morning. That is bad practice from a medical perspective and, quite frankly, ridiculous. It encourages people to refuse medical appointments and therefore staff will miss the opportunity to identify and treat a disease early or at all. It also is bad medically to interrupt people's sleep cycles. All doctors tell you to get a good night's sleep, and for good reason. Sleep deprivation can make you sick, and sleep is already difficult in detention facilities, and particularly so at Camp East Montana in light of the conditions described. The fact that these encounters are occurring so late at night or early in the morning again suggest inadequate staff and inadequate oversight.

71. Finally, healthcare practitioners at Camp East Montana provide grossly inadequate evaluations and treatment in response to sick call requests, which subjects patients to an unacceptable risk of harm. People report that when they are seen, they receive cursory examinations with no meaningful evaluation or treatment. That was confirmed by my review of medical records. As seen in the examples below, medical staff at Camp East Montana do not follow clear standards for evaluating serious symptoms, including by failing to order basic tests, failing

to elevate repeated concerns (so-called "bounce backs"), and failing to review and act on abnormal test results.[8] This all falls well below the standard of care.

72. On May 10, 2026, CCD was seen by a Nurse Practitioner ("NP") for intermittent heavy "[c]hest pain and shortness of breath with walking." The NP did not note the transfer diagnosis of heart disease from Adelanto IPC nor the scheduled appointment to see a cardiologist. The NP ordered an EKG (which was not included in the medical records sent to me) that was done the next day. The EKG was interpreted by another NP as being abnormal with "nonspecific inferior T-wave changes." The second NP did not see CCD herself. She ordered no further work up or follow-up, ending any further work up or evaluation of the cause of CCD's episodes of chest pain and shortness of breath.

73. This was an inappropriate medical evaluation that fell below the standard of care. CCD's description of intermittent chest pain and shortness of breath with walking is a classic description of "angina pectoris," or exercise induced heart pain due to obstructed coronary arteries. About 50% of the time, angina precedes a full-blown heart attack that can kill or cripple the patient. If angina is properly recognized and acted upon, cardiologists can use heart medications and procedures such as stents to effectively treat the patient and prevent the looming heart attack. The proper course of action would have been to urgently refer CCD to a cardiologist. This was especially true since CCD's fragile medical condition had been recognized at the Adelante IPC and communicated to Camp East Montana, where it was ignored.

74. Since CCD was never referred to a cardiologist and has not received any potential therapy to forestall a heart attack, he remains at very high risk to suffer a heart attack at any time that could kill or cripple him. The lab tests that were ordered by the NP were interpreted by her on May 13, 2026, as showing very high cholesterol levels and a very high blood sugar of 413, which by itself confirms the diagnosis of diabetes. The NP did not see CCD or order treatment for these two serious medical conditions, but instead referred CCD to "Chronic Care MGMT."

---

[8] A "bounce back" is when a patient returns to a medical clinic with the same complaint within 24-28 hours. Generally, the work-up of the bounce back should be more comprehensive.

75. CCD was not seen for his initial chronic care visit until 12 days later, on May 25, 2026. This was an unacceptable delay. When a patient with no history of diabetes is discovered to have a blood sugar as high as CCD's at 413, it is incumbent on the medical practitioner to make sure that the patient does not have a deadly complication of diabetes called diabetic ketoacidosis ("DKA"). This can be simply done by doing a physical examination and testing the patient's urine for the level of acidity. This test only takes a couple of minutes to do. In addition, the patient's blood sugar must be monitored at least daily to determine whether it is going even higher than 413. Finally, treatment to lower the patient's blood sugars must be begun immediately. To do nothing—no monitoring or treatment—for 12 days fell below the medical standard of care and put CCD at high risk of medical deterioration and a bad outcome.

76. On June 9, 2026, NYG was seen in the medical clinic with rectal pain that NYG thought was due to prostatitis (which he had had in the past). The correct clinical procedure in such a case is to do an examination of the prostate. If the prostate gland is infected, it should be tender and swollen. Such an examination is not difficult and would take two minutes. However, the Camp East Montana practitioner did not examine NYG's prostate. In addition, when doing an evaluation for a possible infected prostate, the practitioner should have done simple urinalysis and blood tests, which help determine whether there is an infection and how bad it is. They did not order these simple tests. By not doing an examination and not ordering essential tests, the practitioner violated the medical standard of care, increased the risk of missing an important diagnosis and not providing necessary treatment, and increased the risk of a bad outcome for NYG.

77. On June 11, 2026, NYG was seen in sick call for "black stools." Black stools are most commonly caused by bleeding in the stomach, where the stomach acid turns blood from red to black. Black stools can be a symptom of a serious medical problem, such as a bleeding gastric ulcer. Any clinician confronted by a complaint of black stools must determine whether their patient really has blood in their stool. Fortunately, this is easy to do using a simple bedside test called a Guaiac test. Such a test can be done in two minutes. However, the practitioner in NYG's case did not do this simple test. That omission violated the standard of care and increased the risk of failing

to timely confirm gastrointestinal bleeding and to timely diagnose the cause of the bleeding, which potentially could be serious and require immediate treatment, like colon cancer or a bleeding ulcer.

78. Alejandro Ramirez is an 84-year-old man. His age alone makes him high-risk for most medical maladies. On December 18, 2025, Mr. Ramirez was found to be "completely disoriented" and with "incoherent speech." Somewhat later, Mr. Ramirez regained "coherent speech and orientation." From this description in the medical record, it sounds like Mr. Ramirez suffered a Transient Ischemic Attack ("TIA"), which is a type of ministroke that can herald an impending larger stroke. Patients having a TIA should be sent to the ER for a comprehensive evaluation (including brain imaging) and a care plan designed to reduce the risk of future strokes. However, Mr. Ramirez's possible TIA was basically ignored, which was a violation of the standard of care and put Mr. Ramirez at considerable medical risk. Having a transient ischemic attach is a ministroke—it is a warning sign that a big stroke is about to happen and gives medical staff an opportunity to prevent the big stroke. If you don't take that opportunity then a big stroke happens, which is irreversible, leaving the person permanently disabled or dead.

79. On May 5, 2026, and again on June 8, 2026, Mr. Ramirez passed out (termed "syncope") while incarcerated at Camp East Montana. On May 5, 2026, the resultant fall after his syncope resulted in a laceration to his hand. Syncope in the elderly can have several serious causes, including heart rhythm problems, mini-strokes, or occult infections. The proper clinical course of action would be for the practitioner to do a detailed physical examination, routine lab work and repeated observation and consider sending the patient to the ER, where a more detailed and comprehensive evaluation could be done. The Camp East Montana practitioners did none of this, which violated the standard of care and put Mr. Ramirez at considerable risk.

80. LLH reported no past medical history when he arrived at Camp East Montana in November of 2023. Over the course of the next six months, LLH reported problems with urination (twice) and many visits for back pain. Especially since he had no history of either problem before, and because he repeatedly returned to sick call with the same "bounce back" complaints of back pain unresponsive to the treatments offered, the Camp East Montana practitioners should have

suspected the possibility of an undiagnosed medical problem underlying these problems. According to the medical record, they did not. Finally, after LLH's eleventh sick call visit in five months, a practitioner ordered standard blood tests on May 31, 2026. These showed that LLH had type 2 diabetes (A1c 8.3). This diagnosis should have been made months earlier. However, even after the labs confirming type 2 diabetes returned on June 1, 2026, the Camp East Montana practitioners failed to review the lab work. LLH was seen in medical clinic on June 5, 2026, and June 12, 2026, without anyone checking the lab report and noticing the positive test for diabetes. Finally, LLH himself submitted a sick call request on June 22, 2026, stating that he had not heard the results of his blood tests. An RN finally reviewed the labs and wrote, "patients states he has not got news about his blood work. Sn reviewed patient lab work and recommended patient be seen by clinic." The medical records I have end here; LLH had still not been seen by a practitioner for type 2 diabetes and has not been started on any therapy. The medical evaluation and care provided to LLH violated the standard of care. The substandard medical care increased the risk of harm to LLH, because very high blood sugars from untreated diabetes can result both in acute deterioration requiring hospitalization and ongoing damage to nerves, kidneys, and other organs by the excessively high blood sugars.

81. ZOR was seen in the medical clinic on February 3, 2026, for the complaint of burning with urination (termed "urethritis"). By far, the most common cause of urethritis in a young man would be chlamydia or gonorrhea. The proper clinical course of action would be to order a simple urine test for chlamydia and gonorrhea and then to treat the patient with the antibiotics ceftriaxone (for gonorrhea) and doxycycline (for chlamydia). The practitioner in this case did neither, instead diagnosing ZOR with "dehydration." ZOR returned to clinic on February 11, 2026, and the practitioner this time also did no urine testing and treated him only with doxycycline but no ceftriaxone.

82. Both encounters violated the standard of care. Neither practitioner meaningfully evaluated and diagnosed ZOR and ZOR was thus not treated for gonorrhea (if he had it). Without

treatment, the bacterium could cause damage and pain to his genitourinary tract and he would remain infectious to others (that is, he could potentially pass the disease to others).

83. LLH similarly was seen in medical clinic on January 21, 2026, for burning with urination. The practitioner who saw him did not order the simple urine test for the statistical most likely cause, chlamydia and/or gonorrhea. She instead diagnosed LLH with a "urinary tract infection" and treated him with the antibiotic trimethoprim-sulfamethoxazole, which is not effective against either probable pathogen. This encounter violated the standard of care. LLH returned to the medical clinic on March 1, 2026, with the same complaint. This time, the practitioner made a correct diagnosis: "Unspecified sexually transmitted disease," but again did not do the simple urine test for chlamydia and gonorrhea and prescribed only doxycycline, but no ceftriaxone. Here again, both practitioners failed to appropriately evaluate and diagnose LLH and LLH was not treated for gonorrhea (if he had it) and potentially remained infectious to others.

84. Carlos Camarillo-Gonzalez reported to sick call on October 11, 2025, with back pain. Mr. Camarillo-Gonzalez thought the pain was due to a kidney stone, which he had had in the past. The practitioner appropriately ordered a shot of pain medication (which would last approximately 6-8 hours). The practitioner wrote: "No follow-up needed." However, having a kidney stone is a very painful and ongoing condition and the practitioner did not make an adequate care plan for Mr. Camarillo-Gonzalez's pain (if he had a kidney stone, the pain would be expected to last far longer than a few hours). Two days later, Mr. Camarillo-Gonzalez's family called 911 twice, trying to get medical attention for Mr. Camarillo-Gonzalez, who they felt was being neglected. Both times, the EMTs were turned away and not allowed to see Mr. Camarillo-Gonzalez. Mr. Camarillo-Gonzalez was seen a month later in the medical clinic and was prescribed a urinary drug. On December 4, 2025, Mr. Camarillo-Gonzalez was finally sent to the hospital due to persistent kidney stone pain, where according to the medical record he was diagnosed with ureteral stones and adequately treated for pain.

85. In sum, the medical records demonstrate a broken sick call process at Camp East Montana, where practitioners provide grossly inadequate care in response to potentially serious

symptoms. Poor medical care increases the medical risk that serious and even life-threatening diseases will be missed and untreated, leading to unnecessary harm and bad outcomes. The problems I identify suggest inadequate training and oversight of the healthcare provided at Camp East Montana.

3. Chronic Care

86. Patients at Camp East Montana routinely are subjected to shoddy and incompetent treatment of their chronic medical conditions. A core component of any competent healthcare delivery system in a detention facility is chronic care. That refers to the treatment and management of people with chronic care conditions. Many people in detention facilities have serious medical conditions that need to be managed, including people with HIV, HBP, and diabetes. Those people are placed on a chronic care caseload, where they are regularly monitored and evaluated to ensure that the disease is not progressing and that treatment is appropriate. Treatment should conform to nationally recognized guidelines, which are the standard of care for chronic conditions. It is, of course, critically important to identify patients whose condition is worsening so that appropriate changes in treatment plan can be made. Most detention facilities schedule such patients to visit the chronic care clinic every three months to determine their level of control and stability.

87. The NDS 2025 require that facilities provide people with "[m]edically necessary and appropriate medical, dental and mental health care and pharmaceutical services," including "[c]omprehensive, routine and preventive health care, as medically indicated." NDS 2025 at 112, Standard 4.3 § II.A.

88. Camp East Montana does not have an adequate chronic care system. They do not follow people with chronic conditions in appropriately scheduled chronic care clinics. They do not follow the standard of care found in national treatment guidelines. As a result, patients with chronic medical conditions are at increased risk to deteriorate and suffer poor medical outcomes while incarcerated at Camp East Montana. I saw this repeatedly, across patient records, and related to different chronic conditions. I provide several examples below.

a. *Improper evaluation and management of HIV*

89. HIV is improperly evaluated and managed at Camp East Montana. HIV is an infectious disease in which viruses attack lymphocytes in the blood that are responsible for protecting us from infections and cancers. As these lymphocytes are destroyed, the patient becomes prone to develop infections and cancers. If untreated, almost all HIV patients eventually die of this disease. Fortunately, excellent treatments are available for those patients who have HIV.

90. The NDS 2025 include specific requirements as to HIV evaluation and management:

> The accurate diagnosis and medical management of HIV infection among detainees is important. An HIV diagnosis may be made only by a qualified health care practitioner, based on a medical history, current clinical evaluation of signs and symptoms, and laboratory studies. . . .
>
> Medical personnel shall provide all detainees diagnosed with HIV or acquired immunodeficiency syndrome (AIDS) appropriate medical care consistent with national recommendations and guidelines disseminated through the U.S. Department of Health and Human Services agencies, including the CDC, and the Infectious Diseases Society of America.

NDS 2025 at 118, Standard 4.3 § II.N.

91. Carlos Camarillo-Gonzalez was diagnosed with HIV infection at Camp East Montana. However, the medical records provided to me are incomplete. They do not contain any lab tests. Nevertheless, other references in Mr. Camarillo-Gonzalez's chart give the following information. When Mr. Camarillo-Gonzalez arrived at Camp East Montana on September 29, 2025, he knew that his partner was HIV positive and he requested to have an HIV test done. He states that he was never told the results of those tests. The first mention of a positive HIV test is in a clinical encounter on March 21, 2026, which states: "Late this afternoon I was given the results of this patient's recent labs. His HIV test was positive for HIV. We will draw the additional testing for STD and resistance testing." Mr. Camarillo-Gonzalez later told a Mental Health Therapist that "the doctor that gave him the HIV diagnosis and prescribed the medication did not educate him about the medication he started taking or the side effects." In a clinic visit on March 27, 2026, Mr.

Camarillo-Gonzalez "wanted to know why he was not told and treated for his HIV earlier when his labs were done in September." Delaying diagnosis and treatment for six months after labs demonstrated positive HIV violated the medical standard of care and put Mr. Camarillo-Gonzalez at risk of harm, as I explained previously. In addition, patients should be timely told the results of medical tests, particularly those with abnormal findings.

92. SNM reported during his intake assessment on January 8, 2026, that he was HIV positive. Throughout the rest of SNM's chart through June 25, 2026, HIV is mentioned as a diagnosis 35 times but was never addressed by a medical practitioner. SNM was not seen in Chronic Care Clinic. No labs were drawn. SNM was treated with Biktarvy, but the first mention of Biktarvy being prescribed is May 1, 2026. This neglect of a patient with HIV did not meet the medical standard of care.

93. Jesus Fernandez-Gastelum arrived at Camp East Montana on November 11, 2025. He had a history of HIV and had been taking Biktarvy prior to arrival. However, as I explained above, his intake assessment states he reported no medical problems, including no infectious diseases. I find this not to be credible. Why would Mr. Fernandez-Gastelum not mention his HIV status and that he was taking Biktarvy? Mr. Fernandez-Gastelum is first noted to be HIV positive on November 18, 2025, when he was seen in sick call with the complaint of "he has not had his HIV medication and he's worried about getting sick." The practitioner ordered Biktarvy, but did not order labs and made no reference to checking any old records to verify current HIV status. On December 3, 2025, Mr. Fernandez-Gastelum was seen in sick call with the complaint that he had not had his Biktarvy for two days. The practitioner refilled it. On March 10, 2026, as noted above, Mr. Fernandez-Gastelum had a physical exam health assessment done, which did not mention HIV but did say "per chart review, pt. has insomnia. Medical diagnoses obtained through chart review of prior records." Evidently, the reviewer missed entirely the diagnosis of HIV infection. Mr. Fernandez-Gastelum never had a Chronic Care Clinic encounter for HIV and never had labs drawn to determine his degree of control. Mr. Fernandez-Gastelum's care did not meet the medical standard of care.

b. *Improper evaluation and management of hypertension*

94. Hypertension is improperly evaluated and treated at Camp East Montana. Hypertension is appropriately called "the Silent Killer." High blood pressure increases one's risk of several bad medical outcomes like a stroke, a heart attack, or sudden death. The higher the blood pressure, the higher the risk. The goal of hypertension chronic care is to periodically monitor the patient's blood pressure and look for evidence of hypertension induced organ damage. This usually involves a clinic visit every three months to measure blood pressure and labs and an EKG once or twice a year. The goal of hypertension chronic care management is to use medications to keep blood pressure at safe levels. Without scheduled checkups, the Silent Killer can silently set the stage for bad medical outcomes, including death.

95. RES has no intake screen in his chart. It appears none was done. His health assessment was done on January 14, 2026. No blood pressure or any other vital signs were taken at this visit. RES is reported as having no medical conditions. On February 8, 2026, blood pressure medications were ordered for RES following a high blood pressure reading. A high blood pressure reading was again noted on March 28, 2026. RES complained on May 4, 2026, that he was not receiving his blood pressure medications. On May 5, 2026, extremely high blood pressures were recorded (187/122), meeting the criteria for a "hypertensive crisis."[9] Properly, a patient with a blood pressure this high would be sent to the emergency department for a work up. However, in RES's case, nothing was done, which violated the medical standard of care.

96. On June 13, 2026, RES was seen by an RN in sick call for the complaint of "headaches off and on for 10 days." The RN wrote that RES: "States he needs to let staff aware he still has not received his medication since intake (amlodipine and maxide)." RES's blood pressure (193/134) again met the criteria for a hypertensive crisis. The RN recorded that RES was

[9] A hypertensive crisis is defined as a blood pressure greater than 180/120. The patient is at great risk of a sudden and catastrophic medical event. *See* Christos Varounis *et al.*, *Cardiovascular Hypertensive Crisis: Recent Evidence and Review of the Literature*, Frontiers Cardiovascular Med., Jan. 2017, at 1.

"asymptomatic" despite his complaint of headache, which is a classic symptom of extremely high blood pressures. Later in the day, RES was seen by a practitioner. His blood pressure at that time was still high enough to qualify as a hypertensive crisis. The practitioner treated RES with two doses of the blood pressure medication clonidine, which can effectively lower the blood pressure but is very short acting, so that blood pressure can rebound to its previous level within hours. Because of this rebound effect, clonidine was, by itself, inappropriate therapy. It should have been accompanied by longer acting blood pressure agents. Also, RES should have been sent to the ER for evaluation of possible end-organ damage due to the prolonged very high blood pressure, but this was not done. Not recognizing dangerous symptoms, not properly acting on dangerously high blood pressures, and not completing a work up for end organ damage in the setting of a hypertensive crisis violated the medical standard of care.

97. On June 22, 2026, yet another very high blood pressure was recorded (159/110). The NP did nothing at this time. The medical records that I have for RES end here. Overall, the medical evaluation and care provided to RES for his very high blood pressures did not meet the medical standard of care. This was a near-miss medical catastrophe. RES was at great risk for a bad medical event such as a stroke or sudden death.

98. Carlos Camarillo-Gonzalez had several elevated blood pressures measured at his intake exam on September 30, 2025. No action was taken. This inaction violated the medical standard of care, which would have been to start Mr. Camarillo-Gonzalez on appropriate blood pressure medications. On October 11, 2025, Mr. Camarillo-Gonzalez was seen in sick call for back pain. His blood pressure was very high (168/84), but this reading was inappropriately ignored by the practitioner. Similarly, Mr. Camarillo-Gonzalez had an elevated blood pressure measured on November 23, 2025 (147/98) that was also inappropriately ignored by the Camp East Montana practitioner.

99. On December 4, 2025, Mr. Camarillo-Gonzalez was sent to the ER for kidney stones. When he returned, the ER physician had noted incidentally to his kidney stones that Mr. Camarillo-Gonzalez had untreated hypertension. This apparently was ignored by Camp East

Montana medical staff as Mr. Gonzalez continued to not receive treatment for hypertension. On December 9, 2025, a markedly elevated blood pressure (143/103) was again ignored. A high blood pressure of 135/83 in the setting of a nose bleed was ignored on December 19, 2025. On December 30, 2025, Mr. Camarillo-Gonzalez was treated for a very high blood pressure reading (161/100) with a *single dose* of clonidine, but he received no ongoing therapy. This was inappropriate therapy that did not meet the standard of care. Persistently elevated blood pressures were measured after that on December 31, 2025, March 15, 2026, March 21, 2026, and March 27, 2026, that were all similarly ignored by Camp East Montana practitioners.

100. The medical care provided to Mr. Camarillo-Gonzalez at Camp East Montana for hypertension has been incompetent and has repeatedly violated the medical standard of care, including by medical staff repeatedly failing to recognize and act on dangerous blood pressures, by medical staff failing to review and act on information provided by the ER physician, and by failing to put together a treatment plan for Mr. Camarillo-Gonzalez's chronic condition. Mr. Camarillo-Gonzalez was at high risk for a hypertension-related bad medical outcome, such as a stroke or heart attack, due to medical staff's failures to properly treat him.

101. JLE arrived at Camp East Montana with a diagnosis of Essential Hypertension, for which she had been taking the blood pressure medication HCTZ (hydrochlorothiazide) previously. However, HCTZ was not prescribed at Camp East Montana until JLE had had persistently high blood pressures measured *13 times* between May 8, 2026, and June 21, 2026. The proper course of action would have been to bridge the HCTZ immediately upon JLE's arrival to Camp East Montana and then, if high blood pressure persisted, to increase the dose of HCTZ and/or add a second medication. The persistently elevated blood pressures were ignored until June 9, 2026, when a blood pressure medication was finally ordered. However, JLE reported at sick call on June 21, 2026, that she had still not been getting the prescribed blood pressure medication. The treatment provided to JLE did not meet the standard of care and due to medical staff's inaction, she was at increased risk of harm and a bad medical outcome, including stroke, heart attack, and death.

c. *Improperly evaluation and management of hyperlipidemia*

102. Hyperlipidemia is improperly evaluated and treated at Camp East Montana. Like hypertension, elevated blood lipid levels increase the patient's overall risk of cardiovascular diseases, such as heart attacks and stroke. When hyperlipidemia is diagnosed, it is most commonly treated with a class of medications called statins. Cholesterol levels should be routinely checked once a year in chronic care clinic to make sure that the cholesterol levels stay in the safe range. If hyperlipidemia is not treated, or if high cholesterol levels are not discovered in the chronic care clinic, then patients are at increased risk of cardiovascular disease.

103. PKP arrived at Camp East Montana on November 19, 2025. Records from the previous detention center indicated that he had been diagnosed with "Hyperlipidemia" and included his previously measured abnormal lipid levels. This was ignored by medical staff at Camp East Montana. The cholesterol medication he had been taking was not bridged. The diagnosis of Hyperlipidemia was never entered into his problem list. PKP was never treated for hyperlipidemia during his stay at Camp East Montana, nor were his lipid levels remeasured. This lack of medical care violated the medical standard of care and put PKP at increased risk of cardiovascular disease.

104. CCD was prescribed Zocor 20mg a day for hyperlipidemia on May 25, 2026. The NP who prescribed that medication failed to follow recommended guidelines for hyperlipidemia. Based on his history and labs, CCD met the criteria for "high intensity" statin therapy. Zocor should not be used for such a patient and 20mg is too small of a dose. A more appropriate prescription (which is easily accessible online) would be atorvastatin (Lipitor) 40 mg per day or rosuvastatin (Crestor) 20-40mg a day. As a result, CCD is not receiving all of the benefits of statin therapy that he should and his medical risk of harm has not been reduced as much as would be if medical staff provided clinically appropriate care.

d. *Improper evaluation and management of asthma*

105. Asthma is improperly evaluated and treated at Camp East Montana. Asthma is a respiratory disease that causes episodic wheezing and coughing. Asthma can be severe enough to kill people. The treatments for asthma depend on the level of wheezing and coughing. The worse

the asthma symptoms, the more medications are used to control it. Uncontrolled asthma can flare suddenly and cause serious harm to the lungs or even death. Asthma patients are appropriately followed in a chronic care clinic where the degree of persistent asthma is measured with pulmonary function tests, chest x-rays, and/or blood tests. If this is not done, asthma patients are at increased risk of a sudden asthma attack that can be severe.

106. UEG did not have the diagnosis of asthma when he arrived at Camp East Montana on March 21, 2026. He was seen in sick call by a practitioner on April 10, 2026, for the complaint of shortness of breath. Despite not doing any physical examination, including no auscultation of the lungs to hear the wheezing characteristic of asthma, the practitioner diagnosed UEG with asthma and prescribed an albuterol "rescue inhaler." This interaction did not meet the standard of care. The diagnosis of asthma requires a physical examination and, at a minimum, simple 2-3 minute bedside diagnostic tests such as peak flow testing and/or spirometry. This practitioner did neither. Over the course of the next three months, UEG used his rescue inhaler frequently but was not evaluated in a Chronic Care Clinic. The proper medical course of action for an asthmatic using a rescue inhaler frequently would be to prescribe a steroid inhaler, sometimes containing a long-acting bronchodilator, to prevent asthma attacks from happening. This has not happened, which also fails to meet the medical Standard of care. By providing substandard medical care to UEG, Camp East Montana has placed him at increased medical risk of a serious or even catastrophic asthma attack and a potential bad medical outcome, such as needing hospitalization or even death.

e. *Improper evaluation and management of diabetes*

107. Type 2 diabetes Mellitus is improperly evaluated and managed at Camp East Montana. Type 2 diabetes is a condition of insulin-resistant that results in very high blood sugars. Blood sugars can get to such a level that it causes organ damage and can lead to heart attacks, strokes, and other serious problems. The way to manage type 2 diabetes is with diet and medications that lower blood sugars to appropriate levels. Patients with type 2 diabetes should have their blood sugars checked frequently and should be seen often in chronic care clinic, where

medications are adjusted to keep blood sugars at safe levels. If blood sugars are not checked or if patients are not seen for chronic care, their risk for organ damage and bad medical outcomes rises.

108. In the section above, I described concerns in the delay in CCD's chronic care visit. When CCD was finally seen for a chronic care visit on May 25, 2026, he was found to have an exceedingly high hemoglobin A1c of 13.1%. (The A1c approximates average blood sugar levels for the previous three months. Normal is less than 5.7%.) The NP who saw CCD diagnosed him with "uncontrolled DM [Diabetes mellitus] and hyperlipidemia." She prescribed long-acting insulin (Lantus) once a day and short acting insulin (Humulin) to be given as a "sliding scale" three times a day, in which the exact insulin dose depends on the patient's blood sugar at the time.

109. However, the prescriptions of Lantis and sliding-scale Humulin do not meet the medical standard of care as found in "Diabetes Management in Detention Facilities: A Statement of the American Diabetes Association." The American Diabetes Association ("ADA") provides easy-to-use algorithms that provide preferred treatment options. The ADA specifically discourages the use of sliding-scale insulin. The ADA also recommends that other diabetic medications (termed GLP-1 and GIP/GLP) medications be used before starting insulin in patients with newly diagnosed type 2 diabetes. Finally, the ADA recommends that if insulin is to be started in these individuals, long-acting insulin should be used alone before short acting insulin and in combination with a GLP-1 or GIP/GLP.

110. Other people report that they did not receive timely access to their diabetes medication, including insulin, or appropriate meals. *See, e.g.*, Bounvongxay Decl. ¶¶ 9-13; Majok Decl. ¶ 8; JLE Decl. ¶ 27. Missing medication doses for diabetes is bad medical care. Each missed dose increases the risk of medical deterioration and a potential bad medical outcome, like hospitalization or a diabetic complication. It is also critically important that diabetic patients have ready access to food in case their blood sugar drops to dangerous levels. If diabetic patients cannot eat something urgently to increase their blood sugar levels, they risk losing consciousness and suffering serious medical harm.

f. *Improper evaluation and management of women's health problems*

111. Practitioners at Camp East Montana also failed to appropriately evaluate and manage women's health problems. JLE had blood drawn on May 11, 2026, which showed that she had microcytic anemia, which is usually caused by blood loss. In women, that blood loss is usually due to heavy and frequent menstrual flow (termed menorrhagia). However, no one reviewed her blood test results until JLE herself asked about her lab tests a week later. In the resulting sick call visit on May 17, 2026, the NP did not mention anemia and appears to have not noticed that lab abnormality. The anemia was first addressed in a clinic visit on June 9, 2026, when JLE herself reported to the practitioner a history of menorrhagia that had been treated in the past. The proper medical course of action would be to do a pelvic examination to confirm that this was, indeed, the right diagnosis and then review treatment options to decrease her menstrual flow. However, the Physician Assistant ("PA") did not do a work up commensurate with the standard of care and simply ordered iron tablets. This was substandard medical care. Iron tablets help the body to produce more blood, but do not address the main problem, which is losing too much blood during menses. There are medications that are effective in reducing menstrual blood flow. Not prescribing one of these effective medications increases JLE's risk of medical deterioration through excessive blood loss and a bad medical outcome, such as hospitalization.

4. <u>Medication Administration</u>

112. All detention facilities must have a reliable process for administration of medication. In detention facilities, and unlike in the community, access to medication is strictly controlled and, except for limited keep-on-person ("KOP") medications, patients are not allowed to keep a supply of medications with them. Instead, medical staff bring medications to patients to a process called "med pass" or "pill call." This happens multiple times a day for patients who, for example, are prescribed morning and evening medications. All detention facilities are expected to have a properly functioning medication administration system that will reliably distribute medications at predictable times and as prescribed and that will refill prescriptions well in advance so that there are no lapses in administration of medications. Detention facilities should have

systems in place to timely acquire necessary medications and have a well-stocked pharmacy on site. And all administration of medication, including KOP medications, should be documented in the patient's medical record. These are core requirements of any healthcare delivery system in a detention facility; missed medications result in increased risk of medical harm to patients.

113. The NDS 2025 properly require that medication "be distributed according to the specific instructions and procedures established by the health care provider. Health care providers and officers shall keep written records of all medication given to (or refused by) detainees." NDS 2025 at 117, Standard 4.3 § II.L.

114. At Camp East Montana, people report a broken medication administration process, with missed medications and delays in receiving medication after it is prescribed or the current prescription runs out. *See, e.g.*, Senevilay Decl. ¶¶ 14-15 (did not receive medication nurse said she would order); Majok Decl. ¶¶ 6-10 (medication for diabetes, high blood pressure, and depression); Bounvongxay Decl. ¶¶ 9-13 (medications for diabetes, including insulin); Fernandez-Gastelum ¶ 8 (HIV medication); Romero-Paredes Decl. ¶¶ 6-7 (high blood pressure medication); Rivero-Gonzalez Decl. ¶¶ 19, 23-24, 28 (medications for depression, anxiety, sleep, and claustrophobia); Claudina de Paula Decl. ¶¶ 35-36 (medications prescribed by hospital); Nelson Decl. ¶¶ 5, 30 (medications for anxiety, depression, chronic insomnia, hypertension, and asthma); Gonzalez Ramirez Decl. ¶¶ 35, 37 ("It took over 30 days in order for me to get my medication for my prostate."); JLE Decl. ¶¶ 7, 23, 25-27 (medication for diabetes and high blood pressure); RES ¶¶ 33-34 (high blood pressure medication); CCD Decl. ¶¶ 13, 28; *id.* at 5 ¶¶ 1, 4 (medications for schizophrenia, depression, anxiety, PTSD, back pain, high cholesterol, and high blood pressure); Rossa Chanchamire Decl. ¶¶ 5, 7 (HIV medication).

115. The 9-1-1 calls also provide additional evidence of inadequate medication administration. For example, staff reported on February 20, 2026: "We have a patient from the clinic that came in, hasn't had meds for three days, and we had an exacerbation of his [inaudible]. He's, uh, pre-medicine right now, um, unable to walk home from his [inaudible]." That is medically unacceptable; no medication for three days can lead to medical deterioration and harm, and

apparently did in this patient. Similarly, staff acknowledged issues getting medication from the pharmacy that led to patient harm on September 1, 2025: "Um, we have a gentleman that's, uh, he is, um, history of seizures, and he hasn't had his medication in some time, and we were having issues with getting that from the pharmacy today. And he actually had a seizure earlier t-this morning, um, but he was gonna be leaving the facility and then he had another seizure-."

116. Many of the charts I reviewed were missing Medication Administration Records ("MARs"). This is deeply troubling. MARs are an essential part of a patient's medical record and document when medications are successfully given, when medications were not given and the reason they were not given (the patient was at court, the patient refused, etc.). It is essential that medical practitioners have this information available. For example, if a patient's blood pressures are too high, should their blood pressure medications be changed? Maybe not, if a review of the MAR shows that they have not been receiving their medications for whatever reason.

5. Confidentiality of Healthcare Encounters

117. Healthcare encounters at Camp East Montana are not done in a private setting. As explained previously, healthcare encounters must be done in confidential settings with audio and visual privacy.

118. People report that healthcare encounters are not always done in a private setting. As noted above, people report that medical screening during intake does not take place in a confidential setting. People also report that other healthcare encounters also take place in non-confidential settings such as hallways and the open medical tent. Rodriguez Flores Decl. ¶¶ 49 ("I was evaluated by a nurse in the hallway in front of others with no privacy."), 51 ("I was taken to the nurse in the hallway and there were other people and guards around me. . . . When I was seen by the nurse, other people could see and hear me. The appointment was not private or confidential."); Nelson Decl. ¶ 36 (healthcare encounter in public hallway); SNM Decl. ¶ 31 ("The medical staff set up a few tables to evaluate us. Anything that we say in front of the nurse, we have to say it in front of the other detainees and guards"); Baccam Decl. ¶ 39 ("When you're sitting to

wait your turn, you can hear everything the nurse and a patient are saying. So when I met with the nurse, other people, including other detainees, could see and hear me.").

119. Carlos Camarillo-Gonzalez was informed that he had HIV infection in a hallway in the presence of other people—a violation of the standard of care and also the NDS 2025, which emphasize the need "to ensure the highest degree of confidentiality regarding HIV status." NDS 2025 at 118, Standard 4.3 § II.N.2; *see* Camarillo-Gonzalez Decl. ¶ 23 (noting that he "was in shock" and "broke down crying" upon hearing the diagnosis). LLH reported being evaluated for possible COVID in a hallway: "The hallway was public and there were other guards, nurses, and detainees in the hallway" who could "see and hear what people were talking with the nurse about." LLH Decl. ¶ 12. On another occasion, LLH "was taken to the hallway to be examined by a nurse" for a urinary tract infection. *Id.* ¶ 52. LLH explained: "There were other people in the hallway that I could see them and hear what they were saying to the nurses, even without trying to listen. I believe that they could also hear what I was telling the nurse."

120. The conditions described violate basic health care requirements. The fact that care is provided in public spaces raises serious questions on the adequacy of training regarding privacy requirements, whether there is sufficient clinical space to provide health care services for the detained population, and whether there is sufficient security staff to transport people from housing units to the clinic.

6. <u>Specialty Care</u>

121. Patients at Camp East Montana are denied access to necessary specialty care. It is essential that detention facilities have a program to obtain specialty medical care for detainees. Many people have medical problems that cannot be adequately cared for by general medical practitioners, such as cancer, or many other complex medical problems. Patients with these medical problems must be able to see the medical specialists who are trained to take care of them. Without this access, such patients are at high risk to deteriorate and suffer poor medical outcomes.

122. A cancer patient who was undergoing chemotherapy before he was detained did not receive chemotherapy after he was detained at Camp East Montana, according to what he told his

caregiver before he died. Vilay Decl. ¶¶ 3, 11. NYG reported that when he asked the guard to translate on his behalf and tell medical staff he wanted to see a urologist, "the guard interrupted me and told me 'No' and that Camp East Montana would not provide me with a urologist." NYG Decl. ¶ 10. It is of course inappropriate for custody staff to interfere with and dictate access to healthcare.

123. My review of the medical records also showed that referrals to specialists were not carried out or were improperly denied, which raises concerns about the sufficiency of systems to approve specialty referrals and existing oversight mechanisms.

124. As I noted above, CCD was transferred to Camp East Montana on May 10, 2026, with a pending cardiology consult. It appears that medical staff at Camp East Montana did not ensure that he was seen by a cardiologist.

125. On March 22, 2026, HOK was seen in sick call for the complaint of "decreased hearing." The practitioner diagnosed bilateral ruptured tympanic membranes (ear drums) and referred HOK for an evaluation by an ENT specialist. This referral was never carried out, but the medical record does not say why.

126. Patient A is an 84-year-old man who reported decreasing vision.[10] A practitioner at Camp East Montana was appropriately concerned because the elderly are at risk of several eye diseases, such as glaucoma and macular degeneration. The practitioner placed a referral to an optometrist to do this examination. However, the request was denied. The reason for the denial was that Patient A's visual acuity was not bad enough to meet an arbitrary criterion for a referral. But this reasoning makes no sense for an 84-year-old complaining about his vision. The referral was not made in order to get Patient A a new set of glasses. The referral was made to see if Patient A had an eye disease that should be treated.

[10] To protect patient privacy, I use "Patient A" and "Patient B" for two patients. I have provided a key identifying these patients to Plaintiffs' counsel.

7. Emergency Care

127. All detention facilities must have a system to identify and respond to medical emergencies. An emergency medical response system requires the placement of emergency equipment (like AEDs and emergency jump kits) at strategic locations. Custody staff must be trained in their role, such as beginning CPR and timely responding to emergencies and contacting medical staff. Medical staff must also be trained and practice emergency responses. A properly functioning emergency response system will save lives.

128. The NDS 2025 require that each facility "have a written plan for the delivery of 24-hour emergency medical and mental health care when no medical personnel are on duty at the facility, or when immediate outside medical attention is otherwise required." NDS 2025 at 116, Standard 4.3 § II.J.

129. The provision of and protocols around emergency care at Camp East Montana are inadequate. As explained earlier, I identified multiple instances in which a patient should have been sent to the emergency room, but was not. This indicates that practitioners do not understand when there is a medical emergency such that someone should be sent out for further workup and care.

130. Moreover, in reviewing 9-1-1 calls, I also identified additional examples of how the emergency care protocols at Camp East Montana fall short and put people at risk of harm. For instance, on April 10, 2026, staff reported on a 9-1-1 call that a patient had been experiencing stroke-like symptoms for six days. The patient should have been sent to the ER earlier. Similarly, on July 2, 2026, staff called 9-1-1 and noted multiple seizures prior to placing the 9-1-1 call, but apparently did not know to check a blood sugar on a seizing patient and had to be prompted by 9-1-1 dispatch to check the blood sugar. This was a critical error because a very low blood sugar can trigger seizures, which will not stop until either the blood sugar is raised or the patient dies. Checking the blood sugar with a glucometer takes seconds. All emergency jump kits should include a glucometer for this reason (among others).

131. Based on my review of 9-1-1 calls, it also appears that critical emergency equipment such as oxygen, defibrillators, and EKG were not working or not available. If they are not working or available, they cannot be used in an emergency situation. This of course increases the risk that patients will unnecessarily deteriorate and suffer a bad medical outcome that could have been prevented by the presence of emergency equipment.

132. It also is critical that medical practitioners at Camp East Montana promptly obtain, review, and act on hospital discharge records and recommendations, but it appears they do not. As I explained above, an ER physician noted that Mr. Camarillo-Gonzalez had untreated hypertension, but this apparently was ignored by healthcare staff at Camp East Montana. In addition, Patient B went to the hospital and according to opposing counsel in this case, "As of 10Jun26 at 22:50, CEM has not received the ED Discharge Summary nor Discharge Summary from his two emergency room visits and short hospitalization encounters" and therefore could not "confirm whether the hospital gave him an incentive spirometry or if one was recommended." It is the responsibility of medical staff at Camp East Montana to timely obtain those records to ensure appropriate care.

133. Reinaldo Moreno Rodriguez reported that when he returned from being hospitalized, he was not given medication prescribed by the hospital for three days. Moreno Rodriguez Decl. ¶ 23. I do not see records related to his hospitalization in the medical records provided to me, but those records should be part of his Camp East Montana medical record.

8. <u>Infectious Disease Controls</u>

134. When people are congregated in enclosed living spaces with shared toilets and other facilities, such as the housing units at Camp East Montana and other detention facilities, infectious diseases like influenza, measles, and COVID-19 can spread from person to person extremely rapidly. Because of this, all detention facilities must have an infection control plan to identify people with infectious diseases, isolation and quarantine areas to isolate patients while they are or may be infectious and a way to screen those who may have been exposed.

135. The living conditions described at Camp East Montana put all people who live and work there at increased risk of disease. As discussed previously, people described being placed in

a crowded room with obviously sick people during intake. Even in general population, people describe dangerous conditions. Among other things, people describe lack of access to soap, and that they are provided only small shampoo packets which are not enough to clean themselves and wash their hands before eating and after toileting. Since most diseases are contracted and spread from hand to mouth, we were all taught to wash our hands after using the toilet and before we eat. This is excellent medical advice, but people at Camp East Montana are unable to always do this.

136. Multiple detainees described serious problems with the toilets in the housing units. These toilets are located directly next to the tables where detainees ate and were described as looking like "the types of port-a-potties they have in construction sites, but they are hooked to plumbing." *See, e.g.*, ZOR Decl. ¶ 21. People stated that these toilets were "filthy" and "the smell was horrible." *See, e.g.*, RES Decl. ¶¶ 17, 25. In addition, people reported that the toilets often backed up and overflowed, leaking sewage into the housing units. However, when this happened, people reported that it would take a while for it to be cleaned and fixed. In the meantime, people had to continue to use these same toilets and people had to try to clean up the sewage themselves but again were denied appropriate cleaning supplies. Amazingly, many detainees remarked that they had no access to hand soap to wash their hands after using the toilet—or after trying to clean up sewage. *See, e.g.*, Pedro Juan Decl. ¶¶ 10-11.

137. Sewage and even just backed up toilet water contains a huge number of potential pathogens including viruses, bacteria, and parasites. These can cause a large array of illnesses, including hepatitis A, salmonella and E.coli gastroenteritis, to name just a few. One can roughly gauge the level of fecal contamination by the smell of the anaerobic bacteria in feces. Many detainees commented on the foul smell in the housing units. To make matters worse, the toilets are located next to the common tables where detainees eat. In a properly run facility, when there is a sewage back-up, people are immediately moved to another location while the problem is fixed.

138. I understand there have been outbreaks of measles, tuberculosis, and COVID at Camp East Montana since it opened. Given the tent style housing, dirty conditions and shoddy medical care, I am not surprised that such outbreaks have occurred. People reported that during

outbreaks, and when they were in quarantine for measles and tuberculosis, staff provided limited or no information about the diseases. *See, e.g.*, Ly Decl. ¶ 17; Senevilay Decl. ¶¶ 22-23; RES Decl. ¶ 35; LLH Decl. ¶ 47. As one person explained, "Staff didn't tell us much about the outbreak. They just told us someone had measles. But we didn't know what measles was. Staff didn't explain what measles was to us, didn't tell us how to protect ourselves, what to look out for." Senevilay Decl. ¶ 23. People describe being held in pods with no ceiling (beneath the larger tent ceiling), so air in one pod could get into the other. *See, e.g.*, *id.* ¶ 24. People reported that when they were isolated or quarantined for measles or tuberculosis, they were unable to go to the barbershop (and therefore could not shave, clip their nails, or cut their hair), go to recreation, or communicate with lawyers. Gonzalez Ramirez Decl. ¶ 41; Mbabid Decl. ¶¶ 14-16; Reina Decl. ¶¶ 15-16; Nelson Decl. ¶ 28; ZOR Decl. ¶ 50.

139. It is critical that people be provided clear and accurate information related to their health and that, to the extent possible, that they be given access to services and activities while in quarantine or isolation. Otherwise, people may hide their illness for fear of being placed in isolating conditions. Franco Mairena Nelson provides a good example of this. He said that, after he started to feel sick: "I did not write my name down to see a doctor. I was afraid the guards would put us on quarantine again. We already had such a hard time being able to do or go anywhere other than our pod, and being in quarantine just made it so much worse for us." Nelson Decl. ¶ 31. There is no reason to deny people access to attorneys when they are in isolation or quarantine; phones or computers regularly are brought into isolation and quarantine units for people to have confidential legal calls and video visits.

9. Environmental Contamination

140. In my career, I have visited over 150 jails and prisons, including the tent city in Maricopa County Jail, and I have never seen living conditions as bad as those described by people at Camp East Montana. The overall health effect for detained individuals living in this dirty and unhygienic environment is markedly increased risk of disease.

141. All prisons and jails are expected to maintain safe, hygienic living conditions. This is no less true for Camp East Montana, and even the NDS 2025 require that "[e]nvironmental health conditions will be maintained at a level that meets recognized standards of hygiene," "[f]acility cleanliness and sanitation shall be maintained," and "[a]ll surfaces . . . shall be kept clean." NDS 2025 at 6-7, Standard 1.1 § II.I.

142. People overwhelmingly report that housing units at Camp East Montana are dirty and filled with dust and sand that blows in from the surrounding desert and coats every surface of the housing units and results in coughing, sore throats, and other adverse health effects. Camp East Montana practitioners commonly prescribed ineffective treatments to patients with such complaints, such as nasal saline sprays and antihistamines.

143. Breathing dusty air as described is a health hazard. The airborne particles pass easily deep into the lungs and even into the bloodstream. Doctors have long known that people who breathe dusty air have a much increased incidence of cough, asthma and chronic respiratory disease.[11] "A recent review of all available scientific evidence to date clearly shows that particle pollution is associated with increased mortality from all causes, cardiovascular disease, respiratory disease and lung cancer."[12] Breathing dusty air in the West Texas desert also exposes detainees to the risk of contacting coccidiomycosis, a fungal infection of the lungs also known as Valley Fever. People who get Valley Fever may develop serious, long-term lung problems.[13] Wearing masks may, to some degree, mitigate the risks of breathing dusty air, but that is for people who have limited exposure; people at Camp East Montana reportedly are exposed to dusty air constantly

[11] Raheleh Hashemi Habybabady *et al.*, *Effects of Dust Exposure on the Respiratory Health Symptoms and Pulmonary Functions of Street Sweepers*, 25 Malaysian J. Med. Scis. 76, 76–84 (2018).

[12] *Particle Pollution*, Am. Lung Ass'n. (May 27, 2025), https://www.lung.org/clean-air/outdoors/what-makes-air-unhealthy/particle-pollution.

[13] *About Valley Fever*, U.S. Ctr. for Disease Control Prevention (Apr. 24, 2024), https://www.cdc.gov/valley-fever/about/index.html; *Valley Fever (Coccidioidomycosi*s), Am. Lung Ass'n, https://www.lung.org/lung-health-diseases/lung-disease-lookup/coccidioidomycosis (last visited Oct. 13, 2026).

and, even if they did have ready access to masks (which people report they do not), that would not adequately protect them at all times, including when they are eating and sleeping.

144. Besides dusty air, the dirt and sand that blows into the housing units reportedly settles on the surface of beds, tables, food trays and everything else. Besides the constant and visible presence of dirt and dust, detainees described the presence of mold and rats in the housing units. Mold has long been known by the medical establishment as being a potential cause of asthma and other breathing problems as well as increased systemic inflammation. Breathing dust contaminated by rat droppings or urine can transmit several dangerous diseases, including hantavirus infection.

145. People reported that the housing dorms at Camp East Montana were only scheduled to be cleaned once a week and that that was insufficient, and that detained individuals had to clean areas themselves, without adequate cleaning supplies. Alfredo Antonio Reina reported that the cleaning crew used a leaf blower to "clean" the housing unit. Reina Decl. ¶ 13. "After the crew left, the beds were covered in dust and dirt. The pod was worse than before the crew came." *Id.* A GAO report noted (at page 18): "On March 3, 2026, ICE issued a discrepancy report because the contractor had not cleaned some of the dormitories for detained noncitizens daily, as required. Rather, these dormitories were cleaned weekly, resulting in unsanitary conditions."

146. All surfaces that have been dirtied and contaminated by dust in the air, dirty hands, and toilet aerosol should be wiped down frequently. This apparently is not done at Camp East Montana, which increases the risk of the transmission of illness.

10. <u>Nutrition and Medical Diets</u>

147. Detention centers have an obligation to provide detainees with adequate calories and nutritious, unspoiled food. Indeed, the NDS 2025 state that each "facility shall provide detainees with nutritious, attractively presented meals, prepared and served in a sanitary and hygienic food service operation." NDS 2025 at 97, Standard 4.1 § I.

148. The reason for such a policy is self-evident. Poor quality food can make people sick. There are many adverse health effects of inadequate nutrition, both in too little calories to

maintain one's weight and poor nutritional quality. For example, the body's ability to fight infections is diminished if the immune system lacks adequate calories to function properly. Such poor nutrition causes an increased release of stress hormones which can, over time, increase the risk of heart disease, strokes and other cardiovascular maladies. Put differently, inadequate calories, especially from food with poor nutritional value, weakens immunity and makes people more likely to get sick.

149. People detained at Camp East Montana do not receive nutritious food or adequate calories, and Camp East Montana does not provide medically necessary diets. As a result of these lapses, some detainees have become sick and all detainees are at increased risk of adverse medical consequences.

150. People overwhelmingly report inadequate food, including spoiled and rotten food, and lack of sufficient calories at Camp East Montana. People report that the food made them sick and that they experienced nausea, vomiting, and diarrhea. People reported losing significant weight in short periods of time. *See, e.g.*, Ly Decl. ¶ 20; Do Decl. ¶ 11; SNM Decl. ¶ 41; HOK Decl. ¶ 8; ZOR Decl. ¶ 35; Gonzalez Ramirez Decl. ¶ 47; Majok ¶ 13; Pedro Juan Decl. ¶ 13.[14]

151. In addition, the NDS 2025 require that "[d]etainees with certain conditions – chronic or temporary; medical, dental, and/or psychological – shall be prescribed special (therapeutic) diets, supplemental meals, or snacks as appropriate by authorized medical staff." NDS 2025 at 102, Standard 4.1 § II.G. When patients do not receive an appropriate medical diet, this increases their risk of medical deterioration and a potential bad outcome, such as unnecessary hospitalization.

152. People report that Camp East Montana does not provide medically appropriate diets and/or does not provide those diets consistently. *See, e.g.*, PKP Decl. ¶ 7; Mairena Nelson Decl. ¶ 38; Majok Decl. ¶ 12; Bounvongxay Decl. ¶¶ 15-16; JLE Decl. ¶ 21. Mr. Bounvongxay, for

---

[14] Typically, a patient's weight is recorded and documented for each healthcare encounter. In the medical records I reviewed, there was a noticeable lack of documentation of weights during healthcare encounters.

example, reported that although he received a special meal for diabetes when he was housed at a different ICE facility in El Paso, while at Camp East Montana he was not given a special meal and sufficient snacks throughout the day. Bounvongxay Decl. ¶¶ 15-16.

153. The medical records I reviewed corroborate that Camp East Montana does not properly accommodate medical diets. PKP reported that he had been given a medical diet at his previous detention facility, but this was not given at Camp East Montana. PKP Decl. ¶ 7. I see no mention of a medical diet in his medical records from Camp East Montana. In addition, Phetsamone Senevilay reported that he did not get an appropriate diet for his medical condition and, as a result, was in severe pain. Senevilay Decl. ¶¶ 10-11. According to the medical record, the medical practitioner educated Mr. Senevilay about the importance of a low purine diet for his diagnosis of gout, but it does not appear such a diet was provided to him.

11. <u>Mental Health Care</u>

154. The stress of detention in general can exacerbate mental health issues and increase the risk of anxiety disorders, feeling hopeless and helpless, and the risk of suicide. This concern is particularly acute given the conditions at Camp East Montana—a crowded, windowless, dirty environment with few recreational opportunities, mistreatment by staff, and inadequate nutrition. Unsurprisingly, then, people describe worsening mental health conditions due to conditions at Camp East Montana, including feeling despair, depressed, anxious, traumatized, angry, desperate, and distressed. *See, e.g.*, Ly Decl. ¶ 39; Baccam Decl. ¶ 42; Camarillo-Gonzalez Decl. ¶¶ 25, 29; SNM Decl. ¶ 10; PKP Decl. ¶ 12; NYG Decl. ¶¶ 23, 30, 40, 46; HOK Decl. ¶¶ 21, 31; CCD Decl. ¶¶ 16, 19; *id.* at 5 ¶ 5; Angye Decl. ¶ 30; Navdeep Decl. ¶¶ 22, 24; ZOR Decl. ¶ 33; JLE Decl. ¶¶ 9, 13; Gonzalez Ramirez Decl. ¶ 41; Mairena Nelson Decl. ¶ 39; Rodriguez Flores Suppl. Decl. ¶ 16.

155. The same problems I identified above related to medical care at Camp East Montana also apply to mental health care at Camp East Montana. People report delays in seeing mental health professionals, cursory care, inconsistent and delayed administration of medication, and clinical encounters in public spaces. *See, e.g.*, Fernandez-Gastelum Decl. ¶ 13; NYG Decl.

¶¶ 7, 27; CCD Decl. at 5 ¶¶ 3, 5; Rodriguez Sanchez Decl. ¶ 17; ZOR Decl. ¶ 51 ("it took about 1 month of waiting before I could get medication for a mental health condition after it was prescribed by the facility doctor"); Majok Decl. ¶¶ 6, 8-9. For example, NYG reported:

> The nurse usually takes me outside the housing unit in the hallway to ask me personal questions about my trauma in front of other people who could hear in the hallways, like guards and the other detainees who walked by. I didn't feel comfortable with that at all. It's really hard to talk about the mental problems I am having, and I don't want other people to know. That information should be private. I didn't say everything I wanted to say because it was not a safe or confidential place to talk.

NYG Decl. ¶ 17.

156. People also report unprofessional conduct and statements by staff—encouraging a patient to harm himself and laughing at someone who had been assaulted by guards. Majok Decl. ¶ 11 ("The fifth time I requested to speak with a psychiatrist, I told the nurse that I felt like I was going to harm myself and she told me to do it. . . . I stopped asking for help for my mental health after that."); Rodriguez Sanchez Decl. ¶ 30 ("I went straight to the mental health unit where they did an 'evaluation' on my mental health by asking me how I felt after coming back from the hospital. They knew what the guards had done and some of my prior history with PTSD, so I responded by telling them, 'How do you think I feel like right now?' The lady laughed at me, signing a paper that I think indicated that I was in good enough condition to go to solitary and handed it to the guard. She also high-fived the guard, as if she was celebrating sending me to solitary."). Such conduct is profoundly inappropriate and damages the relationship and trust between a patient and healthcare staff that is necessary for good patient care.

157. As with medical care, my review of medical records identified inappropriate mental health care at Camp East Montana that falls well below the standard of care for prisons and jails. For example, NYG had a significant mental health history for which he was taking the antidepressant duloxetine, the PTSD therapy prazosin and the antipsychotic medication aripiprazole. On June 21, 2026, he reported to a mental health counsellor that he had not taken his medications for five days because he was constantly hungry, his medications made him more

hungry and also hurt his stomach when he took them, and "he is not allowed to receive snacks to be able to better stomach his meds." NYG reported that he was now experiencing visual and audio hallucinations including voices telling him to harm himself. However, the counsellor documented that NYG was calm and "made good eye contact." The counsellor submitted a request for snacks to accompany his medications and also urgently referred NYG to see the psychiatry provider.

158. NYG's complaint of being constantly hungry is not unusual among the incarcerated at Camp East Montana, as I have discussed above. It is also not unreasonable to request a snack to take with medications that can cause stomach upset. In fact, patients taking duloxetine and aripiprazole are commonly told to take these medications with food to avoid common side effects like nausea and stomach upset.

159. Urgent mental health referrals to a practitioner should be seen within 72 hours. NYG was not seen by a Psychiatric Nurse Practitioner until seven days later, on June 28, 2026.

160. The Nurse Practitioner documented that NYG's mental health had deteriorated since he had been seen seven days before in that he was now: "Disheveled, pressured, intense, restless, constricted, and angry." The NP also noted that NYG's insight and judgement were "poor." The practitioner also documented that NYG also had not received the snacks that had been requested by the mental health counsellor.

161. NYG told the NP that he stopped taking his medications "two months ago." This statement did not accord with his statement to the mental health counsellor that he had stopped his medications five days before he saw her, or two weeks before he saw the nurse practitioner. I am not able to verify exactly how many doses of medications NYG had missed because the Medications Administration Records are missing from the medical record I have.

162. To summarize to this point: the mental health of the psychiatric nurse practitioner's patient was deteriorating from not taking his psychiatric medications and whose only request was for a snack to take with them to alleviate the stomach upset those medications caused. Incredibly, the NP discontinued NYG's medications except for the sleep aid trazodone.

163. This was an inappropriate decision. NYG clearly benefitted from taking his psychiatric medications as shown by the fact that he had deteriorated in the interval between seeing the counsellor and seeing the psychiatric practitioner. The correct response would have been to allow NYG to have a small snack when he took his medications, as he requested. This was not at all an unreasonable request. What was unreasonable was the intransigence of Camp East Montana about giving detainees adequate food, even when there was a clear therapeutic value in doing so. I was unable to determine if NYG's mental health continued to deteriorate after his psychiatric medications were inappropriately discontinued because the records I have end shortly thereafter.

164. Mental health care for NYG therefore fell way below the standard of care and risked him deteriorating further.

12. Medical Records and Continuity of Care

165. It is critical that healthcare providers maintain complete and accurate records for all patients. This is necessary to ensure accurate diagnoses and appropriate treatment.

166. I understand that the contractor at Camp East Montana certified that 25 of the records produced to me were complete. That is clearly wrong. Many were missing critical documents including MARs, sick call requests, lab results, and consultation reports. If Camp East Montana does not keep all MARs, sick call requests, lab results, and consultation reports in the medical record, then it is falling well below the standard of care and putting patients at risk. Not being able to produce a complete and accurate medical record would be unheard of for a doctor's office or hospital. Keeping accurate records is a basic requirement of medical practice anywhere.

167. As I explained in my previous declaration, filed on June 2, 2026 (ECF No. 13-3), all functional healthcare systems, such as a hospital or a large detention facility, must access and send medical records frequently, including when patients request a copy of their records, patients are transferred to a new facility, or when medical specialists need a copy of a patient's medical records. Accessing and transferring medical records should be a routine matter that can be done quickly and easily. It should not be hard for Camp East Montana to provide medical records upon request.

168. It is a healthcare service provider's duty to maintain complete and accurate records, including for former patients, and produce them when requested. In my experience, it should take no more than seven calendar days to produce a patient's complete medical record, and in many cases this is done the same day as a request is received. Indeed, the NDS 2025 require facilities to "transmit a copy of the full medical record within five business days or sooner if determined by the receiving facility to be a medically urgent matter." NDS 2025 at 120, Standard 4.3 § II.Q.3.a.

169. Patients and their representatives report that Camp East Montana does not produce medical records upon request. *See, e.g.*, Rodriguez Flores Decl. ¶ 35; Reina Suppl. Decl. ¶¶ 5-6; Camarillo-Gonzalez Decl. ¶¶ 26-27. That is inappropriate; patients are entitled to their medical records, should be provided clear instructions on how to request them, and should be provided them promptly upon request.

170. In addition, healthcare service providers must be able to produce medical records for current and former patients to ensure continuity of care. Put differently, it is critical to be able to timely produce the complete medical record, particularly for complex patients where the receiving medical team would want to review past labs, x-rays, and medications, among other things. MARs, sick call requests, lab results, and consultation reports are all considered part of a complete medical record and, in a properly functioning healthcare system, should be easy to locate and produce.

171. The case of Francisco Gaspar-Andres, discussed in detail below, exemplifies the importance of sending a summary of important medical information, like diagnoses, medications and recent tests, with every patient when they are transferred to a new facility. In Mr. Gaspar-Andres's case, the lack of transfer of medical information between Krome Detention Center and Camp East Montana was a critical factor that led to his death. A medical transfer summary should accompany every patient who leaves Camp East Montana to ensure continuity of medical care. When this does not occur, the risk of a bad medical outcome goes up.

172. The NDS 2025 require that, "[w]hen a detainee is transferred to another detention facility, the sending facility shall ensure that a medical transfer summary accompanies the

detainee." NDS 2025 at 120, Standard 4.3 § II.Q.3.a. "Upon removal or release from ICE/ERO custody, the detainee shall be provided medication, referrals to community-based providers as medically appropriate, and a detailed medical care summary." *Id.* § II.Q.3.b (parenthetical omitted).

173. Camp East Montana fails to provide medical transfer summaries and a supply of medications when detainees are transferred or discharged. Mr. Mbabid, for example, reported that he was released to a shelter in the community without his tuberculosis medication. Mbabid Decl. ¶ 18. He reported that an ICE agent told him once he's released, "there's nothing they can do for my medications" and no one told him "what, if anything, I was supposed to do to continue to treat my tuberculosis." *Id.* This lapse in treatment for tuberculosis increased the medical risk for Mr. Mbabid by increasing the possibility of disease worsening and of developing drug resistance, which would pose a risk to the community as well.

174. Failure to timely produce medical records also may result in unnecessary medical tests and delays in care. For example, Cuong Baccam reported that, when he was transferred from Camp East Montana to the El Paso Service Processing Center, a nurse told him that he had to get another chest x-ray: "I said that I didn't want to do it again, because I'd already had one done at Camp East Montana. I asked why they couldn't just look at the medical records from Camp East Montana. The nurse told me that Camp East Montana wouldn't send the medical records over, so we had to do it again." Baccam Decl. ¶ 41.

175. In addition, Mr. Bounvongxay reported that after he was transferred to another immigration detention facility in El Paso, medical staff at the new institution told him that Camp East Montana provided "no information about my condition or medical history," and as a result "they had to start over my medication from the lowest dosage, because they didn't have any of my medical history or prescriptions." Bounvongxay Decl. ¶ 14. This lapse in information transfer increased the medical risk for Mr. Bounvongxay, who was being treated for type 2 diabetes with insulin, among other medications. The receiving detention center was afraid of harming Mr.

Bounvongxay by giving him too much insulin, so started at a dose of too little insulin, which can be predicted to result in too high blood sugars.

176. Francisco Rossa Chanchamire was transferred from Camp East Montana to the El Paso Service Processing Center in April 2026. The "Prisoner in Transit Medical Summary" filled out at Camp East Montana was incompletely filled out. The "Current Medical Diagnosis" section is blank, despite the fact that Mr. Chanchamire had HIV. "Current Medical Issues" is also not filled out. This is an example of sloppy, incomplete information transfer that increases the risk of delays in care. *See also* Rossa Chanchamire Decl. ¶ 14 ("Because there was no evidence of any medical exam conducted at Camp East Montana, the Processing Center had to order new medical tests, including the CD4 blood test and test for the HIV viral load.").

13. Use of Force

177. It is staff's responsibility in any detention facility to keep people in their custody safe from harm, including from violence. This includes violence from staff, who should be well-trained in use of force techniques that minimize risk of harm to detained individuals. I can say that in my 25 years of practicing in jails with well-trained deputies, I have not seen anything like the level of violence by guards reported at Camp East Montana.

178. Medical personnel should be consulted for any calculated use of force and medical personnel should examine any individual on whom force was used. That also is mandated by NDS 2025, which require that (1) "In immediate use-of-force situations, staff shall seek the assistance of mental health or other medical personnel immediately upon gaining physical control of the detainee," (2) "In all calculated uses of force, the use-of-force team leader shall seek the guidance of qualified health personnel (based on a review of the detainee's medical record) to identify physical or mental health concerns," and (3) "After any use of force or application of restraints, medical personnel shall examine the detainee, immediately treating any injuries. The medical services provided shall be documented." NDS 2025 at 58, Standard 2.8 § II.G.

179. I am deeply concerned by repeated reports that staff at Camp East Montana use unnecessary or excessive force against people and that staff do not adequately protect them from

harm from other detained individuals. I am particularly concerned about reports that staff apply pressure to people's necks, and by the findings of the ODO after the May inspection that staff are not trained "in approved methods of self-defense, crisis intervention, conflict de-escalation, use-of-force techniques, recognizing signs and symptoms of mental illness, and reporting requirements" or "on prohibited use-of-force acts and techniques. *See, e.g.*, Angye Decl. ¶ 10; Moreno Rodriguez Decl. ¶ 8; ZOR Decl. ¶ 39; Rodriguez Sanchez Decl. ¶ 24; May 2026 ODO Inspection at 8.

180. Those conditions create an unacceptable risk of serious injury or death to detained individuals. Neck compression during restraint results in risk of brain injury, other serious injuries and death.[15] The death of Geraldo Lunas Campos, apparently as a result of use of force by staff, is particularly alarming. According to the Medical Examiner's report, Mr. Lunas Campos died as a result of "asphyxia due to neck and torso compression." A death during use of force, especially from compression of the neck and torso, should never happen. Multiple detained individuals state that Mr. Lunas Campos had been requesting his asthma inhaler before the use of force against him and did not receive it. That is a serious concern too. He should have been promptly given access to his inhaler.

181. I also am concerned about the role of medical staff and adequacy of medical examinations related to uses of force. Named Plaintiff Gerald Angye, for example, reports that after a use of force against him, he was not immediately evaluated by medical staff. He was sent without a medical exam to another facility, but returned within 24 hours without receiving a medical exam there, either. He reports that guards "forcefully twisted my left wrist and left hand," "smashed my lower spine with [a] boot," and "had [a] knee on my neck," and that he was in tremendous pain. Angye Decl. ¶¶ 9-10. When Mr. Angye was finally sent to the hospital ER the day after he had been injured by the guards, he was determined to have suffered a scaphoid fracture

[15] Am. Acad. of Neurology, Position Statement on the Use of Neck Restraints in Law Enforcement (June 9, 2021), https://www.aan.com/advocacy/use-of-neck-restraints-position-statement/.

of the wrist and a fracture of the lumbar spine—both significant injuries, and both injuries that require a lot of force to cause. Mr. Angye should have received a thorough medical examination immediately after the use of force against him, and the fractures, which are easy to diagnose, should have been diagnosed the same day.

**B. The Preventable Death of Francisco Gaspar-Andres**

182. Next, I detail the case of Francisco Gaspar-Andres, who bled to death after medical staff at Camp East Montana repeatedly failed to notice clear warning signs. His death was the direct result of serious medical errors made by medical staff at Camp East Montana at all levels—Registered Nurse, Nurse Practitioner, Physician Assistant, and Physician. His death illustrates many of the systemic problems I discussed above, and demonstrates the serious harm that may come from them.

183. Mr. Gaspar-Andres died on December 3, 2025, from gastrointestinal bleeding related to cirrhotic liver disease. As part of its pathophysiology, liver cirrhosis can cause a low level of platelets in the blood, which makes patients susceptible to bleeding. In addition, cirrhotic patients are prone to bleed from esophageal varices, which arise at the end of the esophagus. Mr. Gaspar-Andres ultimately died from this type of bleeding. However, the low platelets, the bleeding from the esophagus, and the other manifestations of cirrhosis are reasonably easy to diagnose and can all be treated. Mr. Gaspar-Andres did not receive appropriate medical care while at Camp East Montana, and his death was preventable.

1. <u>If the Intake Process Had Operated Properly, Mr. Gaspar-Andres Likely Would Not Have Died.</u>

184. According to information published by ICE, Mr. Gaspar-Andres was originally detained by ICE on September 1, 2025, and held at the Krome North Service Processing Center in Miami, Florida. Between September 4 and 7, 2025, Mr. Gaspar-Andres was hospitalized due to alcohol withdrawal at West Baptist Hospital in Miami. While hospitalized, Mr. Gaspar-Andres was diagnosed with cirrhosis, anemia, low platelets, pneumonia, a heart valve abnormality, and hepatic encephalopathy (a treatable type of dementia). On September 7, 2025, Mr. Gaspar-Andres returned

to Krome and the next day, a practitioner at Krome ordered the medications prescribed upon discharge from West Baptist Hospital and ordered lab tests.

185. On September 19, 2025, Mr. Gaspar-Andres was transferred to Camp East Montana. As explained in the section above on intake processes, Mr. Gaspar-Andres's serious medical needs should have been documented upon his arrival and a treatment plan developed for his chronic medical problems. This, however, did not happen.

186. Per the NDS 2025, Mr. Gaspar-Andres should have been transferred with a summary of his medical problems and the medications he currently was prescribed. *See* NDS 2025 at 120, Standard 4.3 § II.Q.3. It is unclear to me whether the transfer summary and medications were not sent by Krome, or whether they were sent and ignored by Camp East Montana and not placed in his medical record. Either way, the information and medication transfer between Krome and Camp East Montana did not happen.

187. Upon arrival at Camp East Montana, a "Male Intake Screening Form" was filled out, although this form is not signed or dated. According to this form, Mr. Gaspar-Andres had no medical history, was taking no medications, and was judged to be a "Normal Intake Screening." There is no mention that Mr. Gaspar-Andres had arrived from another facility or reference to transfer documents.

188. On September 19, 2025 at 3 a.m., Mr. Gaspar-Andres had a "Physical Exam Health Assessment done by an NP. The NP noted that Mr. Gaspar-Andres had "No Prescriptions" and a "Normal Exam."

189. Mr. Gaspar-Andres should have arrived at Camp East Montana with a health summary. The NDS 2025 require, "[f]or intra-system transfers, a health care practitioner will review each incoming detainee's health record or health summary within 12 hours of arrival, to ensure continuity of care." NDS 2025 at 113, Standard 4.3 § II.D. This apparently did not happen. Camp East Montana medical staff knew (or should have known) that Mr. Gaspar-Andres had been transferred from another facility and that he should have a health summary and medications with him. Nothing in the medical record indicates that they asked for this.

190. If Krome had not sent the required health summary and medications with Mr. Gaspar-Andres, Camp East Montana medical professionals should have called Krome to have this summary and a list of current medications sent. There is no indication in the medical record that they did this.

191. If Camp East Montana medical personnel had done their due diligence, they would have learned about Mr. Gaspar-Andres's significant health problems and could have continued his prescribed medications.

192. Failure to obtain and review Mr. Gaspar-Andres's recent medical history, labs and currently prescribed medications was a serious medical error that violated the medical standard of care and ICE's own policies.

193. Had medical personnel at Camp East Montana reviewed Mr. Gaspar-Andres's recent medical history and continued his medications and health care plan, more likely than not, Mr. Gaspar-Andres would not have died on December 3, 2025.

2. If the Sick Call Process Had Operated Properly, Mr. Gaspar-Andres Likely Would Not Have Died.

194. After his admission to Camp East Montana, Mr. Gaspar-Andres was seen repeatedly for serious and worsening symptoms.

195. Between September 23, 2025, and October 9, 2025, Mr. Gaspar-Andres was seen three times in the clinic by RNs for heartburn and headache. Each time, he was given single doses of acid reducing medications. Being given a *single dose* of acid medication is clinically inappropriate; it's not clear why the nurses did not provide Mr. Gaspar-Andres with an ongoing supply of this cheap, over-the-counter medication. Also, the second and third time Mr. Gaspar-Andres returned to the clinic with the same complaint constituted "bounce backs," where a person returns multiple times for the same symptoms. Many prisons and jails have processes in place for escalation when that happens, including that the person be seen by a practitioner instead of a nurse and receive a fuller examination.

196. On October 20, 2025, Mr. Gaspar-Andres was seen by an NP for "bright red blood per rectum." The NP noted that Mr. Gaspar-Andres had a history of alcohol use and anemia. She noticed "eyes slight jaundice." She diagnosed Mr. Gaspar-Andres with "iron deficiency anemia" and constipation and prescribed iron tablets. She did not do any physical examination, including checking his rectal area for blood. She appropriately ordered labs.

197. The NP made a serious error in judgment. The most likely source of iron deficiency anemia is bleeding and, in men, the most likely source of surreptitious bleeding is the gut. Mr. Gaspar-Andres told the NP that he had blood coming from his rectum. The NP had an obligation to do an examination of her patient to determine how much he was bleeding from his rectum, whether the blood was bright red or dark, and whether her patient had an obvious reason for bleeding in his rectum, such as hemorrhoids or a cancer. However, the NP did no exam. More likely than not, if this NP had done a rectal exam during this clinical encounter, she would have found copious blood, acted appropriately, and her patient would not have died on December 3, 2025.

198. The NP appropriately ordered labs to be done on Mr. Gaspar-Andres, and these labs would have revealed how sick he was. However, the lab results are not in the chart. There is no record of a refusal. It appears that they simply were never done. This is a serious breach of the medical standard of care. If the NP ordered labs, she is obligated to make sure that her orders were carried out and to interpret the lab results. Based on my review of the medical record, she apparently failed to do this. Had these labs been performed, more likely than not they would have alerted the medical staff as to how sick Mr. Gaspar-Andres was, he would have been treated and would not have died.

199. On November 13, 2025, at 11:34 a.m., Mr. Gaspar-Andres was seen in clinic for a "productive cough" and was found to have a fever of 101.5 and an abnormally high heart rate. The NP did no examination, but diagnosed pharyngitis and cough.

200. The NP who saw him had the professional obligation to make sure that her patient did not have pneumonia. The way to do this would have been for the NP to listen to Mr. Gaspar-

Andres's lungs and generally do a thorough physical examination. There is no indication in the medical record that she did this. Another obligation was to remeasure the abnormal heart rate and determine why it was so high. There is no indication in the medical record that she did this either. These two lapses both violated the medical standard of care.

201. On November 13, 2025, at 8:55 p.m., Mr. Gaspar-Andres was seen in medical clinic for "bleeding gums." He was found to have an extremely high heart rate of 134. The NP who saw him did no examination, and prescribed chlorhexidine as well as Benadryl for insomnia.

202. The NP had an obligation to examine Mr. Gaspar-Andres's gums to see where the bleeding was coming from, how much bleeding there was and to stop the bleeding. According to the medical record, she did none of this.

203. The NP had an obligation to remeasure and investigate the excessively high heart rate and determine why it was so high. According to the medical record, she did not.

204. This is another "bounce back." The NP should have escalated her work up, including a thorough physical examination, observation over time, and a chest x-ray and labs. According to the medical record, she did not do this.

205. These lapses all violated the medical standard of care.

206. On November 14, 2026, Mr. Gaspar-Andres was seen in sick call by a Physician's Assistant for the complaint of fever, and cough. He was found to have a fever of 103.2, his heart rate was still very high at 122, and now he had an abnormally low blood pressure of 94/55. The low blood pressure was a significant change from his previous two clinic visits. Again, the PA did not do a physical examination and made no effort to find out why her patient's heart rate was high or why his blood pressure was newly low. The PA diagnosed Mr. Gaspar-Andres with influenza *despite the fact* that Mr. Gaspar-Andres's influenza test was negative.

207. The PA had the professional obligation to make sure that Mr. Gaspar-Andres did not have pneumonia. The way to do this would have been for the PA to listen to Mr. Gaspar-Andres's lungs and generally do a thorough physical examination. According to the medical record, she did not do this. The PA also had the professional obligation not to diagnose Mr. Gaspar-

Andres with something he was found not to have. By recording an incorrect diagnosis in the medical record, the PA potentially cut off further evaluation and diagnosis.

208. This also is the third visit for the same complaint. Mr. Gaspar-Andres also had increasingly bad vital signs. The PA should have realized that this was another “bounce back” and escalated Mr. Gaspar-Andres’s care. The proper thing to do, in the face of the vital sign abnormalities, would have been to send Mr. Gaspar-Andres to the ER. Had the PA done this, more likely than not, Mr. Gaspar-Andres would not have died.

209. The PA’s conduct violated the medical standard of care.

210. On November 15, 2025, Mr. Gaspar-Andres was seen in medical clinic by a physician for the same complaints of cough and fever, but now he had developed significant swelling in his legs. Mr. Gaspar-Andres still had a fever and an elevated heart rate but now his blood pressure was extremely low. The physician ordered an EKG that confirmed tachycardia. The physician did not do an examination of his patient’s heart or lungs. The physician ordered an antibiotic, amoxicillin, to be taken for 7 days.

211. The physician had the professional obligation to do a complete heart and lung examination. According to the medical record, he did not do this.

212. This is the fourth time Mr. Gaspar-Andres had been seen for the same basic complaint, and he clearly had gotten worse at each visit. This visit, Mr. Gaspar-Andres had swollen ankles that he had never had before. The physician should have noted this and escalated Mr. Gaspar-Andres’ care to the emergency department.

213. Mr. Gaspar-Andres now had critically low blood pressure. The physician should have known that a blood pressure that low in the setting of fever and tachycardia indicated a shock state. The blood pressure alone was indication enough to send Mr. Gaspar-Andres to the ER.

214. By ignoring the signs that Mr. Gaspar-Andres was critically ill, the physician violated the medical standard of care. Had Mr. Gaspar-Andres been sent to the ER at this time, he may have survived.

215. On November 16, 2025, Mr. Gaspar-Andres presented to sick call for a final time. The NP noted jaundice and finally sent Mr. Gaspar-Andres to the ER.

216. At the ER, Mr. Gaspar-Andres was noted to be critically ill. The primary diagnosis was "GI bleed/blood loss anemia." He was also found to have had a heart attack, very low blood sodium (hyponatremia), and sepsis. His kidneys were failing. He was admitted to the ICU, but deteriorated over the next 17 days and died on 12/3/25.

217. The autopsy concluded that Mr. Gaspar-Andres died from "complications of alcoholic hepatic cirrhosis." This is true, but does not tell the whole story. The proximate cause of Mr. Gaspar-Andres's death was bleeding and sepsis. Both bleeding and sepsis, even in someone with cirrhosis, are treatable. The average life expectancy of someone with Mr. Gaspar-Andres's degree of cirrhosis is two years—longer with a liver transplant. All of Mr. Gaspar-Andres's medical problems had already been diagnosed at the West Baptist Hospital in Miami. Had this information been successfully obtained by Camp East Montana, an appropriate treatment plan could have been developed and Mr. Gaspar-Andres would not have died on December 3, 2025, and conceivably could have lived for years longer. Even without this information, on at least five separate interactions, Camp East Montana practitioners should have recognized that Mr. Gaspar-Andres was very sick. Had they acted according to the medical standard of care in even one of those interactions, Mr. Gaspar-Andres, more likely than not, would not have died on December 3, 2025.

218. After Mr. Gaspar-Andres died, his family was notified by hospital staff about Mr. Gaspar-Andres's hospitalization and hospital course, but they reportedly were not contacted by anyone at Camp East Montana until after Mr. Andres-Gaspar's death. The Director at Camp East Montana called Mr. Gaspar-Andres's daughter after he had died: "He said he didn't want me to think that he killed my dad." Cristobal Decl. ¶ 30. That is a bizarre and unprofessional conduct. I have had to make similar calls in my career, and the purpose is not to deflect blame. It is to thoughtfully alert the family as soon as their loved one has been moved to a hospital and to share information candidly and clearly about the prognosis.

**C. Oversight and Accountability**

219. It is critical that any large detention system, including Camp East Montana, has a robust mechanism for review of deaths of patients in their care. This mechanism is sometimes known as a Mortality and Morbidity ("M&M") committee. M&M committees investigate deaths (mortality) and also investigate unexpected severe adverse events that do not lead to death but nevertheless cause unexpected harm, suffering, and/or permanent problems (morbidity).

220. The goal of an M&M program is to identify medical errors that led to the adverse outcome, so that those errors can be avoided in the future. Put differently, the goal is to learn from past mistakes in order to prevent future bad patient outcomes. M&M reviews usually result in some type of action plan to improve patient care.

221. I understand that for deaths of people in ICE custody, there should be an ICE Health Service Corps ("IHSC") Mortality Review, which is defined as an "[e]valuation of a deceased detainee's medical history and clinical care provided to the detainee to ascertain both cause of death, and whether changes to ICE policies, procedures, or practices are warranted; to provide recommendations for follow up actions; and to identify issues that require further study." ICE Directive 11003.6 (Feb. 27, 2025).

222. I have not seen any Mortality Review for Mr. Gaspar-Andres, and I do not know if such a review was conducted. I am concerned about the accuracy and completeness of any Mortality Review because of inaccurate and incomplete information published by ICE in a Detainee Death Report and a press release related to Mr. Gaspar-Andres's death. These reports contain inaccurate information and fail to identify obvious problems in Mr. Gaspar-Andres's medical care. For example:

a. Both reports omit the critically important fact that diagnoses made at West Baptist Hospital in Miami were not communicated to Camp East Montana, as they should have been.

b. Both reports omit the fact that the medications prescribed by West Baptist Hospital and later at Krome Detention Center were not sent to Camp East Montana.

c. The Detainee Death Report accurately reports that a practitioner ordered labs on October 20, 2025, but fails to note that the labs were never done and no one noticed.

d. Both reports omit the failure of any Camp East Montana medical practitioner to do a complete physical examination or to evaluate increasingly abnormal vital signs.

e. The press release states that Mr. Gaspar-Andres was admitted to the hospital in El Paso for "low sodium levels." However, his primary diagnosis upon admission was GI bleeding and anemia due to blood loss.

f. The press release states that Mr. Gaspar-Andres was not admitted to the ICU until December 1, 2025, fifteen days after he was first admitted to the hospital. This was not true. Mr. Gaspar-Andres was admitted to the ICU directly from the emergency department on November 16, 2025.

g. Neither report acknowledge that Mr. Gaspar-Andres's death was preventable.

223. A proper Mortality Review here would have uncovered at least the serious problems in care I detailed above. It should have resulted in implementation of improvement of processes, additional training, and targeted monitoring to ensure the identified problems did not happen in the future. Here, at a minimum, the facility should have improved processes, training, and monitoring around (1) the importance of transfer documents and ensuring that all necessary health information from the sending facility is immediately received and reviewed; (2) bounce-backs, and ensuring staff know that when someone returns with the same complaint, the complaint is fully investigated by appropriate medical staff; and (3) responding appropriately to abnormal vital signs, including development of new rules if necessary, such as retaking vitals within an hour if you see a significantly abnormal vital sign. Concerns of competency of individual healthcare staff who improperly treated Mr. Gaspar-Andres should have been immediately addressed.

224. I am concerned about the efficacy of any corrective action after review of Mr. Gaspar-Andres's death given that the issues I identified in his care were not one-offs, but instead systemic problems I found repeatedly in many other records, continuing to place patients at Camp East Montana at risk of harm.

225. I have also reviewed a document that is titled "Preliminary Report of Findings – Mortality Review Geraldo LUNAS-Campos," dated January 16, 2026. This document, compiled

by an investigator with the ICE Health Service Corps, with a listed pharmacy degree, identifies a number of concerns with the medical care provided to Mr. Lunas Campos before his death. Among other things, the investigator noted (at pages 3-6):

a. "Mr. LUNAS-Campos' medication continuation at intake is unclear; and no documentation indicates the RN alerted a higher-level provider of his abnormal vital signs" on September 6, 2025.

b. "No documentation indicates the APP [advanced practice provider] addressed Mr. LUNAS-Campos' elevated blood pressure" on October 7, 2025.

c. "Documentation of the timing of Mr. LUNAS-Campos' suicide watch placement is unclear."

d. "Medication administration records are not available to confirm missed doses."

e. "No documentation indicates the RN alerted a higher-level provider of Mr. LUNAS-Campos' elevated blood pressure," on December 15, 2025.

f. "No documentation indicates the APP addressed Mr. LUNAS-Campos' elevated blood pressure" on January 3, 2026.

g. "Documentation is unclear regarding the timing of AED placement, and delivery or advisement of shocks."

226. I have not been provided Mr. Lunas Campos's medical records and cannot independently verify the investigator's statements. However, the investigator's notes regarding inadequate and missing medical records, inadequate continuity of care upon arrival, and inadequate response to abnormal vital signs are serious and should have resulted in meaningful corrective action. However, as can be seen in my chart reviews above, these problems persisted, suggesting that any action taken was not effective in protecting the health and well-being of people at Camp East Montana.

//

//

//

//

//

//

## V. CONCLUSION

227. The healthcare delivery system at Camp East Montana is broken, does not meet the standard of care in jails and prisons, and puts all who are housed there at risk of harm. The very foundations of healthcare delivery in detention facilities, including systems related to medical screening, medical records, medication administration, lab results, sick call, chronic care, emergency care, and specialty care, are deeply flawed, and healthcare staff at all levels are providing incompetent care.

228. Given the pervasive, repeated, and substantial problems with healthcare delivery at Camp East Montana, I would recommend that the Court consider appointing an independent monitor over healthcare to advise and support both the Court and Defendants in timely resolving the identified problems.

229. As noted above, I currently serve as an independent monitor of medical care provided in two jail systems as part of ongoing federal litigation. In that capacity, I review whether officials are complying with court orders related to provision of healthcare in the jails through in-person visits, interviews, and document review. I have access to the electronic medical record system in both jail systems. I draft reports explaining whether officials are complying with court-ordered healthcare requirements and, if they are not complying, I conduct a root cause analysis and provide recommendations to the judge on how to correct the problems. I also advise jail officials directly and support their efforts to comply with court-ordered healthcare requirements. Appointment of an independent monitor in this case could provide the Court and Defendants similar support.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 14 day of October 2026 in Idaho Falls, ID.

By: J Keller MD

Jeffrey Keller, M.D.

# APPENDIX A

# Jeffrey E. Keller, MD, FACEP, FACCP

## Employment

| | |
|---|---|
| Current | Independent Court Monitor for the Fresno (California) County Jail |
| Current | Independent Court Monitor for the Fulton County (Georgia) Jail |
| Current | Consultant in Correctional Medicine |
| 2023-2025 | President, American College of Correctional Physicians |
| 1997-2021 | Medical Director and CEO, Badger Correctional Medicine |
| | *I provided medical and mental health services to people in 17 Idaho jails and juvenile facilities. I wrote and implemented medical policies and procedures and oversaw all aspects of the healthcare delivery system.* |
| 2013-2018 | Chief Medical Officer, Centurion LLC |
| | *I supervised medical services for people incarcerated in prisons in Massachusetts, Tennessee, Minnesota, Mississippi, Vermont, New Hampshire, Florida, and New Mexico. I wrote all disease management guidelines and supervised Centurion's Quality Assurance program.* |
| 2009-2013 | Medical Director, Ada County Jail, Boise, Idaho |
| Other | Board-Certified Emergency Medicine Physician with 22 years of experience at a Level II Trauma Center, Eastern Idaho Regional Medical Center, Idaho Falls, Idaho. Subspecialty: prehospital Emergency Medical Services (EMS). |
| | Medical Director of the Idaho Falls Paramedics for 25 years. |
| | Medical Director of several volunteer rural ambulance services. |
| | Founded Air Idaho Rescue, a successful air ambulance service. |
| | Medical Director of the Bonneville County (Idaho) Search and Rescue. |
| | Idaho COVID-19 Vaccine Advisory Committee. |

## Awards

B. Jaye Anno Award of Excellence in Communication, 2023

*Awarded by the National Commission on Correctional Health Care for "innovative, well-executed communications that have had a positive impact on the field of correctional health care."*

Armond Start Award of Excellence, 2020

*Awarded by the American College of Correctional Physicians "on the basis of adherence to the highest ethical standards and dedication to research, publication, and training."*

## Education

Emergency Medicine Residency, Akron City Hospital, Akron, Ohio 1985-1988
*Chief Resident 1987-1988*

University of Utah Medical School, 1981-1985

Brigham Young University, 1974-1981
*BS in Zoology; graduated summa cum laude and with highest honors*

## Certifications

- Current Idaho Medical License
- Board Certified in Emergency Medicine through 2028
- Fellow, American College of Emergency Physicians (FACEP)
- Fellow, American College of Correctional Physicians (FACCP)
- Certified Corrections Health Professional-Practitioner (CCHP-HP)

## Memberships

- American College of Correctional Physicians
- American College of Emergency Physicians
- Academic Consortium on Criminal Justice Health
- Western American Correctional Health Services Association
- American Medical Association
- Idaho Medical Association
- Bonneville County (Idaho) Medical Association

## Select Publications

- The Best of Jail Medicine: An Introduction to Correctional Medicine, Amazon Kindle Direct Publishing, 2022
- JailMedicine.com, articles regarding healthcare in detention facilities, 2012-2021

## National Lectures and Presentations

- The National Commission on Correctional Health Care (NCCHC) National conference.
- The American Correctional Association (ACA) National Conference
- Essentials of Correctional Medicine National Conference
- American College of Correctional Physicians (ACCP) National Conference
- Maricopa County (Arizona) Correctional Conference
- Idaho Peace Officer Standards and Training (POST)
- Idaho Sheriff's Association Conference
- Utah Sheriff's Association Conference
- Oregon Department of Corrections Medical Conference

## Recent Testimony (July 2022-Present)

*Estate of Bradley Grote v. Kenton County*, Kentucky, 2:20-cv-101, U.S. District Court for the Eastern District of Kentucky (Aug. 2022)

*McDaniel v. Southern Correctional Medicine, LLC*, 5:22-cv-00140-TES, U.S. District Court for the Middle District of Georgia (Aug. 2023)

*Boyer v. Advanced Correctional Healthcare, Inc.*, 3:20-cv-01123-SLC, U.S. District Court for the Western District of Wisconsin (Mar. 2024)

*Estate of Alfonso C. Askew v. Trumbull County*, 4:21-cv-12133, U.S. District Court for the Northern District of Ohio (May 2024)

*Costoulas v. Southern Health Partners, Inc.*, 22-C-03305-S3, State Court of Gwinnett County, Georgia (Sept. 2024)

*Dunsmore v. San Diego Sheriff's Department*. 3:20-CV-00406-AJB-DDL, U.S. District Court for Southern District of California (Nov. 2024)

*Smith v. County of Santa Cruz*, 5:21-cv-00421, U.S. District Court for the Northern District of California (Nov. 2025)

*Beckner v. County of Santa Cruz*, 23-cv-05032-NW, U.S. District Court for the Northern District of California (Dec. 2025)

*Narcisse vs. Genesys Health Alliance*, 5:23-cv-00510-TES, U.S. District Court for the Middle District of Georgia (Dec. 2025)

*The Estate of Adam Bryant v. Vigo County Sheriff's Office*, 2:24-cv-00562-MPB-MKK, U.S. District Court for the Southern District of Indiana (Sept. 2026)

*Rodney Brazelton v. Wellpath, LLC*, 1:22-cv-1324-SEM-KLM, U.S. District Court for the Central District of Illinois (October 2026)