# DECLARATION OF ALFREDO ANTONIO REINA

I, Alfredo Antonio Reina, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct.

1. I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently and truthfully to these matters.

2. My name is Alfredo Antonio Reina. I am 41 years old and from El Salvador.

3. Before I was detained by ICE, I lived in Maryland for 5 years with my wife and two daughters. My youngest daughter is approximately a year old and is a U.S. citizen.

4. I was detained on or around October 16, 2025, in Silver Spring, Maryland, after I appeared for an immigration check-in. Since I arrived in the U.S., I have routinely checked in with immigration authorities. So, I did not understand why I was being detained.

5. After I was detained, I was moved around to at least 3 different immigration detention centers in a span of about 9 days. First, I was taken to an immigration detention center in Baltimore. I was then transferred to Louisiana, and then to California. Finally, on October 25, 2025, I was brought to Camp East Montana in El Paso, Texas, where I am currently being held.

6. I have been moved between units multiple times while at Camp East Montana. First, I was in Delta-8, then Delta-7, then Delta-5. Later, I was taken to Alpha-12 and then Alpha-13, where I am currently being held. When I first arrived at Camp East Montana, I was given an orange uniform. In April, I was given a red uniform and moved to a different unit. I was not told and do not know why they changed my classification. I do not have any criminal history in the U.S.

**<u>Housing conditions</u>**

7. Guards at Camp East Montana search us and our belongings periodically throughout the morning and afternoon. They generally conduct searches at least two times a day. During the searches, the guards are often rude and seem arrogant. Some guards mess up my things and thrown them on the floor when they do the search. I feel like they do this to mess with me or humiliate me. Guards search my bunk and belongings and take away any "extras". The things we sometimes keep are an extra towel or shirt that other detainees leave behind when they're released, transferred or deported. We keep these things because we only get 3 sets of underwear and the laundry only comes in once a week.

8. I try to wash my clothes in the sink or shower myself, but we only get two small packet of shampoo/soap per day. Some guards scan my bracelet when they give me the packet of shampoo/soap, so I can't ask for more later. The packet is smaller than half the palm of my hand and only about a third of the packet is filled with liquid. I have to use this shampoo/soap to either shower or wash my clothes. When I ask the guards for more shampoo/soap, they tell me I already got one.

9. I have a back injury from a car accident in 2021. My back hurts or bothers me often. . Before I was detained, I would wear a back brace for support. The mattresses in the Delta units are very thin. It felt like I was sleeping on the bare metal framing. If I pressed my fingers lightly into the mattress, I could feel the metal base. This made it very hard to sleep and my back would hurt the next day, making it painful to move around. At its worst, the pain was at about an 8 out of 10. It bothered me every day during the entire time I was in Delta. I sent approximately 5 handwritten requests to the facility asking for a different or additional mattress because of my back injury. I never got a response. When I asked the guards about my request, they told me they didn't know anything about it and to fill out another request. Later, I was moved to the Alpha units. The mattresses here are slightly thicker. My back still hurts from sleeping on them, but less than before.

10. On December 2025, while I was in Delta-8, the guards told us the facility had run out of shampoo/soap, toothpaste, and toothbrushes. This went on for about two weeks. We had to ration any toothpaste and soap we were able to get or had kept from before. I also had to shower with just water, no soap, and I couldn't always wash my hands with soap after using the toilet or before eating. The toothbrushes we get here are only good for one or two uses. They break very easily. During those two weeks, we had to keep using the same toothbrush even if it broke.

11. Sometime in early July 2026, guards told us that if we wanted a razor to shave, we had to write our names in a list. Guards have been coming into our pod every Wednesday to give out razors. However, there are only 25 razors, approximately, available each week. When guards bring the list, people rush to write their names in. If you don't make the list, then you don't get a razor. On or around July 22, 2025, I made the list and was supposed to get a razor. Female guards escorted us out of the pod and took us to an empty pod. They started passing out razors in and they told us we could not take them into the bathrooms, where there's a mirror. Instead, they were making people shave by the sink and use the reflection of the tablets as a mirror. At that point, I refused the razor. I couldn't see well enough to see my reflection in the tablet and I didn't feel comfortable doing all my personal hygiene in front of the other detainees and the female guards.

12. I also requested a visit to the barbershop for about 4 or 5 weeks. The process of visiting the barber is the same as requesting razors. We have to sign up on a list with limited spots. I believe there are only 25 spots available to go to the barber on a given day. When I was finally allowed to go, the barber told me that he wasn't going to cut hair anymore. The barbers are other detainees who volunteer. The barber told me the guards treated him badly there, and he didn't even get anything in return. I am sure this detention center charges a lot of money to care for us, but we can't even get a haircut. When I'm not able to shave regularly, and when my hair gets long, I feel unkempt and uncomfortable, and it feels like staff don't care about us or think of us as human.

**<u>Dust, illnesses, and lack of medical care</u>**

13. The are often multiple people sick in the pod, often with cold-like symptoms like runny nose and sneezing. I believe this is caused by all the dust in the unit. The staff only cleans once a week, but they don't do a good job. In late July, for example, a cleaning crew came into the pod with a leaf blower and started blowing all the dust up. There is a lot of accumulated dust and dirt under the beds and in the corners of the room. After the crew left, the beds were covered in dust and dirt. The pod was worse than before the crew came. Now all the dust and trash that was on the floor and under the beds, was in the air and on top of our beds and belongings. We breathe all of this dust and dirt every day. Sometimes, we try to clean the unit ourselves. We request supplies but we don't get any disinfectant. We only get a broom, a mop with used or dirty water.

14. I have felt sick since I got to Camp East Montana. I have symptoms of allergies almost every day. I have a stuffy nose and sneeze a lot, my throat is dry, I feel tired, and my head hurts. I have gone to the doctor at least twice to ask for treatment for allergies. The doctor gave me allergy pills for one week. I took the pills, but the symptoms came back after the effect wore off. At times, I have submitted sick calls when I feel sick. But it often takes 3 or 4 days to be taken to the doctor. The symptoms are gone by the time they take me to the doctor.

15. Sometime in early July, in the morning, guards told everyone in my pod to grab their things because we were moving to a different pod. They escorted us to Charlie-1. When we got there, the guards said we were under quarantine because someone from our unit had "tested positive." The guards didn't explain what that meant or which disease we had been exposed to. I was confused. We told the guards that if someone was sick then we should get tested or checked by a doctor. The guards then told us there would be "no outings" during that time. I understood that to mean that while we were in quarantine we would not be able to go to the barber, legal visits, recreation time, or court. In fact, I had an appointment scheduled with a lawyer on July 8th. That appointment was cancelled because I was in

quarantine. It also meant that people who had agreed to voluntary deportation could not leave.

16. Later that night, I am not sure at what time, the guards told us we were in fact not in quarantine. They said we would stay in that unit for 4 or 5 days and then we would go back to Alpha-13. They didn't explain why or what had happened. The next day, however, they took us back to Alpha-13. I feel like they do this to mess with us psychologically, to try to damage our spirits so that we give up on our legal cases.

**Use of force**

17. On or around March 8, 2026, while I was housed in Delta-5, I was feeling very sick. I had a fever and strong body aches. I am not sure if it was a cold, Covid, or something else. I had been feeling like that for about 5 days. I had submitted sick call requests, but I had not been taken to the doctor. My back was also hurting a lot. I had told the guards in my unit that I had a back injury and that I was feeling sick.

18. Sometime around 9 am, I was laying down in my bed resting when two guards, including Officer Ortiz, approached my bunk and told me to get up. I believe the other guard was Officer Henry. They were doing a search. I got up and went to sit down on a bench while they searched my bunk. I had two towels and I saw Officer Ortiz take one. I had two towels because laundry often takes a while to come back and we don't get enough soap to shower, much less to wash our clothes or towels.

19. After a few minutes, I saw the guards walk away from my bunk. They started searching another bed, so I walked back to my bed and laid down. Guards had searched my bunk dozens of times before this day. They never tell us when they are done searching. We know they are done and we can return to our bed when they walk away. That day, however, Officer Ortiz came back and ordered me to get up again. I told him he had already searched my bed, that I was feeling sick, and needed to lay down. He replied, "I told you to get up." I sat up in bed and showed him my things. I only had three shirts and three pants, so I showed him that. I was feeling very sick and weak. Others around me started telling Officer Ortiz to stop bothering me, that I was sick and that he was only doing it to mess with me. Officer Ortiz told us that we were "worse than women."

20. I was still sitting on the edge of the bed when Officer Ortiz grabbed my left arm and pulled me up to stand. I was in a bottom bunk bed, so I hit my shoulder in the top of the metal bed frame as I was getting up. Officer Henry then approached my bed. Officer Ortiz then pulled and twisted my left arm forcefully. I screamed out in pain and told him to stop. Officer Ortiz kept twisting and I heard my arm pop. Officer Henry then grabbed my right arm and kicked my right shin with a lot of force. Officer Henry grabbed my right foot and Officer

Ortiz grabbed my left arm. They dragged me out of the unit like this, with half of my body suspended in the air.

21. Outside of the pod, the guards told me to put my hands behind my back. I told them I couldn't do it because they had hurt my arm. I told them I was injured. Officer Ortiz again grabbed my arm and pulled it behind my back to handcuff me. I screamed out in pain. The guards then took me to a room by myself where they removed the handcuffs.

22. I was in that room for approximately 40 minutes when the lights went out in the entire facility. The guards moved me to a different unit. While I was there, a nurse or doctor came to see me and examined my arm. She also checked my blood pressure. She gave me three red pills and said she would send more. She also gave me a cream to rub on my arm. I asked her to order X-rays of my arm, and she said she would put in a request.

23. Later, another guard came to talk to me. I believe he was a captain. He told me they were taking me to "the hole." He said there would be a hearing or sort of trial and that I would have a right to present witnesses. I told him everyone in my pod was a witness that I didn't do anything. A few minutes later, two guards handcuffed me and walked me to "the hole."

**Solitary confinement**

24. It was around 3 pm when the guards took me to solitary confinement or "the hole." The hole is a small room, maybe 3 by 2 ½ meters in size. There is a small bed and a toilet with a sink, nothing else. There is a sort of net on the roof and the walls are plastic, like in the rest of the encampment. There is a small window on the door that looks into a hallway and the door to the cell across mine. When the guards left, I laid down. My arm hurt a lot. I was trying to massage it. It was very swollen around my elbow, at the joint. It looked red and it was very tender.

25. Around 7 pm, a guard walked by my door and saw me through the window. I had interacted him before so he knew me. He asked what happened. I explained what happened and told him one of his colleagues had twisted and injured my arm. He asked who and when I told him it was Officer Ortiz he said, in Spanish, "that guy is really weird." I showed the guard my arm; it was very swollen. He said he would submit a request to take me to the doctor and if they didn't take me that night, then he would take me the next night. I wanted the doctors to do an X-ray, my arm was very swollen and it hurt a lot. I was worried something was torn or broken. I was not taken to the doctor that night. A nurse came in later to give me 3 red pills again and pomade. I had a hard time sleeping that night because of the pain.

26. The next day, around 9 pm, the same guard came to my room and asked me if I had been taken to the doctor. I told him no. He walked me out of the hole and took me to the doctor

himself. In the medical unit, I asked the doctor for an X-ray, but she refused. She said my arm was just hurt and swollen, and the medication would help. The entire interaction lasted about 10 minutes. The guard then took me back to the hole.

27. Approximately 2 days after I was taken to solitary, a guard came to see me. I believe he was a captain. He took me out of my room and walked me to the desk where he usually sits, out in the hallway. He sat down on a chair. I was standing on the side of the desk. He asked me what happened and I explained. I also told him that I was very sick and not feeling well that day. I asked him to watch the camera recordings. He said I was taken to the hole because I attacked an officer. But I didn't attack anyone. I was shocked to hear this. It is not true. I asked him to show me the camera recordings and told him I had witnesses that saw what happened. I was told I would be able to present witnesses and had not been able to. He didn't respond to this. The guard said he would give me 25 days in segregation and 5 days without a tablet so I would learn to get up from my bed next time.

28. The first few days in solitary, I did not have access to a tablet or any form of communication with my family. My wife suffers from anxiety, and I was very worried about her and what she would think after not hearing from me. It's so painful to not be able to be there for your family and to know they are worried. After a day or two, I was allowed to call my wife briefly only to tell her I would not be able to contact her for the next 5 days. Sometime on March 10, the guards took the tablet away and did not give it back until March 15 or 16, approximately. My birthday is on [redacted]. I spent my birthday in segregation and could not speak to my wife or family that day.

29. During my time in segregation, I received a series of documents from staff. A true and correct copy of the documents I received is attached hereto as **Exhibit A**. I received all these documents in English. I tried to make sense of them but could not fully understand what they said. One of the documents titled, "Incident of Prohibited Acts and Notice of Charges," says I shoved Officer Ortiz into the sink multiple times while being escorted out of the pod. That is lie. This alleged shoving happened after Officer Ortiz had already pulled me up from my bed and injured my arm, and Officer Henry had kicked my leg. Officers Ortiz and Henry dragged me out of the pod with my body half suspended in the air. One was holding my leg and the other my arm. The description also says that I told officers they would have to "make me get out of bed." That is not true. I have witnesses that saw and heard what happened.

30. In the papers I received from staff, there is another document titled "Detainee Rights – IDP." I understand that paper to say that I have a right, among other things, to be assisted by a staff member before a disciplinary hearing, and to present witnesses on my behalf. I did not receive any staff assistance for a hearing and despite multiple requests, was not

allowed to present witnesses or review evidence. The document also says I have a right to appeal the decision. I was never told I had a right to appeal the segregation decision.

31. I was in segregation for 25 days in total. There are no windows in the cell. I was only able to tell if it was day or night because the guards would turn the lights on in the morning and off at night, and later because I checked the time in the tablet. I would spend the days laying down, sitting down, and reading the Bible. The guards took me out to the yard once a day, by myself. There was no one for me to talk with. The yard was just a small enclosed space. I felt sad and frustrated during that time. I was alone for 25 days and my arm was still hurting.

32. I never saw the doctor again to follow up on the injury. For approximately 15 days I received the same 3 red pills around 9 am and then around 9 pm. I kept applying the cream they gave me and massaged my arm. I think the pills are Tylenol. That's all I have ever been given. However, when they stopped giving me the pills, my arm started hurting again. Four months have passed since the incident and I am still in pain. Every morning I wake up with numbness, a pulsating pain, and a tingling sensation in my arm. I am no longer able to exercise the way I used to. For example, I can't do push-ups anymore. After a few push-ups, my elbow starts hurting or feeling uncomfortable, so I stop. When I extend both of my arms out, my left arm is visibly swollen and it rotates outwards. I am worried my arm will be damaged forever and I won't be able to work as I did before to sustain me and my family. I have asked staff at Camp East Montana repeatedly for medication to treat my pain and for a diagnosis to heal my arm, but I have only received Tylenol and a pomade.

33. On or around April 2, I was finally taken out of segregation and brought back to general population.

34. Sometime after I was taken out of segregation, on or around April or May, I submitted a handwritten sick call request to see the doctor about the pain in my arm. Approximately 3 days after, I was taken to the medical area to see a nurse or doctor. I asked the medical professional to order tests for my arm, and she said she would request X-rays. She prescribed Tylenol and a pomade and sent me back to my pod. Approximately a month or more went by, and I was not taken to get X-rays or received any follow up about my arm. Sometime in June submitted another handwritten sick call request to discuss the pain in my arm again. Approximately 3 days later, I was called into the hallway to speak to some medical professionals. I told them about the pain in my arm and again told them I had requested to get tests. The medical professionals said they would request them. Approximately 2 or 3 days later, I was taken to a separate area in the camp where they performed the X-rays of my arm. Approximately a month and a half has gone by, and I still

do not have the results from my X-rays, so I do not have a diagnosis or know if my arm was fractured.

35. Many guards here are abusive and demeaning, and many have been here since I first got here. When I was taken to Alpha-13, I can't remember exactly when, sometime in April maybe, Officer Ortiz came into the pod. There was a man that was sick, and I told the guards to help him. Officer Ortiz called me a woman and said he had seen me crying in segregation. He was mocking me. He said that in the pod, where other people could hear him. It was humiliating. I told him they should help people. Another time, I also heard a guard say that it was a shame that they couldn't do what they wanted with us. When the contractors changed, the guards just changed their uniforms, but they are the same people and things are still the same here.

36. I make this declaration because what we're experiencing here is wrong. They don't respect rights or laws here. We are not treated like human beings. The food, the treatment, the medical care, the hygiene, that is not how human beings should be treated. I don't want others to go through what I have experienced here.

Everything in this declaration is true and correct to the best of my knowledge and recollection. This declaration was read back to me in Spanish, a language in which I am fluent.

Executed on the 29 of July, 2026 in El Paso, Texas.

Signature: AAR

**ATTESTATION AND CERTIFICATE OF TRANSLATION**

I, **Perla F Alvelais**, certify that I am fluent in both English and Spanish. On **July 29, 2026**, I personally spoke with Alfredo Antonio Reina and read the foregoing declaration to him, translated into Spanish faithfully and accurately. Alfredo Antonio Reina affirmed that he understood my translation and that the information in the above declaration is true and accurate.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Signed: ______________________________ Date: 07/29/2026

NAME: **Perla F Alvelais**

# EXHIBIT A

# Incident of Prohibited Acts And Notice of Charges

CEM– 26-_____

Detainee Name: Alfredo Antonio Reina

A-Number: [redacted]

Nationality: El Salvador

Date & Time of Incident: 03/08/26-0930

Incident Location: Delta 5

Work Assignment: None

Classification Level: Medium

Quarters: D5

Prohibited Act(s):

Code: 108 - Assaulting a staff member

Code: ______

Code: ______

Description of Incident:

On 3/8/2026 at approximately 0930 hours in D5, Detainee Alfredo Antonio Reina A#[redacted]refused to get out of his bed for a bed search after receiving multiple directives and verbal commands before shoving DCT B. Ortiz multiple times into the sink while being escorted out of the pod.
Detainee A. Reina A#[redacted]had his bunk selected for a bed search after he was found with two towels. When asked to get up from his bed the detainee refused, telling officers that they would have to make him get out of his bed. He was given additional opportunities to comply through verbal commands. Lt V. Trinh notified Cpt M. Jones and was directed to remove the detainee from the pod. Upon removal the detainee resisted by shoving DCT B. Ortiz into the sink repeatedly while trying to continue to pull away. D/O W. Henry assisted DCT B. Ortiz in escorting the detainee out of the pod. Once out of the pod, Lt V. Trinh assisted DCT B. Ortiz with applying the restraints. Detainee A. Reina A#[redacted]was taken in restraints to intake before being rerouted to D10 due to power outages in medical, intake and outtake. NOD/NOI

Staff Witness? [✔] Yes [ ] No

Evidence Attached? [✔] Yes [ ] No [ ] NA

Supporting Memorandum? [ ] Yes [ ] No [ ] NA

Vincent Trinh — Name of Reporting Officer

03/08/26 1037 — Date & Time

[signature] — Signature

Reviewed for accuracy prior to investigation by: [signature] Supervisor/SDDO — 3/8/26 1100 Date & Time

Incident Recorded on EADM ? [ ] Y [ ] N

Classification Level Changed? [ ] Y [ ] N

Level changed from ______ To ______

[ ] Copy to Detainee within 24 hrs and prior to UDC.

Form No. I-884 (Revised 9/99)

Copy Received by: ______________________ Date/Time: ______________

Detainee Signature

# Administrative Segregation Order

| | |
|---|---|
| Special Management Unit Officer | M. Jones |
| To | Segregation Order issued by |
| Alfredo Antonio Reina | [signature] |
| Reference to Detainee | Signature |
| [redacted] El Salvador | Captain |
| A# Nationality | Title |

The above-named detainee is to be admitted to Administrative Segregation for the following reason *(choose one)*:

- [x] **Pending an Investigation** - hearing for the commission of a Prohibited Act(s) or Rule violation and requires pre-hearing detention.
- [ ] **Pending Prosecution** -- criminal prosecution of the detainee is pending.
- [ ] **Medical Observation** - medical staff will provide DIHS-819 (Special Needs) form.
- [ ] **Pending a Transfer or Release** - within 24 hours.
- [ ] **Terminating Disciplinary Segregation** and has been ordered to Administrative Segregation by the Disciplinary Panel.
- [ ] **Security Risk** - to self or the security of the facility.
- [ ] **Protective Custody (PC)** – requested by detainee for Protection.

I hereby request placement in the Administrative Segregation for my own protection.
I do [ ] do not [ ] request a hearing concerning my segregation.

[signature] FNP — Signature of | [redacted] — A-Number | 03/08/26 — Date

*Record below, a brief outline of the circumstances and the names of any witnesses to events leading to placement in Administrative Segregation.*

On 3/8/26 at approximately 0930 hours in D5, Detainee Alfredo Antonio Reina A#[redacted] refused to get out of his bed for a bed search after being given multiple directives and verbal commands to leave his bed, He began shoving DCT B. Ortiz multiple times while being escorted out of the pod.

## Medical Staff Evaluation for SMU Placement

An assessment and review has been performed on the above noted detainee by medical personnel.

[signature] FNP — Signature or Stamp of Medical Personnel | 03/08/26 — Date/Time

Received at SMU by: ____________ Title: SMU Officer In Charge

Date Received: ____________ Time: ____________

Released by: ____________ Title: ____________

Date Released: ____________ Time: ____________

**Copy received by detainee:** ____________ Detainee Signature ____________ Date and Time

**Refused to sign for copy:** ____________ Officer Signature ____________ Date and Time

Form No. I-886 (Revised 09/09)

# Administrative Segregation Order

| | |
|---|---|
| Special Management Unit Officer<br>To | M. Jones<br>Segregation Order issued by |
| Alfredo Antonio Reina<br>Reference to Detainee | [signature]<br>Signature |
| [redacted] A# / El Salvador Nationality | Captain<br>Title |

The above-named detainee is to be admitted to Administrative Segregation for the following reason *(choose one)*:

- [✔] **Pending an Investigation** - hearing for the commission of a Prohibited Act(s) or Rule violation and requires pre-hearing detention.
- [ ] **Pending Prosecution** – criminal prosecution of the detainee is pending.
- [ ] **Medical Observation** - medical staff will provide DIHS-819 (Special Needs) form.
- [ ] **Pending a Transfer or Release** - within 24 hours.
- [ ] **Terminating Disciplinary Segregation** and has been ordered to Administrative. Segregation by the Disciplinary Panel.
- [ ] **Security Risk** - to self or the security of the facility.
- [ ] **Protective Custody (PC)** – requested by detainee for Protection.

I hereby request placement in the Administrative Segregation for my own protection.

I do [ ] do not [ ] request a hearing concerning my segregation.

[signature] FNP — Signature of / [redacted] — A-Number / 03/08/26 — Date

*Record below, a brief outline of the circumstances and the names of any witnesses to events leading to placement in Administrative Segregation.*

On 3/8/26 at approximately 0930 hours in D5, Detainee Alfredo Antonio Reina A#[redacted]refused to get out of his bed for a bed search after being given multiple directives and verbal commands to leave his bed. He began shoving DCT B. Ortiz multiple times while being escorted out of the pod.

## Medical Staff Evaluation for SMU Placement

An assessment and review has been performed on the above noted detainee by medical personnel.

[signature] FNP — Signature or Stamp of Medical Personnel / 03/08/26 — Date/Time

Received at SMU by: ______ Title: SMU Officer In Charge

Date Received: ______ Time: ______

Released by: ______ Title: ______

Date Released: ______ Time: ______

Copy received by detainee: ______ Detainee Signature ______ Date and Time

Refused to sign for copy: ______ Officer Signature ______ Date and Time

Form No. I-886 (Revised 09/09)

**CEM– 26-**

### Detainee Rights at The Institution Disciplinary Panel Hearing (IDP)

As a detainee charged with a Prohibited Act(s), you have been referred to the Institution Disciplinary Panel for disposition. While at the IDP hearing, you have the following rights;

1. The right to have a written copy of the charge(s) against you at least 24 hours prior to appearing before the IDP.
2. The right to have a full time member of staff who is reasonably available to assist you before the IDP.
3. The right to call witnesses and present documentary evidence in your behalf provided institutional safety would not be jeopardized.
4. The right to remain silent. Your silence may be used to draw an adverse inference against you. However, your silence alone may not be used to support a finding that you committed a prohibited act.
5. The right to be present throughout the IDP, except during committee deliberations and where institutional safety would be in jeopardy.
6. The right to be advised of the IDP decision in writing and the facts supporting the panel's decision, except where institutional safety would be jeopardized.
7. The right to appeal the decision of the IDP by means of the Detainee Grievance Procedure to the Officer in Charge, within 15 days of the notice of the panel's decision and disposition.

**I hereby acknowledge that I have been advised of the rights afforded me at the Institution Disciplinary Panel hearing.**

Signed: ______________________ A – Number: ______________ Date: ______________

Notice of Rights given to the detainee by: ______________________________
Staff Member & Date

---

**Refusal to Sign**

I have personally advised ______________________ of the rights afforded detainees at the Institution Disciplinary Panel Hearing. The detainee refused to sign the acknowledgement.

Staff member and date: ______________________

---

**Waiver of 24 Hours Notice**

I have been advised that I have at least 24-hour notice prior to appearing before the IDP. At this time, I wish to waive this right and proceed with the IDP hearing.

Detainee Signature, Date and Time: ______________________

Form I-892 (Revised 09/92)

Original Form Received by: ______________________ Date/Time ______________
Detainee Signature

# Administrative Segregation Review

* A review shall be conducted within 72 hrs of the detainee's initial placement in Administrative Segregation to determine whether segregation still warranted, then every 7 days thereafter, up to 30 days, then every 10 days up until the release from the SMU.

On: 3/11/26 (Today's Date) Supervisory Detention and Deportation Officer (SDDO) or contract equivalent: J. L (Print Name)

conducted a formal review of the Administrative Segregation status of:

[redacted] (Detainee A Number) REINA, ALFREDO ANTONIO (Detainee Name) ELSAL (Nationality) who is presently in

[ ] Pending an Investigation [ ] Protective Custody [ ] Pending Prosecution [ ] Medical [ ] Security Risk [✓] Pending release/transfer

Detainee has been in Administrative Segregation for 3 days. Admitted on: 3/8/26 (Date)

**The following factors were reviewed with the results as indicated:**

| | YES | NO |
|---|---|---|
| 1. Does the reason for initial placement remain valid? | ✓ | |
| 2. Does the detainee pose a threat to himself? | | ✓ |
| 3. Does the detainee pose a threat to others? | | ✓ |
| 4. Does the detainee pose a threat to property? | | ✓ |
| 5. Does the detainee pose a threat to security? | | ✓ |
| 6. Is the detainee defiant towards authority? | | ✓ |
| 7. Is the detainee unwilling or unable to live in the general population? | | ✓ |
| 8. Is the detainee's habitual conduct, language, or behavior of a type which may provoke or instigate stressful violent situations amongst the general population? | | ✓ |

If any of the above factors are marked "Yes", the detainee must continue his/her existing status, unless the OIC determines otherwise. If all factors are marked "No", the detainee may be released.

**Document Review: X**

| | YES | NO |
|---|---|---|
| 1. Is the detainee being offered three showers per week and taken showers? | ✓ | |
| 2. Is the detainee exercising at least one hour daily, 5 days a week? | ✓ | |
| 3. Is the detainee being offered three meals daily and consuming at least one meal daily? | ✓ | |
| 4. Is the detainee receiving daily visits from medical staff? | ✓ | |
| 5. Are the special housing officers signing and properly filling out the special housing unit record | ✓ | |

A "No" answer to any of the above questions will require notification of the Detention Operations Supervisor or officer of equal or greater rank.

* I state that the initial reason for my placement in Protective Custody (PC) no longer remains valid. I am requesting removal from PC status. Translation into the Spanish or other language provided by: ______

Detainee Signature: ______ Date/Time: ______

For the reasons above, I [ ] recommend [✓] do not recommend removal from Administrative Segregation.

Supervisor signature: [signature] Date/Time: 3/11/26 1000

*If the detainee has been segregated for the detainee's protection, but not at the detainee's request, the signature of the OIC or AOIC is required to authorize continued detention.*

[ ] Concur with Recommendation
[ ] Continue Status
[ ] Release

______ (OIC or Designee Signature) ______ (Date)

Copy received: ______ (Detainee Signature) Date: ______ Time: ______

# Disciplinary Segregation Review

** A review shall be conducted within 72 hrs of the detainee's initial placement in Disciplinary Segregation to determine whether segregation is still warranted, every 7 days thereafter, up to 30 days, then every 10 days up until the release from the SMU.*

On 3/22/26 (Today's Date) Supervisory Detention and Deportation Officer (SDDO) or contract equivalent M. Jones (Print Name) conducted a formal review of the Disciplinary Segregation status of: [redacted] (Detainee A Number) Reina, Alfredo Antonio (Detainee Name) El Sal (Nationality) who is presently in

[ ] Pending an Investigation [ ] Protective Custody [ ] Pending Prosecution [ ] Medical [ ] Security Risk [✓] Pending release/transfer

Detainee has been in Disciplinary Segregation for 14 days. Admitted on: 3/8/26 (Date)

**The following factors were reviewed with the results as indicated:**

| | YES | NO |
|---|---|---|
| 1. Does the reason for initial placement remain valid? | ✓ | |
| 2. Does the detainee pose a threat to himself? | | ✓ |
| 3. Does the detainee pose a threat to others? | | ✓ |
| 4. Does the detainee pose a threat to property? | | ✓ |
| 5. Does the detainee pose a threat to security? | | ✓ |
| 6. Is the detainee defiant towards authority? | | ✓ |
| 7. Is the detainee unwilling or unable to live in the general population? | | ✓ |
| 8. Is the detainee's habitual conduct, language, or behavior of a type which may provoke or instigate stressful/violent situations amongst the general population? | | ✓ |

If any of the above factors are marked "Yes", the detainee must continue his/her existing status, unless the OIC determines otherwise.
**If all factors are marked "No", the detainee may be released.**

**Document Review: X**

| | YES | NO |
|---|---|---|
| 1. Is the detainee being offered three showers per week and taken showers? | ✓ | |
| 2. Is the detainee exercising at least one hour daily, 5 days a week? | ✓ | |
| 3. Is the detainee being offered three meals daily and consuming at least one meal daily? | ✓ | |
| 4. Is the detainee receiving daily visits from medical staff? | ✓ | |
| 5. Are the special housing officers signing and properly filling out the special housing unit record | ✓ | |

A "No" answer to any of the above questions will require notification of the Detention Operations Supervisor or officer of equal or greater rank.

For the reasons above, I [ ] **recommend** [✓] **do not recommend** removal from Disciplinary Segregation.

Supervisor signature: [signature] Date/Time: 3-22-26 0955

[ ] Concur with Recommendation
[ ] Continue Status
[ ] Release

Officer In Charge or Designee Signature ____________ Date ____________

Copy received: ____________ Date: ____________ Time: ____________
Detainee Signature

# Disciplinary Segregation Review

** A review shall be conducted within 72 hrs of the detainee's initial placement in Disciplinary Segregation to determine whether segregation is still warranted, every 7 days thereafter, up to 30 days, then every 10 days up until the release from the SMU*

On 3/29/26 (Today's Date) Supervisory Detention and Deportation Officer (SDDO) or contract equivalent Jones. W (Print Name)

conducted a formal review of the Disciplinary Segregation status of :

[redacted] (Detainee A Number) Reina, Alfredo Antonio (Detainee Name) El SAL (Nationality) who is presently in

[ ] Pending an Investigation [ ] Protective Custody [ ] Pending Prosecution [ ] Medical [ ] Security Risk [✓] Pending release/transfer

Detainee has been in Disciplinary Segregation for 21 days. Admitted on: 3/8/26 (Date)

**The following factors were reviewed with the results as indicated:**

| | YES | NO |
|---|---|---|
| 1. Does the reason for initial placement remain valid? | ✓ | |
| 2. Does the detainee pose a threat to himself? | | ✓ |
| 3. Does the detainee pose a threat to others? | | ✓ |
| 4. Does the detainee pose a threat to property? | | ✓ |
| 5. Does the detainee pose a threat to security? | | ✓ |
| 6. Is the detainee defiant towards authority? | | ✓ |
| 7. Is the detainee unwilling or unable to live in the general population? | | ✓ |
| 8. Is the detainee's habitual conduct, language, or behavior of a type which may provoke or instigate stressful/violent situations amongst the general population? | | ✓ |

If any of the above factors are marked **"Yes"**, the detainee must continue his/her existing status, unless the OIC determines otherwise.
If all factors are marked "No", the detainee may be released.

**Document Review: X**

| | YES | NO |
|---|---|---|
| 1. Is the detainee being offered three showers per week and taken showers? | ✓ | |
| 2. Is the detainee exercising at least one hour daily, 5 days a week? | ✓ | |
| 3. Is the detainee being offered three meals daily and consuming at least one meal daily? | ✓ | |
| 4. Is the detainee receiving daily visits from medical staff? | ✓ | |
| 5. Are the special housing officers signing and properly filling out the special housing unit record | ✓ | |

A "No" answer to any of the above questions will require notification of the Detention Operations Supervisor or officer of equal or greater rank.

For the reasons above, I [ ] **recommend** [✓] **do not recommend** removal from Disciplinary Segregation

Supervisor signature: [signature] Date/Time: 3-29-26 1430

[ ] Concur with Recommendation
[ ] Continue Status
[ ] Release

Officer In Charge or Designee Signature ____ Date ____

Copy received: ____ Date: ____ Time: ____
Detainee Signature