# EXHIBIT 11

Report No. DOWIG-2026-088

~~CUI~~

# INSPECTOR GENERAL

*U.S. Department of War*

JUNE 9, 2026





# (U) Audit of DoW Support for the Care and Safety of Detainees in Response to the National Emergency at the Southern Border

~~Controlled by: DoW OIG~~
~~Controlled by: Audit~~
~~CUI Category: PRIVILEGE; Operations Security~~
~~Distribution/Dissemination Control: FEDCON~~
~~POC:~~ [redacted]

INDEPENDENCE ★ INTEGRITY ★ EXCELLENCE ★ TRANSPARENCY

~~CUI~~

~~CUI~~

Pursuant to Executive Order 14347, "Restoring the United States Department of War," September 5, 2025, the Department of Defense Inspector General (DoD IG) and Office of Inspector General (DoD OIG) use the secondary titles of the Department of War Inspector General (DoW IG) and Office of Inspector General (DoW OIG), respectively. The use of these secondary titles does not in any way affect the primary statutory title or authorities of the DoD IG under The Inspector General Act of 1978, as amended (5 U.S.C. Chapter 4, Inspectors General), or the authorities or responsibilities of the DoD IG or DoD OIG pursuant to any laws, regulations, or policies.

~~CUI~~

~~CUI~~

# (U) Results in Brief

*(U) Audit of DoW Support for the Care and Safety of Detainees in Response to the National Emergency at the Southern Border*

**June 9, 2026**

## (U) Objective

(U) The objective of this audit was to assess the effectiveness of the DoW's planning and execution for the care and safety of individuals in the Department of Homeland Security's custody (IDCs) in response to the national emergency at the Southern Border. Specifically, we focused on the adequacy of care and safety provided to IDCs by DoW contractors, as well as the administration and oversight of the DoW's contracted goods and services for the care of the IDCs at facilities in Fort Bliss, Texas. For this report, we refer to individuals detained at facilities in Fort Bliss as IDCs because they are not detainees as defined by the DoW.

## (U) Background

~~(CUI)~~ On January 20, 2025, the President of the United States issued Proclamation 10886, "Declaring a National Emergency at the Southern Border of the United States," directing that the Secretary of War support the Department of Homeland Security (DHS) activities to obtain complete operational control of the Southern Border. [redacted] The DoW also issued a contract to build a more enduring facility that could house up to 5,000 IDCs on Fort Bliss land, known as the Montana Site.

### *(U) Background (cont'd)*

~~(CUI)~~ To monitor contractor performance, the DoW designated DoW and DHS contracting officer's representatives at the Enhanced Hardened Facility and the Montana Site. [redacted] Additionally, the DoW transferred oversight responsibility of the Montana Site to the DHS on October 1, 2025.

## (U) Findings

(U) Based on our July 2025 site visit observations and our review of selected contractual requirements for goods and services related to the care and safety of IDCs in the contract's performance work statement, we determined that the DoW contractor provided effective care and safety to IDCs at the Enhanced Hardened Facility. In addition, we determined that DoW contract oversight personnel identified and resolved an overbilling related to excess meals and snacks. However, DoW contract oversight personnel did not sufficiently document how contractors complied with performance work statement requirements. Although we identified a weakness related to contract oversight documentation, the DoW contract for the Enhanced Hardened Facility expired on August 27, 2025, ending DoW contract oversight responsibilities.

(U) In addition, we determined that the DoW contractor provided goods and services needed for the support of IDCs at the Montana Site. However, we reviewed contract oversight documentation and determined that in August 2025, DHS contracting officer's representatives identified 22 deficiencies for which the DoW contractor did not meet performance work statement requirements. Furthermore, we identified three instances in which the DoW contracting officer's representative's notes were not clear enough when explaining their assessment of contractor compliance.
As of October 1, 2025, the DoW transferred the Montana Site, its related contract, and all responsibilities pertaining to the care and safety of IDCs to the DHS. The DoW is no longer involved in the provision of contract support related to the care and safety of IDCs at the Montana Site; however, the DoW

~~CUI~~

# (U) Results in Brief

*(U) Audit of DoW Support for the Care and Safety of Detainees in Response to the National Emergency at the Southern Border*

## *(U) Findings (cont'd)*

(U) provides the land where the Montana Site is located. The DoW communicated outstanding deficiencies to the DHS on September 25, 2025, before transferring oversight of the Montana Site to the DHS.

## (U) Recommendations

(U) We did not make any recommendations in this report.

**OFFICE OF INSPECTOR GENERAL**
**DEPARTMENT OF WAR**
4800 MARK CENTER DRIVE
ALEXANDRIA, VIRGINIA 22350-1500

June 9, 2026

MEMORANDUM FOR UNDER SECRETARY OF WAR FOR POLICY
COMMANDER, U.S. NORTHERN COMMAND
AUDITOR GENERAL, DEPARTMENT OF THE ARMY

SUBJECT: (U) Audit of DoW Support for the Care and Safety of Detainees in Response to the National Emergency at the Southern Border (Report No. DOWIG-2026-088)

(U) This final report provides the results of the DoW Office of Inspector General's audit. We are providing this report for informational purposes. This report does not contain recommendations. We coordinated a discussion draft of this report with officials from the Office of the Under Secretary of War for Policy and the Army Contracting Command – Mission and Installation Contracting Command. They concurred with our report and provided technical comments, which we incorporated, as appropriate.

(U) We appreciate the cooperation and assistance received during the audit. If you have any questions, please contact me at [redacted]

Richard B. Vasquez
Assistant Inspector General for Audit
Readiness and Global Operations

# (U) Contents


## (U) Introduction

(U) Objective ..... 1

(U) Background ..... 1

(U) What We Reviewed ..... 4

## (U) Finding A. The DoW Contractor Provided Goods and Services to IDCs at the Enhanced Hardened Facility, But Improvement was Needed ..... 6

(U) Enhanced Hardened Facility Site Observations ..... 6

(U) DoW Contracting Personnel Identified and Resolved an Overbilling ..... 9

(U) Contract Oversight Weaknesses Identified ..... 9

(U) DoW Contract Support Responsibilities for the Enhanced Hardened Facility Ended ..... 11

## (U) Finding B. The DoW Contractor Provided Goods and Services for IDCs at the Montana Site, But Improvement Was Needed ..... 13

(U) Contracting Personnel Identified Deficiencies at the Montana Site ..... 13

(U) DoW Contract Oversight Deficiencies ..... 16

(U) The DoW Transferred Contract Support Responsibilities for the Montana Site to the DHS ..... 18

## (U) Appendix

(U) Scope and Methodology ..... 19

(U) Internal Control Assessment and Compliance ..... 20

(U) Use of Computer-Processed Data ..... 21

(U) Prior Coverage ..... 21

## (U) Acronyms and Abbreviations ..... 22

# (U) Introduction

## (U) Objective

(U) The objective of this audit was to assess the effectiveness of the DoW's planning and execution for the care and safety of individuals in the Department of Homeland Security's custody (IDCs) in response to the national emergency at the Southern Border.[1] We refer to individuals detained at the facilities in our scope as IDCs because they are not detainees as defined by the DoW. The DoW defines a detainee as a person captured, detained, or otherwise under the control of DoW personnel.

(U) During the audit, we learned that the DoW did not operate the facilities housing IDCs or provide direct care and safety to IDCs. We determined that the DoW provided the land for housing IDCs and contracted third-party services to provide the goods and services needed for the care and safety of IDCs.[2] Therefore, we focused on the:

- (U) adequacy of care and safety provided by the DoW contractors to the IDCs, such as housing provided to IDCs and security at Fort Bliss, Texas; and
- (U) administration and oversight of the DoW's contracted goods and services for the care of the IDCs. See the Appendix for the scope and methodology.

## (U) Background

(CUI) On January 20, 2025, the President of the United States issued Proclamation 10886, "Declaring a National Emergency at the Southern Border of the United States," directing that the Secretary of War support Department of Homeland Security (DHS) activities to obtain complete operational control of the Southern Border. [redacted]

[1] (U) This report contains information that has been redacted because it was identified by the Department of War as Controlled Unclassified Information (CUI) that is not releasable to the public. CUI is Government-created or owned unclassified information that allows for, or requires, safeguarding and dissemination controls in accordance with laws, regulations, or Government-wide policies.

[2] (U) For this report, we use the term "DoW contractor" to refer to the third-party contracted services used to provide care and safety to IDCs.

~~(CUI)~~ In response to the DHS request for support, [redacted].[3]

~~(CUI)~~ [redacted] Figure 1 shows the Enhanced Hardened Facility as of March 30, 2025.




(U) Figure 1. The Enhanced Hardened Facility as of March 30, 2025
(U) Source: 2025 Google.

[3] (U) The U.S. Army Contracting Command - Mission and Installation Contracting Command assumed contract oversight responsibilities. In this report, we refer to the U.S. Army Contracting Command - Mission and Installation Contracting Command and its personnel as the DoW. The DoW maintained the same contractor that operated the facility when it was under DHS control.

(U) On July 18, 2025, the DoW issued the Montana Site contract to build a new facility on Fort Bliss land that could house and support up to 5,000 IDCs. The DoW obligated $328 million for the base period of the contract, which was from July 19, 2025, through September 30, 2025. The contract required that the new facility be able to support 1,000 IDCs by August 17, 2025, and have an operating capacity of 3,000 IDCs by September 30, 2025. During that time, the DoW maintained control over contract support for the site, which included goods and services needed to provide for the care and safety of IDCs, such as armed detention guards, medical services, food, transportation, and administrative support. On October 1, 2025, the DoW transferred the Montana Site, its related contract, and all responsibilities pertaining to the care and safety of IDCs to the DHS. Figure 2 shows the Montana Site as of November 26, 2025.




(U) Figure 2. The Montana Site as of November 26, 2025
(U) Source: Office of the Under Secretary of War for Policy.

## *(U) Contract Oversight*

(U) The DoW assumed all contract responsibilities for the Enhanced Hardened Facility and Montana Site.[4] According to the Federal Acquisition Regulation 1.602-2, "Responsibilities," contracting officers are responsible for ensuring performance of all necessary actions for effective contracting, ensuring compliance with the terms of the contract, and safeguarding the interests of the United States in its contractual relationships.[5] Contracting officer's representatives (CORs) assist in contract oversight as the "eyes and ears" of the contracting officer and liaison between the Government and contractor when executing specific technical and administrative functions and surveillance responsibilities. The DoW designated DoW and DHS CORs to monitor contractor performance at the Enhanced Hardened Facility and the Montana Site. For the Enhanced Hardened Facility and the Montana Site contracts, DHS CORs reported to a DoW contracting officer.[6] In addition, Army Regulation 70-13, "Management and Oversight of Service Acquisitions," requires that the Army develop a quality assurance surveillance plan for contracting officers and CORs to use as they perform their contract oversight duties, while ensuring contractor compliance with the performance work statement (PWS).[7] The PWS serves as the foundation of the contract and provides a basis for monitoring and evaluating the progress and accomplishment of the resulting work.

## (U) What We Reviewed

(U) We selected a nonstatistical sample of contractual requirements and reviewed COR reports, daily contractor reports, and surveillance reports to determine whether the DoW contractor provided care and safety to IDCs at the Enhanced Hardened Facility in accordance with the contract. In July 2025, we visited the Enhanced Hardened Facility to observe how the DoW contractor met contractual requirements related to the care and safety of IDCs. During our site visit, we observed housing, food, and safety conditions at the Enhanced Hardened Facility and interviewed DoW, DHS, and contractor personnel. For the Montana Site, we performed a site visit while it was under construction and we met with DoW and DHS contracting personnel and reviewed contract oversight reports to determine whether the DoW contractor provided the required goods and services for IDCs at the Montana Site. We also reviewed contract oversight documents to

---

4 (U) We did not audit the contract award process for the Enhanced Hardened Facility and Montana Site contracts because this topic was outside the scope of our audit.

5 (U) Federal Acquisition Regulation Part 1, "Federal Acquisition Regulations System," Subpart 1.6, "Career Development, Contracting Authority, and Responsibilities," Section 1.602, "Contracting officers," Subsection 1.602-2, "Responsibilities."

6 (U) The DoW contracting officers and DoW CORs were Army personnel.

7 (U) Army Regulation 70-13, "Management and Oversight of Service Acquisitions," Effective August 30, 2010.

(U) determine whether DoW personnel ensured contractor compliance with PWS requirements and properly documented their assessments. We did not conduct a site visit to the Montana Site after it housed IDCs because the DoW transferred the Montana Site, its related contract, and all responsibilities pertaining to the care and safety of IDCs to the DHS on October 1, 2025. See the Appendix for additional details on our scope and methodology.

# (U) Finding A

## (U) The DoW Contractor Provided Goods and Services to IDCs at the Enhanced Hardened Facility, But Improvement was Needed

(U) Based on our July 2025 site visit observations and our review of the selected contractual requirements for goods and services related to the care and safety of IDCs in the contract's PWS, we determined that the DoW contractor provided effective care and safety to IDCs.[8] In addition, we determined that the DoW implemented contract oversight procedures, but improvement was needed. Specifically, DoW contract oversight personnel identified and resolved an overbilling related to excess meals and snacks. However, DoW contract oversight personnel did not sufficiently document how contractors complied with PWS requirements.

(U) Although we identified a weakness related to contract oversight, the DoW contract for the Enhanced Hardened Facility expired on August 27, 2025, ending DoW contract oversight responsibilities.

## (U) Enhanced Hardened Facility Site Observations

(U) During our Enhanced Hardened Facility site visits on July 29 and July 30, 2025, we did not identify any concerns with the condition of the facility or the standard of care that IDCs received. We observed the following housing, food, and safety conditions.

### *(U) IDCs Housing*

(U) The PWS for the contract required that the DoW contractor provide eight holding pods with each pod containing four separate housing units, for a total capacity of 1,000 IDCs. Each unit was required to have hand washing stations, soap dispensers, a method for drying hands, and indoor vacuum toilets with a half-door to view the feet and head of the IDC. During our walkthrough on July 29, 2025, we observed eight holding pods that were divided into 64 housing units—63 housing units held IDCs, and the remaining housing unit was used for medical services, such as storing and dispensing medication. Each housing unit could hold up to 16 IDCs, and contained a seating area, sleeping mats, a sink, and a bathroom area with

[8] (U) To determine the effectiveness of the DoW's contract support for the care and safety of IDCs, we used the contractual requirements to assess the adequacy of support for the care and safety of IDCs during our site visit. For example, we verified accessibility to water, food, toilets, sinks, basic hygiene supplies, and bedding.

(U) three toilets. The housing units also contained a television, and IDCs had access to table games. Based on our site visit observations, the DoW contractor provided adequate housing for the IDCs. Figure 3 shows an example of a housing unit observed on July 30, 2025.




(U) Figure 3. An Enhanced Hardened Facility Housing Unit, Observed on July 30, 2025
(U) Source: The DoW OIG.

## *(U) IDC Food Services*

(U) The PWS for the contract required that the DoW contractor: (1) provide IDCs three meals a day—two of which should be hot meals; (2) offer dietary options on the menu to accommodate individuals with dietary restrictions; (3) provide two snacks per day for each IDC; and (4) ensure that bottled water was available to IDCs and staff 24 hours per day. During our walkthrough on July 30, 2025, we toured the kitchen area, discussed food preparation with contractor staff, and reviewed the contractor's menu for that week. The menu included snack offerings; ready-to-eat offerings of at least two hot meals, such as burritos and empanadas; and information that identified the vegetarian and pork-free meals. The contractor also maintained a list of IDCs with food sensitivities and provided meals that accommodated their dietary restrictions. We observed the kitchen area where food was prepared and stored, as well as a whiteboard that the contractor used to keep track of the menu item quantities. We learned that IDCs received two snacks per day and ate all meals and snacks within their housing units. IDCs who were scheduled to depart from the facility received up to two bagged meals to take with them—the number of bagged meals was based on the IDC's travel time. We also observed readily available cases of water outside the housing units. Based on our observations during this visit, the DoW contractor provided adequate food services to IDCs. Figure 4 shows the kitchen area and the whiteboard the DoW contractor used to keep track of menu item quantities observed on July 30, 2025.




(U) Figure 4. Enhanced Hardened Facility Kitchen (left) and Menu Whiteboard (right), Observed on July 30, 2025
(U) Source: The DoW OIG.

## *(U) IDC Safety*

(U) The PWS for the contract required that the DoW contractor strategically place observation towers that had unobstructed views of all holding pods, and that were suitable for two detention security personnel. The PWS also required the DoW contractor to provide a standalone surveillance system. According to the PWS, the system needed to provide 360-degree unobstructed views of internal and external areas of the facility, with complete coverage and no gaps. During our walkthrough on July 29, 2025, we observed guard towers in the hallway outside the holding pods and in the recreational areas, with enough space to fit two security personnel. In addition, we observed cameras providing coverage throughout the interior of the Enhanced Hardened Facility and contracted detention security personnel monitoring the feeds from a centralized control center. We also observed that each living area had detention security personnel stationed outside the holding pods monitoring the interior of the pod. Based on our observations during this site visit, the DoW contractor provided adequate safety for IDCs.

(U) In addition to the observations discussed above, we identified 10 different days from March 30, 2025, through August 27, 2025, when the DoW contractor housed IDCs at the Enhanced Hardened Facility in excess of the stated capacity of 1,000 IDCs. We reviewed contract oversight and contractor reports from the same time period and determined that the reports did not note any discrepancies related to goods and services for the care and safety of IDCs at the Enhanced Hardened Facility.

## (U) DoW Contracting Personnel Identified and Resolved an Overbilling

(U) While conducting food services billing reconciliations for June 2025, the contracting officer and the DoW COR identified a discrepancy in the number of meals and snacks delivered to IDCs and the number of the IDCs at the Enhanced Hardened Facility. The contracting officer stated that the contractor said that the DHS and the contractor had an agreement under the prior DHS contract that allowed the contractor to add an extra 10 percent of meals and snacks to the actual head count of IDCs, and they billed the Government for the extra meals and snacks. The DoW contracting officer stated that this agreement between the DHS and the contractor was not authorized under the DoW contract. Therefore, the DoW COR was directed not to pay food services invoices from the DoW contractor until the overbilling of excess meals and snacks matter was resolved. Specifically, the contracting officer stated that food services continued, but the DoW did not pay the DoW contractor as the overbilling matter was under review. On December 9, 2025, the overbilling was resolved. The DoW contractor acknowledged the issue and promptly corrected their billing practices. Specifically, the contracting officer and DoW contractor agreed that the overbilling of excess meals and snacks was in the amount of $114,535, and the DoW contractor credited the Government for the funds paid in error. Because the contracting officer identified and resolved the overbilling, we are not issuing a recommendation for the Enhanced Hardened Facility for this area of concern.

## (U) Contract Oversight Weaknesses Identified

(U) The DoW COR did not sufficiently document how contractors complied with PWS requirements. We determined that the DoW COR completed monthly status reports that documented the site visits, and the COR noted that the quality of contractor work was satisfactory in each report. However, there were minimal notes or documentation that specified what the COR observed and how the contractor complied with PWS requirements.

~~(CUI)~~ DoW contract oversight personnel developed a quality assurance surveillance plan to ensure that the contractor performed the technical requirements of the contract. The DoW designated one DoW and one DHS COR to provide contract oversight at the Enhanced Hardened Facility. The DHS COR provided daily onsite monitoring, and the DoW COR was responsible for completing [redacted] site visits, as established by the surveillance schedule, and documenting contractor performance in surveillance checklists and COR status reports.

~~(CUI)~~ The DoW COR conducted the required [redacted] site visits from April 2025 through August 2025 and observed whether the DoW contractor complied with select PWS requirements. Figure 5 shows the dates when the DoW COR completed site visits at the Enhanced Hardened Facility.

*(U) Figure 5. Dates of Enhanced Hardened Facility Site Visits Completed by the DoW COR*

~~(CUI)~~

[redacted]

~~(CUI)~~

(U) Source: The DoW OIG.

(U) We determined that the DoW COR completed monthly status reports that documented the site visits and PWS requirements that were surveilled. The COR noted that the quality of contractor work was satisfactory in each report; however, the COR did not use surveillance checklists, as required by the quality assurance surveillance plan, to document observations and the monthly COR status reports contained minimal notes or documentation that specified what the COR observed and how the contractor complied with PWS requirements. In addition, we identified three site visits in which the DoW COR completed site visits but assessed the DoW contractor's performance for a PWS requirement that was not the one listed on the surveillance schedule for that date. Table 1 shows the three instances when the COR observed PWS requirements that differed from what was on the surveillance schedule.

*(U) Table 1. Comparison of Surveillance Schedule Requirements to COR Observations*

| ~~(CUI)~~ (U) COR Site Visit Date | (U) PWS Requirements Listed on Surveillance Schedule | (U) PWS Requirement Reviewed by DoW COR During Site Visit and COR Determination |
|---|---|---|
| ~~(CUI)~~ [redacted] | ~~(CUI)~~ [redacted] | (U) 5.3.1.4, Temperatures shall be maintained constantly between the ranges of sixty-nine to eighty-three (69-83) degrees Fahrenheit. **Contractor performance satisfactory.** **~~(CUI)~~** |

*(U) Table 1. Comparison of Surveillance Schedule Requirements to COR Observations (cont'd)*

| (~~CUI~~) (U) COR Site Visit Date | (U) PWS Requirements Listed on Surveillance Schedule | (U) PWS Requirement Reviewed by DoW COR During Site Visit and COR Determination |
|---|---|---|
| (~~CUI~~) [redacted] | (~~CUI~~) [redacted] | (U) 5.3, "Utilities/Mechanical." This PWS section includes the following categories: Heating, Ventilation and Air Conditioning (HVAC), Electrical, Lighting, Plumbing/Water/Waste. **Contractor performance satisfactory.** |
| (~~CUI~~) [redacted] | (~~CUI~~) [redacted] (~~CUI~~) [redacted] | (U) 5.8, "Facility and Service Requirements." This PWS section includes the following categories: Food Service, Kitchen Equipment, Panic Buttons and Alarms, Toilets and Handwashing Stations, Laundry Service, Housing Components, Ancillary Components/Services to be Provided by the Contractor, Pest Control, Diesel Fuel, and Furniture. **Contractor performance satisfactory.** **(~~CUI~~)** |

(U) Source: The DoW OIG.

(U) A DoW quality assurance surveillance specialist also conducted a site visit in July 2025 to confirm the contractor resolved an area of concern the COR reported regarding securing snacks and bagged meals. During the site visit, the specialist confirmed the food was stored in a secure location that was accessible only by the contractor, except in emergencies.

## (U) DoW Contract Support Responsibilities for the Enhanced Hardened Facility Ended

(U) Overall, we assessed that the DoW's planning and execution for the care and safety of IDCs at the Enhanced Hardened Facility was effective through August 27, 2025. In addition, based on our review of contract oversight procedures and documentation, we determined that the DoW had internal controls in place to monitor the performance of the contract at the Enhanced Hardened Facility. The DoW contract for the Enhanced Hardened Facility expired on August 27, 2025, and DoW contract monitoring ended. However, as lessons learned from the Enhanced Hardened Facility, it is important for the DoW to ensure CORs use formal checklist

(U) or assessment tools when completing site visits so that they can substantiate their assessment of contractor performance with sufficient details and monitor correct PWS requirements in accordance with the surveillance schedule. The DoW COR Guidebook provides detailed examples of how to sufficiently document contractor performance and use checklists to assess performance.[9] Therefore, we are not making any recommendations.

[9] (U) "Department of Defense Contracting Officer's Representative Guidebook," October 2022.

# (U) Finding B

## (U) The DoW Contractor Provided Goods and Services for IDCs at the Montana Site, But Improvement Was Needed

(U) We determined that the DoW contractor provided goods and services needed for the support of IDCs at the Montana Site. However, we reviewed contract oversight documentation and determined that:

- (U) from August 15, 2025, through August 22, 2025, DHS CORs identified 22 deficiencies related to multiple areas, such as food services, safety, and hygiene, for which the DoW contractor did not meet PWS requirements; and
- (U) although the DoW CORs developed and used a contract surveillance plan that included COR surveillance checklists, interview questions, documents to review, and required observations, we identified three instances in which the DoW COR notes were not clear enough when explaining their assessment on contractor compliance.

(U) As of October 1, 2025, the DoW transferred the Montana Site, its related contract, and all responsibilities pertaining to the care and safety of IDCs to the DHS. The DoW is no longer involved in the provision of contract support related to the care and safety of IDCs at the Montana Site; however, the DoW provides the land where the Montana Site is located. The DoW communicated outstanding deficiencies to the contractor and DHS on September 25, 2025, before transferring oversight of the Montana Site to the DHS.

## (U) Contracting Personnel Identified Deficiencies at the Montana Site

(U) The DoW contractor was responsible for providing all goods and services to IDCs at the Montana Site. These services included housing, food, safety, medical, and recreational areas. The DoW contracting officer for the Montana Site designated two DHS CORs and seven DoW CORs to perform contract oversight. DHS CORs performed an assessment of the Montana Site from August 15, 2025, to August 22, 2025, when the Montana Site was at initial operating capacity status. Based on our review of DHS COR oversight documents, we determined that DHS CORs identified 22 deficiencies for which the DoW contractor did not meet PWS requirements. Figure 6 shows the number of deficiencies from the contract oversight report, organized by PWS requirements.

*(U) Figure 6. August 2025 Contract Oversight Report Deficiencies, by PWS Requirements*




(U) Source: The DoW OIG.

(U) We reviewed subsequent DoW COR surveillance checklists completed from September 4, 2025, to September 22, 2025, and determined that as of September 25, 2025, 12 of the 22 deficiencies remained unresolved, or their compliance status was unknown. These deficiencies generally related to the categories of safety (three); activities (two); personal hygiene (one); justice (two); holding rooms (one); post orders (one); admissions (one); and disability identification, assessment, and accommodation (one). Table 2 shows the list of the 22 deficiencies that the DHS CORs identified at the Montana Site from August 15, 2025, to August 22, 2025; the corresponding PWS requirement; and their compliance status.

*(U) Table 2. PWS Requirements, Montana Site August 2025 Deficiencies, and Compliance Status as of September 25, 2025*

| (U) PWS Requirement | Deficiency | Compliance Status as of 9/25/2025 |
|---|---|---|
| 4.20.3, "Law Libraries and Legal Matters" | Law Libraries not available. | Unknown |
| 4.11.12, "General Environmental Health Guidelines" | The contractor only cleaned IDC dorms once per week. | Noncompliant |
| 4.11.2, "Hazardous Substances" | Water flow and toilet problems within dormitories, and sinks did not have water. | Compliant |
| 4.11.4, "Significant Event Notifications" | Significant event notifications were not provided to all designated DHS CORs. | Unknown |
| 4.11.10, "Barber Operations" | Barber operations were not set up. | Unknown |
| 4.11.13, "Facility Conditions" | No medical biowaste management was available. | Compliant |
| 4.7.3, "Funds and Personal Property" | Personal property personnel failed to have IDCs observe and certify that their personal property was placed in storage. | Compliant |
| 4.7.2, "Detainee Handbook" | IDCs stated that they never received an IDC handbook upon arrival. | Compliant |
| 4.7.1, "Orientation" | The contractor did not show IDCs an orientation video upon arrival. | Noncompliant |
| 4.7.6, "Custody Classification System" | The contractor housed high- and low-level IDCs in the same dorms. | Compliant |
| 4.7.3, "Funds and Personal Property" | The contractor left several personal property containers unsealed. | Compliant |
| 4.4, "Hold Rooms in Detention Facilities" | No log existed for holding rooms. | Unknown |
| 4.10, "Post Orders" | Many of the contracted officers onsite did not have post orders. | Unknown |
| 4.15, "Personal Hygiene" | The contractor did not provide laundry service for 6 days. | Compliant |
| 4.19.1, "Correspondence and Other Mail" | The contractor had not provided a commissary for IDCs to purchase snacks. | Unknown |
| 4.20.2, "Grievance System" | Tablets could only be used to make ICE requests, not for facility complaints. | Unknown |
| 4.13, "Food Service" | There were instances of IDCs not being fed or being served spoiled food. | Compliant |
| 4.15, "Personal Hygiene" | IDCs initially housed at the facility never received two sets of clothes. | Compliant |
| 4.15, "Personal Hygiene" | The contractor did not issue disposable razors to IDCs. | Noncompliant **(U)** |

*(U) Table 2. PWS Requirements, Montana Site August 2025 Deficiencies, and Compliance Status as of September 25, 2025 (cont'd)*

| (U) PWS Requirement | Deficiency | Compliance Status as of 9/25/2025 |
|---|---|---|
| 4.18, "Disability Identification, Assessment, and Accommodation" | There were no wheelchair accessible showers in the dorms. | Unknown |
| 4.19.2, "Recreation" | Outdoor recreation was unavailable until 8/22/2025. | Compliant |
| 4.19.4, "Telephone Access" | Virtual Attorney Visitation booths were not available as of 8/22/2025. | Unknown (U) |

(U) Source: The DoW OIG.

(U) According to a DHS COR, the Government sent IDCs to the Montana Site before the date stipulated in the contract. Specifically, the DoW awarded the contract for the Montana Site on July 18, 2025, and on August 15, 2025, the Government brought IDCs to the Montana Site. During this time the DoW contractor was still in the process of building the facility to accept IDCs. According to the Montana Site contract, IDCs were scheduled to arrive at the Montana Site on August 17, 2025, at the time the facility was scheduled to reach initial operating capacity. Although we cannot confirm that the IDCs arriving at the facility ahead of time was the cause for all the deficiencies at the Montana Site, contracting oversight personnel stated that the Government bringing IDCs ahead of the contractual date of August 17, 2025, created challenges for the contractor to meet the contract requirements.

## (U) DoW Contract Oversight Deficiencies

(U) DoW CORs developed a contract surveillance plan that included surveillance checklists, interview questions, documents to review, and required observations. In addition, the DoW used a quality assurance surveillance plan to hold the contractor accountable for quality control and to encourage the contractor to take appropriate steps to control and improve quality. These tools assisted the DoW CORs in determining contractor compliance with PWS requirements.

(U) To assess the contract oversight in place, we reviewed 19 DoW COR surveillance checklists dated from September 4, 2025, to September 22, 2025. The checklists detailed the performance requirements, findings, and compliance status. Based on our review, we determined that the DoW CORs oversaw contractor performance by using DoW COR surveillance checklists. Table 3 shows the Montana Site surveillance site visits reported in September 2025.

*(U) Table 3. Montana Site Surveillance Site Visits Reported in September 2025*

| (U) Area of Surveillance Per PWS Requirement Areas | Surveillance Report Date | Checklists Completed |
|---|---|---|
| Environmental Health and Safety | September 4, 2025 | 1 |
| Personal Hygiene | September 6, 2025 | 1 |
| Recreation; Detainee Handbook | September 8, 2025 | 2 |
| Hazardous Substances | September 9, 2025 | 1 |
| Food Service; Personal Property; Exterior Perimeter | September 10, 2025 | 3 |
| Facility Water Supply | September 12, 2025 | 1 |
| Pests and Vermin | September 13, 2025 | 1 |
| Facility Conditions | September 14, 2025 | 1 |
| Facility Conditions; Emergency Electrical Power Generator | September 16, 2025 | 2 |
| Detainee Rights; Supervision of Detainees | September 17, 2025 | 1 |
| Admission and Release; In Processing; Detainee Rights; Supervision of Detainees; Security | September 22, 2025 | 5 |
| **Total** | | **19** **(U)** |

(U) Source: The DoW OIG.

(U) However, we identified that some surveillance checklists did not contain clear notes supporting the assessment of contractor performance. Specifically, three DoW COR surveillance checklists contained notes that potentially contradicted their assessment of contractor compliance with the standards of the PWS. For example, in one COR surveillance checklist, a DoW COR determined that the contractor complied with PWS requirement 4.11.13, "Facility Conditions," but stated that the contractor did not meet the 2025 National Detention Standards for cleanliness. However, the PWS stated that to comply with PWS requirement 4.11.13, the contractor must comply with the 2025 National Detention Standards.

## (U) The DoW Transferred Contract Support Responsibilities for the Montana Site to the DHS

(U) On October 1, 2025, the DoW transferred the Montana Site, its related contract, and all contract support responsibilities pertaining to the support of IDCs to the DHS. The DoW is no longer involved in the provision of contract support related to the care and safety of IDCs at the Montana Site. According to an official from the Office of the Under Secretary of War for Policy, the DoW only provides the Montana Site's land. The DoW communicated outstanding deficiencies to the contractor and DHS on September 25, 2025, before transferring oversight of the Montana Site to the DHS. However, as a lesson learned from the Montana Site, it is important for the Government to ensure adherence to the timelines set in contractual requirements and the CORs to fully support COR assessments of contractor compliance with the PWS. The DoW COR Guidebook provides detailed examples on how to fully document contractor performance. As a result, we are not making any recommendations for the Montana Site.

# (U) Appendix

## (U) Scope and Methodology

(U) We conducted this performance audit from June 2025 through March 2026 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objective. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objective.

(U) We met with DoW personnel to understand which facilities located on continental United States DoW installations housed IDCs in response to the national emergency at the Southern Border. We determined that Fort Bliss, Texas, was the only location on a continental United States DoW installation that held IDCs as of July 2025. We consulted with U.S. Army and U.S. Army North personnel to determine location-specific guidance, determine DoW-level guidance for the IDC mission, and schedule a site visit. We met with Army contracting personnel and obtained contracting data for the Enhanced Hardened Facility at Fort Bliss, and we identified the areas we would focus on during our site visit, such as housing, food, and security, to determine the effectiveness of the DoW contractor's care and safety of IDCs.

(U) In July 2025, we performed a site visit to the Enhanced Hardened Facility. We selected a nonstatistical sample of PWS requirements in the areas of housing, food services, and security, and we documented our observations in those areas during two walkthroughs of the facility, as these were the main sections in the PWS that related to the care and safety of IDCs. We also met with the DoW contracting officer, DoW CORs, and DHS CORs to understand their roles and responsibilities in providing contract oversight and discuss challenges related to the Enhanced Hardened Facility. We also requested and reviewed contract oversight reports for the Enhanced Hardened Facility to determine whether the DoW performed contract oversight. This included contract surveillance schedules, COR status reports, contractor reports, and invoicing data. In addition, we followed up with contracting personnel to understand the actions they took to ensure the DoW contractor performed satisfactorily.

(U) In addition, we conducted a walkthrough of the Montana Site in July 2025; however, the facility was under construction and did not house IDCs at that time. We met with the contracting officer for the Montana Site to discuss the contract, construction progress, and challenges related to building the Montana Site. We planned to conduct a second site visit to the Montana Site after it reached full operating capacity on October 1, 2025. However, in late September 2025, we learned that the DoW planned to transfer the Montana Site contract to the DHS on October 1, 2025. Therefore, we did not visit the Montana Site while it housed IDCs, and we did not independently assess the support services IDCs received. Our findings for the Montana Site were based on our review of contract oversight reports and meetings with contracting personnel. Specifically, we reviewed COR reports and surveillance checklists completed in August 2025 and September 2025 that documented whether the contractor complied with PWS requirements. In addition, we assessed whether there was evidence showing that the DoW contractor remediated PWS deficiencies before transferring the facility oversight to the DHS.

(U) This report was reviewed by the DoW Components associated with this project to identify whether any of their reported information, including legacy FOUO information, should be safeguarded and marked in accordance with the DoW CUI Program. In preparing and marking this report, we considered any comments submitted by the DoW Components about the CUI treatment of their information. If the DoW Components failed to provide any or sufficient comments about the CUI treatment of their information, we marked the report based on our assessment of the available information. The contractors for both the Enhanced Hardened Facility and Montana Site reviewed and commented on relevant portions of the report. We considered any comments they provided in preparing the final report. Furthermore, we sent this report to the DHS OIG to provide the DHS awareness of our audit findings.

## (U) Internal Control Assessment and Compliance

(U) We assessed internal controls and compliance with laws and regulations necessary to satisfy the audit objective. In particular, we evaluated whether the DoW had controls in place to provide contract oversight and ensure the contractor provided the goods and services needed to provide for the support of IDCs. We determined that control activities and monitoring were internal control components significant to the audit objective, and the corresponding underlying principles were implementation of control activities, design control activities, performance of monitoring activities, and remediation of deficiencies.

(U) However, because our review was limited to these internal control components and underlying principles, it may not have disclosed all internal control deficiencies that may have existed at the time of this audit.

## (U) Use of Computer-Processed Data

(U) We obtained and used computer-processed data from the Procurement Integrated Enterprise Environment. Specifically, we downloaded COR designation letters, surveillance checklists, and other contract oversight documentation from the Electronic Data Access system and Surveillance and Performance Monitoring Module within the Procurement Integrated Enterprise Environment. We interviewed contract oversight personnel and reviewed relevant controls in place to determine the reliability and completeness of the computer-processed data. We determined that the computer-processed data we used were sufficiently reliable and appropriate to support the audit findings and conclusions.

## (U) Prior Coverage

(U) No prior coverage has been conducted on the DoW's care and safety of IDCs in response to the national emergency at the Southern Border during the last 5 years.

# (U) Acronyms and Abbreviations

**(U) COR** Contracting Officer's Representative

**(U) DHS** Department of Homeland Security

**(U) IDC** Individual in the Department of Homeland Security's Custody

**(U) PWS** Performance Work Statement

# Whistleblower Protection

## U.S. Department of War

*Whistleblower Protection safeguards DoW employees against retaliation for protected disclosures that expose possible fraud, waste, and abuse in Government programs. For more information, please visit the Whistleblower webpage at www.dodig.mil/Components/Administrative-Investigations/Whistleblower-Reprisal-Investigations/Whistleblower-Reprisal/ or contact the Whistleblower Protection Coordinator at Whistleblowerprotectioncoordinator@dodig.mil*

# For more information about DoW OIG reports or activities, please contact us:

**Legislative Affairs Division**
legislative.affairs@dodig.mil

**Public Affairs Division**
public.affairs@dodig.mil

www.dodig.mil

**DoD Hotline**
www.dodig.mil/hotline

CUI





DEPARTMENT OF WAR OFFICE OF INSPECTOR GENERAL
4800 Mark Center Drive
Alexandria, Virginia 22350-1500
www.dodig.mil
DoD Hotline 1.800.424.9098

CUI