**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

GERALD AKARI ANGYE,
*et al.*,

Plaintiffs,

v.

U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, *et al.*,

Defendants.

Case No. 3:26-cv-1515

**DEFENDANTS' RESPONSE IN OPPOSITION TO THE MOTION FOR PRELIMINARY INJUNCTION**

## INTRODUCTION

This Court should deny Plaintiffs' request for a preliminary injunction. Plaintiffs' request for forward-looking relief fails as Camp East Montana ("CEM") fully meets immigration detention guidelines. CEM was opened to immigrant detainees in August 2025. Problems with the previous contractor were promptly identified and Immigration Customs Enforcement ("ICE") replaced the contractor for CEM in April 2026. Plaintiffs rely heavily on reports, media stories, and declarations of detainees who were detained at CEM prior to the change of contractor, but ICE identified and addressed these very concerns in replacing the contractor. CEM currently meets detention standards in all areas where Plaintiffs seek relief. Plaintiffs therefore cannot meet the high burden for an injunction. Accordingly, this Court should deny Plaintiffs' request for an injunction.

## BACKGROUND

### I. CHANGE OF CONTRACTORS IN APRIL 2026

When CEM first opened in August 2025, a spokesperson for the Department of Homeland Security ("DHS") made a statement that still rings true today: "The Fort Bliss Facility will offer everything a traditional ICE detention facility offers, including access to legal representation and a law library, access to visitation, recreational space, medical treatment space and nutritionally balanced meals. It also provides necessary accommodations for disabilities, diet, and religious beliefs."[1] This goal of providing for detainees' needs and for meeting detention standards has shaped the CEM's development over the past year and a half.

During the initial months that CEM was in use, there were operational challenges that needed to be addressed. Ex. A, Declaration of Daniel Subia, "Subia Decl.", ¶ 10. In working to

---

[1] Reena Diamante, *New Immigration Detention Center Opens at El Paso's Fort Bliss*, Spectrum News (Aug. 28, 2025, at 9:00 CT), https://spectrumlocalnews.com/tx/south-texas-el-paso/news/2025/08/28/el-paso-fort-bliss-immigration-detention-center-.

correct these deficiencies, ICE ultimately found the original contractor for CEM to be inadequate. Ex. B, Declaration of Jonathan Orloski, "Orloski Decl.", ¶ 11. As such, in April 2026, ICE hired a new contractor. *Id.* ¶ 10. The new contractor implemented new policies better aligned with the National Detention Standards ("NDS").[2,3] Orloski Decl. ¶ 12. Conditions at CEM have notably improved under the new contractor, and ICE continues to work with its contractor to measure its performance, impose penalties on underperformance, and refine processes to ensure CEM is meeting detention standards. *Id.* ¶¶ 12-13.

## II. CEM CURRENTLY MEETS DETENTION STANDARDS

CEM, like all other ICE detention facilities, must follow the NDS. Ex. C, Declaration of Ernie Marin, "Marin Decl.", ¶ 9. The NDS ensure that "detainees are treated humanely; protected from harm; provided appropriate medical and mental health care; and receive the rights and protections to which they are entitled." Orloski Decl. ¶¶ 12-13. Although CEM was initially found deficient in several standards, subsequent inspections observed that it has eliminated many of these deficiencies. *See* ECF No. 54-10 at 11-2; ECF No. 54-11 at 11-12; Ex. G, ICE Enforcement and Removal Operations ("ERO") [redacted], July 1, 2026, [redacted] CEM actively works to address any remaining deficiencies, and on the whole, CEM currently meets detention standards.

### A. CEM LIVING CONDITIONS EXCEED REQUIRED MINIMUMS

From intake to outtake, CEM works to ensure that detainees' needs are met. Intake processing is done in a climate-controlled building, can take as little as twenty minutes, and is

---

[2] Ex. F, *U.S. Immigration & Customs Enf't, National Detention Standards 2026*, https://www.ice.gov/doclib/detention-standards/2026/nds2026.pdf ["NDS 2026"].

[3] Defendants note that while NDS 2026 is the current standard, Plaintiffs cite to NDS 2025 throughout their Motion for Preliminary Injunction. To be clear about the current governing policies, Defendants cite only to the NDS 2026 implemented on June 15, 2026.

always completed within twelve hours. Ex. J, [redacted] ("SOP") [redacted], ("SOP 057"); Ex. V, [redacted] SOP [redacted] ("SOP 030"). During intake, detainees have access to filtered water and are given bagged meals when applicable. Subia Decl. ¶¶14, 18. They also undergo a medical screening, including a screening for tuberculosis at which point those who appear ill are quarantined. SOP 030.

After intake, detainees are housed in climate-controlled pods where they can watch television or use electronic tablets. Subia Decl. ¶ 66; Ex. E, Declaration of Michael Oslund, "Oslund Decl.", ¶ 6. CEM maintains a 4:1 detainee to tablet ratio. Oslund Decl. ¶ 9. The tablets include access to a law library, educational programming, religious content, and the CEM handbook. *Id*. The tablets can also be used to play games, watch movies or television, send messages, and have video or audio calls. *Id*. They have opportunities to leave the pods for outdoor recreation, medical appointments, attorney visitation, library access, religious programming, grooming services, and other activities. Subia Decl. ¶¶ 45, 80. The occupancy level of the entire facility and of each pod is closely managed, and CEM has discretion to decline proposed transfers. Subia Decl. ¶ 9. Intake, outtake, and medical areas are cleaned daily; housing pods are cleaned weekly. *See, e.g.,* Ex. M, [redacted] – Camp East Montana, October 18, 2026, ("Janitorial Report"). CEM also contracts a pest-control service that visits CEM daily to inspect areas and apply any necessary pest control treatment. Ex. N, [redacted], October 23, 2026, ("Pest Control Record"). In the event that any maintenance is needed, guards or detainees may report the maintenance request which is then routinely and quickly addressed. Subia Decl. ¶ 77.

Detainees have ample access to food, water, and hygiene supplies. Subia Decl. ¶ 19, 22. Detainees receive three hot meals a day. *Id.* ¶¶ 15-16. Menus, which include accommodations for medical and religious restrictions, are reviewed by a certified dietician. *Id.* ¶ 14, 19. Daily calories from these meals meet or exceed 3,000 calories per day. *Id.* ¶ 20. The meals offered to detainees rotate every seven days to allow for variety. *Id.* ¶ 19. In preparing these meals, CEM complies with strict food safety protocols. *Id.* ¶ 17. Cups and water fountains providing filtered water are available in every pod. *Id.* ¶ 15. Detainees are also given hygiene products. *Id.* ¶ 22. Additional hygiene products are located within the pods and are distributed by guards upon request. *Id.* Detainees also may request shaving supplies, which are provided on an as-requested basis due to safety concerns. *Id.* Detainees are able to visit CEM's barber shop once per week. *Id.* Detainees have access to nail clippers at the barber shop. *Id.*

While CEM was designed to house 5,000 detainees, the population at CEM is held significantly lower and is currently at 1,736. *Id.* ¶ 9. The size of the population is controlled to ensure that CEM can continue to meet the detention standards. *Id.*

### B. GUARDS ARE PROPERLY TRAINED AND FOLLOW DETENTION GUIDELINES

CEM guards are trained in accordance with detention standards and guidelines. Subia Decl. ¶ 49. When necessary, but consistent with detention standards, guards conduct pat searches and strip searches, place individuals in segregation, and use force. *Id.* ¶¶ 54, 57. Guards regularly complete after-incident reports, retain related evidence, and conduct reviews after incidents segregation or use of force. *Id.* ¶¶ 65-70. Additionally, detainees have pathways to address concerns, including filing grievances and any Prison Rape Elimination Act allegations. *Id.* ¶ 39. CEM closely follows detention standards by training guards as to the relevant procedures, by monitoring guard conduct, and conducting regular employee evaluations. Subia Decl. ¶ 49, 65-70.

### C. DETAINEES AT CEM RECEIVE ADEQUATE HEALTHCARE

Medical care is designed to keep detainees healthy throughout the length of their detention and beyond. CEM's medical unit is robust, including medical doctors, advance practice practitioners, nurses, and numerous support staff. *Id.* ¶ 9. To improve on the services it already offers, CEM is expanding its medical facility, which will include additional areas for medical treatments, beds, and negative pressure rooms. Orloski Decl. ¶ 19. CEM also follows a vigorous set of procedures in providing medical care. Medical screenings are performed at intake, and needed prescriptions are timely filled. SOP 057. Detainees with complex health situations are transferred from CEM. *Id.* At transfer or outtake, detainees are given sufficient medication to establish continuity of care. Ex. W, [redacted] SOP [redacted] – [redacted] ("SOP 045").

CEMS's provision of care is also well documented. Shortly after the new contractor took over CEM, a new electronic medical records ("EMR") system was put in place. *Id.* ¶ 11. Recordkeeping is thorough and up to date. *Id.* ¶¶ 12, 42; Ex. H, ICE ERO [redacted], June 16, 2026, "[redacted]", at 4. Across relevant standards, CEM complies with the NDS, offering satisfactory medication administration, chronic care, suicide screening, treatment of disability, urgent care, and recordkeeping. [redacted].

## III. LEGAL STANDARD

In the Fifth Circuit, there is a well-established framework governing whether a court should grant a preliminary injunction:

> To be entitled to a preliminary injunction, the movant must satisfy each of the following equitable factors: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) the threatened injury to the movant outweighs the threatened harm to the party sought to be enjoined; and (4) granting the injunctive relief will not disserve the public interest. Because a preliminary injunction is an extraordinary remedy, it should not be granted unless the movant has clearly carried the burden of persuasion on all four requirements. Failure to sufficiently establish any one of the four factors requires this Court to deny the movant's request for a preliminary injunction.

*City of Dallas v. Delta Air Lines, Inc.*, 847 F.3d 279, 285 (5th Cir. 2017). Preliminary injunctions are "not to be granted routinely, but only when the movant, by clear showing, carries the burden of persuasion." *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989).

To prevail on a conditions of confinement claim, detainees must prove either an express policy intended to punish, or a pattern of acts or omissions so pervasive as to establish an intended condition or practice of punishment. *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 644–45 (5th Cir. 1996). A condition amounts to impermissible punishment only if it is "arbitrary or purposeless" or not reasonably related to a legitimate governmental objective. *Bell v. Wolfish*, 441 U.S. 520, 539 (1979). Furthermore, the Court in *Bell* recognized that the Government has legitimate interests that stem from its need to manage the facility in which the individual is detained. *Bell*, 441 U.S. at 540.

The Fifth Circuit has recognized that establishing such a systemic deprivation presents a substantial burden and one that is rarely satisfied under its caselaw. *Shepherd v. Dallas Cnty.*, 591 F.3d 445, 452 (5th Cir. 2009).

## ARGUMENT

### I. PLAINTIFFS CANNOT SHOW THAT THEY ARE LIKELY TO SUCCEED ON THE MERITS

Plaintiffs' Complaint makes claims related to violations of the Fifth Amendment and of the Administrative Procedure Act ("APA"). *See* ECF No. 1 at 73-76. Plaintiffs cannot meet the high burden to show a likelihood to succeed on the merits of their claims. None of the named Plaintiffs are currently detained at CEM. No class has been certified. Their claims for injunctive relief are moot. *See W.M.M. v. Trump*, 184 F.4th 780, 786 (5th Cir. 2026) (holding the removal of named plaintiffs in a putative class action mooted the case where the class was not certified by the district court). Likewise, Plaintiffs' APA claim fails. Plaintiffs challenge an alleged day-to-day operational decision that does not fall within the APA's jurisdiction. *Sierra Club v.*

*Peterson*, 228 F.3d 559, 567 (5th Cir. 2000) (holding that "identifying specific allegedly improper" agency conduct does not constitute final agency action to bring programmatic challenges under the APA).

Contrary to Plaintiffs' allegations, CEM complies with NDS. Conditions at CEM, including intake, housing, sanitation, nutrition, hygiene, and recreation, are not used to punish detainees. The same is true with respect to the conduct of guards as to pat searches, segregation, the use of force, or other interactions with detainees. Further, medical care at CEM is timely and appropriate. Because conditions at CEM are constitutional and in compliance with NDS, Plaintiffs cannot show that they are likely to succeed on the merits of their claims.

### A. THE LIVING CONDITIONS MEET DETENTION STANDARDS AND SERVE A LEGITIMATE GOVERNMENT PURPOSE

Plaintiffs contend that conditions at CEM are unconstitutionally harsh, pointing to allegations concerning intake, housing, sanitation, food service, hygiene, and grooming. ECF No. 52, 3-10. But the Due Process Clause does not prohibit every discomfort, inconvenience, or restriction associated with civil detention. *See Rhodes v. Chapman*, 452 U.S. 337, 349 (1981). Rather, the relevant inquiry is whether Defendants maintain systems reasonably designed to provide food, sanitation, hygiene, bedding, recreation, medical care, and safety consistent with detention standards. *See Bell*, 441 U.S. at 537–40*; Hare*, 74 F.3d at 639, 644*; see also* NDS 2026 Standards 1.2, 4.1, 4.3, 4.4, and 5.2.

Under *Bell*, Plaintiffs must show that the challenged conditions constitute punishment rather than measures reasonably related to legitimate operational and security objectives. *Bell*, 441 U.S. at 538–40. They have not done so. The record does not demonstrate that CEM's current operations lack legitimate purposes or depart so substantially from NDS as to constitute unconstitutional punishment. *See id.* at 539–40; NDS 2026 Introduction at 1. Instead, Plaintiffs

largely contrast CEM with some idealized detention environment, challenging the desirability of particular conditions. *See generally* ECF No. 52. These allegations reflect disagreement with CEM operations or detainee preferences, but they do not establish that CEM's conditions are arbitrary, purposeless, or excessive in relation to legitimate governmental objectives. *Bell*, 441 U.S. at 539. Accordingly, Plaintiffs have not demonstrated a likelihood of success in showing that the challenged conditions amount to unconstitutional punishment.

#### i. INTAKE OPERATIONS MEET OR EXCEED CONSTITUTIONAL AND NATIONAL DETENTION STANDARDS.

Conditions at intake are intended to provide basic structure during the initial experience for detainees. To begin with, intake is designed to be completed as efficiently as possible, with many undergoing the process in as little as twenty minutes—but never more than 12 hours. SOP 057; SOP 030. Moreover, since the new contractor took over, significant operational improvements have been implemented, including upgraded intake procedures. Orloski Decl. ¶¶ 12, 14, 19; SOP 057. During intake, detainees are issued sweaters, blankets, sheets, towels, and hygiene items, and CEM maintains HVAC systems serving detainee-support areas. Subia Decl. ¶¶ 22, 66-68.

Plaintiffs portray intake at CEM as crowded, cold, unsanitary, and lacking basic necessities, alleging insufficient seating, and exposure to visibly ill individuals. ECF No. 52 at 6-7. Plaintiffs are wrong. These allegations are largely anecdotal and fail to demonstrate a current, systemic condition constituting punishment. *See Hare*, 74 F.3d at 644–45. Upon completion of intake, detainees are issued a bedding pack, hygiene supplies, and four uniforms. Subia Decl. ¶ 22. Assuming arguendo that allegations of past conditions under the prior contractor violated detention standards, these problems were addressed months ago, and Plaintiffs have not shown ongoing or imminent harm attributable to current operations.

Plaintiffs' allegation that detainees are exposed to visibly ill individuals does not establish unconstitutional conditions. ECF No. 52 at 6. Rather, Plaintiffs must show that officials were aware of a substantial risk of serious harm and consciously disregarded that risk. *Hare*, 74 F.3d at 650. Maintaining intake screening, medical-evaluation procedures, and protocols for identifying and managing communicable diseases satisfies constitutional requirements; allegations that individual detainees appeared ill are insufficient to demonstrate deliberate indifference. *Domino v. Texas Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001).

Here, every detainee undergoes medical screening upon intake. CEM maintains procedures for identifying, monitoring, treating, and isolating communicable diseases. SOP 057. CEM also has recently expanded medical infrastructure to meet the chronic care, quarantine, suicide watch, and acute care demands of its increased population. Orloski Decl. ¶¶ 15-20. Thus, the mere presence of an individual displaying symptoms does not establish that Defendants are disregarding detainee health or safety. As the Fifth Circuit held in *Shepherd*:

> Thus, isolated examples of illness, injury, or even death, standing alone, cannot prove that conditions of confinement are constitutionally inadequate. Nor can the incidence of diseases or infections, standing alone, imply unconstitutional confinement conditions, since any densely populated residence may be subject to outbreaks.…Rather, a detainee challenging jail conditions must demonstrate a pervasive pattern of serious deficiencies in providing for his basic human needs; any lesser showing cannot prove punishment in violation of the detainee's Due Process rights.

*Shepherd*, 591 F.3d at 454. Plaintiffs cannot show continuing, current, and pervasive constitutional violations.

Plaintiffs further allege that detainees lack mattresses, bedding, adequate seating, food, clean water, privacy, and accurate information during intake. ECF No. 52 at 6. But temporary discomfort during intake is insufficient to prove a constitutional violation. NDS expressly permits temporary placement in intake holding rooms while detainees undergo admission, classification,

medical screening, and housing assignment. NDS 2026 Standards 2.1, 2.2. Importantly, the standards do not require holding rooms to contain beds, bunks, cots, or other sleeping apparatus, and instead provide that hold rooms are temporary processing areas equipped with seating, potable water, sanitation facilities, and supervision. NDS 2026 Standard 2.1(A)(4)-(6). The intake rooms at CEM comply with NDS.

Here, CEM records and leadership declarations confirm that CEM intake procedures either meet or exceed all constitutional and NDS standards: (1) bedding packs are issued immediately upon completion of intake; (2) occupancy is managed through established capacity procedures; (3) detainees at intake receive bagged meals; and (4) filtered drinking water is available throughout CEM, including at intake. Subia Decl. ¶ 22; Marin Decl. ¶¶ 9-10; SOP 057; NDS 2026, Standards 2.1, 2.2, 4.1, 4.4. Plaintiffs challenge temporary intake conditions that are expressly contemplated by the governing detention standards and fail to identify conditions that are arbitrary, purposeless, or punitive. *See Bell*, 441 U.S. at 539–40. Plaintiffs provide no objective evidence substantiating their claims regarding unsafe water or denial of food. Intake procedures and accommodations meet or exceed constitutional and NDS standards.

Likewise, Plaintiffs' contention that detainees receive inaccurate information is contradicted by evidence. NDS requires that detainees receive a facility orientation and both the national and facility handbooks upon admission. *See* NDS 2026 Standards 2.1, 6.1. Detainees have electronic access to CEM policies through tablets and are given all orientation materials in their native language immediately at intake. Oslund Decl. ¶ 7, 11. These materials contain all information in compliance with NDS, including CEM rules, grievances, recreation, hygiene, medical care, visitation, law library access, telephone use, religious services, and other CEM programs. *See* NDS 2026 Standard 6.1(A). Plaintiffs identify no specific false statement in any

materials and instead offer only subjective disagreement with the information provided. Thus, Plaintiffs fail to show that intake procedures at CEM fail to meet or exceed constitutional and NDS standards.

### ii. HOUSING CONDITIONS MEET OR EXCEED CONSTITUTIONAL AND NATIONAL DETENTION STANDARDS.

After intake, CEM further strives to provide detainees with comfortable, safe conditions throughout the length of their detention. Plaintiffs' characterization of the housing units as windowless, ceiling less, crowded enclosures housing up to 72 detainees, with shared tables, showers, and toilets, inadequate bedding and clothing, and little natural light fail to establish unconstitutional punishment. *See* ECF No. 52 at 7-8. The Constitution does not prohibit dormitory-style housing, shared sanitation facilities, open-bay housing configurations, or tent-based detention facilities. *See Bell*, 441 U.S. at 541–43; *Ruiz v. Estelle*, 679 F.2d 1115, 1147–49 (5th Cir. 1982); *see also Jones v. Diamond*, 636 F.2d 1364, 1378–80 (5th Cir. 1981) (en banc). Detention conditions are evaluated based on their actual operation and whether they are reasonably related to legitimate governmental objectives, not on the terminology or architecture used to describe them. *Bell*, 441 U.S. at 538–40. Thus, the relevant inquiry is whether detainees are deprived of basic human needs or subjected to conditions amounting to punishment. *Rhodes*, 452 U.S. at 347–50; *Hare*, 74 F.3d at 644–45.

Shared sanitation and dining facilities are common features of institutional detention settings. Courts have recognized that shared bathrooms, showers, and tables are "typical detention-facility conditions" rather than evidence of punishment. *Toure v. Huron*, No. SA-20-CV-1036-JKP, 2021 WL 75698, at *4 (W.D. Tex. Jan. 8, 2021). NDS do not prescribe any particular architectural design for detention housing. Instead, it requires facilities to provide appropriate living conditions, including adequate lighting, ventilation, sanitation, safety, and housing

assignments consistent with classification needs. *See* NDS 2026 Standards 1.2(I)(1), 2.2(A)(1)-(7), (D). Here, the internal housing configurations serve obvious operational and security functions and Plaintiffs offer no evidence to the contrary.

Finally, Plaintiffs emphasize subjective feelings of depression, anxiety, frustration, hopelessness, and disorientation. ECF No. 52 at 7-8. Such reactions are not unexpected in any detention environment and do not establish unconstitutional punishment. The Constitution does not guarantee freedom from the ordinary stress associated with detention. *Hernandez v. Velasquez*, 522 F.3d 556, 560–61 (5th Cir. 2008); *Rhodes*, 452 U.S. at 347. Rather, the question is whether detainees are afforded reasonable opportunities to maintain their physical and psychological well-being. *Youngberg v. Romeo*, 457 U.S. 307 (1982). Here, detainees have access to recreation, mental-health services, religious programming, library resources, attorney communications, grievance procedures, medical care, and other CEM services. Orloski Decl. ¶¶ 8, 12, 15-18; Marin Decl. ¶ 9. Plaintiffs' subjective dissatisfaction with detention therefore does not establish that the challenged conditions are arbitrary, purposeless, or excessive in relation to legitimate governmental objectives. *Bell*, 441 U.S. at 539–40; *see also City of Dallas*, 847 F.3d at 285.

## III. ENVIRONMENTAL CONDITIONS AND SANITATION MEET OR EXCEED CONSTITUTIONAL AND NATIONAL DETENTION STANDARDS.

Plaintiffs repeatedly allege that the physical structures and housing conditions constitute punishment. ECF No. 52 at 7-8. Neither the Constitution nor NDS prescribe a particular architectural design for detention facilities. *See Bell*, 441 U.S. at 538–40; *Rhodes*, 452 U.S. at 347–49; *Jones*, 636 F.2d at 1376–80. Instead, both focus on whether detainees receive adequate living conditions, including appropriate sanitation, safety, ventilation, lighting, housing assignments, and

access to other essential services. *See Bell*, 441 U.S. at 538–40, 542–43; *Rhodes*, 452 U.S. at 347–49; NDS 2026 Standard 1.2(I)(1).

CEM's housing conditions serve legitimate operational and safety purposes, including detainee accountability, supervision, movement control, and institutional security. Marin Decl. ¶¶ 9-10. The housing units are organized to provide access to sanitation facilities, medical care, recreation, legal resources, grievance procedures, religious programming, and private communication with counsel. Marin Decl. ¶ 9; Oslund Decl. ¶¶ 8, 12, 15-16. Further, Plaintiffs' allegations are contradicted by objective evidence. An independent inspection of the intake areas, housing units, segregation unit, law library, barbershop, food service department, and medical department and reported that "[n]o deficiencies, concerns, or noteworthy observations were identified in the areas inspected" and that "[t]he facility appeared clean, well-maintained, and in good overall condition at the time of the review." [redacted] at 5. CEM was found to be "substantially compliant," where thirteen sections achieved 100% compliance, five sections achieved compliance rates greater than 90%, and one section achieved 88% compliance. *Id.*

Plaintiffs likewise rely heavily on the fact that housing units may contain up to 72 detainees. ECF No. 52 at 7. But the Constitution does not establish a constitutional occupancy limit. *See Bell*, 441 U.S. at 541–43 ("there is no 'one man, one cell' principle lurking in the Due Process Clause"). Nor does NDS. NDS 2026 Standards 1.2(I)(1), 2.2(D) (prescribing no particular housing configuration, instead regulating functional conditions). What matters is whether detainees receive adequate food, sanitation, medical care, recreation, legal access, and safety protections. *Jones*, 636 F.2d at 1376–80. Here, population levels are actively managed at a level substantially lower than overall capacity. CEM had an operational capacity of 5,000 detainees in

2025, which decreased to 4,000 in 2026. Marin Decl. ¶ 10. The detainee population was approximately 1,800 in April 2026 and 2,520 in June 2026. *Id.* CEM's housing conditions are substantially compliant with NDS.

Plaintiffs also emphasize that housing units are cold, lack natural light, and have "no ceiling except the tent roof above." ECF No. 52 at 7-8. NDS do not prescribe that detainee housing contains conventional windows, natural light exposure within housing units, or any other particular architectural feature. Instead, NDS regulate functional conditions such as lighting, ventilation, living space, and access to recreation, and provides only that where recreation is conducted exclusively indoors, detainees must have access to natural light during recreation. *See* NDS 2026 Standards 1.2(I)(1), 5.2(A)(2).

Plaintiffs' contention that detainees are confined to housing units "23 or 24 hours each day" is inconsistent with CEM records. ECF No. 52 at 7. Detainee movement is electronically tracked through RFID bracelets. Marin Decl. ¶ 3; Oslund Decl. ¶¶ 7, 12. The Guardian RFID system tracks detainee movement, including movement between housing units and recreation areas, medical services, meal service, laundry, tablet access, and other operational activities. Subia Decl. ¶¶ 31-32. Plaintiffs' generalized characterization is contradicted by objective movement and activity records. *See Bell*, 441 U.S. at 538–40; *Hare*, 74 F.3d at 644–45.

Plaintiffs also allege that "mice and crickets" infiltrate living areas and suggest that CEM suffers from uncontrolled pest infestations. ECF No. 52 at 8. Isolated allegations of occasional insects or rodents in a large detention facility do not establish unconstitutional conditions of confinement. *See Herman v. Holiday*, 238 F.3d 660, 664–65 (5th Cir. 2001).

CEM maintains an ongoing pest-management program and conducts regular inspections and monitoring. *See* Pest Control Record; Subia Decl. ¶¶ 69-70. A recent pest-control inspection

reported that all rodent bait stations were checked and serviced and found that "[n]o rodent or other pest activity was observed or reported." *Id*. Plaintiffs offer no objective evidence establishing that pests are present at levels posing a substantial risk to detainee health or safety. At most, Plaintiffs identify sporadic sightings of common pests and insects, which do not demonstrate that CEM has failed to maintain constitutionally adequate environmental health and sanitation conditions. *See Bell*, 441 U.S. at 538–40.

Plaintiffs further ignore a critical fact bearing on the *Bell* analysis of living conditions: since the contractor changed, substantial operational and architectural improvements have been implemented independent of this litigation. Orloski Decl. ¶¶ 10-20. Even assuming Plaintiffs' allegations accurately describe past conditions, they have not shown that CEM's current housing configuration amounts to unconstitutional punishment or any ongoing, imminent threat of harm. *See Bell*, 441 U.S. at 538–40; *City of Dallas*, 847 F.3d at 285.

## IV. FOOD AND NUTRITION MEET OR EXCEED CONSTITUTIONAL AND NATIONAL DETENTION STANDARDS.

Plaintiffs devote substantial attention to complaints about food quality, portion sizes, alleged spoilage, special diets, hunger, gastrointestinal symptoms, weight loss, and detainee dissatisfaction. ECF No. 52 at 8-10. But occasional complaints in a large detention facility do not establish that detainees are systematically denied nutritionally adequate meals or subjected to unconstitutional conditions of confinement. *See Green v. Ferrell*, 801 F.2d 765, 770–71 (5th Cir. 1986); *Berry v. Brady*, 192 F.3d 504, 507–08 (5th Cir. 1999) (holding an inmate alleging inadequate food must show that he was denied "well-balanced meals, containing sufficient nutritional value to preserve health"). CEM maintains a system that is reasonably designed to provide safe and adequate nutrition. *See Bell*, 441 U.S. at 538–40. Consistent with NDS food service requirements, detainees receive three meals per day from registered dietitian-approved

menus, with accommodations available for medically required and religious diets. Subia Decl. ¶¶ 19-20; NDS 2026 Standards 4.1(C)-(G). Enhanced food and nutrition standards have been implemented following the contractor transition. Marin Decl. ¶ 9; Orloski Decl. ¶ 12.

CEM officials and meal service tracking data all confirm that CEM is meeting or exceeding constitutional and NDS standards. *See* Ex. O, [redacted], August 8, 2026, ("Meal Service Report"). Food service records and policies demonstrate that detainees receive three meals per day from registered dietitian-approved menus designed to provide approximately 3,000 calories daily, with accommodations for medically required and religious diets. Subia Decl. ¶¶ 19-20. Food preparation, transportation, reheating, and distribution follow established food safety procedures and meal service is electronically tracked. *See* Meal Service Report. Recent food-service logs recorded 54 of 54 meal-temperature readings at or above the required 165°F minimum, with temperatures ranging from 170°F to 197.2°F and no failed temperature checks, corrective actions, or flagged items reported. *Id*. Objective records are far more reliable for evaluating food services than Plaintiffs' anecdotal and unsubstantiated descriptions.

Plaintiffs offer no evidence showing widespread or persistent food safety failures, nor do they identify systemic deficiencies in meal preparation or distribution. Plaintiffs similarly rely on individual gastrointestinal complaints. ECF No. 52 at 9. These allegations establish neither causation nor a facility-wide constitutional violation. *Berry*, 192 F.3d at 507–08; *Shepherd*, 591 F.3d at 454. Plaintiffs' allegations are speculative and anecdotal. *See Bell*, 441 U.S. at 538–39. The overwhelming evidence of food service operations directly contradicts Plaintiffs' claims.

Plaintiffs also claim that inadequate food causes irritability, weakness, stress, anxiety, and conflict among detainees. ECF No. 52 at 9. Those allegations are simply unsupported. Plaintiffs

provide no evidence demonstrating that any tensions among detainees are attributable to food service, as opposed to the ordinary stresses of detention. Nor do subjective complaints concerning mood or interpersonal disputes demonstrate nutritional inadequacy. *See Berry*, 192 F.3d at 507–08. The Constitution does not guarantee detainees' preferred meals, culinary variety, or freedom from dissatisfaction, but only requires food sufficient to maintain health and basic nutritional needs. *See Berry*, 192 F.3d at 507–08. Plaintiffs have not shown otherwise.

Plaintiffs' allegations regarding lack of accommodation for special diets are further unsupported. ECF No. 52 at 9. CEM maintains documented procedures for evaluating medical conditions at intake, tracking chronic care needs, incorporating dietary restrictions into meal management, and providing specialized medical and religious meals when indicated. SOP 057; SOP 045; Subia Decl. ¶ 20. Anecdotal reports from individual detainees do not establish pervasive practice, systemic deprivation, or facility-wide denial of medically necessary dietary accommodations. *See Shepherd*, 591 F.3d at 452–54; *Hare*, 74 F.3d at 644–45.

Nor do hunger strikes and detainee protests demonstrate constitutional deficiencies in food service. *In re Soliman*, 134 F. Supp. 2d 1238, 1240–44 (N.D. Ala. 2001) (holding hunger strikes are a voluntary refusal to eat rather than proof that detention conditions were unconstitutional). Dissatisfaction, however, is not the constitutional test. *See Bell*, 441 U.S. at 538–40. CEM provides nutritionally adequate meals through reasonable food-service procedures. *See Berry*, 192 F.3d at 507–08.

In short, Plaintiffs attempt to elevate subjective complaints, isolated incidents, and anecdotal reports regarding nutrition into a systemic constitutional claim. But the objective evidence demonstrates that CEM maintains dietician-certified menus, food safety protocols, meal-tracking systems, and ongoing medical oversight. Plaintiffs have not shown widespread

deprivation, deliberate indifference, or conditions that are arbitrary, purposeless, or excessive in relation to legitimate governmental objectives. *Bell*, 441 U.S. at 538–40. Accordingly, they fail to establish that CEM's food-service operations constitute unconstitutional punishment required for a preliminary injunction. *City of Dallas*, 847 F.3d at 285.

## V. GROOMING AND HYGIENE MEETS OR EXCEEDS CONSTITUTIONAL AND NATIONAL DETENTION STANDARDS.

Plaintiffs allege that detainees lack sufficient soap and shampoo, must ration hygiene products, have restricted access to razors and nail clippers, and experience prolonged waits for barber services. ECF No. 52 at 8-10. The allegations do not establish constitutional deprivation because they concern the convenience and timing of hygiene and grooming services, not the denial of basic sanitation or hygiene. *Bell*, 441 U.S. at 539; *Hernandez*, 522 F.3d at 560–61. Consistent with NDS, CEM provides detainees with hygiene supplies, replenishes those supplies as necessary, and maintains controlled distribution procedures for razors and similar items for safety and security purposes. Subia Decl. ¶ 22; NDS 2026 Standards 2.1(E), 4.4(F). Plaintiffs' allegations concern only the timing and manner of distribution of hygiene and grooming services, not their denial. Again, the standard for the constitutionality of detention is that basic necessities are being met, not that every possible convenience is being provided. *Bell*, 441 U.S. at 539; *Hernandez*, 522 F.3d at 560–61. With respect to hygiene supplies, detainees are provided with hygiene packs, including combined shampoo, conditioner, and body wash products which are standard-issue at intake and regularly thereafter. Subia Decl. ¶ 22. Detainees receive regularly laundered clothing and linens through an RFID-tracked system that incorporates sanitation controls, contamination safeguards, cleaning logs, and accountability measures. *Id*. ¶¶ 26-30. These procedures are consistent with NDS laundry and linen exchange requirements. NDS 2026 Standard 4.4(G).

Plaintiffs likewise challenge restrictions on razors and nail clippers. ECF No. 52 at 9-10. But those allegations ignore the fact that, for safety reasons, razors and nail clippers are controlled items. NDS 2026 Standard 4.4(F). That policy reflects obvious and legitimate security concerns in a congregate detention setting and is consistent with NDS, which expressly provides that "[t]he distribution of razors shall be strictly controlled." *Id.* Detainees access grooming resources through controlled razor distribution, tracked grooming supplies, barber shop services, and established grooming procedures. Subia Decl. ¶¶ 22, 24-30. NDS likewise contemplates regulated facility control of potentially dangerous items and contraband. *See* NDS 2026 Standards 1.2(H)(1), 2.3(H); *Bell*, 441 U.S. at 540.

Plaintiffs further allege lengthy waits for barber services and limited opportunities to obtain haircuts or nail care. ECF No. 52 at 9-10. The Constitution and NDS, however, do not require on-demand access to hygiene services or guarantee immediate access to barber appointments. *Bell*, 441 U.S. at 539; NDS 2026 Standards 1.2(H)(1) (regulating sanitation and operation of barber services without prescribing any minimum frequency or response time for haircuts), 4.4(F) (requiring provision of hygiene items while permitting controlled distribution of grooming implements for safety and security purposes). CEM maintains a barber shop, provides access to grooming tools through controlled procedures, tracks those items electronically, and offers grooming services through established scheduling systems. Subia Decl. ¶ 22. Plaintiffs describe brief, temporally limited operational delays, not unconstitutional deprivation.

Finally, Plaintiffs point to an allegation that a detainee was told to "bite" their nails. ECF No. 52 at 10. Assuming arguendo such a statement was made, a single isolated comment does not establish a facility policy, a systemic practice, or a constitutional violation. *Hare*, 74 F.3d at 644–

45; *Shepherd*, 591 F.3d at 454. Plaintiffs cannot transform one alleged interaction into evidence that CEM is denying detainees access to basic grooming services.

In short, CEM maintains hygiene-product distribution systems, inventory controls, grooming procedures, barber services, and ongoing corrective measures. Plaintiffs' allegations concern in large part the timing, convenience, or sufficiency of those services, not their absence. Because Plaintiffs have not shown that CEM systematically denies access to basic hygiene or grooming needs, they cannot demonstrate that these practices are arbitrary, purposeless, or punitive. *See Bell*, 441 U.S. at 538–40.

### B. RECREATION AND PROGRAMMING MEET DETENTION STANDARDS

To prevail on a Fifth Amendment claim challenging conditions of confinement, Plaintiffs must demonstrate that CEM's conditions bear no reasonable relation to the purpose of their confinement. *Brown v. Taylor*, 911 F.3d 235, 243 (5th Cir. 2018) (citing *Seling v. Young*, 531 U.S. 250, 265 (2001)). Conditions, both indoors and outdoors, comply with national standards, and CEM is working continuously to make improvements.

Detainees do not stay in their beds all day. Instead, they have various recreational and other programming to engage in throughout the day. As to recreation indoors, the National Detention Standards (NDS) require that dayrooms "offer board games, television, leisure reading materials, and other sedentary activities." NDS 2026 Standard 5.2(C)(7). This is exactly what CEM offers. Detainees have access to televisions, tablets, and books. Oslund Decl. ¶¶ 8-14. There are televisions in the pods, which often play Spanish language programming, as encouraged by the NDS. *See* NDS 2026 Standard 5.2(C)(8); Subia Decl. ¶ 45. There are 18 tablets per pod, which detainees can use to message loved ones, watch movies, listen to music, or read books in multiple languages. *See* Oslund Decl. ¶¶ 5, 8, 14. This quantity of tablets has been adequate to meet demand,

and CEM staff are unaware of any disputes occurring over tablet access. Oslund Decl. ¶ 9. Additionally, physical copies of books are available free of charge at the library. Ex. X, [redacted] Handbook"), p. 33. These resources are ample for the population.

CEM also provides sufficient access to legal materials. There is a law library, which provides detainees with computers dedicated to accessing LexisNexis and other legal research materials. Oslund Decl. at ¶¶ 15-16; [redacted] Handbook, p. 33. Again, this is in accordance with the NDS. *See* NDS 2026 Standard 6.3(A)-(B).

As to other indoor activities, detainees are not prohibited from making religious art or engaging in religious practices. Subia Decl. ¶¶ 80, 84. Each detainee is provided with their own lockable bag that stays with them in their housing unit. *Id.* ¶ 23. If detainees wish to keep any art or religious items, they are allowed to keep them in their bag. *Id.* ¶ 84. CEM employs a Religious Coordinator, who is tasked with ensuring adequate opportunities for detainees to engage in religious practices. *Id.* ¶ 82. Currently, Catholic mass and non-denominational Chrisian services are provided twice per week. *Id.* ¶ 81. Further, on-demand religious content is available on the tablets. Oslund Decl. at ¶ 8.

CEM also complies with the NDS with respect to outdoor time. Subia Decl. ¶ 43. For facilities with outdoor space, NDS require one hour of outdoor access five days per week, "[w]eather permitting." NDS 2026 Standard 5.2(A)(1). One hour of outdoor recreational time is consistent with federal regulations for pretrial detainees. 8 C.F.R. § 551.115(b)(1). CEM's schedule for access to the recreation yard is designed accordingly. Detainees are placed on a rotating schedule by pod to receive outdoor time during a different period each day, at least five days per week. Ex. P, [redacted] Camp East Montana, September 14, 2026,

through September 20, 2026, ("[redacted] Even detainees in isolation for illness or in disciplinary segregation receive outdoor recreation. *See* [redacted], at Echo; Ex. K, [redacted] ("SMU") [redacted], ("SMU Policy"), August 11, 2026.

The outdoor space, a combination of covered and uncovered areas, is also compliant with NDS. NDS has no specific requirements for recreation yards. Indeed, they do not even require facilities to offer outdoor space, permitting purely indoor recreation. *See* NDS 2025 Standard 5.2(A)(2). CEM offers substantial outdoor space that is far from cramped and more than adequate for physical activity or rest. Subia Decl. ¶ 24. Detainees use time in the recreation yard to play sports, talk, or pray. To improve the experience of detainees, CEM has installed soccer nets and is in the process of obtaining additional exercise equipment. Subia Decl. ¶ 24. Overall, CEM provides recreation and programming that satisfies the NDS and is far from inflicting a constitutional injury.

Plaintiffs' reliance on the opinion testimony of Mr. Dean Williams cannot save their claims for the simple reason that this declarant has never so much as stepped foot in CEM. His conclusions are based, rather, primarily on review of outdated reports and Plaintiffs' declarations. These are flatly contradicted by current conditions at CEM.

### C. THERE IS NO SYSTEMATIC ABUSE OR HARASSMENT AT CEM

Detention facilities have wide latitude to adopt policies and practices "to preserve internal order and discipline and to maintain institutional security." *Bell*, 441 U.S. at 546–47. Among other practices, facilities may require pat searches to be conducted prior to internal movement. *Welsh v. McLane*, No. A-23-CV-00969-RP, 2026 WL 2414750, *14 (W.D. Tex. Aug. 18, 2026).

Plaintiffs complain that guards search them as they are moved throughout CEM, but such searches are a standard part of detention necessary to locate contraband and ensure the safety of detainees and staff. NDS 2026 Standard 2.7; Subia Decl. ¶ 49. Indeed, the NDS allow guards to conduct pat searches, "a sliding or patting of the hands over the clothed body of a detainee," and

strip searches, "a search that requires a person to remove or arrange some or all clothing." NDS 2026 Standard 2.7(C)(1)(a), (2)(a). This practice is wholly legitimate.

The same is true as to the use of segregation. Detainees may request segregation or may be involuntarily placed into segregation. SMU [redacted] at 1. Plaintiffs' own declarants' experiences show the range of appropriate reasons a detainee may be placed into disciplinary segregation: engaging in disruptive conduct, refusing orders, assaulting staff, or fighting with other detainees. *See* Ex. Q, CEM [redacted] They also illustrate some of the reasons a detainee may be placed in administrative segregation, such as for medical observation or protective custody. *Id.*

CEM complies with appropriate processes for the use of segregation. Before placement in administrative segregation, staff must document the reason for separation and why less restrictive alternatives are insufficient. *See* SMU Policy. Disciplinary segregation may be imposed only after the CEM disciplinary process, including a hearing and written disciplinary order. *Id*. Continued segregation is subject to required supervisory and periodic review. *Id*. This exact procedure was followed as to Plaintiffs' own declarants. *See, e.g.*, Ex. S, [redacted], ("Angye [redacted]"). Additionally, all but one of Plaintiffs' declarants were in segregation for less than the presumptive thirty-day maximum permitted by the NDS, and many were only in segregation for a few days. CEM Segregation List. When segregation is used, it is done to address issues at CEM and in compliance with the NDS.

Further, guards only use force when necessary to preserve order and security. *See* NDS 2026 Standard 2.8. The vast majority of incidents are resolved without the use of force, particularly for minor infractions. Again, the experiences of Plaintiffs' own declarants show this to be true. *See, e.g.*, Ex. T, [redacted], ("[redacted] Report") (describing the confiscation of contraband items without escalation). Beyond their declarations,

Plaintiffs point only to a report released in June 2026 suggesting that standards related to security were not being met. *See* ECF No. 52 (citing ECF No. 54-9). But this report was largely focused on a death that occurred in January 2026, and before CEM changed contractors.

There are times when force is necessary to maintain security. In such circumstances, CEM follows the NDS as to use of force and record keeping and after-action review. *See* NDS 2026 Standard 2.8; Ex. L, CEM-NDS, [redacted]"). CEM has demonstrated its compliance as to Plaintiffs' own declarants. For example, when force was used during an altercation involving named Plaintiff Angye, CEM records explain that force was needed to apply restraints and used only when Angye "actively resisted and remained physically unwilling" to follow outtake procedures. *See* Angye [redacted]; Ex. R, CEM [redacted] The NDS permit force to be used in such circumstances, when a detainee's behavior threatens "the security and orderly operation of the facility." NDS 2026 Standard 2.8. Further, in contrast with Plaintiffs' assertions, the CCTV footage was retained, again demonstrating compliance with retention of evidence standards. Subia Decl. ¶ 57. Use of force is far from the norm at CEM and is reserved for only the infrequent circumstances when it is necessary. *Id.*

Plaintiffs' allegations regarding the use of chemical munitions are equally baseless. Chemical munitions have been used precisely once since April 2026, when pepper spray was used in response to a riot. *See* CEM [redacted]. This is the exact opposite of deploying munitions "indiscriminately." ECF No. 52 at 12. Chemical munitions, like force in general, are used only when necessary, and their use is documented.

Detainees, in alignment with NDS, may submit grievances regarding any concerns. *See* NDS 2026 Standard 2.10(B). [redacted] handbook, which all detainees have access to on the tablets, instructs them on how to do so. Oslund Decl. ¶ 11. Electronic grievances can be filed using a tablet.

*See id.* at ¶ 12. Alternatively, they may fill out a written grievance. Subia Decl. ¶ 41. Concerns are investigated as soon as possible, with informal grievances generally receiving a response within five business days and emergency grievances receiving a response within 24 hours. *Id.* ¶¶ 38-39. Detainees may easily identify guards against whom they wish to submit a grievance because guards in cells must wear nametags and other guards must wear badges that list their names. *Id.* ¶ 36. Again, as Plaintiffs' declarants show, detainees are both willing to submit grievances and able to identify guards. *See, e.g.*, Angye [redacted] (detainee grievance submitted against a sergeant identified by name); Ex. U, [redacted], ("[redacted] Report") (grievance submitted for dental repair because of fight with other detainee). The notion that detainees are not comfortable enough to submit grievances or think it is fruitless is pure fiction, as CEM records show grievances are filed regularly. *See* Oslund Decl. at ¶ 12.

On the whole, guards speak respectfully to detainees and often have positive interactions with them. Subia Decl. ¶36. In the rare event that a guard does use profanity, such language alone is not a constitutional injury. *See McFadden v. Lucas*, 713 F.2d 143, 146 (5th Cir. 1983). Nor is a threat to place a detainee in segregation. *Id.* Nor is speaking a language the detainee does not understand, as long as the encounter is not about the detainee's core rights. *Cf. U. S. ex rel. Negron v. State of N. Y.*, 310 F. Supp. 1304, 1307 (E.D.N.Y. 1970).

It is true that the option to seek voluntary departure is discussed with eligible detainees. Subia Decl. ¶ 9; Marin Decl. ¶ 14. This is done to inform detainees of their rights and to permit those eligible to request voluntary departure. *Id.* Making detainees aware of voluntary departure is not itself injurious and cannot support a claim of a constitutional violation. *Cf. Advocs. for Advocs. for Hum. Rts. v. U.S. Dep't of Homeland Sec.*, 825 F. Supp. 3d 858, 873, 888 (D. Minn. 2026).

### D. HEALTHCARE AT CEM MEETS DETENTION STANDARDS

Recent review of CEM shows near perfect compliance with NDS standards from intake to outtake. *See* [redacted]. At intake, initial medical inspections are performed and sick individuals are quarantined. SOP 057. As of June 2026, review showed that initial medical screenings were performed within twelve hours for 100% of detainees. [redacted], at 10. CEM also begins acting almost immediately to provide needed prescriptions, stocking a range of medications and contracting with a local pharmacy to get prescriptions that are not in stock within one day. Exhibit Y, [redacted] SOP 064 – [redacted] ("SOP 064"). Similarly, at outtake, detainees are given a clinically sufficient quantity of their prescriptions to avoid disruptions in care. SOP 045. As of June 2026, review showed that there was only one documented instance of needed medication being missed consecutively and that this was because the detainee had left CEM. [redacted], at 4.

While in detention, detainees receive emergency medical care around the clock, meaning if a detainee seeks care at any hour, he will receive it as soon as possible. Exhibit Z, [redacted] SOP 074 – [redacted] ("SOP 074"). Overall, CEM has perfect compliance in the provision of urgent care. [redacted], at 5. Triaging procedures are in place to provide care most quickly for detainees whose condition necessitates a rapid response, and if CEM cannot adequately respond detainees are transferred to another facility or the emergency room. SOP 074. For non-emergencies, regular clinically appropriate follow-up visits are scheduled within normal business hours. Exhibit AA, [redacted] SOP 042 – [redacted] ("SOP 042"). Space is more than sufficient for medical visits, especially in light of forthcoming updates to the medical facility and other enhancements. Orloski Decl. at ¶ 19.

Detainees are free to request their medical records at any time. Exhibit BB, [redacted] SOP 063 – [redacted] ("SOP 063"). These

records are processed and produced promptly while the detainee is still detained but may be subject to delays after release. *Id*. As of June 2026, perfect compliance with medical recordkeeping was observed. [redacted], at 4.

Further, review showed appropriate management of care for the same chronic conditions Plaintiffs take issue with: HIV (100% compliance), hypertension (100% compliance), and diabetes (92% compliance). [redacted], at 2. Review also showed perfect compliance with suicide screening and treatment of disability. *Id*. at 4. It is true that, in June, deficiencies were identified related to care for detainees with asthma, but subsequently, a new policy has been drafted to address these. *Id.*

Additionally, the new contractor made a number of substantial changes to healthcare. It has undertaken improvements to the medical unit, exam rooms, and pods to more quickly and adequately treat health conditions. Orloski Decl. ¶ 19. It has also undertaken substantial steps to address mental health concerns, increasing medical staffing for behavioral and mental health, creating dedicated mental and behavioral health units and a structured suicide prevention program, and implementing improved mental health screening procedures. *Id.* at ¶¶ 15-18.

Regardless of all possible precaution, some detainees will inevitably get sick, but "[a] detainee does not establish a conditions of confinement case merely by alleging that the detention center has disease or infection present as 'the incidence of diseases or infections, standing alone, [cannot] imply unconstitutional confinement conditions, since any densely populated residence may be subject to outbreaks.'" *Toure*, 2021 WL 75698, at *3 (citing *Shepherd*, 591 F.3d at 454). Rather, what is important is that CEM is regularly cleaned, provides adequate hygienic supplies to avoid outbreaks, and quarantines those who are sick. *See* Janitorial Report; Subia Decl. ¶ 25.

Looking specifically at compliance with the NDS: "[t]here were no deficiencies identified during the quality of medical care review." *Id.* Overall, CEM had a 96% rate of overall compliance with medical standards, with twelve sections reviewed achieving 100% compliance. *See* [redacted], at 1. A facility only needs to achieve 80% compliance to meet expectations. *See* Ex. I, [redacted], June 3, 2026, "[redacted]," at 3. The June 2026 review "did not reveal that there were any possible barriers to care or repetitive concerns that could affect clinical care." [redacted], at 3. Simply put, recent reviews show near perfect compliance in the area of medical care.

Again, Plaintiffs alleged "expert" opinion testimony, which is based not on observation of CEM conditions but primarily on review of outdated reports, old medical records, and Plaintiffs' declarations, does nothing to save their claims. The records relied on were at times incomplete due to the then-ongoing transition to an online repository and represented only a sliver of treatment that Plaintiffs' expert himself recognized "warrant[s] a fuller evaluation." ECF No. 52-3 at 5. Additionally, Plaintiffs' declarations are inaccurate and contradicted by current conditions. The practices Plaintiffs complain of perhaps would be "ridiculous" if they were happening—they are not. On the contrary, CEM offers adequate care in compliance with NDS standards and thus Plaintiffs cannot prevail on their claims.

## II. PLAINTIFFS WILL NOT SUFFER IRREPARABLE INJURY

To demonstrate irreparable injury, Plaintiffs "must show a real and immediate threat of future or continuing injury apart from any past injury." *Martinez v. Noem*, No. 5:25-CV-01007-JKP, 2025 WL 2598379, at *4 (W.D. Tex. Sep. 8, 2026) (citing *Aransas Project v. Shaw*, 775 F.3d 641, 648 (5th Cir. 2014)). A plaintiff's "delay in seeking a preliminary injunction counsels against

a finding of irreparable harm." *Tex. Ass'n of Sch. Bds. v. Texans for Excellence in Educ., Inc.*, No. 1:25-CV-1863-DH, 2026 WL 2808318, at *9 (May 13, 2026) (collecting cases).

Plaintiffs do not show that they are at risk of either an ongoing or future injury. Their motion relies largely on months-old declarations, many of which were made by detainees that were housed at CEM before the current contractor was hired and thus are not indicative of current or future conditions. Even their more recent declarations are flatly contradicted by the actual conditions at CEM and otherwise do not support claims of constitutional injury. Moreover, Plaintiffs filed their Complaint on May 29, 2026, but waited until October 15, 2026, to seek a preliminary injunction. *See* ECF No. 1, 52. Just like the plaintiffs in *Tex. Ass'n of Sch. Bds*, Plaintiffs "delayed at least five months in seeking a preliminary injunction." *Tex. Ass'n of Sch. Bds*, 2026 WL 2808318, at *9. "Absent a good explanation, a substantial period of delay militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief." *Wireless Agents, LLC v. T-Mobile USA, Inc.*, Civ. No. 3:05-cv-0094, 2006 WL 1540587, at *4 (N.D. Tex. June 6, 2006). Because Plaintiffs are not at risk of present or future injury and have not acted in a way indicative of an immediate threat that must be redressed, they have not established a threat of irreparable harm.

## III. THE EQUITIES AND PUBLIC INTEREST DO NOT SHOW THE NEED FOR A PRELIMINARY INJUNCTION

In ruling on the equities and the public interest, a court "must balance the competing claims of injury and consider the effect on each party of the granting or withholding of the requested relief." *Rosa v. McAleenan*, 583 F. Supp. 3d 850 (S.D. Tex. 2019). The equities and public interest "merge when the government is the opposing party." *United States v. Texas*, 97 F.4th 268, 274 (5th Cir. 2024) (quoting *Nken v. Holder*, 556 U.S. 418, 426, (2009)).

As to Plaintiffs, the requested relief would be without any benefit. First, none of the named Plaintiffs remain at CEM, and a class has not been certified. More crucially, Plaintiffs request plans to be developed to ensure adequate health care and other conditions of confinement, but health care and other conditions are already adequate, and plans are in place to ensure this remains true. Plaintiffs' proposed relief, therefore, accomplishes little. In contrast, the burden on the government —and thus on the public— would be substantial. Plaintiffs request the appointment of independent monitors, who would enter CEM at least once every three months and be paid for by the government. This is an unnecessary strain on CEM's operations and on the American taxpayer, especially in light of the current conditions at CEM. As such, the equities and public interest weigh strongly against granting a preliminary injunction.

## IV. PLAINTIFFS SHOULD BE REQUIRED TO POST A SECURITY BOND

The Federal Rules of Civil Procedure require the party moving for a preliminary injunction to give security in the amount necessary to pay costs and damages if the injunction is later found to have been in error. Fed. R. Civ. P. 65(c); *Qin v. Partnerships & Unincorporated Associations on Schedule "A"*, No. 6:21-CV-1243-ADA, 2022 WL 80274, at *5 (W.D. Tex. Jan. 7, 2022). In their request for a preliminary injunction, Plaintiffs would require the government to pay for a third-party monitor for the duration of litigation. *See* ECF No. 52-1 at 10. Doing so would come at a substantial expense. To protect the government from incurring such a large expense in error, Plaintiffs should be required to post a security bond.

## CONCLUSION

For all these reasons, the Court should deny Plaintiffs' motion for an injunction in its entirety. If the Court grants Plaintiffs' motion in whole or in part, it should require Plaintiffs to post a security bond.

DATED: November 23, 2026

Respectfully Submitted,

JONATHAN D. GUYNN
Acting Assistant Attorney General
Civil Division

SAMUEL P. GO
Assistant Director

BRIAN V. SCHAEFFER
DOMINIC A. WEISS
Trial Attorney

NICHOLAS K. GHEZAVAT
Law Clerk*

*/s/ Shane A. Young*
SHANE A. YOUNG
Trial Attorney
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 532-4946
Shane.a.young@usdoj.gov

ATTORNEYS FOR DEFENDANTS

**Admitted to practice in Illinois. Application for admission to this Court pending.*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on November 23, 2026, I electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to the following CM/ECF participant, and all other registered participants:

AMERICAN CIVIL LIBERTIES UNION FOUNDATION
Kyle Virgien (*pro hac vice*)
Rita Lomio (*pro hac vice*)
Felipe Hernandez (*pro hac vice*)
425 California Street, 7th Floor
San Francisco, CA 94104
Tel.: (415) 343-0770
kvirgien@aclu.org
npp_rlomio@aclu.org
npp_fhernandez@aclu.org

ACLU FOUNDATION OF TEXAS, INC.
Savannah Kumar
Fabiola Alvelais
Edgar Saldivar
Adriana Pinon
P.O. Box 8306
Houston, TX 77288
Tel. (713) 942-8146
Fax (713) 942-8966
skumar@aclutx.org
falvelais@aclutx.org
esaldivar@aclutx.org
apinon@aclutx.org

*/s/ Shane A. Young*
SHANE A. YOUNG
Trial Attorney
U.S. Department of Justice, Civil Division
Office of Immigration Litigation