# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | |
|---|---|
| Gerald Akari Angye, *et al.*,<br>Plaintiffs,<br>v.<br>U.S. Immigration and Customs Enforcement, *et al.*,<br>Defendants. | Civil Action No.: 3:26-cv-1515-LS |

**DECLARATION OF DANIEL SUBIA**

I, Daniel Subia, declare the following under 28 U.S.C. § 1746, and state that under penalty of perjury that the following is true and correct to the best of my knowledge and belief:

1. I am the Assistant Field Office Director ("AFOD") for the U.S. Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), Enforcement and Removal Operations ("ERO") Office in El Paso, Texas

2. I have been employed by DHS ICE in various roles since November 30, 2003. I have been an AFOD with the El Paso Field Office since September 20, 2026. Prior to entering on duty as an AFOD with ERO El Paso, I was the AFOD with the San Antonio Field Office since July 30, 2023. I am responsible for the oversight of the South Texas ICE Processing Center and its operations since July 1, 2025. I also oversaw the Karnes County Immigration Processing Center and its operations since July 30, 2023.

3. I have experience utilizing ICE record systems to obtain information regarding specific aliens. ICE maintains electronic and paper records on aliens in the course of its regularly conducted business activity. These records are made in the course of regularly conducted business

activity at or near the time of relevant events by a person with knowledge of these events. In preparing this declaration, I have examined ICE official records, including the Enforce Alien Removal Module ("EARM"). EARM is the ICE electronic database utilized by ERO to maintain information regarding the custody and removal status of aliens. EARM is an electronic database ordinarily relied upon to ascertain an alien's immigration and criminal history, current case status, and plans for removal, if any.

4. I hereby submit this declaration in support of Defendants' Response in Opposition to Plaintiffs' Motion for Preliminary Injunction in the above captioned case.

5. The statements contained in this declaration are based upon my personal knowledge, reasonable inquiry, and information made available to me in the course of my official duties from information obtained from records, systems, databases, other DHS employees, and/or information portals maintained and relied upon by DHS.

**BACKGROUND**

6. ICE is the largest investigative branch of DHS and is charged with enforcement of more than 400 federal statutes. The agency was created after the September 11, 2001, terrorist attacks, by combining components of the former Immigration and Naturalization Service and the former U.S. Customs Service, among other agencies, to more effectively enforce federal immigration and customs laws and to protect the United States against terrorist attacks. The mission of ICE is to protect the United States from the cross-border crime and illegal immigration that threaten national security and public safety. To carry out that mission, ICE focuses on enforcing immigration laws, preventing terrorism, and combating transnational criminal threats. ICE consists of three core operational directorates: (1) ERO, which includes 25 field offices led by FODs; (2) Homeland Security Investigations (HSI), which includes 30 field offices led by

Special Agents-in-Charge; and (3) the Office of the Principal Legal Advisor, which has offices in 130 locations throughout the United States and at ICE Headquarters.

7. ERO deportation officers are immigration officers under 8 U.S.C. § 1357 and customs officers under 19 U.S.C. § 1589a. It is the mission of ERO to identify, arrest, and remove aliens who present a danger to national security or are a risk to public safety, as well as those who enter the United States illegally—including those who cross the border illegally, which is a federal misdemeanor, 8 U.S.C. § 1325, and those who illegally reenter after having been removed, which is a federal felony, 8 U.S.C. § 1326—or otherwise undermine the integrity of our immigration laws and our border control efforts.

8. The majority of ERO's immigration enforcement operations take place in the interior of the country. ERO manages all logistical aspects of the removal process by identifying, apprehending, initiating removal proceedings, and, when appropriate, detaining aliens during removal proceedings or if they are subject to a final order of removal, until their removal from the United States. ERO's enforcement activities include locating and taking into custody fugitive aliens and at-large criminal aliens, as well as identifying aliens in federal, state, and local prisons and jails, and working with those authorities to transfer such aliens to ICE custody without releasing them into the community. When aliens are ordered removed, ERO is responsible for safely repatriating them, or otherwise overseeing their departure from the United States.

9. Detention Centers, such as ERO El Paso Camp East Montana Detention Facility ("Camp East Montana") in Fort Bliss, Texas, exist to provide detainees with their Constitutional Due Process minimums, which include, among other provisions, access to counsel, medical care, and necessities, such as nutritional meals, beds, numerous showers, and clothing. This includes a robust medical unit with medical doctors, advanced practice providers, nurses, and numerous

support staff. Furthermore, Detention Facilities are governed by National Detention Standards (NDS), which establishes consistent conditions of confinement. While Camp East Montana was designed to house 5,000 detainees, the current population as of November 23, 2026, is 1,736. The size of the population is controlled to ensure that CEM can continue to meet the detention standards. The occupancy level of the entire facility and of each pod is closely managed, and CEM has discretion to decline proposed transfers. Additionally, the option to seek voluntary departure is discussed with eligible detainees in order to inform the eligible detainees of their rights and to permit them to request voluntary departure.

**CONTRACTOR TRANSITION**

10. The previous prime contractor was Acquisition Logistics LLC. Amentum, Inc. ("Amentum") became the new prime contractor in April 2026.

11. The government issued a formal Show Cause Notice pursuant to FAR 52.212-4, Contract Terms and Conditions-Commercial Products and Commercial Services, and FAR 49.607, due to significant violations of the terms and conditions of the contract. The contractor had failed to successfully perform under the terms and conditions of the agreement; the Government terminated the contract under the provisions for default of this contract.

**FOOD SERVICE**

12. ICE Office of Acquisition Management ("OAQ")/ERO implemented an ICE-designed Performance Work Statement (PWS) that closely aligned with NDS 2026 and ICE Health Service Corps (IHSC) policies. The new PWS significantly raised standards for medical care, food and nutrition, sanitation and housing, transportation, and case processing, specifically to close gaps revealed by the prior contractor's performance.

13. The Camp East Montana Food Service SOP establishes a standardized process for

detainee meal counts, approval, preparation, delivery, specialty diets, sanitation, and accountability.

14. Before each meal, Housing Unit Officers must physically count detainees actually present in each pod using Guardian bracelet scans, provide those counts to the Dorm Lieutenant, verify authorization for medical or religious meals, document refusals or absences, collect all remaining food and service items, and ensure waste is sealed and placed outside the dorm within one hour after meal completion. Dorm Lieutenants verify pod counts, ensure meals are not requested for empty pods or out-processed detainees, submit verified totals to Administrative Lieutenants, and ensure hot boxes are staged at their original delivery point after service. Administrative Lieutenants reconcile counts with current detainee locations, intake and out-processing activity, and medical and religious diet lists before submitting final meal orders to Food Service.

15. Orders are due by 0400 for breakfast, 0830 for lunch, and 1400 for dinner; late counts and post-delivery changes require express approval from Food Service Program Management. Medical submits updated diet lists by 1900 daily, and the Chaplain or Religious Coordinator submits updated approved religious-diet lists by 1900 each Monday, Wednesday, and Friday. Cups and water fountains providing filtered water are available in every pod.

16. Food Service prepares meals only according to verified orders, delivers meals by assigned dorm, pod, medical, or SMU location, obtains Security signatures when hot boxes are transferred, and retrieves all hot boxes within 1.5 hours of delivery.

17. Individually packaged frozen meals, including special-diet meals, are delivered from a USDA-inspected facility to the El Paso, Texas base camp; the meals are stored frozen, reheated, hot-held, and transported hot to detainees in housing units. These operations are intended

to comply with NDS 2025 food-safety requirements and FDA Food Code guidelines through sanitation and time-temperature controls during receiving, storage, reheating, hot holding, and transport, including maintaining cold foods at or below 41°F and hot foods at or above 135°F to prevent food from remaining in the temperature danger zone.

18. Sack meals are limited to intake, out-processing, and court movements and must be requested at 0400, 1000, and 1900 daily. All departments must retain records for audits and inspections, and discrepancies, inflated counts, sanitation failures, or other noncompliance are to be referred to Food Service Program Management for corrective action.

19. The November 2026 menu plan reflects a rotating, seven-day meal cycle consisting of breakfast, lunch, and dinner, with daily offerings that vary among poultry, beef, turkey, pasta, rice, beans, vegetables, fruit, cereal or cereal bars, milk, tortillas, and cookies. The standard menu includes breakfast selections such as eggs, omelets, oatmeal, waffles, French toast, biscuits and gravy, and breakfast burritos; lunch selections such as chicken bowls, chicken sofrito, chicken tamales, pasta dishes, beef goulash, and chili; and dinner selections such as chicken fajitas, chicken marsala, turkey tacos, meatballs, beef dishes, pasta, rice, beans, and vegetables.

20. The plans provide approximately 2,925 to 3,105 total calories per day and state that the weekly vendor-provided meals average approximately 2,300 to 2,400 calories daily, subject to Registered Dietitian approval.

**HOUSING / HYGIENE**

21. At intake, detainees' personal property, funds, and valuables are inventoried, documented, and secured. Detainees are issued identification bracelets and assigned to a housing unit following classification based on applicable factors, including criminal history and security considerations. Detainees are classified at appropriate custody levels, including high, medium-

high, medium-low, and low custody levels.

22. During intake, detainees have access to filtered water and are issued hygiene and bedding items, including blankets, sheets, towels, washcloths, undergarments, socks, sweaters, laundry bags, and personal-property bags. Hygiene items include combs, shampoo, lotion, deodorant, toothpaste, and toothbrushes. Detainees are also provided separate bags for personal property and soiled clothing. Additional hygiene products are located within the pods and are distributed by guards upon request. Detainees also may request shaving supplies, which are provided on an as-requested basis due to safety concerns. Detainees are able to visit Camp East Montana's barber shop once per week and detainees have access to nail clippers at the barber shop. The barber shop provides access to grooming tools through controlled procedures, tracks those items electronically, and offers grooming services through established scheduling systems.

23. The facility has implemented procedures to improve the storage and accountability of detainees' high-value personal items, including medications, books, and photographs. Such items may be secured in clear plastic storage bags.

24. The facility provides recreational opportunities for detainees. Recent and planned improvements include the addition of soccer nets in recreation areas and the planned acquisition of outdoor weights and a multi-use exercise station. The facility also uses incentives, including access to PlayStation activities, for housing-unit competitions and other appropriate programming. Camp East Montana offers substantial outdoor space that is far from cramped and more than adequate for physical activity or rest.

25. Housekeeping and cleaning services are currently performed on a scheduled basis. The facility anticipates increasing the frequency of housing-area cleaning from once per week to up to three times per week as implementation continues. Camp East Montana is regularly cleaned,

provides adequate hygienic supplies to avoid outbreaks, and quarantines those who are sick.

26. The Camp East Montana Laundry Standard Operating Procedure ("Laundry SOP") establishes procedures for the sanitary, timely, and accountable collection, cleaning, and return of detainee-issued clothing, linens, and towels in accordance with ICE National Detention Standards. Under the Laundry SOP, issued clothing is laundered twice weekly, while issued towels and linens, including sheets, pillowcases, blankets, and towels, are laundered weekly. Personal items are not laundered under the Laundry SOP.

27. Housing-unit clothing is collected and returned through RFID-equipped laundry bags tracked in the Guardian system. The bags are assigned to individual detainees and remain associated with the detainee when the detainee moves to another housing pod. Housing Officers are responsible for ensuring that laundry is collected, scanned, placed in designated bins for pickup, and recorded on the laundry register. They are also responsible for scanning returned RFID bags and distributing them to the detainee identified in Guardian.

28. Laundry personnel collect bags according to the posted schedule, inspect bins before accepting them, and obtain staff signatures documenting pickup and delivery. Clean laundry is to be returned to housing units within 48 hours of pickup. The Laundry SOP requires the use of detergent, bleach, and dryer sheets; complete drying of laundry to reduce the risk of mold or bacterial growth; and separation of clean and soiled work areas. Gray bins are used for clean laundry, and red bins are used for soiled laundry.

29. Items contaminated with bodily fluids or suspected exposure to communicable disease, parasites, or harmful chemicals must be segregated and may not enter standard laundry machines without authorization from the Site Supervisor or Laundry Supervisor. The Laundry SOP also requires appropriate personal protective equipment when handling soiled laundry,

handwashing, daily cleaning and sanitization of machines and bins, documented cleaning logs, and procedures intended to reduce mold growth.

30. Damaged clothing items and RFID laundry bags must be documented in Damaged Laundry Reports. Replacement items are provided when available, and RFID tags are recovered from unusable bags. Laundry registers record collection and delivery locations, times, staff signatures, and bin identification. These records are reviewed weekly and archived monthly.

**GUARDIAN SYSTEM**

31. Camp East Montana uses the Guardian system to assist in tracking detainee movement, meal service, facility checks, recreation, laundry, tablet access, and other operational activities. Detainees are issued RFID bracelets during intake, which are removed when the detainee is transferred or removed from the facility.

32. Guardian records detainee movement between locations, including movement from housing units to medical services or recreation areas. During satellite meal service, staff scan detainee RFID bracelets to document the distribution of meals. Officers also use the system to document assumption of posts and completion of required checks in housing units.

33. Guardian includes compliance-monitoring features that indicate the status of required staff activities. The system uses a color-coded display: green indicates compliance; yellow indicates that a required activity is approaching its due time; and red indicates that the required activity is overdue.

34. The system also supports the identification of certain medical cohorts, precautions, special diets, medication needs, and other special-status information relevant to detainee care and operations.

## GRIEVANCES

35. The Camp East Montana Grievance System Policy establishes a documented process through which detainees may raise concerns regarding facility conditions, services, treatment, property, programs, staff conduct, safety, or access to services without retaliation.

36. Detainees are informed of the grievance process through orientation and the facility handbook. They have access to grievance forms and confidential submission methods. The policy provides for language assistance, reading assistance, interpretation, translation, and disability accommodations when needed. Detainees may easily identify guards against whom they wish to submit a grievance because guards in cells must wear nametags and other officers must wear badges that list their names. Generally, guards speak respectfully to detainees and often have positive interactions with them.

37. Detainees may attempt informal resolution through staff, but informal resolution is not required before filing a formal grievance, particularly when the grievance concerns staff misconduct, retaliation, sexual abuse, excessive force, discrimination, serious medical concerns, or immediate health or safety risks.

38. Informal grievances should receive a response within five business days. Formal grievances must be date-stamped, logged, assigned a tracking number, routed to the appropriate reviewer, and answered in writing within 15 business days.

39. Emergency grievances involving immediate risks of harm, urgent medical or mental-health needs, suicide risk, assault, sexual abuse, or unsafe conditions require immediate staff notification and protective action and must be addressed within 24 hours. This includes any Prison Rape Elimination Act ("PREA") allegation.

40. The policy requires referral of sensitive allegations to the appropriate supervisory,

medical, investigative, ICE/ERO, law enforcement, or other required authority. A staff member who is the subject of a grievance may not be the sole reviewer of that grievance.

41. Written grievance responses identify the outcome, provide an appropriate explanation, identify corrective action that may safely be shared, and explain available appeal rights. Appeals are reviewed by a higher-level or uninvolved authority when practicable and require a written decision within 10 business days. Detainees may also appeal to ICE/ERO, which is expected to respond within 10 business days of receipt.

42. The grievance policy prohibits retaliation, including threats, punishment, transfers, segregation, denial of privileges, or other adverse action based on a detainee's good-faith grievance activity. The facility maintains grievance and appeal records for at least three years and conducts periodic trend reviews to identify recurring issues, delays, staff patterns, and systemic concerns.

**RECREATION**

43. The Camp East Montana Recreation Policy requires the facility to provide detainees with regular, safe, equitable, and documented opportunities for indoor and/or outdoor recreation in accordance with ICE National Detention Standards.

44. Each housing unit or population group is to have an updated written recreation schedule identifying the days, times, locations, responsible staff, and movement procedures for recreation. Recreation schedules are to be communicated in a manner detainees can understand.

45. Outdoor recreation is provided when available and safe, considering weather, staffing, security, and operational conditions. When outdoor recreation is unavailable, indoor recreation may be provided. Recreation opportunities are intended to provide meaningful opportunities for physical activity. There are televisions in the pods, which often play Spanish language programming.

46. Recreation may not be denied or restricted except for documented safety, security, medical, disciplinary, or operational reasons authorized by policy. Detainees in special housing, medical observation, or other restricted settings must receive recreation opportunities appropriate to their circumstances when feasible. Recreation restrictions may not be imposed automatically solely because of placement status.

47. The policy provides for equal access and reasonable accommodations for detainees with disabilities, including accessible routes, adaptive equipment, alternative scheduling, or staff assistance when feasible. Staff inspect recreation areas and equipment before use, remove unsafe or damaged equipment from service, supervise detainees, conduct required counts and movement controls, and report incidents or hazards.

48. Recreation may be cancelled or modified for documented reasons, including extreme weather, air-quality concerns, maintenance hazards, emergencies, lockdowns, or staffing emergencies. Cancellations are logged, and make-up recreation is provided when practicable. The facility retains recreation schedules, daily logs, refusal and cancellation records, restriction and accommodation documentation, inspection and maintenance records, equipment inventories, incident reports, and corrective-action records.

**SEARCHES OF DETAINEES**

49. The Camp East Montana Search of Detainees Policy requires detainee, housing, and facility searches to be conducted by trained and authorized staff using the least intrusive method reasonably necessary to meet a legitimate security, safety, or investigative need.

50. Searches may not be used as punishment, retaliation, harassment, intimidation, or to humiliate a detainee. Staff are required to preserve detainees' dignity, privacy, civil rights, disability accommodations, language access, and sincerely held religious beliefs to the extent

consistent with security requirements.

51. Pat searches are conducted over clothing. Opposite-sex pat searches are limited to exigent circumstances or circumstances in which same-sex staff cannot be located after an earnest effort. Such searches require a witness and documentation in Guardian or the applicable search log.

52. Strip searches require specified authorization or circumstances, including reasonable suspicion, facility entry or re-entry, or applicable contact-visitation procedures. Strip searches must be conducted privately, normally by same-sex staff, and fully documented.

53. Body-cavity searches and x-rays are subject to heightened safeguards, including medical involvement, required approvals, reasonable suspicion where applicable, and detainee consent. The policy also addresses dry-cell placement and close observation when there is reasonable suspicion that contraband has been ingested or concealed.

54. Housing staff conduct frequent random and unannounced searches. Required searches include at least five randomly selected bunks per shift in each occupied housing pod, three randomly selected Special Management Unit cells per shift, common-area searches once per shift, and comprehensive pod searches every 30 days. Areas outside housing pods are searched on a documented 30-day cycle, and perimeter and vehicle-sally-port inspections occur once per shift.

55. Required searches must be promptly documented in the applicable housing-pod, area, intake, or dry-cell log. Supervisors and the Compliance Manager conduct recurring reviews and audits.

56. Contraband must be classified, secured, reported to a supervisor, preserved as evidence when appropriate, and maintained with an unbroken chain of custody. Contraband is stored in the Control Room Contraband Safe. Disposal or destruction requires written

authorization, supervisory witnessing, documentation, and, when applicable, coordination with ICE/ERO, law enforcement, or ICE's Office of Professional Responsibility. Evidence may not be destroyed while a related investigation, grievance, claim, disciplinary action, or litigation hold remains open.

## USE OF FORCE

57. The Camp East Montana Use of Force and Restraints Policy provides that force may be used only after reasonable efforts to obtain voluntary cooperation have failed, and only in the minimum amount necessary and reasonable to protect persons, prevent serious property damage, or maintain facility security and order. Force and restraints may not be used as punishment. For example, when force was used during an altercation involving named Plaintiff Angye, force was needed to apply restraints and used only when Angye actively resisted and remained physically unwilling to follow outtake procedures. Force is permitted to be used in circumstances where a detainee's behavior threatens the security of the facility. The CCTV footage of this incident was retained in compliance with appropriate retention of evidence standards related to use of force.

58. Staff are required to follow a graduated force continuum, beginning with officer presence and verbal commands and progressing to control techniques only as circumstances require. Deadly force is authorized only when an officer has probable cause to believe there is an imminent threat of death or serious physical injury. Deadly force may not be used solely to prevent an escape.

59. Staff must use approved techniques and equipment. The policy prohibits chokeholds and other neck restraints, intentionally striking sensitive areas except where deadly force would be justified, and restraints applied in a manner that restricts breathing or circulation,

causes unnecessary pain, or uses prohibited positions, including hog-tying.

60. Restraints must be used for the least amount of time necessary and must be monitored as required. Restraints must be removed or reduced when the detainee no longer presents a danger. Continued restraint after control is gained requires approval from the Officer in Charge.

61. Detainees subjected to force must receive a medical evaluation as soon as possible. Injuries and claimed injuries must be assessed and documented.

62. Calculated uses of force are preferred when there is no immediate threat and require advance authorization, medical consultation, trained staff, supervisory oversight, de-escalation efforts, and full audiovisual recording. Immediate force may be used without prior supervisory direction only in response to a serious and immediate threat, followed by prompt medical care and written reporting.

63. The policy imposes heightened restrictions for pregnant detainees. Pregnant detainees generally may not be restrained except in extraordinary, documented circumstances and with medical direction. Restraints are not permitted during active labor or delivery. The policy also requires medical or mental health consultation, when appropriate, before calculated force involving detainees with special needs.

64. Four- and five-point restraints are a last resort when less restrictive methods are ineffective. Their use requires 15-minute staff checks, medical monitoring at least twice per eight-hour shift, supervisory review at least every two hours, toilet opportunities, documentation in the Special Management Unit log, and Field Office notification if restraints continue for more than eight hours.

65. This policy requires each officer involved in an immediate use-of-force incident to

submit a written report to the shift supervisor by the end of the officer's shift. The shift supervisor must then provide a written report to the Officer in Charge, or designee, by the end of that tour of duty whenever force was used or a detainee remained in restraints.

66. For each use-of-force incident, staff must complete an ICE/ERO-approved use-of-force form identifying the detainee, staff members, and others involved, and describing the incident. If an intermediate force weapon is used, the report must identify the location of the strikes. Each involved staff member must also prepare a memorandum for the record. The completed use-of-force form and related medical reports must be submitted to the Officer in Charge by the end of the shift.

67. The policy requires copies of the completed report to be placed in the detainee's A-File and sent to the Field Office Director within two working days. The Field Office Director must be promptly notified of incidents involving intermediate force devices, hard-control techniques such as strikes or takedowns, deadly force, or progressive four- or five-point restraints.

68. Calculated uses of force require advance authorization from the Officer in Charge or designee and consultation with medical staff. The policy requires calculated use-of-force incidents to be audiovisually recorded, when feasible, and requires the recording and supporting documents to be included in the After-Action Review package.

69. When four- or five-point restraints are used, staff must document the detainee's condition at least every 15 minutes in the SMU logbook, and the shift supervisor must conduct and document a review at least every two hours. If these restraints continue for more than eight hours, the Officer in Charge must notify the Field Office Director and provide updates every eight hours until the restraints are removed.

70. Finally, the policy requires the facility to maintain a separate file for each use-of-

force incident. This file must include the written reports, medical documentation, audiovisual records, and the After-Action Review form, and it must be retained for at least six years.

**HVAC**

71. For the period of November 1 through November 7, 2026, DMG Rapid Global Solutions recorded completion of 100 HVAC preventive-maintenance work orders at Camp East Montana.

72. The listed work orders in the record include systems serving operational and detainee-support areas, including Court and Visitation, Health Services, the Kitchen, Segregation, Charlie housing, Laundry, the Law Library, Delta-East, office modulars, restroom trailers, and ICE administrative buildings.

73. The report for this period documents that scheduled HVAC preventive-maintenance activity was performed across a range of facility locations during the stated period.

**PEST CONTROL**

74. One of the commercial pest-control service records, dated November 1, 2026, documents lice treatment in Pod D9. The technician treated 76 bunk beds, including padding, mattresses, bed frames, cracks, crevices, and nearby surfaces, using Steri-Fab applied by handheld sprayer. Steri-Fab is an EPA-registered, non-residual liquid spray that acts as an insecticide, disinfectant, virucide, fungicide, mildewcide, and deodorizer in one formula. It is designed to treat mattresses, upholstery, carpets, and hard non-porous surfaces without staining or leaving active residue once dry.

75. The report also lists 328 exterior rodent bait stations throughout the facility, including stations near housing pods, the kitchen and dry-storage areas, segregation, health services, laundry, visitation, maintenance, administrative areas, intake and out-processing areas,

and other buildings.

## JANITORIAL RECORDS

76. The janitorial records consist of a weekly compilation of daily janitorial supervisor checklists for Camp East Montana covering November 1 through November 7, 2026. The checklists reflect that the janitorial team reported completing all scheduled cleaning tasks each day, with daily checklist scores of 100 percent and no flagged items or corrective actions.

77. In the event that any maintenance is needed, guards or detainees may report the maintenance request which is then routinely and quickly addressed.

78. The recurring daily checklists identify scheduled cleaning in staff break rooms, restroom trailers, medical areas, intake, offices, property, out-processing, Court and Visitation, and other administrative areas. The records also identify scheduled cleaning in specified housing pods on certain days, including Bravo and Delta pods on November 2, Delta and Echo pods on November 3, Charlie pods on November 4, and selected Echo pods on November 5.

79. Checklist entries generally reflect cleaning of hallways, common areas, restrooms, ramps, and designated housing-pod areas; sweeping and mopping of floors; and removal of trash. Some entries describe more detailed cleaning of Segregation, medical, intake, property, out-processing, Court and Visitation, and other identified spaces. The records also reflect use of floor-cleaning equipment in certain areas and cleaning of specific medical, intake, or operational spaces when accessible.

## RELIGIOUS PRACTICES POLICY

80. The Camp East Montana Religious Practices Policy requires the facility to provide detainees reasonable and equitable opportunities to practice their sincerely held faiths, including access to religious services, individual prayer, study materials, counseling, approved religious

property and apparel, religious diets, fasting accommodations, and observances, consistent with safety, security, sanitation, and orderly operations.

81. Participation is voluntary, and detainees may not be favored, penalized, harassed, or denied services because of their religion, belief system, lack of affiliation, nationality, language, disability, housing status, gender, or other protected status. Religious programs and schedules must be communicated in a manner detainees can understand, and the facility must provide language assistance and reasonable disability accommodations where needed. Catholic mass and non-denominational Chrisian services are provided twice per week.

82. Detainees may make religious accommodation requests verbally or in writing with the Religious Services Coordinator; requests must be reviewed promptly and individually, and any denial, modification, or restriction must be based on a legitimate documented concern and should consider a reasonable, less restrictive alternative. Detainees in restrictive housing, medical housing, protective custody, or the SMU must still receive reasonable religious-practice opportunities, although the format, location, supervision, or timing may be modified for safety.

83. Religious diets and fasting requests must be coordinated with Food Service and religious-services staff. A religious diet may not be denied, removed, or suspended without consultation with ICE/ERO and final approval by the Field Office Director or designee, and the detainee must receive written notice with appeal or reinstatement instructions.

84. Approved religious property, including texts, prayer rugs, beads, medallions, head coverings, and devotional materials, generally must be allowed unless a specific safety, security, sanitation, or contraband concern exists; staff must handle and search such items respectfully.

85. The facility must also maintain records for at least six years covering services, attendance when required, accommodation requests and decisions, diet actions, fasting and holiday

plans, religious property, volunteers and clergy, denials or restrictions, grievances, required ICE/ERO and FOD approvals, training, and corrective actions.

86. This declaration is based upon my personal knowledge and information made available to me in my official capacity. I provide this declaration based on the best of my knowledge, information, belief, and reasonable inquiry for the above captioned case. If called upon to testify, I could and would do so.

Executed this 23rd day of November 2026.

DANIEL J SUBIA
Digitally signed by DANIEL J SUBIA
Date: 2026.11.23 20:47:29 -07'00'

Daniel Subia
Assistant Field Office Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security