

# National Detention Standards

Revised 2026

U.S. Immigration
and Customs
Enforcement

# *Foreword*

## INTRODUCTION

U.S. Immigration and Customs Enforcement (ICE) is a federal agency charged with enforcing the nation's immigration laws effectively and fairly. ICE identifies, apprehends, detains, and removes individuals who are subject to removal from the United States. To fulfill this mission, ICE utilizes its detention authority to securely hold individuals in custody while they await the outcome of their immigration proceedings and/or removal from the United States.

The agency is committed to ensuring that all immigration detention operations adhere to constitutional standards governing the treatment of civil immigration detainees. Detention conditions shall be non-punitive and ensure the due process, health, safety, and security of all individuals in custody. Facilities and personnel are required to maintain conditions of confinement that meet or exceed established constitutional requirements, including access to adequate medical care, reasonable safety measures and humane living conditions.

The National Detention Standards (NDS) reflect ICE's ongoing commitment to collaborating with detention and law enforcement partners to enforce immigration laws while enhancing public safety and national security. These updated standards reflect ICE's strong relationships with law enforcement partners and recognize that detention facilities effectively manage their populations and support ICE by housing immigration detainees. Compliance with these standards is mandatory and shall guide policies, practices and oversight mechanisms related to civil immigration detention.

## BACKGROUND

The U.S. Department of Justice (DOJ) Immigration and Naturalization Service, ICE's predecessor agency, issued the original NDS in 2000. These standards established uniform guidelines and agency expectations for conditions of confinement, operations and management within the detention network. Over the past 25 years, immigration enforcement has evolved significantly, including the expansion of a network of dedicated immigration detention facilities. Despite this shift, ICE's broad scope of immigration enforcement requires continued collaboration with state and local law enforcement agencies and detention facility contractors, and reliance on their facilities to house detainees.

In 2019, ICE released a revised version of the NDS (NDS 2019) to streamline requirements, eliminate redundancies, and reduce the burden on detention facility contractors. NDS 2019 added three standards: Searches of Detainees; Sexual Abuse and Assault Prevention and Intervention; and Disability Identification, Assessment and Accommodation.

In 2025, ICE revised the NDS (NDS 2025) to align with the January 20, 2025, Executive Order,

"Defending Women from Gender Ideology Extremism and Restoring Biological Truth to The Federal Government." References to "gender" were replaced with "sex" throughout the standards. Additionally, ICE addressed the increased focus on immigration enforcement by significantly expanding detention capacity and broadening partnerships to accommodate the housing of aliens in ICE custody.

Nothing in these standards is intended, nor shall it be construed, as a waiver of federal supremacy or the immunity of the United States Government or its detention facility contractors. The standards applicable to the care, health, safety, and transportation of aliens in ICE custody are set forth in the applicable federal ICE detention standards.

## SPECIFIC AREAS OF CHANGE

In 2026, ICE revised NDS to further streamline ICE's standards, reduce the burden on our detention operators, and more closely align with the United States Marshals Service's Federal Performance-Based Detention Standards (FPBDS). ICE is implementing the following changes along with other technical edits to align with ICE's current organizational structure, the 2011 Performance-Based National Detention Standards, *revised* 2016 (PBNDS 2011), and the Non-Dedicated Intergovernmental Service Agreement Standards issued on March 26, 2025:

### *Language Assistance*

ICE added a new standard, 1.1 Language Assistance, to consolidate and emphasize obligations to identify detainees with limited English proficiency (LEP) (i.e., detainees who do not speak English as their primary language and who have limited ability to read, speak, write or understand English) and provide them with access to facility programs and activities through language interpretation and translation services at no cost to the detainees.

ICE also included language to reflect that in some circumstances language assistance can be provided via technology solutions using artificial intelligence (AI) such as machine learning translation or generative AI. In such instances, this technology will be used to the extent practicable during non-critical communication (i.e., moderate degree of importance, urgency, and significance) or during informal interactions with detainees. Machine Translation Technology would be used to communicate the general concept of a request or topic during a discussion or review of a non-vital document. Examples of such communication include collecting or relaying basic and scripted information to or from a detainee during intake; having an informal conversation with a detainee in the housing unit; reviewing and responding to a detainee's non-English grievance or other request related to basic issues/concerns within detention; etc.

Facilities must secure their own contract language assistance services. If a facility's language assistance services cannot accommodate a particular language, then ICE can provide support by offering contact information and other resources to assist in securing necessary interpretation services at no additional cost.

*Language Assistance and Disability Accommodations*

ICE included a note at the beginning of each standard to emphasize that the language assistance and disability accommodation requirements apply to all standards and aspects of detention.

*Admission and Release*

ICE included language that specifies the detention facility contractor does not have a right of refusal for any ICE detainee that ICE decides to detain. The contractor shall take all referrals from ICE. Exceptions may be allowed as determined by the Contracting Officer's Representative (COR) or ICE designated official.

*Special Management Units*

To align with ICE/ERO policy, all segregation placements, regardless of duration, require a segregation order. The facility administrator must notify ICE/ERO in writing as soon as possible, but no later than 72 hours of a detainee's initial placement in segregation.

To align with ICE/ERO policy, language was added to emphasize that the facility must evaluate the appropriateness of placing detainees with a significant mental illness (SMI) in segregation, monitor the detainee's care on an ongoing basis, and remove them from restricted housing if mental health staff determine that the placement has resulted in a deterioration of the detainee's mental health and an appropriate alternative is available.

*Disciplinary System*

ICE removed references to "competency." When a detainee demonstrates a suspected or diagnosed cognitive impairment, disability, or mental illness, the Institution Disciplinary Panel (IDP) or Disciplinary Hearing Officer (DHO) shall consult with the facility mental health provider for input regarding: the detainee's ability to understand the nature of the disciplinary proceedings and help in their own defense, the detainee's ability at the time of the conduct to appreciate the nature and quality or the wrongfulness of his or her acts, and any mitigating factors which may have contributed to their behavior.

*Food Service*

ICE added a provision stating, "If the facility has a kitchen certified to prepare Kosher and/or Halal meals, these meals may be prepared in-house in accordance with the required religious protocols, including proper ingredients, preparation methods, cookware, utensils and sanitation practices."

*Medical Care*

ICE added language to reinforce that in cases where a detainee has medical or mental health needs

that exceed the capabilities of the facility, the facility shall notify ICE and request a transfer of the detainee. The facility will make the request as early as possible to allow ICE time to find an appropriate placement for the detainee.

Any detainee referred for mental health treatment shall be triaged for any emergency needs and receive an evaluation by a qualified mental health provider no later than five days after the referral. Previously, the requirement was seven days.

*Voluntary Work Program*

ICE added language to emphasize that detainee volunteers participating in the voluntary work program are not considered facility and/or government employees and are not entitled to wages or benefits under applicable wage laws or labor regulations. Also, detainees shall not receive a stipend exceeding the amount Congressionally allocated to ICE for reimbursing contract facilities in support of the Voluntary Work Program.

*Detainee Handbook*

ICE added a provision clarifying that detainee handbooks (the ICE National Detainee Handbook and the facility supplement) can be provided to detainees in print or electronically (e.g., via tablet). The facility must provide a printed copy if requested by the detainee.

*Records Retention*

ICE added language in Appendix B to reflect record retention requirements. All Federal records created on behalf of ICE must be retained in accordance with an approved National Archives and Records Administration (NARA) General Records Schedule or a NARA-approved agency-specific records control schedule. If there is no records control schedule, these records must be retained indefinitely until one is approved. In the event the records are subject to a litigation hold, they must be retained indefinitely or until the ICE Office of the Principal Legal Advisor issues a release notification.

# Table of Contents


## SECTION 1: SAFETY

STANDARD 1.1 LANGUAGE ASSISTANCE ……....9

STANDARD 1.2 ENVIRONMENTAL HEALTH AND SAFETY ............................................................11

STANDARD 1.3 TRANSPORTATION BY LAND.....18

## SECTION 2: SECURITY

STANDARD 2.1 ADMISSION AND RELEASE ....... 26

STANDARD 2.2 CUSTODY CLASSIFICATION SYSTEM.................................................................. 30

STANDARD 2.3 FACILITY SECURITY AND CONTROL................................................................ 33

STANDARD 2.4 FUNDS AND PERSONAL PROPERTY ............................................................ 37

STANDARD 2.5 HOLD ROOMS IN DETENTION FACILITIES............................................................ 40

STANDARD 2.6 POST ORDERS............................. 43

STANDARD 2.7 SEARCHES OF DETAINEES........ 45

STANDARD 2.8 USE OF FORCE AND RESTRAINTS ........................................................................... 53

STANDARD 2.9 SPECIAL MANAGEMENT UNITS 62

STANDARD 2.10 STAFF-DETAINEE COMMUNICATION................................................ 75

STANDARD 2.11 SEXUAL ABUSE AND ASSAULT PREVENTION AND INTERVENTION .................... 78

## SECTION 3: ORDER

STANDARD 3.1 DISCIPLINARY SYSTEM............. 98

## SECTION 4: CARE

STANDARD 4.1 FOOD SERVICE.......................... 104

STANDARD 4.2 HUNGER STRIKES..................... 115

STANDARD 4.3 MEDICAL CARE........................ 119

STANDARD 4.4 PERSONAL HYGIENE ............... 133

STANDARD 4.5 SIGNIFICANT SELF-HARM AND SUICIDE PREVENTION AND INTERVENTION... 136

STANDARD 4.6 TERMINAL ILLNESS AND DEATH ............................................................................... 142

STANDARD 4.7 DISABILITY IDENTIFICATION, ASSESSMENT, AND ACCOMMODATION ........... 144

## SECTION 5: ACTIVITIES

STANDARD 5.1 CORRESPONDENCE AND OTHER MAIL ..................................................................... 154

STANDARD 5.2 RECREATION ............................. 158

STANDARD 5.3 RELIGIOUS PRACTICES............ 161

STANDARD 5.4 TELEPHONE ACCESS ................ 165

STANDARD 5.5 VISITATION............................... 170

STANDARD 5.6 VOLUNTARY WORK PROGRAM ............................................................................... 182

## SECTION 6: JUSTICE

STANDARD 6.1 DETAINEE HANDBOOK............ 186

STANDARD 6.2 GRIEVANCE SYSTEM ............... 188

STANDARD 6.3 LAW LIBRARIES AND LEGAL MATERIALS ........................................................ 191

STANDARD 6.4 LEGAL RIGHTS GROUP PRESENTATIONS.................................................. 197

## SECTION 7: ADMINISTRATION AND MANAGEMENT

STANDARD 7.1 DETENTION FILES..................... 201

STANDARD 7.2 DETAINEE TRANSFERS............ 204

**APPENDIX A LIST OF REQUIRED STAFF TRAINING 209**

**APPENDIX B ICE REPORTING REQUIREMENTS........ 213**

**APPENDIX C CONTENTS OF THE LOCAL SUPPLEMENT .................................................................. 219**

**APPENDIX D DEFINITIONS............................................ 221**

## Acronyms and Abbreviations

ACS: Advanced Communication Services

AI: Artificial Intelligence

BIA: Board of Immigration Appeals, Executive Office for Immigration Review

U.S. Department of Justice

CBP: U.S. Customs and Border Protection

CDC: Centers for Disease Control and Prevention, U.S. Department of Health and Human Services

CMA: Clinical Medical Authority

COR: Contracting Officer's Representative

CPR: Cardiopulmonary Resuscitation

CRCL: Office for Civil Rights and Civil Liberties, U.S. Department of Homeland Security

DAN: Disability Accommodation Notification

DFAS: Detention Facility Appointment Scheduler

DHO: Disciplinary Hearing Officer

DHS: U.S. Department of Homeland Security

DOJ: U.S. Department of Justice

DRIL: ICE ERO Detention, Removals, and Information Line

EOIR: DOJ Executive Office for Immigration Review

EPA: Environmental Protection Agency

ERO: ICE Enforcement and Removal Operations

FDA: Food and Drug Administration

FOD: Field Office Director

FOIA: Freedom of Information Act

FSA: Food Service Administrator

HIV: Human Immunodeficiency Virus

HSA: Health Services Administrator

ICC: Integrity Coordination Center

ICE: U.S. Immigration and Customs Enforcement

IDP: Institution Disciplinary Panel

IGSA: Intergovernmental Service Agreement

IHSC: ICE Health Service Corps

LEP: Limited English Proficiency (or Proficient)

MHU: Medical Housing Unit

MOU: Memorandum of Understanding

NARA: National Archives and Records Administration

NDS: National Detention Standards

NFPA: National Fire Protection Association

NGO: Non-Governmental Organization

OIG: DHS Office of Inspector General

OPR: ICE Office of Professional Responsibility

ORR: Office of Refugee Resettlement, U.S. Department of Health and Human Services

OSHA: Occupational Safety and Health Administration, U.S. Department of Labor

PAO: ICE Public Affairs Officer

PBNDS: Performance-Based National Detention Standards

PPE: Personal Protective Equipment

PREA: Prison Rape Elimination Act of 2003, Pub. L. 108-79 (Sept. 4, 2003), codified at 42 U.S.C. § 15601 *et seq*.

PSA: Prevention of Sexual Assault

RN: Registered Nurse

RSC: Religious Services Coordinator

SAFE: Sexual Assault Forensic Examiner

SANE: Sexual Assault Nurse Examiner

SART: Sexual Assault Response Team

SDAC: Supporting Disability Access Coordinator

SDS: Safety Data Sheet

SMI: Serious Mental Illness

SMU: Special Management Unit

TB: Tuberculosis

UDC: Unit Disciplinary Committee

# Section 1: SAFETY

# STANDARD 1.1

## LANGUAGE ASSISTANCE

***NOTE:*** *Standard 4.7: "Disability Identification, Assessment, and Accommodation" is applicable to this standard. The facility is required to provide disability accommodations for equal access to physical spaces, and the opportunity to participate in facility programs, services, and activities.*

## I. POLICY

Facilities must identify detainees with limited English proficiency (LEP) and provide them access to facility programs, services, and activities through language services (interpretation and translation) at no cost to the detainees. Language assistance applies to all aspects of detention, including admission and release, intake, use of force, placement in segregation, sexual abuse and assault prevention and intervention, disciplinary proceedings, staff-detainee communication, and medical and mental health services.

## II. STANDARDS AND PROCEDURES

### A. Provision of Language Assistance

1. Where information or instructions are given to detainees (orally or in writing), it must be provided in a language or manner detainees understand.

2. Facilities must provide LEP detainees with language assistance through professional in-person, telephonic, or video interpretation and translation services, or bilingual personnel.

3. Facilities may employ technology solutions utilizing artificial intelligence (AI), such as machine learning-based translation or generative AI, to the extent practicable during non-critical communication (i.e., those of moderate importance, urgency, or significance) or during informal interactions with detainees. Machine Translation Technology would be used to communicate the general concept of a request or topic during a discussion or review of a non-vital document. Examples of such communication include collecting or relaying basic and scripted information to or from a detainee during intake; having an informal conversation with a detainee in the housing unit; reviewing and responding to a detainee's non-English grievance or other request related to basic issues/concerns within detention; etc.

4. If the facility uses Wi-Fi connected technology, then the safety, security, and/or privacy risks will be assessed if any personally identifiable or other sensitive information is stored or shared.

**B. Prohibition on Detainee Interpreters**

Except in emergencies, detainees shall not be used as interpreters or translators.

**C. Translation of Written Materials**

1. All written materials posted or provided to detainees by the facility or the agency must generally be translated into Spanish and other frequently encountered languages at the facility, as appropriate.

2. Oral interpretation or assistance must be provided to detainees who are illiterate or who speak a language to which the written material has not been translated.

**D. Contracting Language Assistance Services**

1. Facilities must secure their own contract language assistance services.

2. If a facility cannot accommodate a particular language via their own services, ICE will provide support by offering contact information to assist the facility in securing necessary interpretation services.

3. ICE will supply facilities with Spanish and other available translations of frequently used ICE forms and postings.

# STANDARD 1.2

## ENVIRONMENTAL HEALTH AND SAFETY

***NOTE:** Standards 1.1 "Language Assistance" and 4.7: "Disability Identification, Assessment, and Accommodation" are applicable to this standard. The facility is required to provide language assistance and disability accommodations to ensure effective communication, equal access to physical spaces, and the opportunity to participate in facility programs, services, and activities.*

## I. POLICY

This detention standard protects detainees, staff, volunteers, and detention facility contractors from injury and illness by maintaining high facility standards of cleanliness and sanitation, safe work practices, and control of hazardous substances and equipment. The facility will operate in accordance with applicable federal laws, regulations, and codes, such as those of the Occupational Safety and Health Administration (OSHA), the National Fire Protection Association (NFPA), the Food and Drug Administration (FDA), the Centers for Disease Control and Prevention (CDC), and the Environmental Protection Agency (EPA).

## II. STANDARDS AND PROCEDURES

### A. Hazardous Substances

Hazardous substances include chemicals that are flammable, combustible, toxic, or caustic. In accordance with OSHA 29 CFR 1910.1200, *Hazard Communication,* each facility utilizing hazardous substances shall create a written hazardous communication program that outlines proper chemical labeling, providing Safety Data Sheets (SDSs), and training for employees.

The facility will establish a system for storing, issuing, and maintaining inventories of hazardous substances. Every area in the facility must have an up-to-date inventory of the hazardous substances used and stored in that area.

#### 1. Safety Data Sheets (SDSs); Files

In accordance with OSHA requirements, every area using hazardous substances will maintain a file of the corresponding SDSs. The SDSs provide vital information on individual hazardous substances, including instructions on safe handling, storage, disposal, and prohibited interactions. Staff and detainees will have ready and continuous access to SDSs for the substances with which they are working while in the work area.

#### 2. Master Index

The Maintenance Supervisor or facility designee will compile a master index of all

hazardous substances in the facility, including their locations, along with a master file of SDSs. Documentation of reviews will be maintained in the SDS master file.

The master index will also include a comprehensive, up-to-date list of emergency phone numbers (fire department, poison control center, etc.).

**3. Personal Responsibility**

Every individual using a hazardous substance in the facility must be familiar with and follow all prescribed precautions, wear personal protective equipment (PPE) when necessary, and report hazards or spills to the designated authority.

Staff supervising detainees must be familiar with and follow all prescribed precautions, ensuring detainees are provided with instructions on working with hazardous substances and are properly utilizing PPE. Supervisors will promptly report hazards and incidents to the designated authority.

**4. General Guidelines**

a. Hazardous substances will be issued (i.e. drawn from supply points to canisters or dispensed) in the amount necessary and only under the supervision of trained and authorized personnel.

b. Inventory records for a hazardous substance must be kept current before, during, and after each use.

c. Any liquid or aerosol labeled "Flammable" or "Combustible" must be stored and used as prescribed on the label, in accordance with the Federal Hazardous Substances Labeling Act, to protect both life and property.

d. Staff will follow SDS directions in disposing of excess hazardous substances and chemical spills.

**5. Storage of Hazardous Substances**

a. All potentially hazardous substances must be stored in secure areas, in their original containers, with the manufacturer's label intact on each container.

b. Only authorized staff will draw/dispense these substances, in accordance with the applicable SDS(s).

**6. Labeling of Chemicals, Solvents, and Other Hazardous Materials**

a. The facility will require use of properly labeled containers for hazardous substances, including all miscellaneous containers into which employees might transfer the substance.

b. Staff and detainees who work with hazardous substances will have appropriate training, including the classification code and safe handling procedures for each substance.

## B. Emergency Response

The facility will develop written plans and procedures for handling emergency situations reasonably likely to occur. Plans will include procedures for detainees with disabilities to ensure their safety and security during the facility response. All staff will be trained in the emergency plans, which will be reviewed and updated as appropriate on an annual basis.

During declared emergencies, the contractors shall implement contingency plans to manage increased detainee populations or facility transfers. Emergency security protocols must include authorization for temporarily increasing staffing, access control for emergency personnel, and enhanced perimeter monitoring to prevent unauthorized access or attempted escapes.

## C. Significant Event Notification Requirements

1. The facility shall immediately notify ICE/ERO of the following incidents or circumstances:

   a. Disturbances: Activation of disturbance control team(s); disturbances (including gang activities, group demonstrations, food boycotts, work strikes, workplace violence, civil disturbances/protests), escapes or escape attempts, weapons discharge, full or partial lock down of the detention facility, bomb threats, and detention facility evacuations.

   b. Significant environmental issues that impact the detention facility operations; adverse weather, (e.g., hurricanes, floods, ice/snowstorms, heat waves, and tornadoes); fires; industrial accidents and similar occurrences.

   c. Adverse Findings: Citations or denied licensures related to federal, state and local health, life, safety, and fire codes; and adverse incidents that attract unusual interest or significant publicity.

   d. Noncompliance: Per the Public Notification Rule (40 C.F.R. Part 141), the facility is required to notify its water consumers that its water supply violates a national primary drinking water regulation or has a situation that may pose a risk to public health. These consumer notices are required to be provided to persons served (not just billing customers), including detainees.

      1. If potable water is provided by a public water utility, the facility must immediately notify detainees and ICE/ERO if the facility receives a public notification from its water supplier in accordance with the Public Notification Rule.

   e. Accidents/Facility Operation Issues: Transportation (e.g., airlift, bus) accidents resulting in ICE detainee injuries, death, or detention facility property damage; fence damage; power outages; interruption in water service; HVAC system failure impacting

detainee living areas; sewage backup; or roof leaks in detainee living areas.

f. Assaults or Misconduct:

1. Detainee-on-Detainee Assault: any serious physical assault on an ICE detainee by another detainee or inmate.

2. Staff-on-Detainee Assaults: any incident or allegation of a physical assault on an ICE detainee perpetrated by staff, including contract staff.

3. Detainee-on-Staff Assault: any serious physical assault on any ICE or contracted staff by a detainee.

4. Staff Misconduct: any incident or allegation of staff misconduct if that misconduct relates to treatment of ICE detainees, to the security or safety of the facility, or to compliance with detention standards or the provisions of the facility's contract with ICE.

g. Detainee Deaths.

## D. Fire Prevention and Control

The facility will comply with federal standards and regulations issued by the NFPA, EPA and OSHA, and the applicable standards of the American Society for Testing and Materials, American National Standards Institute, and Underwriters' Laboratories or Factory Mutual Engineering Corporation. Such topics will include, but are not limited to, fire safety codes; regular fire and safety inspections; a fire prevention, control and evacuation plan and fire drills.

New construction, alterations, and renovations will comply with the latest revision or update of the National Building Code of the Building Officials and Code Administrators International; the Uniform Building Code; or the Standard Building Code, in accordance with 40 USC 619.

In addition, the construction will comply with the latest edition of the *NFPA 101, Life Safety Code*, and *NFPA 1, Fire Code*.

A qualified departmental staff member shall conduct weekly fire and safety inspections. Written reports of the inspections shall be forwarded to the facility administrator for review and, if necessary, corrective action determinations. The maintenance supervisor shall maintain inspection reports and records of corrective actions in the office. Fire safety deficiencies shall be promptly addressed.

## E. Pests and Vermin

Pests and vermin will be controlled and eliminated. Conditions which provide food, shelter, a medium for breeding, or harborage will be controlled and eliminated. The facility shall immediately notify ICE/ERO in the event of insect or rodent infestation.

## F. Certification of Facility Water Supply

Potable water shall be available throughout the facility. If the facility is not on a certified community water source, the detention facility contractor will utilize a laboratory to test samples of drinking and wastewater to ensure it is potable. The facility shall immediately notify ICE/ERO in the event a report or notification is received showing the water supply violates health-based standards that may lead to water-related illnesses. A copy of the testing and safety certification shall be maintained on site.

## G. Emergency Electrical Power Generator

Power generators will be tested according to the manufacturer's instructions. Other emergency equipment and systems will undergo quarterly testing, with follow-up repairs or replacement as necessary. Testing documentation will be retained for review.

## H. Guidelines for Specific Areas of the Facility:

### 1. Barber Operations

Proper sanitation in barber operations is critical to prevent the transmission of diseases through direct contact or contaminated tools, implements, and supplies, such as towels, combs and clippers.

a. Barber operations shall be located in an easily cleanable area with sufficient lighting.

b. At least one lavatory/sink with hot and cold running water, or waterless hand sanitizer, shall be available.

c. Barber operations will be provided with all equipment and facilities necessary for maintaining sanitary procedures of hair care, including containers for waste, disinfectants, disposable headrest covers, laundered towels and haircloths.

d. All hair care tools which come in contact with detainees will be cleaned and disinfected prior to each use. Hair will be collected between each cut and placed in a waste bin and emptied daily.

e. Towels must not be reused after being used on an individual.

f. No person will be served when infested with head lice. Rather, they shall be reported to the medical authority for appropriate care and treatment.

g. Detailed hair care sanitation regulations shall be conspicuously posted in each barbershop for the use of all hair care personnel and detainees.

### 2. Medical Operations

The facility will provide procedures for safely handling and disposing of used needles and other potentially sharp objects to prevent both mechanical injury and the percutaneous

transmission of infectious disease organisms, especially the hepatitis B virus (HBV) and the human immunodeficiency virus (HIV).

"Sharps" are all disposable or discarded items derived from detainee care that could potentially transmit disease via puncture through the skin. The following procedures will be observed when handling and disposing of needles and other hazardous sharp items:

a. Inventory

A running inventory will be kept of those items that pose a security risk, such as sharp instruments, syringes, needles, and scissors. This inventory will be reconciled weekly by an individual designated by the medical facility Health Service Administrator (HSA) or equivalent.

b. Handling

Without removing the needles or replacing the needle covers, staff will place used (disposable) syringes in commercially available, biohazardous-waste sharps containers approved by the National Institute for Occupational Safety and Health.

1) Disposal

The container will be labeled with the words "infectious waste," or with the universal biohazard symbol, and placed in the proper area for removal and disposal. Sharps will be considered infectious waste and final disposal of the container and contents will be through a commercial detention facility contractor that handles disposal of infectious waste. The facility is responsible for validating the detention facility contractor's disposal methods comply with all infectious and hazardous waste disposal laws and regulations.

c. Accidental Needle Sticks

A written exposure-control plan will be followed in the event of a needle stick.

## I. General Environmental Health Guidelines

Environmental health conditions will meet recognized standards of hygiene, including those from OSHA, the EPA, the FDA, the NFPA (including the Life Safety Code (NFPA 101)), and the CDC.

The facility, in consultation with the HSA (or equivalent) and the Environmental Health and Safety officer (or equivalent), shall design and establish a housekeeping plan to ensure a high level of environmental sanitation.

### 1. Facility Conditions

The facility shall ensure appropriate temperatures, air and water quality, ventilation,

lighting, noise levels, and detainee living space, in accordance with federal standards.

Under emergency circumstances, and only with ICE/ERO written approval, the facility may utilize emergency capacity/temporary bed space. The facility must stay within overall emergency capacity limits and ensure all local fire safety requirements are met.

**2. Housekeeping**

General Areas: Facility cleanliness and sanitation shall be maintained. All surfaces, fixtures, and equipment shall be kept clean and in good repair.

Detainee Living Areas: Detainees shall be responsible for maintaining the cleaning and organizing of their immediate sleeping areas in accordance with facility policies and procedures. Detainees shall also be responsible for appropriate group living cleaning assignments consistent with facility procedures.

Medical Areas: The medical facility will be kept clean and in working order. The HSA or equivalent, or designee, will make a daily visual inspection of the medical facility noting the condition of floors, walls, windows, horizontal surfaces, equipment and furnishings.

Suitable and sufficient cleaning equipment and supplies shall be available throughout the facility.

**3. Blood and Body Fluid Clean-up**

Staff will routinely take precautions to prevent contact with blood and other bodily fluids in accordance with the facility's policies and procedures, which will comply with CDC Universal Precautions.

Spills of blood and body fluids will be cleaned up and the surface decontaminated in such a manner as to minimize the possibility of workers becoming exposed to infectious organisms. A suitable cleanup kit will be maintained for use in cases of spills of blood and body fluids. Cleanup kits may be obtained from commercial sources.

**4. Hazardous and Infectious Waste Disposal**

Infectious and hazardous waste generated at a medical facility will be stored and disposed of safely and in accordance with all applicable federal regulations.

**5. Garbage and Refuse**

Garbage and refuse will be collected, stored, and removed from common areas at least daily and as often as necessary to maintain sanitary conditions and avoid creating health hazards. Refuse inside and outside of the facility must be handled and disposed of in a sanitary and safe manner that complies with applicable federal laws and regulations.

# STANDARD 1.3

## TRANSPORTATION BY LAND

***NOTE:*** *Standards 1.1 "Language Assistance" and 4.7: "Disability Identification, Assessment, and Accommodation" are applicable to this standard. The facility is required to provide language assistance and disability accommodations to ensure effective communication, equal access to physical spaces, and the opportunity to participate in facility programs, services, and activities.*

## I. POLICY

The facility will take all reasonable precautions to protect the lives, safety, and welfare of detainees, officers, other personnel, and the general public during ground transportation.

Detainees being transported between facilities, institutions, or jurisdiction will be moved safely and humanely under the supervision of trained, experienced personnel.

## II. STANDARDS AND PROCEDURES

### A. Transportation Planning

The facility administrator (or designee) has overall responsibility for all aspects of vehicle operations and is responsible for setting schedules and making logistical arrangements to transport detainees, monitoring vehicular maintenance, supervising and instructing personnel, and protecting detainee security. Transportation plans shall be revised as necessary, based on weather and road conditions and any other relevant considerations.

Detainees will not be transported to/from any facility, including ICE/ERO detention facilities, unless a Form G-391, I-216, or I-203, or equivalent, is furnished to authorize the transportation. These forms must be properly signed and shall clearly indicate the name of the detainee(s), the place or places to be escorted, the purpose of the trip and other information necessary to carry out the detail efficiently.

When coordinating the transfer of detainees, originating facility staff shall electronically transmit a copy of Form I-216 or I-203, along with the following information about each detainee, to the receiving facility:

1. Name, date of birth, and sex;
2. Nationality;
3. A-number;
4. Health and general condition;
5. Special handling required, if any (violent, escape risk, medical, disability, etc.);

6. Name and title of point(s) of contact at originating office; and

7. Property and baggage.

The receiving facility staff will confirm receipt of the documentation. The following documents must accompany the transferee, as applicable:

1. I-862, "Notice to Appear;"

2. I-203, "Order to Detain or Release Alien," if required by receiving facility;

3. I-216, "Record of Persons and Property Transferred," with G-589 and I-77 attached (see also Standard 2.1 "Admission and Release");

4. I-205, "Warrant of Deportation," original copy;

5. I-385, "Booking Card," with photo attached;

6. Classification Sheet; and

7. Medical Transfer Summary.

Staff may not transport a detainee without the documents required by Standard 7.2 "Detainee Transfers," including a Medical Transfer Summary. Official health records accompanying the detainee are to be placed in a sealed envelope or other container labeled with the detainee's name and A-number and marked "Confidential Medical Records." Staff are responsible for delivering all required documents and the transfer summary to personnel at the receiving facility.

If the above paperwork is incomplete at the time of departure, the facility must notify ICE/ERO to take corrective action.

**B. <u>Transporting Officer Responsibilities</u>**

Transporting officers shall comply with all federal (including U.S. Department of Transportation, National Surface Transportation Board, and EPA) motor vehicle regulations including, but not limited to, the following:

1. Wearing a seat belt when the vehicle is moving;

2. Transporting detainees in a safe and humane manner and accommodating detainees with disabilities;

3. Verifying individual identities and checking documentation when transferring or receiving detainees; and

4. Driving defensively, taking care to protect the vehicle and occupants; obeying traffic

laws; and reporting damage or accidents immediately.

**C. Vehicle Safety**

The officers shall secure the vehicle before leaving it unattended.

**D. Vehicle Operation**

The driver must have the appropriate type of driver's license, e.g., Commercial Driver's License, issued by the state in which he or she is employed.

The driver shall operate the vehicle in accordance with federal law, including all limitations on hours and maximum driving times.

Driving under the influence of drugs or alcohol is strictly prohibited.

**E. Security Check**

The vehicle crew must be present to ensure a complete and thorough search of the vehicle and each detainee. The crew may take certain precautionary measures with a detainee identified as a special-handling case (such as those who pose security, medical, or mental health concerns) while searches are in progress.

**F. Movement to Vehicles**

The escorting officer/assistant driver will instruct detainees about rules of conduct during the trip.

**G. Vehicle Occupancy Requirement**

The number of detainees transported shall not exceed the occupancy level for which the vehicle is rated.

**H. Detainee Count and Identification**

Officers will confirm the identities of the detainees they are transporting.

**I. Seating of Detainees**

The facility will develop written policy and implement procedures governing the seating of detainees in transportation vehicles.

1. Officers will seat each detainee, with particular attention to detainees with disabilities and those who may require closer observation for their own safety.

2. The facility will establish separate procedures for transporting detainees whose physical or mental health conditions preclude prolonged travel.

3. In accordance with Standard 2.11 "Sexual Abuse and Assault Prevention and Intervention," the facility shall assess all detainees to identify those likely to be sexual aggressors or sexual abuse victims and shall seat detainees in a manner designed to prevent sexual abuse, taking necessary steps to mitigate any such danger.

## J. Departure Scheduling and Security

Before transferring detainees from one facility to another, a designated officer will contact the next receiving office or facility with the following information:

1. The estimated time of departure/arrival (ETD/ETA);

2. The number of detainees in each of the following categories: new arrivals (remaining at the facility), drop-offs, and overnighters;

3. The total number of detainees;

4. Special-handling cases, detailing medications, accommodations, restraints, and other relevant details for each; and

5. Notification of any actual or estimated delays in departure, and the accordingly revised ETA(s).

## K. Responsibilities En Route

The receiving office serves as the contact point and is responsible for monitoring the vehicle's schedule. Upon vehicle arrival, the receiving officers will certify they are taking custody of each detainee by signing the accompanying Form I-216.

Each office will develop and post written guidelines for locating an overdue vehicle. If the vehicle does not arrive within the specified timeframe of its ETA, the contact point will initiate the tracing procedures.

## L. Stops

During stops, when the detainees disembark, the transport officers will keep the detainees under constant observation to prevent external contact(s) and/or contraband smuggling. At least one officer will remain in the vehicle when one or more detainees are present.

## M. Meals

Water, meals, and snacks shall be provided during any trip that exceeds six hours in duration. Consideration shall be given as to when detainees last ate before serving meals and snacks.

Meals must satisfy the nutritional requirements of the sending facility. Special dietary, religious, or medical needs will be identified before departure so suitable meals can be

arranged.

**N. Vehicle Supervision**

The officers must maintain a clear view of the entire vehicle compartment and remain alert for behavior that could jeopardize safety and security.

**O. Vehicle Communication**

The vehicle shall have sufficient equipment to allow for continuous communication during transport.

**P. Vehicle Sanitation**

Vehicles must be kept clean and sanitary at all times. The facility will establish the procedures and schedule for sanitizing facility vehicles.

**Q. Officer Conduct**

Officers will comply with all rules and procedures governing use of government or non-government vehicles. They shall not transport any personal items other than those needed to carry out their assigned duties during the trip. Alcoholic beverages and illegal drugs are strictly prohibited.

**R. Transfer of Funds, Valuables, and Property**

The personal property of a detainee transferring from one facility to another will be inspected and inventoried both upon release and arrival by respective facility personnel. The lead driver will check the manifest against the number of packages by detainee name and A-number before signing the I-216 or placing the baggage on the bus.

The following procedures apply to transferring detainees:

1. Staff at the originating facility will ask the detainee whether they have in their possession all funds, valuables, and other property listed on the I-216.

    a. If the detainee answers "yes," they may board the vehicle.

    b. If the detainee claims missing property, including funds and valuables, they will remain at the facility until completion of the required paperwork (the SF-95 and I-387 or comparable forms). Photocopies of the completed forms are documentation sufficient for the delayed transfer to proceed.

2. The I-77 number(s) in the "checked baggage" section of the I-216 will identify the baggage to be verified by the receiving officer.

**S. Officer Uniform and Equipment**

All officers transporting detainees shall wear the prescribed uniforms or other attire authorized by the facility.

**T. Firearms Storage**

Firearms and weapons will be appropriately handled and stored. Officers carrying firearms shall exercise caution if close contact with a detainee becomes necessary.

**U. Use of Restraints**

Officers shall use authorized techniques and sound correctional judgment when applying restraints, consistent with Standard 2.8 "Use of Force and Restraints." To ensure safe and humane treatment, the officers will check the fit of restraining devices immediately after application, at every relay point, and any time the detainee complains.

The officers will double-lock the restraining device(s). Under no circumstances will officers attach a restraining device to an immovable object, including, but not limited to, security bars, seats, steering wheel, or any other part of a vehicle.

The use of restraints for minors may be modified, as appropriate in accordance with 2.8 "Use of Force and Restraints" considering safety, security, and orderly operations (e.g., restrained with hands in front instead of in back, use of no restraints).

Restraints are never permitted on pregnant women who are in active labor or delivery.

A pregnant woman or woman in post-delivery recuperation shall not be restrained absent extraordinary circumstances that render restraints absolutely necessary, as documented by a supervisor and directed by the on-site medical authority (i.e., documented approval and guidance). Restraints shall not be considered, except under the following extraordinary circumstances:

a. A medical officer has directed the use of restraints for medical reasons.

b. Credible, reasonable grounds exist to believe the detainee presents an immediate and serious threat of hurting herself, staff or others.

c. Reasonable grounds exist to believe the detainee presents an immediate and credible risk of escape that cannot be reasonably minimized through any other method.

In the rare event one of the above situations applies, medical staff shall determine the safest method and duration for the use of restraints and the least restrictive restraints necessary shall be used. If restraints are deemed necessary, handcuffing in the front will be used to enable a pregnant detainee to break her fall. No pregnant detainee shall be restrained in a face-down position with four-point restraints, on her back, or in a restraint belt that constricts the area of the pregnancy. All attempts will be made to ensure the detainee is

placed on her left side if she is immobilized.

Detainees who require a wheelchair for mobility must always be transported in a wheelchair-accessible vehicle. Record-keeping and reporting requirements regarding the medical approval to use restraints shall be consistent with other provisions within these standards, including documentation in the detainee's detention and medical file.

**V. Emergency Situations**

The facility shall establish written procedures for transportation officers to follow in an emergency occurring during transport. Consistent with safety, security and orderly operations, the written procedures must cover scenarios that at a minimum include attacks, escapes, hostages, illness, death, fire, traffic accidents, vehicle failures, and natural disasters.

If an emergency occurs within a reasonable distance of an ICE/ERO office, the transportation officers will make every effort to reach that office before taking extraordinary measures. However, if moving seems ill-advised or impossible, they will contact the office, stating their location and the nature of the problem so the office can provide/secure assistance as quickly as possible.

If the situation is life-threatening and the vehicle crew cannot afford to wait for help from an ICE/ERO office, immediate action shall be taken.

**W. Non-Medical Emergency Escorted Trips**

Facilities shall refer any request for a non-medical emergency escorted trip to ICE/ERO for consideration and approval.

**X. Transporting Minors, Females, and Opposite Sex Transports**

Minors shall be separated from unrelated adults at all times during transport and seated in an area of the vehicle near officers and under their close supervision.

Transportation staff shall search a detainee of the opposite sex only in extraordinary circumstances and only when an officer of the same sex is not available.

The facility administrator shall develop procedures for vehicle crews transporting females. Except in emergency situations, a single transportation staff member may not transport a single detainee of the opposite sex. In the case of individual transports, when transporting detainees of the opposite sex, assigned transportation staff shall call in their time of departure and odometer reading, and then do so again upon arrival, to account for their time.

# Section 2: SECURITY



# STANDARD 2.1

## ADMISSION AND RELEASE

***NOTE:*** *Standards 1.1 "Language Assistance" and 4.7: "Disability Identification, Assessment, and Accommodation" are applicable to this standard. The facility is required to provide language assistance and disability accommodations to ensure effective communication, equal access to physical spaces, and the opportunity to participate in facility programs, services, and activities.*

## I. POLICY

The detention facility contractor does not have a right of refusal for any ICE detainee that ICE decides to detain. The contractor shall take all referrals from ICE. Exceptions may be allowed as determined by the Contracting Officer's Representative (COR) or ICE designated official.

Facility procedures for admitting and releasing detainees are designed to protect the health, safety, and welfare of each person. During admission, detainees are screened for medical and mental health conditions, history and risk of sexual abuse/assault and suicide, and other special vulnerabilities. Their files are reviewed for classification, they undergo a standard body search, and they observe and certify the examination, categorization, inventorying, and safeguarding of their personal belongings.

Adult males shall be separated from adult females at all times, even if married, throughout their stay at the facility (i.e., from arrival through release).

During the release process, detainees return facility-issued clothing, bedding, and other items; undergo identity-verification procedures; and complete required documentation in accordance with facility procedures, including certifying the receipt of all inventoried personal property, such as funds and valuables.

## II. STANDARDS AND PROCEDURES

### A. New Arrivals

Upon arrival, each detainee shall undergo custody and medical screening interviews to assess risks, including potential victimization or risk of sexual abuse, assault, or suicide, and facilitate appropriate classification and housing.

1. Detainees shall remain separated from the general population until health, housing, and custody classification are completed.

2. The facility will identify the detainee's primary language and presence of any disabilities to determine if accommodations are necessary.

3. Detainee medical screenings shall occur as required by Standard 4.3 "Medical Care"

to identify health conditions (e.g., injuries, physical and mental illnesses, oral health) and disabilities.

4. Detainees will complete required questionnaires and forms.

5. Detainees will be afforded the opportunity to make a free telephone call. The facility staff shall document that the detainee made this phone call or declined the opportunity to make a call.

6. During intake, detainees shall be given an opportunity to shower, when possible.

7. Detainees will participate in site-specific orientation programs, and comply with other facility admission procedures, including the issuance of clothing, towels, bedding, feminine hygiene products, and personal hygiene items.

8. Staff must open a detainee detention file for any detainee booked into the facility for more than 24 hours, in accordance with Standard 7.1, "Detention Files." Staff must document the date and time the detention file is opened.

## B. Search of Detainee and Property

Each new arrival will be searched in accordance with Standard 2.7 "Searches of Detainees," in an intake area that provides as much privacy as possible. All items discovered during the search will be categorized as funds, valuables, or other personal property, to be retained by the detainee or inventoried, receipted, and stored. Items classified as contraband will be handled appropriately, in accordance with Standard 2.4 "Funds and Personal Property," and Standard 2.3 "Facility Security and Control."

## C. Funds, Valuables, and Other Personal Property

Each facility shall institute procedures for inventory and receipt of detainee funds, valuables, and personal property in accordance with Standard 2.4 "Funds and Personal Property." The facility shall complete inventory of funds, valuables, and other personal property within 12 hours of admission.

Foreign identity documents, such as passports, birth certificates, etc., will be copied for the detention file, and the original forwarded to ICE/ERO. Detainees will receive a receipt for confiscated identity documents. Upon request, staff will provide the detainee with a copy of the document.

## D. Clothing and Bedding Issued to New Arrivals

Facility staff shall issue detainees clothing and bedding in quantities, sizes, and weights appropriate for the facility environment and local weather conditions, in accordance with Standard 4.4 "Personal Hygiene."

## E. Personal Hygiene Items

Staff shall provide detainees with articles necessary for maintaining proper hygiene, to include feminine hygiene products. The facility will ensure all hygiene supplies are replenished as necessary, at no expense to the detainee, for the entire duration of the detainee's detention (at a minimum: bar soap or equivalent, one bottle of shampoo or equivalent, one toothbrush, one tube of toothpaste, comb, one container of skin lotion, and one deodorant).

## F. Admissions Documentation

Official documentation from ICE/ERO (e.g., Form I-203, I-203a, I-216, I-385, and Risk Classification Assessment) shall accompany each newly arriving detainee. Staff shall prepare specific documents in conjunction with each new arrival to facilitate timely processing within 12 hours, classification, medical screening, accounting of personal effects, and reporting of statistical data.

## G. Missing Detainee Property

The facility shall complete a Form I-387, "Report of Detainee's Missing Property," or equivalent, when any newly arrived detainee claims his or her property has been lost or left behind at a previous location. Facilities shall forward the completed forms to ICE/ERO.

## H. Orientation

Facilities shall provide detainees with an orientation to the facility as soon as practicable, in a language or manner they understand. The orientation must cover facility operations, programs and services, the grievance process, and other rules and requirements.

The facility orientation shall also include the following information:

1. Procedures for how a detainee can contact the ICE/ERO officer handling their case;

2. Instructions on how to use the telephone system to make telephone calls;

3. Instructions on how to use available electronic communication devices, such as tablets, and an orientation of all of the features and materials that are available within the devices, if applicable;

4. Education regarding ICE/ERO's and the facility's zero tolerance policies for all forms of sexual abuse and assault;

5. How to request medical care; and

6. How to request a disability accommodation/modification.

If ICE/ERO provides an orientation video, all reasonable efforts shall be made to show

the video within 72 hours of a detainee's admission. An ICE/ERO orientation video shall not substitute for facility orientation but may supplement it.

## I. Detainee Handbook

Upon admission, every detainee will receive a printed copy or access to a digital copy of both the ICE/ERO National Detainee Handbook and a facility handbook (i.e., local supplement). Even if a digital copy is available, a printed copy must be provided upon detainee request. The facility handbook will fully describe all policies, procedures, and rules in effect at the facility, in accordance with Standard 6.1 "Detainee Handbook."

The ICE/ERO National Detainee Handbook is available in multiple languages and Braile. The facility may request additional hard copies from ICE/ERO as necessary. It is also available to view and download on ice.gov.

## J. Releases

All releases must be coordinated with ICE/ERO. The timing, location, and method of release must prioritize safety and consider any special vulnerabilities. When needed, detainees with mobility impairments will be permitted to retain the mobility disability device (e.g., wheelchair, cane, walker, prothesis).

Before a detainee's release, removal, or transfer from the facility, staff must complete required procedures, including processing forms, closing files, fingerprinting, returning personal property, and collecting facility-issued items such as clothing and bedding.

Prior to release (e.g., bond, recognizance, parole), the facility shall provide the detainee with an opportunity to make a free phone call to facilitate release arrangements. Detainees will be provided with a list of legal, medical, and social services that are available in the release community, and a list of shelter services available in the immediate area along with directions to each shelter. Detainees will be released with one set of non-institutionalized, weather-appropriate clothing.

When appropriate, facilities shall transport detainees to local public transportation stations during operating hours or to an approved non-governmental organization (NGO) for assistance. If public transportation is located within one mile of the facility, detainees shall be provided with an information sheet detailing directions and available transportation options. Facilities must provide transportation for detainees who are not reasonably able to walk to public transportation due to age, disability, illness, mental health, other vulnerabilities, or adverse weather or environmental conditions that may endanger their health or safety.

# STANDARD 2.2

## CUSTODY CLASSIFICATION SYSTEM

***NOTE:*** *Standards 1.1 "Language Assistance" and 4.7: "Disability Identification, Assessment, and Accommodation" are applicable to this standard. The facility is required to provide language assistance and disability accommodations to ensure effective communication, equal access to physical spaces, and the opportunity to participate in facility programs, services, and activities.*

## I. POLICY

Each facility must implement a formal detainee classification system, in accordance with this standard's requirements and guidelines. The classification process begins at admission and is based on interviews and verifiable, documented information. This process helps manage and separate detainees in a manner that promotes safety and security.

## II. STANDARDS AND PROCEDURES

### A. Standards

All officers assigned to classification duties shall be trained in the facility's classification process. The classification system shall ensure:

1. All detainees are classified upon arrival and before being placed in the general population.

2. The initial classification process and initial housing assignment shall be completed within 12 hours of admission to the facility.

3. If a detainee cannot be classified due to missing information at the time of processing (e.g., criminal-record check results), they will remain separated from the general population until the required information is obtained.

4. A supervisor will conduct a secondary review of each detainee's classification.

5. A detainee's classification level will determine their housing assignment, voluntary work assignment, and the management of their recreational activities, meals, disability needs, and access to religious services.

6. Each facility shall establish a system that readily identifies a detainee's classification level, such as using color-coded uniforms.

7. Detainees with special vulnerabilities will be identified and appropriate accommodations provided as required by federal law.

## B. Classification Review

A supervisor will review each detainee's classification file prepared by the intake/processing officer to ensure accuracy and completeness and to assess that the detainee has been assigned to an appropriate housing unit.

## C. Classification Information

Staff shall use the most reliable, objective information available during the classification process. "Objective" information refers to documented or discernible facts, such as age, sex, criminal offense(s), escapes, institutional disciplinary history, violent episodes/incidents, potential victimization or abusiveness based on the criteria in 6 C.F.R. § 115.41, and mental health and/or medical status. ICE/ERO offices will provide the facility with any information available to ICE to assist the facility in classifying detainees.

## D. Classification Levels and Housing Assignments

All facilities shall ensure detainees are housed according to their classification level.

The facility shall assign detainees to the least restrictive housing consistent with facility safety and security.

## E. Special Vulnerabilities

Special consideration shall be given to factors that increase a detainee's vulnerability, risk of victimization, or risk of assault in detention. Detainees with special vulnerabilities include those who are elderly, pregnant, or nursing; have serious physical or mental illnesses; detainees with a disability; or risk(s) of sexual victimization or abusiveness as identified in 6 C.F.R. § 115.41, as well as victims of sexual assault, torture, trafficking, or abuse.

Facilities shall use information about identified disabilities when making classification and housing decisions. Detainees with disabilities shall be housed in the least restrictive and most integrated setting possible.

When making classification and housing decisions, staff must consider, to the extent the information is available, risk factors outlined in 6 C.F.R. § 115.41, ensuring individualized determinations for housing, recreation, voluntary work, and other activities to prioritize each detainee's safety.

## F. Reclassification

Facility classification systems shall ensure detainees are reassessed and reclassified at regular intervals or when relevant events occur (e.g., disciplinary events, incidents of abuse or victimization). Reclassification assessments shall consider factors such as the detainee's risk of victimization or abusiveness. A detainee may request reclassification at any time.

If a detainee is documented, suspected, or reported to have been physically or sexually

abused or assaulted, their perception of their own safety and well-being must be considered as part of the reclassification process.

## G. Classification Appeal

All facility classification systems shall include procedures by which detainees can appeal their classification levels. The facility shall respond to all appeals within seven business days.

## H. Notice to Detainees

The facility shall include a classification section in its facility handbook which will include the following:

1. An explanation of the classification levels, with the conditions and restrictions applicable to each; and

2. The procedures by which a detainee may appeal their classification.

# STANDARD 2.3

## FACILITY SECURITY AND CONTROL

***NOTE:** Standards 1.1 "Language Assistance" and 4.7: "Disability Identification, Assessment, and Accommodation" are applicable to this standard. The facility is required to provide language assistance and disability accommodations to ensure effective communication, equal access to physical spaces, and the opportunity to participate in facility programs, services, and activities.*

## I. POLICY

This standard promotes the safety of communities, staff, detention facility contractors, volunteers, and detainees by preventing events which may pose a risk of harm. Facilities must establish policies and procedures for security inspections; contraband prevention, identification, and disposition; key and lock control; population counts; and a comprehensive tool control policy.

## II. STANDARDS AND PROCEDURES

### A. Facility Policy

The facility shall establish a comprehensive security policy, including procedures for contraband prevention and control, complemented by policies and procedures for tool control, population counts, and key control.

Facilities shall have a secure control center that is staffed continuously, 24/7. Control center staff shall monitor and coordinate facility security, life-safety, and communication systems.

The facility administrator shall establish procedures to implement, at a minimum, the following control center requirements:

1. 24/7 staffing;
2. Restricted staff access;
3. Prohibition of detainee access (staff must perform cleaning duties typically assigned to detainees elsewhere in the facility);
4. Round-the-clock communications; and
5. Up-to-date list of names and contact numbers of every staff member assigned to the facility, including administrative/support services staff members, situation response team members such as Special Response Teams (if applicable), ICE/ERO management, and local corresponding law enforcement agencies.

Each facility shall ensure adequate supervision of detainees through appropriate staffing

levels and, where applicable, video monitoring, to protect against sexual abuse, assault, violence, harassment, significant self-harm, and suicide. Security staffing shall be sufficient to maintain facility security and minimize risks to persons and property.

Facilities shall develop and document comprehensive detainee supervision guidelines, along with a comprehensive staffing analysis and plan to address supervision needs. These documents shall be reviewed and updated at least annually. Essential posts and positions must be filled with qualified personnel.

When determining appropriate levels of detainee supervision and the need for video monitoring, facilities shall consider generally accepted detention and correctional practices, judicial findings of inadequacy, the facility's physical layout, detainee population composition, the prevalence of incidents (substantiated and unsubstantiated) of sexual abuse or other security and detainee safety concerns, findings and recommendations from sexual abuse incident reviews, the duration of detainee custody at the facility, and other relevant factors.

## B. Security Inspections

Security inspections are necessary to control contraband; promote facility safety, security and good order; prevent escapes; maintain sanitary standards; and mitigate fire and safety hazards.

Facilities shall establish a comprehensive security inspection system that addresses every area of the facility, including the perimeter fence line and other areas noted below in this standard.

Frequent unannounced security inspections shall be conducted during both day and night shifts. Staff are prohibited from alerting others without a need to know that security inspections are occurring, unless such announcement is related to the legitimate operational functions of the facility.

### 1. Search Log

Each housing unit, including the Special Management Unit (SMU) and Medical Housing Unit (MHU), where applicable, will document cell and area searches including the date, time, and findings, including location(s) where contraband is found, type(s) of contraband, and the searching officers' names.

### 2. Searches

Facilities must establish written policy and procedures for housing unit and personal area searches.

## C. Perimeter Security

The facility's front entrance shall be a controlled access point. Entrance into the secure perimeter shall be controlled by a sally port (or equivalent with electronic interlocking doors or grilles) to prevent unauthorized entry or exit.

### 1. Identification

The officer assigned to this post shall check the identification documents of every visitor, employee, and other person entering or leaving the facility. (See Standard 5.5 "Visitation.")

### 2. Record

a. The post officer will maintain the visitor logbook. Logbook entries of persons visiting detainees will be completed in accordance with Standard 5.5 "Visitation."

b. Every entry in the logbook will identify the person visiting; the person or department visited; date and time of visitor's arrival; purpose of visit; and time of departure.

## D. Key and Lock Control

Facilities shall establish procedures for key and lock control in compliance with OSHA and NFPA requirements and develop and implement site-specific procedures for controlling gun-locker access.

## E. Population Counts

Facilities shall implement an effective system for counting detainees. Formal and informal counts will be conducted as necessary to ensure around-the-clock accountability for all detainees, including at least one face-to-photo count completed every 24 hours.

## F. Tool Control

Facilities shall establish a tool-control policy that all employees are required to follow. The facility administrator shall designate a person to develop and implement tool-control procedures, including an inventory and inspection system to ensure accountability. Inventories must be kept current and readily available.

## G. Private/Contract Repair and Maintenance Workers

All visitors who are not ICE/ERO officials or facility employees, including repair and maintenance workers, shall submit to an inspection and inventory of all tools, toolboxes, and equipment that could be used as weapons before entering and leaving the facility.

## H. Contraband

Facilities must establish policies and procedures for the prevention, identification, and disposal and/or destruction of contraband items. This must include procedures to secure the SMU from contraband.

"Contraband" refers to all items that pose a threat to the security of people or property. Any facility-approved auxiliary aids, services, or other disability-related items used by a detainee with a disability shall not be considered contraband. Any facility-approved religious worship, prayer, texts/scriptures, or dress items shall not be considered contraband. Additionally, newspaper articles that depict or describe violence in a detainee's country of origin may be relevant to a detainee's legal case and shall not automatically be considered contraband.

A contraband item is either "hard" contraband or "soft" contraband. Hard contraband includes any item that is inherently dangerous as a weapon or tool of violence, e.g., a knife, explosives, a "zip-gun," and brass knuckles. Because hard contraband presents an immediate physical threat in or to the facility, a detainee found in possession of hard contraband may face disciplinary action or criminal prosecution.

Soft contraband includes "nuisance" items that do not pose a direct and immediate threat to individual safety. Nonetheless, soft contraband has the potential to create dangerous or unsanitary conditions in the facility. Examples include excess papers that create a fire hazard and food items that are spoiled or retained beyond the point of safe consumption. The facility administrator shall generally consult the facility chaplain and/or a religious authority before confiscating a religious item that is deemed "soft" contraband.

## I. Canine Units

Law-enforcement agency trained canine units may be used with ICE permission for contraband detection. However, the use of dogs for force, control, or intimidation of detainees is prohibited, in accordance with Standard 2.8 "Use of Force and Restraints."

Any facility that has or uses a canine unit shall establish a clear written policy with detailed procedures governing the circumstances in which canine units may be used in searches. Canines utilized for contraband detection shall be under the direct control of a specially trained and credentialed canine officer, and canines shall not be used in the presence of detainees.

## J. Notice to Detainees

The facility handbook shall notify detainees of the facility's rules and procedures governing pertinent security issues, e.g., counts and contraband.

# STANDARD 2.4

## FUNDS AND PERSONAL PROPERTY

***NOTE:*** *Standards 1.1 "Language Assistance" and 4.7: "Disability Identification, Assessment, and Accommodation" are applicable to this standard. The facility is required to provide language assistance and disability accommodations to ensure effective communication, equal access to physical spaces, and the opportunity to participate in facility programs, services, and activities.*

### I. POLICY

Facilities shall provide for the control and safeguarding of detainee personal property. This includes the secure storage of funds, valuables, baggage, and other personal property. Facilities must implement procedures for documenting and receiving surrendered property and establish initial and regularly scheduled inventories of all funds, valuables, and other property.

### II. STANDARDS AND PROCEDURES

#### A. General

The facility shall provide a secure area, accessible only by designated supervisors and/or property officers, to hold detainee property, valuables, and foreign currency. Detainees lacking baggage or luggage in which to store their property shall have their property placed in facility-provided bags or property bins and stored in the secured baggage area at no cost to the detainee. Staff shall inventory and maintain a record of detainee personal property being shipped from the facility. The record shall be maintained in the detention file or in a retrievable electronic format and the facility shall provide the detainee with a copy of the record.

Any unauthorized personal property is contraband and will be surrendered to staff for securing and inventorying. (See Standard 2.3 "Facility Security and Control.")

The facility may arrange shipping for detainees' excess personal property, if assistance is required. If a detainee refuses to provide an appropriate mailing address, is financially able but unwilling to pay postage, or is unable to cover shipping costs, the facility will seek instructions from ICE/ERO regarding mailing or disposing of the property. Detainees must be provided with written notice prior to the destruction of their property.

#### B. Limitations on Possession of Detainee Personal Property

1. Detainees may keep a reasonable amount of personal property in their possession, provided the property does not pose a threat to facility security. Detainees shall have the opportunity to store excess property with a third party or, as applicable, in the facility's personal property storage area.

2. Each housing area will provide secure individualized storage for each detainee's personal property.

## C. Admission

Detention facilities shall have policies and procedures to account for and safeguard detainee property at time of admission to the facility. Medical staff will determine the disposition of medicine accompanying an arriving detainee.

Standard operating procedures will include obtaining a forwarding address from every detainee who has personal property.

## D. Inventory and Audit

Facilities shall establish a written procedure for the inventory and audit of detainee funds, valuables, and personal property._For recordkeeping and accounting purposes, use of the G-589 *Property Receipt* or an equivalent form is mandatory to document any funds removed from a detainee's possession, including the amount and type of currency. Detainees must be provided with a receipt for all property held until release.

The facility administrator or designee must conduct an inventory of all detainees' personal property, including baggage, valuables, and non-valuables, at least once per quarter. Facility logs must record the date, time, and names of the officer(s) the inventory. Any discrepancies identified during the inventory must be reported immediately to the facility administrator.

## E. Release or Transfer

Facilities shall have a written procedure for returning funds, valuables, and personal property to a detainee upon being transferred or released. U.S. and foreign currency will be returned to the detainee as cash, when possible.

Following a property check, the detainee must sign a receipt confirming the return of all funds and personal property due to them. If the detainee refuses to sign the receipt, the refusal must be documented. The property log and inventory sheets shall reflect the transaction.

## F. Lost/Damaged Property

Facilities shall establish a written policy and procedure for handling reports of missing or damaged detainee property. The policy must include the following provisions:

1. P rocedures for investigating and reporting property loss or damage;

2. An investigation conducted by supervisory staff;

3. Prompt reimbursement to detainees for validated property losses resulting from facility negligence; and

4. Immediate notification to ICE/ERO regarding all claims and their outcomes.

## G. Abandoned Property and Funds

Facilities shall report and surrender to ICE/ERO all detainee property that is abandoned or unclaimed, including funds.

## H. Notice to Detainees

The facility handbook shall inform detainees of the policies and procedures regarding personal property, including:

1. Items permitted to be retained in their possession;

2. Availability of copies of identity documents (e.g., passport, birth certificate) placed in their A-files or detention files, upon request;

3. Rules for storing or mailing property not allowed in their possession;

4. Procedures for claiming property upon release, transfer, or removal; and

5. Procedures for filing claims for lost or damaged property.

# STANDARD 2.5

## HOLD ROOMS IN DETENTION FACILITIES

***NOTE:** Standards 1.1 "Language Assistance" and 4.7: "Disability Identification, Assessment, and Accommodation" are applicable to this standard. The facility is required to provide language assistance and disability accommodations to ensure effective communication, equal access to physical spaces, and the opportunity to participate in facility programs, services, and activities.*

### I. POLICY

Hold rooms may be used for the temporary detention of individuals awaiting removal, transfer, Executive Office of Immigration Review (EOIR) immigration court hearings, medical treatment, intra-facility movement, or other processing related to entry into or exit from the facility.

### II. STANDARDS AND PROCEDURES

#### A. Physical Conditions

1. Hold rooms shall be located within a secure perimeter.

2. Single-occupant hold rooms must provide a minimum of 37 square feet, including seven unencumbered square feet for the detainee, five square feet for a combination lavatory/toilet fixture, and 25 square feet for wheelchair turnaround. Multiple-occupant hold rooms shall provide an additional seven square feet of unencumbered space for each additional detainee.

3. Hold rooms shall be well-ventilated, well-lit, and designed to allow for convenient visual monitoring.

4. Hold rooms must have sufficient seating to accommodate the maximum room capacity, which must be posted outside the hold room.

5. Bunks, cots, beds, and other sleeping apparatus are prohibited in hold rooms except for detainees who are ill, with a disability, are minors, and/or pregnant women.

6. All hold rooms shall be equipped with liquid soap for handwashing and potable water.

7. Hold rooms with toilets must provide an appropriate level of privacy. If the hold room does not have a toilet, an officer must always remain within sight or earshot to ensure detainees have regular access to restroom facilities. Detainees using the restroom must be appropriately monitored, balancing security and privacy considerations.

8. Facilities must be in compliance with the applicable federal accessibility standards.

## B. Time Limits and Restrictions

A detainee will not be held in a hold room for more than 12 hours except when there are exigent circumstances.

The following additional procedures shall be adhered to:

1. Unaccompanied minors (under 18 years), individuals over 70 years of age, females with children, and family groups must not be placed in hold rooms unless they have demonstrated or threatened violent behavior, have criminal convictions involving violence, or have provided staff with articulable grounds to anticipate an escape attempt.

2. Upon determining that a minor in ICE custody is unaccompanied, facilities must immediately coordinate with ICE/ERO. ICE/ERO will work with the Juvenile and Family Management Division to transfer the minor within 72 hours to a U.S. Department of Health and Human Services Office of Refugee Resettlement (ORR)-approved facility designated for unaccompanied minors.

3. Juveniles in ICE custody shall be detained in the least restrictive setting appropriate to their age and special needs, while ensuring the protection of their well-being and the safety of others, in compliance with applicable federal laws, regulations, and legal requirements.

4. Individuals exempt from placement in hold rooms due to obvious illness; special medical, physical disability, or psychological needs; or other documented reasons shall be seated in a designated area outside the hold room under direct supervision and control, except in emergencies. If the physical layout of the facility precludes holding these individuals outside the hold room, they may be held in separate rooms, if available.

5. Adult males shall be segregated from adult females at all times, even if married.

6. Minors (under 18 years) must be separated from adults, minimizing sight, sound, and physical contact. Exceptions may be made if the adult is an immediate relative or recognized guardian, provided no other adult detainees are present in the hold room and there are no safety or security concerns.

7. Detainees shall be provided with basic personal hygiene items, including potable water, disposable cups, soap, toilet paper, feminine hygiene products, diapers, and sanitary wipes.

## C. Detainee Search

Every detainee must undergo a pat-down search for weapons or contraband before

placement in a hold room. Sharp objects, such as pens, pencils, knives, nail files, and other items that could be used as weapons, must be removed from the detainee's possession.

Opposite-sex pat-down searches shall only be conducted if staff of the same sex cannot be located after an earnest effort or in exigent circumstances. A staff witness must be present during the search, preferably of the same sex as the detainee, even if not trained or authorized to conduct searches. All opposite-sex pat-down searches must be documented, to include the names of the staff conducting the search and the witness.

If a pat-down search indicates the need for a more thorough search, a strip search shall be conducted by an officer of the same sex as the detainee or in the presence of another officer of the same sex. Refer to Standard 2.7 "Searches of Detainees" for more detailed guidance.

**D. <u>Basic Operational Procedures</u>**

1. An officer must visually assess each individual prior to placement in the hold room, checking for any open, obvious, or apparent disabilities, mental health concerns, or other special needs.

2. Each facility shall maintain a log documenting custodial information for all detainees placed in and removed from hold rooms.

3. Officers must provide a meal to any adult held in a hold room for more than six hours. Juveniles must receive meal service regardless of time in custody. Juveniles, infants, pregnant women, and others for whom it is medically necessary shall have regular access to snacks, milk, juice, etc.

4. Staff shall ensure that sanitation and temperatures in hold rooms are maintained at acceptable levels. Juveniles, pregnant women, and individuals with evident medical needs shall have access to temperature-appropriate clothing and blankets. The facility must document when food is provided.

5. Officers shall closely supervise hold rooms through direct, in-person observation, with irregular visual checks conducted at intervals not exceeding 15 minutes. Each check must be documented in the detention log, including the time and the officer's name or identifier. Camera/CCTV monitoring or irregular visual checks cannot replace direct observation.

6. Detainees exhibiting signs of hostility, depression, or similar behaviors must be under constant surveillance, and the officer must promptly notify a supervisor.

7. Staff must immediately contact emergency medical services or the designated medical provider if a detainee appears to require emergency medical treatment.

8. Once the last detainee is removed from the hold room, the room shall undergo a thorough cleaning and safety inspection.

# STANDARD 2.6

## POST ORDERS

***NOTE:** Standards 1.1 "Language Assistance" and 4.7: "Disability Identification, Assessment, and Accommodation" are applicable to this standard. The facility is required to provide language assistance and disability accommodations to ensure effective communication, equal access to physical spaces, and the opportunity to participate in facility programs, services, and activities.*

## I. POLICY

Each officer will have written post orders that specifically govern his or her current duties. The post orders will specify the duties of the post, along with instructions on how to perform those duties. The step-by-step procedures will include enough detail to guide an officer newly assigned to the post. The facility will also develop post orders for non-permanent assignments (e.g., details, temporary housing units, emergency changes). If events preclude advance planning, the facility will issue a post order as soon as possible after the need arises.

The facility administrator shall ensure there are written post orders for each security post, and copies are available to all employees.

## II. STANDARDS AND PROCEDURES

### A. Post Orders

Written orders shall specify the duties of each post, along with the procedures to be followed in carrying out those duties. A master file which contains all post orders shall be available to all employees.

### B. Reading and Understanding of Post Orders

All facilities shall have written procedures which:

1. Provide official on-duty time for officers to read the applicable post orders when assigned to a post; and

2. Ensure all officers read applicable post orders prior to assuming their posts.

All officers and supervisors shall use the post orders to familiarize themselves with the duties for which they are responsible, and to stay abreast of changes that occur in the operation and duties of the post. Supervisors shall ensure officers understand the post orders of each post they are assigned, regardless of whether the assignment is temporary, permanent, or due to an emergency.

Prior to assuming a post for any length of time, officers will sign and date the post order to indicate having read and understood its provisions. Post order acknowledgement records must be maintained in written or electronic format and available for review.

Facility Supervisors will assess post orders daily to ensure post officers are reviewing as required.

**C. Maintenance of Post Orders**

Post orders will be kept current at all times. Post orders will be reviewed and updated and approved and signed by the facility administrator at least annually.

Post orders and logbooks are confidential and must be kept secure (under lock and key) at all times and shall never be left in an area accessible to detainees.

**D. Armed and Perimeter-Access Post Assignments**

Post orders for armed and perimeter-access post assignments will, among other things, describe and explain:

1. The proper care and safe handling of firearms lethal or less than lethal; and

2. Circumstances and conditions when use of firearms is authorized.

Post orders for armed posts, and for posts that control access to the institution perimeter, shall clearly state that any staff member who is taken hostage is considered to be under duress. Any order/directive issued by such a person, regardless of his or her position of authority, is to be disregarded.

Specific instructions for escape attempts shall be included in the post orders for armed posts or any post that would be affected by an escape or attempted escape (e.g., perimeter patrol, recreation).

# STANDARD 2.7

## SEARCHES OF DETAINEES

***NOTE:*** *Standards 1.1 "Language Assistance" and 4.7: "Disability Identification, Assessment, and Accommodation" are applicable to this standard. The facility is required to provide language assistance and disability accommodations to ensure effective communication, equal access to physical spaces, and the opportunity to participate in facility programs, services, and activities.*

## I. POLICY

This detention standard safeguards detainees and staff while enhancing the safety and security of the facility by detecting, controlling, and properly disposing of contraband.

## II. STANDARDS AND PROCEDURES

### A. Written Policy and Procedures

The facility shall have written policy and procedures for the following:

1. Body searches, including pat searches ("pat downs"), strip searches, body cavity searches, and x-rays;

2. Sincerely held religious beliefs (e.g., photographing, or same or opposite sex searches of Muslim women who wear hijab (head covering), Sikh men who wear dastar (turban), or Orthodox Jews).

3. Close observation in "dry cells" to detect contraband;

4. Employing the least intrusive method of search practicable, as indicated by the type of suspected contraband and the method of suspected introduction or concealment;

5. Avoiding unnecessary force during searches and preserving the dignity of the detainee being searched;

6. Handling of contraband; and

7. Preservation of evidence.

### B. Staff Training

All staff who conduct searches of housing, work areas, or of a detainee's body shall receive initial training regarding search procedures prior to entering on duty and shall receive annual, updated training in authorized and effective techniques thereafter.

## C. Body Searches of Detainees

### 1. Pat Search

a. Description

A pat search (or "pat down") is a sliding or patting of the hands over the clothed body of a detainee by staff to determine whether the individual possesses contraband.

All pat searches shall be conducted in a professional and respectful manner, and in the least intrusive manner possible, consistent with security needs including consideration of officer safety.

Security staff shall be trained in proper procedures for conducting pat searches, including opposite sex pat searches. The training will include information on religious and cultural sensitivities.

b. Sex of Officer Conducting Pat Searches

Opposite-sex pat-down searches shall only be conducted if staff of the same sex cannot be located after an earnest effort or in exigent circumstances. A staff witness must be present during the search, preferably of the same sex as the detainee, even if not trained or authorized to conduct searches. All opposite-sex pat-down searches must be documented, to include the names of the staff conducting the search and the witness.

### 2. Strip Search

a. Description

A strip search is a search that requires a person to remove or arrange some or all clothing so as to permit a visual inspection of the person's breasts, buttocks, or genitalia. Staff shall not routinely require a detainee to remove clothing or require a detainee to expose private parts of his or her body to search for contraband. To the extent reasonably possible, the inspector shall refrain from touching the skin surface of the detainee; however, the inspector may request that the detainee move parts of the body to permit visual inspection. A strip search is more intrusive than a pat search and shall be conducted in a manner designed to ensure as much privacy to the detainee as practicable.

If items are discovered that protrude from a body cavity, the removal of those items is governed by the procedures applicable to body-cavity searches, addressed below.

The facility shall not search or physically examine a detainee for the sole purpose of determining the detainee's genital characteristics. If the detainee's sex is unknown, it may be determined during conversations with the detainee, by reviewing medical records, or, if necessary, learning that information as part of a

standard medical examination that all detainees must undergo as part of intake or other processing procedure conducted in private, by a medical practitioner.

b. Sex of Officer Conducting Strip Searches

An officer of the same sex as the detainee shall perform a strip search.

In the case of an emergency, a staff member of the same sex as the detainee shall be present to observe a strip search performed by an officer of the opposite sex.

When an officer of the opposite sex conducts a strip search which is observed by a staff member of the same sex as the detainee, staff shall document the reasons for the opposite-sex search in any logs used to record searches and in either the detainee's detention file or a retrievable electronic format.

c. Guidelines

Facilities may perform a strip search when an articulable and reasonable suspicion exists that contraband is concealed on the detainee's person. Facilities may also conduct strip searches as a matter of course when a detainee is entering or re-entering the facility or in accordance with the facility's contact visitation procedures as outlined in Standard 5.5 "Visitation." All strip searches will be documented. Where a strip search is based on reasonable suspicion, the articulable facts supporting that conclusion will also be documented.

d. Reasonable Suspicion

"Reasonable suspicion" is based on the existence of specific and articulable facts that would lead a reasonable officer to believe that a specific detainee is in possession of contraband. It must be based on specific and articulable facts, along with reasonable inferences that may be drawn from those facts.

The lack of identity documents alone does not ordinarily constitute reasonable suspicion.

### 3. Body Cavity Searches

A body cavity search is an inspection for contraband or any other foreign item, in a body cavity of a detainee, by use of fingers or simple instruments, such as an otoscope, tongue blade, short nasal speculum, and simple forceps. A body cavity search is the most intrusive type of search. A body cavity search must be performed by a medical professional and take place in an area that affords privacy from other detainees and from facility staff who are not involved in the search.

a. A body cavity search may only be conducted by authorized medical personnel, upon approval of the facility administrator or acting facility administrator, and only if there is reasonable suspicion that contraband may be concealed in or on the detainee's person.

b. The articulable facts supporting the conclusion that reasonable suspicion exists shall be documented.

c. The detainee's health and welfare shall be considered prior to performance of any digital or simple instrument search.

d. Although a detainee's written consent will be obtained prior to conducting a digital or simple instrument search, such written consent is not required.

e. If located, the contraband or foreign item may be removed immediately by medical staff, if such removal can easily be affected by use of fingers or simple medical instruments.

f. ICE Health Service Corps (IHSC) staff is not authorized to collect or participate in the collection of specimens or other information that will be used for forensic purposes, including for toxicology studies, rape kits, and DNA testing.

Staff shall document all body cavity, digital, and simple instrument searches, the authorizations, and the reasons for the searches, in any logs used to record searches and in the detainee's detention file or retrievable electronic format.

## D. Close Observation in a "Dry Cell"

### 1. Description and Authorization

When an officer has reasonable suspicion to believe that a detainee may have ingested contraband or concealed contraband in a body cavity, and the methods of search specified above are inappropriate or likely to result in physical injury to the detainee, the facility administrator or designee may authorize that the detainee be placed in a room or cell to be closely observed by staff until the detainee has voided or passed the contraband or until sufficient time has elapsed to preclude the possibility that the detainee is concealing contraband.

### 2. Requirements for "Dry Cells"

One or more rooms or cells may be identified as dry cells; such rooms must meet the following requirements:

a. The room shall be free of hiding places and be equipped with only a bed.

b. Doors shall have proper observation panels to protect staff and to allow unobstructed observation.

c. If the designated area is equipped with a toilet and/or sink, the water to the cell shall be shut off for the duration of the dry cell process.

d. Prior to a detainee's placement in dry cell status, the room to be used shall be

completely searched and determined to be free of contraband.

**3. Advising the Detainee**

The supervisor responsible for initiating the dry cell placement shall advise the detainee of the placement in a dry cell and document the notification on an Administrative Segregation Order. The detainee shall be advised of the reasons he or she is being placed in a dry cell, the purpose of this placement, the conditions he or she can expect, and the means by which he or she can request items and services including, but not limited to, food and water, medical care, hygiene products, and bedpans.

**4. Conditions of "Dry Cell" Status**

a. For the detainee's safety, he or she shall be required to provide a urine sample within two hours of placement under close observation. A second urine sample shall be required prior to releasing the detainee from close observation.

b. The detainee shall have regular access to potable water.

c. The detainee shall be provided telephone access.

d. The detainee shall not be allowed to come in contact with other detainees.

e. Personal hygiene items shall be provided as necessary and controlled by staff.

f. The detainee shall not be permitted to leave the cell or room, except in case of extreme emergency.

g. The detainee shall be served the same meals as the general population, unless medical advice dictates otherwise. All meals are to be inspected for contraband prior to delivery to the detainee, and any food remaining after the meal, as well as the utensils and tray, are to be thoroughly inspected before their return to food service.

h. Only medications prescribed and administered directly to the detainee by medical personnel may be given to the detainee.

i. When the detainee needs to urinate and/or defecate, he or she shall be furnished an empty hospital bedpan, which shall afterward be closely inspected to ascertain whether any contraband is present.

j. Since the detainee is in administrative segregation status even if not actually housed in the SMU, the requirements for medical and supervisory and staff visits in Standard 2.9 "Special Management Units" apply.

k. Dry cells must be cleaned in accordance with Standard 1.2 "Environmental Health and Safety."

**5. Post Orders**

The facility shall have post orders for closely observing a detainee in dry cell status. A video camera shall be used whenever possible and as appropriate.

**6. Requirements for Close Observation**

The detainee shall be constantly observed and supervised by a staff member of the same sex. Opposite sex observation shall only occur in in exigent circumstances, the occurrence of which must be documented.

It is the observer's responsibility to ensure the detainee does not dispose of any concealed item, and to prevent activity which would allow the detainee access to the concealed item. Any questions, emergency, or other situation that arises shall immediately be brought to the attention of the shift supervisor.

a. Detainees in dry cells shall be monitored by medical staff for changes in medical and mental health status.

b. A daily log and SMU record shall be maintained on each detainee in dry cell status.

c. The shift supervisor shall provide periodic staff relief to the observer and at any other time the observer must leave the area. The detainee must not be left unattended.

d. Trash may not be allowed to accumulate, and each item shall be thoroughly searched before final disposal.

e. Periodic searches shall be conducted as follows:

   1) A strip search of the detainee when he or she is placed in the dry cell, after which the detainee shall be issued a jump suit (or other suitable loose-fitting clothing);

   2) A strip search of the detainee at least once each shift, if necessary; and

   3) A search of the dry cell at least once each shift.

f. Staff shall notify the shift supervisor when contraband is found, secure the contraband in a properly documented evidence bag, and maintain the chain of custody for the evidence.

**7. Length of Observation**

The length of close-observation status must be determined on an individual basis. The facility administrator or designee, in consultation with qualified health personnel, shall determine when termination is appropriate.

a. The status of a detainee under close observation for as long as three days must be reviewed by a facility supervisor in accordance with Standard 2.9 "Special Management Units."

b. Since the objective of dry cell status is likely to be achieved within seven days, maintaining a detainee under close observation beyond seven days requires prior approval of the facility administrator and medical staff.

## E. X-Ray

### 1. Medical

The facility physician may authorize use of an x-ray for medical reasons and only with the consent of the detainee.

### 2. Security

Only the facility administrator, upon approval by ICE/ERO, may authorize facility medical staff to order a non-repetitive x-ray examination for the purpose of determining whether contraband is concealed in or on the detainee (e.g., in a cast or body cavity).

Such approval and authorization shall be based on the facility administrator and medical staff's determination that:

a. An x-ray examination is necessary for security, safety, good order, or health of the detainee;

b. No reasonable alternative exists; and

c. The examination is not likely to result in serious or lasting medical injury or harm to the detainee.

Staff shall place documentation of the examination, including the authorizations and reasons for the examination, in the detainee's detention file or other retrievable electronic format, as well as in the medical file.

An x-ray examination may not be performed on a detainee without the detainee's consent. Staff shall solicit the detainee's consent and cooperation prior to the x-ray examination. Force may not be used to gain consent and cooperation. If the detainee does not provide consent and fails to cooperate, an x-ray examination shall not be performed.

## F. Body Scanners and Other Contraband Detection Devices

If a facility utilizes scanning devices for contraband detection, the facility administrator must ensure a written procedural policy is in place for its use. Training, certification, and maintenance for the use of the equipment must be maintained on file and in accordance

with the requirements set forth with the equipment's manufacturer.

Any device or equipment that utilizes X-ray transmission capabilities will fall under category E above and requires the facility physician's authorization and the consent of the detainee.

# STANDARD 2.8

## USE OF FORCE AND RESTRAINTS

***NOTE:*** *Standards 1.1 "Language Assistance" and 4.7: "Disability Identification, Assessment, and Accommodation" are applicable to this standard. The facility is required to provide language assistance and disability accommodations to ensure effective communication, equal access to physical spaces, and the opportunity to participate in facility programs, services, and activities.*

## I. POLICY

For the purpose of these standards, force is defined as physical actions required to overcome resistance, gain control, contain, or restrain a detainee. The use of force is authorized only after all reasonable efforts to resolve a situation have failed. Officers shall use only the amount of force necessary to:

1. Gain control of the detainee;
2. Protect and ensure the safety of detainees, staff, and others;
3. Prevent serious property damage; and
4. Maintain the security and orderly operation of the facility.

Physical restraints shall be used to control an apparently dangerous detainee only under specified conditions.

## II. STANDARDS AND PROCEDURES

### A. Principles Governing the Use of Force and Application of Restraints

1. Force must never be used to punish a detainee.
2. Staff shall attempt to gain the detainee's willing cooperation, communicating in a language or manner they understand, before resorting to force.
3. Restraints may be used immediately to prevent the detainee from harming themselves, others, or causing serious property damage.
4. Staff shall use only that amount of force necessary to gain control of the detainee. If continued use of restraints is necessary after the detainee is under control, facility administrator approval is required.
5. Additional restraints may be applied if the detainee continues to resist after physical control is achieved. If the detainee refuses or is unable to move because of the restraints, staff may lift and carry the detainee to the appropriate location. Restraints shall not be

used for lifting or carrying a detainee.

6. The following uses of restraints or devices (e.g., handcuffs) are prohibited:

   a. On a detainee's neck, face, or in any manner that restricts blood circulation or obstructs airways (mouth, nose, neck, esophagus).

   b. To inflict physical pain or extreme discomfort.

7. Staff must monitor all detainees placed in restraints.

8. Medication shall not be used to subdue an uncooperative detainee for staff convenience. Medication may only be prescribed and administered by licensed medical personnel for medical purposes.

## B. Types of Force

When a detainee acts violently or appears likely to do so, staff may use reasonable force and/or restraints to prevent harm to the detainee, others, and/or causing damage to property. All use of force incidents must be documented and submitted to ICE/ERO for review.

The facility's policy must include a use-of-force continuum as prescribed below. The Use-of-Force Continuum is a five-level model illustrating the levels of force staff may use to gain control of a detainee. The levels are:

a. **Staff presence without action** – The mere presence of staff to deter inappropriate behavior.

b. **Verbal commands** – Clear instructions given in a language or manner the detainee understands, where possible.

c. **Soft techniques** – Actions with minimal risk of injury, such as grasping, empty-hand and/or "come-along" holds, impact weapons for holds, pressure point application, or use of chemical agents.

d. **Hard techniques** – Actions with a higher risk of injury, such as strikes, throws, "take-downs," or strikes using impact weapons (e.g., expandable batons, straight batons, authorized less-lethal devices, or specialty impact weapons).

e. **Deadly force** – Force reasonably likely to cause death or serious physical injury. Deadly force does not include actions not reasonably expected to cause death or serious injury that result in such outcomes unexpectedly.

### 1. Immediate Use of Force

An "immediate-use-of-force" situation arises when a detainee's behavior poses a serious and immediate threat to themselves, staff, other detainees, property, or the

facility's security and orderly operation. In such cases, staff may act without a supervisor's direction or presence.

**2. Calculated Use of Force**

If a detainee is in an isolated location (e.g., a locked cell) with no immediate threat to themselves or others, staff shall take time to assess whether the situation can be resolved without force. This includes consulting facility medical and/or mental health staff if the detainee has known communication, mobility, cognitive and/or developmental disabilities. In most cases, a calculated use of force is feasible.

a. Confrontation Avoidance

Before authorizing the calculated use of force, a supervisory detention official, a designated health professional, and other relevant personnel shall assess the situation. This assessment shall consider the detainee's history and the circumstances of the immediate situation to determine whether the use of force is appropriate.

The assessment may include the detainee's medical/mental health history, recent incident reports involving the detainee, and potential shocks or traumas contributing to their state of mind (e.g., pending criminal prosecution, sentencing, a recent removal order, divorce, illness, or death). Interviews with staff familiar with the detainee may provide valuable insight into their current agitation and its immediate cause.

b. Use-of-Force Team Technique

During a calculated use of force, the use-of-force team technique must be employed when a detainee needs to be forcibly moved or restrained.

1) Calculated-use-of-force video recording shall include the following:

a) The Team Leader must introduce the recording by stating facility name, location, time, date, and describing the incident leading to the calculated use of force. The introduction must include the names of each team member, briefly showing their faces (helmets removed, heads uncovered), as well as the video camera operator and any other staff present.

b) The Team Leader must offer the detainee, in a language or manner they understand, a final opportunity to cooperate before team action. This includes outlining use-of-force procedures, attempting confrontation avoidance, and issuing use-of-force order.

c) The entire use-of-force operation must be recorded without edits until the detainee is restrained.

d) The recording must include close-ups of the detainee's body during the medical exam, focusing on the presence or absence of injuries. Any staff injuries must be described but do not need to be shown.

2) Use-of-force recordings shall be available for ICE/ERO incident reviews and may also be used for training purposes, such as after-action review training.

## C. Prohibited Use-of-Force Acts and Techniques

Facility staff shall only use force, restraints, and non-lethal weapons approved by facility policy, in accordance with established policies, procedures, and training requirements.

The following acts and techniques are prohibited when using non-deadly force:

1. Using canines for force, control, or intimidation of detainees;
2. Choke holds, baton-applied choke or "come-along" holds to the neck area, and other neck restraints;
3. Intentional baton strikes to the head, face, groin, solar plexus, neck, kidneys, or spinal column;
4. Striking a detainee for failing to obey an order;
5. Striking a detainee when grasping or pushing would achieve the desired result; and
6. Using force against a detainee offering no resistance.

## D. Use-of-Force Safeguards

Compliance with the Use-of-Force procedures helps prevent injuries and exposure to communicable diseases. Use-of-Force Team members and others involved in a calculated use of force must wear appropriate protective gear. Staff shall use protective devices when entering areas where blood or other body fluids may be present, whenever possible.

The shift supervisor shall inspect areas with blood or body-fluid spillage after an incident. If the spillage does not need to be preserved as evidence, staff shall sanitize the area immediately. Contaminated clothing and use-of-force equipment must be immediately disinfected or destroyed, as appropriate. The medical department shall provide guidance on appropriate cleaning solutions and their proper use.

## E. Progressive and Ambulatory Restraints

Whenever possible, staff shall use ambulatory restraints. If the detainee's behavior necessitates more restrictive or secure restraints, the facility administrator, in consultation with medical or mental health staff when possible, shall determine the appropriate restraint

method. Options may include hard restraints with or without a waist chain or belt, four-point soft restraints secured with hard restraints to a bed, or four-point hard restraints.

For highly assaultive and aggressive detainees, progressive restraints may be used as an intermediate measure during placement into or removal from four-point restraints.

**F. <u>Use of Four- or Five-Point Restraints</u>**

Staff shall follow the specified procedures when using four- or five-point restraints:

1. Provide the detainee with temperature-appropriate clothing and a bed, mattress, sheet and/or blanket.

2. Under no circumstances shall a detainee remain naked or without cover (sheet or blanket) unless determined necessary by qualified health personnel.

3. Check and record the detainee's condition at least every 15 minutes to ensure restraints are not restricting circulation and to monitor their general welfare. If the detainee is restrained to a bed, staff must periodically rotate the detainee's position to prevent soreness or stiffness.

4. A health professional must assess the detainee's breathing, vital signs, and physical and verbal responses. If the detainee is bed-restrained, the health professional shall determine their positioning. Qualified health personnel will ordinarily visit the detainee at least twice per eight-hour shift. If health personnel are unavailable, staff shall place the detainee in a "face-up" position until the medical evaluation is conducted.

5. The shift supervisor shall review a detainee in four-point restraints every two hours. If the restraints have had a calming effect, they may be removed or replaced by a less restrictive device. During each two-hour review, the detainee must be given an opportunity to use the toilet unless they actively resist or become combative when released from restraints for this purpose.

6. Use of four-point restraints beyond eight hours requires medical supervision.

7. The facility must notify ICE/ERO if a detainee remains in restraints for more than eight hours and provide updates every eight hours until the restraints are removed.

**G. <u>Medical Attention in Use-of-Force and Application-of-Restraints Incidents</u>**

1. In immediate use-of-force situations, staff shall seek assistance from mental health or medical personnel as soon as physical control of the detainee is achieved.

2. In calculated use of force incidents, the team leader shall consult qualified health personnel, based on a review of the detainee's medical record, to identify any physical or mental health concerns. If ongoing care is required, the medical or mental health professional must arrange appropriate measures, such as hospital admission.

3. After any use of force or application of restraints, medical personnel shall examine the detainee and provide immediate treatment for any injuries. All medical services provided shall be documented.

4. Medical staff shall immediately examine any staff member involved in a use-of-force incident who reports an injury and provide necessary emergency treatment and referral for follow-up care.

## H. Use of Non-Lethal Weapons

The facility may authorize the use of non-lethal weapons if:

1. The detainee is armed and/or barricaded.

2. The detainee cannot be approached without risking harm to themselves or others.

3. Delaying action would seriously endanger the detainee or others, cause a major disturbance, or result in significant property damage.

Staff shall consult medical staff before using oleoresin capsicum (OC) spray or other non-lethal weapons, unless escalating tension makes immediate action unavoidable. When possible, medical staff will review the detainee's medical file for conditions that could be seriously exacerbated by non-lethal weapons, such as asthma, emphysema, bronchitis, tuberculosis, obstructive pulmonary disease, angina pectoris, cardiac myopathy, or congestive heart failure.

## I. Use of Force in Special Circumstances

If confrontation-avoidance techniques fail or are impractical, staff must decide whether to use force. In cases involving a detainee at high risk of injury to themselves or others – such as a pregnant detainee or an aggressive detainee with open cuts, sores, or lesions – staff shall consult the on-site medical authority before determining if the situation warrants the use of physical force.

The use of restraints requires documented approval and guidance from the on-site medical authority. All approvals must be recorded in accordance with these standards, including documentation in the detainee's detention and medical file.

### 1. Medical or Mental Health Conditions

For the purposes of this section, detainees with medical or mental health conditions are those individuals whose mental or physical condition requires accommodations or arrangements beyond those provided to other detainees. This includes detainees who are chronically ill, infirm, have disabilities, or are addicted to or in withdrawal from drugs or alcohol.

Restraints shall not be used for detainees with medical or mental health conditions, except in the following extraordinary circumstances:

a. Medical staff orders the use of restraints for medical reasons;

b. Credible and reasonable grounds indicate the detainee poses an immediate and serious threat to themselves, staff, or others; or

c. Reasonable grounds indicate the detainee presents an immediate and credible risk of escape that cannot be reasonably mitigated by other means.

**2. Pregnant and Post Delivery Detainees**

Pregnant detainees or detainees in post-delivery recovery shall not be restrained including during transport, in detention facilities, or at outside medical facilities unless extraordinary circumstances render restraints absolutely necessary. Such circumstances must be documented by a supervisor and authorized/directed by the on-site medical authority. Restraints are strictly prohibited for women in active labor or delivery.

In the rare event restraints are needed, medical staff shall determine the safest method and duration for using restraints, ensuring the least restrictive option necessary is employed.

Even in the extraordinary circumstance when restraints are deemed necessary, handcuffing in front must be used to enable a pregnant detainee to break her fall, and no detainee known to be pregnant shall be restrained in a face-down position with four-point restraints, on her back, or in a restraint belt that constricts the area of the pregnancy. All attempts will be made to ensure that the detainee is placed on her left side if she is immobilized.

**3. Detainees with Wounds or Cuts**

Staff shall wear protective gear, including a full-body shield, when restraining aggressive detainees with open cuts or wounds and when the use of force is necessary.

## J. Documentation of Use of Force and Application of Restraints Incidents

ICE/ERO requires all use of force incidents involving detainees to be documented and submitted to ICE/ERO for review. Facility staff shall also document the use of restraints on detainees who become violent or exhibit signs of imminent violence. A copy of the report shall be placed in the detainee's detention file or maintained in a retrievable electronic format. Routine, unresisted use of restraints, such as during detainee movement or transfer, does not require a report.

All personnel involved in or observing the use of force shall submit a written report detailing their actions and observations before the end of their shift. Supervisors present during a

use-of-force incident shall also submit a written report documenting their observations and any orders given to direct the use of force.

1. **Report of Incident**

Facility staff shall prepare a use of force report for every use of force incident. Each staff member who witnesses the incident shall complete a memorandum for the record, which will be attached to the use of force report. The facility administrator or designee shall review all reports and memoranda for sufficiency and determine if corrective action is necessary.

2. **4- or 5-Point Restraints Report**

Facilities shall document all 15-minute checks of detainees in four- or five-point restraints and notify ICE/ERO if a detainee remains restrained for more than eight hours, with additional notifications every eight hours thereafter.

3. **Recordings of Use-of-Force Incidents**

Staff shall immediately record any use-of-force incident with a video camera, unless delaying action would pose a serious hazard to the detainee, staff, or others, or would result in a major disturbance or significant property damage. Calculated use of force shall be video recorded as specified in part B.2.b. of this standard, "Use-of-Force Team Technique." Release of use-of-force audiovisual recordings to the news media may occur only if authorized by the Director of Enforcement and Removal Operations, in accordance with ICE/ERO procedures and rules of accountability.

4. **Record Keeping**

All facilities shall maintain all use-of-force documentation and create a separate file for each use of force incident.

Facilities shall maintain all written use-of-force documentation in compliance with the National Archives and Records Administration (NARA) detention records retention requirements.

Video, audio, and other recordings shall be catalogued and preserved until no longer needed, but for no less than 30 months after their last documented use. In the event of litigation, the facility will retain the recording for a minimum of six months after the conclusion/resolution of the litigation.

5. **Report Completion**

The facility review team shall complete and submit their report to the facility administrator within five working days of the incident or the detainee's release from restraints. The facility administrator shall review and sign the report, acknowledging

either that the use of force was appropriate or inappropriate.

The review team shall determine whether the incident requires further investigation or referral to law enforcement. The facility shall forward a copy of the After-Action Report to the local ICE/ERO Field Office Director (FOD) within seven days of completion.

## K. After-Action Review of Use of Force and Application of Restraints Incidents

Written procedures shall outline the mandatory after-action review process for all use-of-force incidents, whether calculated or immediate, and for the application of restraints. Officers involved in the use of force shall not participate in the review team.

The After-Action Review shall evaluate the reasonableness of the actions taken, including the proportionality of the force used in response to the detainee's actions, and consider all relevant materials, including available video recordings, to ensure facility staff compliance with facility policies and these standards. The review must examine:

1. Whether only the necessary amount of force was used to subdue the detainee, including appropriate responses to a subdued or cooperative detainee (i.e., one who discontinues their violent behavior).

2. Proper use of protective gear throughout the operation.

3. Appropriate use of chemical agents, such as OC spray or mace, in accordance with written procedures.

4. Prompt examination of the detainee by a medical professional, with findings documented on the recording.

5. Continuous video coverage from the start of the recording until the incident concludes, investigating any breaks or missing sequences in the recording.

## L. Training

All detention personnel shall receive training on approved methods of self-defense, crisis intervention, conflict de-escalation, use of force techniques, recognizing signs and symptoms of medical conditions, mental illness, and disabilities, as well as reporting requirements. Staff must also be informed of prohibited use-of-force acts and techniques.

Specialized training is required for certain non-lethal equipment, such as OC spray and electronic devices. Training on the use of chemical agents shall include procedures for treating individuals exposed to them. Officers must be specifically certified to use each device.

# STANDARD 2.9

## SPECIAL MANAGEMENT UNITS

***NOTE:** Standards 1.1 "Language Assistance" and 4.7: "Disability Identification, Assessment, and Accommodation" are applicable to this standard. The facility is required to provide language assistance and disability accommodations to ensure effective communication, equal access to physical spaces, and the opportunity to participate in facility programs, services, and activities.*

## I. POLICY

This detention standard promotes the safety of detainees, staff, detention facility contractors, and volunteers by segregating certain detainees from the general population in Special Management Units (SMUs). Segregation is categorized as Administrative Segregation or Disciplinary Segregation, as described below.

## II. STANDARDS AND PROCEDURES

### A. Placement in Administrative Segregation

Administrative Segregation is a housing status involving restricted conditions of confinement necessary to ensure the safety of detainees or others, protect property, and maintain the security and good order of the facility.

Each facility shall develop and adhere to written procedures governing the management of its administrative segregation unit, consistent with this standard. These procedures must include detailed documentation of the reasons for an individual's placement in administrative segregation.

When practical, the facility administrator or designee must review the case prior to placing a detainee in administrative segregation to confirm that placement is warranted.

#### 1. Reasons for Placement in Administrative Segregation

A detainee may be placed in administrative segregation if their presence in the general population poses a threat to life, property, self, staff, or other detainees; threatens the secure and orderly operation of the facility; is required for medical reasons; or under other circumstances outlined below.

A detainee's age, disability, sex, sexual orientation, race, color, national origin, or religion must never serve as the sole basis for involuntary segregation. Each case requires an individualized assessment.

Examples of reasons for assigning a detainee to administrative segregation include, but are not limited to, the following:

a. A detainee is awaiting an investigation or hearing for a facility rule violation. Generally, a detainee shall not remain in administrative segregation longer than seven calendar days pending an investigation of a disciplinary violation, unless the detainee is pending criminal investigation.

b. A detainee poses a threat to the security of the facility or safety of other detainees and staff.

c. A detainee requires protection (i.e., protective custody), either at their request or staff-initiated to ensure the safety of the detainee.

   Facilities must provide detailed written justification on the segregation order for placement in protective custody. Facilities shall also establish procedures to regularly review continued placement in protective custody and to facilitate release from protective custody when appropriate.

   The use of administrative segregation to protect detainees with special vulnerabilities, including those at risk of sexual abuse or assault, shall be limited to situations where reasonable efforts to provide appropriate alternative housing have been exhausted. Placement must be for the shortest duration practicable and used only as a last resort when no other viable housing options exist.

d. A detainee is scheduled for release, removal, or transfer within 24 hours and administrative segregation is deemed necessary for security reasons or to maintain the orderly operation of the facility.

e. The facility's Institution Disciplinary Panel (IDP), or equivalent, recommends placing a detainee in administrative segregation after completing disciplinary segregation because returning the detainee into the general population would threaten the detainee's safety or the security and orderly operation of the facility. Such placement in administrative segregation requires a separate administrative segregation order with documented justification.

f. A medical professional orders a detainee removed from the general population. The medical professional must complete and sign an administrative segregation order, unless the detainee is placed in the medical department's medical housing unit (e.g., isolation ward).

### 2. Administrative Segregation Order

A written order shall be completed and approved by the facility administrator or designee before placing a detainee in administrative segregation. In exigent circumstances where this is not practicable, the order shall be prepared as soon as possible.

a. The administrative segregation order shall be provided to the detainee within 24 hours of placement and its contents communicated to them in a language or manner they understand.

b. A copy of the administrative segregation order shall immediately be provided to ICE/ERO.

c. Upon the detainee's release from administrative segregation, the releasing officer shall sign the order and record the date and time of release. The completed order shall be included in the detainee's detention file or stored in a retrievable electronic format.

**3. Facility Review of Detainee Status in Administrative Segregation**

Facilities shall implement written procedures for the regular review of detainees placed in administrative segregation, in accordance with the procedures outlined below.

a. A facility supervisor shall conduct a review within 72 hours of a detainee's placement in administrative segregation to assess whether continued segregation is warranted.

1) The review shall include an interview with the detainee.

2) A written record of the decision and its justification must be created.

3) If the detainee is segregated for their protection, but not at their request, the facility administrator or assistant facility administrator must authorize continued segregation placement by signature.

b. A facility supervisor shall conduct an identical review after the detainee has spent seven days in administrative segregation, followed by weekly reviews (i.e., every seven days) for the first 60 days, and at least once every 30 days thereafter.

c. A copy of the decision and justification for each review shall be provided to the detainee and communicated in a language or manner they understand, unless exceptional circumstances would compromise the facility's safety, security, or orderly operations.

d. After seven consecutive days in administrative segregation, the detainee may appeal the conclusions and recommendations of any review to the facility administrator. The appeal may be submitted using any standard form of written communication, including a detainee request form.

e. If a detainee remains in administrative segregation for more than 30 days and objects to the status, the facility administrator shall review the case to determine whether segregation should continue. The review must consider the detainee's

views and result in a written record of the decision and its justification. Similar reviews shall be conducted every 30 days thereafter.

### 4. Privileges in Administrative Segregation

Detainees in administrative segregation shall have access to programs, visitation, legal counsel, and other services available to the general population to the greatest extent possible. Any restrictions or withholding of privileges require written justification and must be reported to ICE/ERO.

## B. Placement in Disciplinary Segregation

Facility authorities may impose disciplinary measures, including temporary confinement in disciplinary segregation, to maintain a safe and orderly living environment for detainees in the general population. A detainee may be placed in disciplinary segregation only by order of the IDP or its equivalent (e.g., Disciplinary Hearing Officer), following a hearing where the detainee is found to have committed a prohibited act, and only if alternative measures are insufficient to address the behavior.

### 1. Duration

The maximum sanction for disciplinary segregation is 30 days per incident, except in extraordinary circumstances. After the initial 30 days and every 30 days thereafter, the facility administrator shall provide ICE/ERO with a written justification for continued segregation.

Any time spent in administrative segregation for the incident prior to the disciplinary hearing shall be deducted from the disciplinary segregation time sanctioned by the IDP.

### 2. Disciplinary Segregation Order

A written order shall be completed and signed by the chair of the IDP (or equivalent) before a detainee is placed in disciplinary segregation.

a. Prior to placement, the IDP shall complete a disciplinary segregation order detailing the reasons for the segregation, with all relevant documentation attached.

b. The completed order shall be immediately provided to the detainee and communicated in a language or manner they understand, unless doing so would compromise the facility's safety, security, or orderly operation.

c. Upon the detainee's release from disciplinary segregation, the releasing officer shall sign the order and record the date and time of release. The completed order shall be included in the detainee's detention file or stored in a retrievable electronic format.

### 3. Facility Review of Detainee Status in Disciplinary Segregation

All facilities shall implement written procedures for the regular review of disciplinary segregation cases, in accordance with the following guidelines:

a. A security supervisor shall interview the detainee and review their status in disciplinary segregation every seven days. The review must ensure the detainee is receiving showers, meals, recreation, and other basic necessities as required by this detention standard.

1) The supervisor may reduce the original sanction but cannot extend it.

2) All review documents shall be placed in the detainee's detention file or stored in a retrievable electronic format.

After each formal review, the detainee shall receive a written copy of the reviewing officer's decision and its justification, unless doing so would compromise the facility's safety, security, or orderly operation. If a written copy cannot be provided, the decision must be communicated orally, and the detainee's detention file or electronic record must note this, including the reasons for not providing written notice.

b. The facility administrator shall review a detainee's status in disciplinary segregation after the initial 30 days and every 30 days thereafter to determine if continued segregation is warranted.

## C. Notifying ICE/ERO of Segregation Placements and Facilitating ICE/ERO Review

### 1. Immediate Notifications

All SMU placements, regardless of duration, require a written order. The facility administrator must notify ICE/ERO in writing as soon as possible, but no later than 72 hours, of a detainee's initial placement in segregation.

### 2. Updates to Segregation Status

The facility administrator must notify ICE/ERO in writing when a detainee previously reported under this section is released from segregation.

### 3. Coordination with ICE/ERO in Reviewing Segregation Placements

The facility administrator shall provide ICE/ERO with all requested information and supporting documentation related to segregation placements and coordinate with ICE/ERO in:

a. Evaluating whether less restrictive housing or custodial options are appropriate and

available, including returning the detainee to the general population or reducing isolation in the SMU through measures such as increased out-of-cell time and participation in group activities; and

b. Evaluating whether a transfer is appropriate, including to a hospital or another facility where the detainee can be housed in the general population or an environment better suited to their needs, such as a facility with dedicated medical beds, a medical observation unit, a non-segregation protective custody unit, or an SMU with enhanced privileges.

## D. Logs and Records

### 1. Permanent SMU Log

A permanent log shall be maintained in the SMU to record all activities related to SMU detainees, such as meals served, recreational time, and visitors.

The SMU log shall include the detainee's name, A-number, housing location, admission date, reasons for admission, status review dates, tentative release date (for disciplinary segregation), authorizing official, and release date. Supervisory staff and other officials shall also use the SMU log to record their visits to the unit.

### 2. Special Management Housing Unit Record

The Special Management Housing Unit Record (ICE Form I-888) or an equivalent form approved by the ICE/ERO FOD or designee shall be completed immediately upon a detainee's placement in the SMU and used to document the detainee's duration in the unit.

a. The special housing unit officer shall immediately and routinely document whether the detainee ate, showered, participated in recreation, and took any medication. They will also document other relevant information, such as medical conditions or indications of suicidal or assaultive ideation, intent, or behavior. The officer shall print their name and sign the record.

b. Facility medical staff shall sign the record for each detainee they visit in the SMU. The housing officer shall initial the record following the medical visit, no later than the end of their shift.

c. Upon a detainee's release from the SMU, the releasing officer shall attach the detainee's complete housing unit record to the administrative or disciplinary segregation order and ensure it is included in the detainee's detention file or retrievable electronic record.

## E. Basic Requirements for Special Management Units

Conditions of confinement are determined by the level of supervision required to manage a detainee and ensure the safety of the detainee, other detainees, and facility staff.

Any exceptions to these requirements shall:

1. Be made solely to ensure the safety and security of detainees and facility staff;

2. Be approved by a supervisor or higher official;

3. Be temporary and situational, lasting only as long as justified by a threat to the safety or security of the facility, staff, or detainee population; and

4. Be documented in the Permanent SMU log and as specified in this detention standard, included in the detainee’s detention file or retrievable electronic record.

Placement in an SMU does not justify the use of restraints while in the unit or during movement within the facility, absent a showing that the detainee presents a risk of harm to himself or others. In the event the use of restraints is necessary, the supervisor can authorize the use of restraints on a case-by-case basis. Notice must be provided to ICE. The authorization must be reviewed at regularly occurring SMU committee meetings. Restraints shall only be used in accordance with Standard 2.8 “Use of Force and Restraints.”

## F. Translation/Interpretation Services

Detainees in the SMU shall be provided translation and/or interpretation services and any necessary communication assistance to ensure they understand the reasons for their confinement, the conditions of their confinement, and their rights and responsibilities.

## G. Special Needs

Detainees in the SMU shall receive appropriate accommodations and professional assistance for disabilities or special needs, including medical, therapeutic, or mental health treatment, equivalent to those provided to the general population.

## H. Cell Condition

Cells and rooms used for segregation must be well ventilated, adequately lit, temperature-controlled, and maintained in a sanitary condition at all times, in accordance with safety and security.

The number of detainees confined to each cell or room must not exceed its designed capacity under normal circumstances. In exigent situations, the facility administrator shall consult with ICE/ERO, who will coordinate with ICE/ERO legal counsel, before approving temporary additional cell occupancy. If approved, a report of the action shall be filed with the facility and the ICE/ERO FOD.

## I. Personal Property

Each facility shall establish guidelines, consistent with this standard, regarding the personal property detainees may retain in each type of segregation. Detainees in administrative segregation shall be generally subject to less restrictive personal property limitations than those in disciplinary segregation.

## J. Privileges

Each facility shall establish guidelines, consistent with this standard, regarding the privileges available to detainees in each type of segregation. If a detainee is deprived of any normally authorized items or activity, a report with documented justification shall be included in their detention file or retrievable electronic record.

### 1. Administrative Segregation

Detainees in administrative segregation shall generally receive the same privileges as those in the general population, subject to safety and security considerations for detainees and staff.

When space and resources permit, detainees in administrative segregation may be allowed additional time outside their cells beyond required recreation periods for activities such as socializing, watching TV, playing board games, or participating in voluntary work details (e.g., serving as orderlies in the SMU).

### 2. Disciplinary Segregation

Detainees in disciplinary segregation generally have fewer personal property privileges than those in the general population or administrative segregation.

## K. Close Supervision

SMU staff shall conduct and log observations at least twice per hour, but no more than 40 minutes apart, on an irregular basis. Detainees requiring increased observation shall be monitored accordingly.

## L. Specialized Training

Security staff assigned to the SMU shall receive training on relevant topics, including:

1. Identifying signs of mental health decompensation;
2. Techniques for interacting appropriately with mentally ill detainees;
3. De-escalation strategies; and
4. Documentation requirements for segregation cases.

## M. Health Care

Detainees must be evaluated by a health care professional prior to placement in an SMU, or as soon as possible, but no later than 24 hours after placement. The evaluation shall include an assessment of suspected or diagnosed mental illness, prior suicide attempts or self-harm, or other special needs, and must be documented by the health care professional.

Health care personnel shall conduct face-to-face medical assessments daily for detainees in an SMU. If concerns arise, the assessment shall be followed by a complete evaluation by a qualified health care or mental health provider, with a treatment plan developed as necessary.

Health care visits shall be documented the SMU housing record or an equivalent form. Whenever possible, out-of-cell, confidential assessments and visits must be provided to ensure patient privacy and remove barriers to treatment.

At least every 30 days, a qualified mental health care provider shall conduct a face-to-face psychological evaluation and document the review.

Detainees with a medical or mental illness, identified as being at risk of suicide, or on a hunger strike shall be removed from segregation if IHSC or facility medical staff determine that segregation has resulted in a deterioration in the detainee's medical or mental health and an appropriate alternative placement is available.

### 1. Detainees with Serious Mental Illnesses (SMI)

Detainees with a serious mental illness (SMI), as defined in Standard 4.3 "Medical Care," shall not be automatically placed in an SMU due to their mental illness. Efforts shall be made to house detainees with an SMI in a setting, either within or outside the facility, where appropriate treatment can be provided instead of an SMU.

The facility shall coordinate with ICE/ERO to explore alternatives to SMU housing for detainees with an SMI, including potential transfer to a hospital or another facility. ICE/ERO shall be immediately notified if a detainee with an SMI is placed in an SMU.

For any detainee with an SMI placed in restrictive housing:

a. Mental health staff shall evaluate the appropriateness of the placement and ensure appropriate mental health care, including any necessary reasonable modification, is provided.

b. Detainees shall be removed from restricted housing if mental health staff determine that the placement has resulted in a deterioration of the detainee's mental health and an appropriate alternative is available.

c. Mental health staff shall conduct a mental health evaluation within 72 hours of placement.

d. Mental health staff shall review the detainee's treatment plan, monitor the detainee's care on an ongoing basis, and review the placement in restricted housing at least every 14 days in coordination with ERO stakeholders.

e. A multidisciplinary committee of facility staff, including facility leadership, medical and mental health professionals, and security staff, shall meet weekly to review all detainees with SMI who are in restrictive housing.

f. At least weekly, a qualified mental health provider shall conduct face-to-face clinical contact with the detainee to monitor the detainee's mental health status, identify signs of deterioration, and recommend additional treatment as appropriate.

The facility shall seek to develop enhanced opportunities for in-cell and out-of-cell therapeutic activities, and additional unstructured out-of-cell time, for detainees with an SMI, to the extent such activities can be conducted while ensuring the safety of the detainee, staff, and other detainees.

**2. Pregnant Detainees**

Women who are pregnant, postpartum, or who recently experienced a miscarriage or terminated pregnancy shall generally not be placed in an SMU. In exceptional circumstances, placement may occur if the individual's behavior poses a serious and immediate risk of physical harm to themselves or others, or if the detainee requests protective custody and no suitable alternatives are available. Such decisions must be approved by the facility administrator or designee, in consultation with a medical professional, and reviewed every 48 hours.

## N. Meals

Detainees in the SMU shall receive three nutritionally adequate meals per day, consistent with the general population meal schedule and typically from the same menu. Special dietary and religious meals shall also be available. Any deviation from meals served to the general population must be documented, including the reason for the difference.

## O. Clothing and Personal Hygiene

Detainees in the SMU must be allowed to shave and shower at least three times per week and provided basic services, such as laundry, clothing, bedding, and linens, equivalent to those provided to the general population, while ensuring facility safety and security. Detainees must never be required to forgo basic hygiene privileges in exchange for recreation or law library access.

Clothing, mattresses, bedding, or linens may be withheld for medical or mental health reasons if possession of these items poses a safety or security risk. All such denials shall be documented and justified.

**P. Correspondence**

Detainees in the SMU may write, send, and receive correspondence under the same conditions as those in the facility's general population.

**Q. Visitation**

Detainees in the SMU shall typically use the visiting room during normal visiting hours. However, the facility may restrict or deny visitation for detainees who violate visitation rules or pose a threat to the security or good order of the visiting room. Detainees must never be required to forgo basic visitation privileges in exchange for recreation or law library access.

**R. Legal Visits**

Facilities shall not deny or restrict standard access to legal visitation for detainees in SMU. However, the facility administrator or designee may implement security precautions to ensure the safety of the detainee and visitors and maintain order. Staff shall inform legal service providers and assistants of any security concerns.

**S. Religious Guidance**

Detainees in the SMU shall be allowed to participate in religious practices, including group or self-led worship and prayer services, in accordance with the facility's safety, security, and orderly operation.

**T. Legal Materials**

Detainees in the SMU shall have access to legal materials in accordance with Standard 6.3 "Law Libraries and Legal Materials."

Detainees may retain personal legal material upon placement in an SMU, provided they do not pose a safety, security, or sanitation hazard.

If a detainee has a large amount of personal legal material, they may be required to place a portion with their stored personal property, with access permitted during scheduled hours. Requests to access stored legal material shall be accommodated as soon as possible, but no later than 24 hours after receipt of the initial request, unless documented security reasons prevent timely access.

**U. Law Library and Legal Rights Group Presentations Access**

Detainees in administrative or disciplinary segregation shall have the same access to the law library and legal rights presentations as the general population, unless compelling security concerns necessitate limitations.

The facility administrator shall notify ICE/ERO whenever access to legal materials is denied, with documentation of the denial and its justification included in the detainee's detention file or retrievable electronic record.

## V. Recreation

Facilities will maximize opportunities for group participation in recreation and other activities, consistent with safety and security considerations. Recreation may be conducted separately for certain individuals to prevent assaults and reduce management challenges.

Each detainee in the SMU shall be provided (or offered) access to exercise opportunities and equipment outside the living area and outdoors for at least one hour per day, at least five days per week, unless documented security, safety or medical concerns require otherwise.

1. Facilities shall prioritize safety when providing access to equipment to mitigate self-harm and ensure the safety of others. Equipment considerations may include sports balls, anchored or fixed pull-up and dip bars, weighted medicine balls or slam balls, cushioned mats to perform body weight exercises, and posted body weight workout charts for guidance.

2. If recreation privileges are suspended, the IDP (or equivalent) or facility administrator shall provide the detainee with written notification, including justification for the suspension.

3. Detainees must never be required to forgo basic hygiene, phone, visitation, or law library privileges for access to recreation privileges.

4. Denial of recreation or exercise privileges outside the detainee's cell for more than seven days requires approval from both the facility administrator and a health care professional. Such denials shall be rare and occur only in extreme circumstances.

5. The facility shall notify ICE/ERO in writing if a detainee is denied recreation or exercise privileges outside their cell for more than seven days.

## W. Telephone and Advanced Communication Services (ACS) Access

Detainees in the SMU shall have access to telephones and Advanced Communication Services (ACS), subject to the safety and security requirements of their SMU placement. Access may be reasonably restricted if it has been or is likely to be used for criminal purposes, poses a threat to safety or security, or if the detainee damages the equipment. Any restrictions must be clearly documented to justify the need for preserving the safety, security, and good order of the facility. This documentation shall be included in the detainee's detention file or maintained in a retrievable electronic format.

Detainees in disciplinary segregation may be restricted from making general telephone calls

as part of the disciplinary process. However, they must retain telephone access for family or personal emergencies, and for calls to attorneys, legal representatives, courts, and government offices.

All detainees, including those in disciplinary segregation, shall be allowed to place calls to attorneys, legal representatives, courts, and government offices – such as the DHS Office of Inspector General (OIG), DHS Office for Civil Rights and Civil Liberties, ICE/Office of Professional Responsibility (OPR) Integrity Coordination Center, and embassies or consulates – according to the facility schedule.

# STANDARD 2.10

## STAFF-DETAINEE COMMUNICATION

***NOTE:** Standards 1.1 "Language Assistance" and 4.7: "Disability Identification, Assessment, and Accommodation" are applicable to this standard. The facility is required to provide language assistance and disability accommodations to ensure effective communication, equal access to physical spaces, and the opportunity to participate in facility programs, services, and activities.*

## I. POLICY

Facilities must establish and implement procedures to facilitate formal and informal contact between detainees, ICE/ERO staff, and facility staff. Detainees shall be able to submit written requests (and electronic, where available) to ICE/ERO staff and receive timely responses in a language or manner they understand.

## II. STANDARDS AND PROCEDURES

### A. Facility Staff and Detainee Contact

Detainees shall have frequent opportunities for formal and informal contact with facility staff, including managerial and supervisory staff. Facility staff are required to address detainees in a professional and respectful manner.

The facility shall establish policies and practices for logging, receiving, and responding to detainee requests submitted in both written and electronic format. Responses must be provided within five business days from the date of receipt.

Any questions the facility receives regarding a detainee's immigration removal process must be immediately referred to ICE/ERO.

### B. ICE/ERO Access and Detainee Contact

The facility shall allow detainees to file grievances and communicate directly with ICE/ERO. Detainee communication with ICE/ERO staff may be facilitated in writing or, where available, via advanced communication services using electronic devices such as tablets. Communication shall be monitored and maintained accordingly.

#### 1. Unannounced Contacts with Detainees

ICE/ERO shall have access to conduct regular unannounced visits (i.e., not scheduled) to the facility's living and activity areas to facilitate informal communication with detainees and informally observe facility conditions.

**2. Scheduled Visits**

The facility shall accommodate requests from ICE and DHS components to access the facility and its detainee population.

**3. ICE/ERO Staff Presence**

ICE/ERO may assign dedicated ICE staff to the facility. This staff shall have unimpeded access to all areas of the facility and detainee records at all times, 24/7.

**4. Documenting ICE visits**

Facilities shall establish a process to document ICE visits.

## C. <u>Requests to ICE/ERO from Detainees</u>

All detainees shall have the opportunity to submit written or electronic questions, requests, or concerns to ICE/ERO staff. The facility must ensure adequate supplies of request forms and writing implements are available to detainees.

The facility shall have written procedures to route detainee requests to the appropriate ICE/ERO official(s). Electronic transmission of staff-detainee requests is acceptable provided all other requirements of this standard are met, including transmission and response timeframes, logging, tracking, confidentiality, and record retention. If there are insufficient working electronic devices, such as tablets, available, the facility must provide written request materials in accordance with this standard.

The facility shall deliver completed detainee request forms to ICE/ERO staff without reading, altering, or delaying them. Detainees may seal their requests in an envelope and clearly mark it with the name, title, or office to which it should be forwarded.

Detainees may seek assistance from another detainee, housing officer, or facility staff when preparing a request form. The facility shall ensure procedures allow detainees with special needs, including disabilities, illiteracy, or limited English proficiency, equal access to complete and submit requests as other detainees. The facility must accommodate these special assistance needs.

**1. ICE/ERO Responses to Detainees**

All ICE/ERO responses to detainee requests shall be provided in person, in writing, or electronically, in a language or manner the detainee understands.

a. In facilities with ICE/ERO onsite presence, detainee requests shall be delivered to the ICE/ERO staff as soon as practicable.

b. In facilities without ICE/ERO onsite presence, detainee requests shall be forwarded

to the ICE/ERO office of jurisdiction within two business days of receipt.

### 2. Record Keeping and File Maintenance

The date a detainee request is forwarded to ICE/ERO and the date it was returned shall be recorded.

All completed detainee request documents shall be retained in the detainee's detention file or a retrievable electronic archive. Copies shall be maintained in compliance with the National Archives and Records Administration (NARA) detention records retention requirements.

### 3. ICE/ERO Informational Postings

The facility administrator shall ensure that all ICE/ERO postings and related information are displayed in every housing unit and appropriate common areas, such as recreation, dining, and processing areas.

### 4. Additional Facility Responsibilities

The facility shall provide detainees with ICE/ERO contact information, including scheduled hours and days when ICE/ERO staff are available at the facility. Contact information shall be updated quarterly or as necessary to reflect changes in ICE/ERO personnel.

The facility shall provide detainees with a drop box to correspond directly with ICE/ERO management. Access to the drop-box shall be restricted to ICE/ERO personnel.

## D. Marriage Requests

Marriage requests must be forwarded to ICE/ERO for review and approval.

When a request is approved, the detainee, legal representative, or other individual(s) acting on his or her behalf must make all arrangements for the marriage. Arrangements may include, but are not limited to, taking a blood test, obtaining a marriage license, and retaining an official to perform the marriage ceremony.

The marriage may take place inside the facility, or ICE/ERO may take temporary custody for marriage arrangements.

# STANDARD 2.11

## SEXUAL ABUSE AND ASSAULT PREVENTION AND INTERVENTION

***NOTE:** Standards 1.1 "Language Assistance" and 4.7: "Disability Identification, Assessment, and Accommodation" are applicable to this standard. The facility is required to provide language assistance and disability accommodations to ensure effective communication, equal access to physical spaces, and the opportunity to participate in facility programs, services, and activities.*

## I. POLICY

ICE maintains a zero-tolerance policy for all forms of sexual abuse and assault. This standard requires facilities to act affirmatively to prevent sexual abuse and assaults on detainees, report allegations immediately, provide prompt and effective intervention and treatment for victims, and ensure the control, investigation, discipline, and prosecution of perpetrators.

## II. STANDARDS AND PROCEDURES

### A. Written Policy and Procedures Required

The facility shall have written policy and procedures for a Sexual Abuse and Assault Prevention and Intervention Program. These policies and procedures shall reflect the unique characteristics of the facility, including factors such as the availability of specialized community-based services (e.g., rape crisis/trauma units in local medical centers, clinics, and hospitals).

Policies and procedures must be reviewed and approved by ICE/ERO and include, at a minimum:

1. **Prevention –** Procedures on preventing sexual abuse and assault, including:

    a. Assessing all detainees for their risk of sexual abusiveness or victimization;

    b. Housing detainees in accordance with their classification assessment;

    c. Training all employees, contractors, and volunteers on their responsibilities; and

    d. Notifying detainees of the facility's Sexual Abuse and Assault Prevention and Intervention Program.

2. **Reporting** – Procedures for immediate reporting of sexual abuse and assault allegations, including:

a. Emphasizing the responsibility of all staff to report allegations or suspicions of sexual abuse and assault;

b. Immediately reporting allegations through the facility's chain of command and external methods;

c. Notifying ICE/ERO (must be sent directly to the FOD);

d. Referring allegations to law enforcement agencies;

e. Providing written documentation requirements to ensure that allegations or suspicions are properly reported and addressed; and

f. Receiving third-party reports of sexual abuse and assault in the facility, with information made available to the public regarding how to report sexual abuse and assault on behalf of a detainee.

3. **Intervention** – Procedures for prompt and effective intervention to address the safety and treatment needs of detainee victims, including:

a. Offering immediate protection, including prevention of retaliation and medical and mental health referrals;

b. Coordinating and facilitating actions taken by staff first responders, medical and mental health practitioners, investigators, and facility leadership; and

c. Addressing the alleged victim's future safety, medical, and mental health needs.

4. **Access to Victim Advocate Services** – Procedures for providing access to victim advocate services in sexual abuse and assault prevention and intervention programs, if such resources are available.

5. **Investigation and Discipline** – Procedures for investigation and discipline of assailants, including:

a. Coordinating with ICE/ERO and appropriate investigative agencies to facilitate administrative and/or criminal investigations;

b. Following a uniform evidence protocol, including access to a forensic medical exam;

c. Coordinating internal administrative investigations with the ICE OPR and mitigating interference with criminal investigations; and

d. Instituting disciplinary sanctions for staff, up to and including termination, when

there is a substantiated allegation of sexual abuse and assault, or when staff has violated agency sexual abuse and assault policies.

6. **Data Collection and Reporting** – Procedures for detailed and accurate data collection and reporting.

7. **Compliance** – Procedures to ensure cooperation with ICE/ERO audits and monitoring of facility compliance with sexual abuse and assault policies and standards.

The facility must implement written policy and procedures and meet all requirements in this standard within 90 days of adopting this standard.

The facility must post its protocols on its website, if it has one, or otherwise make the protocols available to the public.

## B. Acts of Sexual Abuse and Assault

For the purposes of this standard, the following definitions apply:

### 1. Detainee-on-Detainee Sexual Abuse and Assault

Sexual abuse of a detainee by another detainee includes any of the following acts by one or more detainees who, by force, coercion, or intimidation, or if the victim did not consent or was unable to consent or refuse, engages in or attempts to engage in:

a. Contact between the penis and the vulva or anus and, for purposes of this subparagraph, contact involving the penis upon penetration, however slight;

b. Contact between the mouth and the penis, vulva or anus;

c. Penetration, however slight, of the anal or genital opening of another person by a hand or finger or by any object;

d. Touching of the genitalia, anus, groin, breast, inner thighs or buttocks, either directly or through the clothing, with an intent to abuse, humiliate, harass, degrade or arouse or gratify the sexual desire of any person; or

e. Threats, intimidation, or other actions or communications by one or more detainees aimed at coercing or pressuring another detainee to engage in a sexual act.

### 2. Staff-on-Detainee Sexual Abuse and Assault

Sexual abuse and assault of a detainee by a staff member, contractor, or volunteer includes any of the following acts, if engaged in by one or more staff members,

volunteers, or contract personnel who, with or without the consent of the detainee, engages in or attempts to engage in:

a. Contact between the penis and the vulva or anus and, for purposes of this subparagraph, contact involving the penis upon penetration, however slight;

b. Contact between the mouth and the penis, vulva or anus;

c. Penetration, however slight, of the anal or genital opening of another person by a hand or finger or by any object that is unrelated to official duties or where the staff member, contractor, or volunteer has the intent to abuse, arouse, or gratify sexual desire;

d. Intentional touching of the genitalia, anus, groin, breast, inner thighs or buttocks, either directly or through the clothing, that is unrelated to official duties or where the staff member, contractor, or volunteer has the intent to abuse, arouse, or gratify sexual desire;

e. Threats, intimidation, harassment, indecent, profane or abusive language, or other actions or communications aimed at coercing or pressuring a detainee to engage in a sexual act;

f. Repeated verbal statements or comments of a sexual nature to a detainee;

g. Any display of his or her uncovered genitalia, buttocks, or breast in the presence of an inmate, detainee, or resident, or,

h. Voyeurism, which is defined as the inappropriate visual surveillance of a detainee for reasons unrelated to official duties. Where not conducted for reasons relating to official duties, the following are examples of voyeurism: staring at a detainee who is using a toilet in his or her cell to perform bodily functions; requiring an inmate detainee to expose his or her buttocks, genitals, or breasts; or taking images of all or part of a detainee's naked body or of a detainee performing bodily functions.

## C. <u>Compliance Manager</u>

The facility administrator shall designate a Prevention of Sexual Assault (PSA) Compliance Manager who shall serve as the facility point of contact for the ICE/ERO PSA Coordinator and who has sufficient time and authority to oversee compliance with facility sexual abuse and assault prevention and intervention policies and procedures. The PSA Compliance Manager shall:

1. Assist with the development and maintenance of written policies and procedures, as specified above in this standard;

2. Assist with the development of initial and ongoing training protocols;

3. Liaise with other agencies;

4. Coordinate data collection and reporting, as detailed in "O. Data Collection" in this standard;

5. Ensure they are notified of every allegation at the facility;

6. Review investigation results and assist in an annual evaluation of all investigations to improve prevention and response efforts; and

7. Ensure required levels of confidentiality are maintained.

## D. Sexual Conduct Between Detainees is Prohibited

All sexual conduct between detainees, including consensual conduct, is prohibited and subject to disciplinary sanctions. Staff shall assess whether seemingly consensual behavior may have involved coercion.

## E. Staff Training

Training on the facility's Sexual Abuse and Assault Prevention and Intervention Program shall be included in initial training for all employees and in biannual refresher training thereafter.

Training shall include:

1. The facility's zero-tolerance for all forms of sexual abuse and assault;

2. The right of detainees and staff to be free from sexual abuse and assault, and prohibitions on retaliation against individuals who report sexual abuse and assault;

3. Definitions and examples of prohibited and illegal sexual behavior;

4. Dynamics of sexual abuse and assault in detention;

5. Recognition of situations where sexual abuse and assault may occur;

6. How to avoid inappropriate relationships with detainees;

7. Working with vulnerable populations and addressing their potential vulnerability in the general population;

8. Recognition of the physical, behavioral and emotional signs of sexual abuse and assault and ways to prevent and respond to such occurrences;

9. Instruction on reporting knowledge or suspicion of sexual abuse and assault and the requirement to limit reporting to personnel with a need to know in order to make decisions concerning the detainee-victim's welfare, and for law enforcement/investigative purposes;

10. The investigation process and how to ensure that evidence is not destroyed;

11. Prevention, recognition and appropriate response to allegations or suspicions of sexual abuse and assault involving detainees with mental or physical disabilities; and

12. Instruction on documentation and referral procedures for all allegations or suspicions of sexual abuse and assault.

The facility shall ensure that all volunteers and other contractors (i.e., those who provide services on a non-recurring basis to the facility pursuant to a contractual agreement with the agency or facility) who have contact with detainees have been trained on their responsibilities under the facility's sexual abuse and assault prevention and intervention policies and procedures. The level and type of training for volunteers and contractors will be based on the services they provide and their level of contact with detainees; however, all volunteers and contractors who have any contact with detainees must be notified of the facility's zero-tolerance policy and informed how to report such incidents.

The facility must maintain written documentation verifying employee, volunteer, and contractor training.

The facility shall also provide specialized training to facility investigators who conduct investigations into allegations of sexual abuse and assault. This training must cover, at a minimum, interviewing victims, evidence collection in confinement settings, the criteria and evidence required for administrative action or prosecutorial referral, and information about effective cross-agency coordination in the investigation process. The facility must maintain written documentation verifying specialized training provided to investigators pursuant to this paragraph.

Facility medical staff shall be trained in procedures for examining and treating victims of sexual abuse in facilities where medical staff may be assigned these activities. This training shall be subject to the review and approval of ICE/ERO.

## F. <u>Detainee Notification, Orientation and Instruction</u>

The facility orientation program, as required by Standard 2.1 "Admission and Release," must notify and inform detainees of the zero-tolerance policy for all forms of sexual abuse and assault.

Following intake, the facility shall provide instruction to detainees on the facility's Sexual

Abuse and Assault Prevention and Intervention Program and ensure that such instruction includes (at a minimum):

1. The facility's zero-tolerance policy for all forms of sexual abuse and assault;

2. Prevention and intervention strategies;

3. Definitions and examples of detainee-on-detainee sexual abuse and assault, staff-on-detainee sexual abuse and assault, and coercive sexual activity;

4. Methods for reporting sexual abuse and assault, including: one or more staff members other than an immediate point-of-contact line officer, the ICE Detention, Removals, and Information Line (DRIL), the DHS Office of Inspector General (OIG) and the ICE OPR;

5. The right to receive treatment and counseling if a victim of sexual abuse and assault;

6. Information about self-protection and indicators of sexual abuse and assault; and

7. Prohibition against retaliation, including an explanation that reporting sexual abuse and assault shall not negatively impact the detainee's immigration proceedings.

## G. Detainee Reporting

The facility shall develop policies and procedures to ensure that detainees have multiple ways to privately report sexual abuse and assault, retaliation for reporting sexual abuse and assault, or staff neglect or violations of responsibilities that may have contributed to such incidents.

1. The facility shall provide victims the option to report the incident to a designated staff member other than an immediate point-of-contact line officer (e.g., the program coordinator or a mental health specialist). The facility shall provide detainees with the name of the program coordinator or designated staff member and information on how to contact him or her.

2. The facility shall provide instructions on how detainees may contact their consular official, the DHS OIG, the ICE OPR Integrity Coordination Center, or as appropriate, another designated office, to confidentially and, if desired, anonymously report these incidents.

3. The facility shall inform detainees of at least one way to report sexual abuse and assault to a public or private entity or office that is not part of the facility, and that is able to receive and immediately forward detainee reports of sexual abuse and assault to facility officials, allowing the detainee to remain anonymous upon request.

4. ICE/ERO will provide a sexual abuse and assault awareness notice to be posted on all housing-unit bulletin boards, as well as a "Sexual Assault Awareness Information" pamphlet to be distributed. The facility shall post with this notice the name of the facility PSA Compliance Manager and information about local organizations that can assist detainees who have been victims of sexual abuse and assault, including mailing addresses and telephone numbers (including toll-free hotline numbers where available). If no such local organizations exist, the facility shall make available the same information about national organizations.

## H. Victim Advocate Services

The facility shall utilize available community resources and services to provide expertise and support in the areas of crisis intervention, counseling, investigation and the prosecution of sexual abuse perpetrators to most appropriately address victims' needs. The facility administrator shall establish procedures to make available, to the full extent possible, outside victim services following incidents of sexual abuse and assault. The facility shall also attempt to make available such victim services for any detainees identified as having experienced sexual victimization prior to entering DHS custody.

The facility administrator shall maintain or attempt to establish memoranda of understanding (MOU) or other agreements with community service providers or, if local providers are not available, with national organizations that provide legal advocacy and confidential emotional support services for immigrant victims of crime. The facility shall enable reasonable communication between detainees and these organizations and agencies, in as confidential a manner as possible. The facility shall also inform detainees, prior to giving them access to outside resources, of the extent to which such communications will be monitored and the extent to which reports of abuse will be forwarded to authorities in accordance with mandatory reporting laws.

## I. Prevention

All staff and detainees are responsible for being alert to signs of potential situations in which sexual abuse and assaults might occur, and for making reports and intervention referrals as appropriate. If a staff member has a reasonable belief that a detainee is subject to a substantial risk of imminent sexual abuse and assault, he or she shall take immediate action to protect the detainee.

### 1. Classification and Screening

In accordance with Standards 2.1 "Admission and Release" and 2.2 "Custody Classification System," the facility shall assess all detainees on intake to identify those likely to be sexual aggressors or sexual abuse and assault victims. The facility shall consider, to the extent that the information is available, the criteria in 6 C.F.R. § 115.41 to assess detainees for risk of sexual victimization, and prior acts of sexual abuse and assault, prior convictions for violent offenses, and history of prior institutional violence or sexual abuse and assault (as known to the facility), to assess detainees for risk of

being sexually abusive. This information shall be used to make housing decisions and assignment of detainees to recreation and other activities in a manner that mitigates risk of sexual abuse and assault.

Detainees who are considered at risk shall be placed in the least restrictive housing that is available and appropriate. Such detainees shall be assigned to administrative segregation for protective custody only until an alternative means of separation from likely abusers can be arranged, and such an assignment shall not ordinarily exceed a period of 30 days.

Detainees shall not be disciplined for refusing to answer, or for not disclosing complete information in response to, questions asked pursuant to screening for risk of sexual abuse and assault.

The facility shall implement appropriate controls on the dissemination within the facility of responses to questions asked pursuant to this screening in order to ensure that sensitive information is not exploited to the detainee's detriment by staff or other detainees or inmates.

**2. Transportation**

Detainees identified as being "at risk" for sexual victimization shall be transported in accordance with that special safety concern. The section on "Seating of Detainees," found in Standard 1.3 "Transportation by Land," requires that transportation staff seat each detainee in accordance with written procedures from the facility administrator, with particular attention to detainees who may need to be afforded closer observation for their own safety.

**3. Upgrades to Facilities and Technologies**

When designing or acquiring any new facility and in planning any substantial expansion or modification of existing facilities, the facility shall consider the effect of the design, acquisition, expansion, or modification upon its ability to protect detainees from sexual abuse and assault.

When installing or updating a video monitoring system, electronic surveillance system, or other monitoring technology in a facility, the facility shall consider how such technology may enhance its ability to protect detainees from sexual abuse and assault.

## J. <u>Prompt and Effective Intervention</u>

Staff sensitivity toward detainees who are victims of sexual abuse and assault is critical. Staff shall take seriously all statements from detainees claiming to be victims of sexual abuse and assaults and shall respond supportively and non-judgmentally. Any detainee who alleges that he or she has been sexually abused and assaulted shall be offered immediate protection and separation from the assailant and shall be referred for a medical examination

and/or clinical assessment for potential negative symptoms. Staff members who become aware of an alleged assault shall immediately follow the reporting requirements set forth in the written policies and procedures.

If a victim is transferred between detention facilities, the sending facility shall, as permitted by law, inform the receiving facility of the incident and the victim's potential need for medical or social services (unless, in the case of transfer to a non-ICE facility, the victim requests otherwise). If the receiving facility is unknown to the sending facility, the sending facility shall notify ICE/ERO, so that he or she can notify the receiving facility.

Facilities will use a coordinated, multidisciplinary team approach to responding to sexual abuse and assault, such as a sexual abuse and assault response team (SART), which, in accordance with community practices, includes a medical practitioner, a mental health practitioner, a security staff member and an investigator from the assigned investigative entity, as well as representatives from outside entities that provide relevant services and expertise. The facility shall attempt to make available to the victim a victim advocate from a rape crisis center. If a rape crisis center is not available to provide victim advocate services, ICE/ERO will provide these services by making available a qualified staff member from a community-based organization, or a qualified agency staff member. A qualified agency staff member or a qualified community-based staff member means an individual who has received education concerning sexual assault and forensic examination issues in general. The outside or internal victim advocate shall provide emotional support, crisis intervention, information, and referrals.

Care shall be taken to place the detainee in a supportive environment that represents the least restrictive housing option possible (e.g., in a different housing unit, transfer to another facility, medical housing, or protective custody), and that takes into account any ongoing medical and mental health needs of the alleged victim.

Victims shall not be held for longer than five days in any type of administrative segregation, except in highly unusual circumstances or at the request of the detainee. A detainee victim who is in protective custody after having been subjected to sexual abuse shall not be returned to the general population until completion of a proper re-assessment, taking into consideration any increased vulnerability of the detainee as a result of the sexual abuse.

Where an alleged victim of sexual abuse and assault that occurred elsewhere in ICE/ERO custody is subsequently transferred to the facility, the facility shall comply with all applicable response and intervention requirements in this standard, as appropriate based on the nature and status of the case.

## K. <u>Protection Against Retaliation</u>

Staff, contractors, volunteers, and detainees shall not retaliate against any person, including a detainee, who reports, complains about, or participates in an investigation into an allegation of sexual abuse and assault, or for participating in sexual abuse and assault as a result of

force, coercion, threats, or fear of force.

The facility shall employ multiple protection measures, such as housing changes, removal of alleged staff or detainee abusers from contact with victims, and emotional support services for detainees or staff who fear retaliation for reporting sexual abuse and assault or for cooperating with investigations.

For at least 90 days following a report of sexual abuse and assault, the facility shall monitor to see if there are facts that may suggest possible retaliation by detainees or staff and shall act promptly to remedy any such retaliation. Items the facility shall monitor include any detainee disciplinary reports, housing, or program changes, or negative performance reviews or reassignments of staff. The facility shall continue such monitoring beyond 90 days if the initial monitoring indicates a continuing need.

## L. Reporting, Notifications and Confidentiality

The facility shall require all staff to report immediately any knowledge, suspicion, or information regarding an incident of sexual abuse and assault that occurred in a facility; retaliation against detainees or staff who reported such an incident; and any staff neglect or violation of responsibilities that may have contributed to an incident or retaliation.

Staff members who become aware of alleged sexual abuse and assault shall immediately follow the reporting requirements set forth in the facility's written policies and procedures.

Apart from such reporting, staff shall not reveal any information related to a sexual abuse and assault report to anyone other than to the extent necessary to help protect the safety of the victim or prevent further victimization of other detainees or staff in the facility, or to make medical treatment, investigation, law enforcement, or other security and management decisions.

If the alleged victim is under the age of 18 or considered a vulnerable adult under a state or local vulnerable persons statute, the facility shall report that information to ICE/ERO so that the agency can report the allegation to the designated state or local services agency under applicable mandatory reporting laws.

Staff shall accept reports made verbally, in writing, anonymously, and from third parties, and promptly document any verbal reports.

The facility shall establish a method to receive third-party reports of sexual abuse and assault in its facility and shall make available to the public information on how to report sexual abuse and assault on behalf of a detainee.

### 1. Alleged Detainee Perpetrator

When a detainee(s) is alleged to be the perpetrator, it is the facility administrator's

responsibility to ensure that the incident is promptly referred to the appropriate law enforcement agency having jurisdiction for investigation (if the incident is potentially criminal) and reported to ICE/ERO (this notification must go directly to the FOD), which shall report it to the OPR Integrity Coordination Center.

**2. Alleged Staff Perpetrator**

When an employee, contractor, or volunteer is alleged to be the perpetrator of detainee sexual abuse and assault, it is the facility administrator's responsibility to ensure that the incident is promptly referred to the appropriate law enforcement agency having jurisdiction for investigation (if the incident is potentially criminal) and reported to ICE/ERO (this notification must go directly to the FOD), which shall report it to the ICE/OPR Integrity Coordination Center. The local government entity or contractor that owns or operates the facility shall also be notified.

Staff, contractor, and volunteers suspected of perpetrating sexual abuse and assault shall be removed from all duties requiring detainee contact pending the outcome of an investigation.

Upon receiving an allegation that a detainee was sexually abused and assaulted while confined at another facility, the facility whose staff received the allegation shall notify ICE/ERO and the appropriate administrator of the facility where the alleged abuse occurred. The notification provided in this section shall be provided as soon as possible, but no later than 72 hours after receiving the allegation. The facility shall document that it has provided such notification. The facility where the alleged abuse occurred shall then ensure the allegation is referred for investigation and reported to ICE/ERO (this notification must go directly to the FOD) in accordance with this standard.

## M. Investigation, Discipline and Incident Reviews

If a detainee alleges sexual abuse and assault, a sensitive and coordinated response is necessary. The facility shall coordinate with ICE/ERO and other appropriate investigative agencies to ensure that an administrative and/or criminal investigation is completed for all allegations of sexual abuse and assault.

All investigations of alleged sexual abuse and assault must be prompt, thorough, objective, and fair and conducted by specially trained, qualified investigators.

Where an alleged victim of sexual abuse and assault that occurred elsewhere is subsequently transferred to the detention facility, the facility shall cooperate with any administrative or criminal investigative efforts arising from the incident.

**1. Preservation of Evidence**

The first security staff member to respond to a report of sexual abuse and assault, or his or her supervisor, shall preserve and protect, to the greatest extent possible, any crime

scene until appropriate steps can be taken to collect any evidence. If the abuse occurred within a time period that still allows for the collection of physical evidence, the responder shall request the alleged victim not to take any actions, and shall ensure that the alleged abuser does not take any actions that could destroy physical evidence, including, as appropriate, washing, brushing teeth, changing clothes, urinating, defecating, smoking, drinking, or eating. If the first staff responder is not a security staff member, the responder shall be required to request that the alleged victim not take any actions that could destroy physical evidence and then notify security staff.

**2. Forensic Examinations**

Where evidentiarily or medically appropriate, at no cost to the detainee, and only with the detainee's consent, the facility administrator shall arrange for an alleged victim to undergo a forensic medical examination by qualified health care personnel, including a Sexual Assault Forensic Examiner (SAFE) or Sexual Assault Nurse Examiner (SANE) where practicable. If SAFEs or SANEs cannot be made available, the examination can be performed by other qualified health care personnel.

As requested by a victim, the presence of his or her outside or internal victim advocate, including any available victim advocacy services offered by a hospital conducting a forensic exam, shall be allowed for support during a forensic exam and investigatory interviews.

The results of the physical examination and all collected physical evidence are to be provided to the investigative entity. Part of the investigative process may also include an examination and collection of physical evidence from the suspected assailant(s).

In the event the investigation is being conducted by a non-federal investigating agency, the facility shall request that the investigating agency follow the applicable requirements of this standard, including subsections 1 and 2 of this section.

**3. Procedures for Administrative Investigations**

Upon conclusion of a criminal investigation where the allegation was substantiated, or in instances where no criminal investigation has been completed, an administrative investigation shall be conducted. Upon conclusion of a criminal investigation where the allegation was unsubstantiated, the facility shall review any available completed criminal investigation reports to determine whether an administrative investigation is necessary or appropriate. Substantiated allegation means an allegation that was investigated and determined to have occurred. Unsubstantiated allegation means an allegation that was investigated, and the investigation produced insufficient evidence to make a final determination as to whether or not the event occurred. Unfounded allegation means an allegation that was investigated and determined not to have occurred.

Administrative investigations shall be conducted after consultation with the appropriate

investigative office within DHS and the assigned criminal investigative entity. The ICE OPR will typically be the appropriate investigative office within DHS, as well as the DHS OIG in cases where the DHS OIG is conducting an investigation.

The facility shall develop written procedures for administrative investigations, including provisions requiring:

a. Preservation of direct and circumstantial evidence, including any available physical and DNA evidence and any available electronic monitoring data;

b. Interviewing alleged victims, suspected perpetrators, and witnesses;

c. Reviewing prior complaints and reports of sexual abuse and assault involving the suspected perpetrator;

d. Assessment of the credibility of an alleged victim, suspect, or witness, without regard to the individual's status as detainee, staff, or employee, and without requiring any detainee who alleges sexual abuse and assault to submit to a polygraph;

e. An effort to determine whether actions or failures to act at the facility contributed to the abuse;

f. Documentation of each investigation by written report, which shall include a description of the physical and testimonial evidence, the reasoning behind credibility assessments, and investigative facts and findings; and

g. Retention of such reports for as long as the alleged abuser is detained or employed by the agency or facility, plus five years.

Such procedures shall govern the coordination and sequencing of administrative and criminal investigations, in accordance with the first paragraph of this section, to ensure that the criminal investigation is not compromised by an internal administrative investigation.

When an administrative investigation is undertaken, the facility shall impose no standard higher than a preponderance of the evidence in determining whether allegations of sexual abuse and assault are substantiated.

The departure of the alleged abuser or victim from the employment or control of the facility shall not provide a basis for terminating an investigation.

When outside agencies investigate sexual abuse and assault, the facility shall cooperate with outside investigators and shall endeavor to remain informed about the progress of the investigation.

Following an investigation conducted by the facility into a detainee's allegation of sexual abuse and assault, the facility shall notify ICE/ERO of the results of the investigation and any responsive actions taken so that the information can be reported to ICE/ERO headquarters and to the detainee.

**4. Discipline**

a. Disciplinary sanctions for staff

Staff shall be subject to disciplinary or adverse action up to and including removal from their position for substantiated allegations of sexual abuse and assault or for violating agency or facility sexual abuse rules, policies or standards. Removal from their position is the presumptive disciplinary sanction for staff who have engaged in or attempted or threatened to engage in those acts of sexual abuse and assault defined in paragraphs a-d and g-h of "Staff on Detainee Sexual Abuse and/or Assault" in "B. Acts of Sexual Abuse and/or Assault" in this standard.

The facility shall report all incidents of substantiated sexual abuse and assault by staff, and all removals of staff, or resignations in lieu of removal, for violations of agency or facility sexual abuse and assault policies, to appropriate law enforcement agencies unless the activity was clearly not criminal.

The facility shall also report all such incidents of substantiated abuse, removals, or resignations in lieu of removal to ICE/ERO, regardless of whether the activity was criminal, and shall make reasonable efforts to report such information to any relevant licensing bodies, to the extent known.

b. Corrective action for contractors and volunteers

Any contractor or volunteer who has engaged in sexual abuse and assault shall be prohibited from contact with detainees. The facility shall take appropriate remedial measures and shall consider whether to prohibit further contact with detainees by contractors or volunteers who have not engaged in sexual abuse but have violated other provisions within these standards.

Incidents of substantiated sexual abuse and assault by a contractor or volunteer shall be reported to law enforcement agencies, unless the activity was clearly not criminal. The facility shall also report such incidents to ICE/ERO regardless of whether the activity was criminal and shall make reasonable efforts to report such incidents to any relevant licensing bodies, to the extent known.

c. Disciplinary sanctions for detainees

Detainees shall be subjected to disciplinary sanctions pursuant to a formal disciplinary process following an administrative or criminal finding that the detainee

engaged in sexual abuse and assault, consistent with the requirements of Standard 3.1 "Disciplinary System." The facility shall not discipline a detainee for sexual contact with staff unless there is a finding that the staff member did not consent to such contact. For the purpose of disciplinary action, a report of sexual abuse and assault made in good faith based upon a reasonable belief that the alleged conduct occurred shall not constitute falsely reporting an incident or lying, even if an investigation does not establish evidence sufficient to substantiate the allegation.

**5. Sexual Abuse Incident Reviews**

The facility shall conduct a sexual abuse and assault incident review at the conclusion of every investigation of sexual abuse and assault within 30 calendar days. If an allegation was determined to be substantiated or unsubstantiated, the facility must prepare a written report within 30 calendar days of the conclusion of the investigation recommending whether the allegation or investigation indicates that a change in policy or practice could better prevent, detect, or respond to sexual abuse and assault. The facility shall implement the recommendations for improvement or shall document its reasons for not doing so in a written response. Both the report and response shall be forwarded to ICE/ERO for transmission to the ICE/ERO PSA Coordinator. The facility shall also provide any further information regarding such incident reviews as requested by the ICE/ERO PSA Coordinator.

The review team shall consider the criteria in 6 CFR §115.86 (b).

The facility shall conduct an annual review of all sexual abuse and assault investigations and resulting incident reviews to assess and improve sexual abuse and assault intervention, prevention, and response efforts. If the facility has not had any reports of sexual abuse and assault during the annual reporting period, then the facility shall prepare a negative report. The results and findings of the annual review shall be provided to the facility administrator and ICE/ERO for transmission to the ICE/ERO PSA Coordinator (this notification must be sent directly to the FOD).

## N. <u>Medical and Mental Health Care</u>

Detainee victims of sexual abuse and assault shall be provided emergency medical and mental health services and ongoing care. All treatment services, both emergency and ongoing, shall be provided to the victim without financial cost and regardless of whether the victim names the abuser or cooperates with any investigation arising out of the incident.

**1. Access to emergency medical and mental health services**

a. Detainee victims of sexual abuse and assault shall have timely, unimpeded access to emergency medical treatment and crisis intervention services, including emergency contraception and sexually transmitted infections prophylaxis, in accordance with professionally accepted standards of care.

b. Where evidentiarily or medically appropriate, the facility administrator shall arrange for an alleged victim to undergo a forensic medical examination, in accordance with the requirements of "M. Investigation, Discipline and Incident Reviews" of this standard.

c. Transportation of an alleged victim for emergency care or other services provided off-site shall be arranged in a manner that takes into account the special needs of victimized detainees.

**2. Ongoing medical and mental health care for sexual abuse and assault victims and abusers**

a. The facility shall offer medical and mental health evaluation and, as appropriate, treatment to all detainees who have been victimized by sexual abuse and assault while in immigration detention.

b. The evaluation and treatment of such victims shall include, as appropriate, follow-up services, treatment plans, and, when necessary, referrals for continued care following their transfer to, or placement in, other facilities, or their release from custody.

c. The facility shall provide such victims with medical and mental health services consistent with the community level of care.

d. Detainee victims of sexually abusive vaginal penetration by a male abuser while incarcerated shall be offered pregnancy tests. If pregnancy results from an instance of sexual abuse and assault, the victim shall receive timely and comprehensive information about lawful pregnancy-related medical services and timely access to all lawful pregnancy-related medical services.

e. Detainee victims of sexual abuse and assault while detained shall be offered tests for sexually transmitted infections as medically appropriate.

f. The facility shall attempt to conduct a mental health evaluation of all known detainee-on-detainee abusers within 60 calendar days of learning of such abuse history and offer treatment when deemed appropriate by mental health practitioners.

## O. <u>Data Collection</u>

The facility shall maintain, in a secure area, all case records associated with claims of sexual abuse and assault, including incident reports, investigative reports, offender information, case disposition, medical and counseling evaluation findings, and recommendations for post-release treatment, if necessary, and/or counseling shall be maintained in appropriate files in accordance with these detention standards and applicable policies, and retained in accordance

with established schedules.

Particularly applicable to the storage, confidentiality and release of case records are the requirements of the "Confidentiality and Release of Medical Records" section of Standard 4.3 "Medical Care" and the requirements of Standard 7.1 "Detention Files," especially in regard to the Privacy Act of 1974. Because of the very sensitive nature of information about victims and their medical condition, including infectious disease testing, staff must be particularly vigilant about maintaining confidentiality and releasing information only for legitimate need-to-know reasons.

Monitoring and evaluation are essential for assessing both the rate of occurrence of sexual abuse and assault and agency effectiveness in reducing sexually abusive behavior. Accordingly, the facility administrator must maintain two types of files of sexual abuse and assault incidents which include the following minimum information:

1. General files include:

    a. The victim(s) and perpetrator(s) of a sexual abuse and assault;

    b. The date, time, location, and nature of the incident;

    c. The demographic background of the victim and perpetrator (including citizenship, age, sex, and other factors described in 6 C.F.R. § 115.87);

    d. Detailed reporting timeline, including the names of the individuals who reported the incident and received the report of sexual assault, date and time the report was received, and steps taken to communicate the report up the chain of command;

    e. Any injuries sustained by the victim;

    f. All formal and/or informal action taken, including all post-report follow up response taken by the facility (e.g., housing placement/custody classification, medical examination, mental health counseling, etc.);

    g. All reports;

    h. Medical forms or other relevant medical information;

    i. Supporting memos and videotapes, if any;

    j. Any sanctions imposed on the perpetrator; and

    k. Any other evidentiary materials pertaining to the allegation.

The facility administrator shall maintain these files chronologically in a secure location.

In addition, the facility administrator shall maintain a listing of the names of sexual abuse and assault victims and assailants, along with the dates and locations of all sexual abuse and assault incidents occurring within the facility, on his or her computerized incident reporting system. Such information shall be maintained on a need-to-know basis in accordance with the Standards 4.3 "Medical Care" and 7.1 "Detention Files," which includes protection of electronic files from unauthorized access. At no time may law enforcement sensitive documents or evidence be stored at the facility. Access to this designation shall be limited to those staff involved in the treatment of the victim or the investigation of the incident. The authorized designation shall allow appropriate staff to track the detainee victim or assailant of sexual abuse and assault across the system.

On an ongoing basis, the facility PSA Compliance Manager and facility administrator must work with ICE/ERO and the ICE/ERO PSA Coordinator to share data regarding sexual abuse and assault incidents and response.

**P. <u>Facility Audits</u>**

Facilities shall cooperate with all DHS audits of the facility's compliance with this standard, including by making available relevant documents, records, and other information as requested (including available videotapes and other electronically available data). Upon request, facilities shall also provide to DHS the results of any audits conducted of the facility against the DOJ "National Standards to Prevent, Detect, and Respond to Prison Rape," 28 C.F.R. Part 115.

Facilities shall permit auditors access to all areas of the facility and shall make available space suitable for interviews of detainees and staff. Detainees shall be permitted to have private interviews with auditors, and to send confidential information or correspondence to the auditor.

# Section 3: ORDER



# STANDARD 3.1

## DISCIPLINARY SYSTEM

***NOTE:** Standards 1.1 "Language Assistance" and 4.7: "Disability Identification, Assessment, and Accommodation" are applicable to this standard. The facility is required to provide language assistance and disability accommodations to ensure effective communication, equal access to physical spaces, and the opportunity to participate in facility programs, services, and activities.*

## I. POLICY

Facilities shall promote a safe and orderly living environment for detainees by establishing a fair and equitable disciplinary system, requiring detainees to comply with facility rules and regulations, and imposing disciplinary sanctions on those who do not comply.

## II. STANDARDS AND PROCEDURES

### A. Guidelines

1. Facilities shall implement a detainee disciplinary system with progressive levels of reviews, appeals, procedures, and documentation. Disciplinary policy and procedures shall clearly define detainee rights and responsibilities.

2. Disciplinary action must not be capricious or retaliatory, and corporal punishment is strictly prohibited.

3. Staff shall not impose the following sanctions unless such activity poses a threat to life and safety: deviations from food services or availability of water; deprivation of clothing, bedding, or items of personal hygiene; deprivation of correspondence privileges; deprivation of legal visitation, legal mail, access to the law library, or the removal of legal papers; or deprivation of physical exercise.

4. When a detainee demonstrates a suspected or diagnosed cognitive impairment, disability, or mental illness, the Institution Disciplinary Panel (IDP) or Disciplinary Hearing Officer (DHO) shall consult with the facility mental health provider for input regarding:

   a. The detainee's ability to understand the nature of the disciplinary proceedings and help in their own defense.

   b. The detainee's ability at the time of the conduct to appreciate the nature and quality or the wrongfulness of his or her acts.

   c. Any mitigating factors which may have contributed to their behavior.

d. The impact applicable sanctions may have on their treatment plan when determining what type of sanction, if any, shall be imposed.

5. At all steps in the disciplinary process, any sanctions imposed shall be commensurate with the severity of the committed prohibited act and intended to encourage the detainee to conform with rules and regulations in the future.

## B. Incident Reports

Officers who witness a prohibited act, or have reason to suspect one has been committed, shall promptly report the incident according to facility policy and identify the officer(s), the detainee(s), and all witness(es) to the incident.

Minor transgressions involving detainees may be settled informally and by mutual consent whenever possible.

## C. Investigations

The facility shall have procedures in place to ensure that all alleged rule violations are reviewed within 24 hours of the time the violation is reported. The investigation shall be completed within 72 hours of receipt of the Incident Report, barring exceptional circumstances.

The investigating officer shall have had no prior involvement in the incident, either as witness or officer at the scene.

## D. Unit Disciplinary Committee (UDC)

Facilities may establish an intermediate level of adjudication for low or moderate infractions known as the UDC. Before hearing a case, the UDC shall ensure that the detainee is afforded all the rights listed under "Notice of Rights," below.

The UDC will have authority to consider written reports, statements, and physical evidence, hear pleadings on the part of the detainee, make findings that a detainee did or did not commit the rule violation(s) or prohibited act(s) as charged, based on the preponderance of evidence, and impose minor sanctions.

The UDC shall not include the reporting officer, the investigating officer, or an officer who witnessed or was directly involved in the incident, except in the unlikely event that every available officer witnessed or was directly involved in the incident.

The UDC shall:

1. Refer to the IDP or DHO any incident involving a serious violation, with or without a UDC hearing, as appropriate.

2. Serve the detainee with:

   a. A copy of the UDC decision and sanctions imposed; or

   b. Written notification of charges and hearing before the IDP or DHO.

3. If the detainee's case is referred to the IDP or DHO, advise the detainee, in writing, of the right to:

   a. Call witnesses and present evidence before the IDP/DHO; and

   b. A staff representative before the IDP/DHO.

**E. <u>Institution Disciplinary Panel (IDP) or Disciplinary Hearing Officer (DHO)</u>**

The facility shall have an IDP or DHO to adjudicate detainee incident reports. Only the IDP or DHO can place a detainee in disciplinary segregation. It shall be the responsibility of the IDP or DHO to ensure that the detainee does not have documentation in his or her medical record of suspected or diagnosed mental illness or cognitive impairment prior to placing the detainee in disciplinary segregation.

Barring extraordinary circumstances, the panel shall not include the reporting officer, the investigating officer, any member of the referring UDC, or anyone who witnessed or was directly involved in the incident.

The IDP or DHO shall have authority to:

1. Conduct hearings on all charges and allegations.

2. Call witnesses to testify.

3. Consider written reports, statements, physical evidence, and oral testimony.

4. Hear pleadings by detainee and staff representative.

5. Make findings that the detainee did or did not commit the rule violation(s) or prohibited act(s) as charged, based on the preponderance of evidence.

6. Impose sanctions as listed and authorized in each category.

**F. <u>Notice of Rights</u>**

Before the hearing, the UDC, IDP, or DHO will advise the detainee, in a language or manner they understand, of their right to:

1. Remain silent at any stage of the disciplinary process.

2. Due process, including a UDC hearing (or IDP/DHO hearing if the facility does not have or bypasses a UDC) within 24 hours of the end of the investigation. If there is a UDC hearing, then the IDP hearing must be held within 48 hours after the conclusion of the UDC hearing.

3. Attend the entire hearing (excluding committee deliberations). If security considerations prevent the detainee's attendance, the committee must document the security considerations.

4. Present statements and evidence on their own behalf.

5. Utilize language services to participate meaningfully in the hearing.

6. Appeal the committee's determination through the detainee appeal process or waive the right to appeal.

## G. Detainee Assistance

A detainee may be provided staff assistance in preparing his or her defense. This assistance will automatically be offered for detainees who are illiterate, have limited English proficiency, or have disabilities, which may impede the ability to collect or present evidence (including detainees in segregation).

## H. Postponement of Disciplinary Proceedings

The facility shall permit hearing postponements or continuances. Postponements beyond 72 hours from the time of referral to the IDP will be documented.

## I. Duration of Sanctions

The duration of punishment shall be within established limits. Neither the panel recommending sanctions nor the facility administrator making the final decision shall impose sanctions arbitrarily or outside these limits.

1. Time in segregation or the withholding of privileges after a hearing shall generally not exceed 30 days per incident, except in extraordinary circumstances.

2. Multiple sanctions stemming from the same incident shall run concurrently.

3. Time served in segregation pending the outcome of the proceedings shall be credited towards disciplinary segregation time.

4. The disciplinary report and accompanying documents shall not be placed in the file of a detainee who is found not guilty. However, the facility may retain the material in its own files for institutional uses such as statistical or historical recordkeeping, etc.

## J. Disciplinary Severity Scale and Prohibited Acts

The facility shall have graduated scales of offenses and disciplinary consequences, as provided in this section.

## K. Documents

All documents relevant to the incident, subsequent investigation, hearing(s), etc., will be completed and distributed in accordance with facility procedures.

## L. Confidential Information

When a decision relies on information from a confidential informant, the UDC or IDP shall include in the hearing record the factual basis for finding the information reliable.

## M. Notice to Detainees

The facility handbook shall provide notice of the facility's rules of conduct, and of the sanctions imposed for violations of the rules. Among other things, the handbook shall advise detainees of the following:

1. The right to protection from personal abuse, corporal punishment, unnecessary or excessive use of force, personal injury, disease, property damage, and harassment;

2. The right to freedom from discrimination based on race, religion, national origin, color, sex, age, sexual orientation, disability, or political beliefs; and

3. The right to due process, including the prompt resolution of a disciplinary matter in accordance with the rules, procedures, and sanctions and procedures for appealing disciplinary findings provided in the handbook.

# Section 4: CARE



# STANDARD 4.1

## FOOD SERVICE

***NOTE:** Standards 1.1 "Language Assistance" and 4.7: "Disability Identification, Assessment, and Accommodation" are applicable to this standard. The facility is required to provide language assistance and disability accommodations to ensure effective communication, equal access to physical spaces, and the opportunity to participate in facility programs, services, and activities.*

## I. POLICY

The facility shall provide detainees with nutritious, attractively presented meals, prepared and served in a sanitary and hygienic food service operation.

## II. STANDARDS AND PROCEDURES

### A. Administration

#### 1. Food Service Administrator (FSA) or Equivalent

The food service program shall be under the direct supervision of a professional food service administrator (FSA). The FSA is responsible for planning, controlling, directing, and evaluating food service; training staff and detainees; managing budget resources; establishing standards of sanitation, safety, and security; developing nutritionally adequate menus and evaluating detainee acceptance; developing specifications for the procurement of food, equipment, and supplies; and ensuring a quality food service program.

### B. General Policy

#### 1. Custody and Security

The facility's custody and security policy and procedures shall address the buildings or portions of buildings housing the food service department; all types of detainee traffic in and out of the department; detainee behavior; control of utensils with a custodial hazard potential (knives, cleavers, saws, tableware, etc.); official counts and/or census; and any other matters having a direct or indirect bearing on custody and security.

All meals, carts, and trays shall be inspected by security staff prior to entering the secured area of the facility.

The facility will devise and provide appropriate training to all food service personnel in detainee custodial issues.

### 2. Knife Control

Knives must be physically secured to workstations or used only under direct staff supervision.

### 3. Controlled Food Items/Hot Items

All facilities shall have procedures for the storage and handling of food items that pose a security threat, including, but not limited to, yeast, mace, nutmeg, cloves, and alcohol-based flavorings.

### 4. Detainee Job Descriptions

The FSA shall review detainee job descriptions annually to ensure they are accurate and up to date. Before starting work in the department, the detainee will sign for receipt of the applicable job description.

### 5. Detainee Orientation and Training

To ensure a quality food service program and instill good work habits, each FSA or designee shall instruct newly assigned detainee workers in the rules, safety measures, and procedures of the food service department.

## C. Food Service Dining Room/Satellite Meal Operations

### 1. General Policy

Ordinarily detainees shall be served three meals every day, at least two of which shall be hot meals; however, the facility administrator may approve variations in the food service schedule during religious and civic holidays, provided that basic nutritional goals are met. The facility's meal schedule must allow no more than 14 hours between the evening meal and breakfast.

Clean, potable drinking water must be available.

Meals shall always be prepared, delivered, and served under staff (or detention facility contractor) supervision.

### 2. Display and Service

The following procedures apply to the display, service, and transportation of food to mainline and satellite food service areas:

a. Food shall be fit for consumption and appropriately presented;

b. Sanitary guidelines must be observed, with hot foods maintained at a temperature

of at least 135 degrees F and foods that require refrigeration maintained at 41 degrees F or below.

c. Open food items and beverages shall be protected from contaminants by clean sneeze-guards, cabinets, display cases, or other such equipment.

d. Servers must wear plastic gloves whenever direct contact with food, ice, or beverage is possible. They must use tongs, forks, spoons, ladles, or other utensils to serve any food or beverage.

e. Utensils shall be sanitized as often as necessary to prevent cross-contamination and other food-handling hazards during food preparation and service.

f. If the facility cannot maintain the minimum or maximum temperature required for food safety, the affected items (e.g., salad bar staples such as lettuce, meat, eggs, cheese) must be discarded after two hours at room temperature.

g. Food will be delivered from one place to another in covered containers. If the food carts do not have locking devices, they must be supervised by facility staff.

h. All food safety provisions (sanitation, safe-handling, storage, etc.) apply without exception to food in transit.

i. Soiled equipment and utensils must be transported to the appropriate receptacles in closed containers.

j. A member of the food service staff will oversee the loading of satellite-meal carts. Staff shall inspect and secure all food carts before allowing their removal from the food service area.

## D. Menu Planning

### 1. General Policy

The FSA shall base menu selections on a nutritional program meeting or exceeding minimum U.S. recommended daily allowances. The FSA shall consider the ethnic and religious diversity of the facility's detainee population when developing menu cycles.

### 2. Nutritional Analysis

A registered dietitian shall conduct an annual complete nutritional analysis of every master-cycle menu planned by the FSA. Menus must be certified by the dietitian before implementation. If necessary, the FSA shall modify the menu in light of the nutritional analysis, to ensure nutritional adequacy.

## E. Food Preparation

### 1. General Policy

The FSA is responsible for ensuring that all items on the master-cycle menu are prepared and presented according to approved recipes. The FSA or designee has the authority to change menu items when necessary. Every such change/substitution must be documented and forwarded to the FSA. The FSA or designee shall exercise this menu-changing authority as infrequently as possible.

### 2. Preparation Guidelines

Food shall be prepared and served in compliance with the most recent version of the FDA Food Code. Food shall be prepared with minimal manual contact. Food service workers shall thoroughly wash fruits and vegetables with fresh water before cooking or serving raw.

The FSA or designee shall use thermometers to ensure the attainment and maintenance of proper internal cooking, holding, or refrigeration temperatures of all potentially hazardous foods.

### 3. Food Protection - General Requirements

Food and ice will be protected from dust, insects and rodents, unclean utensils and work surfaces, unnecessary handling, coughs and sneezes, flooding, drainage, overhead leakage, and other sources of contamination. Protection will be continuous, whether the food is in storage, during preparation, on display, or in transit.

All food storage units must be equipped with accurate easy-to-read thermometers. Refrigeration equipment shall be designed and operated to maintain temperature of 41 degrees F or below.

### 4. Leftovers

Prepared and properly maintained food items which have not been placed on the serving line may be retained for no more than 24 hours. Leftovers offered for service a second time shall not be retained but discarded immediately after offering. All saved prepared food shall be labeled to identify the product, preparation date, and time.

## F. Religious/Special Diets

### 1. General Policy

ICE/ERO requires all facilities to provide detainees requesting a religious diet reasonable and equitable opportunity to observe their religious dietary practice within the constraints of the security and orderly operations of the facility. While each request for religious diet accommodation is to be determined on a case-by-case basis, ICE/ERO

anticipates that facilities will grant these requests unless an articulable reason exists to disqualify someone for religious accommodation or the detainee's practice poses a significant threat to the secure and orderly operation of the facility.

To initiate or end a religious diet program, the detainee will provide a written statement specifying the religious motivation for participation in or termination of the religious diet program, as appropriate. A copy of the request and decision granting or denying it will be kept in the detainee's detention file or in a retrievable electronic format.

When considering denying a detainee request to participate in the religious diet program, or removal of a detainee from the religious diet program, the facility administrator, or his or her designee, shall consult with the FOD, or their designee. This shall occur prior to denying a request or removing a detainee from the program.

**2. Religious Diet Menu**

Facilities must make available religious diet menus to accommodate the religious requirements of detainees, to include but are not limited to: Kosher, Halal, vegetarian, and vegan.

The religious diet menus must be certified as exceeding minimum daily nutritional requirements and meeting or exceeding U.S. recommended daily allowances (RDAs).

a. <u>Vegetarian</u>

Facilities should establish a vegetarian menu. The vegetarian menu represents a no-flesh protein option, offering vegetables, starches, and other foods that are not seasoned with flesh, and must be provided whenever an entrée containing flesh is offered as part of a meal. This menu may also serve as the foundation for modifications to accommodate religious diets (e.g., the addition of Kosher and Halal flesh-food options).

b. <u>Kosher and Halal</u>

With the exception of fresh fruits and vegetables, the facility's Kosher food purchases shall be fully prepared, ready-to-use, and bearing the symbol of a recognized Kosher certification agency.

Facilities may utilize the vegetarian menu to fulfill the needs of detainees that require a Halal religious diet, by providing a pre-packaged, ready-to-use flesh protein, bearing the symbol of a recognized Halal certification agency.

Facilities may opt to use Kosher meals in place of Halal, if requested or if it meets the religious requirements of the detainee.

If the facility has a kitchen certified to prepare Kosher and/or Halal meals, these meals may be prepared in-house in accordance with the required religious

protocols, including proper ingredients, preparation methods, cookware, utensils, and sanitation practices.

Kosher and Halal meals will be served in a manner that does not violate the religious requirements of the faith group.

### 3. Hot Entree Availability

To the extent practicable, a hot entree shall be available to accommodate detainees' religious dietary needs, including Kosher and Halal entrees. Hot entrees shall be offered five times a week and shall be purchased precooked, heated in their sealed containers, and served hot.

### 4. Plates and Utensils

Religious diet meals shall be served with disposable plates and utensils, except when a supply of reusable plates and utensils has been set aside for the religious diet service only. Separate cutting boards, knives, food scoops, food inserts, and other such tools, appliances, and utensils shall be used to prepare religious diet foods and shall be identified accordingly. Meat and dairy food items and the service utensils used with each group shall be stored in areas separate from each other.

### 5. Ceremonial Meals, Religious Fasts, and Seasonal Observances

The chaplain, in consultation with local religious leaders, if necessary, shall develop the ceremonial-meal schedule for the subsequent calendar year, providing it to the facility administrator. This schedule shall include the date, religious group, estimated number of participants, and special foods required. Ceremonial and commemorative meals shall be prepared in the food service facility unless otherwise approved by the facility administrator.

The chaplain and other facility staff shall ensure detainees observing religious fasts are provided appropriate meals at the appropriate times.

## G. <u>Medical Diets</u>

### 1. Therapeutic Diets

Detainees with certain conditions – chronic or temporary; medical, dental, and/or psychological – shall be prescribed special (therapeutic) diets, supplemental meals, or snacks as appropriate by authorized medical staff. If a prescribed medical diet conflicts with a religious diet, the medical diet takes precedence. If a detainee refuses to accept the medical diet, a medical refusal will be signed and documented by the facility.

Pregnant detainees may also have additional nutritional and caloric requirements. (See Standard 4.3 Medical Care.)

## H. Specialized Food Service Programs

### 1. Satellite Meals

Food transported to housing units or other locations shall be transported in thermal containers that maintain cold items at temperatures below 41 degrees F and hot items at temperatures above 135 degrees F, excluding items served within the two-hour window for food safety.

### 2. Segregation Food Rations

Food rations shall not be reduced, changed, or used as a disciplinary tool.

### 3. Sack Meals

Sack meals shall meet nutritional minimums and be provided for detainees being transported from the facility and detainees arriving/departing between scheduled meal hours. Detainee volunteers assigned to the food service department shall not be involved in preparing meals for transportation but may prepare sack meals for on-site consumption.

## I. Safety and Sanitation

### 1. General Policy

All food service employees are responsible for maintaining a high level of sanitation in the food service department in accordance with the most recent edition of the U.S. Food and Drug Administration (FDA) Food Code.

### 2. Personal Hygiene of Staff and Detainees

a. All food service personnel shall wear clean garments, maintain a high level of personal cleanliness, and practice good hygiene while on duty. They shall wash hands thoroughly with soap or detergent before starting work, and as often as necessary during the shift to remove soil or other contaminants.

b. Staff and detainees shall not resume work after visiting the toilet facility without first washing their hands with soap or detergent.

c. All staff and detainees working in the food preparation and service area(s) shall use effective hair restraints. Personnel with hair that cannot be adequately restrained shall be prohibited from food service operations.

d. Detainees will be issued appropriate safety and sanitation garments and protective coverings, for example, for freezers or garbage duty.

e. Staff and detainees who prepare or serve food shall not clean latrines, garbage cans,

sewers, drains, grease traps, or for other duties during the period of food preparation.

f. Rubber soled safety shoes shall be provided and used by all detainees working in food service.

**3. Medical Examination**

All food service personnel (both staff and detainee) shall receive a documented pre-employment medical examination. Detainees who have been absent from work for any length of time for reasons of communicable illness (including diarrhea) shall be referred to Health Services for a determination as to fitness for duty prior to resuming work.

**4. Daily Health Checks**

Food Service staff will inspect all detainee food service workers daily at the start of each work period. Detainees who exhibit signs of illness, skin disease, diarrhea (admitted or suspected), or infected cuts or boils shall be removed from the work assignment and immediately referred to Health Services for determination of duty fitness. The detainees shall return to work only after the FSA has received written clearance from Health Services staff.

**5. Environmental Sanitation and Safety**

All facilities shall meet the following environmental standards:

a. Clean, well-lit, and orderly work and storage areas.

b. Overhead pipes removed or covered, to eliminate the food-safety hazard posed by leaking or dusty pipes.

c. Routinely cleaned walls, floors, and ceilings in all areas.

d. Ventilation hoods, to prevent grease buildup and wall/ceiling condensation that can drip into food or onto food-contact surfaces. Filters or other grease- extracting equipment shall be readily removable for cleaning and replacement.

e. Eighteen-inch clearance (minimum) underneath sprinkler deflectors.

f. Hazard-free storage areas:

1) Bags, containers, bundles, etc., stored in tiers; stacked, blocked, interlocked, and limited in height for stability/security against sliding or collapsing.

2) No flammable material; no loose cords, debris, or other obvious accident-

causers (stumbling, tripping, falling, etc.); no pest-harborage.

g. Aisles and passageways shall be kept clear and in good repair, with no obstruction that could create a hazard or hamper egress.

h. To prevent cross-contamination, kitchenware and food-contact surfaces will be washed, rinsed, and sanitized after each use and after any interruption of operations during which contamination could occur.

i. A ready supply of hot water (105-120 degrees F).

j. Garbage and other trash shall be collected and removed as often as possible. The garbage/refuse containers shall have sufficient capacity for the volume, and shall be kept covered, cleaned frequently, and insect and rodent proof. The facility shall comply, at a minimum, with federal rules on refuse-handling and disposal.

**6. Equipment Sanitation**

Information about the operation, cleaning, and care of equipment will be obtained from manufacturers or local distributors. The FSA shall develop a schedule for the routine cleaning of equipment. The facility will adhere to the health and safety standards of the FDA with oversight of food service operations.

a. Manual Cleaning and Sanitizing

The FSA shall develop a cleaning schedule for each food service area and post it for easy reference. All areas (walls, windows, vent hoods, etc.) and equipment (chairs, tables, fryers, ovens, etc.) will be grouped by frequency of cleaning, e.g., After Every Use, Daily, Weekly, Monthly, Semi-annually, or Annually.

b. Mechanical Cleaning and Sanitizing

Spray- or immersion-dishwashers or devices, including automatic dispensers for detergents, wetting agents, and liquid sanitizer, shall be maintained in good repair.

**7. Lavatories**

Toilet facilities shall be provided for all food service staff and detainee workers. Toilet facilities, including rooms and fixtures, shall be kept clean and in good repair. Signs shall be prominently displayed directing all personnel to wash hands after using the toilet.

Soap or detergent and paper towels or a hand-drying device providing heated air shall be available at all times in each lavatory.

### 8. Pest Control

Good sanitation practices are essential to an effective pest control program. The facility is responsible for pest control in the food service department.

### 9. Hazardous Materials

a. Only those toxic and hazardous materials required for sanitary maintenance of the facility, equipment, and utensils shall be used in the food service department.

b. All staff members shall know where and how much toxic, flammable, or caustic material is on hand, and be aware that their use must be controlled and accounted for daily.

c. All containers of toxic, flammable, or caustic materials shall be prominently and distinctively labeled for easy content identification.

d. All toxic, flammable, and caustic materials shall be segregated from food products and stored in a locked and labeled cabinet or room.

### 10. General Safety Guidelines

Machines shall be guarded in compliance with OSHA standards.

a. Light fixtures, vent covers, wall-mounted fans, decorative materials, and similar equipment and materials attached to walls or ceilings shall be maintained in good repair.

b. Lights in food-production areas, utensil- and equipment-washing areas, and other areas displaying or storing food, equipment, or utensils shall be equipped with protective shielding.

c. An approved, fixed, fire-suppression system shall be installed in ventilation hoods over all grills, deep fryers, and open flame devices. A qualified detention facility contractor shall inspect the system every six months. The fire-suppression system shall be equipped with a locally audible alarm and connected to the control room's annunciator panel.

d. Hood systems shall be cleaned after each use to prevent grease build-ups, which constitute fire risks. All deep-fryers and grills shall be equipped with automatic fuel or energy shut-off controls.

### 11. Mandatory Inspections

The facility shall implement written procedures for the administrative or food service, personnel conducting the weekly inspections of all food service areas, including dining, storage, equipment, and food-preparation areas and an annual independent inspection

ensuring that all governmental health and safety codes are being met. Staff shall check refrigerator and water temperatures daily, recording the results.

Daily checks of equipment temperatures shall follow this schedule:

a. Dishwashers: every meal;

b. Pot and pan-washers: daily, if water in the third compartment of a three-compartment sink is used for sanitation the required minimum temperature shall be maintained in accordance with the FDA food code;

c. Refrigeration/freezer equipment (walk-in units): site-specific schedule, established by the FSA.

All temperature-check documentation shall be filed and accessible.

## J. Food Storage, Receiving and Inventory

### 1. General Policy

Since control and location of subsistence supplies are site-specific, each FSA shall establish procedures for storing, receiving, and inventorying food.

### 2. Food Receipt and Storage

The following procedures apply when receiving or storing food:

a. Inspect the incoming shipment for damage, contamination, and pest infestation. Rats, mice, or insects may be hiding in the middle of a pallet.

b. Do not store food in locker rooms, toilet rooms, dressing rooms, garbage rooms, mechanical rooms, or under sewer lines, potentially leaking water lines, open stairwells, or other sources of contamination.

### 3. Inventory

The FSA shall base inventory levels on facility needs; however, each facility will at all times stock a 3-day-minimum food supply. Inventory levels shall be established, monitored, and periodically adjusted to correct excesses or shortages.

# STANDARD 4.2

## HUNGER STRIKES

***NOTE:*** *Standards 1.1 "Language Assistance" and 4.7: "Disability Identification, Assessment, and Accommodation" are applicable to this standard. The facility is required to provide language assistance and disability accommodations to ensure effective communication, equal access to physical spaces, and the opportunity to participate in facility programs, services, and activities.*

## I. POLICY

This detention standard protects detainees' health and well-being by monitoring, counseling, and providing appropriate treatment to any detainee who is on a hunger strike.

Nothing in this detention standard is intended to limit or override the exercise of sound medical judgment by the Clinical Medical Authority (CMA) responsible for a detainee's medical care. Each case must be evaluated on its own merits and specific circumstances, and treatment shall be given in accordance with accepted medical practice.

## II. STANDARDS AND PROCEDURES

### A. Staff Training

All staff shall be trained initially and annually thereafter to recognize the signs of a hunger strike, and to implement the procedures for referral for medical assessment and for management of a detainee on a hunger strike.

### B. Initial Referral

Procedures for identifying and referring a detainee on an announced or suspected hunger strike to medical staff shall include obtaining from qualified medical personnel an assessment of whether the detainee's action is reasoned and deliberate, or the manifestation of a mental illness.

Facilities shall immediately notify ICE/ERO when a detainee begins a hunger strike.

1. Staff shall consider any detainee observed to have not eaten for 72 hours (nine consecutive refused meals) to be on a hunger strike and shall refer him or her to the CMA for evaluation and management.

2. Medical personnel shall document the reasons for placing a detainee in a single occupancy observation room. This decision shall be reviewed every 72 hours. Medical personnel shall monitor the detainee in a single-occupancy observation room, when medically advisable and taking into consideration the detainee's mental health needs. If

measuring food and liquid intake/output becomes necessary, medical personnel shall make a decision about appropriate housing placement.

## C. Initial Medical Evaluation and Management

Medical staff shall monitor the health of a detainee on a hunger strike. If a detainee engaging in a hunger strike has been previously diagnosed with a mental health condition or is incapable of giving informed consent due to age or illness, appropriate medical and/or administrative action shall be taken in the best interest of the detainee.

1. During the initial evaluation of a detainee on a hunger strike, medical staff shall:
    a. Measure and record height and weight;
    b. Measure and record vital signs;
    c. Perform urinalysis;
    d. Conduct psychological/psychiatric evaluation;
    e. Examine general physical condition; and
    f. If clinically indicated, proceed with other necessary studies.
2. Medical staff shall measure and record weight and vital signs at least once every 24 hours during the hunger strike and repeat other procedures as medically indicated.
3. Qualified medical personnel may modify or augment standard treatment protocols when medically indicated.
4. Medical staff shall record all examination results in the detainee's medical file.
5. If the detainee refuses the initial medical evaluation or any treatment or other medical procedures, medical staff must attempt to secure the detainee's signature on a "Refusal of Treatment" form. If the detainee will not cooperate by signing, staff shall note this on the "Refusal of Treatment" form.
6. Any detainee refusing medical treatment shall be monitored by medical staff to evaluate whether the hunger strike poses a risk to the detainee's life or permanent health. See "E. Refusal to Accept Treatment" below in this standard.
7. If medically necessary, the detainee may be transferred to a community hospital or a detention facility appropriately equipped for treatment.
8. After the hunger strike, medical staff shall continue to provide appropriate medical and mental health follow-up.

9. Records shall be kept of all interactions with the striking detainee, the provision of food, attempted and successfully administered medical treatment, and communications between the CMA, facility administrator, and ICE/ERO regarding the striking detainee.

## D. Food and Liquid Intake and Output

After consultation with the CMA, the facility administrator shall require staff to measure and record food and water intake and output as follows:

1. Record intake and output in the medical record using an IHSC "Hunger Strike Form" or equivalent;

2. Deliver three meals per day to the detainee's room unless otherwise directed by the CMA. Staff shall physically deliver each meal regardless of the detainee's response to an offered meal;

3. Provide an adequate supply of drinking water or other beverages; and

4. Remove from the detainee's room all food items not authorized by the CMA. During the hunger strike, the detainee may not purchase commissary/vending machine food.

## E. Refusal to Accept Treatment

An individual has a right to refuse medical treatment. Before involuntary medical treatment is administered, staff shall make reasonable efforts to educate and encourage the detainee to accept treatment voluntarily. Involuntary medical treatment shall be administered in accordance with established guidelines and applicable laws and only after the CMA determines the detainee's life or health is at risk.

1. Medical staff shall explain to the detainee the medical risks associated with refusal of treatment and shall document treatment efforts in the detainee's medical record.

2. The physician may recommend involuntary treatment when clinical assessment and laboratory results indicate the detainee's weakening condition threatens the life or long-term health of the detainee.

    a. The facility administrator shall notify ICE/ERO if a detainee is refusing treatment, and the health services administrator shall notify ICE/ERO in writing of any proposed plan to involuntarily feed the detainee if the hunger strike continues. Under no circumstances may a facility administer involuntary medical treatment or sustenance without authorization from ICE/ERO.

    b. ICE/ERO, in consultation with the CMA, shall then contact the ICE Office of the Principal Legal Advisor and the U.S. Attorney's Office with jurisdiction. After discussing the case, the attorneys shall recommend whether to pursue a federal

district court order. ICE/ERO policy is to seek a court order to obtain authorization for involuntary medical treatment or sustenance. If a federal district court determines that it does not have jurisdiction to issue such an order, or a hospital refuses to administer involuntary medical treatment or sustenance pursuant to a court order, ICE/ERO may consider other action if the hunger strike continues.

3. Medical staff shall:

   a. Document all treatment efforts and each treatment refusal in the detainee's medical record;

   b. Continue clinical and laboratory monitoring as necessary until the detainee's life or health is out of danger; and

   c. Continue medical and mental health follow-up as necessary.

## F. Release from Treatment

Only a physician may order the termination of hunger strike treatment. The order shall be documented in the detainee's medical record. A notation shall be made in the detention file or retrievable electronic record when the detainee has ended the hunger strike.

# STANDARD 4.3

## MEDICAL CARE

***NOTE:** Standards 1.1 "Language Assistance" and 4.7: "Disability Identification, Assessment, and Accommodation" are applicable to this standard. The facility is required to provide language assistance and disability accommodations to ensure effective communication, equal access to physical spaces, and the opportunity to participate in facility programs, services, and activities.*

## I. POLICY

All detainees shall have access to appropriate medical, dental, and mental health care, including emergency services.

In cases where a detainee has medical or mental health needs that exceed the capabilities of the facility, the facility shall notify ICE and request a transfer of the detainee. The facility will make the request as early as possible to allow ICE time to find an appropriate placement for the detainee.

## II. STANDARDS AND PROCEDURES

### A. General

Every facility shall directly or contractually provide its detainee population with the following at no cost to the detainee:

1. Initial medical, mental health and dental screening;
2. Medically necessary and appropriate medical, dental and mental health care and pharmaceutical services;
3. Comprehensive, routine and preventive health, mental health, and dental care, as medically indicated;
4. Emergency care;
5. Specialty health care, as medically required;
6. Timely responses to medical complaints; and
7. Hospitalization as needed within the local community.

The health care program and the medical facilities will be under the direction of an HSA and/or CMA. When the HSA is not a physician, final clinical judgment shall rest with the facility's designated CMA.

Facilities shall employ sufficient medical staff to perform basic exams and treatments for all detainees. The HSA will negotiate and keep current arrangements with nearby medical facilities or health care providers to provide required health care not available within the facility. These arrangements will include appropriate custodial officers to transport and remain with the detainee for the duration of any off-site treatment or hospital admission.

**B. Facilities**

Adequate space and equipment will be furnished to provide detainees with basic health examination, treatment, and communication in private. Medical records will be kept separately from detainee records and stored in a securely locked area. All pharmaceuticals will be stored in a secure area and temperature controlled to ensure no alteration in potency.

**C. Health Care Staff**

Health care staff shall have a valid professional license and/or certification for the jurisdiction in which they practice and will perform duties within the scope of their clinical license. The following terms apply to health care staff referred to throughout this standard.

1. Health care practitioner: Defined as an individual who is licensed, certified, or credentialed by a state, territory, or other appropriate body to provide health care services within the scope and skills of the respective health care profession.

2. Independently licensed mental health provider: Defined as a psychiatrist, clinical or counseling psychologist, physician, psychiatric advanced practice provider, licensed clinical social worker, or any other licensed clinical mental health professional who, by virtue of their education, credentials, and experience, are permitted by law to evaluate and care for the various levels of complex mental health needs of patients.

**D. Medical Screening (New Arrivals)**

**1. General Screening**

As soon as possible, but no later than 12 hours after arrival, a health care practitioner shall provide detainees an initial medical, dental and mental health screening and ask for information regarding any known acute, emergent, or pertinent medical conditions (past or chronic), including history of mental illness – particularly prior suicide attempts or current suicidal/homicidal ideation or intent – and any disabilities or impairments affecting major life activities. Detainees responding in the affirmative shall be sent to a qualified, licensed health care practitioner for evaluation as quickly as possible, but no later than two working days from their screening. Detainees who display indications of possible urgent medical or mental health concerns upon arrival shall be prioritized in the intake screening process.

For intra-system transfers, a health care practitioner shall also provide detainees an initial medical, dental, and mental health screening, and will review each incoming

detainee's health record or health summary within 12 hours of arrival, to ensure continuity of care.

Facilities shall implement policies and procedures to ensure documentation of the initial health screening and assessment.

**2. Female Detainees**

Female detainees aged 18-56 will be offered a pregnancy test, and the results will be documented and provided to the detainee. If a detainee is currently lactating, appropriate accommodations will be provided.

**3. Tuberculosis**

All new arrivals shall receive tuberculosis (TB) screening in accordance with the most current Centers for Disease Control and Prevention (CDC) guidelines, including, but not limited to, CDC Guidelines for Correctional Facilities, prior to being placed in general population. For detainees who have been in continuous law enforcement custody, symptom screening plus documented TB testing within one year of arrival may be accepted for intake screening purposes.

Detainees with symptoms suggestive of pulmonary TB disease and/or with suspected or confirmed TB disease based on historical, clinical and/or laboratory findings will be housed in an airborne infection isolation room with negative pressure ventilation and promptly evaluated for TB disease. Detainees with suspected pulmonary TB disease will remain in airborne infection isolation until determined by a health care practitioner to be noncontagious in accordance with CDC guidelines. All detainees with suspected or confirmed TB disease shall be evaluated for human immunodeficiency virus (HIV), and all detainees with HIV shall be evaluated for TB disease, which includes a chest x-ray. The contractor's CMA will consult the local or state TB program on all aspects of health and public health care for detainees with suspected or confirmed TB disease, including testing, treatment, release from isolation, placement in general population, and public health actions.

**E. Infectious and Communicable Diseases**

The facility will have written plans that address the management of infectious and communicable diseases, including, but not limited to, screening testing, isolation, prevention, and education. This also includes reporting and collaboration with local or state health departments in accordance with state and local laws and recommendations.

**F. Comprehensive Health Assessment**

The facility will conduct and document a comprehensive health assessment for each detainee, including a physical examination and mental health screening, within 14 days of their arrival at the facility, and at minimum annually thereafter. Additional health assessments may occur on an as-needed basis throughout the duration of the detainee's

detention. Health assessments shall be performed by a qualified provider (physician, physician assistant/associate, nurse practitioner). If a physical examination is conducted by a registered nurse (RN), it must be reviewed by a physician. If there is documented evidence of a comprehensive health assessment within the previous 90 days, the health care practitioner may determine that a new assessment is not required. If a detainee discloses history of sexual abuse or victimization during the comprehensive health assessment and did not disclose this information during the initial admission process, the medical department shall advise the intake department to update the victim abuse vulnerability assessment, continue with referral protocols, and include the updated form in the detention file.

## G. Substance Dependence and Detoxification

During the initial screening, all detainees shall be assessed for their use of or dependence on mood and mind-altering substances including alcohol, opiates, hypnotics, and sedatives. If there is a positive screening, the patient shall be referred to be evaluated by a medical and mental health provider.

Detainees reporting the use of such substances shall be evaluated for their degree of reliance and potential for withdrawal. The CMA shall establish guidelines for evaluation and treatment of new arrivals who require detoxification. If females are housed at the facility, guidelines will specifically address the treatment of pregnant women who are chemically dependent. Treatment and supportive measures shall be provided to permit withdrawal with minimal discomfort.

Where a detainee requires hospitalization, a physician's order will be obtained and ICE/ERO shall be notified. Detainees experiencing severe or life-threatening alcohol or drug withdrawal shall be immediately transferred to an emergency department for evaluation. Once evaluated, the detainee will be treated on-site if the facility is qualified to provide treatment and monitoring for withdrawal or transferred to an appropriate facility.

## H. Dental Treatment

An oral assessment shall be performed within 14 days of the detainee's arrival. If no on-site dentist is available, the initial dental screening may be performed by a physician, physician assistant, nurse practitioner, or registered nurse. Such non-dental clinicians shall receive an initial training and an annual refresher thereafter on how to conduct the exam by a dentist.

Detainees shall be afforded only authorized dental treatment, defined as follows:

1. Emergency dental treatment shall be provided for immediate relief of pain, trauma, and acute oral infection.

2. Routine dental treatment may be provided to detainees for whom dental treatment is inaccessible for prolonged periods because of detention for over six months. Routine dental treatment includes amalgam and composite restorations, prophylaxis, root

canals, extractions, x-rays, the repair and adjustment of prosthetic appliances, and other procedures required to maintain the detainee's health.

## I. Sick Call

The facility will have regularly scheduled times, in accordance with facility policy, when medical personnel are available to see detainees who have requested medical services, commonly known as sick call. All detainees, including those in SMUs, regardless of classification, will have access to sick call.

The facility will have a mechanism that allows detainees the opportunity to privately request health care services (including mental health and dental services) provided by a physician or other health care practitioner in a clinical setting. If necessary, detainees shall be provided assistance in filling out the request.

The facility shall have procedures to ensure that all sick-call requests are received and triaged by the medical staff within 24 hours of receipt of the request. Request slips shall be provided in English, Spanish, and other frequently encountered languages at the facility, as appropriate. Oral interpretation or assistance shall be provided to any detainee who is illiterate or who speaks another language into which written material has not been translated. Electronic communication of sick call requests is acceptable, provided time frames, confidentiality and safeguarding of the health care information is in place.

A health care practitioner will triage the request and determine when the detainee will be seen based on the acuity of the problem and within a reasonable period of time.

## J. 24-Hour Emergency Medical and Mental Health Treatment

The facility will have a written plan for the delivery of 24-hour emergency medical and mental health care when no medical personnel are on duty at the facility, or when immediate outside medical attention is otherwise required.

## K. First Aid and Medical Emergencies

The CMA will determine the availability and placement of first aid kits.

Detention staff and health care staff will be trained to respond to health-related emergencies within a 4-minute response time. This training will be provided by a responsible medical authority in cooperation with the facility and will include the following:

a. The recognition of signs of potential health emergencies and the required response;

b. The administration of first aid, automated external defibrillator (AED), and cardiopulmonary resuscitation (CPR);

c. The recognition of signs and symptoms of mental illness; and

d. The facility's established plan and procedures for providing emergency medical care including, when required, the safe and secure transfer of detainees for appropriate hospital or other medical services.

If a detainee requires emergency medical care, the first responding officer will immediately take steps to contact a health care practitioner through established procedures.

## L. Delivery of Medication

Medication will be distributed according to the specific instructions and procedures established by the health care provider. Health care providers and officers shall keep written records of all medication given to (or refused by) detainees.

Medication will not be delivered or administered by detainees. In facilities that are medically staffed 24 hours a day, a health care practitioner will distribute medication. In facilities that are not medically staffed 24 hours a day, medication may be distributed, consistent with state law and/or regulations, by detention officers who have received proper training by the HSA or designee, but only when medication must be delivered at a specific time when medical staff are not on duty.

The Clinical Director or Physician shall annually review and authorize all over-the-counter medication and medical supplies if available for purchase.

## M. Special Needs

The facility will notify ICE/ERO of any detainee who requires close medical supervision, including chronic and convalescent care. The facility shall develop a written treatment plan, including access to health care and other treatment, and coordination with non-medical personnel as necessary.

## N. Bloodborne Pathogens

See also Standard 1.2 "Environmental Health and Safety" for additional information.

Information regarding infectious diseases shall be communicated on a regular basis to non-medical and medical staff, as well as detainees. Detainees exposed to potentially infectious bodily fluids (e.g., through needle sticks or bites) shall be afforded immediate medical assistance, and the incident shall be reported as soon as possible to the clinical director or designee and documented in the detainee's medical file. All detainees shall be assumed to be infectious for bloodborne pathogens, and standard precautions are to be always used when caring for all detainees.

The facility shall establish a written plan to address exposure to bloodborne pathogens and post-exposure intervention, including prophylactic administration of medication, as appropriate and according to facility policies; the management of hepatitis A, B, and C; and the management of HIV infection, including reporting.

1. **Hepatitis**

A detainee may request hepatitis testing at any time.

2. **HIV**

A detainee may request HIV testing at any time. Facilities shall develop a written plan to ensure the highest degree of confidentiality regarding HIV status. Staff training shall emphasize the need for confidentiality, and procedures shall be established to limit access to health records to only authorized individuals and only when necessary.

The accurate diagnosis and medical management of HIV infection among detainees is important. An HIV diagnosis may be made only by a qualified health care practitioner, based on a medical history, current clinical evaluation of signs and symptoms, and laboratory studies.

3. **Clinical Evaluation and Management**

Medical personnel shall provide all detainees diagnosed with HIV or acquired immunodeficiency syndrome (AIDS) appropriate medical care consistent with national recommendations and guidelines disseminated through the U.S. Department of Health and Human Services agencies, including the CDC, and the Infectious Diseases Society of America. Medical and pharmacy personnel shall ensure that all Food and Drug Administration (FDA) approved medications currently approved for the treatment of HIV/AIDS are accessible. Medical and pharmacy personnel shall develop and implement distribution procedures to ensure timely and confidential access to medications.

Any detainee with confirmed or suspected TB disease shall also be evaluated for possible HIV infection, and any detainee with HIV shall be evaluated for TB disease.

Medical and pharmacy personnel shall ensure the facility maintains access to adequate supplies of FDA-approved medications for the treatment of HIV/AIDS to ensure that newly admitted detainees are able to continue with their treatment without interruption. Upon release, detainees currently receiving anti-HIV therapy and other drugs shall receive up to a 30-day supply of their medications as medically appropriate.

When current symptoms suggest HIV infection, the following procedures shall be implemented.

a. Clinical evaluation shall determine the medical need for isolation, but HIV infection cannot be the sole reason for isolation. Isolation of HIV-positive detainees is not necessary for public health purposes. Detainees with HIV shall not be separated from the general population, either pending a test result or after a test report, unless clinical evaluation reveals a medical need for isolation.

b. Following a clinical evaluation, if a detainee manifests symptoms requiring treatment beyond the facility's capability, a qualified health care practitioner shall recommend the detainee's transfer to a local hospital or other appropriate facility for further medical testing, final diagnosis, and acute treatment, as needed.

## O. Informed Consent

The facility health care practitioner will obtain specific signed and dated consent forms from all detainees before any medical examination or treatment, except in emergency circumstances. Prior to the administration of psychotropic medications, a separate documented informed consent, that includes a description of the medications side effects, shall be obtained.

As a rule, medical treatment shall not be administered against the detainee's will. If a detainee refuses treatment, ICE/ERO will be consulted in determining whether forced treatment will be administered, unless the situation is an emergency. In emergency situations or those that place other detainees or staff at risk of exposure to infectious agents, the facility shall take appropriate emergency measures and notify ICE/ERO as soon as possible.

If the detainee refuses to consent to treatment, medical staff will explain the medical risks to the detainee of declining treatment and make reasonable efforts to convince the detainee to voluntarily accept treatment. Medical staff will document their recommended treatment efforts, the detainee's refusal of treatment, and the use of any professional language services in the detainee's medical record. A detainee refusing examination or treatment may be segregated from the general population when recommended by the medical staff. Forced treatment is prohibited unless there is a valid court order authorizing involuntary medical treatment.

## P. Confidentiality and Release of Medical Records

All medical personnel, and particularly those who have access to medical records, shall protect the privacy of detainees' medical information to the maximum extent possible while permitting the exchange of health information required to fulfill program responsibilities and to provide for the well-being of detainees.

Detainees and their representatives shall be allowed to request and receive medical records pursuant to facility policy, which shall be communicated to the detainee in the facility handbook. Detainees and their representatives may also request medical records through the detainee's designated ICE officer, or the ICE Freedom of Information Act (FOIA) process as described in the ICE/ERO National Detainee Handbook.

Detainees who indicate that they wish to obtain copies of their medical records shall be provided with any appropriate forms. The facility will provide the detainee with assistance in making the written request (if needed) and will assist in transmitting the request to the appropriate office or person.

Following the release of health information, the written authorization shall be retained in the health record, and a copy placed in the detainee's detention file or maintained in a retrievable electronic format.

## Q. Transfer and Release of Detainees

### 1. Medical Hold

When a health care practitioner determines that a detainee's medical or psychiatric condition requires either clearance by the medical staff prior to release or transfer to another facility, or requires medical escort during removal or transfer, the facility shall notify ICE/ERO in writing.

### 2. Notification of Transfers, Releases, and Removals

Medical personnel will be given advance notice prior to the release, transfer, or removal of a detainee, so that they may provide for any medical needs associated with the transfer or release.

### 3. Transfer of Medical Information

a. When a detainee is transferred to another detention facility, the sending facility shall ensure that a medical transfer summary accompanies the detainee. Upon request of the receiving facility, the sending facility shall transmit a copy of the full medical record within five business days or sooner if determined by the receiving facility to be a medically urgent matter.

b. Upon removal or release from ICE/ERO custody, the detainee shall be provided medication (in quantities specified below), and a detailed medical care summary. This summary will include instructions that the detainee can understand and health history that would be meaningful to future medical providers. The summary shall include, at a minimum, the following items:

1) Patient identification;

2) Tuberculosis (TB) screening results (including testing results date) and current TB status if TB disease is suspected or confirmed;

3) Current mental, dental, and physical health status, including all significant health issues, and highlighting any potential unstable issues or conditions which require follow-up;

4) Current medications, with instructions for dose, frequency, etc., with specific instructions for medications that must be administered en route;

5) Any past hospitalizations or major surgical procedures;

6) Recent test results, as appropriate;

7) Known allergies;

8) Any pending medical or mental health evaluations, tests, procedures, or treatments for a serious medical condition scheduled for the detainee at the sending facility. In the case of patients with communicable disease and/or other serious medical needs, detainees being released from ICE/ERO custody are given information about health care follow-up needed;

9) Copies of any relevant documents as appropriate;

10) Printed instructions on how to obtain the complete medical record; and

11) The name and contact information of the transferring medical official.

#### 4. Medications

The facility shall ensure that, at a minimum, a seven-day supply of medication (or, in the case of TB medications, 15 days; and in the case of HIV/AIDS medications, 30 days) accompanies the detainee upon transfer from the facility, as ordered by the prescribing authority.

Upon removal or release from ICE custody, the detainee shall receive up to a 30-day supply of medication as ordered by the prescribing authority and a medical care summary. If a detainee is taking prescribed narcotics, the clinical health authority shall make a determination regarding continuation, based on assessment of the detainee.

### R. Medical Experimentation and Research

Detainees shall not be used in any medical, pharmaceutical, or cosmetic experiments or research.

This will not preclude an individual detainee from receiving a medical treatment or procedure not generally available, but determined medically necessary by the CMA, such as medications and clinical trials. The administration of such investigational therapies shall follow relevant FDA or other national protocols and will be administered only with written consent from the detainee, which will be retained in the detainee’s medical record. The facility shall notify ICE/ERO of all such situations.

### S. Mental Health Program

#### 1. Details

The facility shall have a mental health program, approved by the appropriate medical authority, that provides:

a. Assistance with intake screening for mental health concerns;

b. Referral as needed for evaluation, diagnosis, treatment and monitoring of mental illness by a qualified mental health care provider;

c. Sufficient capacity to provide crisis intervention and management of acute mental health episodes; and

d. Professional consultation for and assistance with the suicide prevention program.

If the facility is unable to provide the level of care that the detainee requires, the facility shall immediately notify ICE/ERO and seek a transfer to higher-level ICE detention facility or community in-patient psychiatric hospital.

**2. Referrals and Treatment**

Based on the intake screening, the comprehensive health assessment, medical documentation, or subsequent observations by detention staff or medical personnel, a detainee may be referred for mental health treatment or evaluation. Any detainee referred for mental health treatment shall be triaged for any emergency needs and receive an evaluation by a qualified mental health provider no later than five days after the referral. An emergent referral must be seen as soon as possible, and an urgent referral must be evaluated within one day. The qualified mental health provider shall develop an overall treatment/management plan. If the detainee's mental illness or developmental or intellectual disability needs exceed the treatment capability of the facility, a referral for an outside mental health facility shall be initiated and the facility shall notify ICE/ERO in a timely manner. Any detainee prescribed psychiatric medications must be regularly evaluated by a duly licensed and appropriate medical professional to ensure proper treatment and dosage.

**3. Involuntary Administration of Psychotropic Medication**

Involuntary administration of psychotropic medication to detainees shall comply with established guidelines and applicable laws, and shall be performed only pursuant to the specific, written, and detailed authorization of a physician. Absent a declared medical emergency, before psychotropic medication is involuntarily administered, the HSA shall contact ICE/ERO to facilitate a request for a court order.

**4. Serious Mental Illness**

The following non-exhaustive categories of conditions will be considered to constitute a serious mental illness (SMI):

a. Conditions that a qualified mental health provider has determined to meet the criteria for a "serious mental disorder or condition" pursuant to applicable ICE policies, including:

1) A mental disorder that is causing serious limitations in communication, memory, or general mental and/or intellectual functioning (e.g., communicating, conducting activities of daily life, social skills); or a severe medical condition(s) (e.g., traumatic brain injury or dementia) that is significantly impairing mental function; or

2) One or more of the following active psychiatric symptoms and/or behaviors: severe disorganization, active hallucinations or delusions, mania, catatonia, severe depressive symptoms, suicidal ideation and/or behavior, marked anxiety or impulsivity; or

3) Significant symptoms of one of the following:

   i. Psychosis or Psychotic Disorder;

   ii. Bipolar Disorder;

   iii. Schizophrenia or Schizoaffective Disorder;

   iv. Major Depressive Disorder with Psychotic Features;

   v. Dementia and/or a Neurocognitive Disorder; or

   vi. Intellectual Development Disorder (moderate, severe, or profound);

4) Any other mental health condition determined by IHSC to meet SMI criteria.

## T. <u>Referrals for Sexual Abuse Victims or Abusers</u>

If any security or medical intake screening or classification assessment indicates that a detainee has experienced prior sexual victimization (including human trafficking victimization) or perpetrated sexual abuse, staff shall, as appropriate, ensure that the detainee is immediately referred to a qualified medical provider. After evaluating the detainee, the qualified medical provider can determine whether it is appropriate to refer the patient to a mental health provider (and whether the patient would like to be referred).

When a referral for medical follow-up is initiated, the detainee shall receive a health evaluation no later than two working days from the date of assessment. When a referral for mental health follow-up is initiated, the detainee shall receive a mental health evaluation no later than 72 hours after the referral.

For the purposes of this section, a “qualified medical practitioner” or “qualified mental health practitioner” means a health or mental health professional, respectively, who in addition to being qualified to evaluate and care for patients within the scope of his or her professional practice, has successfully completed specialized training for treating sexual abuse victims.

## U. Women's Medical Care

Female detainees shall receive routine, age appropriate gynecological and obstetrical health care, consistent with recognized community and clinical guidelines for women's health services.

### 1. Comprehensive Health Assessment

All comprehensive health assessments of female detainees shall be conducted by a qualified health care practitioner. In addition to the criteria listed on the health assessment form, the evaluation shall inquire about and perform the following:

a. Use of contraception;

b. Reproductive history (number of pregnancies, number of live births, number of spontaneous/elective abortions, pregnancy complications, etc.);

c. Menstrual cycle;

d. History of breast and gynecological problems;

e. Family history of breast and gynecological problems; and

f. Any history of physical or sexual victimization and when the incident occurred.

A pelvic and breast examination, cancer or infection screening, baseline mammography and sexually transmitted infection (STI) testing shall be offered and provided as deemed appropriate or necessary by a health care practitioner.

### 2. Preventive Services

Upon request, appropriately trained medical personnel within their scope of practice shall provide detainees with non-directive (impartial) advice and consultation about family planning and contraception, and where medically appropriate, prescribe and dispense medical contraception.

### 3. Pregnancy

Upon confirmation by health care practitioner that a detainee is pregnant, the detainee shall be provided close medical supervision. Pregnant detainees shall have access to prenatal and specialized care, and comprehensive counseling on topics including, but not limited to, nutrition, exercise, complications of pregnancy, prenatal vitamins, labor and delivery, postpartum care, lactation, family planning, abortion services and parenting skills.

The facility administrator shall ensure that ICE/ERO is notified as soon as practicable

of any pregnant detainee, but no later than 72 hours after such determination.

A health care practitioner will identify any special needs (e.g., diet, housing, and other accommodations such as the provision of additional pillows) and inform all necessary security staff and facility authorities. Pregnant detainees will be referred to medical specialists as necessary.

All chemically dependent pregnant detainees (e.g., detainees dependent on substances including alcohol, sedatives/hypnotics, anxiolytics, and opioids) are considered high risk and referred to qualified physician capable of addressing their needs immediately.

a. Termination of Pregnancy

Under applicable federal law, in the event continued detention is necessary and appropriate, and consistent with the practice of ICE/ERO's federal partners, if the life of the mother would be endangered by carrying a fetus to term, or in the case of rape or incest, ICE/ERO will assume the costs associated with a female detainee's decision to terminate a pregnancy. In this instance, ICE/ERO will arrange for transportation at no cost to the detainee for the medical appointment and, if requested by the detainee, for access to religious counseling, and non-directive (impartial) medical resources and social counseling, to include outside social services or women's community resources groups.

If a detainee requests to terminate her pregnancy, it will be documented in the detainee's medical records. The detainee's statement will be signed personally by the detainee and include clear language of the detainee's intent.

# STANDARD 4.4

## PERSONAL HYGIENE

***NOTE:** Standards 1.1 "Language Assistance" and 4.7: "Disability Identification, Assessment, and Accommodation" are applicable to this standard. The facility is required to provide language assistance and disability accommodations to ensure effective communication, equal access to physical spaces, and the opportunity to participate in facility programs, services, and activities.*

## I. POLICY

Good hygiene is essential to the well-being of detainees in ICE/ERO custody. ICE/ERO requires that all facilities provide detainees with regular exchanges of suitable and clean clothing, linens, blankets, and towels for as long as they remain in detention.

## II. STANDARDS AND PROCEDURES

### A. Clothing, Bedding, Linen, Blanket and Towel Supply

The facility shall have a policy and procedure for the regular issuance and exchange of clothing, bedding, linens, and towels. The facility shall keep a supply of these items that exceeds the minimum amount required for the number of detainees to prevent delay in replacing the items.

### B. Issuance of Clothing

At no cost to the detainee, all new detainees shall be issued clean, indoor/outdoor, temperature-appropriate, presentable clothing during in-processing. Damaged or unusable shoes or clothing shall be replaced at no cost to the detainee.

The standard issue of clothing for detainees shall be consistent with facility policy but will include not less than one uniform shirt and one pair of uniform pants or one jumpsuit; one pair of socks; one pair of underwear; two brassieres, as appropriate; and one pair of footwear. Additional clothing shall be issued as necessary for changing weather conditions or as seasonally appropriate.

### C. Issuance of Bedding, Linen and Towels

All new detainees shall be issued clean bedding, linens, and a towel(s). Detainees shall be held accountable for these items.

### D. Special Uniforms and Protective Equipment for Detainees

Detainees assigned to special work areas shall be clothed in accordance with the requirements of the job and, when appropriate, provided with protective clothing and equipment in accordance with safety and security considerations.

## E. Exchange Requirements

Detainees shall be provided with clean clothing, linens, and towels on a regular basis to ensure proper hygiene. Socks and undergarments will be exchanged daily, outer garments at least twice weekly and sheets, towels, and pillowcases at least weekly.

More frequent exchanges of outer garments may be appropriate, especially in hot and humid climates. Individual facilities may institute their own clothing, linen, and towel exchange policy and procedures, provided the standards in this policy are met.

## F. Personal Hygiene Items

Distribution of hygiene items shall not be used as reward or punishment.

Each detainee shall receive, at a minimum, the following items:

1. One bar of bath soap, or equivalent;
2. One comb or equivalent;
3. One tube of toothpaste;
4. One toothbrush;
5. One bottle of shampoo, or equivalent; and
6. One container of skin lotion.

The facility administrator may modify this list as needed (e.g., to accommodate the use of bulk liquid soap and shampoo dispensers). Detainees may be permitted brushes to replace combs.

The distribution of razors shall be strictly controlled.

The facility shall establish and communicate clear written procedures for detainees to access menstrual products at any time at no cost to the detainee. These procedures shall be made available in accessible formats, such as inclusion in the local supplement handbook and/or posting in the housing unit.

Female detainees shall be issued and may retain sufficient feminine hygiene items for use during the menstrual cycle. Sanitary pads must be provided; tampons should also be offered where available. The facility shall replenish personal hygiene items, including menstrual products, at no cost to the detainee on an as-needed basis, in accordance with written facility procedures. Menstrual products shall be provided in quantities sufficient to meet individual needs throughout the menstrual cycle.

Staff shall not deny reasonable requests for menstrual products. Any denial must be documented in the detainee's detention file with detailed justification.

## G. Bathing and Toilet Facilities

Detainees shall be provided with a reasonably private bathing and toileting environment in accordance with safety and security needs. Detainees shall be able to shower, perform bodily functions, and change clothing without being viewed by staff of the opposite sex, except in exigent circumstances or when such viewing is incidental to routine cell checks or is otherwise appropriate in connection with a medical examination or monitored bowel movement.

Staff of the opposite sex shall announce their presence when entering an area where detainees are likely to be showering, performing bodily functions, or changing clothing.

When operationally feasible, detainees with risk(s) of sexual victimization set forth in 6 C.F.R. § 115.41 shall be given the opportunity to shower separately from other detainees.

Detainees with disabilities shall be provided the facilities and support needed for self-care and personal hygiene in a reasonably private environment in which the individual can maintain dignity. When necessary, assistance to detainees with disabilities who cannot perform basic life functions shall be provided by individuals who are trained and qualified to assist persons with physical and/or mental impairments. Such training may be provided by the health services authority and may involve the expertise of relevant community organizations and government agencies.

# STANDARD 4.5

## SIGNIFICANT SELF-HARM AND SUICIDE PREVENTION AND INTERVENTION

***NOTE:*** *Standards 1.1 "Language Assistance" and 4.7: "Disability Identification, Assessment, and Accommodation" are applicable to this standard. The facility is required to provide language assistance and disability accommodations to ensure effective communication, equal access to physical spaces, and the opportunity to participate in facility programs, services, and activities.*

## I. POLICY

The facility shall maintain a written suicide prevention and intervention program outlining procedures for addressing suicidal detainees and those at risk of self-harm. Staff shall be trained to recognize signs, symptoms, and situations indicating potential self-harm or suicide risk and respond with appropriate sensitivity, supervision, and referrals. Suicidal detainees must receive preventive supervision and treatment.

## II. STANDARDS AND PROCEDURES

### A. General

The facility shall maintain policy and procedures for a comprehensive suicide prevention and intervention program.

### B. Training

All facility staff who interact with or are responsible for detainees shall receive comprehensive suicide prevention training during orientation and refresher training at least annually thereafter.

All of the following topics shall be covered in the training:

1. Potential stressors related to detention and how detention facilities can be conducive to suicidal behavior;
2. Understanding demographic, cultural, and precipitating factors contributing to suicidal behavior;
3. Recognizing verbal and behavioral cues indicating potential suicide;
4. Responding to suicidal and depressed detainees;
5. Suicide precautions, including constant and close observation;
6. Referral procedures;

7. Communicating effectively with correctional and health care personnel;

8. Standard first aid, cardiopulmonary resuscitation (CPR), and the use of emergency equipment located in each housing area of the detention facility;

9. Follow-up monitoring of detainees who have attempted suicide;

10. Reporting and documentation procedures; and

11. Liability considerations related to detainee suicide.

**C. Identification**

All detainees shall receive an initial mental health screening within 12 hours of admission by a health care practitioner. Information regarding a history of suicidal behavior and current suicidal ideation shall be obtained. The results of the screening shall be documented on an intake screening form.

Detainees may be identified as being at risk of self-harm or suicide at any time. This identification may be the result of self-referral, observation, or interaction with medical, mental health, or correctional staff.

If a detainee is observed to display or express any intent, threat, or gesture of self-harm, any custody official may place the detainee on suicide precautions. Only a qualified mental health provider or a physician may remove the detainee from suicide precautions. Any reduction and/or removal from suicide precaution must be done by a face-to-face mental health evaluation. This shall not be done through telehealth/tele-psychiatry.

**D. Referral and Evaluation**

Detainees identified as at risk of suicide or self-harm shall be immediately referred to a mental health provider. An evaluation shall take place within 24 hours. Until this evaluation takes place, security staff shall place the detainee in a secure environment on constant (one-to-one) visual observation.

The mental health provider shall utilize an evidence-based suicide risk assessment tool during mental health evaluation and reassessment. The evaluation shall be documented in the medical record and must include the following information:

1. Relevant detainee history;

2. Environmental factors;

3. Lethality of suicide plan;

4. Psychological factors;

5. Diagnoses;

6. A determination of seriousness of suicide risk;

7. Level of required supervision;

8. Referral/transfer for inpatient care (if needed);

9. Instructions to medical staff for care; and

10. A treatment plan, including reassessment time frames.

Detainees placed on suicide precautions shall be reevaluated by a qualified mental health provider (or a health care practitioner) daily to assess any changes that indicate a need for change in the level of supervision (i.e., constant watch, close observation, or removal from suicide precautions). Each re-evaluation must be documented in the detainee’s medical record.

## E. Treatment

For a detainee who has been identified at risk for self-harm or suicide, a mental health provider will develop a treatment plan. This plan will be documented and placed in the detainee’s medical record.

This treatment plan shall include strategies and interventions to be followed by staff and the detainee if suicidal ideation or intent reoccurs, and a plan for follow-up care. The timing of follow-up appointments shall be based on the level of acuity.

## F. Housing and Monitoring

A qualified mental health provider may place a detainee in a suicide-resistant cell with constant one-to-one in-person detention staff monitoring. A suicide-resistant cell must be free of objects and structural elements that could facilitate a suicide attempt and must be approved by a qualified medical or mental health care practitioner. The monitoring must be documented every 15 minutes or more frequently if necessary. An RN, medical provider, or qualified mental health provider shall perform welfare checks every eight hours. Daily mental health treatment will be conducted by a qualified mental health provider, physician, or advanced practice provider. Urgent matters must be promptly referred to the designated medical or mental health professional for intervention.

Only a qualified mental health provider may remove a detainee from constant monitoring. This must be done face-to-face and onsite (i.e., shall not be done through telehealth/tele-psychiatry). An on-site qualified mental health provider may immediately move or later place the detainee under close observation status after a mental health evaluation and suicide risk assessment has been conducted.

A detainee on close observation may be housed in general population or other medical or suicide-resistant housing, as appropriate following a mental health evaluation and suicide risk assessment. A detainee on close observation shall be regularly monitored. The

monitoring shall consist of staggered checks at intervals not to exceed 15 minutes (e.g., every 5, 10, 7 minutes) and be documented. An RN, medical provider, or qualified mental health provider will perform welfare checks every eight hours. Daily mental health treatment will be conducted by a qualified mental health provider, physician, or advanced practice provider, as clinically indicated.

The facility administrator shall promptly report to ICE/ERO any detainee who is placed on constant observation or close observation status (suicide precautions).

All detainees discharged from suicide observation watch precautions shall be re-assessed within 72 hours and then periodically at intervals prescribed by the treatment plan and consistent with the level of acuity by a qualified mental health provider or physician.

## G. Hospitalization

If a detainee faces an imminent risk of injury or death, appropriate staff will make a recommendation for hospitalization.

Refusal of hospitalization shall prompt immediate placement of the detainee in a suicide-resistant cell under one-to-one observation. It may be necessary to petition the appropriate court to intervene against the detainee's will for hospitalization and treatment.

## H. No Excessive Deprivations

Deprivations and restrictions placed on suicidal detainees must be kept at a minimum. Suicidal detainees may be discouraged from expressing their intentions if the consequences of reporting those intentions result in overly restrictive treatment. Placing suicidal detainees in conditions of confinement that are worse than those experienced by detainees in the general population may result in the detainee not discussing his or her suicidal intentions and falsely showing an appearance of a swift recovery.

## I. Clothing, Hygiene, and Privacy

The facility may allow suicidal detainees under constant (one-to-one) monitoring to wear the standard issue clothing, as long as extraneous items that could aid in self-harm are removed, such as shoelaces or belts.

A mental health provider shall assess the detainee to determine whether a suicide smock is necessary, and if so, whether to provide underwear. Under no circumstances shall detainees be held without clothing.

Suicidal detainees shall be allowed to shower, perform bodily functions, and change clothing with as much privacy as possible under the continuous observation of staff, and without nonmedical staff of the opposite sex viewing their breasts, buttocks, or genitalia, except in exigent circumstances. Although staff of the opposite sex may be assigned to suicide precautions, including constant observation, the facility must have procedures in place that enable a detainee on suicide precautions to avoid exposing himself or herself to

nonmedical staff of the opposite sex. This may be accomplished, for example, by substituting medical staff or security staff of the same sex to observe the periods of time when a detainee is showering, performing bodily functions, or changing clothes. It may also be accomplished by providing a shower with a partial curtain or other privacy shields. The privacy standards apply whether the viewing occurs in a cell or elsewhere.

However, any privacy accommodations must be implemented in a way that does not pose a safety risk for the individual on suicide precautions. Safety is paramount when conducting suicide precautions, and if an immediate safety concern or detainee conduct makes it impractical to provide same sex coverage during a period in which the detainee is undressed, the detainee will continue to be observed, and any such incident shall be documented.

## J. Intervention

Following a suicide attempt, security staff shall initiate and continue appropriate life-saving measures until they are relieved by arriving medical personnel. Arriving medical personnel shall perform appropriate medical evaluation and intervention. The CMA or designee shall be notified when a detainee requires transfer to a local hospital or emergency room.

## K. Notification and Reporting

The facility shall immediately notify ICE/ERO and appropriate outside authorities in the event of a suicide or suicide attempt, placement of a detainee on suicide precautions, or transfer of a detainee to a local hospital or emergency room.

Medical staff shall complete a preliminary Incident Report within 24 hours of any suicide or suicide attempt, and all staff who came into contact with the detainee immediately before the suicide attempt or death shall submit a statement describing their knowledge of the detainee and the incident.

The preliminary Incident Report must include detainee name, alien number, relevant medical history/diagnosis, reason for suicide placement (if applicable), date of death, and name and title of person providing information.

## L. Mortality Review

The facility will cooperate with ICE/ERO on any mortality review process triggered by a death resulting from suicide.

The mortality review process shall include review of circumstances surrounding the incident, facility procedures relevant to the incident, training of staff, medical/mental health reports, identification of possible precipitating factors, and recommendations for changes in response to the incident (e.g., policy, medical or mental health services, operational procedures, training or re-training, counseling, reprimand or discipline of staff identified as failing to follow suicide prevention procedures, and the physical plant or facility layout).

**M. Debriefing**

Facilities are required to offer a critical incident debriefing following a suicide or serious suicide attempt for all affected staff and detainees within 24 to 72 hours after the critical incident.

**N. Detainee Mental Health Follow-up**

Following a suicide or serious suicide attempt, the facility shall offer appropriate mental health services to other detainees who may have been affected.

# STANDARD 4.6

## TERMINAL ILLNESS AND DEATH

***NOTE:** Standards 1.1 "Language Assistance" and 4.7: "Disability Identification, Assessment, and Accommodation" are applicable to this standard. The facility is required to provide language assistance and disability accommodations to ensure effective communication, equal access to physical spaces, and the opportunity to participate in facility programs, services, and activities.*

## I. POLICY

All facilities shall have policies and procedures addressing terminal illness, serious injury, advance directives, and detainee death, including the prompt notification of ICE/ERO in all cases.

## II. STANDARDS AND PROCEDURES

### A. Terminal Illness

The facility's CMA, with support from the HSA, shall arrange the transfer of chronically, critically, or terminally ill detainees to appropriate off-site medical facilities. The facility shall notify ICE/ERO of the need for such transfer as soon as practicable, preferably before the detainee leaves the facility.

When a detainee's medical condition becomes life-threatening, the following standards and procedures apply:

1. Care for a seriously ill or dying detainee shall be consistent with Standard 4.3 "Medical Care."

2. A detainee in a community hospital remains in ICE/ERO custody, with ICE/ERO retaining authority over administrative decisions (e.g., visitors, movement, and authorization of services). The hospital assumes medical decision-making authority (e.g., drug regimens, lab tests, x-rays, treatments).

3. The facility and ICE/ERO will defer to the hospital's standard rules and procedures for seriously ill, injured, or dying patients, including the hospital's protocols for determining and contacting next-of-kin.

### B. Death Occurring in ICE/ERO Custody

The facility shall immediately notify ICE/ERO of any detainee death. If applicable, the chaplain may offer guidance on religious considerations affecting the disposition of remains.

### 1. Notification of Family

Written procedures will provide for the facility's direct coordination with ICE/ERO in communicating news of the serious illness or death of a detainee. The chaplain or designee may coordinate requested religious rituals at the time of a detainee's serious illness, injury, or death.

### 2. Disposition of Property

The facility shall turn over the property of the decedent to ICE/ERO within one week for processing and disposition, unless property of a decedent is being held as part of an investigation into the circumstances of death.

### 3. Disposition of Remains

The detainee's family shall have the opportunity to claim the remains within seven calendar days of the date they received notification (in writing or in person) of the death. If the family chooses to claim the body, the family shall assume responsibility for making the necessary arrangements and paying all associated costs (transportation of body, burial, etc.).

ICE/ERO will coordinate the logistical details involved in returning the detainee's remains to the family.

If family members cannot be located or decline, orally or in writing, to claim the remains, ICE/ERO will notify the consulate of the detainee's country of nationality in writing. The consulate shall have seven calendar days in which to claim the remains.

In the event that neither family nor consulate claims the remains, the facility shall coordinate with ICE/ERO.

The facility shall not independently authorize cremation or donation of the remains for medical research.

### 4. Death Certificate

The facility shall coordinate with ICE/ERO on proper distribution of the death certificate.

### 5. Authority to Order Autopsies

The facility shall make autopsy arrangements in coordination with ICE/ERO.

# STANDARD 4.7

## DISABILITY IDENTIFICATION, ASSESSMENT, AND ACCOMMODATION

***NOTE:*** *Standard 1.1 "Language Assistance" is applicable to this standard. The facility is required to provide language assistance to ensure effective communication, and the opportunity to participate in facility programs, services, and activities.*

## I. POLICY

Facilities are required by federal law, including Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794 (Section 504) and the Architectural Barriers Act of 1968, as amended, Pub. L. 90-480, U.S.C. 4151 et seq, to ensure detainees with disabilities have an equal opportunity to access physical spaces (i.e., accessibility) and participate in the facility's programs, services, and activities. Participation shall occur in the least restrictive and most integrated setting possible, through the provision of accommodations (e.g., auxiliary aids and services) and/or modifications (e.g., exceptions to ICE/ERO or facility policies or procedures), as necessary.

## II. STANDARDS AND PROCEDURES

### A. Definitions

#### 1. Disability

For purposes of these detention standards, the term "disability" means either:

a. A physical, communication, and/or mental impairment that substantially limits one or more of an individual's major life activities; or

b. A record of such a physical, communication, and/or mental impairment.

"Major life activities" are basic activities that a detainee without a disability in the general population can perform with little or no difficulty, including, but not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working. A major life activity can also include the operation of major bodily functions, like the immune, endocrine, and neurological systems; normal cell growth; digestion, respiration, and circulation; and the operations of the bowel, bladder, and brain.

#### 2. Communication Impairments

Detainees with "communication impairments" include detainees with physical, hearing, vision, and speech impairments (e.g., detainees who have hearing loss or are

deaf or blind, who have visual impairments, or who are nonverbal).

**3. Mobility Impairments**

Detainees with "mobility impairments" include detainees with physical impairments who require a wheelchair, crutches, prosthesis, cane, or other mobility device, or other assistance.

**4. Programs, Services, or Activities**

For purposes of these standards, the "programs," "services," "benefits," and/or "activities" of a detention facility include all aspects of the facility's operations that involve detainees. These include, but are not limited to, housing placements, medical care, safety and security protocols, food services, correspondence, visitation, grievance systems, transportation/transfers, and detainee programming and scheduled activities such as law and leisure libraries, religious services, educational or vocational classes, work programs, and recreation.

**5. Auxiliary Aids or Services**

Auxiliary aids or services are services or devices that allow for effective communication by affording individuals with impaired vision, hearing, speaking, sensory, and manual skills an equal opportunity to participate in, and enjoy the benefits of, programs and activities. Such aids or services include sign language and certified deaf interpreters, written materials, note-takers, video remote interpreting and/or video relay services, videophones, or other effective methods of making aurally delivered materials available to detainees with hearing impairments; readers, taped texts, materials or displays in Braille, secondary auditory programs, or other effective methods of making visually delivered materials available to detainees with visual impairments; acquisition or modification of equipment or devices; and other similar services and actions.

**6. Disability Accommodations**

For purposes of these standards, "disability accommodations" collectively means any accommodation (provision of auxiliary aids or services) and any modification to detention facility policy, practice, or procedure, that permits a detainee with a disability to participate in the facility's programs, services, activities, or requirements, or to enjoy the benefits and privileges of detention programs equal to those enjoyed by detainees without disabilities. Examples of "disability accommodations" include, but are not limited to accessible housing, toilet, and shower facilities; devices like bed transfer, accessible beds or shower chairs, hearing aids, or canes; and assistance with toileting and hygiene.

When considering requests and/or the need for disability accommodations, even if not requested, the facility shall engage in an interactive and individualized process with the detainee as outlined in section F below.

## B. Disability Accommodations Process and Compliance

### 1. Disability Accommodation Process

The facility shall establish a process with reasonable timelines for assessing requests and recommendations for disability accommodations (even if not requested), providing disability accommodations (including interim measures), and conducting reassessments.

### 2. Detainee Orientation

The facility orientation program shall inform detainees of the disability accommodations policy, including their right to request accommodations and the process for making such requests. References to disability accommodations must also be included in the local facility handbook. The facility must also post relevant documents in detainee living areas and the medical unit, as requested by ICE/ERO.

### 2. Staff Training

Training on the facility's Disability Accommodations procedures shall be provided to employees, volunteers, and contract personnel, and shall also be included in annual refresher training thereafter. New facility staff, including contractors and volunteers, shall receive this training as part of the Initial Orientation training. The level and type of training for volunteers and contractors will be based on the services they provide and their level of contact with detainees; however, all volunteers and contractors who have any contact with detainees must be notified of the facility's disability accommodations policy.

### 4. Disability Compliance Coordinator

Each facility shall have a designated Disability Compliance Coordinator to assist facility personnel and ensure compliance with this standard and applicable federal laws regarding accommodations for detainees with disabilities. The Disability Compliance Coordinator will be a member of the medical staff or possess relevant knowledge, education, or experience in assessing individuals with disabilities.

The Disability Compliance Coordinator is responsible for maintaining communication with the ICE/ERO field office's designated Supporting Disability Access Coordinator (SDAC).

### 5. Disability Compliance Multidisciplinary Team

Each facility shall establish a Disability Compliance Multidisciplinary Team, led by the Disability Compliance Coordinator, to address detainees with complex disabilities or challenging accommodation needs. This team will include relevant staff, such as medical, mental health, custody, compliance, safety and security personnel. The Multidisciplinary Team shall meet regularly to ensure compliance with detention

standards and federal disability laws.

## C. Identification

A detainee may identify themselves as an individual with a disability or request a disability accommodation at any time during detention. Requests for disability accommodations may be submitted formally or informally, either verbally or in writing.

Facility staff, including but not limited to medical and mental health care staff, shall identify detainees with disabilities or potential disabilities through observation, assessment, and screenings.

The facility shall also consider information from third parties, such as an attorney, family member, other detainees, or state-authorized Protection & Advocacy Groups, regarding a detainee's disability or need for accommodations.

Facility staff are responsible for identifying detainees with open, obvious, and apparent impairments and providing disability accommodations, even if not requested. Potential disabilities may be identified through medical or intake screenings, regular sick call appointments, or at any time in detention through direct observation. Staff shall be particularly attentive to impairments affecting mobility or communication. Upon identifying a detainee with a potential disability, the facility shall review the need for accommodations as outlined in Section F below.

The processes outlined in this standard apply to any detainee who requests or is identified as potentially needing disability accommodations, regardless of whether the request was explicitly made.

## D. Physical Accessibility and Most Integrated Setting Possible

### 1. Physical Accessibility

The facility must comply with all applicable federal laws, including the Architectural Barriers Act of 1968, as amended, Pub. L. 90-480, U.S.C. 4151 et seq, and regulations ensuring accessible, safe, and appropriate housing for detainees with disabilities.

The facility must ensure detainees with disabilities have physical access to its programs, services, and activities, including telephones, law libraries, programming, and toileting and bathing facilities.

### 2. Most Integrated Setting

Detainees with disabilities must be housed in spaces that provide safe and appropriate living conditions. They must have access to the facility's programs and services in the least restrictive and most integrated setting appropriate to their needs.

Detainees with disabilities shall generally be allowed to retain assistive devices, such

as canes, crutches, and prosthetics, at all times, including in general population. Placement apart from the general population due to security concerns related to an assistive device must be based on an individualized review, with documented justification. The justification must detail the specific safety or security concern posed by the assistive device and explain why the concern could not be mitigated through policy or procedural modifications.

A detainee's disability or need for accommodation may not provide the sole reason for placement in an SMU. Each case requires an individualized assessment, with the justification documented in the detention file.

## E. Effective Communication

The facility must ensure effective communication with detainees with disabilities at all stages of the disability accommodations process and throughout its programs and activities. This is necessary to provide detainees with equal opportunities to participate in and benefit from the facility's programs and activities.

Steps to ensure effective communication may include providing auxiliary aids or services for detainees with vision, hearing, sensory, speech, or manual impairments, as needed. The type of auxiliary aid or service required will depend on the method of communication, the nature, length, and complexity of the communication, and the context. The facility must give primary consideration to the detainee's request when determining the appropriate auxiliary aid or service.

Other detainees may only be used to interpret or facilitate communication in emergent situations.

## F. Disability Accommodations Process

The facility's process for accommodating a detainee with a disability will vary based on the nature of the impairment or disability.

### 1. Immediate Accommodations

The facility shall provide necessary disability accommodations to detainees with disabilities in an expeditious manner. In many situations, the facility will be able to immediately fulfill a detainee's accommodation request.

### 2. Interim Accommodations

Interim accommodations are temporary disability accommodations provided to a detainee while the facility conducts a comprehensive assessment to determine appropriate long-term accommodations or awaits the arrival of necessary items (e.g., prescription glasses, hearings aids, prosthetics). These accommodations ensure detainees with disabilities have physical access and equal opportunities to participate in the facility's programs, services, and activities.

**3. Medical and Mental Health Treatment**

Many detainees with disabilities will receive medical and/or mental health treatment from the facility's CMA. If appropriate medical or mental health treatment fully enables a detainee to access the facility's programs and activities, further interactive processes may not be necessary.

When disability accommodations require medical expenditures needing ICE/ERO authorization, the facility shall consider interim accommodations to provide the detainee access to programs and activities while awaiting approval (e.g., providing a wheelchair for mobility while a prosthesis is repaired). Any identified, appropriate interim accommodations must be provided to the detainee.

**4. Interactive Process**

The interactive process involves an individualized, case-by-case assessment and interview with the detainee to evaluate the severity of the disability and their accommodation requests and/or needs. This process must occur within 72 hours of the detainee self-identifying as having a disability, a third-party referral, or facility staff recognizing an open, obvious, or apparent impairment.

Detainee requests, third-party referrals, or staff observations that require an interactive process include, but are not limited to: (1) a detainee reports they are an individual with a disability; (2) detainees with mobility impairments; (3) detainees with communication impairments; (4) detainees whose initial accommodation requests have been denied; (5) detainees who have filed grievances regarding disability accommodations; (6) detainees complex requests requiring input from multiple disciplines (e.g., security, programming, medical, or mental health); (7) detainees identified by facility staff as appropriate for review; and (8) detainees with disabilities that appear to be worsening.

The interactive process must be conducted by medical staff or facility staff with requisite knowledge and expertise in assessing detainees with reported or observed disabilities and/or staff responsible for ensuring facility compliance with disability accommodation requirements. When appropriate, the facility shall consult with ICE/ERO for guidance, information, or resources to provide accommodations.

a. Interaction with the Detainee

If a detainee chooses not to participate in the accommodation process, the facility must respect their decision and document the declination.

b. Determinations

Through the Interactive Process, the facility assesses whether the detainee has a disability, requires accommodations to meaningfully access the facility's programs and activities, and whether to approve, recommend denying the requested

accommodation, or propose an alternate, equally effective accommodation. Written decision and required notifications must be provided within 72 hours of completing the interactive process.

If there is a delay in approving a request or providing accommodations, the facility shall consider interim accommodations to ensure the detainee can access programs and activities while awaiting the final adjudication. Any identified, appropriate interim accommodations shall be provided to the detainee.

If the facility approves an accommodation request requiring ICE/ERO approval (e.g., medical treatment, medication, or durable medical equipment needing IHSC authorization), it shall inform the detainee of the decision and the status of the request with ICE/ERO. The facility must also consider providing interim accommodations and implement any identified interim measures.

If the facility approves an accommodation request and can immediately provide the necessary accommodation, it must follow the notification procedures outlined below and promptly implement the accommodation.

If the facility denies a request for a disability accommodation ICE/ERO must be notified. See Section G External Notifications.

## G. Denial of an Accommodation

Permissible reasons for denying a requested disability accommodation for a detainee determined to be an individual with a disability include: (1) the detainee is not denied access to the facility's programs or activities due to the disability; (2) there is no connection between the disability and the requested accommodation; (3) the requested accommodation would fundamentally alter the nature of the program, service, or activity; (4) the requested accommodation would impose an undue financial or administrative burden; or (5) providing the needed or requested accommodation would unavoidably exacerbate a detainee with a disability posing a direct threat to staff or other detainees.

Providing an equally effective alternative to the requested accommodation is not considered a denial.

Both "fundamental alteration" and "undue financial and administrative burden" are high standards that are generally difficult to meet. If an accommodation would result in such a burden or alteration, the facility must take alternative actions to ensure, to the maximum extent possible, that detainees with disabilities can access the benefits and services of the program or activity.

Similarly, determinations that an individual poses a "direct threat" are rare and require a careful, individualized assessment as outlined below.

**1. Fundamental Alteration**

A "fundamental alteration" is a change so significant that it alters the essential nature of the facility's programs, services, or activities. Determinations of fundamental alteration must be made on a case-by-case basis, taking into account the unique characteristics of the facility and the detainee with a disability.

**2. Undue Financial and Administrative Burden**

An "undue financial and administrative burden" refers to significant difficulty or expense impacting a facility's operations, programs, or activities. When assessing whether an accommodation constitutes an undue burden, the facility must consider all resources available for funding and operating the program or activity as a whole.

**3. Direct Threat**

The facility may deny an accommodation for a detainee with a disability if providing it would unavoidably exacerbate a direct threat to staff or other detainees. Such determinations must be based on an individualized assessment using reasonable judgment and current medical evidence or the best available objective evidence. The assessment must evaluate the nature, duration, and severity of the risk, and whether modifications to policies, practices, or procedures could mitigate or eliminate the risk.

Detainees found to pose a direct threat must still be provided auxiliary aids or services to ensure effective communication.

## H. Reassessments

The multidisciplinary team shall conduct an initial reassessment of approved accommodations within 30 days of the original assessment. All reassessments shall include an interview with the detainee to evaluate the current accommodations and determine if changes to the accommodation plan are needed. Subsequent periodic reassessments shall occur at least every 90 days thereafter, unless requested sooner by the detainee, third-party, or facility staff. These reassessments must evaluate the effectiveness of the accommodation(s), the continued need for them, and whether alternate accommodation would be more effective or appropriate.

Both initial and periodic reassessments shall be documented in the detainee's medical file.

## I. Internal Notifications

**1. Detainee Notification**

The facility must provide the detainee with written notification, in a language or manner they understand, of its final decision regarding their accommodation request, whether granted or denied, including cases requiring further ICE/ERO approval. If an accommodation is denied or an alternate unrequested accommodation is provided, the

notification shall include a justification for the decision.

2. Staff Notification

When disability accommodations are granted, all relevant facility staff, including security personnel, shall be promptly notified and provided instructions for implementation as needed. Notifications must account for applicable privacy and confidentiality requirements.

The Disability Compliance Coordinator shall notify the Facility Administrator or Assistant Facility Administrator if they recommend that a detainee's requested disability accommodation be denied based on the interactive process and other assessments (e.g., outside medical referrals).

All recommendations to deny requested accommodations must be approved by the Facility Administrator or Assistant Facility Administrator, including cases where some or all accommodations are denied.

The facility shall notify the ICE/ERO field office's designated SDAC in writing of any recommendation to deny requested disability accommodations. See Section G External Notifications for more information.

## J. External Notifications

### 1. Notification of a Detainee with a Communication or Mobility Impairment or Recommendation of Denial.

The facility must complete and submit the Disability Accommodation Notification (DAN) to the ICE/ERO field office's designated SDAC as soon as practicable, but no later than 72 hours after the facility completed the interactive process for assessing the needs of a detainee with a communication or mobility impairment or the facility is denying a requested accommodation for any disability (not just mobility or communication).

# Section 5: ACTIVITIES



# STANDARD 5.1

## CORRESPONDENCE AND OTHER MAIL

***NOTE:*** *Standards 1.1 "Language Assistance" and 4.7: "Disability Identification, Assessment, and Accommodation" are applicable to this standard. The facility is required to provide language assistance and disability accommodations to ensure effective communication, equal access to physical spaces, and the opportunity to participate in facility programs, services, and activities.*

## I. POLICY

All facilities shall ensure detainees can send and receive correspondence in a timely manner, subject to safety, security, and orderly facility operations. Other mail is permitted under the same limitations. Facilities must provide guidelines on correspondence and mail policies.

Facilities will review policies and capabilities for detecting contraband and hazardous substances in incoming mail and implement measures to mitigate risks to staff and detainees. Mailroom staff must remain vigilant in identifying contraband and hazardous substances, have access to personal protective equipment when handling mail, understand protocols for exposure to suspected opioids, and follow procedures for reporting incidents to supervisors and law enforcement, as appropriate.

## II. STANDARDS AND PROCEDURES

### A. General

Detainees may send and receive unlimited correspondence at their own expense. However, non-correspondence mail, such as packages and publications, may be subject to restrictions for safety, security, orderly facility operations.

Facilities shall implement policies and procedures to protect staff and prevent hazardous substances from entering the facility through mail.

### B. Detainee Notification

The facility shall notify detainees of its policy on correspondence and other mail and must include information on sending and receiving correspondence in the facility handbook.

At a minimum, the information shall inform detainees of the following:

1. That they have the right to receive mail and the mailing address that should be used to receive mail at the facility;

2. How to send outgoing mail, including instructions on how to address the envelope;

3. The facility's process for inspecting general correspondence;

4. The definition of special correspondence, instructions for properly labeling special correspondence, the requirement that special correspondence be opened only in their presence, and that the facility may inspect it for contraband but cannot read its contents;

5. The facility's policy on packages;

6. Types of mail that may be rejected by the facility and cannot be kept in their possession;

7. Instructions for obtaining writing implements, paper, and envelopes; and

8. Procedures for purchasing postage (if applicable) and rules for providing free postage to indigent or other eligible detainees.

## C. Processing

Detainee correspondence and mail shall be delivered to detainees and the postal service on regular schedules.

Incoming correspondence shall be distributed to detainees within 24 hours of receipt by the facility, barring extraordinary circumstances. Outgoing correspondence shall be delivered to the postal service no later than the next day after receipt by facility staff or placement in a designated mail depository, excluding weekends and holidays.

Exceptions may apply for mail requiring special handling for security purposes, such as holding special correspondence for up to 48 hours to verify the sender or recipient.

## D. Packages

Facilities shall implement policies and procedures regarding the receipt of packages by detainees.

## E. Inspection of Incoming and Outgoing Correspondence and Other Mail

### 1. General Correspondence and Other Mail

Facilities shall implement procedures to inspect all incoming general correspondence and mail, including packages and publications, for contraband and hazardous substances.

Outgoing general correspondence and mail may be inspected and/or read if addressed to another detainee or if there is reason to believe it may threaten the facility's secure or orderly operation, endanger the recipient or public, or facilitate criminal activity.

### 2. Special Correspondence

"Special correspondence" refers to detainees' written communications to or from private attorneys, legal representatives, government attorneys, judges, courts, embassies, consulates, the President and Vice President of the United States, members of Congress, the Department of Justice (including immigration courts), the Department of Homeland Security (including ICE/ERO, IHSC, the DHS Office for Civil Rights and Civil Liberties, and the DHS Office of Inspector General), grievance system administrators, and representatives of the news media. Correspondence is considered special only if the sender's title and office (for incoming mail) or the addressee (for outgoing mail) are clearly identified on the envelope, indicating it as special correspondence.

Facilities shall implement procedures to inspect incoming special correspondence for contraband and hazardous substances. Any such inspection must occur in the detainee's presence.

Outgoing special correspondence must not be opened, inspected, or read, in accordance with facility policy. If inspection is necessary, it shall occur in the detainee's presence.

Staff are prohibited from reading or copying incoming or outgoing special correspondence. Inspections shall be limited to detecting contraband and verifying that enclosures qualify as special correspondence.

## F. Rejection of Incoming and Outgoing Mail

Facilities shall implement policies and procedures defining acceptable and non-acceptable mail, including the rejection of incoming and outgoing mail for facility order and security reasons. General correspondence and other mail may be rejected to protect the security, good order, or discipline of the institution; safeguard the public; or prevent criminal activity.

Detainees must be notified when their incoming or outgoing mail is confiscated or withheld, in whole or in part, and provided a receipt for the confiscated or withheld item(s).

## G. Contraband Recording and Handling

When an officer removes an item from a detainee's mail, they shall create a written record.

Prohibited items discovered in the mail must be handled in accordance with Standard 2.3, "Facility Security and Control." Soft contraband may be returned to the sender at the facility's discretion.

Newspaper articles depicting or describing violence in a detainee's country of origin may be relevant to their legal case and shall not automatically be considered contraband.

Identity documents (e.g., passports, birth certificates) shall be turned over to ICE/ERO. Copies shall be provided to the detainee and placed in their file.

## H. Postage Allowance

The facility shall not limit the amount of correspondence detainees may send at their own expense, except to protect public safety or facility security and order.

Indigent detainees shall be provided with postage allowance at government expense. A detainee is generally considered indigent if their account balance is less than $15.00 for ten consecutive days. A facility shall make a timely effort to determine indigence.

The facility shall establish procedures to ensure indigent detainees can send a reasonable amount of mail each week at government expense, including:

1. At least three pieces of general correspondence;

2. At least five pieces of special correspondence; and

3. Packages containing personal property, if the facility determines storage space is limited and mailing the property is in ICE/ERO's best interest.

Free postage is typically limited to letters weighing one ounce or less, with exceptions allowed for special correspondence. In compelling circumstances, the facility may also grant exceptions for general correspondence and other mail.

## I. Writing Implements, Paper, and Envelopes

The facility shall provide paper, writing implements and envelopes at no cost to detainees.

## J. Detainees in Special Management Units

Detainees in administrative and disciplinary segregation shall have the same correspondence privileges as detainees in the general population.

## K. Notaries, Certified Mail, and Miscellaneous Needs Associated with Legal Matters

If a detainee requests services related to a legal matter (e.g., notary public, certified mail), the facility shall provide the requested services. Detainees are responsible for associated fees unless they are indigent.

If the necessity of the requested service for a legal matter is unclear, the facility must consult with ICE/ERO.

# STANDARD 5.2

## RECREATION

***NOTE:*** *Standards 1.1 "Language Assistance" and 4.7: "Disability Identification, Assessment, and Accommodation" are applicable to this standard. The facility is required to provide language assistance and disability accommodations to ensure effective communication, equal access to physical spaces, and the opportunity to participate in facility programs, services, and activities.*

## I. POLICY

The facility shall provide detainees with access to recreational programs and activities, subject to safety and security constraints.

## II. STANDARDS AND PROCEDURES

### A. Requirements for Recreation

1. Outdoor recreation, if available, shall be offered at a reasonable time of day. Weather permitting, detainees shall have access for at least one hour per day, a minimum of five days per week.

2. If only indoor recreation is available, detainees shall have access for at least one hour each day with access to natural light.

3. Detainees must never be required to forgo basic law library privileges in exchange for recreation privileges.

### B. Recreation Specialist

Facilities shall designate an individual, such as a recreation specialist, to develop and oversee the recreation program.

### C. Program Content

1. Programs and activities must adhere to the facility's security and operational guidelines and may be restricted as necessary.

2. Both indoor and outdoor recreation areas shall be under direct, continuous supervision by facility staff.

3. Designated exercise areas shall be equipped with a variety of corrections-grade equipment.

4. Cardiovascular exercise equipment, such as stationary bicycles or treadmills, shall be available to detainees without access to outdoor recreation.

5. Recreational activities shall be based on the facility's size and location and may include limited-contact sports (e.g., soccer, basketball, volleyball), table games, and competitions between units.

6. Detainees participating in outdoor recreation shall have access to drinking water, weather-appropriate attire, and toilet facilities.

7. Dayrooms in general-population housing units must offer board games, television, leisure reading materials, and other sedentary activities.

8. Where television or broadcast programming is available, facilities are encouraged to provide content in Spanish and other commonly spoken languages at the facility, as appropriate.

**D. <u>Recreation for Special Management Unit (SMU)</u>**

Recreation for detainees housed in the SMU shall occur separately from recreation for the general population.

Facilities will maximize opportunities for group participation in recreation and other activities, while adhering to safety and security considerations. Recreation for certain detainees may occur separately from other detainees when necessary to prevent assaults and reduce management problems.

Detainees in the SMU shall be offered at least one hour of recreation per day outside their cell, scheduled at a reasonable time, at least five days per week. Recreation privileges may only be waived if the detainee's activity poses an unreasonable threat to safety or security, as follows:

1. Recreation privileges may only be denied with written authorization from the facility administrator.

2. The facility shall provide the detainee with written notification of the suspension of recreation privileges, including the reason, conditions for restoration of privileges, and the duration of the suspension (if conditions are met).

3. Denial of recreation privileges exceeding seven days requires approval from both the facility administrator and a health care professional, and the facility shall notify ICE/ERO.

## E. Volunteer Program Involvement

Volunteer groups may offer special recreational or educational programs, subject to security considerations, availability of staff to supervise detainees, and adequate advance notice to the facility.

# STANDARD 5.3

## RELIGIOUS PRACTICES

***NOTE:** Standards 1.1 "Language Assistance" and 4.7: "Disability Identification, Assessment, and Accommodation" are applicable to this standard. The facility is required to provide language assistance and disability accommodations to ensure effective communication, equal access to physical spaces, and the opportunity to participate in facility programs, services, and activities.*

## I. POLICY

This detention standard ensures detainees of various religious beliefs have reasonable and equitable opportunities to participate in the practices of their faith, limited only by documented threats to safety, security, and the orderly operation of the facility.

## II. STANDARDS AND PROCEDURES

### A. General

The facility must designate a Chaplain or Religious Services Coordinator (RSC) to manage and oversee religious programs and services for detainees, ensuring access to religious practices and accommodations in accordance with their faith while adhering to facility policies and security requirements. The Chaplain or RSC shall have physical access to all areas of the facility to serve detainees.

Religious activities must be accessible to the entire detainee population without discrimination based on race, ethnicity, religion, national origin, color, sex, sexual orientation, age, or disability. Attendance at religious activities is voluntary.

No one may disparage a detainee's religious beliefs or coerce or harass them to change their religious affiliation.

The facility shall not cut or shave religiously significant hair unless required for safety, security, or orderly operation of the facility.

### B. Religious Opportunities and Limitations

The facility administrator may discontinue a religious activity or practice or limit participation to a reasonable number of detainees or members of a specific religious group when necessary for security or order, after consulting with the chaplain or RSC.

Facility records shall document any limitation or discontinuance of a religious practice, including the reason for the decision. Denials of access to religious practices or items – such as religious meals, garb, scriptures/texts, or worship items (e.g., rosaries, wine, Tefillin, headwear) shall be documented in the detainee's detention file and made available

to ICE/ERO upon request.

**C. Religious Preferences**

ICE/ERO does not require detainees to profess a religion or spiritual belief. During in-processing, the facility shall record the detainee's religious preference or note if none is declared.

Detainees may change their religion or spiritual belief designation at any time by notifying the chaplain or RSC in writing. The change must be implemented within seven days of receiving the request.

**D. Chaplain/Religious Services Coordinator**

The Chaplain or RSC is responsible for scheduling and managing religious activities in the facility and informing detainees on how to request a religious practice accommodation.

The Chaplain or RSC shall possess relevant education or experience, including pastoral education, knowledge of various religions and cultural groups, and/or experience in a recognized religious or ministerial role within a faith community.

**E. Schedules and Facilities**

Current religious program schedules and group worship times shall be posted in living units or otherwise made available to detainees.

Facilities shall designate adequate space for religious activities to equitably meet the needs of the detainee population. Religious service areas shall be maintained in a neutral manner suitable for various faith groups.

**F. Community Involvement (Volunteers, Detention Facility Contractors)**

Facilities shall have procedures and resources to accommodate religious leaders, clergy, community groups, and volunteers providing religious services or procuring religious items not provided by the Chaplain or RSC. Faith group representatives may include religious leaders, clergy, and spiritual advisors.

**G. Introduction of New and Unfamiliar Religious Components**

Detainees may request the inclusion of new or unfamiliar religious components in the facility's religious services program. If additional information is needed regarding a specific practice, the Chaplain or RSC can request details and materials from the detainee or local/national offices of the relevant religion or faith group to determine whether the practice should be included in the religious services program.

## H. Religious Group Assemblies

Detainees must be provided the opportunity to participate in group religious activities, limited only by documented threats to the facility's safety, security or orderly operation.

## I. Religious Holy Days

The facility shall establish a policy to facilitate the observance of significant religious holidays and holy days while maintaining safety, security, and orderly operations. Observances may include special fasts, dietary requirements, worship or work restrictions. The Chaplain or RSC will work with requesting detainees to provide proper accommodations for religious observances.

## J. Pastoral Visits

Detainees of a different religious faith than the Chaplain may request access to pastoral care and counseling from external clergy and religious service providers. The facility may require documentation of the provider's religious credentials and a criminal background check.

## K. Religious Property

The Chaplain or RSC shall ensure detainees have access to religious items, including worship/prayer materials, specialty food items, and religious headwear and other garb, necessary to practice their religion or spiritual beliefs, consistent with facility safety, security, and orderly operation. Any denial of access must be assessed on a case-by-case basis, with the reason documented in the detainee's detention file or a retrievable electronic format.

Detainees shall be generally allowed to wear or use personal religious items during religious services, ceremonies, and meetings in the chapel, unless a documented threat to safety, security, or facility operations exists. Upon request, detainees may also be permitted to wear or use certain religious items throughout the facility. Any denial of participation in or observance of religious practices must be assessed on a case-by-case basis, with the reason documented in the detainee's detention file or a retrievable electronic format.

Religious literature shall be permitted in accordance with procedures governing incoming publications.

Religious items may be obtained by receiving in-kind donations from religious or other charitable organizations, facilitating family or friends sending items, or the Chaplain or RSC purchasing items directly. Detainees shall not be charged for necessary religious items.

## L. Dietary Requirements

ICE/ERO requires facilities to provide detainees requesting a religious diet a reasonable and equitable opportunity to observe their religious dietary practices, consistent with the

secure and orderly operation of the facility. Refer to Standard 4.1 "Food Service" for more information.

## M. **Detainees in Special Management Units**

Detainees in Special Management Units and medical housing shall be permitted to participate in religious practices on a consistent and scheduled basis, limited only by documented threats to safety, security, and orderly operation of the facility. Any limitations on SMU detainees' participation in or observance of religious practices must be assessed on a case-by-case basis, with the reason documented in the detainee's detention file or a retrievable electronic format.

# STANDARD 5.4

## TELEPHONE ACCESS AND ADVANCED COMMUNICATION SERVICES

***NOTE:*** *Standards 1.1 "Language Assistance" and 4.7: "Disability Identification, Assessment, and Accommodation" are applicable to this standard. The facility is required to provide language assistance and disability accommodations to ensure effective communication, equal access to physical spaces, and the opportunity to participate in facility programs, services, and activities.*

## I. POLICY

The facility shall establish policy and procedures governing the use of telephones and advanced communication services (ACS).

## II. STANDARDS AND PROCEDURES

### A. Definition

**Advanced Communication Services**

Advanced communication services refer to a range of modern, integrated communication technologies that go beyond basic phone calls to include multi-channel features like voice, video, and messaging (e.g., text, email). ACS are facility issued electronic communication devices which use secure platforms, such as tablets and kiosks, capable of transmitting audio, video, or data electronically over a network (e.g., ethernet cable, cellular, wireless).

### B. Detainee Access to Telephones and ACS

The facility shall provide detainees with reasonable and equitable access to telephones and ACS during established waking hours, subject to restrictions outlined in these standards and facility policy.

The facility shall establish policies and procedures for the use of telephones and ACS. Rules on accessing these devices must be provided to detainees via the facility handbook and posted where detainees can easily see them.

Facilities shall provide detainees with access to reasonably priced telephone services. Contracts for such services shall comply with applicable federal regulations and feature rates and surcharges comparable to those charged to the general public.

### C. Number of Telephones

The facility shall provide at least one operable telephone for every 25 detainees.

## D. Telephone and ACS Maintenance

The facility or detention facility contractor shall ensure detainee telephones are kept in proper working order. Facility staff shall inspect telephones daily, promptly report out-of-order telephones to the repair service, and ensure repairs are completed quickly.

ACS capabilities such as tablets and kiosks must be maintained in proper working order. with facility staff conducting daily inspections, reporting out-of-service devices to the repair service, and ensuring timely repairs.

## E. Direct Calls and Free Calls

Even if telephone service is limited to collect calls, the facility must allow detainees to make direct, free calls to the following:

1. Local immigration courts and the Board of Immigration Appeals;
2. Federal and state courts in which a detainee is or may become involved in legal proceedings;
3. Consular officials;
4. Legal service providers, in pursuit of legal representation or to engage in consultation concerning an expedited removal case;
5. Legal service providers or organizations listed on the ICE/ERO free legal service provider list;
6. Government offices, to obtain documents relevant to immigration cases;
7. DHS Office of Inspector General (OIG);
8. ICE/OPR Integrity Coordination Center (ICC);
9. ICE/ERO Detention, Removals and Information Line (DRIL);
10. United Nations High Commissioner for Refugees;
11. Family or friends for personal or family emergencies; and
12. When a detainee can otherwise demonstrate a compelling need (to be interpreted liberally).

The facility must notify ICE/ERO if its existing telephone or ACS system cannot initially meet these requirements. ICE/ERO will provide alternate access, such as providing access to its detainee telephone/ACS service provider or providing cell phones or other communication devices which the facility can pre-program with authorized numbers (as

listed above) while blocking all other numbers. These devices will be maintained by ICE/ERO staff or local officials and calls must be provided in an environment where detainee conversations cannot be readily overheard.

Staff shall allow detainees to make direct, free telephone calls or video calls (as described above) as soon as possible after the request, factoring in the urgency expressed by the detainee. Access will generally be provided within eight facility-established waking hours of the detainee's request, excluding the hours between lights-out and the morning resumption of scheduled activities, but shall always occur within 24 hours of the request. The facility must document delays extending beyond eight waking hours and notify ICE/ERO.

A request form is required to make direct or free calls, and assistance must be provided to detainees who are illiterate, limited English proficient, or have disabilities.

Facilities shall allow detainees to make legal telephone and video calls, and when necessary, make efforts to ensure they can navigate automated systems, including decision trees, and leave messages.

## F. Telephone and ACS Usage Restrictions

The facility shall not restrict the number of telephone or video calls a detainee makes to legal representatives or to obtain representation. Likewise, call duration must not be limited by rule or automatic cut-off unless required for security purposes or to ensure fair access to telephones and ACS. If time limits are necessary, they shall be no shorter than 20 minutes, and detainees shall be allowed to continue the call, if desired, at the next available opportunity.

Reasonable restrictions may be placed on the hours, frequency, and duration of other direct or free calls but may not limit a detainee's attempt to obtain legal representation.

## G. Telephone and ACS Privileges in Special Management Unit

Staff shall allow detainees in the Special Management Unit for disciplinary reasons to make direct and/or free calls as described above, except under documented compelling security conditions.

Detainees in the Special Management Unit for administrative reasons shall have access to telephones and ACS comparable to detainees in the general population, but in a manner consistent with the security and safety requirements of these units.

## H. Inter-facility Telephone Calls

Upon a detainee's request, the facility shall make special arrangements permitting the detainee to speak by telephone with an immediate family member detained in another facility. Immediate family members include the detainee's spouse, co-parent, mother,

father, stepparents, foster parents, brothers and sisters, and children. Reasonable limitations may be placed on the frequency and duration of such calls.

The facility shall liberally grant requests for inter-facility family calls to discuss legal matters. For such calls, the detainee's conversations shall be afforded privacy to the extent possible, while maintaining adequate security.

## I. Incoming Calls

The facility shall deliver telephone messages to detainees as promptly as possible. For emergency calls, facility staff shall obtain the caller's name and telephone number to provide this information to the detainee as soon as possible. Detainees shall be allowed to return emergency calls as soon as reasonably possible within the constraints of security and safety, typically within eight waking hours of the incoming call. Indigent detainees shall be permitted to return emergency calls free of charge.

The facility shall establish a process for legal representatives to schedule legal calls via telephone or video conference. Scheduling may be facilitated using ICE's Detention Facility Appointment Scheduler (DFAS) or its successor platform, at no cost to the facility, or through an alternate process established by the facility.

## J. Privacy for Detainee Telephone and Video Calls on Legal Matters

The facility shall ensure privacy for detainee telephone and video calls related to legal matters by allowing such calls to be made without being overheard by officers, staff, or other detainees.

Facilities are prohibited from electronically monitoring detainee telephone and video calls related to legal matters unless authorized to do so by a court order.

The facility shall inform detainees, in a language or manner they understand, how to schedule legal calls with their legal representatives. If a detainee has difficulty making a confidential legal call, they shall be instructed to notify facility staff. Upon notification, staff shall take measures to ensure the call can be made confidentially.

Privacy can be provided through:

1. Telephones with privacy panels;

2. Placement of telephones where conversations cannot be readily overheard by other detainees or staff; or

3. Use of an office or privacy booth telephone for confidential calls.

## K. Monitoring of Detainee Telephone and Video Calls

The facility shall have a written policy on monitoring detainee telephone and video calls.

The facility shall notify detainees if calls are monitored. At a minimum, the facility shall include this information in the facility handbook and post a notice at each monitored telephone informing the detainee:

1. That calls are subject to monitoring; and

2. The procedure for obtaining an unmonitored call to a court, legal representative, or for the obtaining legal representation.

The facility may monitor other calls for security purposes at its discretion. Facility or ICE/ERO staff may visually monitor detainees during calls. Inappropriate behavior during video visits may be addressed through the disciplinary process.

## L. Telephone and ACS Access for Detainees with Disabilities

In accordance with Standard 4.7 "Disability Identification, Assessment, and Accommodation," the facility shall provide equal access to telephone and ACS for individuals with disabilities. Accessible services may include teletypewriter (TTY) devices, telephones with volume control, hearing-aid-compatible telephones, videophones, video relay service, or video remote interpretation service. If time limitations apply, detainees using accessible telephone services shall be granted additional time, subject to safety and security considerations.

If accessible telephone services and ACS are located separately from telephones used by detainees without disabilities, detainees with disabilities shall be given additional time to travel to and from the accessible location. The facility shall ensure that detainees using accessible telephone services have the same level of privacy for their calls as other detainees, consistent with facility safety and order.

# STANDARD 5.5

## VISITATION

***NOTE:*** *Standards 1.1 "Language Assistance" and 4.7: "Disability Identification, Assessment, and Accommodation" are applicable to this standard. The facility is required to provide language assistance and disability accommodations to ensure effective communication, equal access to physical spaces, and the opportunity to participate in facility programs, services, and activities.*

## I. POLICY

Facilities shall allow authorized persons to visit detainees, subject to security and operational constraints. This includes family and friends, as well as current or prospective legal representatives, legal assistants, and their consular officials.

In coordination with ICE/ERO, facilities may provide authorized representatives of the news media and non-governmental organizations access to public information about facility operations. With appropriate notice, facilities may allow tours and, with ICE/ERO and detainee consent, interviews with individual detainees.

## II. STANDARDS AND PROCEDURES

### A. General

The facility shall establish written visitation procedures, including a schedule and designated visitation hours, accommodating visits from family (including minors), friends, legal representatives, and consular officials.

Approval from ICE/ERO is required to access ICE staff, facilities and information, as outlined in this standard.

Authorizations granted under this section apply only to ICE-related activities and do not extend to activities overseen by other authorities or entities that may operate at or within the facility.

The facility may temporarily restrict visitation when necessary to maintain the security and orderly operation of the facility. Contact visits are encouraged but remain subject to the facility's detainee population and physical conditions.

### B. Notification

The facility handbook shall include visitation rules and hours. The facility shall also prominently display this information in areas accessible to detainees, including in the housing units.

Facilities shall make visitation schedules and procedures available to the public through written materials, the facility's website (if available), postings in the visitors' visitation room and waiting area, and via telephone. Telephone callers shall be provided visitation hours and rules through a live voice or recording.

## C. Visitor Log

The facility shall maintain separate logs for general visitors and legal visitors, as outlined in this standard.

## D. Incoming Property and Money for Detainees

The facility shall have written procedures for handling incoming property and money for detainees. Visitors must be allowed to deposit money into a detainee's account and shall receive a receipt for all money or property left at the facility, unless the items are allowed to be given directly to the detainee.

## E. Sanctions for Violation of Visitation Rules

Violations of visitation rules may result in disciplinary action against the detainee via the formal disciplinary process, including the loss of visitation privileges.

The introduction of contraband or other violations may result in criminal prosecution of the visitor, the detainee, or both.

## F. Visits by Family and Friends

### 1. Hours and Time Limits

The facility shall establish a visiting schedule based on the detainee population and visitation demand. Visits shall be permitted during designated hours on Saturdays, Sundays, and holidays. To the extent practicable, the facility shall accommodate visitors who face hardships visiting on weekends and holidays, such as authorizing special visits for family visitors unable to attend during regular hours.

Detainees shall be allowed visits on at least one weekend day. However, ICE/ERO encourages facilities to provide visiting hours for each detainee on both weekend days and to accommodate visitors who can only visit on a specific weekend day, whenever practicable.

The facility's written rules shall specify time limits for visits, with a minimum duration of 30 minutes under normal conditions. ICE/ERO encourages extending visitation periods when feasible, particularly for family members traveling long distances. In unforeseen circumstances, such as overcrowding in the visiting room, the facility may adjust visiting periods and durations.

Immediate family members detained at the same facility may visit one another during normal visiting hours, regardless of sex, when practicable.

Upon detainee request, facilities without provisions for contact visits by minors must notify ICE/ERO within the first 30 days of a detainee's detention to arrange a contact visit with their children, stepchildren, or foster children. ICE/ERO will coordinate with the facility to arrange these visits and facilitate monthly contact visits upon request until a transfer is completed.

### 2. Visitor Identification and Search

Staff shall verify each visitor's identity using valid state or government-issued photo identification, such as a driver's license, before granting access to the facility. No adult visitor shall be admitted without positive identification.

The facility may conduct a pat search and visually inspect personal items, including purses, briefcases, packages and other containers. Any cancellation of visitation must comply with facility policy and be properly documented.

### 3. Contact Visits

Written procedures shall detail the limits and conditions for contact visits in facilities where they are permitted.

A facility may implement a policy permitting strip searches after contact visits, absent reasonable suspicion, only if detainees are provided the option of non-contact visitation. Detainees must be fully informed of this option and the policy. The facility must document all strip searches conducted under such a policy.

### 4. Visits for Administrative and Disciplinary Segregation Detainees

Detainees in administrative or disciplinary segregation shall retain visiting privileges unless substantial, documented reasons justify withholding those privileges. In facilities permitting contact visits, segregated detainees may use the visiting room during normal visiting hours.

Under no circumstances shall detainees participate in general visitation while in restraints. If a detainee's behavior necessitates restraints, the visit will not be permitted.

## G. Visits by Legal Representatives and Legal Assistants

### 1. General

The facility's written legal visitation policy shall be available upon request or posted on the ICE facility webpage.

During legal visitation, detainees may meet privately with current or prospective legal representatives and their legal assistants, either in-person or via video teleconference.

Legal service providers are not required to complete a Form G-28 (stating they are the detainee's legal representatives) to meet with a detainee.

**2. Hours**

The facility shall permit legal visitation seven days a week, including holidays, for a minimum of eight hours per day on regular business days and four hours per day on weekends and holidays.

Rules and hours for legal visitation must be clearly communicated and prominently displayed in the visiting room. On regular business days, legal visitation may proceed through a scheduled meal period, in which case the detainee shall receive a tray or sack meal following the visit.

**3. Persons Allowed to Visit**

Individuals in the following categories may visit detainees to discuss legal matters, subject to the restrictions outlined below:

a. Attorneys and Other Legal Representatives

An attorney is a person who is a member in good standing with the bar of the highest court of any state, possession, territory, commonwealth or the District of Columbia, and is not subject to any court order suspending, enjoining, restraining, disbarring or otherwise restricting their ability to practice of law.

A legal representative may include an attorney or other person representing another in legal matters, such as law students or law graduates not yet admitted to the bar under certain conditions, U.S. Department of Justice (DOJ) Executive Office for Immigration Review (EOIR)-accredited representatives, and accredited officials.

b. Legal Assistants

An unaccompanied legal assistant may meet with a detainee during legal visitation hours upon presenting a letter of authorization from the supervising legal representative. The letter must confirm that the legal assistant is acting on behalf of the supervising legal representative for the purpose of meeting with the detainee(s).

c. Prospective Representatives

A prospective representative is an attorney or legal representative who is not yet representing a detainee but is considering or evaluating the possibility of providing legal representation. The facility shall allow detainees to meet with prospective representatives during normal legal visiting hours.

d. Interpreters

The facility shall allow interpreters to accompany legal representatives and legal assistants during legal visits. Interpreters must complete the standard security clearance process.

e. Messengers

The facility shall permit messengers, who are not legal representatives or legal assistants, to deliver documents to and from the facility, but not to visit detainees.

**4. Identification of Legal Representatives and Assistants**

Prior to each visit, legal representatives and assistants must provide appropriate identification, such as a bar card from any state, documentation of partial or full accreditation from the DOJ EOIR, or a letter of authorization from the supervising legal representative or attorney as detailed above.

If such documentation is not readily available, attorneys must indicate their licensing jurisdiction and provide instructions on how that may be verified. Facilities may also require attorneys and EOIR-accredited representatives to register for accounts through the ICE/ERO eFile platform (or successor system), which verifies licensing and accreditation prior to scheduling legal visits. Legal assistants may also be required to have an attorney-sponsored account in ERO eFile.

Legal representatives and assistants shall not be asked to disclose the subject matter of their meeting. However, they may be subject to a search of their person and belongings at any time to ensure the absence of contraband.

**5. Identification of Detainee to Be Visited**

The facility shall not require legal service providers to submit a detainee's A-number as a condition of visitation if that information is not available. The facility shall make a good-faith effort to locate a detainee using the information provided.

**6. Call-Ahead Inquiries**

Each facility shall establish written procedures allowing legal service providers and legal assistants to call in advance to confirm whether a specific individual is detained at that facility. Facilities enrolled in the ICE Detention Facility Appointment Scheduler (DFAS) system may satisfy this requirement by adhering to DFAS procedures posted on the facility's ICE.gov page.

**7. Private Meeting Room and Interruption for Head Counts**

Visits between legal service providers or legal assistants and detainees are confidential and shall not be subject to auditory supervision. Private consultation rooms shall be

available for these meetings.

Facility staff may terminate attorney visits if necessary to maintain security, but routine official counts shall not interrupt or end attorney visits.

Facility staff shall not be present in the confidential meeting area unless requested by the attorney. However, staff may visually monitor meetings through a window or camera to ensure security, provided they cannot overhear the conversation.

If private consultation rooms are unavailable and the attorney requests to meet in a regular or alternate visiting room, such requests shall be accommodated whenever practicable, with the highest degree of privacy possible under the circumstances.

**8. Materials Provided to Detainees by Legal Representatives**

The facility's written legal visitation procedures must allow for the exchange of documents between detainees and legal representatives or legal assistants, even if contact visitation rooms are unavailable.

Documents or written materials provided to a detainee during a legal visit may be inspected but not read. Detainees are entitled to retain legal materials for personal use. Excess quantities of blank forms or self-help legal materials beyond personal use may be stored with the detainee's property and accessed through established communication procedures.

**9. Detainee Search**

Detainees shall not be subject to a strip search following a visit by a consular representative, attorney, legal assistant under attorney supervision, or accredited representative, unless there is specific and articulable suspicion that contraband was transferred.

However, if standard operating procedures require strip searches after every contact visit with a legal representative, the facility must offer an option for non-contact visits in a confidential environment. In such cases, the facility must establish a process for the detainee and their representative to securely exchange documents.

**10. Legal Visitation for Detainees in Administrative and Disciplinary Segregation**

Detainees in administrative or disciplinary segregation shall be allowed legal visitation. If the facility administrator determines that special security measures are necessary, legal service providers will be notified of the security concerns prior to the meeting.

**11. Group Legal Meetings**

At the request of a legal service provider or assistant, the facility may allow a confidential meeting (without an officer present) involving the requester and two or

more detainees. Such meetings serve various purposes, including pre-representational, representational, or removal-related matters. The facility shall accommodate these requests to the greatest extent practicable, considering factors such as physical capacity and the need to maintain security and order.

See also Standard 6.4 “Legal Rights Group Presentations.”

### 12. Pro Bono List and Detainee Sign-Up

The facility shall post the current official list of pro bono legal service providers in detainee housing units and other appropriate areas. The list of providers is available at www.justice.gov/eoir/list-pro-bono-legal-service-providers or can be obtained directly from ICE/ERO.

Legal organizations or individuals on the list may request the posting or circulation of a sign-up sheet by writing the facility. The facility shall notify detainees of the sign-up sheet’s availability and, following established procedures, ensure coordination with the pro bono organization.

### 13. Legal Visitation Log

A separate log shall be maintained for all legal visitors, including those denied access to a detainee, with reason(s) for the denial documented. Facilities using the DFAS system are not required to maintain a separate log for the type of visitation (in-person or remote) supported by the facility.

## H. <u>Consultation Visits for Detainees Subject to Expedited Removal</u>

### 1. General

A detainee subject to expedited removal and referred to an Asylum Officer is legally entitled to consult with individuals of their choosing, both before the interview and during the review of the Asylum Officer’s decision.

Given the expedited nature of these procedures, each facility shall establish procedures that provide generous opportunities for consultation visitation in accordance with this standard.

### 2. Method of Consultation

The facility shall facilitate consultation visits through both telephone and in-person meetings.

### 3. Persons Allowed to Visit for Consultation Purposes

Detainees subject to expedited removal may consult with individuals of their choosing during their first 48 hours at the facility. Consultants may include, but are not limited

to, attorneys, legal representatives, prospective legal representatives, legal assistants, NGO staff members, and friends or family.

All consultation visitors are subject to the same identification and security screening procedures as general visitors. If documented security concerns prevent an in-person visit with a specific individual, the facility shall arrange for consultation by telephone. If security reasons also prevent consultation by telephone, the facility shall immediately notify ICE/ERO.

**4. Privacy**

Consultation visits, whether in person or by telephone, shall be afforded the same level of privacy as communications between legal representatives and detainees.

**5. Hours**

Consultation visits shall be permitted during both legal and general visitation hours; however, confidentiality is only guaranteed during legal visitation hours.

If necessary to accommodate demand, the facility shall extend consultation visiting hours.

**6. Duration of Consultation Period**

The consultation visitation period begins prior to the interview with an Asylum Officer and continues through the review of the Asylum Officer's determination by the Supervisory Asylum Officer or Immigration Judge.

The consultation visitation period concludes upon the issuance of a Notice to Appear and the detainee's placement in removal proceedings before an Immigration Judge. However, the detainee retains legal and other visitation privileges in accordance with this detention standard.

**7. Admittance for Asylum Officer Interview**

Detainees subject to expedited removal may bring and consult with advisors during the Asylum Officer interview. Advisors may also be present during the Immigration Judge's review of a negative credible fear determination, subject to the judge's discretion.

**8. Log**

The legal visitation log shall document all consultation visits.

**9. Form G-28**

Visitors, including attorneys and legal representatives, are not required to file a Form

G-28 to participate in a consultation visit or provide consultation during an Asylum Officer interview or an Immigration Judge's review of a negative credible fear determination.

## I. Consular Protection

In accordance with the Vienna Convention on Consular Relations of 1963 and 8 C.F.R. § 236.1(e), facilities must notify all detained individuals of their right to contact their consular representative(s) and receive visits from their consular officer(s). Additional information on consular notification and access is available online at http://travel.state.gov/CNA.

Consular visitation is subject to the same hours, privacy, and conditions as legal visitation, but may be permitted at additional times outside normal visitation hours with prior facility authorization. Consular officers must present U.S. Department of State-issued identification to conduct such visits.

## J. Non-Government Organization Visitation with Detainees and Tours of Facilities

All requests from NGOs and other stakeholders (which include, but are not limited to, intergovernmental entities, state and local governmental agencies, and members of academia for tours or visits), including combined tour-and-visit events, must be submitted in writing to the local ICE/ERO Field Office. All requests must be submitted in accordance with the requirements found at www.ice.gov/leadership/ocr. Note: All requests referenced in this section apply only to ICE-related activities within the facility.

When deciding whether to approve or deny the request, the Field Office Director, or his or her designee, will take into consideration safety and security, and the availability of personnel to staff the tour or visit.

If approved, the facility shall accommodate requests in a timely manner. Tours will be scheduled at times that do not disrupt normal operations and will adhere to facility security requirements.

All participants in tours or detainee visits must provide personal information for mandatory background checks, allowing sufficient time for completion prior to entry to the facility.

## K. Visits from Representatives of Community Service Organizations

The facility, in coordination with ICE/ERO, may approve visits by representatives of community service organizations, including civic, religious, cultural, therapeutic, and other groups. All visits must comply with the facility's visitor policy.

## L. News Media Representative Tours and Detainee Interviews

### 1. General

For the purposes of this standard, news media representatives refer to individuals or entities engaged in the gathering, reporting, or publishing of news and information for public dissemination. This includes journalists, reporters, researchers, photographers, videographers, and other professionals working for media outlets (e.g., newspapers, magazines, television, radio, online news) and academic institutions.

Access will not be denied based on the political or editorial viewpoint of the requestor. Facilities will coordinate with ICE Public Affairs Officers (PAOs), where applicable. PAOs serve as Field Office liaisons for media requests and communications covered by this standard.

### 2. Detention Facility Visits/Tours

News media representatives may tour detention facilities to prepare reports about the facilities. Tours require approval from both ICE/ERO and the facility, with final approvals coordinated between them. Decisions will consider safety, security, and the availability of personnel to staff the tour and provide security. Once approved, news media representatives shall make advance appointments with the facility for visits and tours.

The facility shall require news media organizations to adhere to the policies and procedures of the facility during visits or tours.

The facility shall advise media representatives and detainees that using a detainee's name, identifiable photo, or recorded voice requires prior consent. News media representatives shall obtain a signed release from the detainee before photographing or recording them, and the facility shall retain the signed release in the detainee's detention file or retrievable electronic record.

Detainees have the right to refuse photography (still, movie, or video) and voice recording by the media. If the presence of video, film, or audio equipment or personnel are likely to disrupt facility operations, the facility may limit or prohibit their use. For example, media equipment may be limited to hand-held cameras or recorders.

### 3. Personal Interviews

A media representative seeking to conduct a personal interview at a facility must submit a written request to ICE/ERO at least 24 hours in advance, preferably 48 hours. ICE/ERO may waive the 24-hour requirement if an urgent need is demonstrated.

ICE/ERO will notify the detainee of the interview request, and the detainee must provide written consent before ICE/ERO considers the request. The signed consent form shall be retained in the detainee's detention file or retrievable electronic record.

Interviews shall occur during normal business hours in a location designated by the facility, ensuring the space is suitable for the interviewing while maintaining security and order. ICE/ERO may limit the number of interviews with a specific detainee to a reasonable number per month and may restrict the duration of interviews if they impose significant strain on staff or facility resources.

ICE/ERO reserves the right to monitor or supervise detainee interviews without participating.

News media representatives interested in touring the facility or photograph/record other detainees in conjunction with an individual interview must comply with all applicable facility procedures.

### 4. Press Pools

When ICE/ERO and the facility determine that the volume of interview requests warrants such action, a press pool may be established. All material generated by the press pool shall be made available to all news media without exclusive rights to publication or broadcast.

The facility will notify all news media representatives with pending interviews, tours/visits, or requests that, effective immediately and until further notice, they must adhere to the press pool guidelines established by ICE/ERO.

Upon request, ICE/ERO will provide the media with information about a detainee if it is public record and not protected by privacy laws or ICE/ERO policy. Removal-related data shall remain confidential due to security and safety concerns for staff and detainees.

### 5. Special Conditions

News media representatives must certify that they are familiar with and accept the rules and regulations governing media conduct during facility interviews and visits.

News media representatives are required to comply with all facility rules and regulations. Routine detainee processing shall take precedence over media interviews, and media requests shall not delay or otherwise interfere with the in-processing or departure of any detainee.

## M. <u>Other Special Visits</u>

### 1. Law Enforcement Officials' Visits

Facility visitation procedures shall include guidelines for law enforcement officials requesting interviews with detainees.

### 2. Visitation by Former Detainees or Aliens in Proceedings

Former ICE/ERO detainees, individuals with criminal records, and those in removal proceedings shall not be automatically excluded from visiting. However, individuals in these categories must notify the facility before registering for visitation privileges. The facility shall evaluate the nature and extent of an individual's criminal record or prior conduct against the benefits of visitation when determining visitation privileges.

### 3. Business Visitors

A detainee shall not actively participate in business or professional activities. Detainees engaged in a business or profession prior to detention should delegate authority for daily operations to someone in the community. However, if a detainee must make a decision significantly impacting the assets or prospects of a business, the facility may allow a special visit.

### 4. Examinations by Independent Medical Service Providers and Experts

A medical or psychological examination by an independent practitioner or expert can provide detainees with important information for legal or administrative proceedings. Therefore, ICE/ERO will generally approve such examinations, provided they do not present an unreasonable security risk.

If a detainee requests an independent medical or physical examination, they or their legal representative must submit a written request to ICE/ERO. The legal representative may also submit the request electronically via the ICE DFAS system, providing the reason(s) for the request.

If ICE/ERO approves a medical or psychological examination by an independent practitioner, the facility shall either provide a location for the examination or arrange transportation for the detainee to an alternate site. However, neither the facility nor ICE/ERO will provide medical equipment or supplies. The costs of the examination shall be the detainee's responsibility. The examination must be arranged and conducted in a manner that maintains security and order. ICE/ERO will provide written notification to the requester if a request is denied, including the reasons for denial.

# STANDARD 5.6

## VOLUNTARY WORK PROGRAM

***NOTE:** Standards 1.1 "Language Assistance" and 4.7: "Disability Identification, Assessment, and Accommodation" are applicable to this standard. The facility is required to provide language assistance and disability accommodations to ensure effective communication, equal access to physical spaces, and the opportunity to participate in facility programs, services, and activities.*

## I. POLICY

Facility permitting, detainees may participate in a voluntary work program to earn money.

Participation in a voluntary work program is strictly voluntary and may include assignments in industrial, maintenance, custodial, service, or other tasks. Detainees shall not be required to work, except for personal housekeeping. Detainee volunteers shall not be used as substitutes for facility employees or assigned work in areas where sensitive documents are stored, such as designated ICE workspaces.

The facility shall provide sufficient security staff to supervise detainees participating in the voluntary work program. Work assignments must remain within the security perimeter unless approved by the Contracting Officer's Representative (COR). High-custody detainees shall not, under any circumstances, work outside the secure outer perimeter.

## II. STANDARDS AND PROCEDURES

### A. Voluntary Work Program

If the facility has a voluntary work program, the facility shall develop a voluntary work program plan, subject to approval by the COR.

Participation in the program is strictly voluntary. Detainees may volunteer for work assignments based upon available opportunities and within the constraints of facility safety, security, and order. Eligibility for work assignments will take into consideration the detainee's classification level.

All detainee volunteers shall be searched upon returning from a work detail.

### B. Voluntary Special Details

Detainees may volunteer for temporary special work details, typically lasting several hours to several days, involving tasks such as digging trenches, removing topsoil, and other labor-intensive activities.

## C. Detainee Selection

The facility shall develop site-specific rules for selecting work detail volunteers. The facility shall make selections in coordination with ICE personnel authorized to approve or override the final selections.

Detainees shall not be denied voluntary work opportunities based solely on race, religion, national origin, color, sex, sexual orientation, age, or disability.

## D. Detainees with Disabilities

Where possible, the facility shall allow detainees with disabilities to participate in the voluntary work program through appropriate work assignments.

## E. Work Hours and Restrictions

Detainees participating in the voluntary work program shall adhere to a fixed schedule, working no more than 8 hours per day and 40 hours per week.

The facility may limit the number of work details assigned to a detainee in a single day.

## F. Reimbursement

Detainee volunteers participating in the voluntary work program are not considered facility and/or government employees and are not entitled to wages or benefits under applicable wage laws or labor regulations.

Detainees shall not receive a stipend exceeding the amount Congressionally allocated to ICE for reimbursing contract facilities in support of the Voluntary Work Program. The facility is responsible for ensuring detainees receive their owed reimbursement in cash (USD) before transfer or release.

## G. Removal of Detainee from Work Detail

A detainee may be removed from a work detail for cause. The facility shall document the justification for removal in the detainee's detention file or a retrievable electronic record.

## H. Detainee Responsibilities

The facility shall establish procedures to inform detainee volunteers of their job responsibilities and reporting procedures.

Detainees must use safety equipment and follow other precautions as instructed by the work supervisor.

## I. Detainee Training and Safety

Detention facilities shall comply with all applicable federal health and safety regulations and standards. Detainees shall be provided basic OSHA protections and appropriate safety/protective clothing and equipment during work assignments.

Medical staff shall ensure detainees are medically screened and certified before undertaking food service assignments.

The facility shall ensure all department heads develop appropriate training for detainee workers.

Before beginning any job or work detail, the supervisor shall provide the detainee with thorough instructions on safe work methods and, if applicable, hazardous materials. The detainee must sign a voluntary work program agreement, confirming they have received and understood the training provided by the supervisor. The agreement shall be placed in the detainee's detention file or retrievable electronic record.

## J. Detainee Injury and Reporting Procedures

The facility shall establish procedures to immediately and appropriately respond to on-the-job injuries, including immediate notification to ICE/ERO.

# Section 6: JUSTICE



# STANDARD 6.1

## DETAINEE HANDBOOK – LOCAL SUPPLEMENT

***NOTE:*** *Standards 1.1 "Language Assistance" and 4.7: "Disability Identification, Assessment, and Accommodation" are applicable to this standard. The facility is required to provide language assistance and disability accommodations to ensure effective communication, equal access to physical spaces, and the opportunity to participate in facility programs, services, and activities.*

## I. POLICY

Each facility shall develop and maintain a site-specific detainee handbook (also referred to as the "facility handbook" and "local supplement"), providing an overview of, and guide to, facility rules, procedures, services, programs, and opportunities. The facility will provide detainees with a printed copy or access to a digital copy of both the local supplement and the ICE/ERO National Detainee Handbook upon admission to the facility. Even if a digital copy is available, a printed copy must be provided upon detainee request.

Detainees are expected to comply with the rules outlined in the local supplement and shall be held accountable for violations. Facility staff shall advise detainees to familiarize themselves with the handbook and ensure the information is provided in a language or manner they understand.

## II. STANDARDS AND PROCEDURES

A. The local supplement shall detail the rules, regulations, policies, and procedures that all detainees must follow. It will also provide information on: personal hygiene rules, recreation, correspondence and other mail, visitation, library/legal access, use of telephone and advanced communication services, sexual abuse and assault prevention and intervention, disability accommodations, restricted areas, contraband, housekeeping, disciplinary rules and sanctions, grievance and appeal procedures (see Standard 6.2: Grievance System), health care access, religious services, canteen and commissary, property, and other relevant topics.

B. The local supplement shall, at a minimum, be available in English and Spanish and translated into other commonly encountered languages at the facility, as appropriate. Oral interpretation or assistance shall be provided to detainees who are illiterate, who speak a language into which the local supplement has not been translated, or detainees with a disability.

C. The facility shall provide a printed copy or access to a digital copy of both the local supplement and ICE/ERO National Detainee Handbook to all staff who have contact with detainees. These staff members shall also receive training on its contents.

D. The facility shall review and update the local supplement annually, subject to approval

by the facility administrator.

E. The local supplement does not need to be immediately revised and reprinted for every change; however, the facility administrator shall establish procedures to promptly communicate changes to staff and detainees.

F. The facility shall document and maintain detainee acknowledgement of receipt of the ICE/ERO National Detainee Handbook and local supplement in the detention file. The facility shall document detainee instruction on accessing the ICE/ERO National Detainee Handbook and local supplement if they are provided digitally.

# STANDARD 6.2

## GRIEVANCE SYSTEM

***NOTE:** Standards 1.1 "Language Assistance" and 4.7: "Disability Identification, Assessment, and Accommodation" are applicable to this standard. The facility is required to provide language assistance and disability accommodations to ensure effective communication, equal access to physical spaces, and the opportunity to participate in facility programs, services, and activities.*

## I. POLICY

Every facility shall develop and implement policies and procedures for addressing detainee grievances. These policies must include a process for reviewing formal complaints, reasonable timeframes for processing, investigating, and responding to grievances, and providing written responses to detainees, including the basis for decisions. The facility must also establish procedures for handling emergency grievances. All grievances shall undergo supervisory review, and facility policies must ensure protection against reprisal.

## II. STANDARDS AND PROCEDURES

### A. Grievance Procedure

#### 1. Informal/Oral Grievance

The facility shall make every effort to resolve detainee complaints or grievances at the lowest level possible and in an orderly and timely manner. Each facility shall establish procedures for the informal resolution of oral grievances.

Detainees may bypass or terminate the informal grievance process and proceed directly to the formal grievance stage at any time.

#### 2. Formal/Written Grievance

The facility must allow detainees to submit formal grievances to the facility's grievance committee or grievance coordinator/manager. Detainees may file grievances in writing or electronically. Detainees may submit a formal grievance if dissatisfied with the informal process outcome or if they choose to bypass the informal procedures. Detainees are expected to use the grievance process in good faith and with honesty. The facility shall not impose time limits on submitting formal grievances related to allegations of sexual abuse.

Detainees may seek assistance in preparing grievances from other detainees, housing officers, facility staff, family members or legal representatives. Staff shall take reasonable steps to expedite requests for such assistance.

Grievances shall be addressed within five business days, barring extraordinary circumstances. Medical grievances shall be promptly referred to and addressed by the medical department.

No individual named in a grievance shall be responsible for adjudicating that grievance.

**B. Emergency Grievances**

Each facility shall establish procedures for identifying and addressing emergency grievances. An emergency grievance involves an immediate threat to a detainee's health, safety, or welfare. If a staff member determines that a detainee's issue requires urgent attention, the facility's emergency grievance procedures apply.

**C. Appeal**

If a detainee does not accept the grievance decision, they may file an appeal. Facilities shall establish procedures for handling detainee appeals.

Facilities must allow detainees dissatisfied with the facility's response to their grievance to communicate directly with ICE/ERO in writing or electronically.

**D. Retaliation**

Staff shall not harass, discipline, punish, disclose sensitive information about, or retaliate against a detainee for filing a complaint. However, if a detainee demonstrates a pattern of filing nuisance complaints or otherwise abusing the grievance system, staff may decline to process further complaints and must notify ICE/ERO of the situation.

**E. Recordkeeping and File Maintenance**

Each facility shall establish a method for documenting detainee grievances, including maintaining a Detainee Grievance Log.

A copy of each grievance shall be retained in the detainee's detention file or a retrievable electronic archive for at least three years and in accordance with National Archives and Records Administration (NARA) requirements.

**F. Allegations of Officer Misconduct**

The facility must promptly forward all detainee grievances alleging staff misconduct to DHS OIG and/or ICE OPR, and forward a copy of the report made to DHS OIG and/or ICE OPR to ICE ERO.

**G. Allegations of Sexual Abuse**

If a detainee files a grievance regarding a sexual abuse claim, the facility shall issue a

decision within five calendar days of receipt and respond to any appeal within 30 calendar days. All such grievances must be reported directly to the ICE/ERO FOD.

Facilities shall not impose time limits on detainees filing sexual abuse and assault grievances.

## H. Local Supplement Detainee Handbook

The grievance section of the local supplement shall include the following information:

1. The opportunity to file both informal and formal grievances.

2. Procedures for submitting written or electronic grievances and appeals, including access to assistance in preparing grievances.

3. Steps for resolving grievances or appeals, including the right to escalate grievances to higher levels if the detainee does not believe the grievance has been adequately resolved.

4. Notice that staff are prohibited from harassing, disciplining, punishing, or otherwise retaliating against detainees for filing grievances.

# STANDARD 6.3

## LAW LIBRARIES AND LEGAL MATERIALS

***NOTE:*** *Standards 1.1 "Language Assistance" and 4.7: "Disability Identification, Assessment, and Accommodation" are applicable to this standard. The facility is required to provide language assistance and disability accommodations to ensure effective communication, equal access to physical spaces, and the opportunity to participate in facility programs, services, and activities.*

## I. POLICY

Facilities shall provide detainees access to a law library and provide legal materials, equipment, printing and copying services, and opportunities to prepare legal documents.

## II. STANDARDS AND PROCEDURES

### A. Law Library

The facility shall provide a designated law library room or, if facility design does not allow for a specific room, an appropriate alternative area for this purpose. The law library shall provide sufficient space and be equipped with resources to facilitate detainees' legal research and writing.

### B. Equipment

The law library shall provide the following resources to enable detainees to prepare documents and conduct immigration-related research:

1. An adequate number of computers for electronic legal research;
2. A printer or printing capabilities;
3. A copier or copying capabilities;
4. Writing implements and paper;
5. Where applicable, a personal electronic storage device or access to such device utilized by facility staff. An electronic storage device is any hardware or technology capable of saving, retrieving, and managing information and data electronically (e.g., USB flash drives, external hard drives, CDs/DVDs). These devices must not be shared among multiple detainees and, if reused, must be thoroughly wiped to remove all previous user information.
6. A designated employee responsible for inspecting equipment at least weekly to ensure it is in good working order, including connectivity to the ICE Portal where applicable, and for maintaining sufficient supplies.

Devices such as tablets or kiosks may supplement the law library but shall not replace it unless the requirements of 6.3.II.(C) are met.

## C. Holdings

ICE/ERO shall provide each facility an electronic version of required immigration law library reference materials, consistent with the ICE/ERO law library contract, via electronic media or the ICE Portal. The facility shall post law library hours and information about its contents. ICE/ERO will regularly update the electronic law library, if applicable.

Facilities may choose to provide access to the ICE Portal on law library computers or other devices (e.g., tablets, kiosks) instead of an offline electronic version of the reference materials. If tablets and/or kiosks are the only means of accessing the ICE Portal, the facility must establish a process for printing documents from the ICE Portal.

## D. Materials from Outside Persons or Organizations

Outside individuals and organizations may submit published or unpublished legal material for inclusion in a facility's law library. Material in languages other than English must include an English translation.

Upon receiving material for inclusion in the law library, the facility shall immediately forward it to ICE/ERO for review and approval or denial. ICE/ERO will generally complete the review within 45 days and then provide the disposition to the facility.

## E. Updating/Replacing Legal Materials

ICE/ERO will regularly provide facilities with updated electronic legal materials.

The facility shall designate an employee responsible for updating, inspecting, maintaining, and promptly replacing legal materials as needed. If anticipated updates are not received, the facility shall notify the designated ICE/ERO contact. Electronic media shall be updated upon receipt of new materials.

Damaged materials must be replaced promptly. The facility shall contact the designated ICE/ERO coordinator to obtain replacements. For materials submitted by outside organizations requiring replacement, the facility shall contact ICE/ERO to request replacements from the submitting organization.

## F. Hours of Access

The facility shall establish a flexible schedule to ensure all detainees, regardless of housing or classification, have regular access to the law library. Each detainee shall be allowed a minimum of five hours per week in the law library during reasonable hours. Detainees shall not be required to forego recreation time, as outlined in Standard 5.2 "Recreation," to access the law library. Requests for additional library time shall be accommodated whenever

possible, consistent with the facility's orderly and secure operations, with priority given to detainees with imminent court deadlines.

## G. Requests for Additional Legal Material

Detainees requiring legal material not available in the law library may submit a request for additional information. The facility shall inform ICE/ERO of such requests as quickly as possible.

Priority shall be given to requests from detainees facing imminent court deadlines. Copies of court decisions shall typically be provided within three business days, while other requests will be addressed within reasonable timeframes.

## H. Photocopying and Printing Legal Documents

The facility shall ensure detainees can obtain copies of legal material when reasonable and necessary for a detainee's legal proceeding. This may be accomplished by providing access to a copier or printer or by making copies upon request. Detainees shall not be charged for copying or printing a reasonable amount of legal material.

The required number of copies shall be determined by the court's filing requirements, ICE/ERO records, and at least one copy for the detainee's personal use. Requests for copies of legal material may be denied only if:

1. The document(s) pose a risk to the security or orderly operation of the facility;
2. Copying would violate any law or regulation;
3. The request is clearly abusive or excessive; or
4. Other legitimate security concerns exist.

Staff shall not read documents that are clearly related to a legal proceeding involving the detainee.

## I. Assistance from Facility Staff and Other Detainees

### 1. Assistance from Facility Staff

Facility staff shall assist detainees in accessing legal materials, including orientation to written or electronic media, programs, forms and related materials. Facility staff shall also provide communication assistance to detainees with disabilities and those who are limited English proficient (LEP) or illiterate.

### 2. Assistance from Other Detainees and Volunteers

The facility shall allow detainees to assist others in researching and preparing legal documents upon request, provided such assistance does not pose a security risk.

Assistance must be voluntary, and detainees are prohibited from charging fees or accepting anything of value for their help.

Facilities may also allow outside volunteers and programs to assist detainees in accessing legal materials.

### J. Assistance to Detainees with Disabilities, Limited English Proficient (LEP) Detainees, and Illiterate Detainees

Detainees with disabilities, limited English proficiency, and those who are illiterate and wish to pursue legal claims related to their immigration proceedings or detention must be provided assistance beyond access to English-language law books and materials if they request help or demonstrate difficulty accessing or understanding legal resources.

The facility shall assist these detainees in using the law library by establishing procedures such as:

1. Having the facility's law librarian assist with legal research;
2. Allowing the detainee to receive assistance from other detainees in using the law library;
3. Assisting the detainee in contacting pro bono legal-assistance organizations from the ICE/ERO-provided list;
4. Using bilingual staff or professional interpretation and translation services; and
5. For detainees with disabilities, providing reasonable accommodations and/or auxiliary aids and services, as outlined in Standard 4.7 "Disability Identification, Assessment, and Accommodation."

If these efforts do not provide sufficient assistance, the facility shall contact ICE/ERO to determine appropriate further action.

### K. Personal Legal Materials

The facility shall allow detainees to retain personal legal material upon admission to the general population or segregation, unless the material poses a safety, security, or sanitation hazard. Detainees with excessive legal material may be required to store some items in a personal property storage area, with access permitted during designated hours. Requests for access to stored legal material shall be granted as soon as possible, but no later than 24 hours after receipt of the request, unless documented security concerns prevent timely action.

### L. Law Library Access for Detainees in Special Management Units

Detainees housed in Administrative or Disciplinary Segregation units shall have the same

law library access as the general population, unless compelling security concerns necessitate limitations.

Facilities may supervise law library use by detainees housed in special management units based on their behavior and attitude. Detainees segregated for protection may be required to use the law library separately or, if feasible, have legal material delivered to them. Violent or uncooperative detainees may be temporarily denied access to the law library if necessary to maintain security, with access restored once their behavior and attitude improve. In certain cases, legal material may be delivered to detainees in disciplinary segregation.

Denial of law library access must be justified by compelling security concerns, limited to the shortest duration necessary, and fully documented in the special management housing logbook. Detainees shall not be denied access to law libraries or legal materials as a disciplinary measure, reprisal, retaliation, or penalty. ICE/ERO must be notified each time access is denied.

## M. Envelopes and Stamps for Legal Documents

The facility shall provide indigent detainees with free envelopes and stamps for legal correspondence, including mail to legal representatives, potential legal representatives, or courts. Indigent detainees send a reasonable amount of mail each week, including at least five pieces of special correspondence and three pieces of general correspondence. As an additional option, facilities may provide an electronic process for detainees to exchange legal documents with legal service or pro bono providers.

## N. Notaries, Certified Mail, and Miscellaneous Needs Associated with Legal Matters

If a detainee requests services related to a legal matter, such as notary public or certified mail, the facility shall provide these services upon request.

## O. Retaliation Prohibited

Detainees shall not face reprisals, retaliation, or penalties for seeking judicial relief on any matter, including:

1. The legality of their confinement;
2. The legality of conditions or treatment during detention;
3. Issues related to their immigration proceedings; or
4. Allegations of the Government denying legally protected rights.

## P. Notice to Detainees

The facility shall provide detainees with the rules and procedures for accessing legal materials. These rules and procedures shall include:

1. Scheduled hours for law library access;

2. The process for requesting access to the law library;

3. The process for requesting additional time in the law library beyond the five-hour weekly minimum;

4. The process for requesting legal reference materials not available in the law library; and

5. The process for reporting concerns about legal access to the facility.

# STANDARD 6.4

## LEGAL RIGHTS GROUP PRESENTATIONS

***NOTE:*** *Standards 1.1 "Language Assistance" and 4.7: "Disability Identification, Assessment, and Accommodation" are applicable to this standard. The facility is required to provide language assistance and disability accommodations to ensure effective communication, equal access to physical spaces, and the opportunity to participate in facility programs, services, and activities.*

## I. POLICY

Facilities shall allow authorized individuals to present to groups of detainees on U.S. immigration law and procedures, consistent with the facility's security and orderly operations. ICE/ERO encourages these presentations to educate detainees about the immigration system, their rights, and available options.

## II. STANDARDS AND PROCEDURES

### A. Requests to Make Group Presentations on Legal Rights

Attorneys and legal representatives, including EOIR-accredited representatives, must submit a written request to ICE/ERO to conduct a group presentation on legal rights.

Legal assistants or paralegals may conduct such presentations if the supervising attorney or legal representative is present or provides a letter identifying the presenter(s) and affirming the supervisory relationship directly pertains to the presentation. The letter must be presented to ICE/ERO prior to the presentation.

### B. Scheduling Presentations

ICE/ERO will notify the facility upon approving a group presentation. The facility shall contact the designated party to schedule a mutually acceptable date and time. Presentations will be held during normal legal visiting hours, excluding weekends and holidays. If feasible, group presentations may be conducted daily before detainees' first Immigration Court appearance.

While facilities are not required to arrange presentations, they must coordinate ICE/ERO-approved presentations.

### C. Detainee Notification and Attendance

Informational posters shall be prominently displayed in detainee housing units at least 48 hours before a scheduled presentation, and housing unit officers will maintain a sign-up sheet. Detainees planning to attend may register on the designated sign-up sheet. However, detainees who fail to sign up shall still be allowed to attend.

Presentations are open to all detainees, regardless of the presenter's intended audience, unless a detainee's attendance poses a security risk. If a detainee in segregation cannot attend for security reasons, alternative arrangements may be requested by the detainee or the presenter.

The facility may limit the number of detainees per session but must also accommodate multiple sessions based on the number of interested detainees or the need to separate groups for safety and security. Presenters may contact the facility the day before the presentation to confirm the number of sessions required.

**D. Entering the Facility**

Facility policy shall require all individuals seeking entry to present an official photo identification, such as a driver's license or state-issued identification card. Attorneys must also provide state-issued bar cards or, in states where these are not available, other proof of bar membership.

The facility shall allow interpreters to assist attorneys and legal representatives. ICE/ERO is not responsible for providing interpreters for presenters.

**E. Presentation Guidelines**

The facility shall provide a secure and appropriate environment for the presentation. Once detainees are assembled, presenters shall have a minimum of one hour to deliver the presentation and conduct a question-and-answer session.

The facility shall require presenters to adhere to all facility rules and regulations for visitors. Presentations shall be conducted in a manner that maintains security and orderly operations. Presenters are prohibited from charging fees or soliciting business during the presentation.

**F. Written Materials**

Presenters may distribute brief written materials to detainees and facility staff, provided the materials are pre-approved by ICE/ERO. Distributing unapproved materials may result in the revocation of presentation privileges.

The volume of distributed materials must be kept to a minimum. If the facility determines the materials are too extensive for distribution during the presentation, they shall be made available to detainees in the facility's law library.

**G. Individual Counseling Following a Group Presentation**

The facility shall allow presenters to meet with small groups of detainees to discuss their cases following a group presentation, provided it complies with security and the orderly

operation of the facility. ICE/ERO and facility staff shall not be present during these meetings. Rules and procedures for one-on-one counseling are outlined in Standard 5.5 "Visitation."

## H. Suspension or Termination

The facility may discontinue or temporarily suspend group presentations by any or all presenters, if:

1. They pose an unreasonable security risk;
2. They substantially interfere with the facility's orderly operation;
3. They deviate from approved material, procedures, or presenters; or
4. The facility is operating under emergency conditions.

The facility shall provide written notification to affected presenters outlining the reasons for termination or suspension and send a copy of the notice to ICE/ERO. Presenters may appeal this decision.

## I. Video Presentations

The facility shall play ICE/ERO-approved video presentations on legal rights upon ICE/ERO's request. In the event of technical difficulties, the facility shall contact ICE/ERO for equipment options.

The facility shall regularly provide opportunities for detainees in the general population to view these videos. Detainees in administrative or disciplinary segregation shall be given at least one opportunity to view the video, unless security concerns regarding a particular detainee prevent it.

# Section 7:
# ADMINISTRATION AND MANAGEMENT



# STANDARD 7.1

## DETENTION FILES

***NOTE:*** *Standards 1.1 "Language Assistance" and 4.7: "Disability Identification, Assessment, and Accommodation" are applicable to this standard. The facility is required to provide language assistance and disability accommodations to ensure effective communication, equal access to physical spaces, and the opportunity to participate in facility programs, services, and activities.*

## I. POLICY

Facilities shall create a detention file for each detainee booked into the facility for more than 24 hours. The detention file shall include copies and, in some cases, the originals of documents such as the classification sheet, initial medical screening, property inventory sheet, and disciplinary records. Detention files may consist of hard copy documents, retrievable electronic records (e.g., digital detention files), or a combination of both.

## II. STANDARDS AND PROCEDURES

### A. Policy

The detention file is essential for maintaining a complete record of a detainee's time in facility custody. The file shall include the classification level, copies of receipts for items issued to or surrendered by the detainee, documentation of adverse behavior, information on segregation stays, special requests, non-medical grievances and complaints, and other information considered appropriate by facility officials.

All records within the detention file shall be maintained in compliance with the NARA detention records retention requirements. Detention files are considered ICE/ERO records.

### B. Creation of a Detainee Detention File

When a detainee is admitted to a facility for a stay exceeding 24 hours, staff shall create a detention file as part of in-processing (i.e., admissions) procedures, including the date of file initiation.

### C. Required Contents of File

1. The detention file shall include either originals or copies of forms and documents generated during the admissions process. ICE/ERO may require certain documents be added to the detention file and if necessary, it may also include copies of material from the detainee's A-File.

2. The detention file shall include hard copies of the following information, unless maintained in a retrievable electronic format:

a. Booking Record with original photograph(s) attached;

b. Classification Worksheet;

c. Health Screening Form;

d. Personal Property Inventory Sheet;

e. Housing Identification Card;

f. Property Receipt;

g. Baggage Check(s);

h. Acknowledgment Form, documenting receipt of ICE/ERO National Detainee Handbook, local supplement, orientation, etc.;

i. Work Assignment Sheet;

j. Identifying Marks Form; and

k. Any other relevant documents.

## D. <u>Additions to File</u>

1. During the detainee's stay at the facility, staff shall maintain documents related to normal detention operations in the detention file or a retrievable electronic format. Examples of documents typically maintained in the detention file include:

a. Special requests;

b. Any property or baggage form closed out during the detainee's stay;

c. Disciplinary forms;

d. Classification re-assessment documents;

e. Grievances, complaints, and their dispositions;

f. Forms associated with disciplinary and/or administrative segregation stays;

g. Staff reports about the detainee's behavior, attitude, etc.;

h. Required documentation on detainee searches (e.g., strip search); and

i. Privacy waivers, including release-of-information consent forms.

**E. Location of File**

Physical detention files shall be stored and maintained in a secured area inaccessible to detainees. Digitized detention files shall be stored in a retrievable electronic format capable of being readily shared with ICE/ERO.

**F. Active/Archived File**

1. The detention file shall remain active throughout the detainee's stay. Upon release from the facility, staff shall add any final documents not stored in a retrievable electronic format before closing and archiving the file.

2. The staff closing the detention file shall record the closure date.

3. Closed detention files shall not be transferred to another facility with the detainee. However, staff may forward copies of file documents upon the request from supervisory personnel at the receiving facility or office.

4. Staff shall document the forwarding of documents in the archived file or electronic record.

5. Archived files shall be maintained in compliance with the NARA detention records retention requirements.

**G. Access to File**

1. All documentation is considered the property of ICE/ERO. As such, ICE/ERO may request access to detention files at any time.

2. The facility shall establish procedures outlining the circumstances under which a detention file may be requested and accessed by facility staff or outside officials. The removal of the file from storage shall be recorded in a logbook or retrievable electronic record.

3. Unless required by statute or regulation, to include requests from Congressional oversight entities, a detainee must sign a release-of-information consent form before information from their detention file is released. Oral interpretation or assistance must be provided to detainees who are illiterate or who speak a language into which the consent form is not translated. A copy of the signed form shall be maintained in the detention file.

4. Upon request, the detention file shall be provided to the detainee and their designated attorney of record. Prior to releasing the detention file, the facility shall notify ICE/ERO and confirm there are no security or sensitivity concerns.

# STANDARD 7.2

## DETAINEE TRANSFERS

***NOTE:*** *Standards 1.1 "Language Assistance" and 4.7: "Disability Identification, Assessment, and Accommodation" are applicable to this standard. The facility is required to provide language assistance and disability accommodations to ensure effective communication, equal access to physical spaces, and the opportunity to participate in facility programs, services, and activities.*

## I. POLICY

ICE/ERO may transfer detainees between facilities for various reasons such as security concerns, operational needs, or to facilitate removal. However, transfers shall never be retaliatory. This standard outlines the procedures and notification requirements for detainee transfers.

ICE/ERO shall ensure all required notifications are made when a detainee is transferred. When considering a transfer, ICE/ERO will evaluate whether the detainee is represented before the immigration court. In such cases, ICE/ERO will consider alternatives to transfer, particularly if the attorney is located within reasonable driving distance of the facility and immigration court proceedings are ongoing.

## II. STANDARDS AND PROCEDURES

### A. Notification Procedure

#### 1. Detainee

For security purposes, specific plans and schedules shall never be disclosed to the detainee. The detainee shall be notified of the transfer immediately prior to departure and informed that they are being moved to a new facility within the United States, not being deported.

After receiving transfer notification, the detainee shall typically not be allowed to make or receive telephone calls or interact with other detainees in the general population until arriving at the destination facility. At the time of transfer, ICE/ERO shall provide the detainee in writing with the name, address, and telephone number of the destination facility and notify the attorney of record.

#### 2. Medical Procedures and Information Required for Transfer

a. Notification of Transfers, Releases, and Removals

The facility health care provider shall receive advance notice of a detainee's release, transfer, or removal to evaluate and address any medical needs, as outlined in Standard 4.3, "Medical Care."

b. Transfer of Health Records

The facility shall provide the detainee with complete medical records or a detailed medical transfer summary.

c. Transfer Summary

The sending facility's medical staff shall prepare a Medical Transfer Summary to accompany the detainee, which shall include at a minimum:

1. Patient identification;

2. Tuberculosis (TB) screening results (including results date) and current TB status if TB disease is suspected or confirmed;

3. Current mental, dental, and physical health status, including significant health issues, and any potential unstable conditions requiring urgent follow-up;

4. Current medications with instructions for dosage and frequency, and specific instructions for medications to be administered en route;

5. History of past hospitalizations or major surgical procedures;

6. Known allergies; and

7. Name and contact information of the transferring medical official.

The Medical Transfer Summary is critical for detainee safety during transit and must remain in the escorting officer's possession. The detainee cannot be transferred without the releasing institution providing this information. The transferring officer shall review the summary for completeness and ensure the supplies are available to provide care as indicated during transit.

Officers reviewing the transfer summary must protect the privacy of the detainee's medical information, ensuring it is not shared with other detainees or officers unless necessary to fulfill responsibilities. Refer to Standard 4.3 "Medical Care," part J. "Confidentiality and Release of Medical Records." The transferring officer is responsible for delivering the Medical Transfer Summary and any accompanying material to medical personnel at the receiving facility.

d. Medical/Psychiatric Alert

ICE/ERO shall be notified in writing if medical staff determine that a detainee's medical or psychiatric condition requires:

1. Clearance by medical staff prior to release or transfer; or

2. A medical escort during deportation or transfer.

e. Medications

Prior to transfer, medical personnel shall provide transporting officers with instructions and, if applicable, medication(s) for the detainee's care during transit, in accordance with Standard 4.3 "Medical Care." Medications shall be placed in a property envelope labeled with the detainee's name and A-number. The medications shall accompany the transfer and be handed over to an officer at the receiving field office.

### 3. Other Transfer Paperwork

A properly executed I-203/I-203A and I-216 form from ICE/ERO shall accompany the transfer.

## B. Property

### 1. Checkout of Funds and Small Valuables

The following items shall always accompany a detainee to the receiving facility: cash, legal material, and small valuables such as jewelry, address books, phone lists, correspondence, dentures, prescription glasses, small religious items, pictures, etc.

These items shall typically remain in the detainee's possession during transport. Items that pose a security risk or are particularly bulky shall be separated from the detainee during transport.

Before transfer, the sending facility shall return all funds and small valuables to the detainee and close all funds and valuable receipts in accordance with Standard 2.4 "Funds and Personal Property." The receiving facility shall create a new funds and valuables receipt during in-processing, following procedures outlined in Standard 2.4 "Funds and Personal Property."

### 2. Large Valuables, Excess Luggage, and Other Bulky Items

All items stored at the sending facility shall accompany the transferee. If the receiving facility does not accept excess, oversized, or bulky belongings (e.g., suitcases, cartons, televisions), the sending facility shall retain the items, arrange for alternate storage, or follow the procedures for disposing of excess property.

If a detainee refuses to provide a valid mailing address or is financially able but unwilling to pay for shipping, the facility shall coordinate with ICE/ERO to dispose of the property after providing the detainee with written notice. If the detainee's failure to provide a shipping address is because an appropriate mailing address does not exist, the facility shall coordinate with ICE/ERO for disposition of the property.

**3. Checkout of Luggage, Large Valuables, and Other Bulky Items**

If the property accompanies the detainee, the sending facility shall close out the existing G-589 or local funds and valuables receipt in accordance with Standard 2.4 "Funds and Personal Property." The receiving facility shall create a new I-77 or local funds and valuables receipt during in-processing.

## C. Food During Transfer

During transfers, detainees shall be provided food in accordance with the "Meals" section of Standard 1.3 "Transportation by Land."

# APPENDICES:

Appendix A: List of Required Staff Training .................................... 209

Appendix B: Records Retention and ICE Reporting Requirements ...... 213

Appendix C: Contents of the Local Supplement ................................ 219

Appendix D: Definitions ......................................................... 221

# APPENDIX A

## LIST OF REQUIRED STAFF TRAINING

Detention facility staff, detention facility contractors, and volunteers shall receive sufficient initial and recurrent training to ensure competency in their job duties.

The following list includes general training requirements specified by ICE, including content, duration, or frequency.

Note: See the respective standards for detailed training requirements.

### 1.1 Environmental Health and Safety

Staff and detainees who work with hazardous substances will have appropriate training, including the classification code and safe handling procedures for each substance. (See Standard 1.2 "Environmental Health and Safety," A. Hazardous Substances)

### 2.7 Searches of Detainees

1. All staff who conduct searches of housing, work areas or of a detainee's body shall receive initial training regarding search procedures prior to entering on duty and shall receive annual training in authorized and effective techniques thereafter. (See Standard 2.7 "Searches of Detainees," B. Staff Training)

2. Security staff shall be trained in proper procedures for conducting pat searches, including opposite sex pat searches. (See Standard 2.7 "Searches of Detainees," C. Body Searches of Detainees)

### 2.8 Use of Force and Restraints

1. All detention personnel shall be trained in approved methods of self-defense, crisis intervention and conflict de-escalation techniques, recognizing signs and symptoms of mental illness, reporting requirements, and the use of force to control detainees. Staff will be made aware of prohibited use-of-force acts and techniques.

2. Specialized training is required for certain non-lethal equipment, such as OC spray and electronic devices. Training on the use of chemical agents shall include procedures for treating individuals exposed to them. Officers must be specifically certified to use each device. (See Standard 2.8 "Use of Force," L. Training)

### 2.9 Special Management Units

Security staff assigned to SMU shall receive specialized training in relevant topics, such as:

a. Identifying signs of mental health decompensation;

b. Techniques for appropriate interactions with detainees with mental illness;

c. De-escalation techniques; and

d. Documentation requirements for segregation cases.

(See Standard 2.9 “Special Management Units,” L. Specialized Training)

**2.11 Sexual Abuse and Assault Prevention and Intervention**

1. Training on the facility’s Sexual Abuse or Assault Prevention and Intervention Program shall be included in training for all employees and shall also be included in biannual refresher training thereafter. Specific additional requirements are listed in the standards.

2. All volunteers and detention facility contractors who have contact with detainees must be trained on their responsibilities under the facility’s sexual abuse prevention, detection, intervention and response policies and procedures. The level and type of training for volunteers and detention facility contractors will be based on the services they provide and their level of contact with detainees; however, all volunteers and detention facility contractors who have any contact with detainees must be notified of the facility’s zero-tolerance policy and informed how to report such incidents.

3. Facility investigators must receive training on sexual abuse and effective cross-agency coordination.

4. Facility medical staff shall be trained in procedures for examining and treating victims of sexual abuse, in facilities where medical staff may be assigned these activities. (See Standard 2.11 “Sexual Abuse and Assault Prevention and Intervention,” E. Staff Training)

**4.1 Food Service**

1. The facility will devise and provide appropriate training to all food service personnel in detainee custodial issues. (See Standard 4.1 “Food Service,” B. General Policy)

**4.2 Hunger Strikes**

All staff shall be trained initially and annually thereafter to recognize the signs of a hunger strike, and to implement the procedures for referral for medical assessment and for management of a detainee on a hunger strike. (See Standard 4.2 “Hunger Strikes,” A. Staff Training)

**4.3 Medical Care**

1. Registered Nurses who perform health assessments must have documented initial and annual training provided by a physician. (See Standard 4.3 “Medical Care,” E. Comprehensive Health

Assessment)

2. Registered Nurses who perform initial dental screenings must be trained how to conduct the exam by a dentist annually. (See Standard 4.3 "Medical Care," H. Dental Treatment)

3. Detention staff will be trained to respond to health-related emergencies within a 4-minute response time, and will include:

   a. The recognition of signs of potential health emergencies and the required response;

   b. The administration of first aid and cardiopulmonary resuscitation (CPR);

   c. The recognition of signs and symptoms of mental illness (including suicide risk), and chemical dependency; and

   d. The facility's established plan and procedures for providing emergency medical care including, when required, the safe and secure transfer of detainees for appropriate hospital or other medical services.

   (See Standard 4.3 "Medical Care," K. First Aid and Medical Emergencies)

4. In facilities that are not medically staffed 24 hours a day, medication may be distributed, consistent with state law and/or regulations, by detention officers who have received proper training, but only when medication must be delivered at a specific time when medical staff is not on duty. (See Standard 4.3 "Medical Care," L. Delivery of Medication)

5. Facilities shall develop a written plan to ensure the highest degree of confidentiality regarding HIV status. Staff training shall emphasize the need for confidentiality, and procedures shall be established to limit access to health records to only authorized individuals and only when necessary. (See Standard 4.3 "Medical Care," N. Bloodborne Pathogens)

**4.5 Significant Self-Harm and Suicide Prevention and Intervention**

1. All facility staff members who interact with and/or are responsible for detainees shall receive comprehensive suicide prevention training during orientation and refresher training at least annually thereafter. Subjects are listed in the standards. (See Standard 4.5 "Significant Self-Harm and Suicide Prevention and Intervention," B. Training)

**4.7 Disability Identification, Assessment and Accommodations**

1. All facility staff members who interact with and/or are responsible for detainees shall receive comprehensive disability training during orientation and refresher training at least annually thereafter. Subjects are listed in the standards. (See Standard 4.7 "Disability Identification, Assessment and Accommodations,")

**5.1 Correspondence and Other Mail**

Facilities shall implement policies and procedures to protect staff and prevent hazardous substances from entering the facility through mail. These policies must include staff training, use of personal protective equipment, use of screening and detection equipment, exposure mitigation, and safe disposure of hazardous substances. (See Standard 5.1 “Correspondence and Other Mail,” II. Standards and Procedures, A. General)

**6.1 Detainee Handbook**

The facility will provide a copy of the handbook to every staff member who has contact with detainees. These staff members will also receive training focused on its contents. (See Standard 6.1 “Detainee Handbook,” II. Standards and Procedures)

# APPENDIX B

## RECORDS RETENTION AND ICE REPORTING REQUIREMENTS

### RECORDS RETENTION

All Federal records created on behalf of ICE must be retained in accordance with an approved National Archives and Records Administration (NARA) General Records Schedule or a NARA-approved agency-specific records control schedule. If a records control schedule does not exist, these records must be retained indefinitely until one is approved. In the event the records are subject to a litigation hold, they must be retained indefinitely or until a release notification from the ICE Office of the Principal Legal Advisor.

### ICE REPORTING REQUIREMENTS

The facility shall immediately notify ICE/ERO of any incidents or circumstances listed below.

The local ICE/ERO Field Office may provide additional reporting instructions.

**Significant Events**

1. Activation of disturbance control team(s);
2. Disturbances (including gang activities, group demonstrations, food boycotts, work strikes, workplace violence, civil disturbances/protests);
3. Fires;
4. Citations or denied licensures related to federal, state and local health, life, safety, and fire codes;
5. Significant environmental problems that impact detention facility operations;
6. Violation of a national primary drinking water regulation or a situation that may pose a risk to public health;
7. Interruption in water service;
8. HVAC system failure impacting detainee living areas;
9. Sewage backup;
10. Roof leaks in detainee living areas;
11. Full or partial lock down of the detention facility;

12. Escape(s) or escape attempts;

13. Weapons discharge;

14. Adverse incidents that attract unusual interest or significant publicity;

15. Adverse weather (e.g., hurricanes, floods, ice/snowstorms, heat waves, tornadoes);

16. Fence damage;

17. Power outages;

18. Bomb threats;

19. Transportation (e.g., airlift, bus) accidents resulting in ICE detainee injuries, death, or detention facility property damage;

20. Detention facility evacuations;

21. Detainee (or Inmate)-on-Detainee Assault (i.e., any serious physical assault on an ICE detainee by another detainee or inmate);

22. Staff-on-Detainee Assaults (i.e., any incident or allegation of a physical assault on an ICE detainee perpetrated by staff, including the facility investigation);

23. Detainee-on-Staff Assaults (i.e., any serious physical assault on any ICE or contracted staff by a detainee);

24. Staff Misconduct (i.e., any incident or allegation of staff misconduct if that misconduct relates to treatment of ICE detainees, to the security or safety of the facility, or to compliance with detention standards or the provisions of the facility's contract with ICE);

25. Hazardous or illegal materials entering the facility (e.g., through mail) and impacting life and safety of staff and/or detainees; and

26. Detainee Deaths.

**<u>Standards Notifications</u>**

(The following notifications are listed in the standards.)

**1.2 Environmental Health and Safety**

The facility shall immediately notify ICE/ERO in the event of insect or rodent infestation. (See 1.2"by Land," E. Pests and Vermin)

**1.3 Transportation by Land**

If a detainee's paperwork is incomplete prior to transfer. (See 1.3 "Transportation by Land," A. Transportation Planning)

**1.1 Admission and Release:**

Any detainee claims of lost or damaged property and the outcomes of such claims. (See 2.1 Admission and Release, H. Missing Detainee Property, and 2.4 Funds and Personal Property, G. Lost/Damaged Property)

**2.8 Use of Force and Restraints:**

1. All uses of force involving detainees;

2. Uses of restraints; and

3. Detainees restrained using 4- or 5-point restraints for over eight hours, and every eight hours thereafter.

(These reports must be sent directly to the ICE/ERO FOD.)

(See 2.8 "Use of Force and Restraints," J. Documentation of Use of Force and Application of Restraints Incidents)

**2.9 Special Management Units**

1. When any detainee is placed into segregation, regardless of duration.

2. When a detainee is released from segregation. (See 2.9 "Special Management Units," C. Notifying ICE/ERO of Segregation Placements and Facilitating ICE/ERO Review)

3. Any denial of access to legal materials for a detainee housed in the SMU. (See 2.9 "Special Management Units," U. Law Library and Legal Rights Group Presentations)

4. The denial of recreation privileges in excess of seven days. (See 2.9 Special Management Units, V. Recreation)

**2.10 Staff-Detainee Communication**

If there is a secure ICE/ERO drop box at a facility, and ICE/ERO has not collected detainee correspondence from the drop box for more than five days. (See 2.10 "Staff-Detainee Communication," B. Requests to ICE/ERO Staff from ICE/ERO Detainees, 4. Additional Facility Responsibilities)

**2.11 Sexual Abuse and Assault Prevention and Intervention**

1. If a victim is transferred between detention facilities immediately following an alleged assault and the sending facility does not know what facility the detainee will be transferred to. This allows ICE/ERO to notify the receiving facility of the incident and the victim's potential need for medical or social services. (See 2.11 "Sexual Abuse and Assault Prevention and Intervention," J. Prompt and Effective Intervention)

2. Any allegation that a detainee was sexually abused or assaulted at the current facility or elsewhere while in custody. (See 2.11 Sexual Abuse and Assault Prevention and Intervention, L. Reporting, Notifications, and Confidentiality)

3. The final results of any facility sexual assault investigation. (See 2.11 Sexual Abuse and Assault Prevention and Intervention, M. Investigation, Discipline, and Incident Reviews, 3. Procedures for Administrative Investigations)

4. The completed incident review for any allegation determined to be substantiated or unsubstantiated. (See 2.11 Sexual Abuse and Assault Prevention and Intervention, M. Investigation, Discipline, and Incident Reviews, 5. Sexual Abuse Incident Reviews)

5. An annual review of all sexual abuse investigations to assess and improve sexual abuse and assault intervention, prevention and response efforts, or if there have been no reports, a negative report. (See 2.11 Sexual Abuse and Assault Prevention and Intervention, M. Investigation, Discipline, and Incident Reviews, 5. Sexual Abuse Incident Reviews)

6. Any allegation involving a victim under the age of 18 or who is considered a vulnerable adult under a state or local vulnerable persons statute. (See 2.11 Sexual Abuse and Assault Prevention and Intervention, L. Reporting, Notifications and Confidentiality).

**4.2 Hunger Strikes**

1. A detainee begins a hunger strike. (See 4.1 Food Service, B. Initial Referral)

2. A detainee refuses treatment related to the hunger strike or when the facility plans to involuntarily feed the detainee. (See 4.1 Food Service, E. Refusal to Accept Treatment)

**4.3 Medical Care (Special Medical Needs)**

1. A detainee requires close medical supervision, including chronic and convalescent care. (See 4.3 Medical Care, M. Special Needs)

2. Any plan for forced medical treatment. (See 4.3 Medical Care, O. Informed Consent)

3. A health care practitioner determines that a detainee's medical or psychiatric condition requires either clearance by the medical staff prior to release or transfer to another facility or requires medical escort during removal or transfer. (See 4.3 Medical Care, Q. Transfer and Release of Detainees)

4. A detainee receives a medical treatment or procedure not generally available but determined to be medically necessary by a medical provider. (See 4.3 Medical Care, R. Medical Experimentation and Research)

5. A detainee's mental illness or developmental or intellectual disability needs exceed the treatment capability of the facility and a referral for an outside mental health facility is initiated. (See 4.3 Medical Care, S. Mental Health)

6. A detainee is pregnant. (See 4.3 Medical Care, U. Women's Medical Care)

**4.5 Significant Self-Harm and Suicide Prevention and Intervention**

Any suicide, suicide attempt, placement of a detainee on suicide precautions, or transfer of a detainee to a local hospital or emergency room because of a suicide attempt or ideation. (See 4.5 Significant Self-Harm and Suicide Prevention and Intervention, K. Notification and Reporting)

**4.6 Terminal Illness and Death**

1. A chronically, critically, or terminally ill detainee is to be transferred to an off-site medical facility. (See 4.6 Terminal Illness and Death, A. Terminal Illness)

2. A detainee death. (See 4.6 Terminal Illness and Death, B. Death Occurring in ICE/ERO Custody)

**4.7 Disability Identification, Assessment, and Accommodation**

1. The identification of a detainee with a communication or mobility impairment. (See 4.7 Disability Identification, Assessment, and Accommodation, H. External Notifications)

2. The denial of any disability accommodations requests. (See 4.7 Disability Identification, Assessment, and Accommodation, H. External Notifications)

**5.2 Recreation**

A detainee is denied recreation privileges for a period exceeding 7 days. (See 5.2 Recreation, E. Recreation for Special Management Unit (SMU))

**5.4 Telephone Access, Advanced Communication Services, and Electronic Communication Devices**

1. The facility's existing phone/ACS system cannot meet ICE/ERO requirements for direct calls and free calls. (See 5.4 Telephone Access, F. Direct Calls and Free Calls)

2. A detainee is delayed beyond eight (waking) hours from making a direct call to legal service entities or to address a personal or family emergency or to address a compelling need. (See 5.4 Telephone Access, F. Direct Calls and Free Calls)

**5.5 Visitation**

Security reasons prevent any detainee from engaging in legal consultation in person and by telephone. (See 5.5 Visitation, H. Consultation Visits for Detainees Subject to Expedited Removal, 3. Persons Allowed to Visit for Consultation Purposes)

**5.6 Voluntary Work Program**

A detainee is injured while participating in a voluntary work program. (See 5.6 Voluntary Work Program, J. Detainee Injury and Reporting Procedures)

**6.2 Grievance System**

1. A detainee is determined to be filing nuisance grievances, or otherwise abusing the grievance system. (See 6.2 Grievance System, D. Retaliation)

2. Any detainee grievance that contains an allegation of staff misconduct. (See 6.2 Grievance System, F. Allegations of Officer Misconduct and 2.3 Facility Security)

**6.3 Law Libraries and Legal Materials**

1. If the facility does not receive anticipated updates to the electronic library. (See 6.3 Law Libraries and Legal Materials, E. Updating/Replacing Legal Materials)

2. A detainee requests additional legal material not available in the law library. (See 6.3 Law Libraries and Legal Materials, G. Requests for Additional Legal Materials)

**6.4 Legal Rights Group Presentations**

A legal rights group presentation is discontinued or temporarily suspended. (See 6.4 Legal Rights Group Presentations, H. Suspension or Termination)

**7.1 Detention Files**

Notification of pending release of detainee medical or detention information to the detainee and their designated attorney of record. (See 7.1 Detention Files, G. Access to File)

# APPENDIX C

## CONTENTS OF THE LOCAL SUPPLEMENT

Upon admission to a facility and prior to placement in general population, each detainee shall receive a copy of the ICE/ERO National Detainee Handbook and the facility's local supplement. The contents of both handbooks must be communicated to each detainee in a language or manner they understand.

Staff shall require detainees to acknowledge receipt of the handbook by signature, and the signed acknowledgement shall be maintained in the detainee's detention file.

While all applicable topics in the ICE/ERO National Detainee Handbook must be covered, the following topics are required in the local supplement:

1. The rules, regulations, policies, and procedures with which every detainee must comply;
2. Detainee rights and responsibilities;
3. Procedures for requesting translation and interpretation services;
4. Procedures for requesting disability-related or other accommodations, including auxiliary aids or services for effective communication;
5. Notice of zero tolerance policies for all forms of sexual abuse and assault;
6. The facility's rules of conduct, prohibited acts, disciplinary severity scale, sanctions for rule violations, disciplinary process, appeal procedures for disciplinary findings, and detainees' rights within the disciplinary system, as required by Standard 3.1 "Disciplinary System";
7. Information about the facility's grievance system, including medical grievances, as required by Standard 6.2 "Grievance System";
8. The facility's policies on telephone and electronic communication device access, and the monitoring of telephone calls, if applicable;
9. The facility's visitation rules and hours;
10. Rules and procedures governing access to the law library, as required by Standard 6.3 "Law Libraries and Legal Materials";
11. Policies and procedures for legal rights group presentations and the availability of legal orientation programs;
12. The facility's rules and procedures for correspondence and other mail, as required by

Standard 5.1 “Correspondence and Other Mail”;

13. The facility’s policies and procedures regarding personal property, as required by Standard 2.4 “Funds and Personal Property”;

14. The facility’s marriage request procedures;

15. Contact information for the ICE/ERO Field Office, including scheduled hours and days when ICE/ERO staff are available to detainees at the facility, and the phone number for the Detention Removals and Information Line (1-888-351-4024); and

16. Procedures for submitting written questions, requests, or concerns to ICE/ERO staff, including the availability of assistance in preparing such requests.

# APPENDIX D

## DEFINITIONS AND ACRONYMS

**A-FILE, ALIEN FILE** – The legal file maintained by DHS for each detainee. Contents include but are not limited to the detainee's identification documents (passport, driver's license, other identification cards, etc.), photographs, immigration history, prior criminal record if any, and all documents and transactions relating to the detainee's immigration case.

**ACCREDITED REPRESENTATIVE** – A person whom the U.S. Department of Justice (DOJ) Executive Office for Immigration Review (EOIR) has found qualified to represent individual aliens before DHS and/or the immigration courts, in accordance with federal regulations (see 8 C.F.R. §§ 292.1 and 292.2).

**ADMINISTRATIVE SEGREGATION** – A form of separation from the general population for administrative reasons. Authorized only as necessary to ensure the safety of the detainee, facility staff, and other detainees; the protection of property; or the security or good order of the facility, and therefore will be for the briefest term and under the least restrictive conditions practicable, consistent with the rationale for placement. Generally, detainees in administrative segregation shall receive the same privileges as detainees housed in the general population, consistent with safety and security concerns. Administrative segregation may be necessary for, among other reasons, detainees requiring or requesting protective custody from others who may be likely to harm them; detainees awaiting an investigation or hearing for a violation of facility rules; detainees scheduled for release, removal, or transfer within 24 hours; or detainees presenting a clear threat to the security of the facility.

**ADMISSION/ADMISSIONS PROCESS** – In-processing of newly arrived detainees, which includes an orientation to the policies, programs, rules, and procedures of the facility. Classification, assignment to living quarters, various inspections, medical screening, and safeguarding of funds, valuables and other personal property is completed during this process.

**ADVANCED COMMUNICATION SERVICES (ACS)** – Refers to a range of modern, integrated communication technologies that go beyond basic phone calls to include multi-channel features like voice, video, and messaging (e.g., text, email). ACS includes facility issued electronic communication devices which use a secure platform, such as tablets and kiosks, capable of transmitting audio, video, or data electronically over a network (e.g., ethernet cable, cellular, wireless).

**AMBULATORY RESTRAINTS** – "Soft" or "hard" equipment used to restrict a detainee's movement but leaving him/her able to eat, drink, or attend to basic bodily functions without staff intervention.

**ATTORNEY** – A member in good standing of the bar of the highest court of any State, possession, territory, Commonwealth, or the District of Columbia; who is not under an order of any court suspending, enjoining, restraining, disbarring, or otherwise restricting him/her in the practice of

law (see 8 C.F.R. § 1.1(f)).

**AUXILIARY AIDS AND SERVICES** – Services or devices that allow for effective communication by affording individuals with impaired vision, hearing, speaking, sensory, and manual skills an equal opportunity to participate in, and enjoy the benefits of, programs and activities. Such aids or services include interpreters, written materials, note-takers, video remote interpreting services, or other effective methods of making aurally delivered materials available to detainees with hearing impairments; readers, taped texts, materials or displays in Braille, secondary auditory programs, or other effective methods of making visually delivered materials available to detainees with visual impairments; acquisition or modification of equipment or devices; and other similar services and actions.

**BODY-CAVITY SEARCH** – The visual inspection or physical probing of body openings (anus, vagina, ears, nose, mouth, etc.) where weapons, drugs, or other contraband could be secreted. This is the most intrusive means of searching an individual, reserved for instances where other search techniques have been considered but rejected as ineffective under the particular circumstances of the case. Body-cavity search procedures govern physical probes, but not visual inspections. For example, the procedures would not be appropriate for a visual inspection of the inside of the mouth, nose, or ears, unless contraband is found during the course of that inspection. Body-cavity procedures apply whenever contraband is found, because retrieving or seizing the item will involve physical entry into or probing within the cavity (in this example, the mouth, nose, or ear).

**CAUSTIC** – Capable of burning, corroding, eroding, or destroying by chemical action.

**CHAIN OF COMMAND** – Order of authority (rank): executive, senior management, senior staff, etc. The position titles may vary according to the type of facility and local facility titles. The on-site order of authority at a detention facility descends from the facility administrator to assistant or associate facility administrators to department heads to shift supervisors and other supervisors.

**CHEMICAL** – A substance with a distinct molecular composition produced by or used in a chemical process.

**CHIEF OF SECURITY** – A generic term for the department head in charge of a detention facility's security employees and operations. The position titles may vary according to the type of facility and local facility titles. Ordinarily, a Chief of Security (chief detention enforcement agent, captain, etc.) is organizationally directly under an assistant or associate facility administrator.

**CHRONIC DISEASE** – An illness or condition that affects an individual's well-being for an extended interval, usually at least six months, and generally is not curable but can be managed to provide optimum functioning within any limitations the condition imposes on the individual.

**CHRONIC DISEASE PROGRAM (CARE CLINIC)** – Incorporates a treatment plan and regular clinic visits. The clinician monitors the patient's progress during clinic visits and, when necessary, changes the treatment. The program also includes patient education for symptom management.

**CLASSIFICATION** – A process used to make housing and program assignments by assessing

detainees on the basis of objective information about past behavior, criminal records, special needs, etc.

**CLINICAL DIRECTOR (CD)** – A designated individual licensed to practice medicine and provide health services with final responsibility for decisions related to medical judgments. A CD and CMA are equivalent positions.

**CLINICAL MEDICAL AUTHORITY (CMA) –** The medical authority is responsible for the delivery of all health care services to the detainee population. These services include, but are not limited to, medical, nursing, dental, mental health and nutritional services. A CD and CMA are equivalent positions.

**COMBUSTIBLE LIQUID** – A substance with a flash point at or above 100° Fahrenheit.

**COMMISSARY** – An area or system where detainees may purchase approved items.

**CONSULTATION VISITATION** – A discussion, either in person or by telephone, between a detainee subject to expedited removal and a person of the detainee's choosing.

**CONTACT VISIT** – A meeting between detainee and another person authorized to take place in an area free of obstacles or barriers that prevent physical contact.

**CONTAINER** – Any bag, barrel, bottle, box, can, cylinder, drum, reaction vessel, storage tank, or other vessel holding a hazardous chemical; does not include pipes or piping systems.

**CONTRABAND** – Any unauthorized item in the facility; an item that is illegal, prohibited by facility rules, or otherwise posing a threat to the safety, security or orderly operation of the facility. This includes unauthorized funds.

**CONTRACTOR – (Also referred to as a "support service provider")** A person who or entity that provides services on a recurring basis pursuant to a contractual agreement with the agency or facility.

**CORRESPONDENCE** – Letters, postcards and other forms of written material not classified as packages or publications. Large envelopes containing papers qualify as correspondence, but boxes, sacks, and other shipping cartons do not. Books, magazines, newspapers and other incoming printed matter are not "correspondence."

**CRIMINAL ALIEN** – A foreign national convicted of one or more crimes.

**DHS** – Department of Homeland Security.

**DETENTION FACILITY CONTRACTOR – (Also referred to as a "contractor") -** A person who or entity that performs services on a recurring basis pursuant to a contractual agreement with the agency or facility.

**DETENTION FACILITY CONTRACTOR EMPLOYEE:** An employee of a non-

governmental detention facility contractor hired to perform a variety of detailed services under these standards.

**DETENTION FILE** – Contents include receipts for funds, valuables, and other personal property; documentation of disciplinary action; reports on detainee behavior; detainee's written requests, complaints, and other communications; official responses to detainee communications; records from Special Management Unit, etc. Applicable contents may also be maintained in a retrievable electronic format.

**DETAINEE HANDBOOK** – The policies and procedures governing detainee life in the facility: daily operations, rules of conduct, sanctions for rule violations, recreation and other programs, services, etc.; defined in writing and provided to each detainee upon admission to the facility.

**DETENTION STANDARDS** – The detention standards are guidelines to establish consistent conditions of confinement, program operations, and management expectations within the ICE detention system.

**DIETICIAN** – A professional trained in foods and the management of diets (dietetics) who is credentialed by the Commission on Dietetic Registration of the American Dietetic Association, or who has the documented equivalent in education, training, or experience, with evidence of relevant continuing education.

**DISABILITY –** An individual with a disability is an individual who has a physical or mental impairment that substantially limits one or more major life activities, or an individual who has a history or record of such impairment. "Major life activities" are basic activities that a detainee without a disability in the general population can perform with little or no difficulty, including, but not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working. A major life activity can also include the operation of major bodily functions, like the immune, endocrine, and neurological systems; normal cell growth; digestion, respiration, and circulation; and the operations of the bowel, bladder, and brain.

**DISABILITY ACCOMMODATION NOTIFICATION (DAN)** – The preferred tool/form that facilities should use to provide written notification to the ERO Field Office of a detainee with a mobility and/or communication impairment, or that a denial is being recommended to the Field Office.

**DISCIPLINARY HEARING** – Non-judicial administrative procedure to determine whether the preponderance of evidence supports finding a detainee guilty of a rule violation.

**DISCIPLINARY COMMITTEE** – One or more impartial staff members who conduct and/or oversee a disciplinary hearing. A lower-level committee (Unit Disciplinary Committee) investigates a formal Incident Report and may impose minor sanctions or refer the matter to a higher-level disciplinary committee. A higher-level committee (Institution Disciplinary Panel or Disciplinary Hearing Officer) conducts formal hearings on Incident Reports referred from the lower-level committee and may impose higher level sanctions for higher level prohibited acts. Also see Institution Disciplinary Panel.

**DISCIPLINARY HEARING OFFICER (DHO)** – An impartial staff member, in lieu of a multi-person Institutional Disciplinary Panel, responsible for conducting disciplinary hearings and imposing sanctions for cases of detainee misconduct referred for disposition following the hearing.

**DISCIPLINARY SEGREGATION** – A form of separation from the general population for disciplinary reasons. Authorized only pursuant to the order of a facility disciplinary panel, following a hearing in which the detainee is determined to have committed serious misconduct in violation of a facility rule, consistent with the Disciplinary Severity Scale, and only when alternative dispositions would inadequately regulate detainee behavior.

**DRY CELL** – A cell or room without running water where a detainee can be closely observed by staff until the detainee has voided or passed contraband or until sufficient time has elapsed to preclude the possibility that the detainee is concealing contraband. Dry cells may be used when there is reasonable suspicion that a detainee has ingested contraband or concealed contraband in a body cavity.

**EPA** – Environmental Protection Agency.

**EXIGENT CIRCUMSTANCES** – Any set of temporary and unforeseen circumstances that require immediate action in order to combat a threat to the security or institutional order of a facility or a threat to the safety or security of any person.

**EMERGENCY CHANGES** – Measures immediately necessary to maintain security or to protect the health and safety of staff and detainees.

**ETA** – Estimated time of arrival.

**EXPOSURE/EXPOSED** – Subjected or potentially subjected to a hazardous substance by any means (inhalation, ingestion, skin contact, absorption, etc.).

**FACILITY** – A structure(s) similar to a detention center, comprised of buildings and other structures, where a detention facility contractor delivers secure residential support services under the oversight of the U.S. Government to house its detainees on a 24-hour per day, 7-day per week, 365 day per year basis.

**FACILITY ADMINISTRATOR** – The detention facility contractor's official, regardless of local title (e.g., jail administrator, warden, facility director, superintendent), who has the ultimate responsibility for managing the operations of the contracted detention facility. The qualifications for the holder of this office shall be consistent with ACA standards.

**FACILITY MAINTENANCE** – The upkeep of a facility through cleaning, repairs, and similar work so as to keep the facility is good working order in accordance with all applicable federal laws, regulations, codes, guidelines, and policies.

**FIELD OFFICE DIRECTOR (FOD)** – ICE/ERO Officer with chief responsibility for facilities in an assigned geographic area.

**FLAMMABLE LIQUID** – A substance with a flash point below 100° Fahrenheit (37.8° Centigrade).

**FLASH POINT** – The minimum temperature at which the vapor of a combustible liquid can form an ignitable mixture with air.

**FOOD SERVICE ADMINISTRATOR (FSA)** – The official responsible for planning, controlling, directing and evaluating Food Service Department operations.

**FORCE** – The physical actions necessary to overcome resistance, to gain control, contain, or restrain a detainee.

**FOUR- / FIVE-POINT RESTRAINT** – A restraint system that confines an individual to a bed or bunk in either a supine or prone position. Ordered by the facility administrator when a detainee's unacceptable behavior appears likely to continue, risking injury to self or others.

**FUNDS** – Cash, checks, money orders, and other negotiable instruments.

**GENERAL CORRESPONDENCE** – All correspondence other than "special correspondence."

**GENERAL POPULATION** – Detainees whose housing and activities are not specially restricted. The term is ordinarily used to differentiate detainees in the "general population" from those in Special Housing Units.

**GRIEVANCE** – A complaint based on a circumstance or incident perceived as unjust.

**GROUP PRESENTATION ON LEGAL RIGHTS** – Informational session held in a detention facility by an attorney or other legal representative to inform all interested detainees about U.S. immigration law and procedures; not a forum for providing confidential or case-specific legal advice.

**HARD CONTRABAND** – Any item that poses a serious threat to the life, safety or security of the facility detainees or staff.

**HEALTH ASSESSMENT** – The process whereby an individual's health status is evaluated. This process will address the patient's physical, dental and mental health appropriate to the patient's condition and will include, as determined by the health care provider, questioning the patient about symptoms, a physical examination appropriate to the complaint and, as appropriate, review of screening information, collection of additional information relating to mental, dental and medical health issues, immunization histories, laboratory and diagnostic tests, other examinations, review of results, initiation of therapy and development of a treatment plan.

**HEALTH AUTHORITY** – The health services administrator (HSA), clinical director (CD), or agency responsible for the provision of health care services at a facility or system of facilities. The responsible physician may be the health authority. Health authority may also be referred to as the medical department.

**HEALTH CARE PRACTITIONER** – Defined as an individual who is licensed, certified, or credentialed by a state, territory or other appropriate body to provide health care services within the scope and skills of the respective health care profession.

**HEALTH HAZARD** – Includes carcinogens, toxic agents, reproductive toxins, irritants, corrosives, sanitizers, hepatotoxins, nephrotoxins, neurotoxins, and other agents that act on the hemopoietic system or damage the lungs, skin, eyes, or mucous membranes.

**HEALTH SCREENING** – A system for preliminary screening of the physical and mental health condition of individual detainees upon arrival at the facility; conducted by health care personnel or by a specially trained health officer. The combination of structured inquiry and observation is designed to obtain immediate treatment for new arrivals who are in need of emergency health care, identify and meet ongoing current health needs, and isolate those with communicable diseases.

**HEALTH SERVICES ADMINISTRATOR (HSA)** – Executive responsible for the facility's health care program; may also serve as Clinical Director.

**HOLD ROOM** – A secure area used for temporary confinement of detainees before in-processing, institutional appointments (court, medical), release, transfer to another facility, or deportation-related transportation.

**HOLY DAY** – A day specified for religious observance.

**HUNGER STRIKE** – A voluntary fast undertaken as a means of protest or manipulation. Whether or not a detainee actually declares that he or she is on a hunger strike, staff are required to refer any detainee who is observed to not have eaten for 72 hours for medical evaluation and monitoring.

**ICE** – U.S. Immigration and Customs Enforcement.

**ILLEGAL CONTRABAND** – Any item prohibited by law, the possession of which constitutes grounds for felony or misdemeanor charges.

**ICE HEALTH SERVICE CORPS (IHSC)** – IHSC is charged with advancing global disease prevention through the delivery of health care to ICE/ERO detainees. IHSC is responsible for all aspects of planning, policy formulation, and program direction and management, including coordination and liaison activities, for all health matters concerning ICE/ERO detainees.

**INDIGENT** – Without funds, or with only nominal funds. Ordinarily, a detainee is considered "indigent" if he or she has less than $15.00 in his or her account for ten days.

**INFORMAL COUNT** – Population count conducted according to no fixed schedule, when detainees are working, engaged in other programs, or involved in recreational activities. Unless a detainee is missing, these counts are not reported; also called "census check" or "irregular count."

**INFORMAL GRIEVANCE** – An oral complaint or concern received from a detainee. Informal grievances may be handled at the lowest level in the organization possible to effectively resolve the complaint with no written response.

**INFORMAL RESOLUTION** – Brings closure to a complaint or issue of concern to a detainee, satisfactory to the detainee and staff member involved; does not require filing of a written grievance.

**INFORMED CONSENT** – An agreement by a patient to a treatment, examination, or procedure after the patient receives the material facts about the nature, consequences, and risks of the proposed treatment, examination or procedure; the alternatives to it; and the prognosis if the proposed action is not undertaken.

**IN-PROCESSING** – Administrative processing of a detainee arriving at a detention facility (See "Admissions").

**INSTITUTION DISCIPLINARY PANEL (IDP)** – Review board responsible for conducting disciplinary hearings and imposing sanctions for cases of detainee misconduct referred for disposition following the hearing.

**INTERGOVERNMENTAL SERVICE AGREEMENT (IGSA)** – A cooperative agreement between ICE/ERO and any state, territory, or political subdivision for the construction, renovation, or acquisition of equipment, supplies, or materials required to establish acceptable conditions of confinement and detention services. ICE/ERO may enter into an IGSA with any such unit of government guaranteeing to provide bed space for ICE/ERO detainees, and to provide the clothing, medical care, food and drink, security, and other services specified in the ICE/ERO detention standards; facilities providing such services are referred to as "IGSA facilities."

**INVESTIGATING OFFICER** – An individual of supervisory or higher rank who investigates alleged misconduct and was not involved in the incident; usually a supervisory detention enforcement officer or shift supervisor.

**JUVENILE** – Any person under the age of 18.

**LEAST INTRUSIVE** – In the context of a search, terminology used to refer to alternative means of finding contraband, such as questions, metal detectors, pat down searches and boss chairs, prior to conducting a strip search.

**LEGAL ASSISTANT** – An individual (other than an interpreter) who, working under the direction and supervision of an attorney or other legal representative, assists with group presentations and in representing individual detainees. Legal assistants may interview detainees, assist detainees in completing forms and deliver papers to detainees without the supervisory attorney being present.

**LEGAL CORRESPONDENCE** – See "special correspondence."

**LEGAL REPRESENTATIVE** – An attorney or other person representing another in a matter of law, including law students, law graduates not yet admitted to the bar; "reputable individuals"; accredited representatives; accredited officials; and attorneys outside the United States (see 8 CFR § 292.1, "Representation and Appearances").

**LIFE-SUSTAINING PROCEDURE (LIFE SUPPORT)** – A medical intervention or procedure that uses artificial means to sustain a vital function.

**LIMITED ENGLISH PROFICIENT/PROFICIENCY (LEP)** – A person who does not speak English as his or her primary language and who has a limited ability to read, speak, write, or understand English. LEP individuals may be competent in English for certain types of communication (e.g., speaking or understanding), but still be LEP for other purposes (e.g., reading or writing). LEP designations are also context-specific; an individual may possess sufficient English language skills to function in one setting, but these skills may be insufficient in other settings.

**MAIL INSPECTION** – Examination of incoming and outgoing letters, packages, etc., for contraband, including cash, checks and money orders.

**MAINTENANCE SUPERVISOR** – Individual at the facility responsible for oversight and supervision of the general repairs and preventative maintenance.

**MASTER COUNT** – Total number of detainees housed at a facility.

**MEDICAL DISCHARGE PLAN** – The discharge plan includes: admission diagnosis; discharge diagnosis; brief medical history including the chief complaint and any essential physical findings discovered; all diagnostic test (e.g., x-rays, lab results, ECG's, etc.) results; list of any medications prescribed; a brief summary of care provided, the detainee's response to treatment, medical complications encountered, any outside health care referrals that may have interrupted the infirmary period or that be pending; and continuity of care plan.

**MEDICAL PERSONNEL** – Includes all qualified health care professionals as well as administrative and support staff (e.g., health record administrators, laboratory technicians, nursing and medical assistants, clerical workers).

**MENTAL HEALTH PROVIDER** – Psychiatrist, clinical or counseling psychologist, physician, psychiatric nurse, clinical social worker or any other mental health professional who by virtue of their education, credentials, and experience are permitted by law to evaluate and care for the mental health needs of patients.

**MESSENGER** – A person (neither a legal representative nor a legal assistant) whose purpose is to deliver or convey documents, forms, etc., to and from the detainee; not afforded the visitation privileges of legal representatives and legal assistants.

**MINOR** – A juvenile; a person under the age of 18.

**NATIONAL FIRE PROTECTION ASSOCIATION** (NFPA) – Principal source of fire protection standards and codes.

**NON-CONTACT VISIT** – Visitation with a barrier preventing physical contact between the detainee and his or her visitors.

**NON-MEDICAL EMERGENCY ESCORTED TRIP** – Authorized detainee visit to a critically ill member of his/her immediate family, or to attend the funeral of a member of his/her immediate family. "Immediate family" member refers to a parent (including stepparent and foster parent), child, spouse, sister, or brother of the detainee.

**OSHA** – U.S. Occupational Safety and Health Administration.

**OUTDOOR RECREATION AREA** – Open-air space for exercise or other leisure activities, large enough to allow 15 square feet per detainee for the largest group expected to use the area at any one time; but not less than 1,500 square feet.

**PAT-DOWN SEARCH** – A sliding or patting of the hands over the clothed body of a detainee by staff to determine whether the individual possesses contraband.

**PHYSICAL EXAMINATION** – A thorough evaluation of an individual's physical condition and medical history conducted by or under the supervision of a licensed medical professional acting within the scope of his or her practice.

**PLAN OF ACTION** – Describes steps the facility will take to convert a condition that has caused a determination of noncompliance with a standard.

**POST ORDERS** – Written orders that specify the duties of each position, hour-by-hour, and the procedures the post officer will follow in carrying out those duties.

**PROGRESSIVE RESTRAINTS** – Control the detainee in the least restrictive manner required, until and unless the detainee's behavior warrants stronger and more secure means of inhibiting movement.

**PROTECTIVE CUSTODY (PC)** – Administrative segregation for the detainee's own safety.

**QUALIFIED HEALTH CARE PROFESSIONALS** – Include physicians, physician assistants, nurses, nurse practitioners, dentists, mental health professionals and others who by virtue of their education, credentials and experience are permitted by law and within their scope of practice to evaluate and care for patients.

**REASONABLE ACCOMMODATIONS** – Any change or adjustment in detention facility operations, any modification to detention facility policy, practice, or procedure, or any provision of an aid or service that permits a detainee with a disability to participate in the facility's programs, services, activities, or requirements, or to enjoy the benefits and privileges of detention programs equal to those enjoyed by detainees without disabilities. Examples of "reasonable accommodations" include, but are not limited to, proper medication and medical treatment; accessible housing, toilet, and shower facilities; devices like bed transfer, accessible beds or shower chairs, hearing aids, or canes; and assistance with toileting and hygiene. In these standards, reasonable accommodations, disability-related modifications, and auxiliary aids and services are collectively referred to as "accommodations" or "reasonable accommodations."

**REASONABLE SUSPICION** – Not intuition, but specific, articulable facts that would cause a reasonable law enforcement officer to suspect that a particular person is concealing a weapon, contraband, or evidence of a crime.

**RELIGIOUS PRACTICES** – Worship, observances, services, meetings, ceremonies, etc., associated with a particular faith; access to religious publications, religious symbolic items, religious counseling and religious study classes; and adherence to dietary rules and restrictions.

**SAFETY DATA SHEET (SDS)** – Basic information about a hazardous chemical, prepared and issued by the manufacturer, in accordance with Occupational Safety and Health Administration regulations (see 29 CFR 1910.1200; see also OSHA Form 174); among other things, specifies precautions for normal use, handling, storage, disposal and spill cleanup. (Formerly referred to as Material Safety Data Sheets (MSDS).)

**SALLY PORT** – An enclosure situated in the perimeter wall or fence surrounding the facility, containing double gates or doors, of which one cannot open until the other has closed, to prevent a breach in the perimeter security; handles pedestrian and/or vehicular traffic.

**SANITATION** – The creation and maintenance of hygienic conditions; in the context of food, involves handling, preparing, and storing items in a clean environment, eliminating sources of contamination.

**SATELLITE MEALS** – Food served and consumed in a location other than where prepared.

**SEGREGATION** – Special Management Unit housing to separate an individual from the general population for administrative or disciplinary reasons. Segregation will only be used when necessary and after careful consideration of alternative housing options.

**SHIFT SUPERVISOR** – A generic term for the detention security supervisor in charge of operations during a shift. The position titles may vary according to the type of facility and local facility titles. Ordinarily, a shift supervisor (detention operations supervisor, lieutenant, etc.) is, organizationally, directly under the Chief of Security (chief detention enforcement agent, captain, etc.).

**SOFT CONTRABAND** – Any unauthorized item that does not constitute hard contraband, i.e., does not pose a serious threat to human safety or facility security; includes that quantity of an item possessed in an amount exceeding the established limit.

**SPECIAL CORRESPONDENCE OR LEGAL MAIL –** Detainees’ written communications to or from any of the following:

a. private attorneys and other legal representatives;
b. government attorneys;
c. judges and courts;
d. embassies and consulates;
e. the president and vice president of the United States;
f. members of Congress;

g. the Department of Justice (including the DOJ Office of Inspector General);
h. the Department of Homeland Security (including U.S. Immigration and Customs Enforcement, ICE Health Services Corps, ICE Enforcement and Removal Operations, ICE Office of Professional Responsibility, the DHS Office for Civil Rights and Civil Liberties, and the DHS Office of Inspector General);
i. outside health care professionals;
j. administrators of grievance systems; and
k. representatives of the news media.

**SPECIAL MANAGEMENT UNIT (SMU)** – A designated area or unit used to house detainees who require separation from the general population for specific reasons (e.g., administrative segregation, disciplinary segregation, medical observation). These areas are designed to ensure the safety, security, and orderly operation of the facility while addressing the unique needs or circumstances of certain detainees.

**SPECIAL NEEDS DETAINEE** – A detainee whose mental and/or physical condition requires different accommodations or arrangements than a detainee who does not have special needs would receive. Special needs detainees include, but are not limited to, those detainees who are chronically ill or infirm, those with disabilities, and those who are addicted to or in withdrawal from drugs or alcohol.

**SPECIAL VULNERABILITIES** – Detainees with special vulnerabilities include those who are elderly, pregnant, or nursing; those with serious physical or mental illness, or other disability; those who would be susceptible to harm in general population due to an identified risk of victimization or abusiveness; and those who have been victims of sexual assault, torture, trafficking, or abuse.

**STRIP SEARCH** – A search that requires a person to remove or arrange some or all clothing so as to permit a visual inspection of the person's breasts, buttocks, or genitalia.

**TERMINALLY ILL DETAINEE** – A detainee whose physical condition has deteriorated to the point where the prognosis is less than a year to live.

**TOXIC** – Poisonous; capable of causing injury or death.

**TRAINED INVESTIGATORS** – A person who has been trained in investigative techniques to include interview techniques for victims and proper procedures for collecting and storing evidence.

**TRAINING** – An organized, planned, and evaluated activity designed to achieve specific learning objectives and enhance personnel performance. Training may occur on site, at an academy or training center, an institution of higher learning, professional meetings, or through contract service or closely supervised on-the-job training. Training programs usually include requirements for completion, attendance records, and certification of completion. Meetings of professional associations are considered training where there is clear evidence of the direct bearing on job performance. In all cases, the activity must be part of an overall training program.

**UNENCUMBERED SPACE** – Open, usable space measuring at least seven feet in at least one dimension, free of plumbing fixtures, desk, locker, bed, and other furniture and fixtures (measured

in operational position).

**UNAUTHORIZED FUNDS** – Negotiable instruments (checks, money orders, etc.) or cash in a detainee's possession exceeding the facility-established limit.

**UNAUTHORIZED PROPERTY** – Not inherently illegal, but against the facility's written rules.

**UNIT DISCIPLINARY COMMITTEE** – See **DISCIPLINARY COMMITTEE**.

**VOLUNTEER –** An individual who donates time and effort on a recurring basis to enhance the activities and programs of the agency or facility.

**VOLUNTEER GROUP** – Individuals who collectively donate time and effort to enhance the activities and programs offered to detainees; selected on basis of personal qualities and skills (recreation, counseling, education, religion, etc.).

**WORK ASSIGNMENT** – Carpentry, plumbing, food service, and other operational activities included in the facility's Voluntary Work Program, for which a detainee may volunteer.